**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CITIBANK, N.A.,<br><br>       *Plaintiff,*<br><br>  v.<br><br>BRIGADE CAPITAL MANAGEMENT, LP,<br><br>       *Defendant.* | No. 20 Civ. _____ (___)<br><br>**COMPLAINT** |

Plaintiff Citibank, N. A. ("Citibank"), by and through its attorneys, respectfully submits this complaint against defendant Brigade Capital Management, LP ("Brigade"), and alleges as follows:

## PRELIMINARY STATEMENT

1. Last Tuesday, an operational mistake caused Citibank to transfer approximately $900 million of its own money to parties that were not entitled to it.  When Citibank discovered the mistake, it promptly asked the recipients to return its money.  Brigade, however, has unlawfully attempted to capitalize on the mistaken overpayment.  It has refused to return its share and instead converted approximately $175 million for its own use.   Brigade's actions are not just unconscionable; they threaten the integrity of the administrative agency function and the trust in the global banking system.

2. Citibank's transfer was intended to pass through an interest payment from Revlon, on a loan for which Citibank acts as an administrative agent.  Without justification, Brigade has taken the baseless position that Citibank's overpayment—more than 100 times the amount of the intended transfer—served to pay off Revlon's entire principal balance as well: a balance that was

not due for another three years, that Revlon did not have available, and that today reportedly trades at 30 cents on the dollar.

3.      Brigade has refused to return Citibank's money despite crystal-clear evidence that the payments were made in error.  Among other things, the payments were accompanied by calculation statements that showed the correct (and substantially smaller) amount as the "Total Due."  Citibank advised Brigade upon making  the overpayment that it was, in fact, a mistake and that the funds needed to be returned.  The Credit Agreement itself, which governs the payment schedules under the Lending Facility, makes clear that no such payment was then due, and that any prepayment would have required three-days' advance written notice.  Revlon, too, stated publicly that it had made no principal payment on its debt.  And the day after Citibank's payment, UMB Bank, purportedly as administrative agent for Brigade and other lenders, sued Revlon, claimed it had defaulted on its debt, and demanded in an acceleration notice that it immediately pay the entire balance—thereby conceding that Citibank's overpayment was not intended or understood to discharge Revlon's obligation, and trying to retroactively fabricate a "due and owing" obligation.  Yet Brigade continues to hold the funds unlawfully despite multiple requests from Citibank to return them.

4.      Brigade has not offered a reasonable explanation for its unlawful retention of Citibank's money.  In response to Citibank's demand, Brigade asserted that "[i]t is not at all clear that the funds were sent as a result of 'clerical mistake'"—a self-serving statement that is irreconcilable with the notices of payment, the acceleration notice, and the very rationale underlying the UMB complaint: that Revlon lacks sufficient funds to repay its debt.  Brigade has manufactured a story that defies belief:  that the payment was a deliberate prepayment of the loan's

entire principal balance, even though the governing Credit Agreement would not even have allowed such a payment without advance written notice.

5.      Brigade has no claim to Citibank's money.  It was not expecting Citibank's money. It should have known that a surprise repayment of principal could not be made under the governing Credit Agreement.  And it was well aware that virtually no company, let alone a distressed retail and consumer company such as Revlon, would ever make such a substantial prepayment while dealing with the significant financial consequences caused by the ongoing pandemic.

6.       Brigade's refusal to return money to which it is not entitled is unlawful. Under equitable principles as well as the doctrine of conversion, this Court should require Brigade to return Citibank's money immediately.  Any other outcome would threaten the stability of the banking system and the relationships between administrative agents and lenders, as it would reward bad actors that try to capitalize on operational mistakes.  The global economy depends on financial institutions being able to efficiently make enormous numbers of payments every day. While the vast majority of these payments are seamless, the velocity and complexity of such transactions means that human and technological errors do occur at times.  The legal system needs to treat these as what they obviously are—mistakes—rather than as opportunities for unscrupulous actors to seize massive windfalls.

## PARTIES

7.      Citibank is a bank organized under the National Bank Act with its main office located in South Dakota.

8.      Upon information and belief, Brigade is a corporation, incorporated in Delaware and headquartered in New York.

## JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000 and the parties are citizens of different states.

10.      This Court has personal jurisdiction over Brigade, which is headquartered in New York.

11.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because the defendant resides in this District.  Venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because this is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, and a substantial part of property that is the subject of the action is situated.

## STATEMENT OF FACTS

### I.     Revlon's 2016 Loan

12.      In 2016, Revlon acquired Elizabeth Arden, Inc.  The deal was partially facilitated by a seven-year, $1.8-billion loan.  Brigade currently holds a portion of the loan.  The Credit Agreement governs the term loans held by Brigade.

13.      Citibank serves as the administrative agent and collateral agent for the loan.  One of Citibank's many duties is to collect payments from Revlon to remit to the lenders under the Credit Agreement.  Another is to maintain a register listing the amount of each loan and payment. The register acts as the definitive record of amounts owed and received.  Under the Credit Agreement, the register is deemed "presumptively correct absent demonstrable error," and any error "shall not in any manner affect the obligation of [Revlon] to repay (with applicable interest) the Loans made to [Revlon] in accordance with the terms of th[e] Agreement."  § 2.8(c)–(d).

14.     Revlon is responsible for making periodic interest payments under the Credit Agreement.  The agreement also *permits* Revlon to pay principal ahead of schedule but only if certain requirements are met.  Under Section 2.11(a) of the agreement, any prepayment by Revlon of principal on Eurocurrency loans, like those at issue here, must be preceded by a detailed written notice three business days in advance.

## II.     The August 11 Transfer

15.     On August 11, 2020, several months of accrued interest came due under the Credit Agreement.  The interest payment was to be processed by Citibank in its capacity as administrative agent.  No other amount was due at the time, and Revlon transferred no additional funds to Citibank.

16.     The interest payment was processed by Citibank on August 11, 2020.  Due to issues with the loan-processing system, the payment to each lender was on average more than 100 times the interest that was actually due.  Brigade was one of the lenders that received an overpayment.

17.     Around 5:30 p.m. on August 11, Citibank sent Brigade notices of payment for each of the 40 funds that it manages that held portions of the Revlon loan.  The top of the notices identified the payment as a "Libor Rate *Interim Interest Payment*."  (Emphasis added.)  The notices then provided that "[i]nterim interest is due as per the detailed calculation below."  The calculations showed the principal of the loan held by each fund; the interest rate; the period of interest being paid; and the interest due.  These notices expressly referenced the *intended* amount of the payment, which was far smaller than the actual payment.   For example, the notice sent to Brigade Opportunistic Credit LBG Fund LTD provided as follows (Exhibit A):

Interim interest is due as per the detailed calculation below :

      Interest Due Period  :  29-MAY-2020  to  11-AUG-2020

| LIBOR Funded | Interest Rate | Day Basis | From Date | To Date | # of days | Interest Due |
|---|---|---|---|---|---|---|
| 17,085,488.60 | 4.25% | Actual/360 | 29-MAY-2020 | 02-JUN-2020 | 4 | 8,068.15 |
| 17,468,301.43 | 4.25% | Actual/360 | 02-JUN-2020 | 11-AUG-2020 | 70 | 144,356.10 |

18.     Beneath this was a row marked "Total Due," again stating the correct intended amount:

| | |
|---|---|
| Due Currency        : USD | |
| Total Due           : 152,424.25 | |

19.     The notices went on to state that "[w]e will credit your account representing the above Interim Interest."  Fields captioned "Total Due" and "Credit Amount" yet again stated the intended payment amount.  The above notice, for example, included the following section:

We will credit your account representing the above Interim Interest based on the following instructions :

      Credit Date       :  11-AUG-2020

      Credit Currency   :  USD

      Total Due         :  152,424.25

   Less :Tax Withholding     :  0.00

      Credit Amount     :  152,424.25

20.     In short, this notice unambiguously informed Brigade that Citibank would be sending Brigade Opportunistic Credit LBG Fund LTD an interest payment of $152,424.25.  But

instead of sending the amount due, Citibank sent many multiples of that amount to Brigade—over $17 million in this case, more than 115 times the amount of "Interim Interest" specified in the notice.   And the overpayment was made with Citibank's funds.   As reflected in the below Payment Transaction, which was paired with the above $152,424.25 interest notice, the mistake was obvious: the transferred amounts did not match the "Total Due" for the "Interim Interest" stated in the notices.



21.     Brigade ultimately received 40 notices promising credit amounts totaling $1,501,145.27, on a principal of $174,651,497.63.   And it received wire transfers totaling $176,152,642.90—$174,651,497.63 more than it was due.

## III.    Brigade's Conversion of Citibank's Funds

22.     Clearly, Citibank had made a mistake.   Citibank did not intend to transfer more money than stated in the payment notices, let alone with its own funds.   That was obvious from the language of the notices.   But beyond that, a prepayment like the one that Brigade asserts occurred was not even permissible under the Credit Agreement.   The balance of the loan is not due for another three years, and a prepayment of *any* amount is only permitted with "irrevocable written notice" from Revlon three business days in advance.   § 2.11(a).   No prepayment notice was issued, because no prepayment was made.   Nor was there a payoff letter, which is market standard

practice when payment of the full outstanding balance of a loan is intended. Furthermore, no principal payment was funded by Revlon. And Citibank never modified the register to reflect a full or partial discharge of principal in connection with the overpayment.

23.     As creditors woke up to find thousands if not millions more than expected in their bank accounts, the overpayment was covered widely by news outlets around the world. The *Wall Street Journal* reported that "Citigroup Pays Revlon Lenders Nearly $900 Million by Mistake." *Bloomberg* and *Reuters* made similar reports. Revlon, for its part, publicly stated that "Revlon did not pay down the loan or any part of the loan." And all of the articles made clear that the payment was mistaken.

24.     On both August 12 and August 13, 2020, Citibank sent notices to lenders asking for the funds to be returned, less the correct amount of interim interest reflected by the credit amount in the payment notices. Each notice advised that "[a]n additional amount was included in your interest payment in error and you were overpaid. Please return the amount listed below as soon as possible." And each notice followed with the specific amount owed Citibank. Many of Revlon's lenders, knowing they had received a mistaken overpayment, promptly complied and returned the funds.

25.     Also on August 12, several other lenders—including, upon information and belief, Brigade—took three actions that showed that they, like everyone else, understood that the amount of the payment was a clear mistake.

26.     First, they purported to serve Revlon with a notice of an Event of Default under the 2016 loan. There would have been no reason to serve a notice of an Event of Default if the loan had just been paid in full.

27.     Second, acting through UMB Bank, which claims to have been appointed successor administrative agent, they purported to accelerate the loan's principal.  That acceleration notice was a clear admission that the lenders did not believe that the principal was repaid (or intended to be repaid) on August 11; if it had been, there would have been nothing to accelerate.  Instead, the notice was a belated attempt to give Brigade a pretext for holding on to the overpayment.

28.     Third, UMB Bank, again claiming to be the administrative agent, filed a 117-page complaint accusing Revlon of improperly amending the Credit Agreement to *avoid* paying the 2016 lenders.  *See* Complaint, *UMB Bank v. Revlon*, No. 20-cv-06352, Dkt. 1 (S.D.N.Y. Aug. 12, 2020).  The complaint reconfirmed that the lenders were under no illusion that the loan had been fully repaid on August 11.  Further, it alleged that Revlon was *unable* to repay the loan, because it was "insolvent and facing a severe liquidity crisis."

29.     But rather than return the excess payment, Brigade claimed it for itself and its investors.  In an e-mail to Citibank, Brigade gave the following rationale for refusing to return the funds:

> It is not at all clear that the funds were sent as a result of "clerical mistake".
> Moreover, whether sent in error or not, the funds were sent for the credit and
> account of Revlon such that the Credit Agreement provides for setoff.
> Additionally, the law may provide for a discharge for value of the loans, upon
> receipt of the funds, regardless of any error.

The response is largely incomprehensible.  It is also clear that the payment did not "discharge" any debt—Brigade was on notice that the payment was a mistake as soon as it received it, and no debt was ever "discharged" by the administrative agent, because no repayment of principal was ever intended.  But in any event, this response makes clear that Brigade has no intention of returning Citibank's money.

30.     Brigade is currently holding approximately $175 million of Citibank's money to which is has no right, and knows it has no right.  That money must be returned immediately.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Unjust Enrichment

31.     Citibank repeats, realleges, and incorporates by reference the foregoing allegations as though fully set forth in this paragraph.

32.     Brigade was enriched at the direct expense of Citibank, by mistakenly receiving $174,651,497.62 of Citibank's money to which it was not entitled.

33.     Equity and good conscience militate against permitting Brigade to retain the misappropriated funds.

### SECOND CAUSE OF ACTION
### Conversion

34.     Citibank repeats, realleges, and incorporates by reference the foregoing allegations as though fully set forth in this paragraph.

35.     Brigade has and is continuing to exercise unauthorized dominion over specifically identifiable assets of Citibank, namely the $174,651,497.62 that was mistakenly transferred on August 11, 2020.

36.     Despite Citibank's demands that Brigade return the assets in question, Brigade has refused to do so.

### THIRD CAUSE OF ACTION
### Money Had And Received

37.     Citibank repeats, realleges, and incorporates by reference the foregoing allegations as though fully set forth in this paragraph.

38.    On August 11, 2020, Brigade mistakenly received $174,651,497.62 belonging to Citibank, and to which Brigade had no claim.

39.    Brigade benefitted, and continues to benefit, from the receipt of Citibank's money.

40.    Under principles of equity and good conscience, Brigade should not be permitted to keep Citibank's money.

**FOURTH CAUSE OF ACTION**
**Payment By Mistake**

41.    Citibank repeats, realleges, and incorporates by reference the foregoing allegations as though fully set forth in this paragraph.

42.    On August 11, 2020, Citibank mistakenly sent payments to Brigade.  The payments were intended to transfer the interim interest owed by Revlon to Brigade.  Instead, Citibank transferred an amount more than 100 times greater than the interest owed by Revlon, with the excess coming from Citibank's own funds.

43.    Brigade derived a benefit as a result of the mistaken payments.

44.    Equity demands restitution by Brigade to Citibank.

**PRAYER FOR RELIEF**

**WHEREFORE**, Citibank respectfully requests that this Court enter judgment in favor of Citibank and against Brigade:

A.    Ordering Brigade to immediately return the misappropriated $174,651,497.62, or, in the alternative, freeze the overpayment received from Citibank and refrain from transferring or distributing those funds;

B.    Declaring that Citibank is rightfully entitled to the misappropriated funds;

C.    Ordering Brigade to return to Citibank the funds misappropriated by Brigade, totaling $174,651,497.62;

D.    Ordering Brigade to pay Citibank interest on the funds misappropriated by Brigade for the duration that they remain with Brigade;

E.      Ordering Brigade to pay damages reflecting its misconduct to Citibank;

F.      Awarding reasonable costs and expenses incurred in this action, including attorneys' fees;

G.      Awarding pre-judgment interest on all such damages, monetary or otherwise; and

H.      Awarding further relief as the Court may deem just and proper.

Dated: August 17, 2020                          MAYER BROWN LLP
       New York, New York

                                                By: */s/ Matthew D. Ingber*
                                                    Matthew D. Ingber
                                                    Christopher J. Houpt
                                                    Michael Rayfield
                                                    Luc W. M. Mitchell
                                                    Anjanique M. Watt
                                                    1221 Avenue of the Americas
                                                    New York, New York 10020
                                                    (212) 506-2500

                                                    *Attorneys for Citibank, N.A.*