## quinn emanuel trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7444**

WRITER'S EMAIL ADDRESS
**robertloigman@quinnemanuel.com**

August 18, 2020

**VIA E-MAIL**
**FURMAN_NYSDCHAMBERS@NYSD.USCOURTS.GOV**

Hon. Jesse M. Furman
United States District Court for the Southern
District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

Re:     Citibank, N.A. v. Brigade Capital Management, LP, No. 1:20-cv-06539

Dear Judge Furman:

We represent Brigade Capital Management, LP ("Brigade"), the defendant in this action. Brigade is the investment advisor to a group of approximately 40 investors/funds that own term loans issued by Revlon Consumer Products Corporation ("Revlon") under a 2016 Term Credit Agreement. Brigade itself is not a lender; moreover, lenders advised by Brigade constitute only a fraction of all lenders under that agreement.

On August 11, Citibank sent out electronic wire payments to all of Revlon's 2016 Term Lenders, of which there are more than several hundred. The payments—which total to nearly $900 million—were expressly designated on account of Revlon's Term Loans and matched the accrued interest and remaining outstanding principal under the 2016 Term Loans to the penny. The next day, on August 12, Citibank sent out notices to the lenders asserting, without explanation, that the payments had been made in error and requested the return of the funds. To our knowledge, most all of the lenders, excluding perhaps those that are affiliated with Citibank itself, declined the request to return the funds and, to date, have continued to do so. The lenders were not willing to accept Citibank's bald assertion that the wires were sent in error, and, even more importantly, they were appropriately undertaking legal analyses of their rights with respect to payments received from Revlon's longtime banking agent on loans that were undisputedly owing. For some strategic reason, Citibank has chosen to sue only Brigade in this action, even though (a) the vast majority of the nearly $900 million in payments went to lenders who are not advised by Brigade, and (b) even with respect to Brigade, Citibank transferred no money to defendant Brigade itself. Instead, as Citibank is well aware, Citibank wired money to approximately 40 different funds that employ

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE | BOSTON | SALT LAKE CITY
LONDON | TOKYO | MANNHEIM | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH | SHANGHAI | PERTH | STUTTGART

Brigade as their investment/collateral manager,[1] and thus must know that Brigade itself was not a lender and does not have the money for which Citibank is now suing.

By way of relevant background, this past April, the majority of the 2016 Term Lenders noticed an event of default under the 2016 Term Credit Agreement because Revlon had violated the Credit Agreement by siphoning $200 million of collateral to an affiliate and away from all of the lenders to the Term Credit Agreement. Then, in May 2020, Revlon set out to do the same thing—on a much larger scale—transferring away to an affiliate the most important remaining collateral securing the 2016 Term Loans. Citibank, as the lenders' agent at the time, facilitated the transaction, notwithstanding the pending event of default and the fact that a majority of 2016 Term Lenders opposed it. The transaction was substantively egregious and in violation of the 2016 Term Credit Agreement. Procedurally, it was even worse—in order to get required consents to do the transaction, Revlon, aided by Citibank, created new revolver loans designed solely to vote for the collateral-stripping transaction and not for any legitimate corporate purpose (and in further violation of the agreement). Indeed, these revolver "loans" came into existence on the date of the transaction, always destined to be repaid two weeks later. It was transparent vote manipulation. And Citibank assisted Revlon, even though a majority of Term Lenders demanded that Citibank—which was supposed to be their agent—resign and/or refuse to do so. All of this is the subject of a 117-page complaint that was filed in this Court on August 12, 2020, on which date, UMB Bank, N.A., the lender-appointed successor agent, also accelerated the Term Loans. That was, of course, the very same day that Citibank sent out notices that it had made a "clerical error" when it repaid the lenders' loans to Revlon. *See* Complaint, *UMB Bank, Nat'l Ass'n v. Revlon, Inc., et al.*, N 1:20-cv-06352, ECF Doc. 1.

As set forth below, Citibank cannot establish any of the requirements for a TRO. As to the merits, Citibank wholly ignores the controlling case—*Banque Worms v BankAmerica International*, 77 N.Y.2d 362 (1991)—which makes clear that a lender that receives payment from a third-party in discharge of a debt or lien may keep that money, even it was sent in error, so long as the lender was not aware of the mistake when the money was received. As to irreparable harm, Citibank cannot get around the widely applicable rule that a claim for money damages does not suffice, nor does it even attempt to address its ability to recover the money at issue from the more than 40 lenders to which it made payment. The balance of harms and public interest arguments are similarly flawed, as Citibank fails to recognize that finality in wire transfer payments—particularly when sent to dozens of institutions—is a fundamental policy that the law seeks to promote. Under these circumstances, Citibank's request for a TRO should be denied.

### I. Citibank Is Not Likely To Succeed On The Merits

Citibank's claims—all of which sound in restitution—are all subject to the "discharge for value" defense that fits this case like a glove:

> A creditor of another or one having a lien on another's property who has received from a third person any benefit in discharge of the debt or lien, is under no duty to make restitution therefor, although the discharge was given by mistake of the

---

[1] The actual Term Lenders advised by Brigade, to whom Citibank sent wire transfers, include state and local government pension plans, among other institutions.

> transferor as to his interests or duties, if the transferee made no misrepresentation and did not have notice of the transferor's mistake.

*Banque Worms*, 77 N.Y.2d at 367 (quoting Restatement of Restitution § 14(1)); *see also Colli v. Wirth*, No. 94 Civ. 3234, 1996 WL 243237 at *8 (S.D.N.Y. May 10, 1996) ("[W]here the benefit is deserved, as in the case of a valid debt owed, and the means employed in obtaining it lawful, no injustice has occurred. In such situations, the payor is not entitled to restitution ...." (citations omitted)). Citibank cannot dispute that the transferees were "creditors of another [Revlon] or one[s] having a lien on another's [Revlon's] property who has received from a third person [Citibank] any benefit in discharge of the debt or lien." *Banque Worms*, 77 N.Y.2d at 367 (quoting Restatement of Restitution § 14(1)).

Instead, Citibank hangs its hat on a single disputed fact: whether the transferees "ha[d] notice of the transferor's mistake." But Citibank admits that it did not give actual notice of the purported error until the day *after* it transferred the funds. Br. at 3. This concedes that the lenders were not on notice of the putative error upon receipt. *See Banque Worms v. Bank America Int'l*, 726 F. Supp. 940, 942 (S.D.N.Y. 1989) ("[A]ny awareness by [transferee] of [transferor's bank]'s mistake two hours after the funds were transferred by wire is not material."), *aff'd* 928 F.2d 538 (2d Cir. 1991); *Gen. Elec. Capital Corp. v. Cent. Bank*, 49 F.3d 280, 284 (7th Cir. 1995) ("As the [New York] Court of Appeals saw things, a creditor should be able to treat funds credited in apparent payment of a debt as irrevocably his, unless news of the error precedes arrival of the funds. Costs of errors should be borne by those who make errors (the better to induce them to take care) rather than by innocent beneficiaries."). Nor is it probative that UMB Bank noticed additional defaults, accelerated the loans' principal, and filed a complaint the day after the transfers; obviously, a 117-page complaint was in the works well before its filing.

Citibank next seeks to impose a duty of inquiry notice (without citation) intimating that the Transferee Funds should have known the payments were made in error. But this is not the test. *See Bowman Import/export Ltd. v. F.J. Elsner N. Am. Ltd.*, 799 N.Y.S.2d 158 at *5 (Sup. Ct. N.Y. Cty. 2004) ("The acceptance of payment of a debt requires no inquiry as to the source of the money [and payees] ha[ve] no legal obligation to discern the identity of the payor, or why it wished to discharge [debtor]'s debt, as long as such discharge was for value. To find otherwise would disrupt and disorganize all business operations with risk and uncertainty."); *see also Banque Worms*, 77 N.Y.2d at 373 ("When a beneficiary receives money to which it is entitled and has no knowledge that the money was erroneously wired, the beneficiary should not have to wonder whether it may retain the funds; rather, such a beneficiary should be able to consider the transfer of funds as a final and complete transaction, not subject to revocation."). Moreover, even if it were relevant, the transfers did not appear to be in error when they were received: (i) they were in the precise amounts of principal and interest outstanding under the 2016 Credit Agreement; (ii) they would have required many levels of authorization from accountholder and bank; (iii) they were paid to *all* lenders and funds, not an outlier lender or fund in error; and (iv) they were paid by Citibank, Revlon's long-time banking agent that, to date, holds itself out as administrative agent under the 2016 Credit Agreement.[2]

---

[2] There are many additional reasons why the payments would not appear to be in error, including that the lenders had previously noticed an events of default under the 2016 Credit Agreement and that Revlon knew, because it was publicly reported, that the lenders were on the verge of accelerating their loans and directing successor agent UMB

Citibank's assertions that Brigade should have known the transfers were in error (i) because certain notices calculated interest payments and (ii) there was no three-days' notice provided, likewise, are unavailing. That Citibank sent 43 calculations of interest doesn't explain why 43 transfers of interest *and* principal (which would have needed no calculation) would constitute notice of error. Each Citibank transfer looked like a payment equal to the calculated interest *plus* each lender's outstanding principal. As reflected in Exhibit B to the Zeigon Declaration, the trade confirmations showed only the full amount of the transfers. And a purported technical omission of three-days' notice is a red-herring: the 2016 Credit Agreement and New York law impose no obligation on a lender to inquire why it did not receive a gestural heads-up before receiving a paydown of debt, nor would the omission constitute notice of error as to a repayment of debt itself.

Moreover, while Citibank makes the conclusory assertion that the transfers were in error, Citibank *still* has not explained *how* this purported error came to be, notwithstanding the layers of protocols and required permissions in place to prevent erroneous payments. It is not believable that a sophisticated institution like Citibank could have transferred nearly $1 billion, in the exact amount outstanding under the 2016 Credit Agreement, in error. The Zeigon Declaration states that Citibank is "continuing to investigate the reasons for the mistaken overpayments." How should the lenders have been on notice when Citibank itself cannot explain its story?

Citibank's claim for conversion has no more merit than its other claims. Citibank asserts no facts or law establishing that Brigade or the actual lenders that received the transfers are unauthorized to exercise dominion over the funds *voluntarily* transferred to them by Citibank. Moreover, Section 10.7(b) of the 2016 Term Credit Agreement allows the lenders to retain the payments as a set-off against the amounts they are owed by Revlon:

> In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to the Borrower, ... upon any amount becoming due and payable by the Borrower hereunder ... to set off and appropriate and apply against such amount any and all deposits ..., in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any Affiliate, branch or agency thereof to or for the credit or the account of the Borrower.

## II. <u>Citibank Cannot Allege Irreparable Harm</u>

All of Citibank's causes of action are compensable by money damages. Of course, monetary injury "does not usually constitute irreparable injury." *Sampson v. Murray*, 415 U.S. 61, 88 (1974); *Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd.*, 190 F. Supp. 2d 577, 581 (S.D.N.Y. 2002) ("[T]he alleged injury must be one incapable of being fully remedied by monetary damages."); *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990) (same); *see also Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) ("[T]he court must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the 'remedies available at

---

Bank, National Association ("UMB Bank") to sue Revlon and Citibank. Revlon has very recently satisfied other outstanding debt in full (which similarly traded at significant discounts to par) and it was also recently reported that Revlon had retained an investment bank specifically to focus on the potential maturity of the 2016 Term Loans later this year.

law, such as monetary damages, are inadequate to compensate for that injury.'") (*quoting eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391). Fundamentally, Citibank's complaint concerns its alleged "mistaken" payment of money; indeed, Citibank's prayer for relief seeks only monetary relief.  Compl. at 10-12.[3]

The limited exception to this rule, where a defendant is insolvent, *see Pamlab, L.L.C. v. Macoven Pharm., L.L.C.*, 881 F. Supp. 2d 470, 480 (S.D.N.Y. 2012), is not applicable here. Citibank has not alleged that Brigade nor the lenders it advises are insolvent.  Rather, Citibank asserts that an injunction is appropriate where "the particular funds sought to be frozen are also the funds at issue in the suit" and there is a "risk that defendant will have dissipated the [funds] without paying the plaintiff." Br. at 4.  As a threshold matter, because Brigade never received the funds, there is no risk of dissipation.  Moreover, the cases cited for these propositions, *Ger-Nis Int'l, LLC v. FJB, Inc.*, 2007 WL 656851, at *2 (S.D.N.Y. Mar. 1, 2007) and *Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.*, 2000 WL 1610790, at *1 (S.D.N.Y. Oct. 27, 2000) are meaningfully distinct factually.  In *Ger-Nis Int'l*, the defendant conceded insolvency, telling the plaintiff "that he had insufficient funds to pay the debt, and [he was subject to] five other reparations proceedings for non-payment…." 2000 WL 1610790, at *2.  In *Wishnatzki*, the movant was a beneficiary of a perishable commodities trust asserting a special property interest in the funds with "rights superior to secured creditors." *Wishnatzki*, 2000 WL 1610790, at *2.

### III.     The Balance of Equities Favors Brigade

The equities do not favor Citibank.  Citibank, on its own volition, tendered payment on the outstanding 2016 Term Loans.  Citibank's assertion that "Brigade … will suffer *no* legitimate hardship at all by losing access to funds that it never expected to receive and does not rightfully own" is confusing.  Br. at 7.  The lenders were lawfully owed every penny that was transferred by Citibank in Revlon's name.  Brigade did nothing to induce or coerce such payments.

Moreover, as detailed in UMB Bank's complaint, it is Citibank, not the lenders, that has engaged in inequitable conduct.  The 2016 Term Lenders suffered hardship stemming from the illegal transfer of their collateral perpetrated through a series of transactions in which the lenders' agent, Citibank, was highly involved after refusing to resign at the direction of a majority of lenders.  In any case, Citibank is one of the ten largest money-center banks in the world holding over $1 trillion in assets.[4]  It will suffer no relative hardship, even assuming its claims had merit, in awaiting final judicial resolution with respect to "over a hundred million dollars." Br. at 7.

### IV.     An Injunction Is Not In The Public Interest

An injunction would disserve the public interest.  Citibank's argument that the "very foundations of the modern banking system would be undermined" if it is not "able to recover the funds that remain its rightful property" (Br. at 8), has already been rejected by New York's highest

---

[3] Citibank also fails to establish that the alleged harm is imminent or concrete.  "Irreparable harm must be shown by the moving party to be imminent, not remote or speculative." *Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir. 1990).  Instead, Citibank complains that, in the event it wins on the merits of its complaint, it may be unable to collect due to Brigade's business practices.  These allegations do no show that the alleged harm is imminent. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").

[4] https://www.ibanknet.com/scripts/callreports/getbank.aspx?ibnid=usa_476810.

5

court. In such a circumstance, the public interest is served by allowing a recipient that was rightfully owed the funds (as the lenders were here) to retain the transferred funds, whether made in error or not, thereby prioritizing "finality in business transactions … in respect to electronic funds transfers." *Banque Worms*, 77 N.Y.2d at 373. "The acceptance of payment of a debt requires no inquiry as to the source of the money [and payees] ha[ve] no legal obligation to discern the identity of the payor, or why it wished to discharge [debtor]'s debt, as long as such discharge was for value. To find otherwise would disrupt and disorganize all business operations with risk and uncertainty." *Bowman Import/export Ltd.*, 799 N.Y.S.2d 158 at *5; *see also Banque Worms*, 77 N.Y.2d at 373 ("When a beneficiary receives money to which it is entitled and has no knowledge that the money was erroneously wired, the beneficiary should not have to wonder whether it may retain the funds; rather, such a beneficiary should be able to consider the transfer of funds as a final and complete transaction, not subject to revocation."); *Gen. Elec. Capital Corp.*, 49 F.3d at 284 ("[A] creditor should be able to treat funds credited in apparent payment of a debt as irrevocably his, unless news of the error precedes arrival of the funds."). Citibank seeks relief that runs directly contra to these principles, demanding reversal of 43 wire transfers to 43 bank accounts. Thereafter, Citibank will then seek reversal of hundreds of others transfers to hundreds of other bank accounts of hundreds of other entities. That is far from the finality New York policy favors.

Respectfully submitted,
*/s/ Robert S. Loigman*
Robert S. Loigman

Cc: Matthew D. Ingber, Esq.
Christopher J. Houpt, Esq.