K8IZZCITCGM

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    CITIBANK, N.A.,

4                    Plaintiff,

5              v.                          20 CV 6539 (JMF)
                                           Telephone Conference
6    BRIGADE CAPITAL MANAGEMENT,
     L.P., et al.
7
                    Defendants.
8
     ------------------------------x
9                                          New York, N.Y.
                                           August 18, 2020
10                                         9:14 a.m.

11   Before:

12                       HON. JESSE M. FURMAN,

13                                         District Judge

14                          APPEARANCES

15   MAYER BROWN LLP
          Attorneys for Plaintiff Citibank, N.A.
16   BY:  MATTHEW INGBER
          CHRISTOPHER J. HOUPT
17
     QUINN EMANUEL URQUHART & SULLIVAN LLP
18        Attorneys for Defendant Brigade Capital Management, L.P.
     BY:  ROBERT LOIGMAN
19        BENJAMIN FINESTONE

20

21

22

23

24

25

K8IZZCITCGM

1          (The Court and all parties appearing telephonically)

2          THE COURT:  Good morning.  This is Judge Furman.  If,

3    at any point, you can't hear anyone or hear me, just let me

4    know.

5          Before I take appearances from counsel, a few

6    housekeeping matters.

7          First, anytime you speak, please start with stating

8    your name, just so the court reporter and I know who is

9    speaking and the record is clear.

10          When you're not speaking, please have your phone on

11    mute to minimize background noise distraction, but remember, of

12    course, to unmute yourself when you want to say something.

13          Now, if there is a chime at some point, that means

14    that someone else may have joined or left.  If the case may be,

15    if you're speaking, pause for a moment so I can take stock of

16    what has happened.

17          A reminder to everyone that recording the conference

18    is strictly prohibited, but it is a public conference, as it

19    would be if it were in open court.

20          With that, I will take appearances.  I'd like one

21    counsel from each side just to state appearances for anyone who

22    is participating, starting with the plaintiff, please.

23          MR. INGBER:  Good morning, your Honor.  This is

24    Matthew Ingber, and I'm joined by my colleague, Christopher

25    Houpt, from Mayer Brown for Citibank.

K8IZZCITCGM

            THE COURT:  Good morning to both of you.  Haven't seen

you in a while, but good to hear you.

            For defendant.

            MR. LOIGMAN:  Good morning, your Honor.  This is

Robert Loigman of Quinn Emanuel.  I'm with my partner, Ben

Finestone.  We represent the defendant, Brigade Capital

Management.

            THE COURT:  Good morning to you guys, as well.  Thank

you, all, for joining on relatively short notice.

            Mr. Loigman, thank you for your letter that I received

and read early this morning, which, certainly, was quite

helpful.

            Now, let me start on that by giving Mr. Ingber an

opportunity to respond to the letter.  In particular, there are

two points I'd like your response to.

            One is the claim that the monies you're seeking are

not actually in the possession of Brigade, that they were

wired, essentially, to particular funds, as I understand it,

and that Brigade is just the manager for the funds, but not the

recipient of the wires themselves.

            Second, perhaps more fundamentally, to respond to

*Banque Worms*' argument, I will say that I'm a little surprised

that you didn't address that in your initial motion papers,

just because the discharge for value rule does seem to be, if

not directly on point, certainly close to it.  In that regard,

K8IZZCITCGM

1   I would have thought that you'd try to address why it's not

2   applicable here, but I'll give you a chance to do that now.

3           MR. INGBER:  Thank you, your Honor.  I'll address the

4   first point, and if it's acceptable to the Court, Mr. Houpt is

5   going to address the discharge for value point.

6           THE COURT:  Okay.

7           MR. INGBER:  So, on the first point, your Honor, we

8   are suing Brigade as manager for these 40 or so funds that

9   received wires from Citi mistakenly.  There is a dispute, I

10  suppose, whether these were mistaken payments, whether it was

11  an error or not.  We think that point is actually indisputable,

12  and we lay out all the reasons in our papers.

13          As manager of these various funds, Brigade, we

14  believe, from our perspective, controls whether or not these

15  funds are going to return the payment to Citi or not.  It's no

16  coincidence that all of these funds, all 40 of these funds,

17  have not returned the payment to Citi.  Brigade has said to

18  Citi, flat out, that they believe there was, in fact, not an

19  error in the payment of these funds to the various Brigade

20  funds.

21          What we're seeking is, in the form of our temporary

22  relief here, is to prevent the dissipation or the distribution

23  of these funds to the ultimate beneficiaries, and we're seeking

24  that relief against Brigade, as the manager of these funds,

25  because we think they act -- and this is in our relief section

K8IZZCITCGM

1    of the complaint -- in concert with, or in participation with

2    these funds.  So, we think they have control over whether or

3    not these funds are returned.

4              We think that it was certainly no surprise to Brigade

5    and -- excuse me, it was a surprise to Brigade, and these

6    funds, when they received more than 100 times what they

7    expected to receive based on the calculation statement that

8    Citi had sent over immediately prior to the wire payments.

9              Like I said, we don't think it's a coincidence, at

10   all, that, ultimately, it was these 40 funds, at the direction

11   of Brigade, that have refused to return those funds to Citi.

12   While Brigade itself wasn't a direct recipient of these funds,

13   the funds that it manages were, the funds it controls were.  A

14   lot of these funds are Brigade funds.  They are CLOs and other

15   funds that actually have Brigade in the name of these funds.

16             It's difficult for us to accept and, based on our

17   experience, inconsistent with -- you know, it's difficult to

18   accept that Brigade didn't have control over whether or not

19   these funds would be returned.  From Citi's perspective,

20   Brigade is the party with whom they communicate.  Brigade is

21   the party that is setting up the investment on behalf of these

22   various funds.  Brigade is the one that is documenting the

23   investment on behalf of all of these funds.  So, from Citi's

24   perspective, Brigade is the appropriate party in a position to

25   decide whether or not -- or to direct the funds, whether or not

K8IZZCITCGM

1    to return the funds to Citi.

2              THE COURT:  A couple followup questions.  Although you

3    say that it would have been or should have been obvious, given

4    that it was 100 times or so the interest payment due, is it

5    correct that it was the amount of principal outstanding to the

6    penny?

7              MR. INGBER:  It was the amount of principal.  That's a

8    correct statement.

9              A few things.  Number one, there was, as I said, a

10   calculation statement that was sent prior to the wire.  We

11   attached that to our papers.  The calculation statement itself

12   said that Citi would be paying interest.  The borrower, Revlon,

13   distributed to Citi only the amount of interest that Citi had

14   intended to send by wire to the lenders.  This is Citi money

15   that was paid.  The borrower never sent the amount of principal

16   or the overpayment to Citi for distribution to the lenders.

17   Based on public reports --

18             THE COURT:  Let me interrupt you.  That's not my

19   question.  My question isn't whether the amount of principal

20   was sent in error, and I certainly understand your arguments

21   for why that is the case and the circumstantial evidence of why

22   that is the case.  My question is, from the recipient

23   standpoint, is it correct that it was to the penny, the amount

24   of principal outstanding, putting aside whatever reference to

25   interest is in the papers, that were sent at the time?  I take

K8IZZCITCGM

1    it the answer is yes?

2           MR. INGBER:  The answer is yes.  It was the amount of

3    the principle outstanding, plus the interest that Citi had

4    intended to distribute, and, in fact, did distribute on that

5    day.  So, it's the outstanding principal, plus this periodic

6    interest payment that was being made.

7           THE COURT:  Okay.  Do you have authority for the

8    proposition that Brigade is the proper party to sue, if you're

9    seeking to freeze the particular funds involved, as opposed to

10   the Brigade opportunistic credit LBG Fund, and whatever the

11   other 39 or so funds are?

12          MR. INGBER:  What we have is our factual understanding

13   of Brigade's interactions and control over those funds.  If

14   we're seeking to avoid dissipation or distribution to the

15   ultimate beneficiaries, we need to sue the party that we

16   believe has control over those funds.

17          THE COURT:  Okay.  Then the last factual question,

18   then I'll turn to Mr. Houpt.

19          In the letter I received this morning, there is at

20   least a suggestion, I'm not sure that that matters, but a

21   suggestion that Brigade is not the only lender who has refused

22   to return the funds, but you had alleged in your moving papers,

23   I think, that it was.  Can you just clarify that?

24          MR. INGBER:  Yes.  So, Brigade, as far as we

25   understand, is the only lender that has flat out refused to

K8IZZCITCGM

1   return the funds.  So, there are many lenders that have

2   returned the funds.  Citi is in communication with various

3   other lenders about the return of these funds, but it was

4   Brigade, the largest lender here, that has flat out refused to

5   return the funds on the ground that these actually weren't made

6   in error.

7           THE COURT:  All right.  I'm sorry, I do have one other

8   question before I turn to Mr. Houpt.

9           Can you just explain what the relationship is to the

10  civil case pending before Judge Schofield, and your view on

11  whether this is related to that litigation?  I mean, I'm going

12  to handle the emergency motion, regardless, but I guess the

13  question is, going forward, if it would make sense for the

14  single judge to be handling all of it or whether they're

15  discrete disputes.

16          MR. INGBER:  We think they're discrete disputes.

17          This is a question of whether there was an erroneous

18  payment made, and whether $175 million of Citibank's money,

19  that Brigade wasn't entitled to, should be returned to Citi.

20          The other dispute raises entirely separate issues.

21  The only relevance of the other dispute, in our view, is that

22  it was filed, it was filed after this mistaken payment was made

23  and it seeks the repayment of the debt.

24          So, two things happened immediately after Citibank

25  made this mistaken payment.

K8IZZCITCGM

1          Number one, the party that Brigade says is the

2     successor agent to this facility sent the notice to accelerate

3     the loan, number one.

4          Number two, that same purported agent sued Revlon, and

5     Citi, and others for repayment of the debt.

6          So, counsel for Brigade has said, in their response

7     papers, well, that was in the works, that complaint was in the

8     works.  It's a 117-page complaint, it takes time to prepare

9     that, and so that's why it was filed.

10          They didn't need to file it.  If they had thought that

11     this payment was made intentionally by Citibank, using Citibank

12     funds, not borrower funds, when this loan was trading 30 cents

13     on the dollar, and Revlon, by all accounts, and also by

14     plaintiff, by Brigade, or by their purported agent's own

15     account, in the UMB complaint that was filed before Judge

16     Schofield, by all of those accounts, Revlon couldn't pay back

17     this loan.  Paragraph 171 of the UMB complaint says there was a

18     lack of any prospect for Revlon to pay its debts as they come

19     due for an indeterminate period.  So, they're alleging that

20     Revlon was insolvent in the spring of 2020.

21          It's very difficult for us to accept that they

22     actually believe that, out of the blue, when this loan was

23     trading 30 cents on the dollar and Revlon was having liquidity

24     issues during a pretty serious period of financial distress,

25     all of a sudden, Citibank, on behalf of Revlon, was paying

K8IZZCITCGM

1    $900 million in principal.  That's just not credible, in our

2    view.

3          We think that the filing on the next day, and the

4    notice of acceleration on the next day, betrays what the

5    lenders were actually thinking, which is, this was a mistaken

6    payment.  This loan is not being paid off out of the blue using

7    Citibank's money.  So that, we think, is the only relevance of

8    the UMB complaint.

9          That's going to be litigated separately.  There are a

10   number of allegations against a number of different parties

11   there, and we are going to fight that on the merits.  We think

12   there are standing issues with respect to UMB as the plaintiff

13   because we don't think they're properly the agent, but that can

14   be litigated entirely separately.

15         This is a matter that involves very discrete issues.

16   It has to be, we believe, respectfully, resolved on an

17   accelerated basis.  It's hundreds of millions of dollars that

18   are due to be returned to Citi.  We think it raises serious

19   issues for the banking industry.  If players like Brigade can

20   understand, by all accounts, that this was unintentional, that

21   this was a mistake, and then reap a windfall from this, we

22   think we need to get to an early resolution on this, and we

23   think that the other case is not related.

24         THE COURT:  Mr. Houpt, let me turn to you and ask you

25   to address the discharge for value rule.  In particular, I

K8IZZCITCGM

think the question in my mind is, to me, that rule seems pretty

clearly applicable here.  The only question is whether Brigade,

to the extent that it is a recipient of the funds, at all, was,

quote-unquote, on notice of the error.

That brings up a legal question and a factual

question.  The factual question is, whether and to what extent

it was either actually on notice or on inquiry notice?  The

legal question is, what constitutes sufficient notice?  Whether

it has to be something akin to the notice that was apparently

sent the day after these transfers, saying this was sent in

mistake, or if the sort of circumstantial finds of an error are

sufficient, in some sense, inquiry notice would suffice.

In that regard, Mr. Ingber's concession that the

amount of the transfer was, to the penny, the exact amount of

principal, plus interest, owed, seems rather significant to me,

granted the papers made reference to interest, but the

recipient could easily have concluded, for instance, that the

papers were wrong, and omitting any reference to principal,

since the payment, apparently, did include interest.

So, why don't you start with the legal question of

what notice suffices to get you out of the discharge for value

rule.

MR. HOUPT:  Sure.  I think you heard some of the

relevant facts that I think your Honor addressed; I'll put that

within the legal framework.

K8IZZCITCGM

1          I can start with notice, but there are two important

2     aspects of the discharge for value rule.  One is whether the

3     transferee is on notice, but the other is that there has to be

4     a discharge of the debt because of the animating principle

5     behind this rule, which comes from the restatement of

6     restitution.  It's an equitable concept.  It would be

7     inequitable to require restitution from an innocent transferee

8     who has actually done something as a result of the payments.

9     He has surrendered his debt, his promissory note, his release

10    to the lien, he signed a discharge letter.  So, it would be

11    unfair, after the transferee has done that, to try to claw the

12    money back.

13         So, as to notice, the notice did not have to be

14    actual.  In the alternative, it is not inquiry notice, as their

15    letter suggests.  The alternative is constructive notice, and

16    that has been expressly adopted, at least by the Sixth Circuit.

17         I'd refer the Court to *In re: Calumet Farm*, which is

18    398 F.3d 555.  That's the Sixth Circuit case from 2005.

19         On page 560, the Court says, "Any sensible application

20    of the discharge for value rule in this unique setting must

21    account for constructive as well as actual notice of a

22    mistake."

23         We're not arguing -- and I can start pointing to the

24    relevant facts -- that they needed to launch an investigation.

25    The question is, what factual circumstances were already

K8IZZCITCGM

available to them that would have suggested that this was an

error?

One of the facts that the Court in *Calumet Farm* found

to be highly relevant was that the memo in the wire

instructions contains the rather cryptic phrase "Mogambo Int."

That case involves a promissory note relating to the purchase

of a horse called Mogambo.  The letters I-N-T indicated that an

interest payment was intended, but, instead, a much larger

amount, still less than the outstanding debt, was paid.  The

Court said that the fact that there was this statement that INT

was intended, that was part of what put the recipient on notice

that the excess amount was in error.

Here, we have much more than that.  Exhibit A to this

Zeigon declaration, it is a very elaborate calculation

statement that does more than what the defendant's letter

suggests.  It doesn't simply explain the calculation of the

complicated part of the payment of interest.  It neither shows

you how the interest was paid, but they seem to imply that Citi

might have been throwing in other amounts that would be obvious

and don't need explanation.

At the end of Exhibit A, the statement says, "We will

credit your account representing the above interim interest

based on the following instruction," and it has the dates and

the currency, and it says, "total due."  The amount, down to

the penny, is exactly the interest amount that was calculated

K8IZZCITCGM

above.  Then it says, "Less tax withholding, zero."  Then it

says, "credit amount," and again, that's the interest amount,

"does not include any principal."

So, they received a statement from Citibank that made

perfect sense.  It correctly calculated the interest that was

actually due under the credit agreement on that day, and it

said we are going to credit your account in that amount.  Then

they got a wire transfer that didn't match.

Now, they may be able to concoct some explanation for

why that actual transfer amount couldn't have been explained,

but on its face, there was obviously evidence of an error.

There was a discrepancy between the expressed statement and the

amount of the payment, and that just put them on notice.  It

certainly, under the equitable concept of restitution and

discharge for value, makes them not an innocent party.  If they

choose to willfully say, no, we're going to ignore the

calculation statement and come up with a reason to think that

the payment was actually a prepayment of principal, that's not

equitable conduct.

The second relevant fact is that, as I mentioned, the

interest was the only thing that was actually due and payable

on that date.  This is relevant to their setoff argument under

section 10.7(b) on page 4 of their letter.  They said that they

have a right of setoff, but that provision says that it only

applies to amounts that are due and payable by the borrower

K8IZZCITCGM

1    hereunder.  The principal was not due and payable by Revlon for

2    another three years.  That was further reason that, not only

3    can he not exercise setoff, but they should have at least

4    wondered why the principal was suddenly paid.

5            In addition, as we pointed out in our papers,

6    prepayment requires various procedural requirements.  You don't

7    just send out money and let the borrowers make their own

8    inferences about what that money is.  There are prepayment

9    notices that are required at least three business days in

10   advance of any prepayment.  Again, they try to disparage the --

11   they refer to that as a gestural heads up, but the plaintiff's

12   failure to send a prepayment notice would result in a breach of

13   contract claim against Revlon for damages from a lack of

14   notice.

15           The plaintiffs attest that the absence of a prepayment

16   notice, combined with all the other facts -- the fact that we

17   told them we were paying interest; the fact that they

18   apparently believe that Revlon was not only insolvent, but also

19   didn't have any cash; their recent financial statements, I'm

20   told, showed that Revlon had significantly less cash at the end

21   of the last quarter than the amount of this payment, which we

22   believe a sophisticated lender like Brigade would be well aware

23   of -- the absence of the prepayment notice is yet another fact

24   that fits into the overall circumstances to tell them something

25   is wrong with this payment.  That's most of what's relevant on

K8IZZCITCGM

 1  notice.

 2          The other point that's relevant --

 3          THE COURT:  Can I interrupt for a moment.  Do you have

 4  any New York authority for the proposition that constructive

 5  notice is the proper standard?

 6          MR. HOUPT:  I don't think I have a New York case

 7  offhand that expressly addresses the distinction between

 8  constructive and actual notice.  *Calumet* discusses the *Banque*

 9  *Worms* case that says constructive versus actual is not the

10  issue there.  I certainly have not seen anything in New York

11  that suggests that actual notice is required under the

12  discharge for value rule.

13          THE COURT:  Okay.  So, quickly on the discharge point

14  and then I'll hear from the other side.  I have to warn

15  everybody that I have a 10 o'clock bail hearing.  Given the

16  virtual world we're in, I can't simply make people wait in the

17  courtroom.  So, I do need to wrap this up and have time to go

18  there, but go ahead.

19          MR. HOUPT:  I'll try to be quick.

20          On the discharge claim, again, the archetypal examples

21  here are things like surrendering a promissory note, releasing

22  a lien, doing something detrimental that's irreversible.  Here,

23  not only do we not have that, but we have the exact opposite.

24  The day after they contend the debt was discharged, they

25  directed their self-appointed agent to accelerate the debt.

K8IZZCITCGM

1          First of all, we believe that they did that because

2     they wanted to make the debt due and payable so they can

3     exercise their setoff rights, which is the kind of

4     opportunistic conduct that equity does not allow, but it also

5     shows they did not believe that the debt was discharged.  They

6     believed that it was outstanding and they needed to accelerate

7     it.

8          The other fact, which Mr. Ingber addressed, is that a

9     full day after that, they filed a lawsuit seeking specific

10    performance of the credit agreement that they are now going to

11    tell you was fully discharged.  If that were true, there

12    wouldn't even be an article to free case or controversy in the

13    case before Judge Schofield.  Even if they attribute that to

14    some sort of law office error, that case is still outstanding.

15

16          THE COURT:  Let me interrupt.  Maybe there is a case

17    or controversy problem, but that's neither here nor there.

18          What, in *Banque Worms*, suggests that they needed to do

19    something for the discharge for value rule to apply?  It seems

20    like, if I'm not mistaken, *Banque Worms*' notice of the mistake

21    was given within two hours or so.  I don't think there was any

22    discharge on the part of the lender in that case.  Isn't the

23    reference to discharge just for payment itself?

24          MR. HOUPT:  At a minimum, even if there is not

25    destruction of a note, there has to be an accounting that

K8IZZCITCGM

reflects the discharge.  So, the transferee -- and this

happened in *Calumet*, as well -- they received the payment at

one time, but then it was only a few hours later that they

altered their accounts to reflect the fact that the debt had

been paid.

          In this case, that presents a very clean question,

because the lender's accounts are not what matter under a

syndicated loan.  It's the administrative agent, which is

Citibank, that maintains the official register of what is owed

by the lender.  And, precisely because the borrower did not

remit principal funds to Citi, Citi did not adjust the register

to reduce the principal amount.  Therefore, as a formal matter,

the debt was not discharged in any sense.  It had not been

discharged at all.  It certainly was not discharged before we

gave them express written notice on the 12th that the payment

was in error.

          THE COURT:  All right.  Last question for your side,

either you or Mr. Ingber, and I'll turn to Mr. Loigman briefly.

          Obviously, it's black letter law that money alone is

not irreparable harm.  It doesn't constitute irreparable harm.

How do you address that argument here, granted, you're seeking

the freeze or return of particular funds, but, particularly, if

Brigade itself doesn't have them -- and there is no showing of

their involvement -- or couldn't repay them, why can't this

case just be litigated in the normal course?

K8IZZCITCGM

1        MR. INGBER:  So, your Honor, I'm happy to address

2   that.  The issue is insolvency.  In --

3        THE COURT:  You need to start with your name.

4        MR. INGBER:  I'm sorry.  Matthew Ingber.  Let me

5   address that.  I'm sorry.

6        So, the issue is not one of insolvency, and I don't

7   believe any of the cases require a finding of insolvency in

8   circumstances like this as a prerequisite to showing

9   irreparable harm.  The issue is the nature of the structure

10  between Brigade and its various funds.

11        Now, we don't have as much visibility into the

12  organizational structure of this fund, but we know that the

13  funds consist of CLOs, among other types of funds, that make

14  frequent distributions to investors.  We know that if investors

15  in CLOs are seeing that there could be a judgment against

16  Brigade, they can easily liquidate the CLOs.  We know that

17  there's other funds that, just as a matter of practice,

18  commingle cash, and are likely to commingle Citibank's money

19  with other assets to make payments to ultimate beneficiaries

20  down the line.

21        So, that is the irreparable harm, is having to

22  litigate where that money is, in whose hands that money has

23  wound up, and trying to eventually claw that back.

24        THE COURT:  All right.  Mr. Loigman, briefly, so that

25  we can figure out how to go forward.  If you want to respond to

K8IZZCITCGM

1    the points that have been made, starting with whether the money

2    is in your control, and the sufficient way to justify suing you

3    as opposed to the funds themselves.

4          MR. LOIGMAN:   Thank you, your Honor.   Robert Loigman

5    of Quinn Emanuel.

6          I think your Honor started in the right place, which

7    is that they have chosen to sue Brigade, presumably for some

8    strategic reason.   Citi, itself, wired the funds to the 43

9    lenders that Brigade advises, and, of course, Citi wired the

10   money to them because they're the actual lenders to Revlon.

11   They're the ones who were entitled to receipt of those funds.

12         What they're asking for, in the temporary restraining

13   order, specifically, was that the money not be distributed to

14   the exact entities to whom Citibank already has distributed the

15   funds.   If you try to further enjoin those entities from

16   distributing funds, you would have to address those entities.

17         Mr. Ingber, I think, made the point that Brigade has

18   control over those various funds.   Frankly, I don't know the

19   extent to which that is true, but what I do know is there are

20   lots of different types of accounts that are under management.

21   Yes, there are CLOs, but there are also pension funds, there

22   are managed accounts, there are investment funds.   There is a

23   wide array with various different rules that apply to the

24   different funds.   They have different fiduciary duties to their

25   investors.   So, to sort of target Brigade, as if they were the

K8IZZCITCGM

1    lender here, just doesn't work, and it doesn't make sense with

2    respect to the type of relief that we're seeking.

3          Your Honor, I would press on to the other issues.

4          The principle issue, really, here, is that *Banque*

5    *Worms* is directly on point.  New York has adopted the discharge

6    for value rule.  That's a case that went from the Southern

7    District to the Second Circuit, certified to the New York Court

8    of Appeals.  The language of the case, and what happened there,

9    really could not be any more on point.

10         THE COURT:  Can you just address the constructive

11   notice point or, legally, what level of notice is required.  To

12   the extent that it is constructive notice, why wasn't Brigade

13   on constructive notice here, given the reference in Exhibit A

14   to the declaration of interest, crediting the account and so

15   forth.

16         MR. LOIGMAN:  Sure, your Honor.  It's Robert Loigman

17   again.

18         First of all, *Banque Worms* is not about constructive

19   notice at all.  The *Calumet* case, that was cited by Citibank's

20   counsel, distinguishes *Banque Worms* on that basis.  It says

21   that, in *Banque Worms*, that the creditor should -- that case

22   says that notice, under *Banque Worms*, and also under the *GECC*

23   case in the Seventh Circuit, Judge Easterbrook, which relies

24   heavily on *Banque Worms*, that's 49 F.3d 284.  It says, the

25   notice must occur before the funds arrive, and the creditor

K8IZZCITCGM

1    should be able to treat funds credited in apparent payment of

2    the debt as irrevocably his, unless news of the error precedes

3    arrival of the funds.

4              There's nothing in *Banque Worms* that suggests that a

5    lender, in the position of the 43 lenders here, has to troll

6    the record to try to determine whether, in fact, the payment is

7    correct.  The presumption is that the payment is correct when

8    it's received.

9              That goes to the policy points that are made at the

10   end of *Banque Worms* where it talks about the finality in

11   business transactions, and that recipients of fund transfers

12   shouldn't have to look behind that transfer to determine

13   whether the amount was accurate, or whether the payment was

14   made correctly.  If they receive an amount in good faith,

15   they're entitled to treat that as a correct payment without

16   having to do the type of forensic inquiry that is being

17   suggested by Citibank here.  So, I think *Banque Worms* and

18   *GECC* -- and those are New York authority, and *GECC*, while on

19   the Seventh Circuit, it specifically talked about New York law

20   and *Banque Worms* -- are directly on point.

21             You also have other New York case law that makes

22   clear, again, that you don't have to look behind a transfer

23   when you receive it, because inquiry notice does not apply.  I

24   think that point of law, your Honor, is very clearly addressed

25   by New York law.

K8IZZCITCGM

1        The other related point that they make is that there

2   had to be some sort of reliance that, for example, there had to

3   be some recording of debt being discharged, whatever the

4   reliance may be; I'm not sure what they would point to.

5        Again, on that issue, *Banque Worms* could not be

6   clearer.  It says, in its decision, that it's adopting the

7   decision that it is to make clear that you don't need to have

8   some sort of reliance.  Reliance is the opposite rule that

9   could apply.  It's saying here that you don't need reliance

10  because the finality of the transfers is really what that issue

11  is, and that's what the New York policy is.

12       THE COURT:  Let me cut you off, just because I need to

13  bring this to a close.  I want to talk about the next steps.

14       I'm going to reserve judgment on the immediate

15  application because I got notice of this, no pun intended, last

16  night.  It wasn't until this morning, shortly before this

17  conference, that I saw the defendant's letter, and was even

18  made aware of *Banque Worms*, I haven't read *GECC*, and I learned

19  about *Calumet* just on this call.  Again, I'm a little surprised

20  these issues weren't addressed in the moving papers in the

21  first instance, which would have made my task a lot easier.

22       My question is, what happens?  Obviously, if I grant

23  the TRO, we'll proceed to brief the preliminary injunction.  If

24  I deny it, and deny it on the grounds of, for instance, not

25  likely to succeed on the merits, I presume that that would

K8IZZCITCGM

1      resolve both the TRO and the preliminary injunction, and we

2      would just proceed with the case in the normal course.

3              Can you give me, briefly, your respective views on

4      those issues and next steps.  Let me start with Mr. Ingber.

5              MR. INGBER:  Sure, your Honor.  This is Matthew

6      Ingber.

7              We think that's right.  I mean, we think, obviously,

8      that the TRO should issue on the control point.  If Brigade has

9      control, then they're going to have to make sure that nothing

10     happens with respect to Citibank's money.  If they don't have

11     control, then, I suppose, it's not going to be an issue for

12     them.  So, we think it should issue.

13             Just one related point.  If, ultimately, that is a

14     sticking point for the Court, we can amend the complaint.  We

15     can add the funds, and then we're probably going to be back on

16     the phone, talking about the same issues, presumably involving

17     the same counsel and the same substantive law.

18             So, that's where we stand on the control issue.

19             THE COURT:  What if I advise that the discharge for

20     value rule applies here, and, essentially, you're not entitled

21     to the money back or at least entitled to a TRO?  I presume the

22     case proceeds in the normal course?

23             MR. INGBER:  I think so.  And we have some responses

24     to Mr. Loigman's arguments.

25             I know we're short on time, but, certainly, the notion

K8IZZCITCGM

1  that we would expect a forensic investigation, it's just not

2  true.  Everything was on the face of the document.  They knew

3  and it was reflected by the filing the next day in the notice

4  of acceleration, but, in the interest of time, we'll focus on

5  procedure.

6          We would proceed, but we would ask to proceed on an

7  accelerated basis.  We think it is critical that we get to

8  resolution of these issues.  It's critical that Citibank gets

9  its money back.  If we have to proceed with the case, we're

10  going to want the documents, the internal documents at Brigade

11  and its funds.  I suspect we're going to see some surprise on

12  their part that, as I said, out of the blue, they got this

13  windfall payment that they never expected and never got notice

14  of, so we would want to move pretty quickly on that.

15          THE COURT:  Okay.  Mr. Loigman.

16          MR. LOIGMAN:  Your Honor, Robert Loigman.

17          It won't surprise you that I disagree with what

18  Mr. Ingber said.  With respect to going forward, we think

19  *Banque Worms* is squarely on point, all fours, and therefore

20  would suggest that it makes sense to deny the TRO and to deny

21  the preliminary injunction at the same time.

22          With respect to control, again, we think that

23  Citibank, itself, made the payments to all of the entities that

24  it's saying the money shouldn't be distributed to.  So we just

25  don't see there being any issue on that.

K8IZZCITCGM

1        THE COURT:  Let me interrupt.  Does it make sense to

2    deny the TRO but reserve judgment on the PI and have you

3    formally respond to it, or do you think you've essentially made

4    the arguments that you would make in connection with that?

5        MR. LOIGMAN:  It probably does not make sense, your

6    Honor, largely because, regardless of control, I think *Banque*

7    *Worms* is squarely on point, and that would defeat both the TRO

8    and the preliminary injunction.

9        If control were the only remaining issue, I'm not

10   sure, because, as I said, we haven't investigated it, whether

11   there would be anything further to say.  As I noted before,

12   it's a wide range of funds, and there are a lot of them at

13   issue, and Citibank has already sent the money to them.

14       With respect to the other issue you raised about going

15   forward, I didn't have a chance, of course, just because of

16   timing, to address whether we would even have notice, given the

17   documents they point to.

18       I would tell you, of course, that we don't think those

19   add up to notice at all, under any circumstances.  You received

20   full payment on your loans, and a calculation that corresponds

21   to that, and wire transfers that confirm that, and on its face,

22   it makes sense to think to receive payment on your loans.  In

23   fact, what they don't mention is, Revlon has recently paid off

24   other loans that were trading well below par, at full value, as

25   part of its financial restructuring.  It just announced that it

K8IZZCITCGM

1    had hired PJT, an investment bank, to come in and address,

2    specifically, these loans.  So, the idea these loans would be

3    paid off is not farfetched, at all.

4         Going forward, procedurally, one of the questions that

5    you asked of Citibank was whether this case is related to the

6    case now before Judge Schofield.  If this case goes forward, I

7    would submit, your Honor, it is related to that case.  That

8    case is going to have direct impact on that case.  For example,

9    they mentioned a section 10.7(b) and how it could apply in the

10   event of acceleration.  One of the issues --

11        THE COURT:  Mr. Loigman, we're getting a little far

12   field.  We can address that --

13        MR. LOIGMAN:  I'm sorry, your Honor.

14        THE COURT:  -- but I do need to wrap up.  I'm going to

15   leave it there for now, reserve judgment, because I want to

16   look at the few cases that you all have cited and relied upon,

17   which I didn't have notice of before this proceeding.  I'll

18   issue a ruling later today, at a minimum, on the TRO, and

19   perhaps on the PI, depending on the conclusions I reach, and we

20   can go from there.

21        With that, we are adjourned.  I thank you all for

22   convening on short notice.  I'm sure I'll speak to you all at

23   some point soon again.  Thank you.  Bye-bye.

24                              * * *

25