# THE LAW OFFICES OF JOHN F. BAUGHMAN, PLLC
### 299 Broadway – Suite 207
### New York, NY 10007

September 18, 2020

**By ECF**
Hon. Jesse M. Furman
United States District Court
Southern District of New York
40 Center Street – Room 2202
New York, NY 10007

*In re Citibank August 11, 2020 Wire Transfers*
*No. 1:20-cv-06539 (JMF)*

Dear Judge Furman:

We represent Citibank and write to move for an order compelling Defendants to provide limited discovery on the issue of their "control" over the funds at issue in this case. Despite extensive discussions between the parties, and repeated efforts by Citibank to compromise, Defendants refuse to provide any discovery on this topic. Indeed, they have unreasonably refused to provide basic information, such as documents identifying the authorized signatories for funds that may hold mistakenly distributed money.

On August 11, 2020, Citibank mistakenly wired out an overpayment of approximately $894 million. The money was destined, ultimately, for various lenders on a loan under the 2016 Credit Agreement (the "Revlon Loan"). The lenders are, largely, investment funds and CLOs that are managed by or affiliated with the Defendants. It has always been Citibank's position that the Defendants have control over the money at issue and, significantly, decisions with respect to the loan. Most importantly, Citibank contends that Defendants do have the ability to return the disputed funds if the Court orders them to do so.

Recently, however, it has become clear that Defendants intend to argue that Citibank cannot recover because, they will contend, they do not to have the money. For example, an article published in *Business Insider* on September 15, 2020 reported that, "Brigade has said that it isn't a lender to Revlon and doesn't have the money." [Ex. A.] This is a change from what Defendants said previously regarding the disputed funds. For example, when Your Honor asked whether it would be necessary to add "the specific funds" as defendants, counsel for the Defendants referred to an offer by "my lenders" to "return the cash" subject to certain conditions. [*See* August 21, 2020 Tr. at 6-7, 12 (Ex. B).] Defendants' changing position causes significant concern.

Citibank and Defendants discussed the control issue at length, and **both sides** agreed that it was not necessary—and indeed not in any party's interest—for Citibank to have to sue more than one hundred individual CLOs, investment funds and the like. To avoid that result, the parties undertook to negotiate a stipulation. After extensive discussion, that stipulation was agreed, and the Court approved it. It states, in relevant part:

1. Each Defendant will comply with any and all applicable orders of the Court and take all reasonable steps to direct and/or request that the various Non-Defendant funds managed or advised by such Defendant comply with any and all applicable orders of the Court.

2. Each Defendant will not assert that orders of the Court do not apply to the Non-Defendant Funds managed or advised by such Defendant.

3. Each Defendant will request that the Non-Defendant Funds managed or advised by such Defendant inform the Defendant promptly if they do not intend on complying with applicable orders of the Court, and each Defendant will inform Citibank, N.A., through counsel, promptly of the receipt of any such notice.

[ECF 51.]  This stipulation was designed to obviate the need to add all of Defendants' clients to the case, something both Citibank and Defendants desired.  Importantly, however, the stipulation ***does not limit discovery*** in any way.  Accordingly, Citibank has always maintained its right to pursue control discovery and stepped up those efforts when it began to emerge that Defendants were shifting their position.[1]  Citibank's Document Request No. 9 sought:

> all documents and communications reflecting or defining Your authority to manage, control, or make decisions regarding any funds transferred by Citibank on August 11, 2020, including specifically any funds that You hold, control, or manage on behalf of Your customers and including any direction letters and any custody, customer, management or other agreements relating to such funds.

[Ex. C.]  Defendants refused to produce any information in response to this request and, have maintained that position despite repeated meet and confer efforts to compromise by Citibank.  [*See* Ex. D.]  Their primary rationale seems to be the existence of the stipulation quoted above.  That stipulation does not—and should not—bar discovery on the issue of control, for several reasons.

First:  Defendants are trying to have it both ways.  They are seeking to preserve the argument that they cannot be ordered to return the mistakenly transmitted funds because, allegedly, they do not control those funds.  But, at the same time, they are seeking to avoid discovery on the basic assertion underlying their position:  whether they do—in fact—control those funds.  That is antithetical to the basic framework of litigation.  If a party seeks to base a claim or defense on the existence of a disputed fact, they must provide discovery on that disputed fact.

Second:  Defendants could resolve this matter by answering "no" to a simple question Citibank has asked repeatedly:  "Do defendants contend that Citibank cannot obtain an enforceable judgment that would require the return of the disputed funds on penalty of contempt, because Citibank has sued fund managers, such as Brigade, and not individual term lenders, such Brigade Credit Fund II Ltd?"  [*See id.*]  Defendants, however, refuse to answer.

---

[1] This started to become clearer on September 4, 2020, when Defendants served a Request for Admission asking Citibank to admit that "Defendants' themselves did not receive any of the funds transferred."  Citibank also flagged the issue in its opposition to Defendants motion to compel certain discovery.  [ECF 64.]

Third:  based on limited information available to Citibank, there is a strong basis to believe that the Defendants do, in fact, control the disputed funds.  For example, various lenders have provided so-called "direction letters" to Citibank, documents which provide fund management instructions regarding the Revlon Loan.  The letter for "Battalion CLO XIV Ltd." (the "Battalion CLO") is written on the letterhead of Defendant Brigade, designates Brigade as its signatory, and provides contact details associated with Brigade's offices.  [Ex. E.]  If Defendants contest control, at a minimum, this provides a basis for further inquiry, and Citibank is entitled to that evidence.

The discovery Citibank seeks is targeted and relevant.  Accordingly, the Court should direct Defendants to produce documents in response to Citibank's Request No. 9.  If, however, the Court concludes that more limited discovery is sufficient, it should order Defendants to produce the following, which was the basis of Citibank's most recent effort at compromise:

1. Produce any contract defining the relationship between You [a defendant] and any Customer that You contend received money from Citibank on August 11, 2020 in connection with a payment made in relation to the Revlon loan.

2. In the event that the relationship between You and a Customer is indirect (through an intermediary), please produce any contracts completing the chain between You and the Customer.

3. Produce any documents prepared by You or Your Customers advising Citibank of the Signature Block to be used on any communications relating to any portion of the Revlon loan.

4. Please produce any indenture applicable to any security holding any position in the Revlon Loan, where payments to and from the account of such security are managed by You.

5. Please provide any notices of default prepared by You, or signed by You, on behalf of any entity purporting to notice a default on the Revlon Loan, including specifically any notice of default provided to UMB.

[Ex. D.]  For the foregoing reasons, Citibank's motion to compel should be granted.

Respectfully submitted,[2]

/s/ John F. Baughman

John F. Baughman
The Law Offices of John F. Baughman
*Counsel for Plaintiff Citibank*

---

[2]    This is a joint letter prepared by Mayer Brown and The Law Offices of John F. Baughman. It sets forth Citibank's position with respect to all defendants.

# Exhibit A



### Citigroup is stepping up its war with the hedge funds that refuse to return Revlon money by ignoring their Bloomberg chats and cutting off pricing information on bonds

Dakin Campbell   Sep 16, 2020, 9:29 AM





Citigroup CEO Michael Corbat   Clodagh Kilcoyne/Reuters

- Citigroup has taken steps to freeze out a group of hedge funds and investment managers from its sales and trading business after the funds refused to return money the bank mistakenly sent to a group of creditors to beleaguered cosmetics company Revlon.

- Managers at Citi's sales and trading unit have instructed staff to remove the funds from distribution lists, stop sending them pricing runs, and in some cases, ignore their Bloomberg chat or phone messages, according to people with knowledge of the matter.

- In other cases, Citigroup has threatened to cut off some of the managers from access to new loans that they need to bundle into collateralized loan obligations, one of the people said.

- Visit Business Insider's homepage for more stories.

**BUSINESS
INSIDER**

Citigroup is playing hard ball.

The bank is locked in a battle with a dozen hedge funds and investment firms who have refused to return the money the bank mistakenly sent on behalf of cosmetics firm Revlon last month.

While much of that fighting is playing out in the courts, the bank is also making sure to press its advantage in the rough and tumble world of trading.

Managers at the bank have instructed sales and trading staff to essentially freeze out the funds from services they rely on to make investment decisions and bundle new bonds, according to three people with knowledge of the policies.

Employees have been told to stop sending pricing information on bonds — known on Wall Street as 'runs' — and remove those clients from any distribution lists they may have been on, according to one of the people. In some cases, salespeople and traders are ignoring Bloomberg chat messages or refusing to return calls from those clients, the person said, describing it as a directive.

Desk research, pricing data, and other market-based color can often translate into the edge funds need in the hand-to-hand combat of distressed debt trading.

In other cases, the bank has threatened to withhold access to new loans that some of the funds need to bundle into new collateralized loan obligations, starving them of the supply they need to sell new debt and collect lucrative fees, according to a second person.

One person familiar with the bank's response said it was less a matter of pressing its advantage, and more about a realization that it didn't share the same attitudes with the funds about what is right and wrong, making it difficult to do business with them going forward.

The bank's credit trading business, which includes the distressed debt trading desk and securitized product groups that many of those funds trade with, is run by Mickey Bhatia and Joe Geraci.

**Read more:** *The real reasons behind Citigroup CEO Mike Corbat's retirement*

Brigade Capital Management, HPS Investment Partners, and Symphony Asset Management LLC are among the largest and well known funds fighting with Citigroup, according to court documents which identify the three as among those who haven't returned the money.

Citigroup says Brigade has $176 million in money that the bank sent to various funds and entities related to the fund. Citigroup declined

Citigroup says Brigade has $176 million in money that the bank sent to various funds and entities related to the fund. Citigroup declined to comment on the sales and trading directives, and fund representatives declined to comment.

Brigade has said that it isn't a lender to Revlon and doesn't have the money. A spokesperson for the fund told The Wall Street Journal earlier this month that the fund "has not sought to limit any other business or trading activity with Citibank as a consequence of this specific disagreement."

## Citi's issues stem from an erroneous $900 million wire

Citigroup's tactics are the latest salvo in a skirmish that broke out after human error led the bank on Aug. 11 to mistakenly send $893 million in principal payments to a group of creditors to Revlon, the beleaguered cosmetics company.

Citigroup acts as the administrative agent for a 2016 Revlon loan. Instead of sending only the interest due, it sent the principal as well, according to the bank's version of events submitted in court. The funds had asked Citigroup to resign its duty, alleging that the bank was helping Revlon with a controversial debt restructuring.

Revlon's creditors sued the cosmetics company, fighting the proposed restructuring because they said the company had wrongly moved assets that should have been the collateral for their loans.

When the bank went to get its money back, counterparties returned only about half of it.

The rest has been kept by some investment firms, including Brigade, HPS, Symphony and at least nine others, according to court documents. They argue that the money is rightfully theirs. Citigroup went to court and got the funds frozen, locking the two sides in a wide-ranging legal battle.

"While many lenders have recognized the payment was in error and returned several hundred million dollars so far, other lenders have either refused to return or have not committed to return the funds," a Citigroup spokeswoman said in a statement. "Those funds have been frozen by court order. We believe the law is on our side and that we will recover the outstanding funds."

Internally, the bank has explained the error as the work of a junior employee, according to one of the people. It also did so in a legal document it filed in support of its case against the funds in U.S. District Court for the Southern District of New York.

"The individual who processed the payment mistakenly did not manually select the correct system options and, unfortunately, the manual checks of that selection also failed to detect the mistake," according to the bank's filing.

Citigroup's sales and trading tactics aren't the first time it's sought to wield its influence. In the days following the Aug. 11 transfer, the bank removed itself as the manager of a $400 million collateralized loan obligation managed by Brigade one day before it was set to price, Bloomberg News reported at the time. The decision left the

hedge fund scrambling to find another bank to take Citigroup's place, according to the newswire.

# Exhibit B

K8LPCITO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
CITIBANK, N.A.,

                    Plaintiff,

              v.                        20 CV 6713 (JMF)
                                        20 CV 6539 (JMF)
                                        Telephone Conference
BARDIN HILL LOAN MANAGEMENT,
LLC, ET AL.,

                    Defendants.
------------------------------x
                                        New York, N.Y.
                                        August 21, 2020
                                        2:03 p.m.

Before:

                    HON. JESSE M. FURMAN,

                                        District Judge

                    APPEARANCES VIA TELEPHONE

THE LAW OFFICES OF JOHN F. BAUGHMAN, PLLC
     Attorneys for Plaintiff (20 CV 6713)
BY:  JONATHAN F. BAUGHMAN

MAYER BROWN LLP (NY)
     Attorneys for Plaintiff (20 CV 6539)
BY:  MATTHEW D. INGBER
     CHRISTOPHER HOUPT

QUINN EMANUEL URQUHART & SULLIVAN (NYC)
     Attorneys for Defendants, Allstate Investment Management
Company; Investcorp Credit Management US LLC; Bardin Hill Loan
Management LLC; Greywolf Loan Management LP; New Generation
Advisors LLC; Tall Tree Investment Management LLC; Medalist
Partners Corporate Finance LLC; ZAIS Group LLC; Brigade Capital
Management, LP; HPS Investment Partners, LLC; Symphony Asset
Management LLC
BY:  BENJAMIN I. FINESTONE

ISAAC LEVENTON,
     In-house counsel for Defendant, HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS LP

K8LPCITO

1          (The Court and all parties appearing telephonically)

2          THE COURT:  Good afternoon.  This is Judge Furman.

3     Let me confirm if the court reporter, Rose, is on the line.

4          THE REPORTER:  Yes, your Honor.  I'm here.  Good

5     afternoon.

6          THE COURT:  Good afternoon.  Thank you for joining us.

7          Let me take appearances.  A few reminders.  The first

8     thing you should say, if you say anything, is your name so the

9     court reporter and I know who is speaking and when.

10          If you're not speaking, please put your phone on mute

11     so there's no background noise distraction, but remember to

12     unmute yourself if or when you want to say something.

13          If there's a chime while you're speaking, please pause

14     so I can find out who has joined or left, where the case may

15     be.

16          Reminder to everyone listening that recording this

17     proceeding is strictly prohibited.  At the same time, it is a

18     public proceeding and my understanding is that we can confirm

19     that folks calling on the public access line can indeed hear;

20     so just a reminder on that score.

21          With that, I will take appearances beginning with

22     Citibank in the new matter 20 CV 6713.

23          MR. BAUGHMAN:  This is Jack Baughman for Citibank.

24          THE COURT:  And am I correct that, Mr. Ingber, you're

25     on the line as well; counsel in the original matter?

K8LPCITO

1          MR. INGBER:  Correct, your Honor.  This is Matthew

2     Ingber from Mayer Brown, and Chris Houpt has joined as well.

3          THE COURT:  All right.  Good afternoon to you.

4          And then my understanding is that Quinn Emanuel is

5     representing, I think it's seven of the nine defendants in the

6     new action; is that correct?  And who is on the line for them?

7          MR. FINESTONE:  Good afternoon, your Honor.  Ben

8     Finestone from Quinn Emanuel.  Your math is correct.  Your

9     Honor's math is correct, on behalf of Allstate, Bardin,

10    Greywolf, Investcorp, New Generation, Tall Tree and ZAIS, your

11    Honor.

12         THE COURT:  All right.  So if I'm not mistaken, that

13    is all but Medalist Partners Corporate Finance LLC and Highland

14    Capital Management Fund Advisors LP; is that correct,

15    Mr. Finestone?

16         MR. FINESTONE:  Your subtraction is as good as your

17    addition, your Honor; that is correct.

18         THE COURT:  Thank you.  Flattery will get you nowhere,

19    but thank you.

20         And my understanding is that we are joined by inside

21    counsel at Highland, Mr. Leventon; is that correct?

22         MR. LEVENTON:  Yes, your Honor.  Isaac Leventon on

23    behalf of Highland Capital Management Fund Advisors LP.

24         THE COURT:  And, Mr. Leventon, are you representing

25    them in connection with this litigation, or are you here to see

K8LPCITO

1    what happens today?  What's your --

2              MR. LEVENTON:  I would have to say I am here to see

3    what happens, your Honor.  For the record, I'm Bar'd in the

4    State of Texas.  I am not Bar'd in the State of New York.  As

5    we were given notice of this hearing about two hours ago, we

6    have not hired local counsel nor have I filed a pro hac.

7              THE COURT:  Okay.  I guess to the extent that you

8    intend to say anything in connection with this hearing, you

9    would need to be admitted pro hac, even if it's just orally.

10   For purposes of today's proceeding, would you like to do that,

11   or do you just intend to listen as an observer?

12             MR. LEVENTON:  Out of an abundance of caution, your

13   Honor, I would like to put in an oral request for admission pro

14   hac vice for the limited purposes of this hearing.

15             THE COURT:  All right.  You are a member in good

16   standing of the Texas Bar, you said?

17             MR. LEVENTON:  Yes, your Honor.

18             THE COURT:  All right.  So I will grant that

19   application with the understanding that if you do intend to

20   continue to represent Highland in this litigation, that you'll

21   have to file a pro hac vice motion in the normal course, and

22   enter a notice of appearance in the normal course.

23             All right.  And anyone know anything about the last

24   defendant, who does not have any counsel here, that is Medalist

25   Partners?

K8LPCITO

```
 1            MR. BAUGHMAN:  Your Honor, Jack Baughman speaking.
 2     Yes.  We have e-mailed with the folks at Medalist and received
 3     confirmation from them that they have received the information
 4     and are aware of the existence of the hearing.
 5            THE COURT:  Okay.  But no information with respect to
 6     whether they have counsel, let alone counsel that intends to
 7     enter a notice of appearance?
 8            MR. BAUGHMAN:  Correct.
 9            THE COURT:  Okay.  Mr. Baughman, any further
10     developments, while we're here, with respect to the
11     unrepresented defendants in the second-filed action, I guess
12     Symphony?
13            MR. BAUGHMAN:  Well, Symphony is represented by Quinn
14     Emanuel.
15            THE COURT:  Sorry.  Is it the other HPS, or are they
16     both --
17            (Indiscernible cross-talk)
18            MR. BAUGHMAN:  I'll let Mr. Finestone.  They're his
19     clients, he can speak.
20            MR. FINESTONE:  We filled that void subsequent to the
21     last time that we were before your Honor, and it may be that we
22     owe the docket notice of appearances, and we will cure that if
23     that's the case.
24            THE COURT:  Okay.
25            MR. FINESTONE:  But Quinn Emanuel does represent
```

K8LPCITO

1    Brigade, HPS and Symphony, your Honor.

2            THE COURT:  I don't think you have entered a notice of

3    appearance on behalf of either defendant; so if you could do

4    that after this conference just to make sure the record is

5    clear, that would be great.

6            MR. FINESTONE:  Will do.

7            THE COURT:  I need to pause for one second; so I'm

8    going to put you on mute and bear with me.  Hang on.

9            (Pause)

10           Sorry about that.  I am back.

11           All right.  So very good.  Hopefully, the

12   representation issues with respect to Medalist and, for that

13   matter, Highland Capital will be resolved soon as well.

14           Mr. Baughman, let me ask you, just since it may have

15   some bearing on other things that we have to do.  Any sense of

16   whether there are six cases coming down the pike?  Any sense of

17   this is the universe, or where do we stand?

18           MR. BAUGHMAN:  We anticipated this question, your

19   Honor.  We certainly hope that this is it.  We have

20   undertaken -- Citi has undertaken great efforts to collect

21   funds that were mistakenly distributed, or bring actions in

22   cases where they are not.

23           The vast majority of lenders have returned the funds,

24   other than the parties that are before you.  And we hope,

25   subject to some legal issues that your Honor may get to at one

K8LPCITO

1     point, that there will not be a need to add additional parties.

2                 THE COURT:  Okay.  When you say "subject to some legal

3     issues," what are you referring to, and when do you think that

4     that is likely to occur?  Is that at trial or --

5                 MR. BAUGHMAN:  It is the issue your Honor flagged last

6     time and put in your order about the relationship between the

7     managers and the funds.  It's our belief that the case is

8     appropriate to proceed with the defendants that are in front of

9     you.  That would be the issue that I'm referring to.

10                THE COURT:  All right.  Presumably, that would mean

11    that if you did have to add defendants, they would be the

12    specific funds in relation to the existing defendants?

13                MR. BAUGHMAN:  Correct, your Honor.

14                THE COURT:  Okay.  All right.  That is helpful.

15                So I guess let's talk about what to do with this

16    newest case.  I don't know if you've had an opportunity to

17    speak with one another, but I would think that we should

18    address the issues that we addressed the last time; namely,

19    whether this case should be consolidated with the others, and

20    whether I should sign and enter the TRO; and if so, have it

21    continue through the date of a trial.

22                And on that score, if the same schedule, with trials

23    consolidated on the merits at least tentatively to occur at the

24    end of September, beginning of October, and whether the same

25    schedule should be adhered to.

K8LPCITO

1          My inclination would be to answer yes to all three of

2     those.  That is to say, deal with this case as I did the other

3     case on Tuesday or Wednesday, I guess it was, but let me check

4     with each of you, starting with Mr. Baughman.

5          MR. BAUGHMAN:  Yes, your Honor.  We agree.  The relief

6     is the same.  We think the cases should be consolidated, the

7     TRO entered, and we'll proceed on the same schedule.

8          THE COURT:  All right.  Mr. Finestone?

9          MR. FINESTONE:  Your Honor, Ben Finestone on behalf of

10    the defendants previously enumerated.

11         As the Court is aware, the first TRO entered by the

12    Court was entered over our objection, and so as a technical

13    matter, we'd like to preserve our objections with respect to

14    likelihood of success, the balance of the equities, public

15    policies, irreparable harm, et cetera.

16         But, of course, your Honor, we acknowledge the Court's

17    prior disposition of the previous TROs, and the largely similar

18    situation of the case brought before the Court today.

19         There is one thing, and so we're not going to re-argue

20    what we argued previously, your Honor.  There is one thing that

21    is different here.  In the last few days, if not more, we, the

22    Quinn Emanuel lawyers -- I'm not speaking on behalf of my

23    client at this point -- but we've been inundated with calls

24    from other lenders that were receiving calls from Citi

25    demanding repayment.

K8LPCITO

1          Mr. Baughman described great efforts from our

2     perspective as it was reported to us, it was with great

3     aggression, but things stand where they are today; 60 percent

4     of the lenders did not -- have not returned the funds.  During

5     that period, your Honor, when these lenders were -- when we

6     were receiving the calls from these lenders, who were

7     withstanding these multiple daily phone calls from Citibank, we

8     tried to help.

9          And we explored with counsel to Citibank whether or

10     not these other lenders could simply provide contractual

11     obligations to comply with the TROs that this Court had already

12     entered with respect to Brigade, HPS and Symphony.  That offer

13     was refused.

14          We also explored whether -- and this was an idea that

15     some of the lenders came up with on their own, not wanting to

16     be unnecessarily named in a lawsuit --

17          MR. BAUGHMAN:  Your Honor, I'm going to object at this

18     point.  Your Honor, could I be heard and object?

19          THE COURT:  Mr. Baughman --

20          MR. BAUGHMAN:  There were two issues.  First of all --

21          THE COURT:  Hold on.  First, you need to identify

22     yourself if you want to say anything.

23          MR. BAUGHMAN:  Yes.  This is Jack Baughman.  I would

24     like to object.

25          THE COURT:  So are you objecting to the fact that he

K8LPCITO

1   is saying any of this, or otherwise --

2           MR. BAUGHMAN:  Yes.

3           THE COURT:  -- you'll certainly have an opportunity to

4   be heard.  All right.

5           MR. BAUGHMAN:  No, I am objecting to the record that

6   he is making for two reasons.  One, he is describing things

7   said by parties not before the Court.  He is saying things that

8   were allegedly said by, quote, lenders who he does not

9   represent.  So that is irrelevant.

10          The second thing is it is inappropriate for him to be

11  discussing communications between counsel that are in the

12  course of attempting to work out a discovery schedule in a

13  resolution to the Court.  Those would be covered by numerous

14  privileges your Honor is familiar with.  So it's inappropriate,

15  the record that he's trying to spread, and I object.

16          THE COURT:  Okay.  Mr. Finestone, do you wish to be

17  heard on that before you continue to make a record?

18          MR. FINESTONE:  Yes, yes.  Thank you, your Honor.

19          He didn't enumerate the privileges that he referenced,

20  but to the extent that he's pointing to Federal Rule of

21  Evidence 408, one, we're not in an inadmissibility posture

22  here; two, these were not settlement discussions.

23          If your Honor is curious about relevance, that would

24  be a fair question.  This goes to his burden to show immediate

25  and irreparable injury, loss or damage, and if I'm allowed to

K8LPCITO

1    continue, I will certainly tie it in for your Honor.

2            THE COURT:  Well, I was under the impression that you

3    were not rearguing that issue.  You were resting on the

4    objections that you had made in connection with the first

5    matter.  Am I wrong about that?

6            MR. FINESTONE:  Your Honor is right that we weren't

7    going to argue that the funds are solvent and that there was no

8    risk of dissipation.  I said there was one thing different with

9    this posture relative to the other posture, and the thing

10   that's different, your Honor -- may I continue?

11           THE COURT:  All right.  Go ahead.  I certainly don't

12   think there's a rule 408 issue, given the present posture.  But

13   given that I would ultimately be the fact finder, assuming this

14   goes to a bench trial or, for that matter, a preliminary

15   injunction hearing, I certainly want to be careful about being

16   told issues relating to settlement discussions.  But, you know,

17   it may or may not be relevant to cases before me.  So with that

18   proviso --

19           MR. FINESTONE:  Your Honor --

20           THE COURT:  -- go ahead.

21           MR. FINESTONE:  -- I'm one hundred percent sensitive

22   to that.  In fact, my comments today have zero to do with the

23   equities or the merits -- sorry, zero to do with the merits.

24   In fact, they have the opposite of anything to do with the

25   merits, which I will clarify.

K8LPCITO

1      These lenders and my lenders to date, your Honor, not

2  only made the offer to comply with the TRO, but they went

3  further, inspired by something that was in the *Banque Worms*

4  case.  They offered to return the cash to Citibank provided

5  that Citi -- return the cash, allow Citibank to be custodian of

6  the cash provided that Citibank would provide what's referred

7  to as an indemnity.  In other words, provided that Citibank

8  would agree to pay the cash back if it were later determined by

9  your Honor that Citibank had no right to return of the cash.

10      And the reason why I say my comments are the opposite

11  of having anything to do with the merits is because by my

12  clients agreeing to return the cash, they're the ones that need

13  to be completely -- that are being sensitive about -- we're not

14  offering to return the cash because we think Citibank has any

15  right to it.  We think *Banque Worms* does apply squarely, and

16  this is just as an irreparable harm issue, this is just custody

17  so people don't have to continue to get -- so these lenders

18  don't continue to get yanked into court on an emergency basis

19  when there's no risk of irreparable harm.

20      And Citibank ignores that prong, your Honor.  They

21  didn't want to negotiate and said no.  They took the following

22  position:  Return the cash or you're going to get sued.  We

23  think it's inappropriate.  The action has been brought, but

24  even standing here today, my clients, the new clients that

25  aren't subject to a TRO yet, are still willing to do what

K8LPCITO

1   they're offering, which is return the cash subject to

2   indemnity.  And it's not an admission or anything to do with

3   the merits, your Honor.  It's the opposite.  It's just

4   possession.

5       THE COURT:  Okay.  So I'm a little confused about why

6   you're telling me this.  Are you making an argument that with

7   respect to the seven defendants in this new action that you're

8   representing, that plaintiff cannot make the showing of

9   irreparable harm on the grounds that you just described?

10      Because I don't know whether those discussions

11  occurred with these seven defendants, or you're referring to

12  others not yet before the Court.  So I'm a little confused what

13  the point is.

14      MR. FINESTONE:  I apologize, your Honor.  Yes.  I'm

15  making an argument that they haven't met their burden with

16  respect to any irreparable harm.  It's just unnecessary to have

17  a TRO entered in this case, given the willingness of these

18  clients to return the cash subject to an indemnity.

19      THE COURT:  Mr. Baughman?

20      MR. BAUGHMAN:  There are numerous problems with what

21  has just been asserted to the Court.  First of all, Mr --

22  counsel just said, quote, my clients and what they offered, and

23  he was referring to an offer apparently made on behalf of his

24  new clients before today.

25      However, yesterday, when I asked him if he represented

K8LPCITO

1    these parties, he told me no.  And it wasn't until

2    approximately 8:30 this morning that he claimed to represent

3    the seven new entities.  So it is false for him to say that

4    when he made this supposed offer, he was making it on behalf of

5    the seven clients.  That's untrue.

6         Secondly, it is also untrue that he actually was

7    authorized to make this offer that he says.  I will read to you

8    the e-mail he sent to me in which he said that --

9         THE COURT:  Why don't you --

10        MR. BAUGHMAN:  -- he said:  I don't have client's

11   authority for this --

12        THE COURT:  Mr. Baughman --

13        MR. BAUGHMAN:  -- and he goes on from there; so --

14        THE COURT:  -- why don't you not do that.  Why don't

15   you not read the e-mail and keep going, please.

16        MR. BAUGHMAN:  Okay.  The point is, when he made this

17   supposed offer, he told me he had no authority to make it, and

18   it was just an idea that he had.  So it was not something to be

19   pursued.

20        In any event, our position, Citi's position has been

21   clear, the clients should return the money.  This is not

22   anything going on here that goes to the issue of the merits.

23   He has said that.  He said it has nothing to do with the

24   merits.  I don't see how it has to do anything with the issue

25   of irreparable harm, your Honor.

K8LPCITO

1      I think the standing -- the issue in the case has been

2      briefed.  It has been argued.  Your Honor has addressed it, and

3      the same ruling should be apply.  The TRO should be entered.

4          THE COURT:  All right.  I am going to sign the TRO in

5      this action as well.  Obviously, that's -- first of all, I'm

6      not sure whether the interactions Mr. Finestone described, you

7      know, they haven't been tethered to particular defendants.  But

8      the bottom line is there is a sum of money here, and there is

9      precedent suggesting that that sum is being sought and there's

10     an equitable claim for it and that can constitute irreparable

11     harm.

12         And I think it makes sense to preserve the status quo.

13     Where those monies are held is less important to me than

14     ensuring that the monies are still there; and at the end of the

15     case, when this is resolved, who is entitled to them, the

16     monies will go to that party.  But in the meantime, they should

17     be maintained, and the status quo should be maintained.

18         With that, let's talk about the schedule, and again,

19     my inclination and assumption is that this should be put on the

20     same schedule with the other cases that you're meeting and

21     conferring with respect to, and with at least tentative plans

22     to have a trial consolidated on the merits at the end of

23     September, beginning of October, subject to the same caveats

24     that we discussed the same day.  Namely, including, for

25     instance, the possibility of defendants requesting a jury

K8LPCITO

1    trial, the possibility that discovery may be broader than we

2    are currently anticipating, and so on.

3            Mr. Baughman has already indicated his agreement on

4    that front.  But, Mr. Finestone, what's your view?

5            MR. FINESTONE:  Thank you, your Honor.  We consent to

6    consolidation.  I forget if that ship already sailed, but if

7    not, I want to get that on the record.  We consent to

8    consolidation.  We consent and intend on continuing to -- the

9    meet-and-confer process that your Honor described will be on

10    behalf of my prior clients and my new clients.  And so, yes, we

11    are putting this on the same track.

12            Just so as not to mislead the Court, I'm not

13    optimistic that the Court will not see competing proposed

14    schedules on Monday and letter submissions.  But yes, we are

15    agreeing to put it on the same track as the previous

16    defendants, your Honor.  I hope that was responsive.

17            THE COURT:  Yes, it was.

18            MR. FINESTONE:  Okay.  Thank you.

19            THE COURT:  I'm not so optimistic as to think that

20    there weren't going to be disagreements, but the threshold

21    question is whether to have the same meet-and-confer process.

22            And, Mr. Leventon, I apologize.  I should have asked

23    if you wished to be heard on any of this before I proceeded,

24    but do you wish to be heard?

25            MR. LEVENTON:  No, Judge.

K8LPCITO

1        THE COURT:  All right.  Very good.

2        So I will sign the TRO.  I think, Mr. Finestone, you

3   may have spoken to this, but do you consent, at least on behalf

4   of the seven that you represent, for the TRO to be extended

5   through the start of the trial, which again is currently

6   scheduled for September 30th?  Mr. Finestone?

7        MR. FINESTONE:  Is that not the request that was made

8   of the Court through -- yes, your Honor.  Yes.

9        THE COURT:  Okay.  I just wanted to make the record

10  clear.

11       MR. FINESTONE:  Yes.

12       THE COURT:  Great.  So I will do that and put it on

13  the same track, schedule of the other case, which requires the

14  parties to submit a proposed schedule on Monday, which

15  contemplates, again, trial on September 30th and October 1st,

16  but mindful that there may be disagreements that would affect

17  our ability to do that.

18       I would also just note, for Mr. Baughman and

19  Mr. Ingber, obviously, if it turns out that there are other

20  cases coming down the pike and your optimistic view on that

21  front turns out to be wrong, it will become increasingly

22  difficult to maintain the expedited schedule that we have put

23  these on, and I assume that you are aware and mindful of that.

24       Two additional things.  First, I think it would be

25  prudent to figure out the representation of the two

K8LPCITO

1    unrepresented defendants in this new action, and I include in

2    that Highland Capital, since Mr. Leventon is here just for

3    today's purposes for the moment.  I would think that it would

4    pay to figure that out sooner rather than later, and perhaps in

5    time for those parties to be represented in connection with the

6    meet-and-confer process and be heard on Monday.  But I'll leave

7    that to you all.

8            And, second, I wonder, in light of the fact that there

9    are now three cases and multiple defendants, if it might make

10   sense to change the caption of the case to something that sort

11   of encompasses all of it, something like:  In re: Citibank Wire

12   Transfers, or something that would adequately identify the

13   transactions, but somehow encompass all of what we're now

14   dealing with.

15           But why don't you guys discuss that, and you can

16   include that in your meet-and-confer.  And if you agree that a

17   caption change is appropriate, you can submit a proposal on

18   that score on Monday.

19           Anything else for us to discuss, Mr. Baughman?

20           MR. BAUGHMAN:  Jack Baughman speaking.  Nothing, your

21   Honor.  Thank you very much.

22           THE COURT:  Mr. Ingber?

23           MR. INGBER:  Nothing here, your Honor.  Thank you.

24           THE COURT:  Mr. Finestone?

25           MR. FINESTONE:  No, your Honor.

K8LPCITO

1            THE COURT:  And, Mr. Leventon?

2            MR. LEVENTON:  Nothing, your Honor.

3            THE COURT:  All right.  In that case, our business is

4    done.  We're adjourned, and I wish everybody a safe and

5    pleasant weekend.  Thank you very much.

6            MR. BAUGHMAN:  Thank you, your Honor.

7            MR. FINESTONE:  Thank you.

8            (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

*In re Citibank August 11, 2020 Wire Transfers*　　　｜　Case No. 1:20-cv-06539  (JMF)

**DEFENDANTS' PRELIMINARY RESPONSES AND OBJECTIONS
TO CITIBANK N.A.'S FIRST SET OF REQUESTS
FOR THE PRODUCTION OF DOCUMENTS**

The parties, having met and conferred on September 2, 2020, determined to exchange Preliminary Responses and Objections on September 3, 2020, before the interim discovery deadline of September 18, 2020, under the operative Scheduling Order, Dkt. 46. The intent of these Preliminary Responses and Objections is to facilitate the ongoing meet-and-confer process between the parties. These Preliminary Responses and Objections are not intended to be final or exhaustive and Defendants (defined below) reserve all rights to supplement and amend them.

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, defendants Brigade Capital Management, LP; HPS Investment Partners, LLC; Symphony Asset Management, LLC; Allstate Investment Management Company; Bardin Hill Loan Management LLC; Greywolf Loan Management, LP; Investcorp Credit Management US LLC; Medalist Partners Corporate Finance LLC; New Generation Advisors LLC; Tall Tree Investment Management LLC; and ZAIS Group LLC (collectively, "Defendants"), by their undersigned counsel, preliminarily respond and object to Citibank N.A.'s ("Citibank") First Set of Requests for the Production of Documents as follows:

## GENERAL OBJECTIONS

1.      Defendants object to the Requests to the extent they seek documents or information protected by the attorney-client privilege, the attorney work product doctrine or any other applicable privilege or protection from disclosure. Defendants object to the Requests to the extent they seek documents created in connection with this Action. The inadvertent disclosure of any information or document that is privileged or otherwise protected from disclosure will not waive such privilege or protection.

2.      Defendants object to the Requests to the extent they purport to impose on Defendants any obligations beyond those set forth in the Federal Rules of Civil Procedure or the local rules of this Court.

3.      Defendants object to the Requests to the extent they seek discovery beyond the limits of or different from that permitted by the Federal Rules of Civil Procedure or the local rules of this Court.

4.      To the extent any definition does not comport with the Federal Rules of Civil Procedure or the local rules of this Court, or the ordinary meaning of the word itself, Defendants will follow the Federal Rules of Civil Procedure or the local rules of this Court, or apply the ordinary meaning of the word. References below to terms defined in the Requests do not mean that Defendants agree with the definitions of those terms.

5.      Defendants object to the Instructions to the extent they purport to require Defendants to do more than produce documents.

6.      Defendants object to the Requests to the extent they are so vague, ambiguous or confusing as not to be susceptible to a reasoned interpretation or response.

7.    Defendants object to the Requests to the extent they fail to identify with reasonable particularity the information sought.

8.    Defendants object to the Requests to the extent they are overly broad, overly expansive, oppressive or unduly burdensome and would thus impose upon Defendants an unreasonable burden of inquiry or unreasonable costs.

9.    Defendants object to the Requests to the extent they contain legal conclusions or characterize certain information, allegations or ideas as undisputed fact.

10.    Defendants object to every Request that is duplicative of other Requests.

11.    Defendants object to the Requests to the extent they seek information that is neither relevant to any claim or defense in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

12.    Defendants' decision to provide any document requested, notwithstanding the objectionable nature of any Request, is not a concession that the produced information is relevant, material or admissible in these or any other proceedings. Defendants reserve all objections regarding the relevance and admissibility of these responses and all forthcoming production(s) by Defendants as evidence in these or any other proceedings.

13.    Defendants object to the Requests to the extent they require the disclosure of trade secrets or confidential or proprietary information or documents.

14.    Defendants object to the Requests to the extent they require Defendants to provide documents that are not in their possession, custody or control.

15.    Defendants object to any form of production of electronically-stored information that imposes obligations beyond those required by the Federal Rules of Civil Procedure or the local rules of this Court.

16.     All responses and forthcoming production(s) of documents are made subject to these objections and are based solely on the information known to Defendants at the time these responses are served. Defendants reserve the right to revise, supplement or clarify any objection, response or production at any time, and to use at trial in this action information or documents later determined to have been responsive to these Requests.

17.     Defendants reserve the right to object to further discovery into the subject matter of the Requests.

18.     Statements below to the effect that records shall be produced does not necessarily mean that such records actually exist.

19.     Each of the foregoing general objections is incorporated into each and every specific response set forth below. Notwithstanding the specific response to any Request, Defendants do not waive any of their general objections. Defendants may repeat a general objection below for emphasis or for some other reason, and the failure to repeat a general objection shall not be construed as a waiver of any general objection to the Requests.

## RESPONSES AND OBJECTIONS TO DEFINITIONS

### DEFINITION NO. 2

References to "Defendants," "you," or "your," shall mean and include, collectively and/or individually, each of Defendants and/or (i) Defendants' affiliates, divisions, units, predecessors-in-interest, successors-in-interest, subsidiaries, parent corporations or entities, and assigns; (ii) Defendants' present and former officers, directors, agents, employees, representatives, accountants, investigators, attorneys, secretaries, and treasurers; (iii) any other person acting or purporting to act on behalf of Defendants; and/or (iv) any other person otherwise subject to

Defendants' control, which controls any of the Defendants, or is under common control with any of the Defendants.

## RESPONSE TO DEFINITION NO. 2

Defendants object to these Definitions on the ground that they are over broad and unduly burdensome. Defendants also object to these Definitions on the ground that they contain and/or require legal conclusions, including as to who "act[s] or purport[s] to act on behalf of Defendants" and who is "subject to Defendants' control, which controls any of the Defendants, or is under common control with any of the Defendants." Defendants also object to these Definitions to the extent they circumvent the parties' Stipulation, Dkt. 52, or the purposes of the parties' Stipulation. Defendants further object to these Definitions to the extent that they seek to impose obligations to collect and produce documents in the possession, custody, or control of non-Defendants.

Defendants will meet and confer with Citibank regarding the scope of the definition of "Defendants," "you," and "your," but until the parties come to a resolution, Defendants will read the term—including in connection with these Responses and Objections—as referring only to named Defendants to this action.

## DEFINITION NO. 11

"Customers" shall refer to any customers, funds, or accounts that you manage that hold portions of the Revlon 2016 Term Loan.

## RESPONSE TO DEFINITION NO. 11

Defendants object to this Definitions to the extent it circumvents the parties' Stipulation, Dkt. 52, or the purposes of the parties' Stipulation. Defendants further object to this Definition to

the extent that it seeks to impose obligations to collect and produce documents in the possession, custody, or control of non-Defendants.

## RESPONSES AND OBJECTIONS TO INSTRUCTIONS

### INSTRUCTION NO. 9

These Requests require you to produce all documents and electronically stored information in your "possession, custody, or control" within the broadest meaning of that phase under the Federal Rules, including documents and ESI in the possession, custody, or control of your agents, brokers, representatives, subsidiaries, or any other person acting or purporting to act on your behalf or under your direction or control. If documents and ESI called for in any Request cannot be produced in full after exercising due diligence to secure them, you should so state and specify why the requested documents or information cannot be produced.

### RESPONSE TO INSTRUCTION NO. 9

Defendants object to this Instruction because, notwithstanding its Instruction to "produce all documents and electronically stored information in your 'possession, custody, or control' within the broadest meaning of that phrase under the Federal Rules," it proceeds to instruct Defendants to produce information from sources substantially broader than required under the Federal Rules. Defendants will not produce documents in the possession, custody, or control of non-Defendants.

6

## RESPONSES AND OBJECTIONS TO REQUESTS

### REQUEST NO. 1

All documents and communications that serve as the basis for any allegation or affirmative defense Defendants intend to assert in this Action, including but not limited to any documents, internal communications, or communications with third-parties related to any notices you sent or contemplated sending under the Governing Agreements in connection with the August Wire Transfers.

### RESPONSE TO REQUEST NO. 1

In addition to their general Objections, Defendants object to this Request on the ground that it is over broad and unduly burdensome. Defendants further object on the grounds that this Request is premature and calls on Defendants to identify and specify those documents to be offered in support of their defenses at trial prior to the time such disclosure is called for pursuant to the case schedule adopted by the Court. Defendants also object on the grounds that the Request is vague, ambiguous, and fails to identify with reasonable particularity the information sought, including because Defendants do not understand what Citibank means by "notices you sent or contemplated sending under the Governing Agreements."

Defendants will not produce documents pursuant to this Request.


### REQUEST NO. 2

All documents and communications from August 4, 2020 to August 17, 2020 concerning the August Wire Transfers, including, but not limited to:

a.  documents and communications with Citibank regarding the August Wire Transfers;

b.  documents and communications with Virtus regarding the August Wire Transfers;

c.  documents  and  communications  with  trustees  or  custodians  or anyone  acting  in  a  similar  capacity  with  respect to funds relating  to the Revlon 2016 Term Loan;

d.  documents  and communications  with Revlon  regarding  the August Wire Transfers;

e.  documents  and  communications  with  your  Customers  regarding  the  August  Wire  Transfers; and

f.  documents  and communications  concerning  any due diligence  performed  by you in  connection  with the August Wire Transfers.

**RESPONSE TO REQUEST NO. 2**

In addition  to their general Objections,  Defendants object on the grounds  that the Request  is vague,  ambiguous,  over broad,  unduly burdensome,  and fails  to identify  with reasonable  particularity  the information  sought.  Specifically,  the word "funds"  in Request No. 2(c) is vague  and ambiguous,  including  because it has been used in different  manners  throughout  Citibank's  Requests.  *Compare, e.g.* Definition  No. 10 (using "funds"  to refer to transferred funds) *with*  Definition  No. 11 (using "funds"  to refer to managed funds).  Defendants further object on the  basis of relevance, including  with respect to Virtus's pertinence to this action.  Defendants further  object,  with respect to Request No. 2(e), that the request calls for the production  of privileged  documents  or communications.

Subject to and without  waiving  any Objections,  Defendants will  produce  non-privileged  documents responsive to Request No. 2 that can be located after a reasonable search.  Defendants  will not produce documents  created in connection  with this Action.

**REQUEST NO. 3**

All documents and communications regarding Citibank's August 12 and 13, 2020 Notices, including communications with any Term Lenders concerning those notices, and in addition, all documents and communications regarding any other request by Citibank for the return of funds transmitted on August 11, 2020.

**RESPONSE TO REQUEST NO. 3**

In addition to their general Objections, Defendants object to this Request to the extent it circumvents the parties' Stipulation, Dkt. 52, or the purposes of the parties' Stipulation. Defendants also object to this Request to the extent it seeks to impose obligations on Defendants to collect and produce documents in the possession, custody, or control of non-Defendants.

Subject to and without waiving any Objections, Defendants will produce non-privileged, responsive documents that can be located after a reasonable search. Defendants will not produce documents created in connection with this Action.

**REQUEST NO. 4**

Without regard to any date limitation, all policies and procedures applicable to Defendants' receipt or distribution of funds received in connection with the Revlon 2016 Term Loan, including any policies or procedures regarding processing performed on funds received or distributed, due diligence performed on funds received or distributed, or recording receipt or distribution of funds.

**RESPONSE TO REQUEST NO. 4**

In addition to their general Objections, Defendants object to this Request on the ground that it is over broad, unduly burdensome, and not time delimited. Defendants also object on the

grounds that the Request is vague, ambiguous, and fails to identify with reasonable particularity the information sought.

Subject to and without waiving any Objections, Defendants will produce non-privileged, responsive documents that can be located after a reasonable search.

## REQUEST NO. 5

All documents concerning your accounting for the August Wire Transfers, including whether you discharged any debt or other obligation as a result of the August Wire Transfers.

## RESPONSE TO REQUEST NO. 5

In addition to their general Objections, Defendants object to this Request on the ground that it is vague, ambiguous, and fails to identify with reasonable particularity the information sought. Defendants also object to this Request on the ground that it is redundant of other Requests, including Request No. 2. Defendants also object to this Request as requiring a legal conclusion as to what constitutes a "discharge" of debt.

Defendants will meet and confer with Citibank regarding the information sought in this Request and its relevance to this Action.

## REQUEST NO. 6

All documents and communications concerning your knowledge, awareness, understanding, discussion, and/or analysis of the Revlon 2016 Term Loan and Revlon's ability to pay the Revlon 2016 Term Loan.

**RESPONSE TO REQUEST NO. 6**

In addition to their general Objections, Defendants object to this Request on the ground that it is over broad and unduly burdensome. Defendants also object to the Request for information regarding "Revlon's ability to pay the Revlon 2016 Term Loan" on the basis of irrelevance.

Subject to and without waiving any Objections, Defendants will produce non-privileged, responsive documents that can be located after a reasonable search.

**REQUEST NO. 7**

All documents and communications concerning your knowledge, awareness, understanding, discussion, and/or analysis of the amount to be paid on the Revlon 2016 Term Loan on August 11, 2020.

**RESPONSE TO REQUEST NO. 7**

In addition to their general Objections, Defendants object on the grounds that the Request is vague, ambiguous, and fails to identify with reasonable particularity the information sought.

Subject to and without waiving any Objections, Defendants will produce non-privileged, responsive documents that can be located after a reasonable search.

**REQUEST NO. 8**

All documents and communications with UMB Bank, National Association, including its agents and legal counsel, concerning the August Wire Transfers, the purported notice of acceleration, or the decision to file a lawsuit by UMB on August 12, 2020.

**RESPONSE TO REQUEST NO. 8**

In addition to their general Objections, Defendants object to this Request as specifically targeting documents or information protected by the attorney-client privilege, the attorney work product doctrine or any other applicable privilege or protection from disclosure. Defendants also object on the basis of irrelevance.

Subject to and without waiving any Objections, Defendants will produce non-privileged, responsive documents that can be located after a reasonable search.

**REQUEST NO. 9**

Without regard to any date limitation, all documents and communications reflecting or defining Your authority to manage, control, or make decisions regarding any funds transferred by Citibank on August 11, 2020, including specifically any funds that You hold, control, or manage on behalf of Your customers and including any direction letters and any custody, customer, management or other agreements relating to such funds.

**RESPONSE TO REQUEST NO. 9**

In addition to their general Objections, Defendants object to this Request on the ground that it is over broad, unduly burdensome, and not time delimited. Defendants also object to this Request as seeking to circumvents the parties' Stipulation, Dkt. 52, or the purposes of the parties' Stipulation. Defendants also object to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

Defendants will not produce documents pursuant to this Request.

**REQUEST NO. 10**

All documents and communications with Your customers or any other entity concerning compliance with the Court's temporary restraining orders entered on August 18, 2020, August 19, 2020, August 21, 2020.

**RESPONSE TO REQUEST NO. 10**

In addition to their general Objections, Defendants object to this Request on the ground that it seeks information that is neither relevant to any claim or defense in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

Defendants will not produce documents pursuant to this Request.

Dated: New York, New York
September 3, 2020

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By: */s/ Robert S. Loigman*

Michael Carlinsky
Robert Loigman
Benjamin Finestone
Adam M. Abensohn
Anil Makhijani
Alexandre Tschumi
Zachary Russell
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
michaelcarlinsky@quinnemanuel.com
robertloigman@quinnemanuel.com
benjaminfinestone@quinnemanuel.com
adamabensohn@quinnemanuel.com
anilmakhijani@quinnemanuel.com
zacharyrussell@quinnemanuel.com
alexandretschumi@quinnemanuel.com

Bennett Murphy
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
bennettmurphy@quinnemanuel.com

*Attorneys for Defendants*

14

## CERTIFICATE OF SERVICE

The undersigned certifies that on September 3, 2020, these Preliminary Responses and Objections to Citibank N.A.'s First Set of Requests for the Production of Documents was served via email, as agreed upon by the parties, to the following counsel of record:

1. Alina Artunian      aartunian@mayerbrown.com
2. Allison Joan Zolot      azolot@mayerbrown.com
3. Anjanique Maria Watt      awatt@mayerbrown.com,
4. Christopher James Houpt      choupt@mayerbrown.com
5. John Frederick Baughman      jbaughman@jfblegal.com
6. Luc W. M. Mitchell      lmitchell@mayerbrown.com
7. Matthew D. Ingber      mingber@mayerbrown.com,
8. Nathaniel Ethan Marmon      nmarmon@jfblegal.com

*/s/ Robert S. Loigman*
Robert S. Loigman

# Exhibit D

| | |
|---|---|
| **From:** | Robert Loigman |
| **To:** | John F Baughman; Adam Abensohn; Anil Makhijani; Zachary Russell |
| **Cc:** | Ingber, Matthew D.; Houpt, Christopher J.; Zolot, Allison; Andrew Reynard; Benjamin Finestone |
| **Subject:** | RE: In re Wire Transfers - Follow up on Defendants" Discovery Positions |
| **Date:** | Thursday, September 17, 2020 11:44:12 AM |

Jack:  As you know, Citibank chose to sue managers rather than the lenders to which Citibank wired the money.  That was Citibank's litigation decision.  Citibank continued along this path even after we made this point clear to the Court in our first submission in response to Citibank's TRO motion.

Following entry of the TROs, Citibank began inquiring whether Defendants "control" the parties that Citibank paid.  From the outset, we've been consistent in our responses, including (a) the Defendants will abide by court orders, as they have done and will continue to do, (b) the Defendants will direct their clients (the actual lenders) to similarly comply with any such orders, and (c) Defendants have no reason to believe that their clients will not follow those directions.  At the same time, we've made clear that Defendants did not receive the money, and cannot and will not underwrite their clients' compliance with orders.  Based on those points, at Citibank's request, the parties entered into a stipulation at the end of August that was so-ordered by the Court.  We believed that resolved the issue with respect to these cases.

To our surprise, Citi did not.  On August 31, just after entering into the stipulation, Citibank served document requests seeking documents regarding Defendants' "control" over the parties to which Citibank sent funds.  We believed that request was inappropriate, and objected as such three days later, on September 3.  We confirmed that position during a meet and confer the next day, and you acknowledged our position in writing on September 5.  On September 6, you wrote, with respect to this issue, "we agree that there is an impasse and no further discussion is required."  We made a motion to the Court the next day (September 7) with respect to our document requests as to which the parties were at impasse.  Citibank chose not to do the same.

Instead, several days later (on September 10), you wrote that you still hoped to reach a "compromise" on the "control" issue notwithstanding the acknowledged impasse.  I responded the next day.  And now, after waiting four more days, you propose a new set of discovery requests that is even broader than what was included in your original requests of August 31.  We can't help but notice that you chose not to raise this issue for days, notwithstanding our prompt responses to your e-mails, only to raise it again immediately after the Court rejected our motion to extend the current schedule—which request Citibank opposed.  It certainly seems that you avoided bringing this discovery issue to the Court's attention—even though the impasse was acknowledged by both parties more than 10 days ago—while the Court was still considering our motion to extend the schedule.

In all events, looking past the timing of your newest demand for even broader discovery, your demand is no more appropriate now than it was on August 31.  Citibank chose to sue the managers, rather than the actual recipients of the funds.  Nonetheless, we have cooperated with Citibank and executed a requested stipulation in furtherance of judicial and party economies.  There is no basis for you to revisit this issue now, and certainly no grounds for you to demand extensive discovery regarding documents and communications between the 11 Defendants and 130 lenders to whom

Citibank wired money.  Surely you recognize that such discovery falls outside the scope of issues that the Court repeatedly has identified as relevant—indeed, Citibank does not even allege Defendants' control over the lenders in any of its serial complaints—and that it could not plausibly be undertaken and completed in the little time that remains for fact discovery.

Regards,
Bob

---

**From:** John F Baughman [mailto:jbaughman@jfblegal.com]
**Sent:** Tuesday, September 15, 2020 12:43 PM
**To:** Robert Loigman <robertloigman@quinnemanuel.com>; Adam Abensohn <adamabensohn@quinnemanuel.com>; Anil Makhijani <anilmakhijani@quinnemanuel.com>; Zachary Russell <zacharyrussell@quinnemanuel.com>
**Cc:** Ingber, Matthew D. <MIngber@mayerbrown.com>; Houpt, Christopher J. <CHoupt@mayerbrown.com>; Zolot, Allison <AZolot@mayerbrown.com>; Andrew Reynard <areynard@jfblegal.com>; Benjamin Finestone <benjaminfinestone@quinnemanuel.com>
**Subject:** RE: In re Wire Transfers - Follow up on Defendants' Discovery Positions

---

<div style="background-color:#fbe7a1">

**[EXTERNAL EMAIL]**

</div>

---

Bob:  thank you for your email.  I note that we do not agree that Defendants' position "remains unchanged."  From our point of view, Defendants' position has shifted several times and in many ways remains unclear.  That is why we are continuing to discuss the topic with you.  As both sides have said repeatedly, there are prudential and business reasons why all parties would like to avoid (if possible) litigating certain "control" issues, but Citibank can only agree to do so if it will not be prejudiced in the litigation.  Accordingly, please let us know whether your clients will provide the following limited discovery, which all falls within our Request No. 9 :

   (1) Produce any contract defining the relationship between You [a defendant] and any Customer that You contend received money from Citibank on August 11, 2020 in connection with a payment made in relation to the Revlon loan.  This request is made without regard to the specific form or name of the relevant agreements but it would include, for example, agreements between You and the Customers entitled "Investment Management Agreement," "Investment Manager Agreement," "Collateral Management Agreement," "Collateral Manager Agreement," "Investment Advisory Agreement," and so forth.

   (2) In the event that the relationship between You and a Customer is indirect (through an intermediary), please produce any contracts completing the chain between You and the Customer.  This would include, for example, any "Sub Management Agreement" or similarly functioning document.

(3)  Produce any documents prepared by You or Your Customers advising Citibank of
the Signature Block to be used on any communications relating to any portion of
the Revlon loan.  These documents may be called things like "Administrative
Details Form," "Administrative Instructions," "Direction Letters," and similar
names.

(4)  Please produce any indenture applicable to any security holding any position in the
Revlon Loan, where payments to and from the account of such security are
managed by You.

(5)  Please provide any notices of default prepared by You, or signed by You, on behalf
of any entity purporting to notice a default on the Revlon Loan, including
specifically any notice of default provided to UMB.

Please let us know the Defendants' position on these points.  We are, of course, willing to
meet and confer on these requests to answer any questions you might have so that discovery
can proceed expeditiously.

Thank you.

Jack


Jack Baughman
1 (347) 241-6347
jbaughman@jfblegal.com
Admitted in New York and Virginia

---

**From:** Robert Loigman <robertloigman@quinnemanuel.com>
**Sent:** Friday, September 11, 2020 10:29 AM
**To:** John F Baughman <jbaughman@jfblegal.com>; Adam Abensohn
<adamabensohn@quinnemanuel.com>; Anil Makhijani <anilmakhijani@quinnemanuel.com>;
Zachary Russell <zacharyrussell@quinnemanuel.com>
**Cc:** Ingber, Matthew D. <MIngber@mayerbrown.com>; Houpt, Christopher J.
<CHoupt@mayerbrown.com>; Zolot, Allison <AZolot@mayerbrown.com>; Andrew Reynard
<areynard@jfblegal.com>; Benjamin Finestone <benjaminfinestone@quinnemanuel.com>
**Subject:** RE: In re Wire Transfers - Follow up on Defendants' Discovery Positions

Jack:  In your e-mail just below, you pose the question, "Do defendants contend that Citibank cannot
obtain an enforceable judgment that would require the return of the disputed funds on penalty of
contempt, because Citibank has sued fund managers, such as Brigade, and not individual term
lenders, such Brigade Credit Fund II Ltd?"

Our answer remains unchanged:  If Citibank gets a judgment against the Defendants, we believe that the lenders will act in accordance with the substance of any such judgment and/or directions from the Defendants to comply with any such judgment.  Because the Defendants were not themselves lenders who received the payments, a judgment should not impose liability on the Defendants in the event any funds are not returned.  This is already spelled out in the stipulation executed by both parties and so-ordered by the Court.

Regards,
Bob

**From:** John F Baughman [mailto:jbaughman@jfblegal.com]
**Sent:** Thursday, September 10, 2020 3:54 PM
**To:** Adam Abensohn <adamabensohn@quinnemanuel.com>; Robert Loigman <robertloigman@quinnemanuel.com>; Anil Makhijani <anilmakhijani@quinnemanuel.com>; Zachary Russell <zacharyrussell@quinnemanuel.com>
**Cc:** Ingber, Matthew D. <MIngber@mayerbrown.com>; Houpt, Christopher J. <CHoupt@mayerbrown.com>; Zolot, Allison <AZolot@mayerbrown.com>; Andrew Reynard <areynard@jfblegal.com>
**Subject:** RE: In re Wire Transfers - Follow up on Defendants' Discovery Positions

[EXTERNAL EMAIL]

Adam:  Citibank is still hoping to reach a compromise with your clients on the issue of "control" discovery.  With that in mind could you please get back to me on the following:  Will defendants answer the questions posed in my September 5 email (which you did not answer in your previous response)?  A clear yes or no answer will inform this discussion a lot.

Here are the questions again:  do defendants contend that Citibank cannot obtain an enforceable judgment that would require the return of the disputed funds on penalty of contempt, because Citibank has sued fund managers, such as Brigade, and not individual term lenders, such Brigade Credit Fund II Ltd?  Put another way, will Defendants contend at trial that Citibank's case should be dismissed because, according to you, Citibank has sued the wrong parties (the fund managers and not the individual term lenders)?

Please let us know your clients' position.

Thank you.

Jack

Jack Baughman
1 (347) 241-6347
jbaughman@jfblegal.com
Admitted in New York and Virginia

---

**From:** Adam Abensohn <adamabensohn@quinnemanuel.com>
**Sent:** Sunday, September 6, 2020 7:20 AM
**To:** John F Baughman <jbaughman@jfblegal.com>; Robert Loigman
<robertloigman@quinnemanuel.com>; Anil Makhijani <anilmakhijani@quinnemanuel.com>; Zachary
Russell <zacharyrussell@quinnemanuel.com>
**Cc:** Ingber, Matthew D. <MIngber@mayerbrown.com>; Houpt, Christopher J.
<CHoupt@mayerbrown.com>; Zolot, Allison <AZolot@mayerbrown.com>; Andrew Reynard
<areynard@jfblegal.com>
**Subject:** RE: In re Wire Transfers - Follow up on Defendants' Discovery Positions

Jack,

You are mistaken.  We did get back to you, by email from Zachary Russel at 6:01 pm Friday, which,
among other things, clarified Defendants' position on the first issue you raise below.  It appears from
your discussion of "item three" that you're referring instead to Citibank's Request No. 5, which seeks
documents concerning the "discharge" of any debt as a result of the wire transfers.  And, as to that
request, we do not believe the parties are at impasse.  As Zachary indicated in his Friday email,
Defendants will produce documents in response to that request based on our understanding, from
our most recent meet and confer call, that Citibank is requesting that Defendants produce all
internal documents/communications concerning whether Revlon's loan obligations were satisfied
through the August 11 Transfers.  If that does not resolve the issue, please let us know.

With respect to your item nine, we agree that the parties are at an impasse.  We also reject your
characterization of the stipulation and its purpose.  Citibank represented to the Court in its letter of
August 24, in order to justify its request for an abbreviated discovery schedule, that Citibank would
seek discovery on only two issues:  "(1) whether the August 11 Transfers were a mistake, and (2) the
viability of the Defendants' discharge–for-value affirmative defense."  It was Defendants'
expectation that Citibank would honor that representation, and that the stipulation, entered a short
time later, would be the end of the matter.  But Citibank is instead adding a third complex subject
matter to its discovery demands – namely, the relationship between Defendants and more than a
hundred funds that received the August 11 Transfer payments.  We view that as unreasonable and
improper.  Furthermore, your suggestion that Defendants have somehow "refused to address"
whether Citibank can obtain an enforceable judgment is exactly backwards.   Citibank has decided
who to sue, not Defendants, and it is not Defendants' obligation to demonstrate for Citibank that it
selected the right parties.

We are available to meet and confer regarding search terms tomorrow at 2 pm.  As we previously
requested, please provide hit data in advance of that call so that our discussion can be as productive
as possible.

Regards,
Adam

---

**From:** John F Baughman [mailto:jbaughman@jfblegal.com]
**Sent:** Saturday, September 5, 2020 8:57 PM
**To:** Robert Loigman <robertloigman@quinnemanuel.com>; Anil Makhijani
<anilmakhijani@quinnemanuel.com>; Zachary Russell <zacharyrussell@quinnemanuel.com>; Adam
Abensohn <adamabensohn@quinnemanuel.com>
**Cc:** Ingber, Matthew D. <MIngber@mayerbrown.com>; Houpt, Christopher J.
<CHoupt@mayerbrown.com>; Zolot, Allison <AZolot@mayerbrown.com>; Andrew Reynard
<areynard@jfblegal.com>
**Subject:** In re Wire Transfers - Follow up on Defendants' Discovery Positions

---

**[EXTERNAL EMAIL]**

---

Dear Counsel:

We are following up on the parties' discussion at the meet and confer yesterday. Although we asked
you to clarify your position in several matters, you have not gotten back to us. We believe that we
are an impasse on the following items in Citibank's First Set of Requests for the Production of
Documents.

Item Three: At our meet and confer you stated that you were confused by the meaning of the term
"discharge." We believe this objection is not well founded. You have asserted a "discharge for
value" defense. If you are able to conceive that defense, it would seem to us, you are able to
identify documents on the topic. We are asking for any documents concerning or reflecting any
effort by any Defendant to discharge a debt (in a way that would support your defense) as a result of
the August Wire Transfers. We believe that you are standing by your refusal to produce any
documents on this topic. If we are wrong, please advise immediately and be specific as to what you
are willing to produce.

Item Nine: At our meet and confer you said that you would refuse to produce any documents in
response to this subject and appeared to take the position that Citibank is somehow estopped from
seeking materials covered by this request, due to the parties' agreement on the stipulation entered
at Docket No. 52. We reject that position. The discussions concerning the stipulation were not tied
to any agreement to limit discovery and no such agreement is contained in the stipulation. Had you
wanted to limit discovery in this way you could have negotiated it into the stipulation. Moreover,
the discovery requested is very relevant. On behalf of your clients, you have steadfastly refused to
address a central topic: do you contend that Citibank cannot obtain an enforceable judgment that
would require the return of the disputed funds on penalty of contempt, because Citibank has sued
fund managers, such as Brigade, and not individual term lenders, such Brigade Credit Fund II Ltd?
Put another way, will Defendants contend at trial that Citibank's case should be dismissed because,
according to you, Citibank has sued the wrong parties (the fund managers and not the individual

term lenders)?  These are simple questions that can be answered yes or no.  If you are willing to answer, "no" then we will consider whether or not discovery on "control" issues, as reflected in Citibank's Request No. 9 is warranted.  Absent such agreement, however, we will conclude that we are at an impasse and proceed accordingly.  In this regard, we note with concern the Requests for Admission Defendants served last night, which we believe ask questions antithetical to any argument that discovery on control issues is not required.

If you believe that further discussion on these topics is useful, we are available at 7pm on Sunday or 2pm on Monday.

Citibank is further considering its position with respect to other areas of dispute.  We reserve all rights.

Best regards,


Jack Baughman
(347) 241-6347
jbaughman@jfblegal.com
www.jfblegal.com
Admitted in New York and Virginia

# Exhibit E



# Battalion CLO XIV Ltd.

| Wire Instructions | Registered Address |
|---|---|
| **USD** | Queensgate House |
| Bank: U.S. Bank N.A. | South  Church Street |
| ABA#: ███████ | Georgetown, Grand Cayman, KY1-1102 |
| GLA: ████████████ | |
| Account Name: CDO/Battalion CLO XIV, Ltd. | **Signature Block** |
| FFCT Acct#: ██████ | **Battalion CLO XIV Ltd.** |
| | By: BRIGADE CAPITAL MANAGEMENT, LP |
| Reference:   (Borrower's Name)Battalion CLO XIV Ltd. | as Collateral Manager |
| | |
| | _____ |
| | Name: |
| | Title: |

| Notice Contact |
|---|
| E-mail:      18177684959@tls.ldsprod.com |

| Trustee Contact |
|---|
| Battalion CLO XIV Ltd. |

| Entity Identifiers |
|---|
| MEI #: ██████████ |

| | |
|---|---|
| U.S. Bank N.A. | |
| 190 S. LaSalle Street, 8th Floor | |

| Settlement / Documentation Contact |
|---|
| Battalion CLO XIV Ltd. |
| 399 Park Avenue, 16th Floor |
| New York, NY 10022 |

Chicago, IL 60603

Phone: (312) 332-7339

| | |
|---|---|
| Attn:        Jim Keogh | |
| Phone:       (212) 745-9420 | |
| | |
| E-mail:      Bankdebt@brigadecapital.com | |

| |
|---|
| *Please grant deal site acces to:* |
| *Amendments@brigadecapital.com* |

| |
|---|
| *For Private information please contact:* |
| *Bankdebt@brigadecapital.com* |

| Callback Line |
|---|
| Phone: 212-745-9459 |