**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7229**

WRITER'S EMAIL ADDRESS
**adamabensohn@quinnemanuel.com**

October 13, 2020

**VIA ECF**

Hon. Jesse M. Furman
United States District Court for the
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

Re: *In re Citibank August 11, 2020 Wire Transfers*, No. 20 Civ. 06539 (JMF) (S.D.N.Y.)

Dear Judge Furman:

    Defendants write pursuant to the Scheduling Order, Dkt. 46, to compel Citibank to provide testimony and documents, covering the six day period from August 11 to August 17, 2020, concerning the communications between Citibank and those investment managers and/or lenders who returned funds disbursed in the August 11 Transfers. The parties have met and conferred and are at an impasse on this issue. As set forth below, the discovery Defendants are seeking is highly relevant, and directly responsive to arguments Citibank is relying on in support of its claims.

    Citibank has repeatedly claimed that the fact that certain lenders returned funds is evidence that those lenders concluded (and that Defendants should have concluded) that the August 11 Transfers were mistaken. In its Complaint, Citibank called this its "best evidence." *See* Complaint, Case No. 1:20-cv-06617 (Dkt. 1), at 3. In its written discovery responses, Citibank insisted that the return of funds by certain lenders supports a "reasonable [] infer[ence]" that those lenders "recognized [that the money] rightfully belonged to Citibank," Ex. 1 (Citibank's Resp. to Interrogatory No. 19), and Citibank made similar arguments in multiple Court conferences.[1] Moreover, just four days ago, Citibank's counsel elicited testimony in deposition on this very topic from its Rule 30(b)(6) witness. Notwithstanding its heavy and repeated reliance on the supposed inferences that can be drawn from the decision by certain

---

[1] *See, e.g.*, Aug. 18, 2020 H'rg Tr. 7:24-8:6; Aug. 19, 2020 H'rg Tr. 22:24-23:14; Aug. 21, 2020 Hr'g Tr. 6:23-24; Aug. 29, 2020 Hr'g Tr. 5:2-9.

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE | BOSTON | SALT LAKE CITY
LONDON | TOKYO | MANNHEIM | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH | SHANGHAI | PERTH | STUTTGART

lenders to return a portion of the August 11 Transfers, Citibank has carefully avoided producing any discovery whatsoever that would permit Defendants to test those inferences. There are at least two reasons that such discovery would be highly relevant.[2]

*First*, discovery into Citibank's communications with those lenders and managers that returned a portion of the August 11 Transfers will reveal whether the lenders and managers initiated outreach to Citibank to report the receipt of a "mistaken" transfer – as one would expect if they had concluded, upon receipt of the funds, that a mistake had occurred – or instead whether they were contacted first by Citibank, with its demand for repayment. This sequencing of events is directly relevant to a key point of dispute in this case – namely, whether lenders (and therefore Defendants) were on notice of a "mistake" immediately upon receipt of the funds, as Citibank maintains, or whether lenders would have reasonably concluded, until Citibank later sent an error notice, that the transfers were *bona fide* payments on outstanding debt, as Defendants maintain. *Compare* Letter from R. Loigman to J. Furman, dated Aug. 18, 2020 (Dkt. 22) ("Moreover, even if it were relevant, the transfers did not appear to be in error when they were received: (i) they were in the precise amounts of principal and interest outstanding under the 2016 Credit Agreement; (ii) they would have required many levels of authorization from accountholder and bank; (iii) they were paid to *all* lenders and funds, not an outlier lender or fund in error; and (iv) they were paid by Citibank, Revlon's long-time banking agent that, to date, holds itself out as administrative agent under the 2016 Credit Agreement"), *with* Complaint, Case No. 1:20-cv-06617 (Dkt. 1), at 2 ("Brigade has refused to return Citibank's money despite crystal-clear evidence that the payments were made in error.").

*Second*, discovery into communications between Citibank and those lenders and managers who returned funds may reveal whether their decision to do so means that they concluded that they were not entitled to retain the funds, as Citibank asks the Court to accept, or that they acted for different reasons. Specifically, based on Defendants' own interactions with Citibank in the days following the August 11 Transfers, Defendants have a strong basis to suspect that Citibank applied pressure on those lenders that returned funds, including by threatening to discontinue important financial services and/or relationships. Evidence that Citibank used its position as a massive financial institution to strong arm lenders into returning funds will enable Defendants to refute Citibank's preferred narrative, which it has presented multiple times to the Court already, that those lenders did so "without significant … complaint."[3]

---

[2] In its Order on August 23, 2020 (Dkt. 46), the Court gave its preliminary "inclin[ation] [that] Citibank's *post*-transfer recovery efforts an unlikely to be relevant to the issues in dispute (except insofar as they include communications that are relevant to whether the wire transfers were a mistake)." As explained in text, Citibank has relied on the return of funds as purported evidence of "mistake," making the surrounding communications relevant to that very question. Those communications will reveal whether, as Citibank maintains, the decision by certain lenders to return funds is evidence that it was immediately apparent that Citibank made the August 11 Transfers by mistake, or whether those lenders did not initially reach that conclusion and/or acted only because Citibank pressured them to do so.

[3] *See* Complaint, Case No. 1:20-cv-06617 (Dkt. 1), at 3 ("Some of the best evidence is that not every lender who received an erroneous payment pocketed the money. Consistent with industry norms, numerous non-party lenders that received funds by mistake returned them in good faith and without significant comment or complaint").

In all events, Citibank's factual explanation as to what led certain investors to return funds should not be accepted simply based on Citibank's say so, but rather should be subjected to factual inquiry.

Defendants have sought discovery into this critical issue, and been rebuffed repeatedly. In their Requests for Documents, served on August 31, 2020, Defendants sought "Communications between Citibank and any current or former lenders under the 2016 Credit Agreement regarding the return of funds transferred by Citibank pursuant to the Citibank Wire Transfers." Citibank refused to produce responsive documents, claiming such discovery was irrelevant and unduly broad. Ex. 2 (Citibank's Resp. & Obj. to Defs.' Req. for Documents), at No. 10. Defendants then requested, in its Rule 30(b)(6) deposition notice, that Citibank produce a witness to testify on "[c]ommunications with lenders who returned funds transmitted in the August 11, 2020 wire transfers." Citibank refused, claiming it would be unduly burdensome to prepare a witness to testify concerning its communications with dozens of lenders, and offered only to provide testimony into the number of lenders who returned funds and the amounts they returned, *see* Ex. 3 (Oct. 6, 2020 email from A. Zolot), thus avoiding discovery into the reasons those lenders acted as they did. Defendants then proposed multiple compromises to ensure against undue burden, including, most recently, asking for testimony only into Citibank's communications with the managers associated with those lenders who returned funds (rather than the much larger universe of all relevant lenders), and limiting the scope of its document demand to Citibank's communications over a mere six day period, from August 11 to August 17, 2020, with the lenders and/or managers who returned funds. *See* Ex. 4 (Oct. 6, 2020 email from A. Abensohn). Citibank refused to provide this limited testimony and document discovery as well. *See* Ex. 3 (Oct. 6, 2020 e-mail from A. Zolot).

Citibank has maintained that Defendants knew or should have known, upon receipt of the August 11 Transfers, despite being paid the exact amount owed to them, that Citibank had made an historically unprecedented mistake.[4] Defendants' most recent discovery proposal sets reasonable parameters aimed at securing documents and testimony pertinent to that issue, and directly relevant to refuting Citibank's repeated claims to this Court that the decision by certain lenders to return their portion of the August 11 Transfers is "best evidence" that those lenders (and lenders generally) were on notice the transfers were made in error. Defendants respectfully request that Citibank be directed to produce the requested documents and testimony.

Respectfully submitted,

*/s/ Adam M. Abensohn*
Adam M. Abensohn

cc: Counsel of Record (via ECF)

---

[4] As Defendants have argued before, constructive knowledge is not the relevant legal standard, as only actual notice of error at the time of a payment is pertinent. *See, e.g.*, Letter from R. Loigman to J. Furman, dated Sept. 16, 2020 (Dkt. 69).