**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re:* | Case No. 1:20-cv-06539 (JMF) |
| *Citibank August 11, 2020 Wire Transfers* | |

**DEFENDANTS' PROPOSED FINDINGS OF**
**FACT AND CONCLUSIONS OF LAW**

Michael Carlinsky
Robert Loigman
Benjamin Finestone
Adam M. Abensohn
Anil Makhijani
Sophia Qasir
Alexandre Tschumi
Zachary Russell
Mario Gazzola

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Defendants*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

FINDINGS OF FACT..................................................................................................4

I.      INTRODUCTION ...........................................................................................4

II.     THE PARTIES............................................................................................5

III.    THE 2016 TERM LENDERS.........................................................................6

IV.     THE 2016 TERM LOANS AND CREDIT AGREEMENT ..............................8

        A.      Governing Law ........................................................................9

        B.      Maturity Date ..........................................................................9

        C.      Interest Payment Date ...........................................................10

        D.      Term Loan Repurchases .........................................................11

        E.      Optional Prepayments ...........................................................12

        F.      Citibank as Administrative Agent ..........................................13

        G.      Register ...................................................................................14

V.      REVLON'S ACTIONS LEADING UP TO THE AUGUST 11, 2020 WIRE
        TRANSFERS...............................................................................................15

        A.      May 2020 Transactions...........................................................15

        B.      Payoffs of Debt at Par ............................................................15

        C.      Repurchase of 2016 Term Loans ...........................................16

                1.      June 2020 Repurchases .................................................16

                2.      August 2020 Repurchases .............................................18

VI.     THE AUGUST 11, 2020 WIRE TRANSFERS...............................................20

VII.    DOCUMENTATION RECEIVED IN CONNECTION WITH THE AUGUST 11,
        2020 WIRE TRANSFERS...........................................................................24

VIII.   DEFENDANTS THOUGHT THE PAYMENTS WERE INTENTIONAL
        PAYDOWNS OF REVLON 2016 TERM LOANS .......................................28

        A.      Brigade ....................................................................................29

        B.      HPS ..........................................................................................30

        C.      Symphony ................................................................................30

        D.      Bardin Hill ..............................................................................31

        E.      Allstate ....................................................................................32

        F.      Greywolf, ZAIS, Tall Tree, New Gen, and Medalist............................32

i

IX.     FAILURE TO RECEIVE PAYDOWN NOTICE DID NOT INDICATE ERROR..........32

X.      CITIBANK'S IDENTIFICATION OF A PURPORTED ERROR ...................35

XI.     HISTORIC NATURE OF ERROR ......................................................36

XII.    THE UMB ACTION.........................................................................38

XIII.   CITIBANK'S COMMUNICATION OF ERROR AND RECALL OF FUNDS ............39

XIV.    DEFENDANTS DID NOT BELIEVE THAT THE PAYMENT HAD BEEN
        MADE IN ERROR ..........................................................................41

XV.     THIS LAWSUIT..............................................................................46

CONCLUSIONS OF LAW .............................................................................49

I.      DEFENDANTS ARE ENTITLED TO RETAIN THE AUGUST 11
        TRANSFERS, BECAUSE THEY CONSTITUTE A "DISCHARGE FOR
        VALUE" OF THE TERM LOANS ...................................................49

        A.      Defendants Meet The Requirements For A Discharge For Value Under
                New York Law.....................................................................49

        B.      The Answers To Each Question Posed By The Court Demonstrates That
                Citibank Cannot Avoid Application Of The Discharge For Value Defense. ........52

                1.      The Discharge For Value Defense Applies Upon Receipt of Funds .........52

                        (a)     This Action is Governed By The Court Of Appeals
                                Decision in Banque Worms, Which Applies The Discharge
                                For Value Defense Upon Receipt Of Funds, And Not By
                                The Sixth Circuit Decision in Calumet...........................53

                        (b)     Defendants Would Prevail Even Under Citibank's Incorrect
                                Reliance on Calumet ....................................................60

                                (i)     Citibank Credited The August 11 Transfer As A
                                        Full Paydown Of The Term Loans ...................61

                                (ii)    The August 11 Transfer Was Also Credited By
                                        Certain Defendants and Custodians. ................65

                2.      Defendants Were Not On Actual or Constructive Notice Of A
                        Mistake At The Time Of The August 11 Transfers .....................66

                        (a)     Defendants Prevail Under the Actual Notice Standard That
                                Applies To The Discharge For Value Defense Under New
                                York Law ....................................................................66

                        (b)     Defendants Would Prevail Even Under A Constructive
                                Notice Standard..........................................................71

                3.      The UMB Action Was Filed In Good Faith...............................76

II.     CITIBANK CANNOT PROVE ANY OF ITS CLAIMS.................................78

        A.      Citibank Cannot Prove Conversion .....................................79

    B.       Citibank Cannot Prove Unjust Enrichment ............................................................ 81

    C.       Citibank Cannot Prove Its Claim Of Money Had and Received ........................... 83

    D.       Citibank Cannot Prove Its Claim Of Payment by Mistake ................................... 84

III.      CITIBANK CANNOT OBTAIN RELIEF FROM DEFENDANTS .............................. 85

    A.       The Relationship Between Defendants And The Term Lenders ........................... 85

    B.       Citibank Cannot Obtain Relief From Defendants ................................................. 87

IV.      CITIBANK IS ASSERTING COMMON LAW CLAIMS THAT ARE
        PRECLUDED BY THE NEW YORK UNIFORM COMMERCIAL CODE .................. 91

APPENDIX A ....................................................................................................................... 93

    Brigade Clients ............................................................................................................ 93

    Allstate Clients ............................................................................................................ 95

    Zais Clients ................................................................................................................. 95

    Greywolf Clients ......................................................................................................... 95

    Medalist Clients .......................................................................................................... 96

    Tall Tree Clients ......................................................................................................... 96

    New Generation Clients .............................................................................................. 96

    HPS Clients ................................................................................................................. 96

    Symphony Clients ....................................................................................................... 98

    Bardin Hill Clients .................................................................................................... 100

APPENDIX B ..................................................................................................................... 101

# TABLE OF AUTHORITIES

**Page**

**Cases**

*A.I. Trade Fin., Inc. v. Altos Hornos de Vizcaya, S.A.*,
840 F. Supp. 271 (S.D.N.Y. 1993) ........................................................................ 70

*Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*,
731 F.2d 112 (2d Cir. 1984) ................................................................................ 83

*In re Allou Distribs., Inc.*,
446 B.R. 32 (S.D.N.Y. Bankr. 2011) ................................................................ 83, 84

*Arlington Park Racetrack Ltd. v. SRM Computers, Inc.*,
674 F. Supp. 986 (E.D.N.Y 1987) .................................................................... 55, 67

*Fidelity Bank, Nat. Ass'n v. Avrutick*
740 F. Supp. 222 (S.D.N.Y. 1990) ...................................................................... 70

*Bank of N.Y. v. Nickel*,
14 A.D.3d 140 (N.Y. App. Div. 1st Dep't 2004) .................................................. 80

*Banque Worms v. Bank America Int'l*,
726 F. Supp. 940 (S.D.N.Y. 1989) ................................................................. *passim*

*Banque Worms v. BankAmerica Int'l*,
77 N.Y.2d 362 (1991) ...................................................................................... *passim*

*Banque Worms v. BankAmerica Int'l*,
928 F.2d 538 (2d Cir. 1991) ........................................................................... *passim*

*U.S. v. BCCI Holdings*,
(Luxembourg), S.A., 980 F. Supp.21, 27 ............................................................ 80

*Bowman Import/export Ltd. v. F.J. Elsner N. Am. Ltd*,
No. 603756/03, 2004 WL 2853024 (N.Y. Sup. Ct. Oct. 13, 2004) ........................ 67

*Brand v. Brand*,
811 F.2d 74 (2d Cir. 1987) ................................................................................ 78

*Cachet Fin. Servs. v. MyPayrollHR*,
1:19-CV-1181 (FJS/CFH), 2020 WL 5232275 (N.D.N.Y. Sept. 2, 2020) ......... 79, 81

*Calisch Assocs., Inc. v. Mfrs. Hanover Trust Co.*,
151 A.D.2d 446 (N.Y. App. Div. 1st Dep't 1989) ................................................ 83

*In re Calumet Farm, Inc.*,
398 F.3d 555 (6th Cir. 2005) ..................................................... 53, 55, 56, 57, 60, 65

*Carlisle v. Norris*,
215 N.Y. 400 (1915) ........................................................................................ 53

*Case v. Anderson,*
No. 16 CIV. 983(NSR), 2017 WL 3701863 (S.D.N.Y. Aug. 25, 2017)...................................71

*City of Almaty v. Ablyazov,*
278 F. Supp.3d 776 (S.D.N.Y. 2017)...................................................................................90

*Colavito v. N.Y. Organ Donor Network, Inc.,*
8 N.Y.3d 43 (2006) ...........................................................................................................79

*Colli v. Wirth,*
1996 WL 243237 (S.D.N.Y. 1996)..............................................................................50, 83

*Consol. Edison Co. of N.Y., Inc. v. U.S.,*
221 F.3d 364 (2d Cir. 2000)..............................................................................................71

*Cumis Ins. Soc'y Inc. v. Citibank, N.A.,*
921 F. Supp. 1100 (S.D.N.Y. 1996)........................................................................79, 81, 92

*Dabrowski v. Abax Inc.,*
64 A.D.3d 426 (N.Y. App. Div. 1st Dep't 2009)....................................................90, 91

*Delbrueck & Co. v. Mfrs. Hanover Trust Co.,*
609 F.2d 1047 (2d Cir.1979)........................................................................................53, 54

*Dillenbeck v. Dygert,*
52 Sickels 303 (N.Y. 1884)................................................................................................55

*Doctor's Assocs., Inc. v. Reinert & Duree, P.C.,*
191 F.3d 297 (2d Cir. 1999) ...............................................................................................90

*E. Hampton Union Free Sch. Dist.,*
66 A.D.3d 122 (N.Y. App. Div. 2d Dep't 2009) ...............................................................90

*Empire City Capital Corp. v. Citibank, N.A.,*
No. 10–CV–2601 (KMK), 2011 WL 4484453 (S.D.N.Y. Sept. 28, 2011) ...........................90

*Fara, Inc. v. Gouvis,*
245 A.D.2d 483 (N.Y. App. Div. 1st Dep't 1997)................................................................55

*First Int'l Bank of Israel, Ltd. v. L. Blankstein & Son, Inc.,*
59 N.Y.2d 436 (1983) .........................................................................................................70

*First Union Nat'l Bank v. A.G. Edwards & Sons, Inc.,*
262 A.D.2d 106 (N.Y. App. Div. 1st Dep't 1999)................................................................68

*Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A.,*
No. 01 Civ. 1047(AJP). 2002 WL 31174470 (S.D.N.Y. Sept. 26, 2002)........................79, 81

*Galtieri v. Kramer,*
232 A.D.2d 369 (N.Y. App. Div. 2d Dep't 1996) ...............................................................80

*Gen. Elec. Capital Corp. v. Cent. Bank,*
49 F.3d 280 (7th Cir. 1994) .....................................................................................55, 58, 65

*Giraffe G4 Sys., LLC v. Measurement, Ltd.,*
No. 17 CV 5334, 2018 WL 1801962 (S.D.N.Y. Apr. 13, 2018) ....................................90, 91

v

*Goldberg v. Gray*,
   No. 5:15-CV-0538, 2016 WL 4099189 (N.D.N.Y Aug. 2, 2016) ......................................... 82

*Grain Traders, Inc. v. Citibank, N.A.*,
   960 F. Supp. 784 (S.D.N.Y. 1997) ................................................................................ 80, 83

*Grain Traders, Inc. v. Citibank, N.A.*,
   160 F.3d 97 (2d Cir. 1998)........................................................................................... 92, 93

*Hartford Accident & Indemnity Company v. American Express Company*,
   74 N.Y.2d 153 (1989) ........................................................................................................ 68

*Hatch v. Fourth Nat'l Bank*,
   147 N.Y. 184 (1895) .......................................................................................................... 58

*Isaacson & Weingrad v. Newport Iron Works*,
   229 A.D. 243 (N. Y. App. Div. 2d Dep't 1930) ................................................................. 69

*Jackson v. Am. Cigar Box. Co.*,
   141 A.D. 195 (N.Y. App. Div. 1st Dep't 1910)................................................................. 55

*Jacobs v. Morrison*,
   91 Sickels 101 (N.Y. 1892).............................................................................................. 69

*J-T Assocs. V. Hudson River--Black River Regulating Dist.*,
   175 A.D.2d 438 (N.Y. App. Div. 3d Dep't 1991) ............................................................. 89

*Kaye v. Grossman*,
   202 F.3d 611 (2d Cir. 2000)............................................................................................... 81

*King v. Holland Trust Co.*,
   8 A.D. 112 (N.Y. App. Div. 3d Dep't 1896) ..................................................................... 69

*Legurnic v. Ciccone*,
   63 F. Supp.3d 241 (E.D.N.Y. 2014) ................................................................................. 81

*Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   597 F.3d 84 (2d Cir. 2010)................................................................................................. 93

*Marini v. Adamo*,
   12 F. Supp.3d 549 (E.D.N.Y. 2014) ................................................................ 79, 81, 82, 83

*MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*,
   471 F.3d 377 (2d Cir. 2006)............................................................................................... 89

*McCrea v. Purmont*,
   16 Wend. 460 (N.Y. 1836)................................................................................................ 55

*Miner v. Edwards*,
   221 A.D.2d 934 (N.Y. App. Div. 4th Dep't 1995) ............................................................ 67

*Nat'l Commercial Bank & Trust Co. of Albany v. Madison*,
   270 A.D. 437 (N.Y. App. Div. 3d Dep't 1946) ................................................................. 55

*Nationwide Merchant Bank Ltd. v. Star Fire International*,
   889 F. Supp. 124, 127 (S.D.N.Y. 1995) ............................................................................ 68

*NBase Communications, Inc. v. American National Bank*
    *& Trust Company of Chicago,*
    8 F. Supp. 2d 1071 (N.D. Ill. 1998) ........................................................ 56, 57, 59

*Paradigm BioDevices, Inc. v. Centinel Spine, Inc.,*
    No. 11 Civ. 3489(JMF), 2013 WL 1830416 (S.D.N.Y. May 1, 2013) ................... 91

*ReAmerica, S.A. v. Wells Fargo Bank Int'l,*
    No. 04 Civ. 5233, 2008 WL 7811571 at *7 (S.D.N.Y. Mar. 18, 2008) .................. 92

*Regatos v. N. Fork Bank,*
    5 N.Y.3d 395 (2005) ........................................................................ 66, 69, 70

*Rodriguez v. City of New York,*
    38 A.D.3d 349 (N. Y. App. Div. 1st Dep't 2007) ...................................... 71

*Stearns v. Gage,*
    34 Sickels 102 (N.Y. 1879) .............................................................. 69

*Stephens v. Bd. of Educ. of City of Brooklyn,*
    78 N.Y. 183 (1879) ...................................................................... 67, 68

*U.S. ex rel. Feldman v. City of N.Y.,*
    808 F. Supp. 2d 641 (S.D.N.Y. 2011) ................................................. 84

*United Magazines Co. v. Murdoch Magazines Distrib.,*
    353 F. Supp. 2d 433 (S.D.N.Y. 2004) ................................................. 90

*Vertex Constr. Corp. v. T.F.J. Fitness L.L.C.,*
    No. 10-CV-683, 2011 WL 5884209 (E.D.N.Y. Nov. 23, 2011) ....................... 82

*Vigilant Ins. Co. of Am. v. Housing Auth. of City of El Paso, Tex.,*
    87 N.Y.2d 36 (1995) ...................................................................... 79

*Wm. Passsalacqua Builders, Inc. v. Resnick Developers S., Inc.,*
    933 F.2d 131 (2d Cir. 1991) ............................................................. 91

## Statutory Authorities

N.Y. U.C.C. § 4-A-303 ........................................................................... 93

## Additional Authorities

*Discharge,* Black's Law Dictionary (11th ed. 2019) ..................................... 55

Restatement § 14(1)) ........................................................................... 51

Restatement (First) of Restitution § 1 cmt. c .............................................. 78

Defendants respectfully submit these Proposed Findings of Fact and Conclusions of Law, pursuant to this Court's Individual Rules and Practices Rule 5(B)(iii) and this Court's Scheduling Order dated August 25, 2020 (ECF No. 46), in connection with the upcoming bench trial in this matter, scheduled to commence on December 9, 2020.

## PRELIMINARY STATEMENT

On August 11, Citibank wired nearly $900 million, to over 300 lenders, in the exact amounts each was owed in principal and interest on term loans issued by Revlon Consumer Products Corporation ("Revlon"). The following day, Citibank claimed for the first time that the transfers were a "mistake," and demanded that each lender return the principal portion of the payment, notwithstanding that the amounts paid were indisputably owed to each recipient. Lenders holding a majority of the loans refused, and Citibank brought this action against those lenders' investment managers, who are the Defendants in this action. Citibank's claims fail on multiple grounds.

This case is, in all material respects, identical to *Banque Worms v. BankAmerica Int'l* – a case in which the New York Court of Appeals, the Second Circuit, and the Southern District of New York each agreed that the recipient of a mistaken transfer was entitled to retain the funds in discharge for value on a valid outstanding debt.

- In *Banque Worms*, a bank (SPIB) mistakenly wired funds on behalf of a borrower (Spedley Securities, Ltd). In this action, it is undisputed that a bank (Citibank) wired funds, purportedly by mistake, on behalf of a borrower (Revlon).

- In *Banque Worms*, the bank transferred the funds to a *bona fide* creditor (Banque Worms). In this action, it is undisputed that Citibank transferred the funds to *bona fide* creditors (the lenders managed by Defendants).

- In *Banque Worms*, the amounts transferred were owed to the lender. In this action, it is undisputed that Citibank transferred to each lender the exact amount it was owed in outstanding principal and accrued interest.

- In *Banque Worms*, the bank first notified the lender of its mistake after the transfer was completed (a mere two hours after).  In this action, it is undisputed that Citibank first notified the lenders of its purported mistake after the transfers were completed (twenty hours after).

- In *Banque Worms*, the lender made no misrepresentation or otherwise induced the mistaken transfer.  In this action, it is undisputed that neither Defendants, nor any lender, made any misrepresentation or otherwise induced the mistaken transfers.

On these nearly identical facts, the New York Court of Appeals held that a creditor who receives money it is owed, like the lenders here, can treat "the transfer of funds as a final and complete transaction, not subject to revocation."  *Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 373 (1991).  Also on these nearly identical facts, the Second Circuit, applying the decision by the New York Court of Appeals, affirmed the ruling by the District Court that Banque Worms was entitled to retain the mistakenly transferred funds.  *Banque Worms v. BankAmerica Int'l*, 928 F.2d 538, 542 (2d Cir. 1991).

Citibank has sought to avoid the State and Federal court rulings in *Banque Worms* by asking this Court to impose two requirements that simply do not exist under New York law, which has long endorsed a concern for finality in business transactions.  *First*, Citibank argues that a debt is not discharged at the time of payment, but only later when and if the recipient of a mistaken transfer "credits" the funds in its internal records.  But this Court in *Banque Worms* rejected this requirement as "mere bookkeeping," *Banque Worms v. Bank Am. Int'l*, 726 F. Supp. 940, 942 (S.D.N.Y. 1989); the New York Court of Appeals held that discharge occurs "when [the lender] receives [the] money," 77 N.Y.2d at 373; and the Second Circuit affirmed the District Court, agreeing that a debt is discharged "at the time [the lender] received the mistaken payment," 928 F.2d 538, 541 (2d Cir. 1991).

Citibank has also argued that Defendants were on "constructive notice" of the mistaken transfer at the time it occurred, but *Banque Worms* requires actual notice.  The New York Court

of Appeals rejected a standard that would require a lender, who receives funds in an amount

owed on a *bona fide* debt, to "wonder" or "inquir[e]" as to whether the payment was intentional.

77 N.Y.2d at 372, 373. And that is the burden a constructive notice standard would impose.

Even if constructive notice were the applicable standard, Citibank's own witnesses have

admitted that no reasonable lender would have believed on August 11 that Citibank – one of the

largest and most sophisticated financial institutions in the world – had accidentally transferred

hundreds of millions of dollars in the exact amounts owing to the Revlon lenders.

      The discharge for value rule is not the only basis upon which Citibank's claims fail. All

four purported causes of action include as an element that Defendants "possess" the transferred

funds. But there is no dispute that none of the Defendants actually do. Citibank sent the funds to

the lenders, not to Defendants, and the lenders continue to hold those funds today. Moreover,

Citibank's insistence that Defendants, in their capacity as investment managers, "control" the

lenders or their funds is both factually wrong and legally irrelevant.

      For all of these reasons, as detailed below, Defendants respectfully request that a verdict

be entered in their favor across all claims.

**FINDINGS OF FACT**

## I.     INTRODUCTION

1.      On August 11, 2020, between 5:55 pm Eastern Time ("ET") and 6:05 pm ET, 126 investment funds for which Defendants act as investment managers (each a "Lender" or "2016 Term Lender") received approximately $558 million in payments from Citibank, N.A. ("Plaintiff") on account of valid term loans held by the Lenders and issued by Revlon.  Under controlling law, the Lenders should be permitted to retain these payments in satisfaction of their loans to Revlon based on a relatively small set of core, undisputed facts.

2.      It is undisputed that:

- The Lenders held valid Revlon term loans, and thus were creditors of Revlon, as of the morning of August 11, 2020.  *See infra* at ¶ 1; Appendix A.

- The Lenders received payments from Citibank, which was acting as Revlon's agent, at approximately 6:00 pm ET on August 11, 2020.  *See infra* at ¶ 44.

- Neither Defendants nor the Lenders made any misrepresentations to induce the payments. (*See* DX-1089, Citibank's Revised Responses and Objections to Defendants' First Set of Requests for Admissions Directed to Citibank, N.A. Response to Request No. 9.)

- The amount of money sent by Citibank and received by each Lender was the exact amount of accrued interest and outstanding principal on each Lender's Revlon term loan, to the penny.  *See infra* at ¶ 44.

- With each payment, Citibank sent documents stating that the payments were made on account of the "Revlon Term Loan 2016."  *See infra* at ¶¶ 49-50.

- With each payment, Citibank sent documents stating that "[i]nterim interest is due," which would be the case only in the event Revlon, through its agent Citibank, was prepaying the outstanding principal on the 2016 Term Loans.  *See infra* at ¶¶ 49-50.

- The payments were made via Fed Wire, which transfers funds "immediately."[1]  "Once funds [sent by Fed Wire] are received by the receiving bank, settlement is final."[2]  *See infra* at ¶ 45.

- Citibank did not itself conclude that its payments had been made in error until the morning of August 12, 2020, at around 9 am ET.  *See infra* at ¶¶ 73-74.

- Citibank did not communicate to Defendants that these payments were made in error until after 2:23 pm ET on August 12, 2020, more than 20 hours after the August 11 payments had been completed.  *See infra* at ¶ 83.

3.      Additional facts are described below.  The foregoing undisputed facts, however, are legally dispositive, and based on these facts alone, this Court should find that Defendants have no obligation to return the money that was paid to the Lenders they manage in discharge of the Revlon loans.

## II.      THE PARTIES

4.      The Defendants in this action are investment fund managers Brigade Capital Management, LP ("Brigade"), HPS Investment Partners, LLC ("HPS"), Symphony Asset Management, LLC ("Symphony"), Bardin Hill Loan Management LLC ("Bardin Hill"), Greywolf Loan Management LP ("Greywolf"), ZAIS Group LLC ("ZAIS"), Allstate Investment Management Company ("Allstate"), Tall Tree Investment Management LLC ("Tall Tree"), Medalist Partners Corporate Finance LLC ("Medalist"), and New Generation Advisors LLC ("New Gen") (each a "Defendant" and collectively the "Defendants").

5.      The Plaintiff in this action is Citibank, N.A., which served as the administrative agent under a credit agreement that is at issue in this action.

---

[1]  https://www.citibank.com/tts/insights/eSource_academy/docs/country_profiles/north_america/ 1471900639-1442257856-Citi-TTS-US-Country-Profile-Sep2015.pdf

[2]  https://www.citibank.com/tts/insights/eSource_academy/docs/country_profiles/north_america/ 1471900639-1442257856-Citi-TTS-US-Country-Profile-Sep2015.pdf

## III.    THE 2016 TERM LENDERS

6.    The Lenders are separately managed client accounts and funds whose investments are managed by Defendants.  (Caraher Decl. ¶ 7; Crocombe Decl. ¶¶ 5-7; Dent Decl. ¶ 5; Frusciante Decl. ¶ 5; Greene Decl. ¶ 5; Josephson Decl. ¶ 5; Lenga Decl. ¶¶ 5-6; McCoy Decl. ¶¶ 5-6; Meneses Decl. ¶¶ 5-6; Perkal Decl. ¶¶ 6-7; Phipps Decl. ¶¶ 5-6; Vaughan Decl. ¶ 5; Xanthakys Decl. ¶ 5.)  Defendants invest in various types of debt and equity securities and instruments on behalf of the Lenders.  (Caraher Decl. ¶ 5; Crocombe Decl. ¶ 5; Dent Decl. ¶ 5; Frusciante Decl. ¶ 5; Greene Decl. ¶ 7; Josephson Decl. ¶ 5; Lenga Decl. ¶¶ 6-7; McCoy Decl. ¶ 7; Meneses Decl. ¶¶ 6-7; Perkal Decl. ¶¶ 5-7; Phipps Decl. ¶¶ 5-7.)  Each Lender is a legal entity independent from Defendants; the relationships between the Defendants and the Lenders are generally defined by contract.  (Caraher Decl. ¶ 6; Crocombe Decl. ¶ 6; Dent Decl. ¶ 5; Frusciante Decl. ¶ 5; Greene Decl. ¶ 6; Lenga Decl. ¶ 6; McCoy Decl.  ¶ 6; Meneses Decl. ¶ 6; Perkal Decl. ¶ 6; Phipps Decl. ¶ 6; Vaughan Decl. ¶ 5; Xanthakys Decl. ¶ 5.)  Defendants provide Lenders with investment and/or management services as specified by the terms of the applicable contract.  (Caraher Decl. ¶ 6; Crocombe Decl. ¶ 6; Frusciante Decl. ¶ 5; Greene Decl. ¶ 6; Lenga Decl. ¶ 6; McCoy Decl.  ¶ 6; Meneses Decl. ¶ 7; Perkal Decl. ¶ 6; Phipps Decl. ¶ 6.)

7.    As described in further detail below, on August 11, 2020, Citibank transferred money directly to bank accounts held by the Lenders.  (DX-0396 at Citi00001735.)  Defendants themselves did not receive any money from Citibank on August 11, 2020, and are not in possession of the money transferred by Citibank.[3]

---

[3] A payment from an administrative agent directly to lenders—as opposed to directly to investment managers—is typical when interest and principal payments are made pursuant to syndicated term loans.  (Zeigon Dep. Tr. 76:5-17; *see also* Zeigon Dep. Tr. 163:5-10).

8.      There are three broad categories of Lenders managed by Defendants: private funds and mutual funds; collateralized loan obligations ("CLOs") and collateralized debt obligations ("CDOs"); and separately managed accounts.[4]  Appendix B, attached to this document, describes which category each Lender falls in.

9.      "Private funds" are legal entities formed directly by the fund manager but funded by various third-party investors.  The fund manager invests this joint pool of money on behalf of these third parties.  The relationship between a private fund and the fund manager is governed by an Investment Management Agreement.  (*See, e.g.*, DX-0322.)  "Mutual funds" are private funds where the shares of the fund are publicly traded.  The relationship between a mutual fund and the fund manager is also governed by an Investment Management Agreement.  (*See, e.g.*, DX-0177.)

10.     "CLOs" are structured special purpose vehicles funded by multiple third parties and have their own independent directors.[5]  The rights and obligations for each CLO is governed by an Indenture, which sets forth specific rules for what types of investments the CLO can hold.  (*See, e.g.* DX-0142.)  The Indenture may also specify how interest and principal proceeds from an investment can be used.  For example, an indenture may provide that interest proceeds must be paid out to investors, while principal proceeds may be re-invested.  (*See id.* at BARDIN_CITI_00001246.)  The relationship between a CLO and a fund manager is governed by a Collateral Management Agreement.  (*See, e.g.*, DX-0141.)  Collateral Management

---

[4]   In addition to these broad categories, Allstate Investments LLC, which is an affiliate of Allstate Investment Management Company, manages funds for two insurance companies that held the 2016 Term Loans: Allstate Insurance Company and Allstate Life Insurance Company. (McCoy Decl. ¶ 5.)

[5]   Collateralized Debt Obligations ("CDOs") are similar to CLOs.  Only Brigade manages CDOs that held the 2016 Term Loan: Brigade Debt Funding I, Ltd.; and Brigade Debt Funding II, Ltd.

Agreements and Indentures provide mechanisms through which investors may remove the fund manager.

11.     "Separately managed accounts" are portfolios that are funded and owned by unaffiliated third-parties.  (*See, e.g.*, DX-0288.)  The third parties then contract with the fund managers to manage the funds in those accounts on their behalf.  (*See id.*)  The accounts may either be held by separate legal entities or directly by the third-party investor.  (*Compare* DX-0288 at BRIGADE_CITI_00010214 *with* DX-0914 at BRIGADE_CITI_00010613.)  Regardless of how the funds are held, the relationship between a separately managed account and the fund manager is governed by an Investment Management Agreement.  (*See, e.g.* DX-0276.)  The fund manager has little discretionary authority for these accounts beyond selecting investments.  (*See id.* at BRIGADE_CITI_00009469-70.)  These accounts are generally managed for clients such as large pension funds, and the accounts are typically held on the clients' balance sheets.  In these types of arrangements, the clients themselves have their own employees and directors, and many of these Investment Management Agreements provide mechanisms for removing the investment manager without cause and in the clients' discretion.  (*Id.* at BRIGADE_CITI_00009473.)

## IV.    THE 2016 TERM LOANS AND CREDIT AGREEMENT

12.     In 2016, Revlon issued approximately $1.8 billion of term loans (the "2016 Term Loans") pursuant to a credit agreement (as amended, the "2016 Credit Agreement").  (DX-1034 at 2.)  Revlon entered into the 2016 Credit Agreement to finance its acquisition of Elizabeth Arden, a global beauty products company.  (DX-1034 at 2.)  Pursuant to and subject to the terms of the 2016 Credit Agreement, Revlon promised to repay the Lenders $1.8 billion in principal plus interest.  (DX-1044.)  The 2016 Credit Agreement was signed on September 7, 2016 by Revlon (as borrower), Citibank (as administrative agent and collateral agent), and various

lenders.  (DX-1044.)  Several Lenders managed by Defendants have held the 2016 Term Loans since their issuance in 2016.  (*See, e.g.*, Greene Decl. ¶ 9; Lenga Decl. ¶ 9; Perkal Decl. ¶ 9.)

13.     Revlon purported to amend the 2016 Credit Agreement on May 7, 2020.  (DX-1044.)  The May amendment purportedly "amended and restated in its entirety [and] replaced and superseded in all respects" the 2016 Credit Agreement.  (DX-1044 at 8.)  Upon amendment, the 2016 Credit Agreement created two tranches of loans—"2016 Term Loans" and "2020 Extended Term Loans."  (DX-1044.)  Lenders managed by Defendants hold only 2016 Term Loans.

### A.     Governing Law

14.     The 2016 Credit Agreement—which is signed by Citibank—states that New York law governs with respect to "the rights and obligations of the parties" under the agreement.  (DX-1044 at 191.)  Section 10.11 of the Credit Agreement states "**THIS AMENDMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS TO THE EXTENT THAT THE SAME ARE NOT MANDATORILY APPLICABLE BY STATUTE AND THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY**."  (DX-1044 at 191 (emphasis and capitalization in the original).)  Section 9 of the May 2020 amendment to the Credit Agreement includes an identical choice of law provision.  (DX-1044 at 8.)

### B.     Maturity Date

15.     The 2016 Credit Agreement provides that the "Term Maturity Date" of the "2016 Term Loans" is the "earlier of … (x) 7 years after the Closing Date … and (y) the Accelerated

Maturity Date." (DX-1044 at 65.) The 2016 Credit Agreement further defines "Accelerated Maturity Date" as "the date that is 91 days prior to the stated maturity date of the 2021 Notes if, on such date, any 2021 Notes remain outstanding." (DX-1044 at 2.)[6] The stated maturity date of the 2021 Notes is February 15, 2021 (DX-1032 at 11), and therefore the Accelerated Maturity Date for the 2016 Term Loans is November 16, 2020. Thus, as of August 11, 2020, the 2016 Term Loans were potentially Revlon's next maturing debt obligation. (Perkal Decl. ¶ 36.) Failure to resolve the Accelerated Maturity (by either repaying the 2016 Term Loans or a sufficient number of 2021 Notes) would have resulted in a default on the 2016 Term Loans, which in turn would have resulted in a cross default on Revlon's other debt and almost certainly would have caused Revlon to file for bankruptcy.[7] (Perkal Decl. ¶ 36.)

### C.    Interest Payment Date

16.    Interest payments on the 2016 Term Loans—which have been made periodically since the debt was issued—were governed by the 2016 Credit Agreement. (DX-1044.) The 2016 Credit Agreement defines "Interest Payment Date" as:

> (a) as to any ABR Loan, the last Business Day of each March, June, September and December to occur while such Loan is outstanding and the final maturity date of such Loan, (b) as to any Eurocurrency Loan having an Interest Period of three months or less, the last day of such Interest Period, (c) as to any Eurocurrency Loan having an Interest Period longer than three months, each day that is three months or a whole multiple thereof after the first day of such Interest Period and the last day of such Interest Period and (d) **as to any Loan (other than any Revolving Loan that is an ABR Loan), the date**

---

[6] The 2016 Credit Agreement thereafter lists certain pre-conditions under which the Accelerated Maturity Date triggers. (DX-1044.) Specifically, according to the 2016 Credit Agreement, the "Accelerated Maturity Date" will not trigger if Revlon has "Liquidity … of at least the sum of (x) the outstanding principal amount of the 2021 Notes, plus (y) $200,000,000."

[7]    Warren Dep. Tr. at 124:2-15 (" ███████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████ ").

*of any repayment or prepayment made in respect thereof*.  (DX-1044 at 41 (emphasis added).)

17.     It is undisputed that subsections (a), (b), and (c) were not applicable on August 11, 2020.  As of August 11, 2020, the "Interest Period" was specified by Revlon to be the period between May 29, 2020 and August 31, 2020, making August 31 "the last day of such Interest Period."  (DX-1018; Fratta Dep. Tr. at 38:23-39:18, 75:15-24.)  On August 11, 2020, under the definition of "Interest Payment Date," only subsection (d)—prepayment of principal on a loan—could possibly apply.  (Tichauer Dep. Tr. at 76:24-77:7, 77:23-78:6.)  In other words, to the extent interest was due on August 11, 2020 (as Citibank's notices clearly stated), it could only be due as a result of a prepayment of principal.

18.     It is also extremely uncommon for borrowers to pay interest before it is due as there is typically no economic benefit for borrowers to make a payment before they are legally obligated to.  (Warren Dep. Tr. at 49:21-25.)

## D.     Term Loan Repurchases

19.     When Revlon purported to amend the 2016 Credit Agreement in May of 2020, Revlon added a new provision titled "Term Loan Repurchases" (Section 2.3).  (DX-1044 at 75-76.)  Section 2.3 provides that "[e]ach BrandCo Lender shall have the right to require the Borrower to purchase its Term Loans pursuant to the terms of this Section 2.3 and Section 10.6(h) of this Agreement in an aggregate amount not to exceed such BrandCo Lender's Excess Roll-up Amount."  (DX-1044 at 75.)  As stated in the provision, this right to have Revlon repurchase term loans was not available to all lenders.  (DX-1044 at 75.)  Instead, this right was limited to "BrandCo Lenders" who—unlike the 2016 Term Lenders—consented to the May 2020 amendment of the 2016 Credit Agreement.  (DX-1044 at 75.)

20.     As described in further detail below, in June, and then again in August 2020, at the request of certain "BrandCo Lenders," Revlon effectuated repurchases of certain term loans, at par plus accrued interest, under Section 2.3 of the 2016 Credit Agreement.  The June repurchases were from the 2020 Extended Term Loan tranche and the August repurchases were from the 2016 Term Loan tranche.  In each case, neither Revlon nor Citibank gave notice to Defendants or the 2016 Term Lenders, who were unaware that Revlon was carrying out these repurchases.  (Warren Dep. Tr. at 34:10-34:17, 35:14-23, 36:10-37:12, 52:20-53:15, 71:4-72:18.)

## E.     Optional Prepayments

21.     Under the 2016 Credit Agreement, and on August 11, 2020, Revlon had the ability to prepay the 2016 Term Loans at any time and without premium or penalty.  Section 2.11(a) of the 2016 Credit Agreement states: "The Borrower may at any time and from time to time prepay . . . any Tranche of Term Loans, in whole or in part, without premium or penalty . . . upon irrevocable written notice delivered to the Administrative Agent no later than 12:00 Noon, New York City time."  (DX-1044 at -0105.)

22.     Under the 2016 Credit Agreement, any prepayment of principal must be made "together with . . . accrued interest . . . on the amount prepaid."  (DX-1044 at -0105.)  In other words, when a prepayment is made under the 2016 Credit Agreement, all accrued interest must be paid, even if interest was not otherwise due to be paid on the day of prepayment.  (Fratta Dep. Tr. at 164:15-165:9.)  As noted above, subsection (d) of "Interest Payment Date" similarly provides that interest is due and payable on the date of "prepayment."  (DX-1044 at -0063.)  This is a typical feature of credit agreements. (Caraher Decl. ¶¶ 21-22; Greene Decl. ¶ 33; Lenga Decl. ¶ 22; Perkal Decl. ¶ 21.)

23.     In connection with an optional prepayment, the 2016 Credit Agreement provides that Revlon is supposed to deliver a written notice to Citibank prior to the repayment (but not to the 2016 Term Lenders).  (Tichauer Dep. Tr. at 52:13-18, 53:3-17.)  Citibank is then to "promptly" notify the 2016 Term Lenders, although no specific applicable time period is provided.  (DX-1044 at -0105.)  Justin Tichauer, the Citibank representative who signed the May amendment to the 2016 Credit Agreement, testified that he did not know if Citibank's obligation to "notify" lenders was to be satisfied prior to payment or as much as seven days after; whether Citibank would notify lenders verbally, written, or otherwise; or whether the payment notification that Citibank did send in this case (discussed *infra*) would have satisfied Citibank's obligation.  (Tichauer Dep. Tr. at 53:24-55:6, 59:17-62:18, 228:13-229:7.)  Vincent Fratta, who works in operations at Citibank, testified that it is not unusual in the industry for lenders to receive notices *after* payments are made.  (Fratta Dep. Tr. at 168:9-20 ("████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████"); *id.* at 185:16-21

("████████████████████████████████████████████████

████████████████████████████████████████████████).)

Several Defendants have also testified that it is not unusual to receive notices several days after payments are made.  (Caraher Decl. ¶ 23; Frusciante Decl. ¶ 28; Greene Decl. ¶ 34; Lenga Decl. ¶ 29; McCoy Decl. ¶ 37; Meneses Decl. ¶ 28; Vaughan Decl. ¶ 25 ; Xanthakys Decl. ¶ 22.)

**F.     Citibank as Administrative Agent**

24.     On the morning of August 11, 2020, Citibank considered itself the "████████████

████ under the 2016 Credit Agreement.  (Fratta Dep. Tr. at 32:5-15.)  In connection with that role, Citibank distributes interest and principal payments that are made pursuant to the 2016

13

Credit Agreement.  (Zeigon Dep. Tr. at 76:5-17, 89:10-90:7; Fratta Dep. Tr. at 26:9-25.)

Citibank has served as administrative agent since the inception of the 2016 Credit Agreement

and has made every interest and principal distribution to Lenders to date.  (DX-1033.)  In its role

as administrative agent, Citibank views Revlon as its customer.  (Fratta Dep. Tr. at 28:14-17.)

Citibank made the August 11, 2020 payments in its capacity as administrative agent.  (Fratta

Dep. Tr. at 42:23-43:10.)

> **G.     Register**

25.     Section 10.6(b)(iv) of the 2016 Credit Agreement states that Citibank "shall

maintain at one of its offices … a register for the recordation of the names and addresses of the

Lenders, and the Commitments of, and principal amount of the Loans . . . owing to, each Lender

pursuant to the terms hereof from time to time (the 'Register')."  (DX-1044 at -0208.)  In its

October 23, 2020 letter to the Court, Citibank stated that it tracked its "Register" in a report titled

as the "OC Report."  *See* ECF No. 125 at 3 n.2 (claiming "Citibank had already produced to

Symphony the Register with a 'Reference Date' of August 11, 2020 (Citi00029489).").  The OC

Report identified by Citibank in its letter to the Court was created on August 21, 2020.  (DX-

0924 at Citi00029489.)

26.     As described in greater detail below, after the completion of the wire transfers on

August 11, 2020, Citibank's "OC Report"—i.e., the Register—stated that the principal balance

for each of the 2016 Term Loans was $0.00, reflecting a full paydown.  (DX-0541 (circulating

the "OC Report" reflecting $0.00 total outstanding for all 315 former 2016 Term Lenders)).

Although Citibank alleges it subsequently "rebuilt" a "new loan," that did not happen until the

evening of August 13, 2020.  (DX-0664; DX-0598.)  Moreover, from August 11 onward, the OC

Reports for the original 2016 Term Loans, as identified by the "tranche number" that Citibank

assigned to those loans, have always indicated a balance of zero on the 2016 Term Loans.  (*See,*

14

*e.g.,* DX-1023.)  For example, Citibank has produced a single OC Report generated on August 12, 2020, which shows that the balance on the 2016 Term Loans as of that day was zero.  (DX-0541.)

## V.   REVLON'S ACTIONS LEADING UP TO THE AUGUST 11, 2020 WIRE TRANSFERS

### A.   May 2020 Transactions

27.     In May 2020, Revlon was purportedly facing liquidity issues.  (Warren Dep. Tr. at 114:12-18.)  Nevertheless, that same month Revlon was able to add $880 million in cash to its balance sheet, issuing approximately $1.7 billion of debt in a so-called "2020 BrandCo Term Loan Facility."  (DX-1052 at -0028-29; Warren Dep. Tr. at 115:5-9 ███████████████████

████████████████████████████████████████████████████████████████

████████████).)  Certain of the 2016 Term Lenders—including the Lenders managed by Defendants—objected to the transaction (the "May 2020 Transaction") in large part because Revlon, with assistance of Citibank, transferred collateral away from the 2016 Term Lenders in violation of the 2016 Credit Agreement.[8]  (DX-1060 at -0002.)  In connection with this transaction, Revlon purported to issue new revolving loans under the 2016 Credit Agreement. (DX-1052 at -0028.)

### B.   Payoffs of Debt at Par

28.     In connection with the May 2020 Transaction, Revlon paid off debt *at par* at least five times.  *First*, on May 7, 2020, Revlon repurchased approximately $810 million in 2016 Term Loans at par—the same loans at issue in this action, although held by lenders not managed

---

[8]   Warren Dep. Tr. at 117:15-22 ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████).

by Defendants.  (DX-1052 at -0060; Warren Dep. Tr. at 116:11-23.)  *Second*, on the same day, Revlon repurchased approximately $50 million of its unsecured "5.75% Senior Notes" at par. (DX-1052 at -0062; Warren Dep. Tr. at 115:10-20.)  *Third*, Revlon fully prepaid "the entire principal amount outstanding under its 2019 Term Loan Facility, totaling $200 million, plus approximately $1.3 million of accrued interest outstanding thereon, as well as approximately $33.5 million in prepayment premiums."  (DX-1052 at -0030; Warren Dep Tr. at 115:21-116:10.)  *Fourth,* in May, Revlon paid down at par the remaining balance of a $41.5 million first-in-last-out revolving credit facility.  (DX-1052 at -0031.)  *Fifth*, on May 28, 2020, Revlon prepaid $65 million of outstanding revolving commitment loans at par.  (DX-1052 at 27; Warren Dep. Tr. at 128:18-130:22.)  In sum, throughout the summer of 2020, Revlon was focused on managing its significant liabilities, including repaying significant debt at par.

### C.      Repurchase of 2016 Term Loans

29.      In addition to the five foregoing repayments of debt at par in May of 2020, Revlon repurchased debt at par two more times in the summer of 2020—in June and August.

#### 1.      *June 2020 Repurchases*

30.      First, on May 22, 2020, certain BrandCo Lenders who also owned term loans under the 2016 Credit Agreement—2020 Extended Term Loans, not 2016 Term Loans—sought to exercise their rights under Section 2.3 of that agreement to have Revlon repurchase their obligations at par.  (DX-0340 at REVLON_CWT_000053-54.)  These transactions were ultimately completed on or around June 5, 2020, when Revlon repurchased approximately $200 million of 2020 Extended Term Loans at par.  (DX-0340 at REVLON_CWT_000038-39.)

31.      Under the 2016 Credit Agreement, and as testified to by Revlon's treasurer, these repurchases at par under Section 2.3 did *not* require interest payments to be paid to term lenders who were *not* having their loans repurchased.  (Warren Dep. Tr. at 58:22-60:15, 63:22-64:9.)  In

fact, Section 2.3 of the 2016 Credit Agreement does not even specifically provide that interest be paid to the term lenders who *were* having their term loans repurchased.  (DX-1044 at -0097 ("All Term Loan Repurchases shall be made at par."))

32.     Nevertheless, Revlon and Citibank intended to—*and did*—pay interim interest to the 2020 Extended Term Lenders (a group that did not include the lenders to whom payments were later made in August, all of which held non-extended 2016 Term Loans) who were having their loans repurchased in June of 2020.  (Warren Dep. Tr. at 63:22-64:9.)  Additionally, because of a technical limitation in Citibank's systems, Revlon and Citibank made interim interest payments to *all* 2020 Extended Term Lenders (without any notice of any kind to any kind of 2016 Term Lenders) when only a select few lenders within that tranche had their loans repurchased, even though such an interest payment was never contemplated by the 2016 Credit Agreement in any way.  (Zeigon Dep. Tr. 90:15-91:13.)

33.     With respect to the June repurchases, Revlon's counsel stated in a June 4, 2020 email to Citibank that, upon execution of these repurchases, Revlon intended interest to be paid only to lenders who were having their debt repurchased: ████████████████

████████████████████████████████████████████████████████████

██████  (DX-0340 at REVLON_CWT_000048.)  Citibank's counsel, however, explained that although the 2016 Credit Agreement did *not* require interest to be paid to all lenders at the time of repurchase, its systems would require such an interest payment to all lenders (within the tranche of loans) in any event:

████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████████

████████████████████████████ (DX-0340 at
REVLON_CWT_000038.)

34.     The June repurchases—which concerned the 2020 Extended Term Loan tranche

and not the 2016 Term Loan tranche under the 2016 Credit Agreement—were executed on or

around June 5, 2020 and interim interest was paid to all of the 2020 Extended Term Lenders

(without notice of any kind to the 2016 Term Lenders, who did not receive the interim interest

payment and had no involvement in that repurchase transaction).  (Warren Dep. Tr. at 34:10-

34:17, 35:14-23, 36:10-37:12, 52:20-53:15, 71:4-72:18.)

2.     *August 2020 Repurchases*

35.     The same issue would be confronted once again in August when Revlon sought to

execute repurchases under Section 2.3 of the Credit Agreement.  (Zeigon Dep. Tr. at 125:19-

126:20 ████████████████████████████████████

███████████████████████████████████████

████████████████████ ))  This time Revlon made selective repurchases of 2016 Term

Loans instead of the 2020 Extended Term Loans.  However, once again, because of limitations in

Citibank's "infrastructure," upon Citi's execution of these selective repurchases, Revlon and

Citibank agreed that *all* 2016 Term Lenders would have interim interest payments made to them

notwithstanding the 2016 Credit Agreement not requiring it and the 2016 Term Lenders having

no reason to expect it.  (Zeigon Dep. Tr. at 125:19-126:20.)

36.     On August 4, 2020, several 2016 Term Lenders—this time several funds managed

by investment manager Angelo Gordon—notified Revlon's counsel that they intended to have

certain of their 2016 Term Loans repurchased.  (DX-0330 at REVLON_CWT_000417.)  The e-

mail correspondence indicated that the Angelo Gordon-managed lenders were buying the loans

specifically to have them rolled-up (which is why the purchases had to be approved by the

company).  *Id.*  The parties agreed to have Citibank execute the repurchase on August 11, 2020,

and the required paperwork and logistics were finally completed at approximately 4:30 pm ET

on that day.  (DX-0351 at REVLON_CWT_000070; DX-0352 at REVLON_CWT_000056; DX-

0347 at REVLON_CWT_000112.)

37.     As with the June repurchases, even though not required or contemplated by the

2016 Credit Agreement, because of the limitations in Citibank's systems, Revlon and Citibank

planned on August 11, 2020 to pay *all* lenders within that tranche of loans interim interest.

(Zeigon Dep. Tr. 125:19-126:20.)  And as was the case in June, on August 11, 2020, Defendants

were not aware that Revlon was repurchasing certain 2016 Term Loans held by lenders who

were exercising their rights under Section 2.3 of the 2016 Credit Agreement.  (Caraher Decl. ¶

12; Dent Decl. ¶ 9; Frusciante Decl. ¶ 10; Greene Decl. ¶ 11; Lenga Decl. ¶ 23; McCoy Decl.  ¶

11; Meneses Decl. ¶ 11; Perkal Decl. ¶ 12; Phipps Decl. ¶ 10; Warren Dep. Tr. at 34:10-34:17,

35:14-23, 36:10-37:12, 52:20-53:15, 71:4-72:18.)

38.     Defendants were also not aware of limitations in Citibank's systems which

required Citibank to pay accrued interest to all holders of 2016 Term Loans when Revlon was

repurchasing certain 2016 Term Loans.  (Caraher Decl. ¶ 12; Dent Decl. ¶ 9; Frusciante Decl. ¶

10; Greene Decl. ¶ 11; Lenga Decl. ¶ 23; McCoy Decl.  ¶ 11; Meneses Decl. ¶ 11; Perkal Decl. ¶

12; Phipps Decl. ¶ 10; Warren Dep. Tr. at 34:10-34:17, 35:14-23, 36:10-37:12, 52:20-53:15,

71:4-73:8.)  In other words, even if Defendants had known that repurchase transactions were

taking place (they did not), they would not have expected an interim interest payment because

the Credit Agreement did not provide for it.  Thus, on August 11, Defendants were not aware of

any circumstances that could result in the payment of interim interest other than an optional pre-

payment of principal under Section 2.11 of the 2016 Credit Agreement.  (Caraher Decl. ¶ 12;

Dent Decl. ¶ 9; Frusciante Decl. ¶ 10; Greene Decl. ¶ 11; Lenga Decl. ¶ 23; McCoy Decl. ¶ 11; Meneses Decl. ¶ 11; Perkal Decl. ¶ 12; Phipps Decl. ¶ 10.)

## VI.    THE AUGUST 11, 2020 WIRE TRANSFERS

39.    As described above, all of the necessary logistics to execute the repurchases at par from the lenders managed by Angelo Gordon were completed by approximately 4:30 pm ET on August 11, 2020, including the signing of all necessary documents by Revlon and Angelo Gordon.  (DX-0351 at REVLON_CWT_000070; DX-0352 at REVLON_CWT_000056; DX-0347 at REVLON_CWT_000112.)  At around 4:54 pm ET, Citibank's operations team was instructed to execute the repurchase. (DX-0357 at Citi00001108.)

40.    In order to effectuate the Angelo Gordon repurchase, *Citibank intentionally processed the repurchases as if all 2016 Term Lenders were receiving full prepayment of all principal plus accrued interest*. (Fratta Dep. Tr at 117:3-16.)  However, as described in further detail below, Citibank intended that the principal amounts be paid to a so-called "Wash" account. (DX-0355 at Citi00000254 ("████████████████████████████████ ██████████████████████████████████████████████████████████████) (emphasis added.)).

41.    Citibank manages interest and principal payments to lenders via a system called "Flexcube."  (Zeigon Dep. Tr. at 58:12-22.)  As is well known in the industry, Citibank has a multitude of rigorous manual and automated controls in place to make sure payments are not made in error.[9]  Before finalizing wire payments of this magnitude in Flexcube, Citibank

---

[9]    Zeigon Dep. Tr. at 262:23-263:11 ("███████████████████████████████ █████████████████████████████████████████████████ ██████████████████████████████████████████████████████ █████████████████████████████████████████████████

conducts a process known as a "six-eye" approval, meaning that in addition to the person who executes the transaction (known as the "maker"), two other people review and approve the transaction before it is finalized.  (Zeigon Dep. Tr. at 259:12-260:4; DX-0358).

42.     On August 11, 2020, at approximately 5:45 pm ET, a WIPRO employee, Santhosh Kuppusamy Ravi,[10] (the "maker") set up the repurchase transaction in Flexcube and sent it to his manager Arokia Raj for approval.  (DX-0358 at Citi00001763; Zeigon Dep. Tr. at 260:5-16).  Mr. Raj reviewed and approved the transaction, and then forwarded Mr. Ravi's email to Citibank employee Vincent Fratta for his approval at 5:47 pm ET.  (DX-0358 at Citi00001760).  At 5:54 pm ET, Mr. Fratta provided his approval.  (DX-0358 at Citi00001760; Fratta Dep. Tr. at 95:10-15).

43.     In addition to this "six-eye" check, Flexcube had various additional and automatic checks in place to ensure erroneous wire payments are not made.  For example, Flexcube had an automated check to ensure that the amount of payment queued up to be paid out did not exceed the total amount outstanding under the loan.[11]  Flexcube also had other automated checks to

---

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████ *id.* at 264:2-6 ("█████████████████████

████████████████████████████████████████████████ *id.* at 264:8-13 █████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████).

[10]  Fratta Dep. Tr. at 96:7-16.

[11]  Zeigon Dep. Tr. at 266:4-18 ████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

ensure that there was no "scrivener's" error when the payment amounts were inserted into Flexcube by the "maker."[12]  None of these checks flagged any issues because Citibank's wire payments matched the exact principal and accrued interest outstanding on the 2016 Term Loans, down to the penny.  (Zeigon Dep. Tr. at 108:16-22, 185:24-186:12; Fratta Dep. Tr. at 64:7-23, 284:4-20.)  In short, Citibank's system which was designed to discern and prevent payment errors did not detect anything erroneous about these payments.

44.      With the six-eye process completed, the wire transfers began.  Between approximately 5:55 pm ET and 6:05 pm ET, funds, accounts, and CLOs managed by Defendants received a total of approximately $558 million of payments.  (Appendix A.)  Citibank accomplished these transfers in a total of 126 wire transfers.  (Appendix A.)  It is undisputed that each lender received exactly the amount of principal and accrued interest that was owed to it as of August 11, 2020.  (Appendix A.)

45.      These August 11, 2020 payments were made via Fed Wire.  Payments made via Fed Wire are "transferred immediately" and "[o]nce funds are received by the receiving bank, settlement is final."[13]

46.      Citibank's Flexcube system also tracks the outstanding balance of principal of loans, and directly feeds into Citibank's books and records, general ledger, and "Register."

---

had to make a payment, you couldn't make a 2-billion-dollar payment on that loan.  It would keep you at that one billion.").

[12]   Zeigon Dep. Tr. at 267:8-17 ("███████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████").

[13]   https://www.citibank.com/tts/insights/eSource_academy/docs/country_profiles/ north_america/1471900639-1442257856-Citi-TTS-US-Country-Profile-Sep2015.pdf; https://www.newyorkfed.org/aboutthefed/fedpoint/fed43.html.

(Zeigon Dep. Tr. at 59:3-17 ("███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████); Zeigon Dep. Tr. at 75:16-76:4.)  This means that when a full paydown happens in

Flexcube and the principal balance drops to $0.00 (Fratta Dep. Tr. at 103:11-25), accounting

entries reflecting this paydown are automatically fed into Citibank's books and records, general

ledger, and "Register."  (Zeigon Dep. Tr. at 59:3-17.)

47.    At the conclusion of the wire transfers on August 11, 2020, Citibank's "Flexcube"

system reflected an outstanding principal balance on the 2016 Term Loans of $0.00.  (DX-0541

at Citi00031181;  DX-0744 at Citi00000411 ("█████████████████████████████

███████████"); DX-0397 at Citi00000704 ███████████████████")).[14]  Because Flexcube

automatically feeds into Citibank's general ledger, as of the evening of August 11, 2020,

Citibank's books and records reflected that the principal balance of the 2016 Term Loans had

been fully paid down.

---

[14] The "OC Report" that is included in DX-0541 is the only "OC Report", or "Register", that was
contemporaneously emailed between Citibank employees on August 12, 2020.  This report listed
all of the former lenders under the 2016 Term Loans and shows their outstanding principal
balance as $0.00.  (DX-0541 at Citi00031181.)  Citibank has identified another "OC Report" as
the operative register as of August 12, 2020.  ECF No. 125 at 3 n.2 (claiming "Citibank had
already produced to Symphony the Register with a 'Reference Date' of August 11, 2020").
Critically, however, this "OC Report" was not created until 10 days after the August 11, 2020
wire transfers (and four days after this litigation was commenced) and there is no evidence that
this was actually the "Register," other than Citibank's post-litigation say-so.  (DX-0924 at
Citi00029489.)

48.     As each of the Defendants testified in their declarations, they consider the balance of the 2016 Term Loans paid off and discharged once the wire transfers were received on the evening of August 11, 2020.  (Caraher Decl. ¶ 18; Dent Decl. ¶ 16; Frusciante Decl. ¶ 22; Greene Decl. ¶ 27; Lenga Decl. ¶ 17; McCoy Decl.  ¶ 30; Meneses Decl. ¶ 21; Phipps Decl. ¶ 20; Vaughan Decl. ¶ 26.).

## VII.   DOCUMENTATION RECEIVED IN CONNECTION WITH THE AUGUST 11, 2020 WIRE TRANSFERS

49.     In connection with the August 11, 2020 wire transfers, each of the Lenders, through their custodians, administrators, and/or trustees, received certain notices regarding "REVLON TERM LOAN 2016 TERM LOAN."  An excerpt of one such notice that Citibank included in its filings with this Court[15] is below:

DATE:     11-AUG-2020

TO:        BRIGADE OPPORTUNISTIC CREDIT LBG FUND LTD

ATTN:     JIM KEOGH

RE:        REVLON TERM LOAN 2016
TERM LOAN
USD 896,265,941.01 CREDIT FACILITY
DATED AS OF 07-SEP-2016

AGENT:   Citibank N.A

REF:       001PDLL201485015

CUSIP:    761520AY1

***Payment of the amount(s) specified in this notice is subject to the lender's compliance with all its obligations under the subject credit agreement***

<b>Libor Rate Interim Interest Payment</b>

*****************************************************************

Please be advised that Interim Libor Interest will be paid on the LIBOR outstanding under the above referenced facility.

| Effective Date: | 11-AUG-2020 |
| --- | --- |
| Libor Currency: | USD |
| Libor Amount: | 893,944,008.52 |
| Maturity Date: | 31-AUG-2020 |

---

[15]  Declaration of B. Zeigon, Ex. A (ECF 8-1) at 2-3.

Interim interest is due as per the detailed calculation below:

Interest Due Period:   29-MAY-2020 to 11-AUG-2020

| LIBOR Funded | Interest Rate | Day Basis | From Date | To Date | # of days | Interest Due |
|---|---|---|---|---|---|---|
| 17,085,488.60 | 4.25% | Actual/360 | 29-MAY-2020 | 02-JUN-2020 | 4 | 8,068.15 |
| 17,468,301.43 | 4.25% | Actual/360 | 02-JUN-2020 | 11-AUG-2020 | 70 | 144,356.10 |
| Due Currency: | | USD | | | | |
| Total Due: | | 152,424.25 | | | | |

50.     These statements are consistent with a principal paydown for several reasons.

*First*, the notices state that interest was "due" on August 11, 2020 at least six times.  As described above, the 2016 Credit Agreement defines Interest Payment Date—the dates on which interest is payable.  The only applicable prong of that definition, and thus the only reason why interest would be "due" on August 11, 2020, was if Revlon was making a pre-payment of principal under the 2016 Term Loans.[16]  (Caraher Decl. ¶¶ 21-22; Dent Decl. ¶ 21; Frusciante Decl. ¶¶ 20, 27; Greene Decl. ¶ 33; Lenga Decl. ¶¶ 27-29; McCoy Decl.  ¶ 36; Meneses Decl. ¶ 26; Perkal Decl. ¶ 22.)  *Second*, the notices did not state that the only payment to be made that day would be an interest payment.  And as Defendants have testified, the receipt of an *interim* interest calculation statement alone indicates that an accompanying principal payment was made. (Caraher Decl. ¶¶ 21-22; Frusciante Decl. ¶ 20, 27; Josephson Decl. ¶ 22; Lenga Decl. ¶¶ 28-29; McCoy Decl.  ¶ 37; Vaughan Decl. ¶ 18.)  *Third*, the notices referred to the correct loan ("Revlon Term Loan 2016") and the correct loan identification number/CUSIP.  (Fratta Dep. Tr. at 81:25-82:13.)  In summary, as all of the Defendants have testified, nothing in the notices gave

---

[16]   Even after Citibank sent its error notices, individuals at several lenders still believed the circumstances surrounding the payment suggested the payment was intentional.  For example, Mr. Frusciante did not understand how Citibank could assert that an interim interest payment was intentional but the principal payment was mistaken because payment of interim interest indicates that principal is being prepaid.  (Frusciante Decl. ¶ 20.)  That is, payment of interim interest in the syndicated loan market is so synonymous with principal prepayment that even after Citibank sent a notice of error, Mr. Frusciante could not believe that a pre-payment of principal was unintended.  *See id.*

any indication that the principal portion of the payments had been made in error.  (Caraher Decl. ¶¶ 19-23; Crocombe Decl. ¶ 4; Dent Decl. ¶ 17; Frusciante Decl. ¶¶ 26-29; Greene Decl. ¶¶ 28-34; Josephson Decl. ¶ 19; Lenga Decl. ¶¶ 24-31; McCoy Decl.  ¶¶ 31-37; Meneses Decl. ¶ 22-30; Phipps Decl. ¶¶ 21-23; Vaughan Decl. ¶¶ 24-25; Xanthakys Decl. ¶¶ 22-23.)

51.    Mr. Tichauer, Citibank's managing director who signed the amended 2016 Credit Agreement could not identify anything in the notices that suggested error to the 2016 Term Lenders.  (Tichauer Dep. Tr. at 112:20-113:10



))  Revlon's treasurer testified that nothing in the interest calculation notice would "suggest that a lender in receipt of this notice would have expected it to be a payment made in error."  (Warren Dep. Tr. at 93:25-94:4

52.    In connection with the August 11, 2020 wire transfers, each of the Lenders, through their custodians, administrators, and/or trustees, also received a transaction confirmation notice.  (Declaration of B. Zeigon at ¶ 13 (Dkt. 8.))  An example of an excerpt of a transaction confirmation is included below.  (Declaration of B. Zeigon Exhibit B (Dkt. 8-2.))



53.     Nothing on the payment confirmation notices indicates that the payments were

made in error.  *First*, for each of the lenders, the amount listed on the payment confirmation is

the exact amount of principal outstanding plus accrued interest owed to that lender, down to the penny.  (Appendix A).  *Second*, the amount listed on the payment confirmation is the exact amount that was received in each lenders' bank account, down to the penny.  (Caraher Decl. ¶ 20; Dent Decl. ¶ 11; Frusciante Decl. ¶ 26; Greene Decl. ¶ 31; Josephson Decl. ¶ 22; Lenga Decl. ¶¶ 25-26; McCoy Decl.  ¶ 34-35; Meneses Decl. ¶ 24-25; Perkal Decl. ¶ 18; Phipps Decl. ¶ 23; Vaughan Decl. ¶¶ 9, 24 ; Xanthakys Decl. ¶¶ 10, 23.)  *Third,* the payment confirmations stated that the payments were made pursuant to the "Revlon Term Loan 2016."  (Frusciante Decl. ¶¶ 11, 26; Josephson Decl. ¶ 9; Lenga Decl. ¶ 10; McCoy Decl.  ¶ 13; Meneses Decl. ¶ 12; Phipps Decl. ¶ 11; Vaughan Decl. ¶ 9-11; Xanthakys Decl. ¶ 10.)  *Fourth*, the payment confirmation referred to the borrower "Revlon Consumer Products Corp."  (Declaration of B. Zeigon Exhibit B (Dkt. 8-2) at 4.)  Witnesses for all parties in this case (including Citibank's managing director who signed the 2016 Credit Agreement) have unequivocally testified that nothing in the notices indicated that the payments had been made in error.  (*See, e.g.,* Caraher Decl. ¶¶ 19; Dent Decl. ¶ 12; Frusciante Decl. ¶¶ 23-28; Greene Decl. ¶¶ 28-34; Josephson Decl. ¶ 10; Lenga Decl. ¶¶ 24-29; McCoy Decl.  ¶¶ 31-33; Meneses Decl. ¶ 22-23; Phipps Decl. ¶¶ 21-22; Vaughan Decl. ¶ 24.)  Even Revlon's corporate treasurer testified that nothing in the payment notification would indicate to a lender that the payment was made by a mistake.  (Warren Dep. Tr. at 93:3-10 ("Q. Is there anything in this notice that would suggest to a lender that the payment was made by mistake? *** A. I don't see anything that would indicate that this payment was made by mistake.").)

## VIII.   DEFENDANTS THOUGHT THE PAYMENTS WERE INTENTIONAL PAYDOWNS OF REVLON 2016 TERM LOANS

54.   Each of the Defendants testified that, at the time payments were received on the evening of August 11, 2020, there was no indication or reason to believe that the payments had

been made in error.  (Abrams Decl. ¶¶ 4, 19; Caraher Decl. ¶ 19; Crocombe Decl. ¶ 4; Dent Decl.

¶ 4; Frusciante Decl. ¶ 23; Greene Decl. ¶ 28; Josephson Decl. ¶ 4, 22; Lenga Decl. ¶¶ 4, 12;

McCoy Decl. ¶¶ 15, 31; Meneses Decl. ¶ 4, 22; Perkal Decl. ¶ 13; Phipps Decl. ¶ 21; Vaughan

Decl. ¶ 24; Xanthakys Decl. ¶ 17.)  The Defendants also testified that none of the custodians,

trustees, or administrators with access to the bank accounts held by the lenders identified the

incoming wires as made in error prior to Citibank sending its error notices starting on the

afternoon of  August 12, 2020.  (Frusciante Decl. ¶¶ 18, 19; Josephson Decl. ¶ 11; Lenga Decl. ¶

4; McCoy Decl. ¶ 13, 16; Dent Decl. ¶4, 10; Meneses Decl. ¶ 14; Phipps Decl. ¶ 11, 15-17;

Vaughan Decl. ¶¶ 14-16; Xanthakys Decl. ¶ 16.)

  55. On the contrary, every single Defendant that became aware of the payments prior

to Citibank's error notice affirmatively concluded that the payments were a full paydown of the

2016 Term Loans:

### A. Brigade

  56. Individuals at Brigade first learned about the August 11 payments on the morning

of August 12, 2020 when they received an email from Virtus, LLC ("Virtus"), a Citibank partner

that serves as administrator for certain funds managed by Brigade.  Virtus sent Brigade a cash

flow statement at 9:07 a.m. ET indicating that Brigade-managed lender Battalion CLO VIII Ltd.

received a payment from Citibank on behalf of the 2016 Term Loans.  (DX-0483.)  In that email,

a Virtus employee noted that ████████████████████████████████████ (*Id.*)

  57. At 11:29 a.m. ET on August 12, Virtus sent Brigade an updated cash flow "with

Revlon paydown processed."  (*Id.*)  Jeffrey Frusciante, Brigade's Bank Debt Manager, testified

that when he saw this exchange, he assumed at the time that Virtus – a Citibank partner – had

already reached out to Citibank and confirmed the transaction.  (Frusciante Decl. ¶ 15.)  At 11:28

a.m. ET, an administrator for other funds managed by Brigade also notified Brigade of the payment. (DX-0545 at -0001-2.)

58.     Following these notifications, Brigade began reaching out to custodians and administrators to confirm that all of their funds had received the same full payment. (Frusciante Decl. ¶ 17.) Through this process, Mr. Frusciante concluded that funds managed by Brigade had received a paydown because Brigade's clients had all received the exact amount of principal and interest they were owed; and Brigade's clients had received interim interest which is consistent with a prepayment of principal. (Frusciante Decl. ¶ 18.)

**B.     HPS**

59.     Individuals in HPS's operations team reviewed the August 11 payments at or around 8:00 a.m. ET on August 12, 2020 as part of their daily cash reconciliation process. The individual who conducted the review noted that the payments were to be booked, and did not report that the payments were made in error. (Xanthakys Decl. ¶ 13.)

60.     At around 12:02 p.m. ET on August 12, 2020, an individual at Harmonic, an administrator for certain funds managed by HPS, emailed HPS's operations team noting that they had received "full principle [sic] repayment plus interest" on the 2016 Term Loans. (DX-0489.)

61.     George Xanthakys, Senior Vice President in the operations group, emailed U.S. Bank and asked them to apply cash that came in on August 11, 2020, including the paydown on the 2016 Term Loans. (DX-0504.) An individual at U.S. Bank replied that it was working to book the paydown. *Id.* As demonstrated by Mr. Xanthakys' instruction, he believed the payments to be a paydown. (Xanthakys Decl. ¶ 15.)

**C.     Symphony**

62.     On the morning of August 12, 2020, Scott Caraher, Portfolio Manager at Symphony, reached out to John Vaughan, a senior loan operations associate. (Caraher Decl. ¶

13.)  Mr. Caraher asked Mr. Vaughan whether any Symphony clients had received paydowns on the 2016 Term Loans.  *Id.*

63.     Mr. Vaughan then inquired with the custodians of several Symphony clients. (Vaughan Decl. ¶¶ 14-16.)  One custodian, Deutsche Bank, confirmed at 12:52 p.m. ET that it had "████████████████████████████rday."  (DX-0561 at -0003.)  Another custodian, Bank of New York Mellon, confirmed at 12:51 p.m. ET that interest payments and "████████████" were received on accounts of Symphony clients.  (DX-0495.)  A third custodian, Nomura, confirmed that it had "████████████████████████████████."  (DX-0562 at -0012.)  Finally, U.S. Bank confirmed at 10:34 am ET that funds were received.  (DX-0531.)

64.     Based on this information, Mr. Vaughan and Mr. Caraher concluded that Symphony's clients had received full paydowns.  (Caraher Decl. ¶ 15; Vaughan Decl. ¶¶ 16, 18.) Mr. Vaughan directed Symphony's operations team to book the payments as full paydowns of principal and interest on their internal system.  (Vaughan Decl. ¶ 17.)  Of particular relevance to their determination was the fact that the transfers occurred in a manner consistent with how borrowers make unscheduled paydowns: they were accompanied by interim interest, and they matched outstanding principal and interest to the penny.  (Caraher Decl. ¶ 20; Vaughan Decl. ¶ 18.)

### D.     Bardin Hill

65.     John Greene, Partner at Bardin Hill, first learned about the payment on August 12, 2020 at 6:00 p.m. ET through a call with his colleague Phil Raciti.  Prior to learning about the error notices, Mr. Greene believed that the payment was a full paydown in response to the UMB Bank litigation.  (*See infra* at *65;* Greene Decl. ¶ 17.)

### E.     Allstate

66.     On the morning of August 12, 2020, individuals in Allstate's bank loan operations team notified Catherine McCoy, Allstate Portfolio Manager, and others, that two 2016 Term Loan lenders had received paydowns.  (McCoy Decl. ¶¶ 17-18; DX-0542 at ALLSTATE_CITI_00000058.)  Due to the unexpected nature of the payment, Ms. McCoy initially thought the bank loan operations team had reported a payment that was not actually received (McCoy Decl. ¶ 19), but once she received confirmation of Fed Reference numbers on the wires, she concluded that the payments were intentional paydowns (McCoy Decl. ¶¶ 20-22; DX-0542 at ALLSTATE_CITI_00000056).  Once the bank loans operations team confirmed that the paydown was received for all Allstate clients, Ms. McCoy was even more certain that Revlon had made an intentional paydown.  (McCoy Decl. ¶ 23.)

### F.     Greywolf, ZAIS, Tall Tree, New Gen, and Medalist

67.     Employees from Greywolf, ZAIS, Tall Tree, New Gen, and Medalist all testified that the trustees, custodians, and/or administrators for the lenders they managed did not alert them of any error on August 11 or August 12, prior to Citibank's August 12 error notice.  (Dent Decl. ¶ 12; Josephson Decl. ¶ 12; Lenga Decl. ¶ 4; Meneses Decl. ¶ 14; Phipps Decl. ¶¶ 21-22.) This is unsurprising given that these Defendants have testified that nothing in the documentation or communication provided by Citibank suggested that the payments had been made in error. Plainly, these Defendants did not know of any error at the time the payments were received because they were unaware of the payments at that time.

## IX.     FAILURE TO RECEIVE PAYDOWN NOTICE DID NOT INDICATE ERROR

68.     Citibank has noted that Defendants did not receive a "payoff" notice for the principal amounts paid on August 11, 2020.  (ECF No. 1 ¶ 22.)  However, even Citibank's witness, Mr. Fratta, testified it is not unusual for lenders to receive notices *after* payments are

made[17] and that not receiving a notice would not be indicative of an error.[18]  Additionally, it is

not unusual for lenders to receive principal paydowns *without receiving principal paydown

notices at all*.[19]  Accordingly, Defendants have testified that the absence of an accompanying

principal payment notice would not place a lender on notice of mistake, particularly where the

interest notice states that interim interest was "due." (Caraher Decl. ¶ 21-23; Frusciante Decl. ¶

28; Greene Decl. ¶ 34; Josephson Decl. ¶ 21; Lenga Decl. ¶ 29; McCoy Decl. ¶ 37; Meneses

Decl. ¶ 27; Vaughan Decl. ¶ 18, 25; Xanthakys Decl. ¶ 22.)

69.      Section 2.11 of the 2016 Credit Agreement only requires that Revlon provide a

written notice *to Citibank*, not to the Term Lenders, DX-1044 at 83, which is added reason that

the absence of a principal notice would not have indicated any problem with the August 11

Transfer.  Moreover, to the extent that Citibank was required to forward such notice from Revlon

to lenders, the Citibank managing director who signed the 2016 Credit Agreement could not

describe what form a Citibank notice to the Term Lenders would take and how long it would

take Citibank to deliver such a notice or whether Citibank did in fact send such a notice in the

form of the payment confirmations described *supra*.  (Tichauer Dep. Tr. at 54:6-56:7, 60:9-

61:16.)



---

[17]   Fratta Dep. Tr. at 168:9-20 ("███████████████████████████

███████████████████████████████████████

████████████████████████████); Fratta Dep. Tr. at 185:16-22 █████████

███████████████████████████████████████)

[18]   Fratta Dep. Tr. at 169:10-15 ████████████████████████████████████

█████████).

[19]   For example, Mel Meneses, Senior Credit Analyst at ZAIS, has, in his declaration, included
an example where ZAIS received an unscheduled principal prepayment with no prepayment
notice.  (Meneses Decl. ¶ 28.)  To this day, ZAIS has not received a payment notice for that
paydown.  *Id.*

70.     While often not provided in advance of payment, payment notices, including

principal paydown notices, may be important for some investment managers, trustees,

custodians, and fund administrators for book keeping purposes.  Additionally, certain investment

managers, trustees, custodians, and/or fund administrations may have policies, procedures, or

practices that require them to obtain support for unscheduled payments.  Payment notices of

every type frequently arrive late, and it is common for operations teams to assist custodians and

administrators with identifying additional backup.  (Frusciante Decl. ¶¶ 28-29; Vaughan Decl. ¶

25; Xanthakys Decl. ¶ 22.)  In fact, identifying missing notices is a routine process of the various

operations teams' jobs.  (Frusciante Decl. ¶ 29; Vaughan Decl. ¶ 25; Xanthakys Decl. ¶ 22.)  In

summary, notices can be helpful for bookkeeping purposes, but they are not necessary for

lenders to identify the payments as related to a specific loan, and they are not required to

consider loans paid off.  (Frusciante Decl. ¶¶ 28-30; Vaughan Decl. ¶ 18.)

71.     After the August 11, 2020 payments, some trustees, custodians, and

administrators reached out to Defendants to either (i) gather these principal notices or (ii) obtain

other factual support for the payments.  Such outreach did not suggest to Defendants that any of

the payments were made in error—virtually all of the time they request such notices, a notice or

some other form of backup is ultimately located.  (Frusciante Decl. ¶¶ 28-29; Xanthakys Decl. ¶

22.)  And on the morning of August 12, 2020, when some fund administrators reached out to

Citibank for notices, Citibank did not identify that the August 11, 2020 payments were made in

error.  (*See* DX-0489.)  As these witnesses testified, they were not seeking notices out of any

concern that the August 11 Transfer was a mistake.  They were simply following standard

practice in obtaining factual support for the payments for purposes of bookkeeping.  (Frusciante

Decl. ¶ 28; Xanthakys Decl. ¶ 22.)

72.     On August 11 and August 12, many trustees, custodians, and administrators made the accounting entries for the August 11 payments, prior to Citibank sending its error notice in the afternoon of August 12, 2020.  For example, Virtus, LLC, which is a partner of Citibank, booked the payments for a Brigade CLO as principal and interest based on their policy that full paydowns that match outstanding principal and accrued interest do not require further backup documentation.  (Frusciante Decl. ¶ 30; DX-0483 at BRIGADE_CITI_00003314.)

## X.     CITIBANK'S IDENTIFICATION OF A PURPORTED ERROR

73.     It is not just the 2016 Term Lenders that did not know the payments were made in error on August 11.  It is undisputed that Citibank did not itself determine that the August 11, 2020 payments had been made in error until the next day.  (Zeigon Dep. Tr. 186:13-22 ████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

██████); Fratta Dep. Tr. at 183:14-184:5 ("████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████).

74.     On the morning of August 12, 2020 at 9:36 AM Eastern Time, Arokia Raj, an employee of the company WIPRO, emailed Vincent Fratta identifying that principal payments had been sent to the 2016 Term Lenders even though these principal payments were supposed to go to ████████  In his email Mr. Raj stated: ████████████████████████████████████

35

████████████████████████████████████████ (DX-0371 at

Citi00001594.)  This email from Mr. Raj, which was sent over 16 hours after the wire payments

were completed, is the first evidence that Citibank itself became aware of a potential error in the

payments.  (Fratta Dep. Tr. at 192:15-193:5 ██████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████ ).  Mr. Raj himself only

somewhat fortuitously determined that there had been an error, telling Citibank employees on

August 12, 2020 at 10:12 am ET that he found that the principal payments had gone out the door

during a █████████████ (DX-0375 at Citi00000940.)

## XI.  HISTORIC NATURE OF ERROR

75.    Citibank's error was unprecedented, and Defendants would have had no reason to

conclude that such an historic error had occurred.  According to Revlon's corporate treasurer:

████████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████
██████████████ (Warren Dep. Tr. At 143:2-12) (emphasis added).

76.    All of Citibank's witnesses who have testified, have stated that this was the

largest error they had ever seen in their decades of working on Wall Street.  (*See, e.g.* Zeigon

Dep. Tr. 279:9-281:2 ███████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████).)  Witnesses have testified that, in their decades of experience on Wall Street, they had not seen a similar error where a bank had paid lenders the exact amount of principal and accrued interest under a loan in error.[20]  Citibank witnesses admitted that they were ████████████ by this error and that it would be unforeseeable on the morning of August 11, 2020. Citibank has never had an error of this magnitude in the past and does not expect to have an error of this magnitude again.  Zeigon Dep. Tr. 282:13-24 ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████).

77.     Such a mistake was also unforeseeable because it is well known that Wall Street banks, including Citibank, have many checks in place to ensure that accidental payments are not made.  As described above, Citibank implemented a "six-eye" system whereby at least three people need to review a payment of this magnitude.  *See supra* at ¶¶ 41-42.  Citibank's systems

---

[20]   Fratta Dep. Tr. at 57:15-19 █████████████████████████
████████████████████████████████████
█████ Fratta Dep. Tr. at 59:11-60:2 ███████████████████████
█████████████████████████████████████████
█████████████████████████████████████
██████████████████████████████████████████); Fratta Dep. Tr. at 186:21-187:6.
[21]   Fratta Dep. Tr. at 196:10-197:4 ██████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████
█████████████████████).

also had additional checks to ensure that payments were not released from their Flexcube system that exceeded the amount of debt outstanding and to check for scrivener's errors.  *See supra* at ¶ 43.

## XII.   THE UMB ACTION

78.     On August 12, 2020, at approximately 2:06 pm ET, UMB Bank, National Association ("UMB Bank"), as successor administrative agent under the 2016 Credit Agreement, filed a lawsuit against Revlon, Citibank, and number of other entities, claiming over 20 counts, including for fraudulent conveyance, conversion, unjust enrichment, breach of contract, and tortious interference with contract.  (DX-1055.)   UMB elected not to serve the complaint in that lawsuit in light of the August 11 payment and it subsequently proposed to the Court presiding over that action that it be stayed in consideration of this case.   (*See* Letter from B. Finestone, dated October 5, 2020, Case 1:20-cv-06352-LGS (ECF No. 15).)  After that request was denied, UMB voluntary dismissed its complaint without prejudice.  (*See* Notice of Voluntary Dismissal, dated November 6, 2020, Case 1:20-cv-06352-LGS (ECF No. 17).)

79.     Prior to its filing, the UMB suit had been in the works for several months.  As is typical in cases when administrative agents file lawsuits against borrowers, such as Revlon, the administrative agent needs to be "directed" by more than 50% of the lenders before it files suit, which can be a long and often complicated process.  The direction letter also contained a direction for UMB to notice an Event of Default and Notice of Acceleration to Revlon.  (Abrams Decl. ¶ 32; Caraher Decl. ¶ 40; Crocombe Decl. ¶ 16; Dent Decl. ¶ 27; Greene Decl. ¶ 39; McCoy Decl. ¶ 45; Meneses Decl. ¶ 35; Perkal Decl. ¶¶ 49-51; Phipps Decl. ¶ 26.)

80.     Each of the Defendants in this action that signed a direction and indemnification letter—on behalf of the lenders it manages—did so in advance of August 11, 2020:

- Brigade signed the D&I Letter on behalf of the lenders it manages on July 30, 2020. (Perkal Decl. ¶ 50.)

- HPS signed the D&I Letter on behalf of the lenders it manages on July 31, 2020. (Crocombe Decl. ¶ 16.)

- Symphony signed the D&I Letter on behalf of the lenders it manages on July 30, 2020. (Caraher Decl. ¶ 40.)

- Medalist signed the D&I Letter on behalf of the lenders it manages on August 4, 2020. (Phipps Decl. ¶ 27.)

- New Gen signed the D&I Letter on behalf of the lenders it manages on August 5, 2020. (Dent Decl. ¶ 27.)

- Greywolf signed the D&I Letter on behalf of the lenders it manages on August 6, 2020. (Abrams Decl.  ¶¶ 31-32.)

- Allstate signed the D&I Letter on behalf of the lenders it manages on August 7, 2020. (McCoy Decl. ¶¶ 44-45.)

- Bardin Hill signed the D&I Letter on behalf of the lenders it manages on August 10, 2020.  (Greene Decl. ¶ 40.)

- ZAIS signed the D&I Letter on behalf of the lenders it manages on August 10, 2020. (Meneses Decl. ¶¶ 35-36.)

81.    Tall Tree was not a directing lender and therefore did not sign the direction letter to UMB.

82.    In other words, all of the lenders managed by Defendants that directed UMB to file the lawsuit did so *prior* to Citibank's August 11, 2020 Wire Transfers.  The impending UMB lawsuit was leaked by popular publication S&P Global Market Intelligence on August 10, 2020, a day prior to the August 11, 2020 wire transfers.  (DX-1053.)

## XIII.   CITIBANK'S COMMUNICATION OF ERROR AND RECALL OF FUNDS

83.    On August 12, 2020, starting at around 2:20 pm ET Citibank began sending "recall" notices to the 2016 Term Loan Lenders.  The first of these notices arrived at approximately 2:22 pm ET on August 12, 2020, *almost 20 hours after the wire transfers cleared*.

(Appendix A.)  These initial "recall" notices stated: ████████████████████ ██ ███

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████  (DX-0529 (emphasis added).)

The notice did not say what the error was.  Nor did it provide any details regarding how

Citibank made such an error, nor why Citibank considered interest to be due on August 11th.

Citibank's witness, Mr. Fratta, testified that one of the reasons that Citibank sent out the error

notices is because it did not expect that lenders would otherwise come to the conclusion that the

payments had been made in error.  (Fratta Dep. Tr. at 205:16-206:21 ("████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████

84.      Citibank continued to send subsequent "recall" notices to lenders in the following

days.  In these subsequent notices, Citibank attempted to backtrack from its original

characterization of the August 11 Transfer as a payment of "██████," by removing that word

from the notice.  (*See, e.g.,* DX-0865 at Citi00005225.)  In an August 13, 2020 1:57 am email,

Mr. Fratta stated with respect to the recall communications: "████████████████████████

████████████████████████████████████████████  (DX-0541 at

Citi00031172.)

85.      Prior to Citibank communicating to Defendants and Lenders that the wire transfer

had allegedly been made in error on August 12, 2020, no Lender or Defendant believed that the

wire transfers had been made in error.  (Caraher Decl. ¶ 4; Crocombe Decl. ¶ 4; Dent Decl. ¶ 18;

40

Frusciante Decl. ¶¶ 4, 18; Greene Decl. ¶¶ 4, 28-30; Josephson Decl. ¶ 4; Lenga Decl. ¶ 24; McCoy Decl. ¶ 4; Meneses Decl. ¶ 4; Perkal Decl. ¶ 4; Phipps Decl. ¶¶ 4, 21-22; Vaughan Decl. ¶ 18; Xanthakys Decl. ¶ 17.)

## XIV.   DEFENDANTS DID NOT BELIEVE THAT THE PAYMENT HAD BEEN MADE IN ERROR

86.     In this action, Defendants have produced 47,978 pages of documents, and Citibank has deposed sixteen employees of Defendants, obtaining 2,800 pages of deposition testimony.  Additionally, Citibank has issued twelve third party subpoenas, and 8,400 total pages of documents have been produced by third parties to date.  The evidence—and the testimony from witnesses—unequivocally points to the fact that the Defendants and the funds that they managed believed (and should have believed) that the payments were an intentional paydown of the 2016 Term Loans.  Additionally, there is no evidence suggesting that Defendants or Lenders knew or should have known the payments had been made in error prior to Citibank's error notices, which were sent over 20 hours after the August 11 payments had been completed.  Even Citibank's employees have testified that, from the lender's perspective, one would not have (and could not have) concluded that the payments had been made in error on August 11, 2020.  For example, Mr. Fratta testified that he would not have concluded that the payments were made in error upon receipt of payment.[22]

87.     Instead, rather than jumping to the highly unlikely conclusion that the August 11, 2020 payments were a historically unprecedented error by one of the most sophisticated banks in the world, upon receiving the payments, Defendants believed in one of several significantly more

---

[22]   Fratta Dep. Tr. at 188:17-21 ▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬

plausible explanations for the August 11, 2020 Wire Transfers. (*See, e.g.*, Caraher Decl. ¶¶ 19-25; McCoy Decl. ¶ 24.)

88.     *First*, Revlon knew that the 2016 Term Lenders had objected and were unhappy with the May 2020 Transaction.[23]  And Defendants were aware that Revlon and Citibank knew that a group of lenders, which included funds managed by Defendants, were planning to imminently sue them.  (Caraher Decl. ¶¶ 31-32; Crocombe Decl. ¶ 15; Perkal Decl. ¶ 32.)  In fact, on the evening of August 10, just a day before the transfers, the fact that these lenders were planning to imminently file suit against Revlon and Citibank had leaked to the press and published in a popular financial publication.  (DX-1053 ("[A] group of lenders is also preparing a lawsuit against [Revlon] for a recent recapitalization transaction, alleging that the deal involved creditor vote manipulation and violated the terms of its 2016 Credit Agreement, two of the sources said."))  Certain Defendants believed that Revlon, through Citibank as administrative agent, may have been selectively paying off lenders under the 2016 Credit Agreement so that the lenders would no longer have the required 50% ownership of the 2016 Term Loans to direct UMB to file a lawsuit against Revlon.  (Caraher Decl. ¶ 33; Crocombe Decl. ¶ 13; Greene Decl. ¶ 19; McCoy Decl. ¶ 24; Perkal Decl. ¶ 31; Phipps Decl. ¶ 18.)  Certain Defendants had this view because, as recently as May of 2020, Revlon and Citibank had taken actions under the 2016 Credit Agreement to impact the lender's voting rights under the 2016 Credit Agreement through the issuance of a revolver, which served no corporate purpose other than the gerrymander of Defendants' voting rights.  (Caraher Decl. ¶¶ 27-28; Crocombe Decl. ¶ 13; Greene Decl. ¶¶ 12, 19; McCoy Decl. ¶ 12; Perkal Decl. ¶¶ 28-30.)  Certain Defendants believed that Revlon was

---

[23]   Warren Dep. Tr. at 117:15-22 ███████████████████████████████
████████████████████████████████████████████████████████████████
█████████████████████████████████████████████.

again taking actions to manipulate the vote under the 2016 Credit Agreement—this time by selectively repurchasing certain 2016 Term Loans—so that Defendants would no longer have the 50% votes required to direct UMB to sustain its lawsuit against Revlon and Citibank.  (Caraher Decl.¶ 33; Crocombe Decl. ¶ 13; Greene Decl. ¶ 19; McCoy Decl. ¶ 24; Perkal Decl. ¶ 31; Phipps Decl. ¶ 18.)

89.     *Second*, in the weeks leading up to the August 11 payment, the springing maturity of the 2016 Term Loans was a critical issue for Revlon.  (DX-1056 at -0001.)  Absent satisfaction, the 2016 Term Loans threatened to trigger cross defaults on the rest of Revlon's debt.  (Warren Dep. Tr. at 124:2-10 ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

Revlon's treasurer testified that Revlon "is obviously trying to address the maturities" in order to avoid default and to stay out of bankruptcy.  (Warren Dep. Tr. at 124:16-25 ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████.)  Certain Defendants believed that Revlon may have been taking steps to repurchase the 2016 Term Loans to avoid the springing maturity, and thereby stave off a bankruptcy filing.  (*See, e.g.*, Perkal Decl. ¶¶ 35-38.)

90.     *Third*, Revlon's history—including very recent history—suggested that the company had the ability to raise the necessary capital to prepay the 2016 Term Loans.  In May, just three months before these payments, Revlon successfully refinanced almost a billion dollars of 2016 Term Loans and had paid off debt at par at least four other times.  Warren Dep Tr. at

116:11-23 ██████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████ Revlon had also certified its own

solvency twice.  (Warren Dep Tr. at 99:2-100:6; DX-0046 at Citi00002350; DX-1044 at -0007.)

On August 11, Revlon's stock price implied several hundred million dollars of market

capitalization.  On August 11, Defendants believed, and had sound basis for believing, that

Revlon had the fund raising capacity to pay off the term loans and it had acted on August 11,

2020 to do so. (Abrams Decl. ¶¶ 26-28; Caraher Decl. ¶¶ 34-35; Dent Decl. ¶ 25; Greene Decl. ¶

38; Lenga Decl. ¶¶ 32-33; McCoy Decl. ¶ 42; Meneses Decl. ¶¶ 33-34; Perkal Decl. ¶¶ 39-44;

Phipps Decl. ¶ 24.)

91.    *Fourth*, certain Defendants believed that it was possible that Ronald Perelman,

who owns more than 85% of Revlon through his investment company MacAndrews & Forbes,

was acting to save Revlon, as he has done before.  (Caraher Decl. ¶¶ 36-39; Dent Decl. ¶ 25;

Greene Decl. ¶ 38; Lenga Decl. ¶¶ 33-34; McCoy Decl. ¶ 43; Meneses Decl. ¶ 34; Perkal Decl.

¶¶ 39-42; Phipps Decl. ¶ 24; DX-1051.)  Many sophisticated market participants believe that Mr.

Perelman will not allow Revlon to fail under any circumstances.  (*See, e.g.,* DX-1037.)  Indeed,

Mr. Perelman has historically saved Revlon so many times that there is a term in the industry

known as the "Perelman Put"—referring to Mr. Perelman's acumen for finding pockets of

liquidity within his portfolio companies to refinance and pay down maturing debt to avoid a

bankruptcy.  (DX-1029 ("Every time Revlon's future looks imperiled, Mr. Perelman pumps more

money into the company …"); Perkal Decl. ¶ 41.)  It is well known in the market that Mr.

Perelman's daughter is the CEO of Revlon and that Mr. Perelman has had a long time "love affair" with the company.  (DX-1029; *see also* DX-1051.)

92.     In addition to Mr. Perelman's sale of assets, on August 11, 2020, the day of Citibank's wire payments, popular publication Reorg Research leaked that Revlon had hired investment bank PJT, a bank that is well known for its restructuring work.  (DX-0361; Perkal Decl. ¶ 37.)  That article noted that PJT was specifically working on addressing Revlon's upcoming accelerated maturity on the 2016 Term Loans.  (DX-0361; Perkal Decl. ¶ 37.)  That same day, Vanity Fair published a statement from Mr. Perelman stating that he wished to lead a "less leveraged business life."  (DX-0904 at -0005.)

93.     While Defendants did not know specifically what Mr. Perelman was up to, after the payments were received on August 11, 2020, many of the Defendants believed that, based on prior history, Mr. Perelman could have used those monetized assets to rework and restructure the debt in his portfolio, including the 2016 Term Loans, the closest maturity for Revlon.[24]  (Caraher Decl. ¶¶ 36-39; Dent Decl. ¶ 25; Greene Decl. ¶ 38; Lenga Decl. ¶¶ 33-34; McCoy Decl. ¶ 43; Meneses Decl. ¶ 34; Perkal Decl. ¶ 41.)

94.     The reasonableness of Defendants' state of mind on August 11 has proven out. On November 12, 2020, Revlon announced that (in order to address the springing maturity on the 2016 Term Loans), it would optionally prepay approximately $106.8 million of its unsecured notes "at a price equal to 100% of their aggregate principal amount, together with interest

---

[24]   While Revlon would have had to disclose such a transaction to the Securities and Exchange Commission, such a disclosure would not have to happen until *after the* transaction was completed.  It is typical for such disclosures to come several days after the transaction's execution.  (*See* Warren Dep. Tr. at 178:7-22.)

accrued."[25]  Thereafter, Revlon and Perelman have been lauded in the press as having successfully reached a deal to avoid bankruptcy, which would have been caused by the springing maturity on the 2016 Term Loans.[26]  Indeed, Perelman's private equity company, MacAndrews & Forbes, revealed in a November 13, 2020 SEC filing that it made a significant financial contribution to the deal.[27]

95.    Regardless of whether Defendants' understanding of the payments was correct, they had no reason even to contemplate a far-fetched scenario in which Citibank paid all of them their exact principal, and the corresponding accrued interest, by mistake.

## XV.   THIS LAWSUIT

96.    Once Defendants received or became aware of the "recall" communications from Citibank, Defendants took the conservative step of instructing the various trustees, custodians, and fund administrators for the 2016 Term Lenders to freeze the August 11 payments in place so that the money received would not be sent to investors.  (Abrams Decl. ¶¶ 29-30; Caraher Decl. ¶ 17; Dent Decl. ¶ 15; Frusciante Decl. ¶ 21; Greene Decl. ¶ 26; Lenga Decl. ¶ 16; McCoy Decl. ¶ 29; Meneses Decl. ¶ 20; Perkal Decl. ¶ 16; Phipps Decl. ¶ 20; Vaughan Decl. ¶ 22.)  This step was taken because it was clear that there could be potential litigation over the August 11 Wire Transfers, and did not reflect a belief that the 2016 Revlon Term Loan is still outstanding. (Abrams Decl. ¶¶ 29-30; Dent Decl. ¶ 15; Frusciante Decl. ¶ 21; Greene Decl. ¶ 26; Lenga Decl.

---

[25]   *See* Revlon Announces Final Results and Expiration of Amended and Restated Exchange Offer and Concurrent Consent Solicitation, Nov. 12, 2020, available at: https://investors.revlon.com/news-releases/news-release-details/revlon-announces-final-results-and-expiration-amended-and

[26]   *See* Revlon to Avoid Bankruptcy Filing Upon Completing Debt Deal, Nov. 12, 2020, available at:  https://www.bloomberg.com/news/articles/2020-11-12/revlon-to-avoid-bankruptcy-filing-upon-completion-of-debt-deal

[27]   *See* Revlon, Inc., Schedule 13D/A (Nov. 11, 2020), available at: https://app.reorg.com/print/sec/5faf0418bbc0c77b3e8b4e6d

¶ 16; McCoy Decl. ¶ 16; Meneses Decl. ¶ 20; Perkal Decl. ¶ 16; Phipps Decl. ¶ 20; Vaughan Decl. ¶ 22.)

97.     On August 17, 2020, Citibank sued Brigade (the investment manager, not the Lenders that it manages) for return of the funds that were transferred to the Term Lenders pursuant to the August 11, 2020 wire transfers.  *See* Complaint, Case No. 1:20-cv-06539 (Dkt. 1) ("Brigade Complaint").  On August 18, 2020, Citibank followed on with lawsuits against HPS and Symphony.  *See* Complaint, Case No. 1:20-cv-06617 (Dkt. 1) ("HPS Complaint").  On August 21, 2020, Citibank sued the remaining seven defendants.  *See* Complaint, Case No. 1:20-cv-06713 (Dkt. 1) ("Bardin Hill Complaint").  In these complaints, Citibank brought claims for unjust enrichment, conversion, money had and received, and payment by mistake.

98.     In Citibank's first two complaints, Citibank alleged that interest was "due" on August 11, 2020.  Brigade Complaint ¶¶ 15, 16; HPS Complaint ¶¶ 17, 18.  In its third complaint, Citibank no longer alleges that interest was "due" on August 11.  As noted, interest would have been "due" on that date only if Revlon were making a prepayment of principal at the same time.  *See* Supra at ¶ 50.

99.     By the time Citibank filed its first complaint on August 17, 2020 against Brigade, it still had not determined the reasons for the alleged error,[28] even though it was asserting that Defendants and 2016 Term Lenders should have known that an error occurred.

100.     In all three of Citibank's complaints, Citibank alleged that it "never modified the register to reflect a full or partial discharge" of the 2016 Term Loans.  *See, e.g.,* Brigade

---

[28]   Zeigon Dep. Tr. at 240:10-14 ██████████████████████████████
██ ████████████████████████████████████████████████████████████
████████████████████████████ .

Complaint ¶ 22.  As noted supra, Citibank's register reflected a zero balance following the August 11 payments.  *See supra* at ¶ 26.

101.    Based in part on certain of the foregoing allegations, the Court entered Temporary Restraining Orders (the "TROs") with respect to the funds transferred to Defendants on August 11, 2020, and Defendants have instructed the trustees, custodians, and fund administrators for the 2016 Term Lenders to hold the transferred funds in compliance with those TROs.  (Abrams Decl. ¶¶ 29-30; Dent Decl. ¶ 15; Frusciante Decl. ¶ 21; Greene Decl. ¶ 26; Lenga Decl. ¶ 16; McCoy Decl. ¶ 29; Meneses Decl. ¶ 20; Perkal Decl. ¶ 16; Phipps Decl. ¶ 20; Vaughan Decl. ¶ 22.).

**CONCLUSIONS OF LAW**

I.    **DEFENDANTS ARE ENTITLED TO RETAIN THE AUGUST 11 TRANSFERS, BECAUSE THEY CONSTITUTE A "DISCHARGE FOR VALUE" OF THE TERM LOANS**

102.    It is undisputed that, on August 11, 2020, Citibank transferred the precise amount outstanding on the Revlon Term Loans to each of 315 lenders.  (Citibank's Responses and Objections to Defendants' Requests for Admissions, Request No. 6.  *See also* Zeigon Dep. Tr. at 108:16-22.).  Citibank's purported "mistake," then, is that it paid those lenders *exactly what they were owed*.  As detailed in Section I.A, *infra*, the lenders are entitled to retain those funds, under well settled New York law, as a "discharge for value" on their Term Loans.  In Section IB, *infra*, Defendants address a series of questions posed by the Court in its Order on August 19, 2020 (the "August 19 Order"), and the answers to those questions demonstrate there is no merit to Citibank's various arguments aimed at avoiding a finding that the Term Loans were discharged.

   A.    **Defendants Meet The Requirements For A Discharge For Value Under New York Law**

103.    New York recognizes the "discharge for value" defense.[29]  *See Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 376 (1991).  In *Banque Worms*, the New York Court of Appeals held that a creditor who receives money "to which it is entitled," having "no knowledge that the money was erroneously wired," can treat "the transfer of funds as a final and complete transaction, not subject to revocation."  *Id.* at 373.  That is the exact situation here:  It is undisputed that the Term Lenders were owed (and therefore "entitled to") the exact amounts they received through the August 11 Transfer.  (Citibank's Responses and Objections to Defendants' Requests for Admissions, Request No. 6.  *See also* Zeigon Dep. Tr. at 108:16-22.)  And

---

[29]   This action is governed by New York law, pursuant to a choice of law provision in the 2016 Credit Agreement.  *See* Credit Agreement § 10.11.

49

Defendants have presented extensive testimony confirming they had "no knowledge" that the funds were "erroneously wired." (*See, e.g.*, Abrams Decl. ¶¶ 4, 19; Caraher Decl. ¶ 19; Crocombe Decl. ¶ 4; Frusciante Decl. ¶ 23; Greene Decl. ¶ 28; Josephson Decl. ¶ 4, 22; Lenga Decl. ¶¶ 4, 12; McCoy Decl. ¶¶ 13-15, 31; Meneses Decl. ¶¶ 4, 22; Perkal Decl. ¶ 13; Phipps Decl. ¶ 21; Vaughan Decl. ¶ 24; Xanthakys Decl. ¶ 17.)  The August 11 Transfer therefore is "not subject to revocation."  *Banque Worms*, 77 N.Y.2d at 373; *see also Colli v. Wirth*, 1996 WL 243237, at *8 (S.D.N.Y. 1996) ("[W]here the benefit is deserved, as in the case of a valid debt owed, and the means employed in obtaining it lawful, no injustice has occurred.  In such situations, the payor is not entitled to restitution.").

104.    The facts here are strikingly similar to the facts in *Banque Worms*—a case in which the New York Court of Appeals, the Second Circuit, and the Southern District of New York, all concluded that a mistaken bank payment constituted an irreversible discharge of debt.[30]  In *Banque Worms*, the defendant bank, Security Pacific International Bank ("SPIB"), received a direction from its accountholder, Spedley Securities Ltd. ("Spedley"), to transfer approximately $2 million to Banque Worms as full payment on an outstanding loan.  726 F. Supp. at 940-41.  Spedley subsequently reversed that direction, and directed that the funds be sent elsewhere.  *Id*.  SPIB mistakenly followed the initial direction, however, and sent the funds to Banque Worms.  *Id*.  SPIB advised the bank that held Banque Worms's account two hours later that the funds had

---

[30]  In *Banque Worms*, the District Court held that the disputed payment was a discharge for value under New York law.  *Banque Worms*, 726 F. Supp. at 943.  On appeal from that Order, the Second Circuit noted uncertainty, under New York law, as to whether the defense includes a reliance requirement, and certified the question to the New York Court of Appeals.  *Banque Worms v. BankAmerica Int'l*, 928 F.2d 538, 541 (2d Cir. 1991).  The Court of Appeals held that discharge for value does not require any showing of reliance, *Banque Worms*, 77 N.Y.2d at 366, and the Second Circuit then affirmed the original district court decision, holding that Banque Worms was entitled to the disputed funds as a discharge for value on its loans, *Banque Worms*, 928 F.2d at 541.

been sent by mistake and demanded that they be returned, and Banque Worms later invoked the

discharge for value defense.  *Id*.  At every key juncture, the situation here is the same:  Citibank

maintains that it mistakenly executed a direction to transfer funds in its role as an agent for a

third party (in this case, Revlon); it transferred those funds to the Term Lenders in the amounts

they were owed (Fratta Dep. Tr. at 64:7-23, 284:4-20); it sent an error notice after the mistaken

transfer (Zeigon Dep. Tr. at 212:4-6); and Defendants are invoking the discharge for value

defense as a basis to retain the funds.

      105.    In finding a discharge for value in nearly the same scenario as now before this

Court, the Court of Appeals in *Banque Worms* applied the requirements set out in Section 14 of

the Restatement of Restitution.  Under that provision,

> A creditor of another or one having a lien on another's property who has received
> from a third person any benefit in discharge of the debt or lien, is under no duty to
> make restitution therefor, although the discharge was given by mistake of the
> transferor as to his interests or duties, if the transferee made no misrepresentation
> and did not have notice of the transferor's mistake.

*Banque Worms*, 77 N.Y.S. 2d at 367 (quoting Restatement § 14(1)).  The Court explained why a

finding of discharge under this standard was "particularly appropriate":  "[A]s a creditor . . .

Banque Worms was a beneficiary entitled to the funds who 'made no misrepresentation and did

not have notice of the transferor's mistake.'"  *Id.* at 376.  The Second Circuit, addressing the

same facts, gave a similar rationale:  "At the time it received the mistaken payment, Banque

Worms was Spedley's bona fide creditor.  Further, Banque Worms made no misrepresentation

regarding the transfer or its right to receive the funds and did not have notice of the transferor's

error."  928 F.2d at 541.  Here, too, it is undisputed that, "at the time it received the mistaken

payment," each lender was Revlon's "bona fide creditor"; that Defendants "made no

misrepresentation regarding the transfer or its right to receive the funds" (*see* DX-1089,

Citibank's Revised Responses and Objections to Defendants' First Set of Requests for

Admissions Directed to Citibank, N.A. Response to Request No. 9); and that Citibank provided

no notice "at the time" (928 F.2d at 541) of the transfer of any "error." (Zeigon Dep. Tr. at

212:4-6 ("Q. Okay.  Well, Citibank began sending notices of an error on the afternoon of August

12th, right? A. Correct."));[31] 928 F.2d at 541.

106.    On a straightforward application of *Banque Worms*, Defendants are "entitled to

retain the mistakenly transferred funds."  *Id.*

### B.    The Answers To Each Question Posed By The Court Demonstrates That Citibank Cannot Avoid Application Of The Discharge For Value Defense.

107.    In its August 19 Order, the Court asked that the parties address three questions,

each related to an argument that Citibank has advanced as a basis for avoiding application of the

discharge for value defense.[32]  ECF No. 28 at 2.  Defendants address those questions below, and

the answers demonstrate that Citibank's arguments are without merit.

### 1.    *The Discharge For Value Defense Applies Upon Receipt of Funds*

108.    In the first question it posed in its August 19 Order, the Court asked the

following:

At what point in time does the "discharge for value" rule apply?

---

[31]    The question of whether Defendants were "on notice" of Citibank's purported mistake is addressed in greater detail in Section I.B.2.b, *infra*.  But for the present purpose of comparing the facts of *Banque Worms* with the facts here, it is significant that Citibank, like the transferor bank in *Banque Worms*, first gave notice of its purported error *after the money had already been sent*. Indeed, Citibank sent "error notices" to Defendants the day after the August 11 Transfer (*see, e.g.,* Zeigon Dep. Tr. at 212:4-6), whereas the defendant bank in *Banque Worms* gave notice of its mistake just two hours after it occurred.  726 F. Supp. at 942.  The Court concluded that giving notice two hours after the mistake, which was far more prompt than the nearly full day delay here, was still too late and therefore "immaterial" to the discharge analysis.  *Id.*

[32]    The Court also posed a question concerning the relationship between Defendants and the Lenders to which Citibank sent the August 11 Transfers.  ECF No. 28 at 2.  Because that issue does not relate directly to the discharge for value rule, it is addressed separately in Section III.A, *infra.*

– Are there any New York authorities applying the rule in *In re Calumet Farm, Inc.*, 398 F.3d 555 (6th Cir. 2005)?

– If *Calumet* accurately states the law in New York, how does it apply in this case? Were the debts in this case "discharged" and, if so, when?

ECF No. 28 at 2.  As detailed below, the discharge for value rule applies upon receipt of the disputed funds, and not, as Citibank contends, at some later time when the discharge is recorded in the recipient's books and records.  Moreover, no New York court has applied the rule in *In re Calumet Farm, Inc.*, 398 F.3d 555 (6th Cir. 2005), and *Calumet* itself relies on authority that rejects New York law, including specifically the requirement that discharge be assessed upon the receipt of funds.  Lastly, even if *Calumet* were the governing standard under New York law (it is not), Defendants would prevail because Citibank itself made the bookkeeping entries that, according to its own argument, constitute a discharge of debt.

      (a)     *This Action is Governed By The Court Of Appeals Decision in Banque Worms, Which Applies The Discharge For Value Defense Upon Receipt Of Funds, And Not By The Sixth Circuit Decision in Calumet*

109.   Citibank maintains that, in order to prevail on the discharge for value defense, Defendants must show that they affirmatively "credited" Citibank's payment in their records prior to receiving notice that the funds had been transferred by mistake.  *See* ECF No. 41;[33] ECF No. 23 at 2 ("Brigade has offered no evidence that it 'credited' Revlon in any manner.  Again,

---

[33]   As its support for a "crediting" requirement, Citibank relies on *Banque Worms'* citation to the 100-plus year old decision in *Carlisle v. Norris*, 215 N.Y. 400, 415 (1915).  ECF 41 (citing Banque Worms, 77 N.Y.2d at 368).  That is misguided:  The Court of Appeals in *Banque Worms* did not cite *Carlisle* as the modern governing standard, but as part of its discussion as to why the discharge for value rule needed to be updated in the context of "electronic funds transfer technology."  *Banque Worms*, 77 N.Y.2d at 368-69.  In that context, which is the context here, the Court emphasized that the need to "establish[] finality in electronic wire transfers" is a "singularly important policy goal," and explained that electronic payments are "final and irrevocable" as soon as the funds are released.  *Id*. at 372, quoting *Delbrueck & Co. v. Manufacturers Hanover Trust Co.*, 609 F.2d 1047, 1049-51 (2d Cir. 1979).

that is essential under Restatement Section 14 . . . .").  There is no such requirement under New York law.

110.    *Banque Worms* and its progeny apply the discharge for value rule immediately upon payment and receipt of the disputed funds, and not when the recipient later "credits" the funds in its books.  In fact, this Court in *Banque Worms* expressly rejected placing any weight on the "final settling of accounts," which it viewed as nothing more than "mere bookkeeping."  726 F. Supp. at 942 (citing *Delbrueck & Co. v. Mfrs. Hanover Trust Co.*, 609 F.2d 1047, 1049-51 (2d Cir.1979)).  Moreover, with the critical moment occurring upon receipt of the funds, the district court held that "any awareness by Banque Worms of SPIB's mistake two hours after the funds were transferred by wire *is not material*."  *Id.* (emphasis added).  The New York Court of Appeals similarly held that a debt is discharged where the recipient has no knowledge the funds were sent in error "when [it] receives [the] money."  77 N.Y.2d at 373.  The Second Circuit affirmed the District Court, also focusing its analysis at "the time [the lender] received the mistaken payment."  928 F.2d at 541 ("*At the time it received the mistaken payment,* Banque Worms was Spedley's *bona fide* creditor.  Further, Banque Worms made no misrepresentation regarding the transfer or its right to receive the funds and did not have notice of the transferor's error.  Therefore, as Judge Patterson concluded, Banque Worms is entitled to retain the mistakenly transferred funds." (emphasis added)).[34]  Other leading authorities understand New York law and *Banque Worms* the same way:  "As the [New York] Court of Appeals saw things, a creditor should be able to treat funds credited in apparent payment of a debt as irrevocably his,

---

[34]    On appeal, SPIB argued that the district court erred by determining discharge at the time of fund receipt, complaining that the "court's reasoning effectively eliminates any 'window' at all."  App. Opening Brief at 47.  *See* Exhibit A.  The Second Circuit rejected all of SPIB's arguments, finding them "to be without merit."  *Id.* at 542.

*unless news of the error precedes arrival of the funds*."  *Gen. Elec. Capital Corp. v. Cent. Bank*, 49 F.3d 280, 284 (7th Cir. 1994) (Easterbrook, J.) (emphasis added).

111.    *Banque Worms*' rejection of a rule that would delay discharge until the fund recipient records the transfer in its books is also consistent with the plain meaning of the term "discharge," which is defined as "the payment of a debt," not the subsequent "booking of a payment after receipt."  *Discharge*, Black's Law Dictionary (11th ed. 2019) (debts are typically "discharge[d] by performance" of the debtor).  Consistent with that plain understanding, numerous courts applying New York law have recognized that it is the payment of a debt that discharges it, not some subsequent action by the lender.  *See Nat'l Commercial Bank & Trust Co. of Albany v. Madison*, 270 A.D. 437, 439 (N.Y. App. Div. 3d Dep't 1946) ("The drawee's payment discharged the instrument."); *McCrea v. Purmont*, 16 Wend. 460, 474 (N.Y. 1836) ("The payment of the money discharges or extinguishes the debt; a receipt for the payment does not pay the debt, it is only evidence that it has been paid."); *Dillenbeck v. Dygert*, 52 Sickels 303, 309 (N.Y. 1884) ("That the note was extinguished by payment . . . we concede."); *Jackson v. Am. Cigar Box. Co.*, 141 A.D. 195, 196 (N.Y. App. Div. 1st Dep't 1910) ("The mere acceptance of the principal sum and interest would . . . discharge the debt pro tanto . . . ."); *Arlington Park Racetrack Ltd. v. SRM Computers, Inc.*, 674 F. Supp. 986, 992 (E.D.N.Y 1987) ("The debt of [debtor] was extinguished when [payor] paid it with a check . . . ."); *Fara, Inc. v. Gouvis*, 245 A.D.2d 483, 484 (N.Y. App. Div. 1st Dep't 1997) ("Reliance and Royal discharged their duty to the plaintiff when their settlement checks, payable to the plaintiff as an additional insured, were paid by the drawee banks.").

112.    Citibank attempts to escape the rule of *Banque Worms* (and New York law generally), that a debt is discharged upon payment, by relying on the Sixth Circuit decision in *In*

*re Calumet Farm, Inc.*, 398 F.3d 555 (6th Cir. 2005), in which the Court, applying Kentucky

law, held that the "relevant event" under the discharge for value doctrine is whether the lender

receives notice of mistake "before it credits the debtor's account."  ECF No. 10 (citing *In re*

*Calumet Farm, Inc.*, 398 F.3d 555 (6th Cir. 2005)).  But *Calumet* has never been cited by any

New York court, and departs from New York law.[35]  *Calumet* relies principally on *NBase*

*Communications, Inc. v. American National Bank & Trust Company of Chicago*, 8 F. Supp.2d

1071 (N.D. Ill. 1998), which recognized that "[*Banque Worms*] makes clear that the discharge

for value rule (as applied in New York) entitles the holder of a mistaken payment to keep such

payment *upon receipt*," and that "*Banque Worms'* approach . . . protects creditors who have done

nothing more than receive a mistaken payment."  *Id.* at 1075-76.  The Court in *NBase* explained

that *Banque Worms* follows from a long "tradition" under New York law favoring the finality of

financial transactions, and the *NBase* Court openly acknowledged it was adopting a contrary rule

that there is no discharge until the recipient credits the funds—the same rule Citibank wants

applied here—*because it "disagree[d] with Banque Worms' approach."  Id.* at 1076 ("[O]ne

way to avoid [a] 'lengthy period of uncertainty' is to allow banks to keep mistaken payments

---

[35]   The Sixth Circuit acknowledged that the New York Court of Appeals in *Banque Worms*
states that notice that a payment was by mistake "must occur before the funds arrive," but
nevertheless oddly suggests that the Court of Appeals did not focus on that question or on "how"
the discharge for value rule applies.  398 F.3d at 559.  In fact, as discussed in text, the Court of
Appeals held that discharge is determined at the time of payment, because that standard
comports with the strong New York policy in favor of the finality of financial transactions.
*Banque Worms*, 77 N.Y.2d at 373 ("The 'discharge for value' rule is consistent with and furthers
the policy goal of finality in business transactions and may appropriately be applied in respect to
electronic funds transfers.").  And the district court and Second Circuit in *Banque Worms*,
neither of which the Court in *Calumet* acknowledged or considered, both plainly addressed
"how" the discharge for value rule applies:  Indeed, they applied it to facts analogous to the facts
here, with the district court even specifically holding that an error notice received two hours after
a mistaken payment, and before the "final settling of the account," was not sufficient to require
return of the funds.  726 F. Supp. at 942; 77 N.Y.2d at 376; 928 F.2d at 541.

upon receipt. *This is what the Banque Worms Court did . . . . [W]e decline to do so.*" (emphasis added)). The Courts in *NBase* and *Calumet* had the option of "disagree[ing]" with New York law, but Citibank does not. This action is governed by *Banque Worms*, which, as *NBase* recognized, holds that a debt is discharged "upon receipt" of the disputed funds. *Id.*

113.     The contrast between the rule adopted in *NBase* and *Calumet*, as compared to the rule in *Banque Worms*, is further highlighted by the Court's acknowledgement in *NBase* that its rule, pursuant to which there is no discharge until the lender credits the debtor's account, "reduces the inquiry to whether [the lender] performed a minor bookkeeping task before it received notice." *NBase*, 8 F. Supp.2d at 1077 n.8. This is a stark departure from *Banque Worms*, where the district court expressly rejected the notion that discharge depends on the timing of "mere bookkeeping." 726 F. Supp. at 942. In other words, Citibank is asking this Court to adopt the specific feature of *NBase* and *Calumet* that most directly contradicts New York law.

114.     Citibank's position is incompatible with *Banque Worms* for the added reason that Citibank's proposed standard—by which a debt is not discharged until the recipient of a transfer affirmatively "credits" the funds to its account—would, in essence, impose a "reliance" requirement by another name. That is clear from Citibank's representations to this Court. *See* Aug. 18, 2020 Hr'g Tr. at 12:6-8 ("[The Discharge For Value Rule is] an equitable concept. It would be inequitable to require restitution from an innocent transferee who has actually done something as a result of the payments."); *id.* at 16:20-22 ("On the discharge claim, . . . the archetypal examples here are things like surrendering a promissory note, releasing a lien, doing something detrimental that's irreversible."). A reliance requirement is exactly what the Court of Appeals rejected in *Banque Worms*. One of the specific questions the Second Circuit certified to

the New York Court of Appeals was whether, in order to retain mistakenly transferred funds, the recipient must demonstrate that "the payment has caused such a change in the position of the receiving party that it would be unjust to require the party to return the funds." 77 N.Y.2d at 366. The Court of Appeals answered that the recipient is entitled "to retain the funds mistakenly transferred without the necessity of demonstrating detrimental reliance." *Id*. Thus, Citibank is wrong that discharge requires that the fund recipient "do[] something detrimental that's irreversible." Aug. 18, 2020 Hr'g Tr. at 16:20-22. Under *Banque Worms*, the August 11 Transfer discharged the Term Loans, regardless of whether the Defendants or the lenders took any affirmative steps, such as crediting those payments to their accounts, in reliance on Citibank's purported mistake.

115. Finally, the decision by *Banque Worms* to reject a standard that would delay the discharge of a loan until the fund recipient records the payment in its books is not arbitrary, but is a fully considered judgment by the Court of Appeals promoting the important purpose of ensuring "finality in business transactions, which has long been a significant policy consideration in this State." 77 N.Y.2d at 372. The Court explained that a creditor who receives payment on an outstanding debt without knowledge "that the money was erroneously wired," "should not have to wonder whether it may retain the funds." *Id.* at 373. Any other standard "would disorganize all business operations and entail an amount of risk and uncertainty which no enterprise could bear." *Id.* at 372 (quoting *Hatch v. Fourth Nat'l Bank*, 147 N.Y. 184, 192 (1895)); *see also Gen, Elec. Capital Corp. v. Cent. Bank*, 49 F.3d at 284 (agreeing with *Banque Worms* that discharge should be determined upon receipt of funds, and observing that "[c]osts of errors should be borne by those who make errors (the better to induce them to take care) rather than by innocent beneficiaries."). The Court of Appeals also rejected the suggestion that its rule

58

would "undermine" electronic banking or "impose" unreasonable risks on banks, reasoning that banks can and should keep mistakes to "a minimum" by implementing available "security features in effecting wire transfers." 77 N.Y.2d at 375; *see also Banque Worms*, at 726 F. Supp. at 943 (New York law "dictates" that the bank transferor "suffer the loss for its mistaken payment" of an outstanding debt). As *NBase* recognized, even while making a different policy choice under a different State's law, New York has determined that the need for finality in financial transactions dictates that lenders be permitted "to keep mistaken payments upon receipt." 8 F. Supp.2d at 1076 (citing *Banque Worms*, 77 N.Y.2d at 373). That is the governing standard in New York, and therefore the governing standard here.

116.    Applying that standard, the Term Loans were discharged immediately upon the lenders' receipt of the August 11 Transfer. It is undisputed that, "[a]t the time [they] received the mistaken payment," *Banque Worms*, 928 F.2d at 541, the lenders had not yet received Citibank's "error notices." In fact, Citibank did not send those notices until approximately twenty hours after the transfer (*see, e.g.*, Zeigon Dep. Tr. at 212:4-6), which is a far longer delay than the error notice in *Banque Worms*, which occurred just *two hours* after the payment, 726 F. Supp. at 942. Because New York law looks to the time of payment to determine discharge, rather than any later "bookkeeping," even that two hour period—and certainly the twenty hour notice period here—was too late. *Id.* Moreover, Citibank's own witness, Vincent Fratta, has acknowledged that, before Citibank sent its error notices, which occurred the day after the August 11 Transfer, there would be no reason to expect that Defendants would have known that the transfer had occurred by mistake. (Fratta Dep. Tr. at 205:16-206:21 ("████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████   Similarly, Citibank's expert, Mr. Byrne, could not identify any steps that

Citibank took that would have put the lenders on notice of error.  (Byrne Dep. Tr. at 183:20-

184:8.)  And Defendants' witnesses have consistently testified that they did not believe that the

transfer was a mistake.[36]  (Abrams Decl. ¶¶ 4, 19; Caraher Decl. ¶ 19; Crocombe Decl. ¶ 4;

Frusciante Decl. ¶ 23; Greene Decl. ¶ 28; Josephson Decl. ¶ 4, 22; Lenga Decl. ¶¶ 4, 12; McCoy

Decl. ¶¶ 13-15, 31; Meneses Decl. ¶¶ 4, 22; Perkal Decl. ¶ 13; Phipps Decl. ¶ 21; Vaughan Decl.

¶ 24; Xanthakys Decl. ¶ 17.)

117.    In sum, Defendants did not have knowledge of any mistake "when [they]

receive[d] money," and the August 11 Transfer was therefore a "final and complete transaction,

not subject to revocation."  *Banque Worms*, 77 N.Y.2d at 373.

>    *(b)    Defendants Would Prevail Even Under Citibank's Incorrect*
>    *Reliance on Calumet*

118.    Even if this action were governed by the Kentucky law applied in *Calumet*, rather

than the New York law applied in *Banque Worms*, Defendants would still prevail.  As discussed

above, Citibank relies on *Calumet* for the proposition that the discharge for value defense

applies, not upon receipt of a mistaken payment, but only later when the lender or its agent

---

[36]  Personnel working for several Defendants were aware of the August 11 Transfer before
Citibank sent its "error notices" the following afternoon.  All of those witnesses testified that
they believed, upon learning of the transfer, that it was an intentional pre-payment of the
outstanding principal on the Term Loans.  (Caraher Decl. ¶ 4; Frusciante Decl. ¶ 4; McCoy Decl.
¶ 4; Perkal Decl. ¶ 4; Vaughan Decl. ¶ 4; Xanthakys ¶ 3.)  The employees of certain Defendants
did not learn of the August 11 Transfer until after Citibank sent its "error notices," and therefore
certainly had no knowledge of any mistake at the time of the transfers.  Those employees have
each testified that, but for the error notices, they would have had no reason to believe there had
been a mistake.  (Abrams Decl.; ¶ 4; Crocombe Decl. ¶ 4; Dent Decl. ¶ 4; Josephson Decl. ¶ 4;
Meneses Decl. ¶ 4; Phipps Decl. ¶ 4.)  Two of the employees who learned of the August 11
Transfer after Citibank sent its "error notices" learned about the transfers before learning of the
"error notices," and also testified that they believed, upon learning of the transfer, that it was an
intentional pre-payment.  (Greene Decl. ¶ 4; Lenga Decl. ¶ 4.)

"credits" those funds in its records, ECF No. 23 at 2. The main problem with this argument (*see* Section I.A., *supra*), is that *Banque Worms* rejects this hyper-technical approach, in which application of the discharge for value defense depends arbitrarily on the timing of the "mere bookkeeping" function of recording the disputed payment. 726 F. Supp. at 942. But if Citibank were correct that such a technical requirement applies, the evidence shows that it was satisfied here. As detailed below, Citibank itself credited the August 11 Transfer as a complete paydown of the Term Loans in its official Register, as did several Defendants and custodians who maintain the Term Lenders' books and records.

(i)    <u>Citibank Credited The August 11 Transfer As A Full<br>Paydown Of The Term Loans</u>

119.    Citibank argues it would have been impossible for Defendants to satisfy the "crediting" requirement that Citibank asks the Court to impose. According to Citibank, "the official record of Revlon's debt under the Credit Agreement is the Register, which is maintained by the Administrative Agent (Citibank), not by each lender; thus [the creditors] had no ability to credit or discharge Revlon unilaterally." ECF No. 23 at 2 *see also* Aug. 18, 2020 Hr'g Tr. at 18:6-16 ("[T]he lender's accounts are not what matter under a syndicated loan. It's the administrative agent, which is Citibank, that maintains the official register of what is owed by the lender. . . . Citi did not adjust the register to reduce the principal amount. Therefore, as a formal matter, the debt was not discharged in any sense."). In other words, Citibank conveniently takes the position that only Citibank could discharge the Revlon Term Loans, and it claims it never did because it "never modified the register to reflect a full or partial discharge." Compl. 22.

120.    Citibank's professed confidence that it "never modified the register" has turned out to be false. After Citibank staked out its position that the Term Loans would be discharged

61

only if Citibank had recorded them as paid down in its register, it surfaced through document

discovery and deposition testimony that Citibank had done exactly that.  In a text message

exchange, dated August 17, 2020, two Citibank personnel involved in executing the August 11

Transfer, Mr. Fratta and Mr. Arokia, discussed how Mr. Arokia had compiled ██████████

████████████ in connection with the error notices that Citibank had sent on August 12, 2020.

(DX-0744.)  Mr. Arokia explained that he had run an ██████████ for August 10, *i.e.*, the day

before the transfer.  *Id.*  When Mr. Fratta asked why he had not run a report for August 11, Mr.

Arokia advised that, on that day, ██████████████████████████████████████████████████

████  *Id.* (emphasis added).  In his testimony, Mr. Fratta confirmed that, as part of the process of

executing the August 11 Transfer, Citibank had in fact reduced the outstanding principal balance

on the Term Loans in its internal books to ██████[7]

     121.    Defendants determined that Citibank's document production did not include the

OC report that Mr. Arokia referenced in his text, and that Mr. Fratta acknowledged in his

testimony, and requested that Citibank produce it.  In a letter to the Court pertaining to a related

discovery dispute, on October 23, 2020, Citibank insisted it had already produced the relevant

"OC Report," which it referred to as the "Register" for the Term Loans.  *See* ECF No. 125 at 3

---

[37]  Mr. Fratta testified that Citibank's plan had been to conduct the August 11 Transfer in two
phases.  First, the principal amount would be forwarded to a "wash" account within Citibank,
with the balance of the Term Loans reduced to zero in Citibank's records; and, second, a
reconstituted loan would be built by Citibank, with its full principal amount recorded as
outstanding.  (Fratta Dep. Tr. at 101:24████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████████
████████.)  Citibank's "mistake" was that it sent the principal to the Term Lenders, rather than
to its internal wash account.  But, as planned from the start, it recorded the Term Loans as fully
paid down in its records, prior to building the reconstituted loan in its system.  (Fratta Dep. Tr. at
101:24.)

n.2 (claiming ████████████████████████████████████████████

████████████████████████ The document that Citibank referenced was created after

the start of this litigation (on August 21, 2020).  (DX-0924 (████████████████

████████████████)).  That document was actually the Register for the newly constituted loan

(*see* FN 15, *supra*), which showed the principal still outstanding rather than the Register for the

original Term Loans, showing zero principal balance.  Indeed, the OC Report referenced by

counsel was run on August 21 (not when Mr. Arokia had generated the report he referenced in

his texts with Mr. Fratta); it listed a different loan number than Citibank used to designated the

Term Loans[38]; and, rather than reflect the zero balance indicated by Mr. Arokia in his text and

Mr. Fratta in his testimony, it showed nearly $900 million outstanding principal.  It was thus

apparent that Citibank had produced its preferred version of the Register—one that it generated

after the start of the litigation for the reconstituted loan that listed full principal as outstanding—

rather than the contemporaneously created Register, acknowledged by its witnesses, that

recorded the Term Loans as fully paid down.

122.    After Defendants made clear that they would otherwise pursue the matter with the

Court, Citibank finally produced an email thread from August 12 attaching the "Register" dated

August 12, 2020, with the same loan number Citibank had used internally to reference the Term

Loans, and which recorded loan balances of $0.00 across all 315 lenders.  (DX-0541 at

Citi00031181 (referencing the correct "████████████████████████████ At that same

time, Citibank produced another "Register" that was created post-litigation (but this time with

---

[38]   An internal e-mail sent by Citibank employee Dorothy Lee-Murray one hour before the wire
transfers were sent out on August 11 listed the identifying information for the 2016 Term Loans:
"████████████████████████████████."  *See* DX-0357.  The "████████
referenced by Citibank in its October 23 letter to the Court concerns a different loan, with a
different loan number.  *See* DX-0924.

the same loan number Citibank had used internally to reference the Term Loans), which also

showed loan balances of $0.00 across all 315 lenders.  (DX-1023 (referencing the correct

███████████████████████████  Plainly concerned that these Registers would defeat

its argument that the August 11 Transfer did not constitute a discharge for value because

Citibank had "never" credited the paydown in "the Register," Citibank took the unusual step of

making a substantive assertion in its production letter—it "clarif[ied]" that the newly produced

documents were not Registers, and repeated its earlier claim that it had "already produced the

Register with a reference date of August 11, 2020 (Citi0029489)."[39]  (*See* Exhibit B, Letter from

J. Baughman, dated October 29, 2020.)  This conspicuously defensive and self-serving assertion

could not change the facts that the August 12 report is labeled an "OC Report," which is the

identical type of report Citibank's counsel, in its letter on October 23, 2020, characterized as a

loan "Register"; that the August 12 report has the same loan number that Citibank assigned to the

Term Loans; and that the August 12 report shows zero remaining balance across all the loans

held by all 315 Term Lenders.

123.    In sum, Citibank was wrong when it represented that it "never modified the

register to reflect a full or partial discharge."  Compl. 22.  That is exactly what it did.  Thus, even

if the Court were to accept Citibank's insistence that the discharge for value rule includes a

---

[39]  That document, which reflects Citibank's "rebuil[ding]" of the fully repaid loan, did not even
exist on August 11 or 12, because Citibank did not rebuild the new tranche until at least August
13.  *See* DX-0664 at Citi00000931 ("█████████████████████████████████████
█████████████████████."); DX-0598 at Citi00000979 ("█████████████████████
█████████████").  Indeed, Mr. Fratta acknowledged that it was not possible to
create the newly constituted loan until some time after the original Term Loans were "zeroe[d]."
Fratta Dep. Tr. at 282:10-283:2.  As such, the only Register in existence immediately after the
August 11 Transfer recorded zero outstanding balance on the Term Loans.

technical requirement that the debt be "credited" in the official Register, that requirement was satisfied here.

(ii)    <u>The August 11 Transfer Was Also Credited By Certain Defendants and Custodians.</u>

124.    Not only did Citibank record the August 11 Transfer as a paydown of the Term Loans in its Register, but several Defendants and/or the custodians responsible for maintaining the books for the Term Lenders did so as well.  For example, Symphony, the fund manager for 30 lenders holding $109,673,303.59 of the Term Loans, booked that full amount, across all of its clients, as pay downs of interest and principal in its accounting system, and reversed that booking only once Citibank demanded return of the payments in order to ensure that the funds would be segregated pending resolution of this dispute.  (Vaughan Decl. ¶ 17.)  The custodians or trustees responsible for maintaining the accounts of numerous other lenders likewise credited the funds from the August 11 Transfer to Revlon's account.[40]  (*See* Frusciante Decl. ¶¶ 30-31; Greene Decl. ¶ 16; McCoy Decl. ¶ 16; DX-0109; DX-0112; DX-0114; DX-0115.)  Thus, here again, even under the standard in *Calumet*, where a mistaken transfer discharges a loan provided that it is credited to the recipient's account, these Term Loans were discharged.

---

[40]   The entity-by-entity fact finding that Citibank's standard would require in order to determine which lenders credited the August 11 Transfer as a paydown in advance of Citibank sending its "error notices" highlights the reasons the Court of Appeals in *Banque Worms* chose a bright line rule that discharges debts immediately upon receipt of a mistaken transfer.  Citibank's approach, in addition to being highly inefficient, would potentially lead to a different result for different lenders, all of whom received payment on their outstanding loans at the exact same time, based randomly on when they happened to update their records to reflect those payments.  The Court in *Banque Worms* looked to the time of receipt in order to promote "finality," N.Y.2d at 373, and purposely placed the cost of a mistaken payment on the bank that made it.  *Banque Worms*, 77 N.Y.2d at 375; *see also Gen. Elec. Capital Corp.*, 49 F.3d at 284 ("As the [*Banque Worms*] Court of Appeals saw things, a creditor should be able to treat funds credited in apparent payment of a debt as irrevocably his, unless news of the error precedes arrival of the funds. Costs of errors should be borne by those who make errors (the better to induce them to take care) rather than by innocent beneficiaries.").

2.      *Defendants Were Not On Actual or Constructive Notice Of A Mistake At The Time Of The August 11 Transfers*

In the second question in its August 19 Order, the Court asked the following,

> What kind of notice of notice is required under New York law when applying the discharge for value rule — constructive or actual?  Relatedly, should the Court's holding in *Regatos v. N. Fork Bank*, 5 N.Y.3d 395, 404-05 (2005), that a bank customer's duty to notify the bank of any unauthorized transfer of funds under U.C.C. § 4-A-204 is triggered by "actual," not "constructive" notice, apply to the "discharge for value" rule?

77 N.Y.2d at 373.  As detailed below, the Court of Appeals in *Banque Worms* held that the discharge for value rule applies except where the fund recipient was on *actual notice* of a mistaken transfer, and it did so based on the same analysis that the Court in *Regatos* applied when it adopted an actual notice standard in an analogous context.  But even if constructive notice were sufficient, no reasonable fund manager would have concluded, at the time of the August 11 Transfers, that the funds had been paid by mistake.

(a)      *Defendants Prevail Under the Actual Notice Standard That Applies To The Discharge For Value Defense Under New York Law*

125.      The Court of Appeals in *Banque Worms* held that the discharge for value rule requires that the recipient of funds receive actual notice of a mistaken transfer as a condition for requiring the return of those funds.  The Court explained its holding as follows,

> The "discharge for value" rule is consistent with and furthers the policy goal of finality in business transactions and may appropriately be applied in respect to electronic funds transfers.  When a beneficiary receives money to which it is entitled and *has no knowledge* that the money was erroneously wired, *the beneficiary should not have to wonder whether it may retain the funds*; rather, such a beneficiary should be able to consider the transfer of funds as a final and complete transaction, not subject to revocation.

77 N.Y.2d at 373.  Thus, the Court focused on the beneficiary's "knowledge," and explained it was adopting a standard designed to ensure "finality" and to spare the beneficiary of any need to "wonder" as to the status of the funds.  *Id*.  That describes actual notice, since constructive

66

notice, by definition, imposes the exact obligation on fund recipients—*i.e.*, the ongoing obligation to "wonder" (or inquire or investigate) as to the status of funds — that the Court of Appeals rejected.  *Compare id.* (adopting a standard that leaves fund recipient with no obligation to "wonder" as to status of the funds), *and id.* at 372 ("In a different but pertinent context, we observed . . . that to permit in every case of the payment of a debt an *inquiry* as to the source from which the debtor derived the money, and a recovery if shown to have been dishonestly acquired, would disorganize all business operations and entail an amount of risk and uncertainty which no enterprise could bear" (emphasis added)),) *with Miner v. Edwards*, 221 A.D.2d 934, 934 (N.Y. App. Div. 4th Dep't 1995) (explaining that a party who "fails to make some investigation" is on constructive notice of those facts that a "reasonable inquiry . . . would have revealed.").

126.     A long line of cases has cited the same concerns with finality that the Court emphasized in *Banque Worms* as justification for rejecting any duty of "inquiry" as a condition for the retention of a payment or the discharge of a debt.  See, e.g., *Stephens v. Bd. of Educ. of City of Brooklyn*, 78 N.Y. 183, 187 (1879) ("It is absolutely necessary for practical business transactions that the payee of money in due course of business shall not be put upon inquiry at his peril as to the title of the payor.  Money has no ear-mark."); *Bowman Import/export Ltd. v. F.J. Elsner N. Am. Ltd*, No. 603756/03, 2004 WL 2853024 at *5 (N.Y. Sup. Ct. Oct. 13, 2004) ("The acceptance of payment of a debt requires no inquiry as to the source of the money."); *Arlington Park Racetrack Ltd.*, 674 F. Supp. at 991 ("[T]he strict rule in New York and elsewhere against allowing restitution of money paid in cash . . . from holders in due course, rests on policy consideration that it is 'absolutely necessary for practical business transactions

that the payee of money in due course of business shall not be put on inquiry at his peril as to the title of the payor.'" (quoting *Stephens*, 78 N.Y. at 187)).

127.    Courts have cited *Banque Worms* as support for rejecting a "constructive notice" standard in discharge for value cases, and in other contexts.  *See First Union Nat'l Bank v. A.G. Edwards & Sons, Inc.*, 262 A.D.2d 106, 106-07 (N.Y. App. Div. 1st Dep't 1999); *Nationwide Merchant Bank Ltd. v. Star Fire International*, 889 F. Supp. 124, 126, 127 (S.D.N.Y. 1995) (holding that defendant could not prevail because it had notice of the transferor's mistake, based on a "subjective test of actual knowledge rather than an objective test which might involve constructive knowledge," and "one who has notice of the transferor's mistake, by definition, may not invoke the discharge for value rule").  In *First Union*, the Court affirmed the denial of a claim by a bank plaintiff seeking to recover funds that it lost through fraud from broker defendants who later received those funds from clients for investment, without "actual knowledge that the funds transferred to them . . . were fraudulently obtained."  262 A.D.2d at 106-07.  The bank argued that, although the defendants did not have actual knowledge, "they were on notice of facts and circumstances that would have led an ordinarily prudent broker to investigate and ascertain the provenance of the funds."  *Id*. at 107.  The Court rejected this argument, relying on *Banque Worms*, because "[i]t would conflict with the strong public interest in maintaining the finality of payments of money in business transactions to require frequent inquiries by firms into the sources of funds paid in the ordinary course of business."  *Id*. (citing *Banque Worms,* 77 N.Y.2d at 372-373).[41]

---

[41]   Numerous courts have applied an "actual notice" standard in "holder in due course" cases, and in cases involving the "*bona fide* purchaser for value rule."  *See, e.g.*, *Hartford Accident & Indemnity Company v. American Express Company*, 74 N.Y.2d 153, 163 (1989) (holding that "holder in due course" defense is "determined by the simple test of what they actually knew, not

128.     Against this backdrop, the decision by the Court of Appeals in *Regatos v. N. Fork Bank*, 5 N.Y.3d 395, 404-05 (2005), to apply an "actual notice" standard to determine when an accountholder is required to notify its bank of an unauthorized transfer from its account, is plainly not unique to that situation, but applies equally in the discharge for value context.  In *Regatos*, the Court of Appeals was asked by the Second Circuit whether, "[i]n the absence of agreement, [] New York U.C.C. Article 4–A require[s] actual notice, rather than merely constructive notice."  The Court of Appeals explained its answer, that Article 4-A requires "actual notice, rather than constructive notice," as follows:

> Policy arguments support an actual notice requirement.  An invariable statutory rule provides a bright line for banks and their customers, bringing reliability and certainty to these dealings.  Constructive notice is far less exact, leaving too much room for varying interpretation and disorder.  If the bank had complied with its security procedures, it would have called Regatos the same day it received each purported transfer order, thereby providing him with actual notice of the events. . . .

*Regatos v. N. Fork Bank*, 5 N.Y.3d 395, 400 (2005).  The Court's analysis mirrors the analysis in *Banque Worms*.  Indeed, the UCC Article that the Court in *Regatos* applied, Article 4-A (addressed to "Fund Transfers"), is the same Article the Court in *Banque Worms* identified as persuasive authority for applying the discharge for value defense.  77 N.Y.2d at 371-76.

---

by speculation as to what they had reason to know, or what would have aroused the suspicion of a reasonable person in their circumstances"); *Jacobs v. Morrison*, 91 Sickels 101, 105 (N.Y. 1892) ("She was a purchaser for a valuable consideration, and any notice of fraud, to be effectual to impair or avoid the title, must have been actual."); *Isaacson & Weingrad v. Newport Iron Works*, 229 A.D. 243, 243 (N. Y. App. Div. 2d Dep't 1930) ("[T]here was merely a suspicion of fraud which does not warrant a rejection of title."); *King v. Holland Trust Co.*, 8 A.D. 112, 117 (N.Y. App. Div. 3d Dep't 1896) ("[A] purchaser for a valuable consideration is not chargeable with constructive notice that the conveyance to him was made with intent to defraud creditors; . . . actual notice is required, to impair or affect his title."); *Stearns v. Gage*, 34 Sickels 102, 108 (N.Y. 1879) ("No authority has been cited which sustains the principle that a purchaser for a valuable consideration, without previous notice, is chargeable with constructive notice of the fraudulent intent of his grantor.").

Moreover, *Regatos* adopted its actual notice standard based on the identical policy concerns—namely, the need for a bright line rule to ensure certainty in financial dealings—that *Regatos* deemed critical in framing the discharge for value defense.  5 N.Y.3d at 403 (citing *Banque Worms*, 5 N.Y.2d at 371).  In both settings, those concerns lead to the same conclusion:  Actual notice is the preferred standard under New York law to ensure finality in financial transactions.

129.    There can be no serious question that Defendants prevail under an actual notice standard.  As a threshold matter, New York courts recognize that where a party is required to show it "did not have knowledge" of something, the "burden of proof is a slight one" because the defense "involves proof of a negative fact."  *First Int'l Bank of Israel, Ltd. v. L. Blankstein & Son, Inc.*, 59 N.Y.2d 436, 444 (1983); *see also A.I. Trade Fin., Inc. v. Altos Hornos de Vizcaya, S.A.*, 840 F. Supp. 271, 275 (S.D.N.Y. 1993) ("Under New York law, the obligation of a holder to show good faith and lack of knowledge of defenses is 'slight.'" (quoting *First Int'l*, 59 N.Y.2d at 444)); *Avrutick*, 740 F. Supp. 222, 236 (S.D.N.Y. 1990) ("A party challenging the good faith and lack of notice of a holder bears a substantial burden.").  Defendants easily meet that (or any) burden.  As discussed above, numerous defense witnesses have testified that they did not know that the August 11 Transfer was in error at the time the funds were received (or at any time before Citibank sent its error notices), (Abrams Decl. ¶¶ 4, 19; Caraher Decl. ¶ 19; Crocombe Decl. ¶ 4; Frusciante Decl. ¶ 23; Greene Decl. ¶ 28; Josephson Decl. ¶ 4, 22; Lenga Decl. ¶¶ 4, 12; McCoy Decl. ¶¶ 13-15, 31; Meneses Decl. ¶¶ 4, 22; Perkal Decl. ¶ 13; Phipps Decl. ¶ 21; Vaughan Decl. ¶ 24; Xanthakys Decl. ¶ 17); it is undisputed that those transfers were not accompanied or preceded by any notice that the funds had been paid in error, (Zeigon Tr. at 212:4-6); and, as discussed below, Citibank's own witnesses acknowledge that there is no reason Defendants would have known of any mistake.

> (b)    *Defendants Would Prevail Even Under A Constructive Notice Standard*

130.    Even if constructive notice were the applicable standard (it is not), there is no basis for a finding that Defendants "reasonably should have known," upon receipt of the August 11 Transfers, that the funds had been sent by mistake.  *See Rodriguez v. City of New York*, 38 A.D.3d 349, 350 (N. Y. App. Div. 1st Dep't 2007) (holding that a person is on constructive notice of something he or she "reasonably should have known"); *see also Consol. Edison Co. of N.Y., Inc. v. U.S.*, 221 F.3d 364, 371 (2d Cir. 2000) (equating "constructive knowledge" with "reason to know"); *Case v. Anderson*, No. 16 CIV. 983 (NSR), 2017 WL 3701863, at *26 (S.D.N.Y. Aug. 25, 2017) ("constructive notice—what the [party] reasonably should have known").  The evidence on this point is overwhelming, and much of its comes from Citibank's own witnesses.

131.    Citibank's expert, Mr. Byrne, testified that he was not aware of anything Citibank did to place Defendants on notice of a mistake,



(Byrne Dep. Tr. at 183:20-184:8.)  Revlon's treasurer was just as clear, testifying that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ that Citibank, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇," could have made a mistaken transfer on the scale of the August 11 Transfer.  (Warren Dep. Tr. at 143:2-12.)  The manager of Citibank's Asset Based Transitional Finance ("ABTF") team, who oversaw execution of the August 11 Transfer, Mr. Fratta, testified that the very reason Citibank sent error notices the day after the August 11

Transfer was because, absent such notices, there would have been no reason to expect that the

Term Lenders would have known that the transfer had occurred by mistake.  (Fratta Dep. Tr. at

42:23-43:10, 205:16-206:21 (" ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ ).  And Mr. Tichauer, who

signed the credit agreement, testified he was " ████████ of any steps that Citibank took to put

lenders on notice of a mistake.  (Tichauer Dep. Tr. at 135:12-22.)

132.    This testimony, from Citibank's expert, its head of the department that executed

the August 11 Transfer, and its client (Revlon), simply leaves no room for any plausible claim by

Citibank that Defendants were on notice that the August 11 Transfer was a mistake at the time it

occurred, which, as detailed in Section I.B.1, *supra*, is the relevant timeframe for the analysis.

But if any more evidence were needed, the record provides it,

- Citibank is one of the largest and most sophisticated financial institutions in the world.  Its own witnesses could not recall a single instance in which it had ever mistakenly transferred anywhere close to the $900 million it transferred here.  *See, e.g.,* Zeigon Dep. Tr. 279:9-281:2 █████████████████████████████████
  ████████████████████████████████████████
  ████████████████████████████████████
  ████████████████████████████████████████
  ████████████████████████████████████
  ████████████████████████████████████████
  █████████ ); Fratta Dep. Tr. at 305:22-306:9 (" █████████████████████
  ████████████████████████████████████
  ████████████████████████████████████████ ).
  Those witnesses, including Mr. Fratta, were ████████ that the bank had transferred the funds by mistake, (Fratta Dep. Tr. at 196:10-197:4), which hardly suggests that Defendants somehow "should have known" that such an exceedingly unlikely error had taken place.

- It is undisputed that Citibank sent each lender the exact amount outstanding in principal and interest on its Term Loan.  *See* Citibank's Responses and Objections to

Defendants' Requests for Admissions, Request No. 6.  Citibank's witnesses acknowledge that this was not a "fat finger" mistake—e.g., a payment to the wrong recipient, or with a decimal period in the wrong place—that would be obvious on its face.  *See, e.g.*, *Zeigon* Dep. Tr. at 264:2-267:7.  Rather, as numerous defense witnesses testified, the payment of all outstanding principal and interest, on a date when payment is not otherwise due, is the hallmark of an off-schedule paydown of a pending loan.  (Caraher Decl. ¶¶ 21-22; Frusciante Decl. ¶ 20, 27; Josephson Decl. ¶ 22; Lenga Decl. ¶¶ 28-29; McCoy Decl.  ¶ 37; Meneses Decl. ¶ 27; Vaughan Decl. ¶ 9.)  Any reasonable lender surely would have concluded that the August 11 Transfer was what it appeared to be—*i.e.*, pre-payment on the Term Loans—and not an historically unprecedented mistake.

- The calculation statement that was sent to each lender with the payments stated no less than six times that interest was "due."  Declaration of B. Zeigon Ex. A (ECF# 8-1) at 2-3.  But Citibank's own witnesses acknowledge that August 11 was not a scheduled interest payment date under the Credit Agreement.  (Fratta Dep. Tr. at 75:15-20 ██████████████████████████████████████████████████ ████████████████████████████████ ████████████████████  Under the Credit Agreement, then, there was only one possible reason for interest to be "due" on August 11—*i.e.*, a voluntary prepayment of the Term Loans.  *See* ¶¶ 54-67, *supra*.  Several defense witnesses have testified to that same understanding.  (Caraher Decl. ¶ 21; Frusciante Decl. ¶ 28; Greene Decl. ¶ 34; Josephson Decl. ¶ 21; Lenga Decl. ¶ 29; McCoy Decl. ¶ 37; Meneses Decl. ¶ 27; Vaughan Decl. ¶ 18; Xanthakys Decl. ¶¶ 17, 24-26.)  And Mr. Fratta acknowledged that interest "generally" comes due in connection with a prepayment of principal on an outstanding loan.  (Fratta Dep. Tr. at 91:5-12.  *See also* Tichauer Dep. Tr. at 48:10-14.)  Having been told by Citibank that interest was "due," notwithstanding that it was not scheduled for August 11, Defendants reasonably would have concluded that principal on the Term Loans was being pre-paid.

- Defendants had good reason to believe that the August 11 Transfer was an intentional pre-payment on the Term Loans for the added reason that, because of the "Accelerated Maturity Date" provision of the 2016 Credit Agreement, the nearest term maturity for Revlon was the Term Loans.  *See* ¶¶ 15-18, *Supra*.  It is undisputed that if Revlon was not able to address these maturities, Revlon would be forced to file for bankruptcy.  (*See, e.g.*, Perkal Decl. ¶¶ 35-38.)  Moreover, on August 11, 2020, it was publically reported that Revlon had hired PJT, a well-known investment bank, to help address the 2016 Term Loans.  (DX-0906 ████████████████████████████ ████████████████████████████████████████████ ).)  A reasonable lender could have believed—and several Defendants did believe—that the paydown on the 2016 Term Loans was an attempt by Revlon to help address this impending accelerated maturity to avoid a default.  (*See, e.g.*, Perkal Decl. ¶¶ 35-38.)  And there is certainly no reason that they "should have known" otherwise.

- It was especially unlikely that any Term Lender would have concluded that the August 11 Transfer was a mistake given the recent history between the parties.  As

multiple defense witnesses have recounted, in May of 2020, Citibank and Revlon—in order to amend the Credit Agreement to permit Revlon to strip the collateral backing the Term Loans—manipulated the voting provisions under the 2016 Credit Agreement to create a 50% lender majority to support the amendment.  (Caraher Decl. ¶¶ 27-28; Crocombe Decl. ¶ 13; Greene Decl. ¶¶ 12, 19; McCoy Decl. ¶ 12; Perkal Decl. ¶¶ 28-30.)  It would be reasonable for lenders to believe—and several did believe—that Citibank and Revlon were again acting to break the lenders' voting bloc, this time repurchasing obligations under the 2016 Credit Agreement so that the lenders would not have the requisite holdings to direct the UMB action against Revlon and Citibank, which had been leaked to the press on August 10.  (Caraher Decl. ¶ 33; Crocombe Decl. ¶ 13; Greene Decl. ¶ 19; McCoy Decl. ¶ 24; Perkal Decl. ¶ 31; Phipps Decl. ¶ 18.)

133.    In sum, there are multiple compelling reasons that the only reasonable conclusion that the Lenders would have reached is that the August 11 Transfer was a pre-payment on the Term Loans.

134.    Citibank has strained to resist this conclusion, notwithstanding the admissions by its own witnesses, but its arguments are unavailing.  As a threshold matter, those arguments can only be viewed skeptically given that Citibank itself did not perceive any mistake until over 15 hours after the payments were completed.  (Zeigon Dep. Tr. 186:13-22 ███████████████

███████████████████████████████████████████

███████████ ); Fratta Dep. Tr. at 183:14-184:5 ("███████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

███████████ ).  It is only with hindsight that Citibank can insist that Defendants should have recognized, upon receipt of the August 11 Transfer, that the funds had been sent by mistake – notwithstanding that it took Citibank until the next day.

135.    Citibank attempts to support that conclusion by pointing to the fact that the August 11 Transfer was not accompanied by a notice indicating the payment of principal, and

arguing that, in the absence of such notices, Defendants should have recognized that the principal amount had been paid by mistake.[42]  ECF No. 1 ¶ 3.  But numerous witnesses, including Mr. Fratta from Citibank, testified that it is not unusual for a lender to receive a payment on an outstanding loan without an accompanying notice, and that this is not an indication of any mistake.  (Caraher Decl. ¶ 21; Frusciante Decl. ¶ 28; Greene Decl. ¶ 34; Josephson Decl. ¶ 21; Lenga Decl. ¶ 29; McCoy Decl. ¶ 37; Meneses Decl. ¶ 27; Vaughan Decl. ¶ 18; Xanthakys Decl. ¶¶ 17, 24-26.); *see also* Fratta Dep. Tr. at 168:9-20 (" ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████ ).  Moreover, as discussed above, the calculation statement that was provided with the August 11 Transfer stated that interest was "due," (Declaration of B. Zeigon Exhibit A (Dkt. 8-1)), which would only have been true if it were being paid in connection with a pre-payment of principal.  *See supra* at ¶ 17.  Even Mr. Fratta allowed that it is " ██████ " the case that, "if you pay down a loan, that triggers interest payment at the same time."  (Fratta Dep. Tr. at 91:5-12).  Mr. Warren, Revlon's Treasurer, also acknowledged that he saw "nothing" about the calculation statement or the transaction confirmations " ████████████████████ ████████████████████████████████████████████████████████ (Warren Dep. Tr. at 93:3-10; 93:25-94:4).  Thus, the accompanying documentation, if anything, gave Defendants

---

[42]  This argument presumes that there was a requirement, under the 2016 Credit Agreement, for notice of a principal payment to be sent with or in advance of such payment.  In fact, the 2016 Credit Agreement requires that notice be sent to the administrative agent (*i.e.*, Citibank) in advance of the payment, and then only requires that Citibank provide "prompt" notice to the lenders.  *See* ¶ 23, *supra.*.  Mr. Tichauer, who signed the 2016 Credit Agreement, did not know what would constitute "prompt" notice, and there is no indication, then, that the lenders were even supposed to receive notice with or before the payment.  But as discussed in text, even if notice was supposed to arrive with the payment, it is not at all unusual for notices to arrive late, which in no way signifies that a payment was made by mistake.

added reason to conclude that the August 11 Transfer was an intentional pre-payment of principal on the Term Loans.

136.     Finally, Citibank has argued that no reasonable lender would have believed that Revlon, given its financial difficulties, would have had the financial wherewithal to make the payments on August 11, 2020.  Aug. 18 Hr'g Tr. at 9:21-10:2.  Numerous witnesses have explained why that is false.  (Abrams Decl. ¶¶ 26-28; Caraher Decl. ¶¶ 34-35; Dent Decl. ¶ 25; Greene Decl. ¶ 38; Lenga Decl. ¶¶ 32-33; McCoy ¶ 42; Meneses Decl. ¶¶ 33-34; Perkal Decl. ¶¶ 39-44; Phipps Decl. ¶ 24.)  Foremost, past experience demonstrates Revlon's ability to raise money, in large amounts, to satisfy its debts.  In fact, only months before the August 11 Transfer, Revlon had paid off nearly a billion dollars in debt, at par, notwithstanding it financial difficulties.  *See* ¶ 90, *supra*.  As Revlon's Treasurer acknowledged, Revlon had been successful ███████████████████████████████████████  (Warren Dep. Tr. at 115:5-9.)  Moreover, Revlon's majority owner, Ronald Perlman, is a high profile multi-billionaire, with a reputation for finding ways to satisfy Revlon's outstanding debts in order to avoid bankruptcy.  (DX-1029 ("Every time Revlon's future looks imperiled, Mr. Perelman pumps more money into the company.")).  It is simply nonsense to suppose that sophisticated lenders, familiar with Mr. Perlman's track record, would have doubted his ability to pay down the Term Loans, just as he had found ways to pay other Revlon debt before.

137.     In sum, the record is overwhelming that Defendants were not on constructive notice that the August 11 Transfer was a mistake.

### 3.     The UMB Action Was Filed In Good Faith

138.     The Court posed the following question in its August 19 Order:  "Are Defendants still acting as 'good faith' recipients of the funds given that they filed a lawsuit seeking to

accelerate payment of the same debt?"  ECF No. 28 at 2.  The answer is yes.  The Court's question relates to an argument by Citibank that Defendants acted in "bad faith" by authorizing UMB, which was selected by a majority of lenders to replace Citibank as administrative agent for the Revlon Credit Agreement, to file suit challenging the collateral stripping transaction engineered by Citibank and Revlon in May 2020.  Aug. 18 Hr'g at 10:3-8.  According to Citibank, this filing "clearly demonstrates" Defendants' "understanding that the payment was a mistake."  ECF No. 9 at 3.  Citibank's attempt to link the decision by Defendants to proceed with the UMB action with the August 11 transfer is cut from whole cloth.

139.    Witnesses across the Defendant entities have confirmed the unsurprising fact that the UMB complaint (a 117 page document) was in process long before the August 11 transfer; and that all authorizations had been given for UMB to file that complaint before the transfer.  *See supra* at ¶¶ 79-82.  Moreover, far from exhibiting "bad faith," UMB elected not to serve its Complaint in light of the August 11 transfer; it subsequently proposed to the Court presiding over that action that it be stayed in consideration of this case (*see* Letter from B. Finestone, dated October 5, 2020, Case 1:20-cv-06352-LGS (Dkt. 15)); and, after that request was denied, it voluntary dismissed its complaint without prejudice (*see* Notice of Voluntary Dismissal, dated November 6, 2020, Case 1:20-cv-06352-LGS (Dkt. 17)).  In short, Defendants have conducted themselves reasonably, and in entire good faith, in connection with the UMB action.

140.    In contrast to the good faith exhibited by UMB in connection with its action, Citibank's bad faith in its administration of the Term Loans is added reason that the discharge for value defense should now apply.  *See, e.g.,* Restatement (First) of Restitution § 1 cmt. c ("Even where a person has received a benefit from another, he is liable to pay therefor only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for

him to retain it."); *Brand v. Brand*, 811 F.2d 74, 81 (2d Cir. 1987) ("A conclusion that one has been unjustly enriched is essentially a legal inference drawn from the circumstances surrounding the transfer of property and the relationship of the parties."(quotations omitted)).  Citibank, as agent for the Term Lenders, acted against their interests in facilitating Revlon's collateral-stripping transactions.  In April 2020, Revlon sought to engage in a series of sale-leaseback transactions to facilitate its repledging of the Term Lenders' collateral.  (*See* Perkal Decl. ¶ 28.) A majority of Term Lenders blocked the amendment to the Credit Agreement required to effectuate the transactions.  Instead of recognizing the majority bloc, Citibank facilitated Revlon's creation of a $65 million revolving loan facility, which came into existence the day the Credit Agreement was amended and was terminated only 15 days later.  The revolving loan facility generated new lenders who would prevent the Term Lenders from maintaining their majority to block the purported amendment of the Credit Agreement to strip the collateral backing their loans.  The purported amendment effectuated by Citibank contained a term permitting Revlon's future repurchase of preferred minority-bloc term lenders' loans *at par*.  It was the exercise of those term lenders' repurchase rights that led Citibank to execute the August 11 Transfer.  That is, in the process of advancing a scheme aimed at harming the Term Lenders, Citibank "mistakenly" paid them what they were owed.  Equity and good faith does not support Citibank's claims.

## II.   CITIBANK CANNOT PROVE ANY OF ITS CLAIMS

141.    As detailed above, the discharge for value rule applies as a complete defense across all of Citibank's claims.  Each of those claims—conversion, unjust enrichment, money had and received, and payment by mistake—also fails on its individual merits.  As set forth below, Citibank cannot meet its burden of proof as to any of its claims.  *See Marini v. Adamo*, 12

F. Supp. 3d 549, 552 (E.D.N.Y. 2014) ("Plaintiffs must prove [their] claims . . . by a preponderance of the evidence.").

### A.     Citibank Cannot Prove Conversion

142.    Conversion is "any act of dominion wrongfully exerted over another person's personal property inconsistent with that person's rights in the property." *Cumis Ins. Soc'y, Inc. v. Citibank, N.A.*, 921 F. Supp. 1100, 1110 (S.D.N.Y. 1996); *see also Vigilant Ins. Co. of Am. v. Housing Auth. of City of El Paso, Tex.*, 87 N.Y.2d 36, 44 (1995) ("Conversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." (quotation marks and citation omitted)).  The "[t]wo key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Colavito v. New York Organ Donor Network, Inc.*, 8 N.Y.3d 43, 50 (2006) (citations omitted).  Further, Citibank must prove that Defendants converted the property "to their own use."  *Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A.*, No. 01 Civ. 1047(AJP)., 2002 WL 31174470 at *16 (S.D.N.Y. Sept. 26, 2002); *see also Cachet Fin. Servs. v. MyPayrollHR*, 1:19-CV-1181 (FJS/CFH), 2020 WL 5232275 at *8 (N.D.N.Y. Sept. 2, 2020).  Citibank cannot make the required showing.

143.    *First*, Citibank lost its "possessory interest" in the funds immediately upon completion of the wire transfers.  As discussed in section I.A, *supra*, the transfer was a discharge of debt immediately upon receipt of the funds into the lenders' accounts.  But even beyond that, it is settled that a transferor losses title to funds upon the completion of a wire transfer:

> [T]itle to funds in a wire transfer passes upon acceptance of a payment order. [A] funds transfer is complete when the beneficiary's bank accepts the payment order. . . . Because an accepted transfer cannot be revoked without the consent of the beneficiary, and the beneficiary bank incurs an obligation to the beneficiary upon

acceptance of the funds, the ownership interest in those funds must pass from the originator upon completion of the funds transfer.

*U.S. v. BCCI Holdings (Luxembourg), S.A.*, 980 F. Supp.21, 27 (D.C. Cir. 1997) (applying New York law); *see also Bank of N.Y. v. Norilsk Nickel*, 14 A.D.3d 140, 145 (N.Y. App. Div. 1st Dep't 2004) (holding title passed upon execution of payment order); *c.f. Galtieri v. Kramer*, 232 A.D.2d 369, 369 (N.Y. App. Div. 2d Dep't 1996) ("Once the defendant accepted the check tendered by the plaintiffs in the instant case, the plaintiffs no longer had a possessory right to it.").[43]

144.    Citibank, itself, has prevailed against similar conversion claims on the basis that plaintiffs relinquished possessory interests in transferred funds immediately upon a transferee's receipt of those funds.  In *Grain Traders, Inc. v. Citibank, N.A.*, Citibank defeated claims for conversion and money had and received by arguing that both torts require a plaintiff to maintain a possessory interest in the funds.  960 F. Supp. 784, 793 (S.D.N.Y. 1997) (Chin, J.) ("To prevail on either of its common law claims, Grain Traders must prove that at the time it alleges Citibank improperly kept the $310,000, Grain Traders still had a possessory interest in the funds …. Grain Traders, however, did not have possession of the funds at the time Citibank credited them to BCI's account. This is because a depositor loses title to money deposited in a general account

---

[43]   The August 11 Wire Transfers were sent through the Fedwire system, which is designed for the immediate and irrevocable electronic transfer of funds between member participants. Citibank, *United States of America Country Profile* at 6 (Jan. 2013) ("Once funds are received by the receiving bank, settlement is final."), https://www.citibank.com/tts/insights/eSource_academy/docs/country_profiles/north_america/14 71900639-1442257856-Citi-TTS-US-Country-Profile-Sep2015.pdf.  The *Banque Worms* Courts reiterate the finality of wire transfers and its importance to the financial markets. *See Banque Worms v. BankAmerica Int'l*, 77 N.Y. 2d 362, 372 (1991) ("Establishing finality in electronic fund wire transfers was considered a singularly important policy goal."); *Banque Worms v. Bank America Int'l*, 726 F. Supp. 940, 942 (S.D.N.Y. 1989) ("[A] CHIPS transaction is irrevocable and final once the transfer takes place.").

at the moment those funds are deposited."); *see also Cumis*, 921 F. Supp. At 110 ("Citibank was under no obligation to agree to return the funds once accepted [it] accepted [the payment order].")..

145.     *Second*, Citibank cannot establish Defendants' "dominion over the property or interference with it, in derogation of plaintiff's right," for at least two reasons.  As demonstrated in at ¶¶ 6-7, Defendants do not have "dominion" over the funds:  Those funds were transferred to Defendants' clients' accounts, not to Defendants, and those lenders continue to hold the funds to this day.  In addition, there was no "wrongful act of dominion" by those lenders, for all the reasons set out in Section I.A, *supra*—namely, because the transfer was a "discharge for value" under New York law.

146.     *Third*, the fact that the funds were sent to Defendants' clients (and not to Defendants), also precludes Citibank from proving that any Defendants "converted [Citibank's money] for its own use."  ECF No. 1 ¶ 1.  That the funds have not been converted "to [Defendants'] own use," defeats Citibank's conversion claim.  *Fleet Capital Corp.*, 2002 WL 31174470 at *16; *see also Cachet Fin. Servs*, 2020 WL 5232275 at *8.

### B.     Citibank Cannot Prove Unjust Enrichment

147.     An unjust enrichment claim requires that the defendant received a "specific and direct benefit." *Kaye*, 202 F.3d at 616.   "[I]f the Plaintiff fails to show that the Defendant received a benefit, there can be no liability for unjust enrichment."  *Legurnic v. Ciccone*, 63 F. Supp.3d 241, 248 (E.D.N.Y. 2014).  A showing of an "indirect benefit" is insufficient.  *Marini v. Adamo*, 12 F. Supp. 3d 549, 552 (E.D.N.Y. 2014).  For that reason, "courts are cautious about extending unjust enrichment liability beyond the principals to the transaction . . . ."  *Id.* at 552.

Defendants are "not unjustly enriched simply because [they] ha[ve] access to [the Term

Lenders'] funds in [the Term Lenders'] bank account."  *Id.* at 553.

148.     As discussed in ¶¶ 6-7, *supra*, Defendants did not receive any funds in the August

11 Transfer; rather, Defendants' clients did.  Citibank has admitted this itself.  Aug. 18, 2020

Hr'g Tr. at 5:12-13 ("[Mr. Ingber:] Brigade itself wasn't a direct recipient of these funds, the

funds that it manages were . . . .")  Thus, Defendants received no direct benefit.  The only

potential benefit to Defendants is indirect – namely, the receipt of a management fee for

managing the Term Lenders' accounts.  But courts have held that unjust enrichment claims

"premised upon a management fee . . . are precluded."  *Goldberg v. Gray*, No. 5:15-CV-0538

(DNH/TWD), 2016 WL 4099189, at *13 (N.D.N.Y Aug. 2, 2016); *see also Vertex Constr. Corp.

v. T.F.J. Fitness L.L.C.*, No. 10-CV-683 (CBA)(ALC), 2011 WL 5884209, at *5 (E.D.N.Y. Nov.

23, 2011) (explaining royalties tied to revenues would constitute "an indirect benefit [that] would

not establish the sort of 'specific and direct' benefit that New York law requires to sustain a

claim for unjust enrichment" (citation omitted)).

149.     Citibank's unjust enrichment claim fails for the added reason that there is nothing

"unjust" about the lenders retaining the funds.  It is undisputed that those lenders were in fact

owed the precise amounts they received.  In that sense, if anyone received a benefit to which

they were not entitled as a result of the August 11 Transfers, it was Revlon, insofar as it had a

debt extinguished.  That is dispositive:

> [I]f the monetary payment that forms the basis of a claim for restitution is to a
> lawful creditor who has neither participated in the wrongful conduct nor breached
> a legally imposed duty, then as concerns that creditor, the enrichment is not
> unjust.  Accordingly, relief can be sought only against the party whose debt has
> been paid through the wrongful acquisition of funds.

*Colli v. Wirth*, No. 94 Civ. 3234 (LBS), 1996 WL 243237 at *8 (S.D.N.Y. May 10, 1996)

(citations omitted).  "[I]t is to [the debtor], not [the creditor], that [the transferor] must look for

restitution, for it is [the debtor], not [the creditor], who has been unjustly enriched at [the transferor's] expense." *Id.* at *9. Revlon is the only party that was enriched by Citibank's extinguishment of Revlon's debts validly owed to the Term Lenders.

### C.   Citibank Cannot Prove Its Claim Of Money Had and Received

150.    "The essential elements in a claim for money had and received under New York law are that (1) defendant received money belonging to plaintiff; (2) defendant benefitted from the receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 125 (2d Cir. 1984). "[T]he question whether [defendant] benefitted . . . is the same for both the unjust enrichment and money had and received claims." *Marini v. Adamo*, 12 F. Supp.3d 549, 552 (E.D.N.Y. 2014). Thus, Citibank's claim for money had and received, like its claim for unjust enrichment, fails because Citibank cannot show that Defendants – none of whom actually received any of the funds in the August 11 Transfer – derived any direct benefit as a result of that transfer.

151.    Citibank's claim fails for the added reason that "[a] plaintiff cannot state a claim for money had and received if the defendant did not receive the plaintiff's money." *In re Allou Distribs., Inc.*, 446 B.R. 32, 77 (S.D.N.Y. Bankr. 2011); *see also Calisch Assocs., Inc. v. Mfrs. Hanover Trust Co.*, 151 A.D.2d 446, 448 (N.Y. App. Div. 1st Dep't 1989) ("The fifth cause of action for money had and received is defective as there is no assertion in the complaint that Manufacturers Hanover received and retained money belonging to plaintiff."). As explained *supra*, Citibank lost its property interest in the transferred funds upon completion of the August 11 Wire Transfers, for the very reasons it prevailed in *Grain Traders*. 960 F. Supp. at 793 ("Grain Traders, however, did not have possession of the funds at the time Citibank credited them to BCI's account. This is because a depositor loses title to money deposited in a general

account at the moment those funds are deposited.").  The funds did not belong to Citibank upon completion of the wire transfers on August 11, and the lenders therefore "did not receive the plaintiff's money."  *In re Allou Distribs., Inc.*, 446 B.R. at 77.

### D.  Citibank Cannot Prove Its Claim Of Payment by Mistake

152.    Citibank's remaining claim is for "payment by mistake."  ECF No. 1 ¶¶ 41-44. Of course, *Banque Worms* squarely addresses a plaintiff's ability to recover mistaken payments and recognizes the discharge for value as a defense.  *See* 928 F.2d at 541 ("At the time it received the mistaken payment, Banque Worms was Spedley's *bona fide* creditor.  Further, Banque Worms made no misrepresentation regarding the transfer or its right to receive the funds and did not have notice of the transferor's error.  Therefore, as Judge Patterson concluded, Banque Worms is entitled to retain the mistakenly transferred funds."); 726 F. Supp. at 941.  The governing rule, in a case involving a mistaken payment in satisfaction of a genuine debt, is the discharge for value rule addressed in Section I, *supra*.  726 F. Supp. at 941 (reasoning that payment by mistake doctrine applies only where the recipient of a mistaken transfer "did not have a right to the money when the mistaken payment was made"); 928 F.2d at 541.  For the reasons detailed above, this was a discharge for value, and, as in *Banque Worms*, therefore cannot qualify as a reversible "payment by mistake."

153.    Even if "payment by mistake" were an available claim in the present scenario, Citibank would not meet its requirements.  That is because, "[a]t the very least, to state a claim for payment under mistake of fact, the defendant against whom it is asserted must have received some direct and measurable financial benefit from the payments in question."  *U.S. ex rel. Feldman v. City of New York*, 808 F .Supp. 2d 641, 657 (S.D.N.Y. 2011) (Rakoff, J.).  And as discussed above with respect to Citibank's other claims, it is undisputed that Defendants did not receive the funds that are in dispute in this action and thus obtained no direct benefit from the

August 11 Transfer.  Rather, Citibank sent the funds to the individual lenders, not the Defendant fund managers.  Accordingly, Citibank has no claim for "payment by mistake" against those fund managers, and this claim fails on that additional basis.

## III.   CITIBANK CANNOT OBTAIN RELIEF FROM DEFENDANTS

154.   The final question the Court posed in its August 19 Order is, "Are the fund managers the proper defendants?  Factually, what is the relationship between the fund managers and the actual recipients of the funds?"  ECF No. 28 at 2.  As detailed below, the fund managers are not the proper defendants; they are not the entities that actually received the funds at issue in this case.  *See* Aug. 18, 2020 Hr'g Tr. 4:7-9 ("[W]e are suing Brigade as manager for these 40 or so funds that received wires from Citi mistakenly."); *id.* 5:12-13 ("While Brigade itself wasn't a direct recipient of these funds, the funds that it manages were . . . .").  Thus, in addition to the fact that the August 11 Transfers qualify as a discharge for value (see Section I, *supra*), this action can be dismissed in its entirety on the alternative basis that the fund managers are not the proper defendants.

### A.   The Relationship Between Defendants And The Term Lenders

155.   Defendants are fund managers who handle investments on behalf of the Term Lenders.  Each Term Lender is a legal entity independent from Defendants, and the relationships between the Defendants and the Term Lenders are generally defined by contract.  (Caraher Decl. ¶¶ 6-7; Crocombe Decl. ¶ 6; Dent Decl. ¶ 5; Frusciante Decl. ¶ 5; Greene Decl. ¶ 6; Lenga Decl. ¶ 6; McCoy Decl.  ¶ 6; Meneses Decl. ¶ 6; Perkal Decl. ¶ 6; Phipps Decl. ¶ 6; Vaughan Decl. ¶¶ 5-6; Xanthakys Decl. ¶ 5.)  It is undisputed that Defendants did not receive any funds in the August 11 Transfer.  Rather, Citibank transferred funds to the Term Lenders, which are the entities that continue to hold those funds.  (Caraher Decl. ¶¶ 5-7; Crocombe Decl. ¶¶ 5-7; Dent Decl. ¶ 5; Frusciante Decl. ¶ 5; Greene Decl. ¶ 5; Josephson Decl. ¶ 5; Lenga Decl. ¶¶ 5-6;

McCoy Decl. ¶¶ 5-6; Meneses Decl. ¶¶ 5-6; Perkal Decl. ¶¶ 6-7; Phipps Decl. ¶¶ 5-6; Vaughan

Decl. ¶¶ 5-6; Xanthakys Decl. ¶¶ 5-6.)

156. Defendants manage three broad categories of Term Lenders: private funds, CLOs,

and separately managed accounts ("SMAs").[44]

- Private funds are legal entities formed directly by the fund manager but funded by various third-party investors. The fund manager invests this joint pool of money on behalf of these third parties. The relationship between a private fund and the fund manager is defined by an Investment Management Agreement. (*See, e.g.*, DX-0322.)

- CLOs and CDOs are special purpose vehicles funded by multiple third parties, and have their own independent directors. Each CLO and CDO is governed by an Indenture, which sets forth specific rules for what types of investments it can hold. (*See, e.g.* DX-0142.) The Indenture may also specify how interest and principal proceeds from an investment can be used. For example, an indenture may provide that interest proceeds must be paid out to investors through a waterfall, while principal proceeds may be re-invested. The relationship between a CLO or CDO and a fund manager is defined by a Collateral Management Agreement. Collateral Management Agreements and Indentures provide mechanisms through which investors may remove the fund manager. (*See, e.g.* DX-0142 at BARDIN_CITI_00001246.)

- Separately managed accounts are portfolios funded and owned by unaffiliated third-parties. (*See, e.g.* DX-0276.) The third parties then contract with the fund managers to manage the funds in those accounts on their behalf. The accounts may either be held by separate legal entities or directly by the third party investor. Regardless of how the funds are held, the relationship between a separately managed account and the fund manager is defined by an Investment Management Agreement. The fund manager has little discretionary authority for these accounts beyond selecting investments. These accounts are generally managed for clients such as large pension funds, and the accounts are typically held on the clients' balance sheets. In these types of arrangements, the clients themselves have their own employees and directors, and many of these Investment Management Agreements provide mechanisms for removing the investment manager without cause and in the clients' discretion. (*See, e.g.*, DX-0276 at BRIGADE_CITI_00009473.)

The relationship between each Term Lender and its fund manager is governed by the

management agreements and other contracts referenced above. While it is difficult to generalize

---

[44] For a breakdown of fund types, see Appendix B.

across those agreements, they generally vest Defendants with discretion to make investments on the lenders' behalf.  (Caraher Decl. ¶ 6; Crocombe Decl. ¶ 6; Frusciante Decl. ¶ 5; Greene Decl. ¶ 6; Lenga Decl. ¶ 6; McCoy Decl. ¶ 6; Meneses Decl. ¶ 6; Perkal Decl. ¶ 6; Phipps Decl. ¶ 6.)

        **B.**    **Citibank Cannot Obtain Relief From Defendants**

        157.    As set forth in Section II, *supra*, Citibank cannot establish its *prima facie* claims against Defendants because they were not the recipients of the August 11 Wire Transfers, and do not possess the disputed funds.  Rather, Citibank sent funds, in its August 11 Transfer, to the Term Lenders, who are managed by Defendants, and not to Defendants themselves.  (Caraher Decl. ¶¶ 5-7; Crocombe Decl. ¶¶ 5-7; Dent Decl. ¶ 5; Frusciante Decl. ¶ 5; Greene Decl. ¶ 5; Josephson Decl. ¶ 5; Lenga Decl. ¶¶ 5-6; McCoy Decl.  ¶¶ 5-6; Meneses Decl. ¶¶ 5-6; Perkal Decl. ¶¶ 6-7; Phipps Decl. ¶¶ 5-6; Vaughan Decl. ¶¶ 5-6; Xanthakys Decl. ¶¶ 5-6.)  This case therefore turns on the competing property rights of the Term Lenders and Citibank – namely, the Court is being asked to determine whether the Term Lenders are entitled to the funds as a discharge of their debts or whether Citibank is entitled to the funds on account of a mistaken transfer.  That is a problem for Citibank:  It is axiomatic that a plaintiff cannot adjudicate the property rights of parties not before the Court.  *See J-T Assocs. v. Hudson River--Black River Regulating Dist.*, 175 A.D.2d 438, 440-41 (N.Y. App. Div. 3d Dep't 1991) ("If petitioner were to obtain the declaration that it seeks, the property rights of other property owners, many of whom are not parties here, could and would be adversely affected without affording them the opportunity to be heard on the issue."); *see also MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 387 (2d Cir. 2006) ("[T]he district court could not grant the relief sought— declaring the plaintiff the titleholder—in the absence of the current or competing titleholders to that piece of property.").

158.    Citibank recognizes it has this problem.  Defendants have told Citibank from the

start that they are not the proper defendants.[45]  And the Court has expressed similar concerns,

> [I]t does raise a broader concern, in my view, that whether this is all essentially --
> I don't know how to put it, but it does raise a concern, which I imagine Citibank
> is also harboring, which is at the end of the day if the lenders themselves decide
> not to obey a request from the defendants here that we would either have to start
> over again or, in essence, Citibank has sued the wrong party.  So I don't know
> what to make of that.  Obviously this is an issue that was flagged at the very
> beginning of the case, and I raise[d] the question of whether Citibank should just
> amend the complaint to take the issue out of the case.  It chose not to do that and
> it chose to enter the stipulation instead, but I am a little bit concerned about the
> implications of that writ large.

Sept. 29 Hr'g Tr. 4:1-14.  Notwithstanding those concerns, Citibank elected to pursue this action

against Defendants, attempting to justify its decision on the basis that those entities purportedly

"control" the funds of their client lenders.  Aug. 18, 2020 Hr'g Tr. at 4:13-15.

159.    This "solution" does not work.  As an initial matter, Citibank misapprehends the

relationship between the Defendants and the funds they manage.  Defendants are *agents* and

*servants* of the funds, not their principals, and therefore, as a matter of law, do not "control" the

Term Lenders.  *See Doctor's Assocs., Inc. v. Reinert & Duree, P.C.*, 191 F.3d 297, 304 (2d Cir.

1999) ("By definition, the servant does not control the principal."); *see also United Magazines*

*Co. v. Murdoch Magazines Distrib.*, 353 F. Supp. 2d 433, 441 (S.D.N.Y. 2004) ("Under

principals [sic] of tort law, an agent is not liable for its principal's tortuous conduct . . . .").  Just

as Citibank is not liable when its depositors receive funds obtained by tort, neither can a

---

[45]   *See, e.g.*, ECF No. 22 ("For some strategic reason, Citibank has chosen to sue only Brigade in
this action, even though . . . Citibank transferred no money to defendant Brigade itself.  Instead,
as Citibank is well aware, Citibank wired money to approximately 40 different funds that employ
Brigade as their investment/collateral manager, and thus must know that Brigade itself was not a
lender and does not have the money for which Citibank is now suing.") (footnotes omitted); Aug.
19, 2020 Hr'g Tr. at 25:8-16 ("MR FINESTONE: . . . [T]here are 40 some recipients of funds. . .
. I think they sued the wrong party, and that may or may not be a problem.").

Defendant fund manager be liable to return funds that its clients purportedly improperly obtained. *C.f. Empire City Capital Corp. v. Citibank, N.A.*, No. 10–CV–2601 (KMK), 2011 WL 4484453 at *9 (collecting cases in support of the "almost universal rule" that banks do not owe common law duties to non-customer third-parties).

160.    If Citibank is invoking Defendants' supposed "control" over their clients' funds as a basis to "pierce the corporate veil" separating Defendants from their clients, which would at least theoretically enable Citibank to adjudicate rights to the disputed funds against Defendants, Citibank falls far short of meeting its "heavy burden."[46]  *See City of Almaty v. Ablyazov*, 278 F. Supp.3d 776, 799 (S.D.N.Y. 2017) ("[T]hose seeking to pierce a corporate veil bear a heavy burden").  To pierce the corporate veil, Citibank must demonstrate Defendants' "complete domination" over the Term Lenders.  *Id.*  Showing that Defendants merely made investment decisions for the Term Lenders, which was their role as fund managers, would not constitute "domination."  *See Dabrowski v. Abax Inc.*, 64 A.D.3d 426, 427 (N.Y. App. Div. 1st Dep't 2009) ("[T]he cause of action for piercing the corporate veil to hold the individual defendants liable should have been dismissed, since the sole allegation of 'domination' in the complaint is that the principals made the decisions for the corporation.").

---

[46]   If this is Citibank's theory, it is also one that it failed to plead in its complaint, and it is therefore precluded from pursuing now.  *See Giraffe G4 Sys., LLC v. Measurement, Ltd.*, No. 17 CV 5334, 2018 WL 1801962 at *8 (S.D.N.Y. Apr. 13, 2018) (dismissing case for failing to allege "a single fact to suggest Petrucilli had complete dominion over Measurement to warrant veil piercing"); *E. Hampton Union Free Sch. Dist. v. Sandpebble Builders, Inc.*, 66 A.D.3d 122, 127 (N.Y. App. Div. 2d Dep't 2009) ("Conduct constituting an abuse of the privilege of doing business in the corporate form is a material element of any cause of action seeking to hold an owner personally liable for the actions of his or her corporation under the doctrine of piercing the corporate veil."); *Dabrowski*, 64 A.D.3d at 427 ("[T]he cause of action for piercing the corporate veil to hold the individual defendants liable should have been dismissed, since the sole allegation of 'domination' in the complaint is that the principals made the decisions for the corporation.").

161.    Veil piercing is "fact intensive, and disregarding corporate separateness is a remedy that differs with the circumstances of each case."  *Giraffe G4 Sys.*, 2018 WL 1801962 at *7; *see also Paradigm BioDevices, Inc.*, No. 11 Civ. 3489-JMF, 2013 WL 1830416 at *2. Among the many factors to be considered are whether there was a "failure to adhere to corporate formalities, inadequate capitalization, commingling of assets, and use of corporate funds for personal use."  *E. Hampton Union Free Sch. Dist. v. Sandpebble Builders, Inc.*, 66 A.D.3d 122, 127 (N.Y. App. Div. 2d Dep't 2009).[47]  Moreover, to make such a showing here, Citibank would, in effect, have to pierce *more than 100 veils* between Defendants and each of the non-party Term Lenders they manage – there is no reason to assume that each relationship is the same.  There is simply nothing in the record that would permit Citibank to make that comprehensive showing.

162.    The Court asked Citibank, at the very start of this matter, whether Citibank had "authority for the proposition that Brigade [the first Defendant] is the proper party to sue."  *See, e.g.*, Aug. 18, 2020 Hr'g Tr. at 7:7-13.  It cited none, and answered instead that, "[w]hat we have is our factual understanding of Brigade's interactions and control over those funds."  *Id.*  But for all the reasons discussed, even if there were control as a factual matter, it would not entitle

---

[47]  *See also Wm. Passsalacqua Builders, Inc. v. Resnick Dev.s S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991) ("To determine whether these assertions are valid, the triers of fact are entitled to consider factors that would tend to show that defendant was a dominated corporation, such as: (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.").

Citibank to adjudicate the rights of the Term Lenders in the disputed funds through this action against Defendants.

## IV.    CITIBANK IS ASSERTING COMMON LAW CLAIMS THAT ARE PRECLUDED BY THE NEW YORK UNIFORM COMMERCIAL CODE

163.    All four of Citibank's causes of action are common law claims precluded by the New York Uniform Commercial Code ("New York U.C.C."). Article 4-A of the New York U.C.C., which governs "Funds Transfers," "was enacted to correct the perceived inadequacy of 'attempt[ing] to define rights and obligations in funds transfers by general principles [of common law] . . . .'" *Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97, 102 (2d Cir. 1998) (quoting *Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 369 (1991)) (alterations in original); *see also ReAmerica, S.A. v. Wells Fargo Bank Int'l*, No. 04 Civ. 5233, 2008 WL 7811571 at *7 (S.D.N.Y. Mar. 18, 2008) (dismissing common law claims for negligence on the basis that "[r]esort[ing] to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article").[48]

164.    New York U.C.C. Article 4-A includes a provision, Section 303, that defines the rights of a bank that allegedly paid more than its accountholder directed (as Citibank claims occurred here). Under that provision, the sender (*i.e.*, Revlon) is not required to pay the overage, and the bank that made the transfer is entitled to pursue relief from the fund recipient only to the

---

[48]  Citibank, itself, was the appellee that established Article 4-A's broad scope of preclusion. *See Grain Traders*, 160 F.3d at 103 (affirming summary judgment "because we agree with Citibank's argument . . . that even assuming Grain Traders could establish its claims [for conversion and money had and received], they are precluded by Article 4-A"). Citibank has raised a preemption defense to common law claims stemming from wire transfers on numerous occasions. *See, e.g.*, *Cumis Ins. Soc'y Inc. v. Citibank, N.A.*, 921 F. Supp. 1100, 1110 n.7 (S.D.N.Y. 1996) (finding Citibank's proposition that "U.C.C. Art. 4-A preempts any cause of action for conversion in connection with wire transfers where remedies are explicitly provided in the statute" "does have support in the official commentary to the statute itself," and ignoring that basis for dismissal only because Citibank improperly raised it on reply).

extent permitted by law.  N.Y. U.C.C. § 4-A-303  Thus, Citibank's common law claims are

"redundant of" Article 4-A, *Sheerbonnet*, 951 F. Supp. at 407 n.2, related to a "situation covered

by particular provisions of" Article 4-A, *id.* at 407-08, are "expressly addressed by" Article 4-A,

*Grain Traders*, 160 F.3d at 103, and allege "underlying injury or misconduct" protected by

Article 4-A, *Ma*, 597 F.3d at 89-90. Thus, they are preempted.[49]

---

[49]   If the Court finds that the discharge for value rule applies and restitution is unwarranted, it
need not determine whether Citibank's claims are precluded by the New York U.C.C., as the
discharge for value rule is also a defense to claims under the New York U.C.C.  *See Banque
Worms*, 77 N.Y.2d at 373 ("We believe such an application [of the discharge for value rule]
accords with the legislative intent and furthers the policy considerations underlying article 4-A of
the New York Uniform Commercial Code.").

## APPENDIX A

**Brigade Clients**

| Lender Name | Principal Outstanding as of August 11, 2020 | Accrued Interest Outstanding as of August 11, 2020 | Total Payment by Citibank on August 11, 2020 |
|---|---|---|---|
| ACIS CLO 2014-5 Ltd. | $2,771,208.23 | $24,209.58 | $2,795,417.81 |
| Battalion CLO IX Ltd. | $4,672,318.15 | $40,817.89 | $4,713,136.04 |
| Battalion CLO VII Ltd. | $4,674,202.06 | $40,834.35 | $4,715,036.41 |
| Battalion CLO VIII Ltd. | $5,068,312.34 | $44,277.34 | $5,112,589.68 |
| Battalion CLO X Ltd. | $3,233,418.17 | $28,247.50 | $3,261,665.67 |
| Battalion CLO XI Ltd. | $5,079,994.91 | $44,379.40 | $5,124,374.31 |
| Battalion CLO XII Ltd. | $1,821,197.60 | $15,910.18 | $1,837,107.79 |
| Battalion CLO XIV Ltd. | $869,878.02 | $7,599.35 | $877,477.37 |
| Big River Group Fund SPC LLC | $1,293,954.55 | $11,284.49 | $1,305,239.04 |
| Blue Falcon Limited | $4,032,315.18 | $35,226.75 | $4,067,541.94 |
| Brigade Credit Fund II Ltd. | $39,781,444.61 | $347,159.61 | $40,128,604.22 |
| Brigade Debt Funding I, Ltd. | $3,859,319.53 | $33,715.44 | $3,893,034.97 |
| Brigade Debt Funding II, Ltd. | $2,891,977.61 | $25,264.64 | $2,917,242.24 |
| Brigade Distressed Value Master Fund Ltd. | $2,992,227.98 | $2,825.99 | $2,995,053.97 |
| Brigade Diversified Credit CIT | $1,271,114.54 | $11,081.40 | $1,282,195.94 |
| Brigade Opportunistic Credit LBG Fund Ltd. | $17,468,301.42 | $152,424.25 | $17,620,725.67 |
| City of Phoenix Employees' Retirement Plan | $869,659.86 | $7,579.09 | $877,238.94 |
| Delta Master Trust | $2,600,081.41 | $22,647.13 | $2,622,728.54 |
| FCA Canada Inc. Elected Master Trust | $542,163.01 | $4,724.93 | $546,887.95 |
| FCA US LLC Master Retirement Trust | $1,643,028.73 | $14,294.96 | $1,657,323.70 |
| FedEx Corporation Employees' Pension Trust | $5,670,171.68 | $49,400.57 | $5,719,572.25 |
| Future Directions Credit Opportunities Fund | $3,649,935.77 | $31,886.24 | $3,681,822.02 |
| Goldman Sachs Trust II - Goldman Sachs Multi-Manager Non-Core Fixed Income Fund | $1,403,341.99 | $12,259.75 | $1,415,601.74 |
| Illinois State Board of Investment | $3,959,936.14 | $34,530.15 | $3,994,466.30 |
| JPMorgan Chase Retirement Plan Brigade | $553,091.93 | $4,831.87 | $557,923.80 |

| Lender Name | Principal Outstanding as of August 11, 2020 | Accrued Interest Outstanding as of August 11, 2020 | Total Payment by Citibank on August 11, 2020 |
|---|---|---|---|
| JPMorgan Chase Retirement Plan Brigade Bank Loan | $1,159,789.49 | $10,132.05 | $1,169,921.54 |
| Los Angeles County Employees Retirement Association | $9,477,040.97 | $82,792.48 | $9,559,833.46 |
| Mediolanum Best Brands | $7,445,819.23 | $65,047.50 | $7,510,866.73 |
| New York City Fire Department Pension Fund | $449,209.93 | $3,924.35 | $453,134.28 |
| New York City Police Pension Fund | $885,555.47 | $7,736.31 | $893,291.78 |
| Northrop Grumman Pension Master Trust | $1,975,772.60 | $17,107.36 | $1,992,879.95 |
| Panther BCM, LLC | $1,528,123.39 | $13,349.86 | $1,541,473.25 |
| SC CREDIT OPPORTUNITIES MANDATE LLC | $3,167,244.27 | $27,621.40 | $3,194,865.67 |
| SEI Global Master Fund Plc the SEI High Yield Fixed Income Fund | $1,774,217.87 | $15,499.76 | $1,789,717.63 |
| SEI Institutional Investments Trust-High Yield Bond Fund | $7,967,831.48 | $69,572.90 | $8,037,404.37 |
| SEI Institutional Managed Trust - Multi-Strategy Alternative Fund | $855,770.95 | $7,446.24 | $863,217.20 |
| SEI Institutional Managed Trust-High Yield Bond Fund | $4,956,765.26 | $43,297.58 | $5,000,062.83 |
| Teachers' Retirement System of the City of New York | $3,033,982.48 | $26,505.21 | $3,060,487.69 |
| The Coca-Cola Company Master Retirement Trust | $5,900,224.88 | $51,455.30 | $5,951,680.19 |
| U.S. High Yield Bond Fund | $1,401,553.84 | $12,244.13 | $1,413,797.97 |
| Brigade Leveraged Capital Structures Fund Ltd. - Citi TRS (Citi USPTRS1 Loan Funding LLC) | $31,782,683.71 | $277,657.06 | $32,060,340.77 |
| Panther BCM, LLC - Citi TRS (Citi USPTRS1 Loan Funding LLC) | $4,793,291.48 | $41,874.73 | $4,835,166.21 |

**Allstate Clients**

| Lender Name | Principal Outstanding as of August 11, 2020 | Accrued Interest Outstanding as of August 11, 2020 | Total Payment by Citibank on August 11, 2020 |
|---|---|---|---|
| AIMCO CLO 2015-A | $994,711.38 | $8,689.91 | $1,003,401.29 |
| AIMCO CLO 2017-A | $1,107,794.84 | $9,677.82 | $1,117,472.66 |
| AIMCO CLO 2018-A | $810,340.06 | $7,079.22 | $817,419.28 |
| AIMCO CLO 2018-B | $798,421.37 | $6,975.20 | $805,396.47 |
| AIMCO CLO 10 | $735,503.94 | $6,425.44 | $741,929.38 |
| Allstate Life Insurance Company | $760,928.88 | $6,647.56 | $767,576.44 |
| Allstate Insurance Company | $5,336,328.29 | $46,618.76 | $5,382,947.05 |

**Zais Clients**

| Lender Name | Principal Outstanding as of August 11, 2020 | Accrued Interest Outstanding as of August 11, 2020 | Total Payment by Citibank on August 11, 2020 |
|---|---|---|---|
| ZAIS CLO 1, Limited | $950,347.23 | $8,302.34 | $958,649.57 |
| ZAIS CLO 2, Limited | $972,222.23 | $8,492.44 | $980,715.67 |
| ZAIS CLO 5, Limited | $1,465,754.87 | $12,805.00 | $1,478,559.87 |
| ZAIS CLO 6, Limited | $2,430,555.56 | $21,233.60 | $2,451,789.16 |
| ZAIS CLO 7, Limited | $3,893,811.53 | $34,016.77 | $3,927,828.30 |
| ZAIS CLO 8, Limited | $2,439,188.98 | $21,309.03 | $2,460,498.01 |
| ZAIS CLO 9, Limited | $1,469,465.65 | $12,837.42 | $1,482,303.07 |
| ZAIS CLO 11, Limited | $989,717.23 | $8,646.28 | $998,363.51 |
| ZAIS CLO 13, Limited | $989,717.23 | $8,646.28 | $998,363.51 |

**Greywolf Clients**

| Lender Name | Principal Outstanding as of August 11, 2020 | Accrued Interest Outstanding as of August 11, 2020 | Total Payment by Citibank on August 11, 2020 |
|---|---|---|---|
| GREYWOLF CLO IV LTD REISSUE | $4,812,500.00 | $42,042.53 | $4,854,542.53 |
| GREYWOLF CLO II LTD | $3,888,888.89 | $33,973.77 | $3,922,862.66 |
| GREYWOLF CLO V LTD | $7,218,750.00 | $63,063.80 | $7,281,813.80 |

**Medalist Clients**

| Lender Name | Principal Outstanding as of August 11, 2020 | Accrued Interest Outstanding as of August 11, 2020 | Total Payment by Citibank on August 11, 2020 |
|---|---|---|---|
| JMP CREDIT ADVISORS CLO III R LTD (FKA) JMP CREDIT ADVISORS CLO III LTD | $1,925,000.00 | $16,817.01 | $1,941,817.01 |
| JMP CREDIT ADVISORS CLO IV LTD | $1,929,836.69 | $16,859.27 | $1,946,695.96 |
| JMP CREDIT ADVISORS CLO V LTD | $680,007.74 | $5,940.62 | $685,948.36 |

**Tall Tree Clients**

| Lender Name | Principal Outstanding as of August 11, 2020 | Accrued Interest Outstanding as of August 11, 2020 | Total Payment by Citibank on August 11, 2020 |
|---|---|---|---|
| LOCKWOOD GROVE CLO LTD | $2,887,500.00 | $25,225.52 | $2,912,725.52 |
| MONARCH GROVE CLO LTD | $481,250.00 | $4,204.25 | $485,454.25 |
| EVANS GROVE CLO LTD | $481,250.00 | $4,204.25 | $485,454.25 |

**New Generation Clients**

| Lender Name | Principal Outstanding as of August 11, 2020 | Accrued Interest Outstanding as of August 11, 2020 | Total Payment by Citibank on August 11, 2020 |
|---|---|---|---|
| New Generation LP | $2,735,788.12 | $23,900.15 | $2,759,688.27 |

**HPS Clients**

| Lender Name | Principal Outstanding as of August 11, 2020 | Accrued Interest Outstanding as of August 11, 2020 | Total Payment by Citibank on August 11, 2020 |
|---|---|---|---|
| Arch Investment Holdings IV LTD | $493,341.71 | $4,309.89 | $497,651.60 |
| LIQUID LOAN OPPORTUNITIES MASTER FUND LP (FKA) HIGHBRIDGE LIQUID LOAN OPPORTUNITIES | $16,248,944.68 | $141,952.59 | $16,390,897.27 |

| Lender Name | Principal Outstanding as of August 11, 2020 | Accrued Interest Outstanding as of August 11, 2020 | Total Payment by Citibank on August 11, 2020 |
|---|---|---|---|
| MASTER FUND LP (HIGHBRIDGE CAPITAL MANAGEMENT LLC) | | | |
| HPS LOAN MANAGEMENT 3 2014 LTD  (FKA) HIGHBRIDGE LOAN MANAGEMENT 3 2014 LTD | $5,980,656.27 | $52,247.68 | $6,032,903.95 |
| HPS LOAN MANAGEMENT 2013 2 LTD  (FKA) HIGHBRIDGE LOAN MANAGEMENT 2013 2 LTD (FKA LOMBARDI 2013 2 LLC) | $5,122,945.64 | $44,754.62 | $5,167,700.26 |
| HPS LOAN MANAGEMENT 5 2015 LTD  (FKA) HIGHBRIDGE LOAN MANAGEMENT 5 2015 LTD | $5,923,507.04 | $51,748.42 | $5,975,255.46 |
| HPS LOAN MANAGEMENT 4 2014 LTD  (FKA) HIGHBRIDGE LOAN MANAGMENT 4 2014 LTD | $6,404,778.80 | $55,952.86 | $6,460,731.66 |
| ZALICO VL SERIES ACCOUNT 2 | $619,095.48 | $5,408.49 | $624,503.97 |
| ZURICH AMERICAN INSURANCE COMPANY | $14,510,050.25 | $126,761.41 | $14,636,811.66 |
| HPS LOAN MANAGEMENT 6 2015 LTD  (FKA) HIGHBRIDGE LOAN MANAGEMENT 6 2015 LTD | $7,281,666.74 | $63,613.45 | $7,345,280.19 |
| HPS LOAN MANAGEMENT 7 2015 LTD  (FKA) HIGHBRIDGE LOAN MANAGEMENT 7 2015 LTD | $6,307,249.94 | $55,100.84 | $6,362,350.78 |
| GIM CREDIT MASTER LUX SARL  (FKA) HPS GIM CREDIT MASTER LUX SARL (FKA) HIGHBRIDGE GIM | $30,471,105.53 | $266,198.96 | $30,737,304.49 |

| Lender Name | Principal Outstanding as of August 11, 2020 | Accrued Interest Outstanding as of August 11, 2020 | Total Payment by Citibank on August 11, 2020 |
|---|---|---|---|
| CREDIT MASTER LUX SARL | | | |
| WATFORD ASSET TRUST I | $8,887,156.98 | $77,639.19 | $8,964,796.17 |
| INSTITUTIONAL CREDIT FUND  SUBSIDIARY LP (FKA) HPS INSTITUTIONAL CREDIT FUND SUBSIDIARY LP | $3,500,699.94 | $30,582.50 | $3,531,282.44 |
| HPS LOAN MANAGEMENT 8 2016 LTD  (FKA) HIGHBRIDGE LOAN MANAGEMENT 8 2016 LTD | $1,925,000.00 | $16,817.01 | $1,941,817.01 |
| HPS LOAN MANAGEMENT 9 2016 LTD | $5,582,960.23 | $48,773.36 | $5,631,733.59 |
| HPS LOAN MANAGEMENT 10 2016 LTD | $6,737,500.00 | $58,859.55 | $6,796,359.55 |
| HPS LOAN MANAGEMENT 11 2017 LTD  (FKA) JORDY WAREHOUSE 2016 LTD | $4,836,683.42 | $42,253.80 | $4,878,937.22 |
| CARDINAL FUND LP | $3,240,577.88 | $28,310.05 | $3,268,887.93 |

**Symphony Clients**

| Lender Name | Principal Outstanding as of August 11, 2020 | Accrued Interest Outstanding as of August 11, 2020 | Total Payment by Citibank on August 11, 2020 |
|---|---|---|---|
| Nuveen Senior Income Fund | $2,513,845.03 | $21,961.23 | $2,535,806.26 |
| Nuveen Diversified Dividend and Income Fund | $746,003.58 | $6,517.17 | $752,520.75 |
| Nuveen Floating Rate Income Fund | $5,027,689.97 | $43,922.46 | $5,071,612.43 |
| Nuveen Floating Rate Income Opportunity Fund | $3,633,536.78 | $31,742.98 | $3,665,279.76 |
| Nuveen Credit Strategies Income Fund | $15,055,796.61 | $131,529.11 | $15,187,325.72 |

| Lender Name | Principal Outstanding as of August 11, 2020 | Accrued Interest Outstanding as of August 11, 2020 | Total Payment by Citibank on August 11, 2020 |
|---|---|---|---|
| Municipal Employees Annuity & Benefit Fund of Chicago | $1,008,331.09 | $8,808.89 | $1,017,139.98 |
| Nuveen Symphony High Yield Income Fund | $7,347,134.31 | $64,185.38 | $7,411,319.69 |
| Nuveen Symphony Floating Rate Income Fund | $3,979,650.76 | $34,766.67 | $4,014,417.43 |
| Nuveen Short Duration Credit Opportunities Fund | $2,140,156.78 | $18,696.65 | $2,158,853.43 |
| Symphony Floating Rate Senior Loan Fund | $1,488,267.74 | $13,001.67 | $1,501,269.41 |
| Principal Funds, Inc. - Diversified Real Asset Fund | $3,670,168.61 | $32,063.00 | $3,702,231.61 |
| California Street CLO IX Limited Partnership | $3,853,806.65 | $33,667.28 | $3,887,473.93 |
| Principal Diversified Real Asset CIT | $1,835,083.93 | $16,031.51 | $1,851,115.44 |
| California Street CLO XII, LTD. | $5,878,829.89 | $51,358.11 | $5,930,188.00 |
| Menard, Inc. | $3,247,347.84 | $28,369.19 | $3,275,717.03 |
| BayCity Senior Loan Fund, L.P. (FKA BAYCITY SENIOR LOAN MASTER FUND LTD (FKA SYMPHONY SENIOR LOAN MASTER FUND LTD | $2,484,983.45 | $21,709.09 | $2,506,692.54 |
| Symphony CLO XIV, Ltd. | $6,524,108.31 | $56,995.34 | $6,581,103.65 |
| Nomura Multi Managers Fund - Global Bond | $567,439.23 | $4,957.21 | $572,396.44 |
| Symphony CLO XV, Ltd. | $5,466,748.06 | $47,758.12 | $5,514,506.18 |
| SCOF-2 LTD. | $3,159,429.45 | $27,601.13 | $3,187,030.58 |
| Goldman Sachs Trust II - Goldman Sachs Multi-Manager Non-Core Fixed Income Fund | $1,311,728.86 | $11,459.41 | $1,323,188.27 |
| BayCity High Yield Income Fund, L.P. | $645,307.22 | $5,637.48 | $650,944.70 |
| Symphony CLO XVI, LTD. | $3,512,280.70 | $30,683.67 | $3,542,964.37 |
| Pensiondanmark Pensionsforsikringsaktieselskab | $3,677,319.95 | $32,125.48 | $3,709,445.43 |
| BayCity Long-Short Credit Master Fund Ltd. | $4,743,725.56 | $2,240.09 | $4,745,965.65 |
| Symphony CLO XVII, LTD. | $3,984,608.15 | $34,809.98 | $4,019,418.13 |

| Lender Name | Principal Outstanding as of August 11, 2020 | Accrued Interest Outstanding as of August 11, 2020 | Total Payment by Citibank on August 11, 2020 |
|---|---|---|---|
| BayCity Alternative Investment Funds SICAV-SIF - BayCity US Senior Loan Fund | $1,890,123.97 | $16,512.33 | $1,906,636.30 |
| TCI-Symphony 2016-1 Ltd | $3,512,280.51 | $30,683.67 | $3,542,964.18 |
| Symphony CLO XVIII, LTD. | $3,385,678.20 | $29,577.66 | $3,415,255.86 |
| TCI-Symphony 2017-1 Ltd | $3,381,892.40 | $29,544.59 | $3,411,436.99 |

**Bardin Hill Clients**

| Lender Name | Principal Outstanding as of August 11, 2020 | Accrued Interest Outstanding as of August 11, 2020 | Total Payment by Citibank on August 11, 2020 |
|---|---|---|---|
| Halcyon Loan Advisors Funding 2013-1 Ltd. | $2,117,500.00 | $18,498.72 | $2,135,998.72 |
| Halcyon Loan Advisors Funding 2013-2 Ltd. | $6,164,712.46 | $53,855.61 | $6,218,568.07 |
| Halcyon Loan Advisors Funding 2014-1 Ltd. | $5,185,038.90 | $45,297.08 | $5,230,335.98 |
| Halcyon Loan Advisors Funding 2014-2 Ltd. | $7,139,849.73 | $62,374.52 | $7,202,224.25 |
| Halcyon Loan Advisors Funding 2014-3 Ltd. | $7,374,070.29 | $64,420.70 | $7,438,490.99 |
| Halcyon Loan Advisors Funding 2015-1 Ltd. | $4,857,005.00 | $42,431.34 | $4,899,436.34 |
| Halcyon Loan Advisors Funding 2015-2 Ltd. | $4,895,506.49 | $42,767.69 | $4,938,274.18 |
| Halcyon Loan Advisors Funding 2015-3 Ltd. | $4,911,086.54 | $42,903.80 | $4,953,990.34 |
| Halcyon Loan Advisors Funding 2017-1 Ltd. | $1,600,452.38 | $13,981.73 | $1,614,434.11 |
| Halcyon Loan Advisors Funding 2017-2 Ltd. | $1,378,786.51 | $12,045.23 | $1,390,831.74 |

**APPENDIX B**

| Manager | Category | Lender |
|---------|----------|--------|
| Brigade | Private Fund | Brigade Credit Fund II |
| Brigade | Private Fund | Brigade Distressed Value Master Fund Ltd. |
| Brigade | Private Fund | Brigade Opportunistic Credit LBG Fund Ltd. |
| Brigade | Private Fund | Brigade Leveraged Capital Structures Fund Ltd. |
| Brigade | CDO | Brigade Debt Funding I, Ltd. |
| Brigade | CDO | Brigade Debt Funding II Ltd. |
| Brigade | CLO | ACIS CLO 2014-5 Ltd. |
| Brigade | CLO | Battalion CLO VII Ltd. |
| Brigade | CLO | Battalion CLO VIII Ltd. |
| Brigade | CLO | Battalion CLO IX Ltd. |
| Brigade | CLO | Battalion CLO X Ltd. |
| Brigade | CLO | Battalion CLO XI Ltd. |
| Brigade | CLO | Battalion CLO XII Ltd. |
| Brigade | CLO | Battalion CLO XIV Ltd. |
| Brigade | SMA | Brigade Diversified Credit CIT |
| Brigade | SMA | Future Directions Credit Opportunities Fund |
| Brigade | SMA | SEI Global Master Fund plc the SEI High Yield Fixed Income Fund |
| Brigade | SMA | SEI Institutional Investments Trust-High Yield Bond Fund |
| Brigade | SMA | SEI Institutional Managed Trust – Multi-Strategy Alternative Fund |
| Brigade | SMA | SEI Institutional Managed Trust-High Yield Bond Fund |
| Brigade | SMA | U.S. High Yield Bond Fund |
| Brigade | SMA | Big River Group Fund SPC LLC |
| Brigade | SMA | Blue Falcon Limited |

| Manager | Category | Lender |
|---|---|---|
| Brigade | SMA | City of Phoenix Employees' Retirement Plan |
| Brigade | SMA | Delta Master Trust |
| Brigade | SMA | FCA Canada Inc. Elected Master Trust |
| Brigade | SMA | FCA US LLC Master Retirement Trust |
| Brigade | SMA | FedEx Corporation Employees' Pension Trust |
| Brigade | SMA | Goldman Sachs Trust II – Goldman Sachs Multi-Manager Non-Core Fixed Income Fund |
| Brigade | SMA | Illinois State Board of Investment |
| Brigade | SMA | JPMorgan Chase Retirement Plan Brigade |
| Brigade | SMA | JPMorgan Chase Retirement Plan Brigade Bank Loan |
| Brigade | SMA | Los Angeles County Employees Retirement Association |
| Brigade | SMA | Mediolanum Best Brands |
| Brigade | SMA | New York City Fire Department Pension Fund |
| Brigade | SMA | New York City Police Pension Fund |
| Brigade | SMA | Northrop Grumman Pension Master Trust |
| Brigade | SMA | Panther BCM, LLC |
| Brigade | SMA | SC Credit Opportunities Mandate LLC |
| Brigade | SMA | Teachers' Retirement System of the City of New York |
| Brigade | SMA | The Coca-Cola Company Master Retirement Trust |
| HPS | Private Fund | GIM Credit Master Lux S.a.r.l. |
| HPS | Private Fund | Institutional Credit Fund Subsidiary, L.P. |
| HPS | Private Fund | Cardinal Fund, L.P. |
| HPS | Private Fund | Liquid Loan Opportunities Master Fund, L.P. |
| HPS | CLO | 2013-2, Ltd. HPS Loan Management |
| HPS | CLO | 3-2014, Ltd. HPS Loan Management |
| HPS | CLO | 4-2014, Ltd. HPS Loan Management |
| HPS | CLO | 5-2015, Ltd. HPS Loan Management |

| Manager | Category | Lender |
|---|---|---|
| HPS | CLO | 6-2015, Ltd. HPS Loan Management |
| HPS | CLO | 7-2015, Ltd. HPS Loan Management |
| HPS | CLO | 8-2016, Ltd. HPS Loan Management |
| HPS | CLO | 9-2016, Ltd. HPS Loan Management |
| HPS | CLO | 10-2016, Ltd. HPS Loan Management |
| HPS | CLO | 11-2017, Ltd. HPS Loan Management |
| HPS | SMA | Watford Asset Trust I |
| HPS | SMA | ZALICO VL Series Account – 2 |
| HPS | SMA | Zurich American Insurance Company |
| HPS | SMA | Arch Investment Holdings IV LTD. |
| Symphony | Private Fund | BayCity Alternative Investment Funds SICAV-SIF – BayCity US Senior Loan Fund |
| Symphony | Private Fund | BayCity High Yield Income Fund, L.P. |
| Symphony | Private Fund | BayCity Long-Short Credit Master Fund Ltd. |
| Symphony | Private Fund | BayCity Senior Loan Fund, L.P. |
| Symphony | Private Fund | Nomura Multi Managers Fund – Global Bond |
| Symphony | Mutual Fund | Nuveen Credit Strategies Income Fund |
| Symphony | Mutual Fund | Nuveen Diversified Dividend and Income Fund |
| Symphony | Mutual Fund | Nuveen Floating Rate Income Fund |
| Symphony | Mutual Fund | Nuveen Floating Rate Income Opportunity Fund |
| Symphony | Mutual Fund | Nuveen Senior Income Fund |
| Symphony | Mutual Fund | Nuveen Short Duration Credit Opportunities Fund |
| Symphony | Mutual Fund | Nuveen Symphony Floating Rate Income Fund |
| Symphony | Mutual Fund | Nuveen Symphony High Yield Income Fund |
| Symphony | Mutual Fund | Goldman Sachs Trust II – Goldman Sachs Multi-Manager Non-Core Fixed Income Fund |
| Symphony | CLO | California Street CLO IX Limited Partnership |

| Manager | Category | Lender |
| --- | --- | --- |
| Symphony | CLO | California Street CLO XII, LTD |
| Symphony | CLO | SCOF-2 LTD. |
| Symphony | CLO | Symphony CLO XIV, Ltd. |
| Symphony | CLO | Symphony CLO XV, Ltd. |
| Symphony | CLO | Symphony CLO XVI, LTD. |
| Symphony | CLO | Symphony CLO XVII, Ltd. |
| Symphony | CLO | Symphony CLO XVIII, LTD. |
| Symphony | CLO | TCI-Symphony 2016-1 Ltd. |
| Symphony | CLO | TCI-Symphony 2017-1 Ltd. |
| Symphony | SMA | Menard Inc. |
| Symphony | SMA | Municipal Employees Annuity & Benefit Fund of Chicago |
| Symphony | SMA | Pensiondanmark Pensionsforsikringsaktieselskab |
| Symphony | SMA | Principal Diversified Real Asset CIT |
| Symphony | SMA | Principal Funds, Inc. – Diversified Real Asset Fund |
| Symphony | SMA | Symphony Floating Rate Senior Loan Fund |
| Bardin Hill | CLO | Halcyon Loan Advisors Funding 2013-1 Ltd. |
| Bardin Hill | CLO | Halcyon Loan Advisors Funding 2013-2 Ltd. |
| Bardin Hill | CLO | Halcyon Loan Advisors Funding 2014-1 Ltd. |
| Bardin Hill | CLO | Halcyon Loan Advisors Funding 2014-2 Ltd. |
| Bardin Hill | CLO | Halcyon Loan Advisors Funding 2014-3 Ltd. |
| Bardin Hill | CLO | Halcyon Loan Advisors Funding 2015-1 Ltd. |
| Bardin Hill | CLO | Halcyon Loan Advisors Funding 2015-2 Ltd. |
| Bardin Hill | CLO | Halcyon Loan Advisors Funding 2015-3 Ltd. |
| Bardin Hill | CLO | Halcyon Loan Advisors Funding 2017-1 Ltd. |
| Bardin Hill | CLO | Halcyon Loan Advisors Funding 2017-2 Ltd. |
| ZAIS | CLO | ZAIS CLO 1, Limited |

| Manager | Category | Lender |
|---------|----------|--------|
| ZAIS | CLO | ZAIS CLO 2, Limited |
| ZAIS | CLO | ZAIS CLO 5, Limited |
| ZAIS | CLO | ZAIS CLO 6, Limited |
| ZAIS | CLO | ZAIS CLO 7, Limited |
| ZAIS | CLO | ZAIS CLO 8, Limited |
| ZAIS | CLO | ZAIS CLO 9, Limited |
| ZAIS | CLO | ZAIS CLO 11, Limited |
| ZAIS | CLO | ZAIS CLO 13, Limited |
| Allstate | CLO | AIMCO CLO 2015-A |
| Allstate | CLO | AIMCO CLO 2017-A |
| Allstate | CLO | AIMCO CLO 2018-A |
| Allstate | CLO | AIMCO CLO 2018-B |
| Allstate | CLO | AIMCO CLO 10 |
| Allstate | Insurance Company | Allstate Life Insurance Company |
| Allstate | Insurance Company | Allstate Insurance Company |
| Greywolf | CLO | Greywolf CLO II, Ltd. |
| Greywolf | CLO | Greywolf CLO IV, Ltd. |
| Greywolf | CLO | Greywolf CLO V, Ltd. |
| Tall Tree | CLO | Monarch Grove CLO, Ltd. |
| Tall Tree | CLO | Evans Grove CLO, Ltd. |
| Tall Tree | CLO | Lockwood Grove CLO, Ltd. |
| Medalist | CLO | JMP CLO IIIR |
| Medalist | CLO | JMP CLO IV |
| Medalist | CLO | JMP CLO V |

Dated: New York, New York       **QUINN EMANUEL URQUHART &**
       November 13, 2020           **SULLIVAN, LLP**

By:  */s/Robert Loigman*
      Michael Carlinsky
      Robert Loigman
      Benjamin Finestone
      Adam M. Abensohn
      Anil Makhijani
      Sophia Qasir
      Alexandre Tschumi
      Zachary Russell
      Mario Gazzola
      51 Madison Avenue, 22nd Floor
      New York, New York 10010
      (212) 849-7000
      michaelcarlinsky@quinnemanuel.com
      robertloigman@quinnemanuel.com
      benjaminfinestone@quinnemanuel.com
      adamabensohn@quinnemanuel.com
      anilmakhijani@quinnemanuel.com
      sophiaqasir@quinnemanuel.com
      zacharyrussell@quinnemanuel.com
      alexandretschumi@quinnemanuel.com
      mariogazzola@quinnemanuel.com

      Bennett Murphy
      865 S. Figueroa Street, 10th Floor
      Los Angeles, CA 90017
      (213) 443-3000
      bennettmurphy@quinnemanuel.com

      *Attorneys for Defendants*