# Exhibit A-1

ORIGINAL

# 90-7106

## United States Court of Appeals

*for the*

### Second Circuit



UNITED STATES COURT OF APPEALS
FILED
MAR 1 2 1990
ELAINE P. GOLDSMITH, CLERK
SECOND CIRCUIT

BANQUE WORMS,

*Plaintiff-Appellee,*

— against —

BANKAMERICA INTERNATIONAL,

*Defendant-Third-Party Plaintiff,*

— against —

SECURITY PACIFIC INTERNATIONAL BANK,

*Third-Party Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## BRIEF OF THIRD-PARTY DEFENDANT-APPELLANT
## SECURITY PACIFIC INTERNATIONAL BANK

---

KELLEY DRYE & WARREN
*Attorneys for Third-Party
Defendant-Appellant*
101 Park Avenue
New York, New York 10178
(212) 808-7800

SARAH L. REED
ALAN R. KUSINITZ
*Of Counsel*

<u>Corporate Disclosure Statement Pursuant To
Fed. R. App. P. 26.1 And Section 0.15 Of
The Rules Of The United States Court
Of Appeals For The Second Circuit</u>

Third-Party Defendant-Appellant, Security Pacific International Bank is a wholly-owned subsidiary of Security Pacific National Bank ("SPNB"), which in turn is a subsidiary of Security Pacific Corporation ("SPC"). SPC has issued shares to the public and has numerous other subsidiaries, which are affiliates of SPNB.

# TABLE OF CONTENTS

PAGE

CORPORATE DISCLOSURE STATEMENT......................... i

TABLE OF AUTHORITIES................................... iv

PRELIMINARY STATEMENT................................. 1

ISSUES PRESENTED FOR REVIEW........................... 1

STATEMENT OF THE CASE................................. 2

    A.   Nature Of The Case............................ 2

    B.   Course Of Proceedings......................... 3

    C.   Disposition Below............................. 4

STATEMENT OF THE FACTS................................ 5

    A.   The Factual Record Below...................... 5

    B.   The Parties................................... 9

    C.   Spedley....................................... 9

    D.   Spedley's Financial Difficulties
          And Subsequent Failure........................ 9

    E.   The Events Immediately Preceding
          The Mistaken Wire Transfer.................... 10

    F.   The Mistaken Wire Transfer.................... 13

    G.   SPIB'S Investigation.......................... 18

ARGUMENT.............................................. 20

POINT I:   UNDER APPLICABLE NEW YORK LAW, THE COURT
            BELOW ERRED IN DENYING SPIB SUMMARY
            JUDGMENT ON ITS CLAIM FOR RESTITUTION        20

    A.   SPIB Is Entitled To the Return Of
          The Funds Since BW Has Conceded It
          Had No Detrimental Reliance................... 23

Page

B.    New York Rejects The "Discharge For
      Value" Rule Set Forth In Section 14
      Of <u>The Restatement of Restitution</u>............... 29

C.    The Stop-Order Check Cases Do Not Support
      BW's Claim That New York Recognizes The
      Discharge For Value Rule...................... 36

D.    Summary...................................... 40


POINT II:  SUMMARY JUDGMENT MUST BE DENIED TO BW BECAUSE
           MATERIAL ISSUES OF FACT EXIST AS TO BW's
           ENTITLEMENT TO THE FUNDS IN QUESTION          41

A.    It Is Inequitable For a Payee To Retain
      Funds Received By Mistake Where The Payee
      Has Notice Of The Probable Insolvency
      Of The Payor.................................. 42

B.    The Court's Use of <u>Delbreuck</u> To Analogize A
      Wire Transfer To A Check Case Effectively
      Ignores The Realities Of This Transaction....... 44


CONCLUSION.............................................. 50

ADDENDUM

Exhibit "A"   <u>Manufacturers Hanover Trust Co. v.
              Chemical Bank</u>, No. 30740-87
              (Sup. Ct. N.Y. Co. Sept. 11, 1989).........

Exhibit "B"   <u>Bankers Trust Co. v. Manufacturers
              and Traders Trust Co.</u>, No. 6747-88
              (Sup. Ct. N.Y. Co. Oct. 21, 1988)...........

Exhibit "C"   <u>Citibank, N.A. v. Misulovin</u>, slip op.
              (Sup. Ct. N.Y. Co. 1989)...................

Exhibit "D"   <u>Uban Int'l Ltd. v. Mitsui Bank, Ltd.</u>,
              N.Y.L.J., May 3, 1985 at 12, col. 3
              (Sup. Ct. N.Y. Co.).......................

## TABLE OF AUTHORITIES

**Cases**                                                                   **Page**

Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank,
    731 F.2d 112 (2d Cir. 1984)........................... 49

Alden Auto Parts Warehouse, Inc. v. Dolphin
    Equipment Leasing Corp., 682 F.2d 330
    (2d Cir. 1982)....................................... 30

Ball v. Shepard,
    202 N.Y. 247 (1911)................................. 25, 34
                                                  35, 36
                                                  37

Bank Leumi Trust Co. v. Bally's Park Place, Inc.,
    528 F. Supp. 349 (S.D.N.Y. 1981).................... 24, 49

Bankers Trust Co. v. Manufacturers and Traders
    Trust Co., No. 6747-88 (Sup. Ct. N.Y. Co.
    Oct. 21, 1988)...................................... 24, 28
                                                  29

Celotex Corp. v. Catrett, 477 U.S. 317 (1986).............. 44

Chase Nat'l Bank of City of N.Y. v. Battat,
    105 N.Y.S.2d 13 (Sup. Ct. N.Y. Co. 1951)............. 40

Citibank, N.A. v. Misulovin, slip op.
    (Sup. Ct. N.Y. Co. 1989)............................ 25

Citibank, N.A. v. Warner,
    113 Misc.2d 748, 449 N.Y.S.2d 822
    (Sup. Ct. N.Y. Co. 1981)............................ 21, 24

Commercial Ins. Co. of Newark v. Scalamandre,
    56 Misc.2d 628, 289 N.Y.S.2d 489
    (N.Y. Civ. Ct. N.Y. Co. 1967)....................... 39, 43

Consolidated Nat'l Bank v. First Nat'l Bank,
    129 A.D. 538 (2d Dep't 1908)
    aff'd, 199 N.Y. 516 (1910).......................... 31, 32

Cukierski v. Standard Milling Co.,
    60 Misc.2d 690, 303 N.Y.S.2d 586
    (N.Y. Civ. Ct. N.Y. Co. 1969)....................... 21, 27

Delbrueck & Co. v. Manufacturers Hanover
    Trust Co., 609 F.2d 1047 (2d Cir. 1979)............. 22, 38
                                                  45, 46

Evra Corp. v. Swiss Bank Corp.,
    673 F.2d 951 (7th Cir. 1982)........................ 38

-iv-

**Cases**                                                                  **Page**

Hathaway v. County of Delaware,
    185 N.Y. 368 (1906)...................................  36

Lawrence v. American Nat'l Bank,
    54 N.Y. 432 (1873)...................................  36

Manufacturers Hanover Trust Co. v. Chemical Bank,
    No. 30740-87 (Sup. Ct. N.Y. Co.
    Sept. 11, 1989) appeal pending ......................  23, 24,
                                                           27, 28,
                                                           48

Manufacturers Trust Co. v. Diamond,
    17 Misc.2d 909, 186 N.Y.S.2d 917
    (1st Dep't 1959)....................................  24, 26,
                                                           27

Martin v. Morgan, 129 Eng. Rep. 734,
    1 Brod. & Bing, 290 (C.P. 1819).....................  43, 50

Mayer v. Mayor, 63 N.Y. 455 (1875).......................  23, 33,
                                                           34, 36
                                                           48

Middle East Banking Co. v. State Street
    Bank Int'l, 821 F.2d 897 (2d Cir. 1987).............  45, 46

Morgan Guar. Trust Co. v. American Sav. and Loan,
    804 F.2d 1487 (9th Cir. 1986).......................  43, 50

Nat'l Bank of Canada v. Artex Industries, Inc.,
    627 F. Supp. 610 (S.D.N.Y. 1986)....................  29

Nat'l Bank of Commerce in New York v.
    Nat'l Mechanics Banking Ass'n of New York,
    55 N.Y. 211 (1873)..................................  24, 25

Nat'l Boulevard Bank of Chicago v. Schwartz,
    175 F. Supp. 74 (S.D.N.Y. 1959),
    aff'd, 274 F.2d 823 (2d Cir. 1960)..................  40, 41,
                                                           43, 48

Oddie v. Nat'l City Bank, 45 N.Y. 735 (1871).............  31, 32

Satchell v. Dilworth,
    745 F.2d 781 (2d Cir. 1984).........................  29

Smith & McCrorken v. Chatham Phoenix Nat'l Bank
    & Trust Co., 239 A.D. 318 (1st Dep't 1933)..........  43

Turetsky v. Morris Plan Indus. Bank of New York,
    22 N.Y.S.2d 514 (2d Dep't 1936).....................  27

**Cases**                                                                    **Page**

Uban Int'l Ltd. v. Mitsui Bank, Ltd.,
    N.Y.L.J., May 3, 1985 at 12, col. 3
    (Sup. Ct. N.Y. Co.)...................................   49

Union Nat'l Bank of Troy v. Sixth Nat'l
    Bank of New York, 43 N.Y. 452 (1871)..................   36

Valley Bank of Nevada v. Bank of Commerce,
    74 Misc.2d 195, 343 N.Y.S.2d 191
    (N.Y. Civ. Ct. N.Y. Co. 1973)........................   24

Wells v. Washington Heights Federal Sav.
    and Loan Ass'n, 63 Misc.2d 424,
    312 N.Y.S.2d 236 (Civ. Ct. Cty. M.Y. Co. 1970).........   39

Young v. U.S. Dept. of Justice, 882 F.2d 633
    (2d Cir. 1989), cert. denied, 110 S. Ct. 1116 (1990)...   41


**Statutes:**

N.Y.U.C.C. Law § 1-103 (McKinney 1964).....................   38
N.Y.U.C.C. Law § 4-212 (McKinney 1964).....................   32
N.Y.U.C.C. Law § 4-213 (McKinney 1964).....................   32
N.Y.U.C.C. Law § 4-301 (McKinney 1964).....................   32
N.Y.U.C.C. Law § 4-407 (McKinney 1964).....................   37, 38


**Other Sources**

3 G. Palmer, The Law of Restitution 490-91 (1978)..........   34

Restatement of the Law of Restitution
    § 1 (1937)..........................................   40

Restatement of the Law of Restitution
    § 2 (1937)..........................................   40

Restatement of the Law of Restitution
    § 14 (1937)..........................................   5, 21,
                                                             29, 30,
                                                             33, 37
                                                             40, 42

Restatement of the Law of Restitution
    § 45 - comment 6 (1937).............................   40

W. Seavey and A. Scott, Notes on Certain Important
    Sections of Restatement of Restitution 10 (1937).......   22, 43

5 Wright & Miller, Federal Prac. and Pro.,
    § 1278 at 339 (1969)................................   29

## PRELIMINARY STATEMENT

*Third-Party Defendant-Appellant*, Security Pacific International Bank ("SPIB") submits this brief in support of its appeal from a final judgment of the United States District Court for the Southern District of New York (Patterson, J.) entered on December 27, 1989 (Joint Appendix at 657, hereinafter "A."), which granted Plaintiff-Appellee Banque Worms' cross-motion for summary judgment against SPIB and denied SPIB's motion for summary judgment against Banque Worms ("BW"). The district court's opinion and order determining the motions is set forth at A. 647-655.

## ISSUES PRESENTED FOR REVIEW

1)    Did the district court err in holding that BW was entitled to retain funds mistakenly wire-transferred to it by SPIB without valid instructions from its customer Spedley Securities, Ltd. ("Spedley") and without any detrimental reliance on such transfer by BW?

2)    Did the district court err in relying in its decision below on the Restatement of Restitution's "Discharge for Value" rule, as opposed to the established law of restitution and mistake in New York to the contrary, in holding that BW, as an alleged bona fide creditor, allegedly without notice of the mistaken transfer, was entitled to retain the mistakenly transferred funds without showing detrimental reliance?

3)    Did the district court err in holding in its decision below, prior to any discovery, that no triable issues of fact existed which precluded entry of summary judgment against SPIB?

- 1 -

4)   Did the district court err in finding that the issue of BW's bona fides in attempting to extract a payment of a loan from its insolvent debtor, Spedley, which then revoked its instructions for payment because of its insolvency and filed for liquidation, did not present a material issue of fact under New York law as to the equitable right of BW to retain the mistakenly transferred funds, such that summary judgment could not be entered against SPIB?

## STATEMENT OF THE CASE

### A.   Nature Of The Case.

SPIB's action against BW seeks a declaration that BW does not have any entitlement to $1,974,267.97 undisputably transferred in error to BW by SPIB on April 10, 1989.  As discussed more fully below, in order to reap this windfall, BW is attempting to use the wire transfer system, known in the banking industry as the Clearing House Interbank Payment System or "CHIPS", to have SPIB repay from its own funds a bad loan BW's Singapore branch made to its now-bankrupt Australian debtor, Spedley.  SPIB is and was a complete stranger to that loan.  There is no factual dispute that at the time of the transfer in question, SPIB had no valid instructions to pay to BW's account because Spedley had countermanded its instructions seven hours before and had directed the funds, received by SPIB after the initial instructions were revoked, elsewhere.  It is also undisputed that SPIB's only role in this matter was to facilitate payments through the CHIPS system as directed by its customer, Spedley.  As discussed below, New York law is absolutely clear that a bank has a restitutionary right to

- 2 -

recover money it mistakenly paid to another party, which is exactly what happened here.

B.   Course of Proceedings.

By complaint dated May 4, 1989, BW commenced this action against its New York bank, BankAmerica International ("BI") to compel BI to recredit $1,974,267.57 to BW's Singapore branch's account at BI, which BI had debited and returned to SPIB upon being advised of the mistaken transfer by SPIB and the issuance of SPIB's indemnity to BI pursuant to CIB rules (A. 4).  On May 17, 1989, BI commenced a third-party action against SPIB for the return of the transferred funds (A. 11). On June 7, 1989, SPIB, in turn, counterclaimed against BW, seeking, inter alia, a declaration that neither BI nor BW had any entitlement to the $1,974,267.97 transferred in error to BW's account at BI by SPIB on April 10, 1989 (A. 32).

On June 14, 1989, prior to any discovery, BW moved for summary judgment against BI and filed its reply against SPIB's counterclaim (A. 46).  The reply did not plead any reliance on the mistaken payment (A. 46-48).  BW's motion was supported by the affidavit of David Yeo Kiat Poh, an Assistant General Manager of BW in Singapore (A. 49-58).

On June 16, 1989, BI moved for summary judgment against SPIB and SPIB moved for summary judgment against BW (A. 59, 122).  SPIB's motion was supported by the June 16, 1989 affidavit of Robert Manheimer, the President and CEO of SPIB (A. 130-148).

On July 21, 1989, BW cross-moved for summary judgment against SPIB and BW served opposition papers to SPIB's motion

for summary judgment (A. 149).  On the same day, SPIB
cross-moved for summary judgment against BI (see A.2 entry
18).  BW's cross-motion for summary judgment was supported by
the "declaration" of Scott Andrew Larimore, a foreign exchange
dealer who was formerly employed by Spedley prior to the time
it filed bankruptcy as of April 11, 1989 (A. 157-178).  In
addition, BW submitted the opinion on Australian bankruptcy law
by Minter Ellison, an Australian law firm (A. 179-190).

On August 3, 1989, pursuant to the CIB indemnity which
SPIB had issued in favor of BI on April 10, 1989, SPIB
retransferred to BI $1,974,267.97, with interest, use of funds
and clerical costs, amounting to $59,992.71, the entire amount
in dispute (A. 314).  This transfer consisted of SPIB's own
money (A. 314).  On August 8, 1989, in opposition to BW's
cross-motion for summary judgment, SPIB filed the affidavit of
Robert Manheimer dated August 4, 1989 (A. 312-569), and the
opinion letter of Freehill, Hollingdale & Page, an Australian
law firm (A. 334-561).

After SPIB transferred the $1.9 million to BI, BI
recredited BW's account.  On August 14, 1989, the parties filed
two stipulations, which were "So Ordered" by the district court
(A. 584, 587).  The first dismissed BW's complaint against BI
and the second dismissed BI's complaint against SPIB and SPIB's
claims against BI.

C.   **The Disposition Below.**

As a result of the two stipulations, the only action
before the district court was SPIB's counterclaim against BW
seeking a declaration that BW was not entitled to the $1.9

- 4 -

million (A. 32).  Accordingly, the only motions before the
district court were SPIB's motion against BI for summary
judgment and BW's cross-motion for summary judgment against
SPIB and the papers in support thereof (see A. 122-149,
152-190, 312-583).[1]

Oral argument was held on September 19, 1989 (see
A. 598-641).  On December 12, 1989, the district court granted
BW's cross-motion and denied SPIB's motion for summary
judgment.  In doing so, the district court relied on the
Restatement of Restitution's "Discharge for Value" rule, as
opposed to the established New York law of restitution and
mistake to the contrary, and held that BW was entitled to
retain the mistakenly transferred funds, even though there was
substantial evidence, which BW chose not to rebut, suggesting
that BW was not acting in good faith at the time it attempted
to force repayment from its debtor.

On January 24, 1990, SPIB filed a notice of appeal
from the district court's final judgment (A. 660).

### STATEMENT OF THE FACTS

### A.   The Factual Record Below.

As noted above, the summary judgment motions were
filed within days of the commencement of the action and
accordingly prior to any discovery.  The factual record

---

[1]   The Record and portions of the Joint Appendix designated
by BW contain papers relating to the BI motions which
were never reviewed by the district court in deciding
this motion (e.g., A. 191-311).  The Court requested
counsel to advise it which papers were properly before
it.  That correspondence is reflected at A. 590-97,
642-46.

supporting SPIB's motion for summary judgment against BW and
BW's cross-motion for summary judgment consisted of four sworn
statements, bank records and the opinions of two Australian
attorneys on the Australian law of preferences.

SPIB's motion for summary judgment against BW was
supported by the June 16, 1989 affidavit of Robert Manheimer,
the President and CEO of SPIB (A. 130-148).  The June 16, 1989
affidavit of Robert Manheimer set forth the sequence of events
concerning Spedley's instructions to transfer approximately
$1.9 million received as cover in the early morning of April
10, 1989 (A. 132-135).  Attached to the affidavit were various
telexes and other bank records supporting the sequence of
events as related by Mr. Manheimer (A. 138-148).  The sequence
of events in Mr. Manheimer's affidavit was never contradicted
and was in fact supported by the "declaration" of Scott Andrew
Larimore, which was submitted on July 20, 1989 by BW.

As noted, BW's cross-motion for summary judgment was
supported by the "declaration" of Mr. Larimore (A. 157-178).
This "declaration" supported the essential sequence of events
as related by Mr. Manheimer, including that the payment to BW
was an error (A. 161-162).  BW also submitted an opinion on
Australian bankruptcy law by Minter Ellison (A. 174-190), an
Australian law firm, which opined that the transfer of funds
from Spedley before its bankruptcy would not automatically be a
preference (A. 181).  Significantly, the Minter Ellison opinion
*did not take into account any of the facts related in the*
Larimore "declaration" or the reports in the Australian
financial press that Spedley was having financial

difficulties.  In addition, BW relied on the affidavit of David
Yeo Kiat Poh, an Assistant General Manager of BW, which BW had
originally submitted in support of its motion against BI
(A. 49-58).  Mr. Poh's affidavit only asserted that Spedley
informed BW on April 6, 1989 that it intended to repay a loan
to it on April 10, 1989, that its account at BI received a
deposit on April 10, 1989 and that BI without authorization
returned the funds to SPIB on April 11, 1989 (A. 50-51).  In
fact, the Poh affidavit is more significant for what it does
not say than for what is does say.  It does not discuss any of
the following material facts (see A. 582-83):

> (i)     Whether BW made a loan commitment to Spedley;
>         the type of loan, if any, which was made; the
>         terms and conditions of the loan, if any; and
>         whether the loan, if any, was made in good
>         faith and for valuable consideration;
>
> (ii)    The facts and circumstances underlying BW's
>         decision to send a telex dated March 31, 1989
>         to Spedley indicating that it refused to renew
>         a purported Eurocurrency facility and demanding
>         payment on April 10, 1989;
>
> (iii)   The extent and type of communication BW had
>         with Spedley concerning Spedley's financial
>         affairs;
>
> (iv)    The extent BW, independently of Spedley, knew
>         of Spedley's financial difficulties;
>
> (v)     When and how BW learned that Spedley would file
>         for provisional liquidation or was insolvent;
>         and

    (vi)   The facts and circumstances underlying the
attempt by Spedley's Scott Larimore to forward
funds to BW within a day of Spedley filing for
provisional liquidation.

In opposition to BW's cross-motion for summary
judgment, SPIB filed the affidavit of Robert Manheimer dated
August 4, 1989 (A. 312-569).  Attached to this affidavit were
additional bank records (A. 332-33, 562-69) supporting the
chronology as established in Manheimer's June affidavit and the
Larimore declaration.  In addition, SPIB submitted the opinion
of Freehill, Hollingdale & Page that the transfer of the funds
to BW constituted a *prima facie* preference under Australian Law
and thus improved BW's position vis-a-vis the Spedley
bankruptcy (A. 337-342).  Unlike the Minter Ellison letter, the
Freehill letter took into account the revelations in the
Larimore declaration and the reports in the Australian
financial press since November 1988 concerning Spedley's
financial turmoil.  Copies of the press articles were attached
to the Freehill letter (A. 359-78).  In the proceedings below,
SPIB argued that such publicity in the financial press
concerning Spedley and BW's failure to explain why it requested
on March 31, 1989 payment by Spedley of its facility, which had
been previously rolled over on three monthly intervals for
approximately four years, raised an issue of fact as to BW's
good faith in requesting and receiving the funds in question.
Even though the district court acknowledged that there was an
issue of fact as to BW's good faith (A. 650 n.2), the Court, in
holding that BW was entitled to retain the mistakenly

- 8 -

transferred funds, apparently found that BW's assertion that it
was a bona fide creditor was sufficient.

### B.   The Parties.

SPIB is a federally-chartered banking corporation with
offices in New York, New York and is a member of the United
States Council of International Banking, Inc. ("CIB") (A. 132,
317).  BW is a French bank, organized and existing under the
laws of the Republic of France (A. 50).  Its Singapore branch
office maintains an account with BI (A.50), a
federally-chartered banking corporation with offices in New
York, New York.

### C.   Spedley.

Spedley was an Australian merchant bank with a
principal place of business in Sydney, Australia (A. 157, 317,
359).  SPIB has had a relationship with Spedley, whereby it
effected wire transfers on Spedley's behalf from time to time
(A. 317).  On April 10, 1989, Spedley had approximately
$84,514.56 in its account with SPIB and, pursuant to banking
industry custom, such a residual balance would have been
considered as part of the compensation required to maintain the
account (A. 157-158, 317).  At the time of the events in
question, SPIB had no credit extended to Spedley and Spedley
did not have a line of credit with SPIB (A. 317).

### D.   Spedley's Financial Difficulties
And Subsequent Failure.

Unknown to SPIB, from November 1988 to April 1989
there was considerable speculation in the Australian financial
press as to the financial position of Spedley (A. 341,
359-378).  For example, in November 1988, the Sydney Morning

- 9 -

Herald disclosed that the National Companies and Securities
Commission was investigating Spedley in connection with the
failure of Rothwells, another merchant bank, and the diversion
of Aus. $15 million (A. 363, 378).  Again, in March 1989, the
Sydney Morning Herald reported that Spedley posted an Aus. $8.5
million loss for the latest year ended October 31, compared
with a previous Aus. $3.4 million profit (A. 361).  The same
article noted that a GPI Leisure Corporation Ltd. took a loss
on a secret Aus. $100 million capital infusion into Spedley
(A. 361), which threatened a GPI "shareholder revolt" (see
366-370). Other articles disclosed that Spedley owed Australian
National Industries Aus. $194 million and that "Spedley
executives have been unavailable to comment on whether Spedley
is making profits."  (A. 365.)

On April 11, 1989, unknown to SPIB, Spedley and its
parent Spedley Holdings Ltd. were placed in provisional
liquidation after an application from GPI Leisure Corporation
Ltd. and Australian National Industries, Ltd. (A. 377-78).
Peat Marwick and Hungerfords was appointed provisional
liquidator (A. 135, 328, 377-78).

### E.    The Events Immediately Preceding The Mistaken Wire Transfer.

According to the "declaration" of Scott Larimore, and
completely unknown to SPIB until it received a copy of the
Larimore "declaration,"[2] Spedley had an established U.S.$

---

[2]    SPIB had no relationship to the BW-Spedley loan, knew
       nothing of it, and did not know for sure until June 14,
       1989 that a loan had ever been made by BW to Spedley
       (A. 131, 316).

- 10 -

off-shore facility with BW (A. 157).  The facility had been in place for at least four years prior to April 1989 and purportedly had been continuously and automatically rolled over by BW when it fell due at three-monthly intervals (A. 157).  The facility was rolled over on January 10, 1989 and, therefore, fell due on April 10, 1989 (A. 157, 158).  On March 30, 1989, however, after considerable speculation in the Australian financial press as to the profitability of Spedley (A. 341, 359-378), BW requested payment by Spedley on April 10, 1989 of principal and interest under the facility totalling $1,974,267.97 (A. 50, 157).  BW never explained to the district court the facts and circumstances underlying BW's decision to send a telex dated March 31, 1989 to Spedley in effect refusing to renew the facility and demanding payment.  The Poh affidavit, the only factual support submitted by BW other than the Larimore declaration, merely claims that a loan had been made by BW to Spedley (A. 50).  It says nothing as to how and why such a loan was made, the basis on which it was made, or the nature of the relationship and contacts between Spedley and BW (see 582-83).

On April 7, 1989, Scott Larimore contracted with Natwest Australia Bank, Sydney ("Natwest")[3] to buy $1,974,267.97 to pay back the BW loan (A. 158).  He purchased the money on April 7, 1989 on the "spot" market for value on April 10, 1989 (A. 158).  On April 10, 1989 at 9:18 a.m.

_____

3       Natwest was Spedley's principal domestic bank in Sydney
        and it was the bank with whom Spedley maintained its
        checking account (A. 158, 160).

(Sydney time), Larimore instructed Natwest to pay the money to SPIB for the account of Spedley and advised Natwest that the sum of Aus. $2,445,822.56 would be deposited in the Spedley account by check to meet the cost of the U.S. funds (A. 158-59). Then at approximately 12:34 a.m. (New York time) or 2:34 p.m. (Sydney time), Larimore instructed SPIB, via telex, to wire transfer $1,974,267.97 to BI for BW's Singapore account (A. 138, 159, 168, 319).

Prior to the close of banking in Sydney (4:00 p.m.) on April 10, Spedley's management instructed Larimore not to deposit the check in the amount of Aus. $2.4 million into the Spedley's Natwest account (A. 159). According to Mr. Larimore, "This meant that funds were not available for payment to Natwest" (A. 159). Unfortunately, Natwest had already wired $1.9 million dollars to SPIB (A. 159, 320, 563). Thus, if the transaction was not reversed, Spedley's Natwest account would have been overdrawn on the value date (April 10, 1989) (A. 159-60). Since Natwest was Spedley's principal bank, Larimore decided not to pay BW and to reverse the transaction by cancelling the Australian dollars owed by Spedley in exchange for the return to Natwest of the U.S. dollar funds it had sent to SPIB (A. 157, 160).

Accordingly, as described in more detail below, at 3:37 a.m. (New York time) or 5:37 p.m. (Sydney time), Spedley, via telex, countermanded its earlier instructions to SPIB and instructed SPIB to transfer the funds to National Westminster Bank USA for the account of Natwest (A. 139, 161, 170, 319). The telex stated:

- 12 -

"URGENT MESSAGE++URGENT MESSAGE"

"RE OUR EARLIER TELEX...OUR PAYMENT
INSTRUCTIONS WERE INCORRECT - PLEASE DO NOT
PAY TO BANKAMERICA...FOR A/C BANQUE WORMS -
INSTEAD PLEASE PAY AS PER INSTRUCTIONS
BELOW."

....

"PLEASE DEBIT USD 1,974,267.97 FROM OUR A/C
NO. 06001717 AND TRANSFER FUNDS VALUE 10
APRIL 89 TO:  NATIONAL WESTMINSTER BANK
USA...."

"WE WILL BE RECEIVING USD 1,974,267.97 FROM
NATWEST AUSTRALIA BANK VALUE 10 APRIL 89 TO
COVER TRANSFER OF FUNDS."

"+WE REPEAT PLEASE DO NOT PAY TO BANK
AMERICA, NEW YORK+"

(A. 139, 161, 170, 319).  SPIB was not informed of the reason
for the change of instructions.

Unknown to SPIB, twenty-four hours later, on April 11,
1989 at approximately 5:55 p.m. (Sydney time), 3:55 a.m. (New
York time), Spedley filed for bankruptcy in the New South Wales
Court and Peat Marwick and Hungerfords was appointed
Provisional Liquidator (A. 327-28, 377-78).  On May 25, 1989,
Spedley was wound up by the New South Wales Supreme Court and a
liquidator was appointed (A. 135).

F.    The Mistaken Wire Transfer.

As noted above, on April 10, 1989, at approximately
12:34 a.m. (New York time), SPIB's Communications Department,
which receives telexes, telecopier message and SWIFT messages,
received instructions from Spedley, via telex (A. 159, 319), to
wire transfer funds in the amount of $1,974,267.97 to be
received as cover to BI for the BW Account.  (A. 138, 159, 168,
319).  Three hours later, at approximately 3:37 a.m. (New York

- 13 -

time), before SPIB activated its CHIPS system, SPIB's Communications Department received instructions from Spedley, via telex, countermanding its initial instructions and instructing SPIB to transfer the funds to be received as cover to National Westminster Bank USA for the account of Natwest (A. 139, 161, 170, 319).

At approximately 8:46 a.m. (New York time) the same morning, SPIB received funds to cover the amended instructions by wire transfer from National Westminster New York (A. 159, 320, 563).  As noted above, this cover was intended by Spedley to be transferred only to one specific beneficiary - namely, National Westminster Bank USA, and not BW (A. 139, 161, 319).

After being routed to the Testing Department, the two Spedley instructions were sent to the Paying and Receiving Department (A. 320).  The first countermanded instruction went to the Manual Payments Unit and the second superceding instruction went to the Same-Day Operations Unit, headed by Ms. Ann Guarino (A. 320).  At approximately 11:32 a.m. (New York time), the Manual Payments Unit erroneously wire transferred funds in the amount of $1,974,267.97 to the BW Account (A. 140, 320) pursuant to the countermanded instructions, using the Clearing House Interbank Payments System ("CHIPS").

Because SPIB clearly held no valid instructions from Spedley for this transfer, the transferred monies were not properly chargeable to Spedley (A. 133).[4]

---

[4]     While BW correctly asserted that during the initial investigation some SPIB personnel thought the transfer may be properly debited to Spedley's account, and even

(footnote continued)

As discussed above, the Communications Department forwarded the second superceding instructions to Ms. Guarino in the Same-Day Operations Unit of the Paying and Receiving Department. When Ms. Guarino reviewed the valid instructions, she contacted the Manual Payments Unit to instruct it not to input the first set of instructions (A. 321). Unfortunately, the cover, which was specifically intended for National Westminster, had already been transferred to BI (A. 140, 320). Mr. Larimore clearly acknowledges that the payment was in error:

> I received a telex from SPI dated 10 April 1989 which was a type of "transactions statement" recording all the transactions on the previous day. I noticed **an error in the debit items**, namely that SPI had not only paid the U.S. $1,974,267.97 to BW, but also to Natwest. Accordingly, from my point of view, the figures at the front of the telex **were in error**.

(A. 161-62)(emphasis added).

Everything that SPIB did after this point in time was done solely to recover the cover and to carry out Spedley's instructions as Spedley intended (A. 321). Shortly after the error was discovered, and two hours after the transfer, at approximately 1:45 p.m. (New York time), Ms. Guarino telephoned an investigator at BI and advised him that the transferred funds were wired over countermanded instructions, were not

---

**4**      (footnote continued)

tried to get Spedley to cover the transfer, a complete review of the facts, however, shows that these individuals, who were attempting to determine what had happened, were operating on mistaken assumptions, including at one point the belief two covers might have been intended by Spedley (A. 320). See Section "G" infra.

intended for the BW account and requested that BI return the transferred amount to SPIB (A. 321).  BI indicated it would return the transferred amount that day if SPIB would issue a CIB indemnity (A. 321; see A. 77-98).  Ms. Guarino agreed and an indemnity was sent at approximately 1:47 p.m. (New York time) (A. 141-42, 321).

SPIB's practice was to process instructions on the value date according to the customer's instructions, in this case, Spedley's instructions (A. 321).  This had not yet been done (A. 321).  The failure to pay on April 10, 1989 would have triggered the CIB Compensation rules (A. 321, see A. 77-98).  Since Ms. Guarino believed, based on her conversation with BI, that the funds were returning on April 10, 1989, she manually input a transfer to National Westminster New York according to Spedley's second set of instructions (A. 321-22).

SPIB's computer is programmed not to effectuate payment unless the account has a covering balance or the account has an intra-day limit (A. 322).  An intra-day limit allows an automatic temporary overdraft in an account while awaiting same-day cover (A. 322).  Spedley's account did not have an intra-day limit (A. 317, 322).

When a proper payment instruction is in the system but the account does not have sufficient funds or an intra-day limit, the payment instruction comes to the attention of Mr. Douglas Chapman, a SPIB First Vice President (A. 322).  The genesis of a payment instruction is not indicated on the computer.  At approximately 3:30 p.m. (New York time), based on Mr. Chapman's knowledge that Spedley's payment instructions had

always been covered, he effectuated payment in the expectation
that cover would arrive before the close of business on April
10, 1989, as had occurred on previous occasions (A. 322).  In
fact, Spedley had covered its payment instruction in this case
(A. 160, 320, 322), but SPIB, in error, had sent the cover to
the wrong party, BW (A. 50, 161-62, 320, 322).  At
approximately 3:42 p.m. (New York time), SPIB wire transferred
$1,974,267.97 to National Westminster New York for the account
of National Westminster Australia pursuant to the second and
valid instructions received from Spedley (A. 322, 565).

On April 11, 1989, at approximately 3:38 p.m.
(New York time), BI returned the $1,974,267.97 to SPIB via
CHIPS (A. 324, 566), putting the Spedley account back into the
balance it would have been in had SPIB properly carried out
Spedley's instructions and had BI returned the funds on April
10, 1989, as was expected (A. 324).  At this time, the parties
had been restored to the position they would have been in if
Spedley's valid second set of instructions had been followed.

This sequence of events demonstrate several things.
First, the only reason Mr. Chapman was presented with a
decision to effectuate payment in the expectation of cover was
because Ms. Guarino input a payment instruction on the
reasonable belief that BI would return the funds on April 10,
1989, against SPIB's indemnity (A. 323).  Moreover, the
decision to effectuate payment was only initiated and presented
to Mr. Chapman after SPIB requested a recall of funds from BI
(A. 323).  At that time, SPIB had absolutely no exposure to
Spedley in terms of outstanding loans (A. 317, 323).  Finally,

- 17 -

there was absolutely no intent on Mr. Chapman's, or any other SPIB personnel's, part to create an overnight (or longer) overdraft (A. 323).[5]

On April 12, 1989, BW refused to give BI debit authorization for the return of the funds and demanded that its account be recredited (A. 51, 57).  Also, on April 12, 1989 and several times thereafter, BI demanded that SPIB return the transferred amount to BI (A. 324).

G.   **SPIB'S Investigation.**

On April 12, 1989, when BI informed Ms. Guarino that BW refused to authorize this debit, she transferred the matter to the Investigation Department, which is separate from the Paying and Receiving Department (A. 324).  The matter was originally assigned to Mr. Michael Chao (A. 324).  Because BW refused to give BI debit authorization, because BI requested

---

[5]    Even if Mr. Chapman had not honored Spedley's correct instructions at that time, SPIB would have been obligated to regain the mistakenly transferred funds in order to carry out its customer's instructions.  SPIB had no right to retain these funds which had been forwarded to it by its customer, and accordingly the funds would have had to have been transferred to National Westminster as soon as the cover was returned (A. 323).  According to SPIB's customary practice, these instructions would have been input again in the system the following day to effectuate the customer's instructions as soon after the value date as possible (A. 323).  Thus, upon the return of these funds from BI on April 11, 1989, the transfer to National Westminster Bank USA would have been effected as instructed.  Since BI did not return the funds by the close of business on April 10, 1989, Spedley's account went into a technical overdraft position (A. 323-24).  However, this was not a "loan" in the sense that BW asserts it loaned money to Spedley.  Spedley did not apply for credit from SPIB, did not request SPIB to create an overdraft to cover two wires and did not authorize SPIB to debit its account twice (A. 324).

that the funds be returned pursuant to the indemnity which Ms.
Guarino issued on April 10, 1989, and because SPIB knew nothing
of the underlying transactions, Mr. Chao attempted to contact
Spedley to clarify what clearly was a confusing situation and
to get debit authorizations, if appropriate, in order to honor
the indemnity (A. 324-25). As Mr. Larimore notes, on April 13,
1989, Mr. Chao sent two telexes to Spedley (A. 162, 175, 176,
324-25). The two Chao telexes were not answered by Spedley
(A. 325). Mr. Larimore is silent as to why he did not respond
to Mr. Chao's telexes, even though he knew that a provisional
liquidator had been appointed to Spedley on April 11, 1989
(A. 162, 325).

When Mr. Chao did not receive a response from Spedley
and BI continued to demand the return of the funds, Mr. Chao
turned the matter over to his supervisor, Mr. Art Bauer
(A. 325). During the handling of this matter, Mr. Bauer, among
other actions, sent two telexes on April 14, 1989 to Spedley
which attempted to learn the facts of the transaction from
SPIB's customer (A. 177, 178, 325).[6]

---

[6]     In SPIB's haste to satisfy the conflicting requests of
        its customer, Spedley, and its indemnitee, BI, Mr. Bauer
        wrote the telexes with certain inaccuracies. For
        example, the first telex (A. 177) states that the
        countermanded instructions were "received after the
        original payment was effected." This was a critical
        misunderstanding on Mr. Bauer's part. Mr. Bauer was
        wrong, as the foregoing chronology clearly shows and as
        Larimore himself acknowledges (see A. 138, 139, 140,
        142, 160-62, 319-24, 562-65). The rest of the telex is
        consistent with Mr. Bauer's original misunderstanding.
        However, the statements made in the telex are not
        consistent with the facts. Mr. Bauer, based on
        incomplete information, thought that all the transferred
        funds belonged to Spedley and were "chargeable" to

                                        (footnote continued)

SPIB was finally informed by Mr. Larimore on April 16, 1989, that Peat Marwick and Hungerfords had been appointed Provisional Liquidator of Spedley and that Spedley's failure was one of the largest in Australian history (A. 327).

Once SPIB completed its investigation and had ascertained the underlying facts surrounding the payment in error, during the last week of April and the first week of May, 1989, SPIB shared the results of its investigation with BI's counsel, BW's counsel and the Chief Executive Officer of Banque Worms Capital Corporation, who is the New York representative of BW (A. 24-27, 147-48, 328-29). Ignoring the results of SPIB's investigation, BW chose instead to sue BI, which in turn, sued SPIB, as described previously (A. 4, 11, 32). Thereafter, SPIB attempted to negotiate an agreement with BI to fully indemnify BI pending this litigation, while holding the funds in question. Ultimately such efforts proved futile and on August 3, 1989, SPIB retransferred the funds to BI who in turn recredited BW's account (A. 314).

### ARGUMENT

### POINT I

#### UNDER APPLICABLE NEW YORK LAW, THE COURT BELOW ERRED IN DENYING SPIB SUMMARY JUDGMENT ON ITS CLAIM FOR RESTITUTION

This appeal centers on the correct application of New York's law of mistake and restitution or alternatively the law

---

6       (footnote continued)

Spedley. This was not correct. Spedley countermanded its first instructions and, therefore, the first instruction was not properly payable (A. 325-26).

of money had and received, to the facts herein.[7]   SPIB argues
that the funds in question, concededly paid by mistake, must be
returned to SPIB because there was no detrimental reliance by
BW on the mistaken payment.  BW concedes it had no detrimental
reliance.  Instead it argues, and the court below apparently
found, that its status as an alleged bona fide creditor exempts
it from the general rule by virtue of Section 14 of the
Restatement of the Law of Restitution (1937), the so-called
"Discharge for Value" rule, which, as an aspect of the bona
fide purchaser doctrine, permits a good faith creditor to
retain a mistaken payment absent notice of the mistake.[8]   The
parties agree that no New York case has ever discussed, let
alone recognized, this so-called rule.  Nevertheless, BW argued
and the Court found that the doctrine is sub silentio reflected
in four check stop-payment cases, which the Court found were
applicable by analogy to the case at bar, citing Delbrueck &
Co. v. Manufacturers Hanover Trust Co., 609 F.2d 1047 (2d Cir.
1979).

---

[7]     The test for an action for money had and received and
        for an action to recover money paid under mistake of
        fact are essentially the same:  although both are
        actions at law, they "are based on equitable principles,
        requiring those who receive money under certain
        circumstances to repay the monies on the ground that to
        permit the retention of such monies would be against
        equity and good conscience."  Cukierski v. Standard
        Milling Co., 60 Misc.2d 690, 691, 303 N.Y.S.2d, 586, 588
        (Civ. Ct. N.Y. Co. 1969)(citations omitted); see also,
        Citibank, N.A. v. Warner, 113 Misc.2d 748, 449 N.Y.S.2d
        822 (Sup. Ct. N.Y. Co. 1981).

[8]     Point II demonstrates that under applicable New York law
        BW is not a good faith creditor and that the district
        court's analysis of the notice issue is erroneous.

On this appeal SPIB demonstrates that the district court applied the wrong standard to this case in finding that a so-called "Discharge for Value" doctrine exists in New York. The doctrine is not recognized in this context and never has been.  Since 1937, the date of the Restatement's promulgation and as recently as 1989, New York state courts have held on summary judgment that money paid by mistake must be returned to the sending bank absent detrimental reliance, and that the burden of proving detrimental reliance falls on the recipient of the funds, regardless of the creditor status of the payee and regardless of whether the payee knew of the mistake or not.  Creditor status is simply not a focus of or defense to the general New York rule because New York law envisions that the creditor will still have its claim against the debtor and, thus, finds it cannot be prejudiced by a return of the mistaken payment.  As the New York Court of Appeals wrote in rejecting the fundamental reasoning of Section 14 of the Restatement of Restitution, and as the Reporters to the Restatement themselves indicated at the time in their Notes[9]:

> The [payee] city received the money upon a
> lawful demand, but from a person who was not
> legally liable to pay it, and we do not find
> the circumstance that money paid by mistake
> is received upon a valid claim in favor of
> the recipient against a third person
> prevents a recovery back, provided that the
> claim against the party who ought to pay it
> is not thereby extinguished or its
> collection prevented," (citing 43 N.Y. 452
> and 14 id., 432).

---

[9]   W. Seavey and A. Scott, Notes on Certain Important Sections of Restatement of Restitution 10 (1937).

- 22 -

Mayer v. Mayor, 63 N.Y. 455, 459 (1875).  The reasoning of

Mayer has been consistently followed in New York.  As recently

as September 1989, the New York Supreme Court granted summary

judgment to a bank which had mistakenly wire-transferred funds

despite the fact that the recipient bank had used the funds to

reduce its now insolvent depositor's debt to it.  The court

found that the mere fact that a creditor's payor is now

insolvent cannot constitute detrimental reliance sufficient to

allow retention of the funds.  Manufacturers Hanover Trust

Company v. Chemical Bank, No. 30740-87 (Sup. Ct. N.Y. Co. Sept.

11, 1989)(appeal pending)(attached hereto as Exhibit A).  Thus,

under New York law the mere fact that one receives funds on a

valid claim in favor of the recipient against a third party

from a party not legally liable to pay does not entitle the

recipient to retain the funds unless it can show detrimental

reliance, which BW has conceded it cannot.  Therefore, summary

judgment should have been awarded to SPIB.

> **A.    SPIB Is Entitled To The Return Of**
> **The Funds Since BW Has Conceded It**
> **Had No Detrimental Reliance.**

It is well-established that New York courts allow

restitutionary actions by banks to recover money mistakenly

paid in a wide variety of circumstances, provided that the

party who received the mistaken payment did not rely to its

detriment on the payment such that it would be unjust to

require him to refund it.  This rule was announced long ago by

the New York Court of Appeals in Nat. Bank of Commerce of New

York v. Nat. Mechanics Banking Ass'n of New York, 55 N.Y. 211

(1873).  The Court stated: