**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Citibank August 11, 2020 Wire Transfers | No. 20 Civ. 06539 (JMF) |

## CITIBANK'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

MAYER BROWN LLP

Matthew D. Ingber
Christopher J. Houpt
Richard A. Spehr
Michael E. Rayfield
Allison J. Zolot
Alina Artunian

1221 Avenue of the Americas
New York, New York 10020
(212) 506-2500

THE LAW OFFICES OF JOHN F. BAUGHMAN, PLLC

John F. Baughman
Andrew H. Reynard

299 Broadway, Suite 207
New York, NY 10007
(347) 241-6347

*Attorneys for Citibank, N.A.*

# TABLE OF CONTENTS

**Page**

PROPOSED FINDINGS OF FACT ................................................................. 4

    A.    Revlon's 2016 Loan And Citibank's Duties As Agent ........................................... 4

    B.    The Defendants' Control Over The Accounts Of Their Fund Clients ................................................................................................ 4

    C.    The August 11, 2020 Transfers ................................................................ 7

        1.    Citibank And Revlon Intended To Pay Lenders Only Interest on August 11, 2020. ........................................ 7

        2.    Out of its Own Account, Citibank Mistakenly Transferred About 100 Times More Than The Interest That Had Accrued. ........................................ 9

        3.    Citibank Quickly Recognized The Mistake. ........................................ 14

    D.    Defendants' Notice Of The Mistake ........................................ 15

        1.    Citibank's Calculation Statements, The Amount Of The Payment, And Citibank's Recall Notices Put Defendants On Notice Of The Mistake. ........................................ 15

        2.    The Absence Of Any Prepayment Notice Put Defendants on Further Notice of the Mistake. ........................................ 18

        3.    Each Defendant Acknowledged Internally That The Overpayments Were Made By Mistake. ........................................ 19

        4.    Defendants Recognized That The Revlon Loan Was Still Outstanding On August 12, 2020. ........................................ 30

    E.    Defendants' Failure To Discharge The Debt ........................................ 32

    F.    Procedural History ........................................ 33

I.    CITIBANK IS ENTITLED TO RETURN OF THE FUNDS THAT IT MISTAKENLY TRANSFERRED ........................................ 34

    A.    A Party That Mistakenly Sends Money Is Entitled To Have It Returned. ........... 34

    B.    Citibank's August 11, 2020 Transfer Was Mistaken. ........................................ 34

II.    THE DISCHARGE-FOR-VALUE DEFENSE DOES NOT APPLY ........................................ 39

    A.    Defendants Were Not Entitled To The Transferred Funds. ........................................ 40

    B.    Defendants Had Notice Of Citibank's Mistake. ........................................ 41

    C.    The Debt Has Not Been Discharged. ........................................ 50

CONCLUSION ........................................ 53

# TABLE OF AUTHORITIES

## Cases

*A.I. Trade Fin., Inc. v. Bank*,
  1997 WL 291841 (S.D.N.Y. June 2, 1997) ...................................................................36, 39

*ADP Invest. Commn's Servs. v. In House Atty Servs., Inc.*,
  390 F. Supp. 2d 212 (E.D.N.Y. 2005) ...................................................................35

*Anderson v. Blood*,
  152 N.Y. 285 (1897) ...................................................................44

*In re Awal Bank*,
  455 B.R. 73 (Bankr. S.D.N.Y. 2011)...................................................................38, 51

*Bank Sadaret Iran v. Amin Beydoun, Inc.*,
  555 F. Supp. 770 (S.D.N.Y. 1983) ...................................................................36

*Banque Worms v. BankAmerica Int'l*,
  77 N.Y.2d 362 (1991) ................................................................... *passim*

*Bayerische Hypo-Und Vereinsbank, AG v. HSBC Bank*,
  941 N.Y.S.2d 536 (N.Y. Sup. Ct. 2011) ...................................................................51

*Bd. of Managers of Trump Tower at City Ctr. Condo. v. Palazzolo*,
  346 F. Supp. 3d 432 (S.D.N.Y. 2018)...................................................................34

*Booth v. Ameriquest Mortgage Co.*,
  63 A.D.3d 769 (2d Dep't 2009) ...................................................................44

*In re Calumet Farm, Inc.*,
  398 F.3d 555 (6th Cir. 2005) ................................................................... *passim*

*Carlisle v. Norris*,
  215 N.Y. 400 (1915) ...................................................................39, 50

*Colavito v. N.Y. Organ Donor Network*,
  8 N.Y.3d 43 (2006) ...................................................................35

*Colli v. Wirth*,
  1996 WL 243237 (S.D.N.Y. May 10, 1996) ...................................................................51

*Gen. Elec. Co. v. Am. Export Isbrandtsen Lines, Inc.*,
  37 A.D.2d 959 (2d Dep't 1971) ...................................................................35

*Golden Door V & I, Inc. v. TD Bank*,
    123 A.D.3d 976 (2d Dep't 2014) .................................................................42, 46

*Island Fed. Credit Union v. Smith*,
    60 A.D.3d 730 (2d Dep't 2009) ..............................................................................36

*Mfg. Hanover Tr. v. Chem. Bank*,
    160 A.D.2d 113 (1st Dep't 1990) ....................................................................34, 36

*Middle E. Banking Co. v. State St. Bank Int'l*,
    821 F.2d 897 (2d Cir. 1987) ...................................................................................35

*Nat'l Bank of Canada v. Artex Indus., Inc.*,
    627 F. Supp. 610 (S.D.N.Y. 1986) .........................................................................34

*NBase Commcn's v. Am. Nat'l Bank*,
    8 F. Supp. 2d 1071 (N.D. Ill. 1998) .......................................................................50

*Qatar Nat'l Bank v. Winmar*,
    650 F. Supp. 2d 1 (D.D.C. 2009) ......................................................43, 44, 47, 50

*RCN Telecom Servs., Inc. v. 202 Ctr. St. Realty LLC.*,
    156 F. App'x 349 (2d Cir. 2005) ...........................................................................36

*Regatos v. N. Fork Bank*,
    5 N.Y.3d 395 (2005) ........................................................................33, 44, 45

*Schreibman v. Chase Manhattan Bank*,
    15 A.D.2d 769 (1st Dep't 1962) .............................................................................35

*T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*,
    2010 WL 4038826 (E.D.N.Y. Oct. 14, 2010) ........................................................35

*In re T.R. Acquisition Corp.*,
    309 B.R. 830 (Bankr. S.D.N.Y. 2003) .............................................................36, 37

*U.S. Bank Nat'l Assoc. v. Jordan*,
    176 A.D.3d 1523 (3d Dep't 2019) .........................................................................44

*Wells Fargo Bank, N.A. v. Burke*,
    155 A.D.3d 668 (2d Dep't 2017) ...........................................................................35

*Williamson v. Brown*,
    15 N.Y. 354 (1857) ........................................................................................44, 45

**Statutes**

U.C.C. § 4-A-204..............................................................................................33, 44

U.C.C. § 4-A-505.................................................................................................45

**Other Authorities**

RESTATEMENT (FIRST) OF RESTITUTION § 13 ...............................................................43

RESTATEMENT (FIRST) OF RESTITUTION § 14 ..............................................41, 42, 50

RESTATEMENT (THIRD) OF RESTITUTION § 69 .......................................................41, 45

## PRELIMINARY STATEMENT

Citibank is the administrative agent on a 2016 term loan to Revlon. The defendants are managers of dozens of funds that participate in the loan syndicate. On August 11, 2020, Citibank attempted to make an interest payment on this loan consisting of $7.8 million of Revlon's funds. Citibank instead made a mistaken payment to the defendants—with its *own* funds—of about $893 million (the "August 11 Transfers"). Starting the next day, Citibank informed the defendants about the mistake and asked them to return Citibank's money. They refused.

Citibank brought this action seeking return of the mistakenly paid funds. This Court entered a temporary restraining order freezing the funds and set the case for trial. It has indicated that there are two core issues for consideration: (1) whether Citibank transferred the funds by mistake; and (2) whether defendants are nonetheless entitled to keep the money under New York's "discharge for value" rule. The answer to the first question is yes; the answer to the second is no.

The August 11 Transfers arose from human error. Neither Revlon nor Citibank intended to transfer anything more than the accrued interest, and neither intended for Citibank to pay lenders with its own money. The full principal balance of the Revlon loan was not due until 2023. Revlon lacked the financial wherewithal to make the payment—which was $500 million more than the cash on Revlon's balance sheet. Under the agreement covering Revlon's loan, Revlon was not *permitted* to pay the principal unless it gave three days advance notice of the payment—which it never issued. On the day of the payment, Citibank sent the defendants and their corresponding investment funds a total of 119 notices stating that it would be making an *interest* payment only, and specifying accrued interest amounts that were a fraction of the payments actually transmitted. Citibank has submitted affidavits explaining in detail the loan-processing errors that resulted in the mistaken overpayment. The defendants, for their part, have offered no coherent explanation for why Citibank would pay Revlon's entire debt with its own funds. There is no explanation.

1

The defendants' principal argument is that they are permitted to keep the payments even though Citibank never owed them a penny. Under New York's discharge-for-value doctrine, when a creditor receives funds "*in good faith* and without *any notice* of any wrong *and credit[s] them* on an indebtedness *due them*," the transferor "is not entitled to recover them back." *Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 368 (1991) (emphases added) (quoting *Carlisle v. Norris*, 215 N.Y. 400, 415 (1915)). This rule has three elements, on which the defendants bear the burden of proof: (1) the creditor must be entitled to the funds at the time of transfer (they must be "due," not just outstanding); (2) it must discharge ("credit") the debt; and (3) it cannot have "any notice" of the mistake at the time of the discharge.

The defendants have not satisfied any of these elements. First, they had no entitlement to the funds when they received them. The Revlon loan was not due for another three years. The governing agreement did not even allow a prepayment of principal without prior notice from Revlon. And it is undisputed that no defendant expected, or believed they were owed, any principal payment on August 11, 2020, much less a payment from Citibank's own account.

Second, there was no "discharge for value," or any discharge at all. Even before the Court issued its TRO, defendants and/or every single lender account managed by the defendants put the money in a suspense or other segregated or "unapplied" account. No defendant notified investors or clients of any principal payment on the Revlon loan. Every defendant continues to use the correct, unreduced balance for investor reporting, calculation of the defendants' own management fees, and contractual collateral and cash-flow tests. Indeed, the day after the mistaken payments, the defendants sent Revlon a notice purporting to *accelerate* the still-outstanding debt, and filed a lawsuit through UMB Bank seeking to secure the debt in light of what it thought was Revlon's insolvency. In short, each defendant has behaved *exactly* as if the Revlon loan were still

outstanding.

Third, the defendants had both actual and constructive notice of Citibank's mistake. The defendants explicitly acknowledged that the payments were a mistake. Several defendants even used that exact word—"mistake"—to describe the payments. Others used synonyms, like "erroneous payment," "overpayment," and "accidental[]" payment. And others were more colorful. Another defendant mocked Citibank for "fat finger[ing] a $900mm erroneous payment" to "people who weren't supposed to have it." Another wanted to keep the funds, even though they rightfully belonged to Citibank, in order to give Citibank "a taste of its own medicine."

There is good reason that they believed the payment was a mistake. All of the available evidence pointed in that direction. Defendants had statements from Citibank before the transfers were made that described interest payments only; the payment was over 100 times the accrued interest; Revlon and Citibank had *not* sent any contractually-required notice of prepayment; and, finally, Citibank sent a barrage of recall notices to defendants, their custodians, fund managers, and trustees less than 24 hours after the accidental payments were released, stating that the payment was a mistake. On top of that, the defendants believed (correctly) that Revlon did not even have $900 million to pay down the loan. Even if—somehow—the defendants did not see or believe *any* of these statements, they still put them on constructive notice of the mistake, which is sufficient to defeat the defense.

To make matters worse, many defendants instructed their custodians to return the funds to Citibank, only to *reverse* that decision at the direction of their counsel, Quinn Emanuel, based on opportunism rather than legal advice. Others feared that the mistake was so obvious that their trustees would return the funds without consulting them, and ordered those trustees to "disregard" Citibank's recall notices. Not one defendant genuinely concluded that the payments were

deliberate. No reasonable person, acting in good faith, would have reached that conclusion.

The Court should enter judgment in Citibank's favor and order the defendants to direct their funds to return the money that Citibank mistakenly transferred on August 11, 2020.

## PROPOSED FINDINGS OF FACT

### A.    Revlon's 2016 Loan And Citibank's Duties As Agent

In 2016, Revlon, Inc. took out a seven-year, $1.8 billion loan in connection with its acquisition of another company. PX 485. Citibank serves as the administrative agent for this loan. Its duties are set forth in a Credit Agreement. One of those duties is to receive payments from Revlon and pass them on to the lenders, including periodic interest payments. *Id.* § 2.8(a). Another is to maintain a "Register" listing the amount of each loan and payment, which serves as the "conclusive" record of amounts owed and received. *Id.* § 10.6(b)(iv). When Citibank passes on a payment, it first sends a standard form called a "Calculation Statement," which describes the payment. Farrell Decl. ¶ 25.

The Credit Agreement permits Revlon to "prepay" its principal obligations before they become due, but only if it first sends a detailed written notice before noon three business days in advance of the intended prepayment date. PX 485 § 2.11(a) ("The Borrower may at any time . . . prepay any [loan], in whole or in part, . . . *upon irrevocable written notice* delivered to the Administrative Agent no later than 12:00 Noon, New York City time [ ] three Business Days prior." (emphasis added)). "Upon receipt of any such notice, [Citibank] shall promptly notify each relevant Lender thereof" *Id.* Revlon never issued any notice under this provision.

### B.    The Defendants Control The Accounts Of Their Fund Clients

The ten defendants in this lawsuit are asset managers of various clients—primarily investment funds and Collateralized Loan Obligations ("CLOs")—that hold pieces of the Revlon loan. The defendants are: Allstate Investment Management Company ("Allstate"); Bardin Hill

Loan Management LLC ("Bardin Hill"); Brigade Capital Management, LP ("Brigade"); Greywolf Loan Management LP ("Greywolf"); HPS Investment Partners, LLC ("HPS"); Medalist Partners Corporate Finance LLC ("Medalist"); New Generation Advisors LLC. ("New Gen"); Symphony Asset Management, LLC ("Symphony"); Tall Tree Investment Management LLC ("Tall Tree"); and ZAIS Group LLC ("ZAIS"). Two of the original defendants, Highland Capital Management and Investcorp Credit Management US, were voluntarily dismissed from the case under Rule 41(a)(1)) on August 27 and October 14, 2020, respectively. *See* Dkt. 49 & 111.

The defendants' responsibilities are generally uniform with respect to their various clients. These duties include "making investment decisions" (Allstate, McCoy Dep. at 35:11-14) and "manag[ing] and administer[ing] the day-to-day business and affairs of the [funds] diligently" (New Gen, Beals Dep. at 31:5-32:5). Meanwhile, the trustees and custodians for some funds "manage the cash flows related to the investment" at the direction of the defendants. Allstate, McCoy Dep. at 34:10-13; *see also* New Gen, Beals Dep. at 45:12-13. The defendants' collateral administration agreements often require that the defendants "cooperate with the [funds] in connection with the preparation . . . of the Monthly Reports"; "review" and "verify the contents" of such reports; and "notify the [funds] of any such discrepancy" identified in the reports. PX 189 § 2(l); PX 25 § 2(o).

Each of the defendants has testified that they have the authority to direct their clients (through trustees, custodians, or otherwise) to apply, retain, or return transmitted payments:

- Allstate: "Q: Are you aware of any reason that if Allstate were ordered to return the funds to Citibank that it would not be able to return the funds from all of the lenders that we've been talking about today? A: Not to my knowledge." McCoy Dep. at 288:19-289:2.

- Bardin Hill: "Q: [M]y question to you is, in the capacity as a manager of those funds, do you have the ability to direct the repayment of the Citi funds back to Citi? A: . . . I would say [Bardin Hill has] generally broad day-to-day managerial

authority over those accounts and, again, subject to certain limitations, [Bardin Hill has] the ability to . . . direct and manage those funds." Greene Dep. at 35:6-20.

- Brigade: "Q: [E]ach of the other [trustees and custodians] . . . held the funds that you just described at the direction of Brigade, correct? A: That's correct. . . . Q: Is it your expectation that had you instructed them to return the funds, they would have returned the funds? A: With a form of a letter of authorization that would have had to come from senior people at Brigade." Frusciante Dep. at 221:7-222:12.

- Greywolf: "Q: Did anyone at Virtus or Citi question Greywolf's authority to direct [Virtus] not to send the money back? A: No. It never came up, but no. Q: So the question of whether or not Greywolf had that authority was never raised even by anyone. Is that right? A: Never raised by anybody. Josephson Dep. at 78:9-16.

- HPS: "Q: So is it correct that HPS had the authority at 5:21 p.m. on August 12th to tell custodians not to release funds? A: Yes. Q: And did HPS have the opposite authority, could it, in fact, have instructed the custodians to release funds? A: Yes. Q: Does it [ ] have that authority today? A: Yes." Xanthakys Dep. at 139:5-16.

- Medalist: "Because we are able to direct the Trustee to withdraw funds in the CLO bank accounts and fund transactions and pay expenses, we are deemed to have custody." Phipps Dep. at 55:20-56:9.

- New Gen: "Q: Was it your understanding as of this time, that is, 2:00 and 3:00[pm] on August 12, that you had the authority to make the decision one way or another whether New Gen would return the funds? A: Yes." Beals Dep. at 60:18-23.

- Symphony: "Q: And as far as you know, Symphony has the authority to give instruction to [a custodian] about what to do with the books and records vis-à-vis the 2016 Revlon term loan, right? A: I believe . . . Doris [at the custodian] would have followed what we told her." Vaughan Dep. at 118:4-12.

- Tall Tree: "Q: And if the TRO was lifted and the judge ordered Tall Tree to transfer the money that is in the unapplied payment accounts to a particular recipient, Tall Tree could give that instruction to U.S. Bank, correct? A: Generally yes, unless there was some odd circumstance where Tall Tree was not the  manager. But if Tall Tree is the manager, we would have generally the authority to direct that payment under the order to whoever we're ordered to send it to. . . . A: And is it your testimony that Tall Tree intends to follow the judge's order and that Tall Tree would indeed instruct that the money be sent wherever the judge instructed? A: Without question. It's a court order." Lenga Dep. at 161:22-162:23.

- Zais: "Q: And is it fair to say that ZAIS Group, LLC directs the activity of [the ZAIS CLOs]? A: I would say, yes." DiPoalo Dep. at 17:11-17.

Thus, each defendant had control over the funds held by their lenders. As discussed below

(pp. 32-33 *infra*), they demonstrated that control on August 12 and 13, 2020, when each defendant ordered either its own staff or trustees and custodians to retain the August 11 payment.

### C.     The August 11, 2020 Transfers

#### 1.     Citibank And Revlon Intended To Pay Lenders Only Interest on August 11, 2020.

In the hours leading up to the August 11 Transfers, Citibank employees arranged for an interest payment to lenders.[1] Revlon did not intend to pay off its 2016 term loan. *See* Revlon, Warren Dep. at 140:16-140:19. It did not instruct Citibank to pay off the loan. *Id.* at 141:24-141:3. Revlon did not provide any funds to Citibank to pay off the entire balance of the loan. *Id.* at 141:4-8. And "Revlon didn't have the financial wherewithal in order to pay down the outstanding principal on the 2016 term loan." *Id.* at 142:23-143:2. Revlon's only direction to Citibank on August 11 was to "give effect to all the Term Loan Repurchases" and authorizing Citibank to "update the Register . . . held on file with the Administrative Agent[.]" PX 283 at 50. With this Direction Letter, Revlon attached each of the term loan repurchases that would be effectuated. *Id.* at 53.

Between 5:30 p.m. and 5:37 p.m. on August 11, 2020, prior to any payments, Citibank prepared and sent each defendant a Calculation Statement for the funds the defendants managed

---

[1]     *See, e.g.*, PX 472 at 1798 (email from Citibank confirming that "[t]he below  break is interest due to your team for the Revlon 2016 term loan"); PX 290 at 171 (August 11, 9:32 a.m. email from Latham & Watkins, Citibank's outside counsel, to Paul Weiss, Revlon's outside counsel: "[P]lease find attached the accrued interest calculations, which we just received from Citi. Could you please confirm company's sign off?"); PX 289 at 160 (August 11, 10:32 a.m. email from Latham counsel to Paul Weiss counsel sending "updated invoice for interest due today"); PX 285 at 73 (August 11, 1:43 p.m. email from Paul Weiss counsel to Latham counsel confirming that "[t]he Company agrees with this [interest] calculation"); PX 284 at 58 (August 11, 2:46 p.m. email from Paul Weiss to Latham noting that Revlon "want[s] to make sure we can give the company enough notice to process the interest payment").

that held portions of the Revlon loan. Farrell Decl. ¶ 26. These documents stated that the lenders would receive a "Libor Rate Interim *Interest* Payment," and further described the payment as "Interim *Interest*." PX 123 (emphases added). They contained no mention of any payment of loan principal. And they specified amounts that were dramatically lower than the outstanding principal.

The following is an example of a statement issued to Brigade (PX 123):

Interim interest is due as per the detailed calculation below :

Interest Due Period  :  29-MAY-2020  to  11-AUG-2020

| LIBOR<br>Funded | Interest<br>Rate | Day<br>Basis | From<br>Date | To<br>Date | # of<br>days | Interest<br>Due |
|---|---|---|---|---|---|---|
| 3,649,935.77 | 4.25% | Actual/360 | 29-MAY-2020 | 11-AUG-2020 | 74 | 31,886.24 |

As shown in the image, the Calculation Statement described the payment as "Interim interest," referenced an "Interest Due Period" spanning from May 29, 2020 to August 11, 2020, and calculated an interest rate of 4.25 percent on the principal amount of $3,649,935.77, which resulted in a total "interest due" of $31,886.24.

Underneath this table was a row that repeated the "Total Due," which did not include any principal due or any principal prepayment:

| Due Currency | : USD |
|---|---|
| Total Due | : 31,886.24 |

Underneath that row, there was a note that "[w]e will credit your account representing the above Interim Interest based on the following instructions":

We will credit your account representing the above Interim Interest based on the following instructions :

    Credit Date          : 11-AUG-2020

    Credit Currency    : USD

    Total Due            : 31,886.24

Less :Tax Withholding    : 0.00

    Credit Amount      : 31,886.24

The Calculation Statements issued to the other defendants or their funds were similar. Each of the defendants and their corresponding investment funds received a similar Calculation Statement, which specified that the lenders would receive interest payments in amounts far lower than the transfers mistakenly sent. Zeigon Decl. ¶ 16; Farrell Decl. ¶¶ 29-30.

### 2. Out of its Own Account, Citibank Mistakenly Transferred About 100 Times More Than The Interest That Had Accrued.

Citibank processed the interest payments on August 11, 2020. But due to human error, Citibank made an overpayment of about 100 times the interest intended to be paid to each fund. As Citibank later informed the lenders (*see, e.g.*, PX 150 at 2273; PX 1151 at 1117), the entire overpayment came from Citibank's own funds. The following chart (PX 346 at 382) shows the total overpayments for each of the defendants' funds:

| Defendant | Intended Amount on August 11 | Actual Payment on August 11 |
|---|---|---|
| Allstate | $92,113.91 | $10,636,142.57 |
| Bardin-Hill | $398,576.42 | $46,022,584.72 |
| Brigade | $1,820,677.07 | $213,048,149.83 |
| Greywolf | $139,080.10 | $16,059,218.99 |
| HPS | $1,171,284.67 | $135,245,205.20 |
| Medalist | $39,616.90 | $4,574,461.33 |
| New Gen | $23,900.15 | $2,759,688.27 |
| Symphony | $918,916.55 | $110,592,220.14 |
| TallTree | $33,634.02 | $3,883,634.02 |
| ZAIS Group | $136,289.16 | $15,737,070.67 |
| **TOTAL** | $4,774,088.95 | $558,558,375.74 |

In the affidavits that Citibank's witnesses have provided to the Court, they explain in detail the reason for the mistake. Zeigon Decl. ¶¶ 21-23; Fratta Decl. ¶¶ 16-35; Farrell Decl. ¶¶ 34-36; Raj Decl. ¶¶ 8-23; Ravi Decl. ¶¶ 7-15. The August 11 Transfers arose out of a 2020 transaction in which certain lenders "rolled up"—or transferred—their interest in the Revlon loan to a separate Revlon loan facility. Farrell Decl. ¶ 17. This meant that those lenders would have their pro rata share of the Revlon loan "repurchased" by Revlon in a cashless transaction and moved to the new facility. *Id.* ¶ 21. The remaining Revlon lenders would continue to hold a pro rata share of the 2016 Revlon loan based on the new, slightly reduced principal balance. *Id.* ¶ 17. As part of this transaction, Revlon would pay the accrued interim interest to *all* Revlon lenders on August 11, 2020. *Id.*

To process this transaction from an operational standpoint, Citibank had to "rebuild" the Revlon loan in "Flexcube," its payment processing system, to account for the change in the lender composition and the modified principal balance. Fratta Decl. ¶ 22. As part of that process, Citibank directed Flexcube to reflect an amount equal to the total outstanding principal balance of the Revlon loan in Citibank's "wash account," an internal Citibank account used for certain cashless internal Flexcube transactions. *Id.* ¶ 25. The wash account is not a bank account and does not actually contain any funds.  Although it is common parlance to say that money is being "sent" or

"paid" to a wash account, there is no actual money transmitted. It is therefore impossible to make a payment to a third-party from the wash account. *Id.* ¶ 23.

On August 11, 2020, as discussed above, Citibank intended to make an interim interest payment to lenders on the Revlon loan, and to reflect an amount equal to the principal in the Citibank internal "wash" account. *Id.* ¶ 25. The interest payment was subject to a "six eyes" approval at Citibank. *Id.* ¶ 12. The first and second set of "eyes" in this process—the "maker" and the "checker," respectively—were employees of Wipro Limited. This particular Wipro team works exclusively for Citibank and assists with certain operational functions, including wire transfers. *Id.* The third set of eyes is a Citibank "approver," who reviews and approves the transaction. *Id.*

To make both the interest payment and reflect an amount equal to the principal in the wash account, the maker must input certain payment information into Flexcube. *Id.*; Ravi Decl. ¶ 11. But Flexcube has a *default* setting whereby a payment amount entered into it will be released from a cash account (the "DDA" account), rather than from the wash account, and actually wired out to third parties, unless the maker suppresses, or overrides, the default. *Id.* ¶ 12. To do so, the maker must check off three separate boxes on a screen in Flexcube: "Principal," "Front," and "Fund," and populate the field with the internal wash account number. *Id.* This requirement is explained in Citibank's internal policies (PX 430 at 1257).

> When Principal needs to be suppressed, ALL of the below field must be set to the wash account:
> FRONT
> FUND
> PRINCIPAL

At 4:02 p.m. on August 11, 2020, a member of Citibank's Deal Closing Team emailed the loan operations group, explaining that "there will be a Roll-up Repurchase for Revlon [Term Loan] 2016 scheduled to close either 8/11/2020 or 8/12/2020," and asking the group to "[p]lease pay the

Principal to the Wash Account when accrued interest is processed effective 8/11/2020." PX 469 at 1762. At 4:54 pm, a Citibank employee confirmed that the "Interest funds are in," and attached a verification of a $7.8-million transfer from Revlon (Ravi Decl. ¶ 8; PX 416 at 1092, 1094):

| 8/11/2020 | | | ShowMQPymtUSDDetails | |
|---|---|---|---|---|
| **PAYMENT TRANSACTION** | | | GID : **D0202240059601** | |
| **Transaction information** | | | | |
| Transaction ID(GID): | **D0202240059601** | | Txn amount | **7,809,594.19 / USD** |
| Instruction Date: | **11-Aug-2020** | | Received Date: | **11-Aug-2020** |
| Input Source: | **CDI** | | Value Date: | **11-Aug-2020** |
| Debit amount | **7,809,594.19 / USD** | | Credit Amount: | **7,809,594.19 / USD** |
| Txn Type: | **TXN** | | Charges Amount: | |
| Priority Wire Flag: | **N** | | Operator ID: | —— |
| Message Type: | **103** | | FX Indicator: | —— |
| Verify ID: | —— | | FX Rate: | —— |
| Input Reference: | —— | | Output Reference: | —— |
| Status: | **COMPLETE** | | Hold Time: | —— |
| Output Time: | **16:50** | | OFAC Status: | **2** |
| Receive Time: | **16:50** | | | |

At that point, the Wipro "maker" began to input the transaction into Flexcube. Although the maker needed to select the three boxes described above (and include the internal wash account number) to suppress the Flexcube default and reflect an amount equal to the principal in the wash account, he selected *only* the "Principal" box with the wash account number, believing it was sufficient:



Fratta Decl. ¶ 30-32; Ravi Decl. ¶ 12-13.

At 5:45 pm, the maker asked the Wipro "checker" to approve his work: "Kindly approve," he wrote, noting "Princip[al] to Wash A/c." Ravi Decl. ¶ 13; PX 470 at 1774. The checker also believed that selecting the "Principal" box was sufficient to overwrite the default option and reflect an amount equal to the principal in the wash account. *Id.*; Raj Decl. ¶ 17. He emailed the Citibank approver at 5:47 pm, noting that "Principal set to Wash and Interest Notice released to Investors," and asked for final approval of the transaction. Fratta Decl. ¶ 28; Raj Decl. ¶ 19; PX 470 at 1774.

At 5:54 pm, Vincent Fratta, the Citibank approver, sent an email approving the transaction: "Looks good, please proceed. Principal is going to wash." PX 469 at 1760. Mr. Fratta likewise believed that he was approving a payment of interim interest to lenders and directing principal to be reflected in the internal Citibank wash account, and that checking the "Principal" box and populating the internal wash account number would suppress Flexcube's default setting. Fratta Decl. ¶ 32; PX 469 at 1763. The checker then executed the transaction. Raj Decl. ¶ 21. At 6:08 pm, he confirmed by email that "Principal set to wash and Interest paid to Investors with Invoice." ¶ *Id.* 22; PX 419 at 1108.

Because no one had checked the "Front" and "Fund" boxes and populated the internal wash account number in Flexcube to override the default instruction, the system remitted to lenders a payment of both the interest *and* an amount equal to the principal balance of Revlon's loan. *Id.* ¶ 29. Citibank thereby mistakenly transmitted an amount equal to the entirety of Revlon's outstanding debt at the time—a total of $893 million—consisting of Citibank's own funds.

### 3.    Citibank Quickly Recognized The Mistake.

The error was discovered the next morning by the Wipro checker. He said that while "Principal was set to wash and only Interest was set to [the lenders]," "it looks like fund has gone out along with principal." PX 446 at 1371; Fratta Decl. ¶ 36; Raj Decl. ¶ 26.

This quickly became the subject of numerous internal emails and chats. At first, Citibank believed that the overpayment had resulted from a "tech issue" in Flexcube. PX 463 at 1655. At 9:52 a.m., Fratta sent a chat message to Vincent Farrell, his supervisor and the Head of North American Loan Operations: "bad news . . . principal to wash, wires look like they went out the door." PX 788 at 29469. At 10:26 a.m., he sent an email to Citibank's technology support group relaying what had happened with the August 11 Transfers: "Yesterday we processed a payment with Principal to the wash and Interest to be sent to lenders." PX 366 at 541. Still believing that this was an issue with Flexcube, Fratta attached screenshots "indicat[ing] that the wash account . . . is present and boxes checked appropriately for the principal components." *Id.* At 10:34 a.m., he emailed other members of the Citibank team with the subject line, "Urgent Wash Account Does Not Work," and alerting the team that "Flexcube is not working properly and it will send your payments out the door to lenders/borrowers. . . . This [led] to ~1BN going out the door in error yesterday for an ABTF Deal, Revlon." *Id.* At 10:48 a.m., Fratta emailed Brendon Zeigon, Citibank's Managing Director:  "[C]ash was sent to lenders on our Revlon Term Loan yesterday

in error. A transaction processed yesterday was intended to have interest sent to lenders and to have principal suppressed and sent to internal accounts." PX 451 at 1410-11.

During a telephone conference at 10:50 a.m. on August 12, Fratta and other Citibank colleagues learned that the mistake had resulted not from a technical glitch with Flexcube, but rather from the maker's initial selection of only the "Principal" box. Fratta Decl. ¶ 43; PX 299 at 82-83. Once Fratta understood that this overpayment was caused by human error, he sent several emails that acknowledged the error and informed others at Citibank about what had occurred. At 1:53 p.m. on August 12, Fratta emailed Citibank's "front office" to inform his colleagues that "[d]uring our processing and internal rebooking of [the Revlon] deal, we had a processing error, which [led] to the full principal amount of the loan outstanding being sent via wire to all of the lenders in the deal." PX 436. Fratta said that "[w]e will be contacting the lenders asking them to return their share of this erroneous payment as soon as possible." *Id.* at 3:03 p.m. on August 12, Fratta expressed frustration with the error, noting that "the procedure doc spells out pretty facking [*sic*] clearly on how to process this sort of transaction, ugh." PX 476 at 1829.

### D.   Defendants Had Actual and Constructive Notice Of The Mistake

The record contains a variety of sources demonstrating that the defendants had both constructive and actual notice of Citibank's error.

### 1.   Citibank's Calculation Statements, The Amount Of The Payment, And Citibank's Recall Notices Put Defendants On Notice Of The Mistake.

As discussed above, Citibank sent Calculation Statements to the defendants and/or the subject funds they control describing each payment as an "interest" payment and detailing Citibank's calculation of the amount of interest that had accrued. Some defendants received the Calculation Statements directly from Citibank on August 11.  New Gen, PX 1297 at 4; Medalist, PX 1223 at 32; ZAIS, PX 679. For others, Citibank sent the Calculation Statements to fund

administrators or custodians (per defendants' instructions) on August 11, who forwarded them to

the defendants. Medalist, PX 1224 at 7-8; HPS, PX 1207 at 9; Brigade, PX 113 at 5. The amounts

described in the Calculation Statements were a fraction of the payments actually made. *See* pp. 7-

10 *supra*. As detailed by Citibank's expert, the Calculation Statements and the discrepancies with

the payments were sufficient on their own to give the defendants constructive notice and, at a

minimum, "require [ ] an investigation."  Byrne Decl. ¶ 32.

As early as August 12 at 2:22 p.m., Citibank began sending "Recall Notices" to all

defendants and/or their funds. These documents informed the defendants in no uncertain terms:

> [O]n August 11th 2020 regarding REVLON TERM LOAN 2016—
> Global Amount 893,944,008.52 we have paid Interest Accrual from
> May 29th to August 11. ***Your share of Principal amount was
> released erroneously***. . . . Please return the principal portion of the
> payment you received to the below instructions as soon as possible."

PX 111 at 855 (emphasis added). The Recall Notice also included specific wire instructions to

return the funds, and a Citibank email address to direct any questions. *Id.* Citibank then sent

another Recall Notice to all defendants a few hours later—at around 6 p.m. on August 12—with

the same instruction to return the funds. PX 0105.

Citibank followed up with another notice on August 13:

> Please be advised that on August 11th 2020 regarding REVLON
> TERM LOAN 2016—Global Amount 893,944,008.52, we have
> paid interest accrual from May 29 to August 11. ***An additional
> amount was included in your interest payment as error and you
> were overpaid.*** Please return the amount listed below as soon as
> possible.

PX 137 at 2220 (emphasis added)

By August 17, Citibank had sent additional Recall Notices making clear that Citibank made

the payments with its own money, noting that the return of the funds was required by standard

industry practice, and warning of potential legal action against those recipients who did not return

16

the mistaken funds:

> As you are aware, on August 11, Citibank funds were mistakenly remitted to you. ***To be clear, those funds belong solely to Citibank; they are not borrower or Revlon 2016 Term Loan facility funds.*** In view of this mistaken transfer, you are legally obligated to return those funds and, ***as is standard industry practice when fund transfers occur mistakenly***, we expect that you will return those funds to Citibank immediately. To date, you have failed to return Citibank's funds and Citibank is prepared to take legal action to recover its funds.

PX 156 at 2342 (emphases added).

In addition, as early as August 13, Citibank employees began personally reaching out to lenders. Citibank explained that an error had occurred that led Citibank to accidentally wire an overpayment in an amount equal to the full outstanding principal amount of Revlon's loan; that Citibank mistakenly made the payment with its own money; and requested return of the overpayment. *See* Farrell Decl. ¶ 45; Brigade, Frusciante Dep. at 235:14-237:24. Following a phone call with Brigade, for example, Citibank confirmed that Brigade was "in receipt of all notices for the funds under [their firms'] management and once internal review is complete [they] will revert back on the timing of return of funds." PX 371 at 625.

The fund managers and lenders of the Revlon loan  reacted to Citibank's Recall Notices in one of two ways. Some returned the money; approximately 200 lenders returned an amount totaling approximately $385 million. *See* PX 346 at 382. Others—the defendants—kept $508 million in payments, approximately ***$501 million more*** than the $7.8 million total interest that they were due. PX 346 at 382.

### 2.    The Absence Of Any Prepayment Notice Put Defendants on Further Notice of the Mistake.

As discussed above (at 4), the Credit Agreement did not permit Revlon to make a prepayment on principal unless it gave three-days' advance written notice to Citibank, which in

turn was required to promptly send the notice to the lenders. PX 485 § 2.11(a). When Citibank acts as an administrative agent and receives a prepayment notice from a borrower, Citibank forwards that information to lenders promptly, either the same day or the next. Farrell Decl. ¶ 48. Revlon never issued any notice under this provision—so naturally, Citibank did not do so either. This further placed the defendants on notice of the mistake. As Citibank's expert explained: "Because lenders rely on [ ] prepayment notices, the lack of a prepayment notice is something that a reasonable lender would have considered." Sunshine Decl. ¶ 33.

Indeed, several defendants testified that after receiving the August 11 overpayment from Citibank, someone from their team *did* check for a prepayment notice, and that this was a normal part of their process. *See, e.g.*, Allstate, McCoy Dep. at 217:17-22 (Allstate executive testifying that she had never seen a loan paid off in full without a prepayment notice); Greywolf, Josephson Dep. at 36:17-24 (testifying that a "prepayment notice . . . would lead [a custodian] to expect principal to be paid"); Symphony, Vaughan Dep. at 76:15-76:20 (to "determine whether a paydown . . . is or is not a mistake," Symphony executive would "check the [prepayment] notice"); Tall Tree, Lenga Dep. at 178:14-179:14 (testifying that he reviewed "the part [of the Credit Agreement] that says [Revlon] can't prepay principal without giving three days notice," and understood that section to mean that "[t]he agent bank is supposed to send [the prepayment notice]"). And nearly every defendant or defendant's custodian asked about a prepayment notice after receipt of the funds. *See e.g.*, Allstate, PX 13 at 56 ; Brigade, PX 140 at 2229; HPS, PX 1207 at 5386.

### 3.    Each Defendant Acknowledged Internally That The Overpayments Were Made By Mistake.

Every defendant internally acknowledged—either expressly or by strong implication—that Citibank had sent the August 11 Transfers by mistake.

*Allstate.* Allstate first learned of Citibank's payment on the morning of August 12. By 11:07 a.m. on August 12, an Allstate operations analyst, Chiara Feijoo, asked whether Allstate was "expecting a *large unscheduled paydown* on 8/11 for Revlon"—to which Allstate's senior portfolio manager, Kevin Roth, responded in the negative. PX 13 at 58 (emphasis added). Less than 20 minutes later, a member of Allstate's bookkeeping team, Blake Fairbanks, stated that "[t]here are currently no agent notices" for the payment. *Id.* at 57.

At 11:27 a.m., Catherine McCoy, an Allstate portfolio manager and Allstate's corporate representative, replied: "[S]o strange—***could this be a mistake?***" *Id.* (emphasis added). This prompted Fairbanks to "sen[d] an email to the agent and WSO" to find out "more info." *Id.* That "info" led Allstate's operations team to determine by 12:51 p.m. that "*[t]here are no agent notices pertaining to the principal paydowns*." *Id.* at 56 (emphasis added). By contrast, there were "notices reflecting the libor contract which was supposed to pay f[rom] 5/29/20 to 8/31/20 *breaking and paying interest* from 5/29/20 to 8/11/20." *Id.* (emphasis added). In other words, less than two hours after learning of the payment, Allstate recognized that a mistake may have been made, and then confirmed that suspicion by determining that the only notice Citibank sent was for an interest payment and nothing more.

Two hours later, Allstate received the first Recall Notice from Citibank, which indicated the "erroneous" release of the "Principal amount" of the Revlon loan, and requested the "return [of] the principal portion" "as soon as possible." *Id.*; PX 2 at 3. Citibank sent another Recall Notice to Allstate at about 6:00 p.m. the same day. PX 8 at 16.

On August 13, at 8:21 a.m., Allstate was *planning to return the funds to Citibank*. It advised its trustee, The Bank of New York Mellon ("BNYM"), that Allstate was " working with [its legal department] ***to get approval to return the funds***." PX 21 at 167 (emphasis added). But Allstate

then reversed course: By 12:07 p.m., Allstate instructed BNYM that it should "**NOT** [ ] send back the principal funds received for Revlon." *Id*. at 666.

About two hours after that instruction, Citibank sent a *third* Recall Notice e-mail to Allstate demanding they return the overpayment. PX 18 at 151. Allstate did not do so. By 10:32 a.m. on August 14, the funds were "tracked as unapplied wires." PX 21 at 164. And on August 17, 12:57 p.m., after receiving two further emails from Citibank requesting "urgent assistance" on "funds paid in error from our own account on 8/11" (from August 14 and August 17), Allstate responded: "It is not at all clear that the funds were paid in error. We continue to analyze the situation." PX 22. No such analysis, however, is apparent in the record. Allstate's corporate representative was unable to answer the question of whether, "at some point in time," Allstate "investigate[d] or analyze[d] whether or not the August 11 payment was in error," or whether "Allstate [did] *anything at any time to investigate* whether the payment by Citibank was in error." Allstate, McCoy Dep. at 203:6-209:12 (emphasis added).

***Bardin Hill.*** Bardin Hill did not know about any payment from Citibank until the late afternoon of August 12—hours after Citibank had sent its first Recall Notice. Bardin Hill, Greene Dep. at 67:24-68:15 & PX 810 at 29521. At 4:46 p.m. that day, the Vice President of Bardin Hill, Michael Janowitz, reached out to U.S. Bank, the trustee on its funds, asking to "please let [him] know" whether any "funds [came] in for Revlon recently[,]" and whether there were "any notices saying there was a pay down." PX 47 at 510. At 6:10 p.m. that evening, U.S. Bank responded that "there was an ***erroneous principal payment*** for Revlon," and attached the Recall Notice. *Id*. (emphasis added). Thus, the *very first* piece of information that Bardin Hill received about the payment was that it was a mistake and subject to recall.

Bardin Hill nonetheless declined to reach out to Citibank, or to try to understand why it

received the overpayment on the Revlon loan. Bardin Hill, Greene Dep. at 96:5-22. Instead, referencing a "great deal of dispute between . . . Revlon and us" (*id.* at 109:6-7), Bardin Hill chose to do "nothing" to "determine whether or not the Citi payment was made in error" (*id.* at 112:8-12). Just minutes after learning about the overpayment *and* the Recall Notice, Janowitz instructed U.S. Bank to "*not* send back any funds" and to "*hold* for all deals." PX 57 at 800 (emphasis added). When asked about this instruction, Bardin Hill testified that any attempt even to "investigate whether or not the payment, in fact, had been made in error" "would have been effectively pointless" (Bardin Hill, Greene Dep. at 108:23-109:5)—an acknowledgment that the discrepancy and the Recall Notices made that error clear.

**Brigade.** Brigade's corporate representative, Matt Perkal, was "surprised" when he learned that a payment had been made on the Revlon loan. Brigade, Perkal Dep. at 22:24-23:7. Brigade discovered the payment "[a] little after 10 a.m. on August 12" from one its custodians, Virtus. Brigade, Frusciante Dep. at 80:12-16. Virtus emailed Brigade's bank debt manager, Jeff Frusciante, that it had received "a large payment from Revlon in which [it was] reaching out to the agent." *Id.* at 80:20-81:6. About an hour later, Brigade's fund administrator, SEI, also "reached out asking" about the funds from Citibank and requesting "back up" on the wires received. *Id.* at 82:25-83:9; PX 115 at 871. At 3:14 p.m., Brigade's bank debt operations analyst, Maureen Turk, informed SEI that Brigade was "still investigating this," and requested that SEI "hold th[e] wire while [Brigade] continue[d] to investigate." PX 115 at 870.

At 2:30 p.m., Frusciante, messaged Brigade's internal counsel Chris Chaice and asked him a question: "*Revlon full paydown?* Seeing the cash for our funds now." PX 167 at 2703 (emphasis added). Two minutes later, Frusciante messaged Chaice again that "Citi just [ ] sent a notice," and pasted the text of the first Recall Notice Citibank had sent to Brigade. PX 167 at 2704. By 2:30

p.m. Frusciante had "read the [recall] notice," "understood what the notice said," and understood that it indicated that the funds were sent "***incorrectly***." Brigade, Frusciante Dep. at 139:7-140:10 (emphasis added).

Beginning at 3:13 p.m.—45 minutes after Brigade had received Citibank's Recall Notice—Turk began reaching out to all custodians and trustees on Revlon loans managed by Brigade, requesting that they "urgently confirm" receipt of the wires related to Revlon's loan, and—even though all information pointed to an error—instructing them not to "kick them back" because Brigade was "still investigating." PX 126 at 2206. During the course of this "investigation," Brigade "pulled [ ] up" the Calculation Statement—or as Frusciante called it, the "*interim interest notice*." Brigade, Frusciante Dep. at 199:4-16. As Frusciante testified, the Calculation Statement said "***nothing about the paydown of principal***" and said "everything about interim interest." *Id.* at 202:6-10 (emphasis added). Brigade also determined that there had been no prepayment notice of a principal payment. Brigade, Frusciante Dep. at 228:19-229:7. Brigade's trustees conducted their own inquiries into the funds. On August 13 at 4:35 p.m., Virtus informed Brigade that it had "been in contact with [Citibank]" and had been advised "that ***these funds were released accidentally and are not the borrower's funds***." PX 145 at 2247 (emphasis added).

Nonetheless, on August 12 at 7:25 p.m., Brigade's Chief Financial Officer, Patrick Criscillo, directed Frusciante to instruct each trustee and custodian in receipt of the mistaken wire to "retain the funds received," to "not book" the funds," and to "carry the funds as a cash break for the time being." PX 110. Beginning on August 13 at 8:44 a.m., Maureen Turk began reaching out to all trustees and custodians with the same instructions. This message was relayed to custodians/trustees for nearly every Brigade loan holding the Revlon loan. *See* PX 114, 116-118, 123, 126-127, 129-133, 134-136, 139, 160, 162-163, 166.

On August 14, several Brigade employees took part in a chat with other investors. One participant summed up well the defendants' reaction to the payment:  PX 122 at 1393 (emphasis added).

**Greywolf.** Greywolf learned about both the August 11 Transfers *and* the Recall Notice for "[t]he first time" when Greywolf participated in a "lender call with counsel [Quinn Emanuel] on Wednesday, August 13th." Greywolf, Abrams Dep. at 86:12-22, 87:4-10; 88:10-20. Immediately after this call, Abrams sent an internal email stating that "we may have been paid down on Revlon yesterday in full," and instructing employees: "do NOT send back any money on this paydown." PX 1117.

But by August 13, Virtus, the custodian for Greywolf's funds, had already returned the mistaken overpayments for one Greywolf CLO back to Citibank. Upon discovering this fact at 11:50 a.m., Greywolf chastised Virtus, stating that "[Greywolf] never agreed to send the GW4 funds back. This money needs to be clawed back. This is important." PX 1119 at 593.

At 12:13 p.m. on August 13, Andrew Marcellus, a Greywolf analyst, emailed Virtus about the August 11, Transfers, noting that Citibank "apparently" "*made an overpayment*," and attaching three Calculation Statements and three Recall Notices received as of August 13. PX 1126 at 780 (emphasis added). (emphasis added). Marcellus included a chart comparing the "interest amount" (pulled from the Calculation Statements) and with the "*Actual overpayment amount*":

|      | Interest amount | Actual overpayment amount |
|------|-----------------|---------------------------|
| CLO2 | $33,973.77      | 38,888.89                 |
| CLO4 | $42,042.53      | 48,125.00                 |
| CLO5 | $63,063.80      | 72,187.50                 |

*Id.* (emphasis added). Nevertheless, Greywolf told Virtus that Citibank is "looking to claw back the overpayment," and "DO NOT RETURN ANY FUNDS RELATED TO REVLON." *Id.*

*HPS.* At 5:36 a.m. on August 12, HPS's fund administrator emailed Citibank and others asking about the payment it had received, requesting confirmation "that there was a full principal repayment" on the Revlon loan, and asking Citibank to "please send us the notice for this as ***the [Calculation Statement] below does not indicate it***." PX 1207 at 5386 (emphasis added). This email is contrary to what HPS's company witness said at his deposition, which is that the first time anyone at HPS learned about the August 11 Transfers was "around 3:15 p.m. [on] August 12," through a "[recall] notice that came in from Citi." HPS, Xanthakys Dep. at 71:23-72:24.

In any event, after receiving the Recall Notice, HPS began asking questions. The answers to those questions confirmed the mistake. At 4:50 p.m. on August 12, a Vice President at HPS, Marc Sikoscow, asked if anyone had "see[n] any agent notices for a paydown" (PX 1153), referring to "supporting documentation" "typically" sent "when a paydown is made or an interest payment" is remitted (HPS, Xanthakys Dep. at 92:4-17. At 5:01 p.m., another Vice President at HPS, George Daniolos, responded: "It looks like they ***erroneously released*** paydown payment and are asking for it back. Do you agree?" PX 1154 at 1128 (emphasis added). Daniolos attached both the Recall Notice and the Calculation Statement from Citibank. *Id.*

As with Allstate, the original plan was to return the funds. At 5:18 p. m. on August 12, an analyst at HPS said that "***[w]e will be sending the erroneous paydowns back*** first thing tomorrow." PX 1197 at 5020 (emphasis added). That plan was overruled: One minute later, an HPS managing director, David Frey, responded: "Don't send back. [REDACTED]. Ops please acknowledge you all see this message[.]" *Id.* The message was confirmed, and Frey responded at 6:12 p.m. to "make sure no one returns this payment unless directed by me," but also cautioning to "not include it in the cash reports *so we don't invest it by accident.*" *Id.* at 5019 (emphasis added).

Internally, other employees at HPS exchanged messages ridiculing Citibank for its

accidental payment. The news spread as early as 3:15 p.m. on August 12. One employee said in a chat message that "Revlon paid an interim interest yesterday which we received, but Citi also *accidentally* paid us back our entire positions[.] *Unbelievable*[.]" PX 1201 (emphasis added). Another employee wrote that he "fe[lt] really bad for the person that *fat fingered a $900mm erroneous payment*[,]" calling it "[n]ot a great career move," and mimicking a conversation between the maker and his spouse: "How was work today honey? It was ok, except I *accidentally* sent $900mm out *to people who weren't supposed to have it.*" PX 1165 at 1325 (emphases added). By August 14, after major news outlets had picked up the story, HPS's Vice President, Kelly Andrew, asked Lucian Tira, another Vice President at HPS, whether they "[paid] it back," and joked that "[a]s Steve Miller said, *take the money and run*"—to which Tira responded, "we have not paid the money back :)" PX 1188 at 2031 (emphasis added).

*Medalist.* Although it directly received two Calculation Statements on August 11, 2020 (PX 1223, 1224), Medalist claimed that it learned about Citibank's wire transfer when it received Citibank's first Recall Notice, on "the afternoon of the 12th" (Medalist, Phipps Dep. at 112:2-6). Immediately upon receipt of the Recall Notice and after review of the Calculation Statement (Medalist, Phipps Dep. at 103:25-104:5), Miranda Wenderdaum, a Vice President at Medalist, forwarded the notice to U.S. Bank to "confirm" when the return was "complete." PX 1228 at 18. At 3:15 p.m. on August 12, Wenderdaum instructed U.S. Bank to "just" "*return the principal amount of $1,929,836.69*." *Id.* (emphasis added). At 4:34 p.m. on August 12, U.S. Bank stated that "[t]his has been returned." PX 1231 at 25. And on August 13, Wenderdaum instructed U.S. Bank to "return the principal" on a *second* fund, after which U.S. Bank "should be able to apply the interest portion of the unapplied wire." PX 1247 at 162.

On "the morning of the 13th," after a telephone conference with Quinn Emanuel and other

lenders, Medalist's Chief Investment Officer, Jeremy Phipps, realized that Medalist "had received a payment on Revlon." Medalist, Phipps Dep. at 153:18-24. At that point, "while on a call with attorneys" (PX 1251 at 1768), Phipps "instructed [Wenderdaum] to hold off on sending those proceeds back until we understood what the situation was" (Medalist, Phipps Dep. at 153:24-153:2). And so at 11:19 a.m. that day, Wenderdaum asked U.S. Bank and other custodians to "not return the funds for now" (PX 1245 at 149) and at 11:39am, that "[i]t's fine if it sits unapplied" (*id.*).

Medalist, in fact, made little attempt to "under[stand] what the situation was" (Medalist, Phipps Dep. at 153:24-53:2), because it was eager to "have a good bargaining chip with Citi/Revlon" (PX 1251 at 1767). Although Medalist found it "unfortunate" that Wenderdaum returned the funds for "CLO 4" back to Citibank (PX 1236 at 40), Medalist's CEO Bryan Hamm assured his team on August 13 that Wenderdaum "*was just trying to do the right thing*" by returning what she understood did not belong to Medalist. PX 1251 at 1767 (emphasis added). Hamm took a different approach, concluding on August 14 at 8:51 a.m.—after receiving three Recall Notices from Citibank—that there was "no good reason to return funds to Citi group. *They are getting a taste of their own medicine*." PX 1236 at 40 (emphasis added).

*New Gen.* On August 11 at 5:33 p.m., New Gen had received a Calculation Statement that "indicate[d] that the total amount that would be paid by Citi [on August 11 was] $23,900.15." New Gen, Beals Dep. at 39:14-23 & PX 1297. "According to th[at] notice," New Gen "expected to be paid $23,900.15 by Citi on [that] day." *Id.* at 40:8-11. New Gen did not expect any principal overpayment. *Id.* 40:12-15. It therefore gave a "heads-up" to its custodian, Northern Trust, to look for an interest payment of $23,900.15. *Id.* at 45:3-13 & PX 1298.

New Gen only became aware of Citibank's overpayment on August 12, upon receipt of

Citibank's Recall Notice at 2:28 p.m. *See* New Gen, Beals Dep. at 58:18-59:25. At 2:30 p.m., Darren Beals, an executive at New Gen, forwarded Citibank's Recall Notice to Northern Trust. PX 1300. At 3:11 p.m., Northern Trust responded that, "[f]or simplicity sake, it would make sense to have our custody team [ ] ***return the original wire and have [Citibank] send only the funds we are due***." *Id.* at 13 (emphasis added). Beals agreed. *Id.*

On August 13, at 9:34 a.m., Beals reached out to Northern Trust again to confirm that "the funds [were] returned" and that Citibank "sen[t] us only the funds that ***were due***." PX 1307 at 448 (emphasis added). By "due," Beals was "referring to" "the original notice of the interim interest." New Gen, Beals Dep. at 63:6-13 (emphasis added). *See also* New Gen, Beals Ex. 11. At 11:09 a.m., Beals sent an email to an equity member of New Gen, Baily Dent: "***We received interest which we were due and the principal by mistake***." PX 1309 at 461 (emphasis added). One minute later, at 11:10 a.m., Dent instructed Beals to "call [Northern Trust] immediately to not return." *Id.* Beals immediately sent another email to Northern Trust (marked with "high" importance), instructing Northern Trust to "hold off sending until you hear from me." PX 1308 at 453. Two minutes later, Beals emailed again, asking Northern Trust to "confirm the money was NOT returned yet." *Id.* And by 11:27 a.m. on August 13, Beals instructed Northern Trust: "do <u>not</u> send [back the funds] until you hear from me again." *Id.* (emphasis in original).

Meanwhile, minutes after instructing Beals to "call [Northern Trust] immediately to not return" the funds (PX 1309 at 461), *Dent* referred to Citibank's payment as a "***big mistake*** considering $893m" in an internal chat to another New Gen analyst, warning that "mistakes like this can be hard to undo," and praising himself for stopping Beals from returning of the funds—"I thankfully got to him." PX 1311 at 901. The analyst responded: "Someone's losing their job over this. . . . [D]id they repay all 1.8 bn?" *Id.*

On August 13 at 1:14 p.m., Citibank sent a follow-up Recall Notice. Dent instructed Beals to "ignore for [the] time being." PX 1310 at 462. Dent testified that this instruction was based on "advice of [external] counsel" at Quinn Emanuel. New Gen, Dent Dep. at 21:24-22:9.

*Symphony.* By late morning on August 12, Symphony was aware that Citibank had made a payment on the Revlon loan. Symphony, Vaughan Dep. at 83:19-84:6. And by 3:13 p.m. on August 12, Symphony received its first Recall Notice from Citibank. PX 837. After investigating the matter, Symphony confirmed that it did not receive "a full paydown notice from Citi with respect to the 2016 Revlon term loan" (Symphony, Vaughan Dep. at 93:23-94:3), and instead received an "*interim interest notice*" (*id.* 93:18-22 (emphasis added)). Other custodians for Symphony's funds referenced the same discrepancy. *See e.g.*, PX 1328 at 237 ("We understand that this term loan was undergoing a restructure but we haven't received any full paydown notice from BNY so far. . . . Please advise . . . and please kindly provide full paydown notice, if you have any, thanks!"); PX 1330 at 433 ("We did receive 3,275,717.03 but we do not have a notice to apply the funds. Can you provide a notice?"). And in some instances, Symphony's fund administrators stated that they had "not confirmed" the wire transfer because, "[s]eeing as the loan is pricing around 24, *a full paydown at 100 would be fairly unusual*." PX 1333 at 444 (emphasis added).

Symphony's senior loan operations associate understood that Citibank informed them it "*had made a mistake.*" Symphony Vaughan Dep. at 134:22-135:3 (emphasis added). But by 3:50 p.m., Symphony informed its custodians:  "Regardless of any notification you may have received from the Agent regarding return of funds for Revlon—please DO NOT return the money." PX 1335 at 454.

*Tall Tree.* Tall Tree was not aware of the payments until August 13—the day after Citibank had sent the Recall Notices—when it spoke to its counsel, Arnold & Porter. Tall Tree, Lenga Dep.

at 111:19-23, 121:10-122:2; PX 773. It "came to learn that Citibank had said there was a mistake" after it asked U.S. Bank "for any notices received on Revlon." Tall Tree, Lenga Dep. at 139:5-11. And when Tall Tree learned of the payments and Recall Notices—which Tall Tree described as a "***notice of mistake***"—it instructed its custodians "[t]o hold the funds" (*id.* at 139:10-18, 140:9-12 (emphasis added)), to "keep the money in unapplied payment account" (PX 1463), and to "***treat Revlon as though nothing happened***" (*id.* (emphasis added)).

        ***ZAIS.*** ZAIS was not aware of the payment from Citibank until it received a Recall Notice in the afternoon of August 12. ZAIS, DiPoalo Dep. at 87:3-7; ZAIS, Meneses Dep. at 27:21-28:8. Citibank sent more Recall Notices to ZAIS around 6:00 p.m. that day. PX 686.

        The next morning, Elizabeth DiPoalo, a ZAIS executive, requested that its trustee U.S. Bank return a portion of the August 11 wire "as per the attached notice . . . ***that is principal paid in error***." PX 1539 at 218 (emphasis added). Marta Kuder, one of DiPoalo's subordinates, reached out to BNYM, another trustee, to "check if we got a wire for Revlon paydown ***that we did not expect***"; "[t]hey are recalling it." PX 1538 at 216 (emphasis added). BNYM confirmed that ZAIS CLOs 2 and 9 received the funds and that they had "***submitted requests for those funds to be returned today.***" *Id*. (emphasis added).

        At 11 a.m. on August 13, after *both* trustees had been instructed to return the funds as "principal paid in error" (PX 1539 at 218), several ZAIS employees participated in a call with other lenders and Quinn Emanuel (ZAIS, Meneses Dep. at 34:24-35:10). Following this call, at 11:25 a.m., DiPoalo immediately sent a follow-up email (marked with "high" importance) to U.S. Bank: "[D]on't send back the REVLON wires. Our desk wants to hold. Please confirm if anything has been sent back yet, or if you can stop." PX 1540 at 232. DiPoalo sent the same email to BNYM, with the additional note that "WE DON'T WANT THIS PAID BACK YET." PX 1541 at 235.

While U.S. Bank was able to stop the return of funds back to Citibank, BNYM informed ZAIS at 11:26 a.m. that "the wires have already been submitted and left the bank." *Id.* One minute later, DiPoalo responded: "Can you stop the wires that went out, ***like recall them?***" *Id.* (emphasis added). At 11:37 a.m., BNYM began a "recall process." *Id.* BNYM was unable to recall two wires; the remaining wires were reversed and remained unapplied in the possession of ZAIS's custodians. ZAIS, DiPoalo Dep. at 124:25-126:14.

Days later, ZAIS employees would characterize the August 11 Transfers as "[b]izarre," explaining that "they've never seen anything like it." PX 1544 at 550.

### 4. Defendants Recognized That The Revlon Loan Was Still Outstanding On August 12, 2020.

On August 12, 2020, the day after the defendants and/or their funds received the mistaken payments, UMB Bank served Revlon with a Notice of Acceleration of the 2016 loan at the defendants' direction. New Gen, Dent Dep. at 37:20-38:8; Greywolf, Abrams Dep. at 114:7-18; PX 172. As defendant Greywolf conceded, there would be no reason to *accelerate* a loan that had already been discharged. *See* Greywolf, Abrams Dep. at 114:2-5 ("Q: Have you ever seen a lender accelerate a loan that has already been repaid? A: No I have not.").

That same day, UMB Bank filed a 117-page complaint against Revlon at the direction of the defendants, claiming to be the successor administrative agent on the Revlon loan. Compl, *UMB Bank, Nat'l Ass'n v. Revlon*, 1:20-cv-06352 (Aug. 12, 2020) (PX 171). UMB Bank's complaint accused Revlon of improperly amending the Credit Agreement to *avoid* paying the 2016 lenders, and contained allegations about Revlon's *default* on the loan under the Credit Agreement. *Id.* at ¶ 11. It further alleged that Revlon was *unable* to repay the loan because it was "insolvent and facing a severe liquidity crisis." *Id.* at ¶ 166. Indeed, Revlon's total liquidity was less than $400 million—about a half-billion less than what was transferred. PX 120 at 913.

Each of the defendants was aware of the Notice of Acceleration and the UMB Complaint. *See, e.g.*, Brigade, Perkal Dep. at 32:4-9 ("Q: Specifically what aspect of the financial profile of Revlon made this loan stressed? A: I mean, as we alleged in the UMB complaint, you know, we thought they were insolvent."); Greywolf, Abrams Dep. at 107:4-13 ("Q: Do you agree . . . that Revlon was insolvent in May 2020? A: I think the term 'insolvent' is a legal term, and they have gone ahead in this write-up and defined what they meant by insolvent. Based on that definition, on its face, it seems reasonable to me."); HPS, Crocombe Dep. at 71:10-20 ("Q: Why did HPS authorize the filing of the UMB Bank lawsuit on August 12? A: . . . We were part of the direction of UMB to file the Complaint because we believed in the merits of the Complaint."); Medalist, Phipps Dep. at 235:15-236:8 ("Q: So the allegation[] being made [was] that Revlon was insolvent as of May [2020], correct? A: Yes. . . . Q: And do you believe that Revlon was insolvent on [ ] August 11th? A: Yes[.]"); New Gen, Dent Dep. at 35:21-36:8 ("Q: And in conjunction with your review [of the UMB Complaint], did you disagree with any of the allegations [about Revlon's insolvency]? A: I don't disagree . . . ."); ZAIS, Meneses Dep. at 75:7-23 ("Q: [The UMB complaint has] a set of allegations that Revlon was insolvent as of May 2020. Do you have any opinion on whether [] those allegations are accurate? A: . . . Revlon was in a distressed environment.").

In short, defendants understood that Revlon could not have—and did not—pay the loan. The *UMB Bank* complaint was withdrawn four days ago, on November 9, 2020. Dkt. 19, *UMB Bank*.

### E.      Defendants' Failure To Discharge The Debt

Although the defendants did not return the funds to Citibank, they studiously avoided discharging Revlon's debt. Starting as early as the afternoon of August 12, the defendants began instructing their custodians and trustees to refrain from discharging Revlon's debt. The few

custodians that initially reflected the transfers in their own internal cash flows were instructed by the defendants to reverse these reports and refrain from "reduc[ing] the [Revlon] position." Allstate, PX 21 at 164; Brigade, Frusciante Dep. at 118:7-13; Symphony, PX 1334 at 447. The available monthly reports for September 2020 indicate that, for each of the defendants' CLOs, the Revlon position following the August 11 Transfers remained (and remains) fully outstanding and unapplied. *See* PX 924, 927-928, 930-31, 944-1060, 1496. For example, the September 3, 2020 monthly report for ZAIS CLO 5 (PX 927) shows the following:

**us bank**

**ZAIS CLO 5, Limited**
**Purchase Prices and Market Values**
**As of : 9/3/2020**
**Next Payment: 10/19/2020**

| Issuer | Issue | Principal Amount | Purchase Price | Market Price | Pricing Source | Purchase Value | Market Value |
|---|---|---|---|---|---|---|---|
| Petco Animal Supplies, Inc. | Second Amendment Term Loan B1 | 1,897,911.45 | 98.000 | 85.850 | Mark-It Partners | 1,859,953.22 | 1,629,356.95 |
| Pitney Bowes Inc. | Term Loan B | 6,089,583.34 | 97.486 | 96.333 | Mark-It Partners | 5,936,520.84 | 5,866,278.33 |
| Pixelle Specialty Solutions LLC | Term Loan | 2,952,247.46 | 97.834 | 98.250 | Mark-It Partners | 2,888,315.01 | 2,900,583.13 |
| Plantronics, Inc. | Term Loan B | 398,921.57 | 99.500 | 93.650 | Mark-It Partners | 396,926.96 | 373,590.06 |
| Plaskolite PPC Intermediate II LLC | Term Loan 11/18 | 985,000.00 | 98.000 | 98.333 | Mark-It Partners | 965,300.00 | 968,580.05 |
| Plastipak Packaging, Inc. | Term Loan B (04/18) | 1,442,111.14 | 99.000 | 98.833 | Mark-It Partners | 1,427,690.03 | 1,425,281.71 |
| Polar US Borrower, LLC | Term Loan | 1,970,000.00 | 99.250 | 95.250 | Mark-It Partners | 1,955,225.00 | 1,876,425.00 |
| Priority Payment Systems Holdings LLC | Term Loan | 983,991.66 | 99.501 | 97.000 | Mark-It Partners | 979,085.48 | 954,471.91 |
| Pug LLC | Term Loan B (02/20) | 1,243,126.57 | 94.097 | 86.750 | Mark-It Partners | 1,169,748.44 | 1,078,412.30 |
| QUIKRETE Holdings, Inc. | Term Loan B | 2,035,456.74 | 99.559 | 97.643 | Mark-It Partners | 2,026,481.38 | 1,987,480.98 |
| Quartz Holding Company | Term Loan | 990,000.00 | 99.500 | 97.750 | Mark-It Partners | 985,050.00 | 967,725.00 |
| Quidditch Acquisition, Inc. | Term Loan | 1,462,697.45 | 100.345 | 88.167 | Mark-It Partners | 1,467,746.07 | 1,289,616.46 |
| Rackspace Hosting, Inc. | Term Loan B | 1,480,935.18 | 91.963 | 99.179 | Mark-It Partners | 1,361,912.22 | 1,468,776.71 |
| RegionalCare Hospital Partners Holdings, Inc. | Term Loan B | 2,631,971.83 | 99.000 | 98.531 | Mark-It Partners | 2,605,652.11 | 2,593,308.12 |
| Rent-A-Center, Inc. | Term Loan | 2,701,805.54 | 99.122 | 99.250 | Mark-It Partners | 2,678,095.82 | 2,681,542.00 |
| Research Now Group, Inc. | Term Loan B | 1,950,000.00 | 95.000 | 94.450 | Mark-It Partners | 1,852,500.00 | 1,841,774.94 |
| Revere Power, LLC | Term Loan B | 843,567.98 | 99.750 | 91.833 | Mark-It Partners | 841,463.28 | 774,673.78 |
| | | | 99.751 | 91.833 | | 89,097.54 | 82,025.59 |
| Revlon Consumer Products Corporation | Initial Term Loan B | 1,465,754.87 | 81.396 | 26.333 | Mark-It Partners | 1,193,059.53 | 385,977.23 |
| | | | 99.000 | 64.333 | Mark-It Partners | 2,916,600.00 | 1,891,390.21 |

The defendants all acknowledged at their depositions that the funds currently remain unapplied, either in suspense or segregated accounts. Allstate, McCoy Dep. at 73:3-6; Bardin Hill, Greene Dep. at 129:18-130:19; Brigade, Frusciante Dep. at 218:23-219:16; Greywolf, Josephson Dep. at 159:2-5; HPS, Xanthakys Dep. at 192:20-193:2; Medalist, Phipps Dep. at 191:6-8; New Gen, Beals Dep. at 78:3-14; Symphony, Vaughan Dep. at 154:6-13; Tall Tree, Lenga Dep. at 158:16-22; ZAIS, Meneses Dep. at 23:13-20. And the defendants have admitted that the *only* action they took on the Revlon loan was to "***accept[] and retain[] the funds*** wired by Citibank on August 11, 2020." Def. RFAs 7-8 (emphasis added).

**F.      Procedural History**

On August 17, 2020, Citibank filed a complaint in this Court alleging four causes of action under New York law: (1) unjust enrichment (Compl. (Dkt. 1) ¶¶ 31-33); (2) conversion (*id.* ¶¶ 34-36); (3) money had and received (*id.* ¶¶ 37-40); and (4) payment by mistake (*id.* ¶¶ 41-44).[2] Citibank sought several forms of equitable relief, including a judgment ordering the defendants to return the misappropriated funds. *Id.*, Prayer for Relief. Citibank also filed an application for a TRO that would bar the defendants from disposing of the mistakenly transferred funds. Dkt. 9. In response to Citibank's filings, the defendants indicated that they intended to assert a discharge-for-value defense. Dkt. 22 at 2-3.

On August 18, 2020, the Court issued an order granting Citibank's application for a TRO and setting the case for a bench trial. Dkt. 25. The Court directed the parties to address the following issues in their pre-trial submissions (Dkt. 28):

- At what point in time does the "discharge for value" rule apply?

    o   Are there any New York authorities applying the rule in *In re Calumet Farm, Inc.*, 398 F.3d 555 (6th Cir. 2005)?

    o   If *Calumet* accurately states the law in New York, how does it apply in this case? Were the debts in this case "discharged" and, if so, when?

- Are Defendants still acting as "good faith" recipients of the funds given that they filed a lawsuit seeking to accelerate payment of the same debt?

- What kind of notice of mistake is required under New York law when applying the discharge for value rule—constructive or actual? Relatedly, should the Court's holding in *Regatos v. N. Fork Bank*, 5 N.Y.3d 395, 404-05 (2005), that a bank customer's duty to notify the bank of any unauthorized transfer of funds under U.C.C. § 4-A-204 is triggered by "actual," not "constructive" notice, apply to the "discharge for value" rule?

---

[2]      Citibank originally filed a complaint against Brigade alone, but then filed two other actions against additional defendants. The Court later consolidated the actions into one case against all of the lenders who refused to return the funds mistakenly transferred on August 11, 2020. Dkt. 28.

- Are the fund managers the proper defendants? Factually, what is the relationship between the fund managers and the actual recipients of the funds?

*Id.* at 1-2.

During the course of discovery, the Court has emphasized that the issues in this case are narrow. On August 25, it explained that discovery in this case should be "limited [in] scope"— confined to the issues of "(a) whether the August 11th transfers were a mistake; and (b) the viability of the [defendants'] discharge-for-value defense." Dkt. 46. In a ruling on September 15, the Court reiterated that "the issues in dispute [are] whether the transfers were made by mistake and whether the discharge-for-value defense applies." Dkt. 65 (emphasis omitted).

## PROPOSED CONCLUSIONS OF LAW

Under New York law, a party that transfers money by mistake is entitled to return of the funds so long as the transferee has not relied to its detriment on the mistaken payment. The record overwhelmingly demonstrates that Citibank's August 11, 2020 transfer to the defendants was mistaken. And defendants have offered no evidence—or even contended—that they detrimentally relied on the mistaken payments. Instead, in a brazen departure from industry custom, and despite multiple forms of notice stating that Citibank had paid them with its own money by mistake, the defendants decided to keep the money by concocting a discharge-for-value defense that is unsupported by the law and the facts. Defendants have failed to satisfy any of the three elements of that defense: They were not entitled to the mistakenly transferred funds at any point in time; they had immediate notice that the funds were remitted mistakenly; and they never took any action to discharge Revlon's debt (nor could they). The funds should be returned to Citibank.

## I.   CITIBANK IS ENTITLED TO RETURN OF THE FUNDS THAT IT MISTAKENLY TRANSFERRED.

### A.   A Party That Mistakenly Sends Money Is Entitled To Have It Returned.

Under a "long standing and well recognized" principle of New York law, "a party who

pays money, under a mistake of fact, to one who is not entitled to it should, in equity and good conscience, be permitted to recover it back[.]" *Mfg. Hanover Tr. v. Chem. Bank*, 160 A.D.2d 113, 117 (1st Dep't 1990) (citing *Ball v. Shepard*, 202 N.Y. 247 (1911)). The only exception is when a "payee has changed his position to his detriment in reliance upon the mistaken payment"—an allegation that the defendants have never made here. *Nat'l Bank of Canada v. Artex Indus., Inc.*, 627 F. Supp. 610, 614 (S.D.N.Y. 1986) (quoting *Bank Saderat Iran v. Amin Beydoun, Inc*., 555 F. Supp. 770, 773 (S.D.N.Y.1983)).

This principle has been applied to each of Citibank's four causes of action: unjust enrichment (*Bd. of Managers of Trump Tower at City Ctr. Condo. v. Palazzolo*, 346 F. Supp. 3d 432, 466 (S.D.N.Y. 2018)); conversion (*ADP Invest. Commn's Servs. v. In House Atty Servs., Inc*., 390 F. Supp. 2d 212, 223 (E.D.N.Y. 2005)); money had and received (*Schreibman v. Chase Manhattan Bank*, 15 A.D.2d 769 (1st Dep't 1962)); and payment by mistake (*T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*, 2010 WL 4038826, at *7 (E.D.N.Y. Oct. 14, 2010)). Accordingly, although there are minor variations in the elements of these claims, "each cause[] of action turn[s] on a single inquiry": whether Citibank's payment was mistaken, "such that equity and good conscience demand restoration of the disputed property." *Id.* at *4.[3]

---

[3]     A claim for unjust enrichment requires that "the defendants were enriched, at the plaintiff's expense, and that it is against equity and good conscience to permit the defendants to retain what is sought to be recovered." *Wells Fargo Bank, N.A. v. Burke*, 155 A.D.3d 668, 671 (2d Dep't 2017) (quoting *Cty. of Nassau v. Expedia, Inc*., 120 A.D.3d 1178, 1180 (2d Dep't 2014)). The elements of conversion are "(1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Colavito v. N.Y. Organ Donor Network*, 8 N.Y.3d 43, 50 (2006) (citation omitted). For money had and received, a plaintiff must prove that "(1) defendant received money belonging to plaintiff; (2) defendant benefitted from the receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money." *Middle E. Banking Co. v. State St. Bank Int'l*, 821 F.2d 897, 906 (2d Cir. 1987) (quoting *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 125 (2d Cir. 1984)). For payment by mistake, a plaintiff must

The only claim with an additional element is the tort of conversion, which requires an "exercise of dominion and control over plaintiff's property." *Gen. Elec. Co. v. Am. Export Isbrandtsen Lines, Inc.*, 37 A.D.2d 959, 960 (2d Dep't 1971). Importantly, "it is *not* necessary that one take *actual physical possession* of property to be guilty of conversion." *Id.* (emphases added). And here, there is no dispute that each defendant had absolute authority to determine whether the lenders would keep the funds or send them back. *See* pp. 4-7 *supra*. Thus, to answer one of this Court's questions, "the fund managers" are "proper defendants" in this case. Dkt. 28 at 2.

"[S]ince the essence of a mistaken payment . . . action is that while the plaintiff has made a mistake, the defendant will not be allowed to profit unjustly as a result, it is of no legal significance" whether "it was [the plaintiff's] transmission error which set the chain of events in motion." *Mfrs'. Hanover Tr.*, 160 A.D.2d at 117. This is true "even if the mistake is due to the *negligence* of the payor[.]" *Id.* (emphasis added); *see also Island Fed. Credit Union v. Smith*, 60 A.D.3d 730, 732 (2d Dep't 2009); *RCN Telecom Servs., Inc. v. 202 Ctr. St. Realty LLC.*, 156 F. App'x 349, 350 (2d Cir. 2005) ("In New York, money paid by mistake is recoverable, even if the mistake is due to the payor's own negligence."). Courts have recognized numerous kinds of mistakes by a plaintiff that give rise to a duty to return the funds, including paying twice on a single payment order (*Bank Sadaret Iran v. Amin Beydoun, Inc.*, 555 F. Supp. 770, 773 (S.D.N.Y. 1983)); issuing payments after stop-payment orders (*In re T.R. Acquisition Corp.*, 309 B.R. 830, 838-89 (Bankr. S.D.N.Y. 2003)); wiring ten times the intended amount due to a typing error (*In re Calumet Farm, Inc.*, 398 F.3d 555, 561 (6th Cir. 2005)); and transferring funds to the wrong bank (*A.I. Trade Fin., Inc. v. Bank*, 1997 WL 291841, at *5 (S.D.N.Y. June 2, 1997)).

---

show that (1) it made a payment under a mistake of fact; (2) the defendant derived a benefit; and (3) equity demands restitution by defendant to plaintiff. *T.D. Bank,* 2010 WL 4038826, at *5.

Nor is it legally significant whether the individual who *made the payment* intended to transfer money. The question is whether the individual who *owned the funds* intended to pay the specific amount actually transmitted. In the lead case in this area, *Banque Worms v. BankAmerica International*, 77 N.Y.2d 362 (1991), a New York bank wired $2 million into the account of a French bank, Banque Worms, executing its depositor's order to pay down a revolving line of credit. Before the payment was sent, the depositor changed its mind and instructed the New York bank to cancel the payment order, but the New York bank did not process this instruction in time. *Id.* at 364. Although the Court of Appeals held that Banque Worms was entitled to keep the funds based on the "discharge for value" rule (*see* Part II *infra*), it took as a given that the money was transferred based on a "mistake of fact"—that of the depositor. 77 N.Y.2d at 366. Indeed, it would be "a caricature of the personal knowledge requirement . . . to focus the inquiry on the state of mind of the individual who physically cuts the check." *T.R. Acquisition Corp.*, 309 B.R. 830, 839 (Bankr. Aug. 8, 2003). What matters is the "intent of the corporate entity" (*id.* at 340)—here, Citibank.

### B.      Citibank's August 11, 2020 Transfer Was Mistaken.

Several categories of undisputed evidence demonstrate—individually and cumulatively— that Citibank's transfer of funds on August 11, 2020 was mistaken under New York law.

First, Citibank has submitted affidavits from the people responsible for the mistake, explaining the loan-processing errors that resulted in the overpayment—in particular, the failure to input the correct system options in Flexcube, and the subsequent failure of anyone at Citibank to notice that error. Defendants have offered no contrary evidence. *See* pp. 9-15 *supra*.

Second, Citibank's internal communications in the hours leading up to the August 11 Transfers—as well as its communications with Revlon's outside counsel—show that Revlon and Citibank intended to transmit only interest to Revlon's lenders. *See* pp. 7-14 *supra*.

Third, under the Credit Agreement, Revlon was permitted to "prepay" its principal obligations only if it issued an irrevocable written noticed three days in advance of such payment, and Revlon never issued such a notice. *See* pp. 4 *supra*.

Fourth, the balance of the Revlon loan was not set to mature for another three years, and Revlon—whose liquidity was less than $400 million—lacked the financial wherewithal to make a $900 million principal payment. *See* pp. 30 *supra*.

Fifth, every Calculation Statement Citibank sent to the defendants stated that Citibank would be making an *interest* payment on August 11, 2020, and specified an amount far lower than the payments actually transmitted. *See* pp. 7-9, 15-17 *supra*.

Finally, as soon as Citibank realized the error, it sent the defendants Recall Notices demanding repayment and informing them that the payments were mistaken; it later told the defendants that the overpayment consisted of Citibank, not Revlon, funds. *See* pp. 15-17 *supra*.

In the face of all this evidence, defendants have been unable to offer a single coherent explanation for why Citibank would choose to intentionally pay off the entire outstanding principal of Revlon's debt using its own funds—much less why it would then demand a return of the funds the following day. Instead, they have suggested that the payments must have been deliberate because they matched the amount of principal and interest outstanding under the Credit Agreement. 8/19/2020 Hr'g Tr. at 13-14. That makes no sense. Citibank's witnesses have clarified why the selection error in Flexcube resulted in a payment that matched the principal, and defendants have offered no evidence or explanation to rebut that testimony. *See* pp. 10-14 *supra*. As discussed, the error occurred because the "maker" of the transaction failed to input the appropriate information that would prevent an amount equal to the principal from being released to all lenders—Flexcube's default setting for this type of transaction. Therefore, the type of

38

loan-processing error at issue could *not* have resulted in a payment amount *other* than one that matched the full balance of the Revlon loan. *Id.*

Citibank's transfer was an unfortunate human error. "[E]quity and good conscience demand" that the funds be returned. *T.D. Bank*, 2010 WL 4038826, at *7.

## II.    THE DISCHARGE-FOR-VALUE DEFENSE DOES NOT APPLY.

The defendants' principal argument is that they may keep the mistakenly transferred funds under New York's "discharge for value" doctrine. They are wrong.

As the Court has recognized, the discharge-for-value rule is an affirmative defense on which the defendants bear the burden of proof. *See In re Awal Bank*, 455 B.R. 73, 93 (Bankr. S.D.N.Y. 2011). The New York Court of Appeals has described the doctrine as follows:

> A creditor of another or one having a lien on another's property who has received from a third person any benefit in discharge of the debt or lien is under no duty to make restitution there for, although the discharge was given by mistake of the transferor as to his interests or duties, if the transferee made no misrepresentation and did not have notice of the transferor's mistake.

*Banque Worms*, 77 N.Y.2d at 367 (quoting RESTATEMENT (FIRST) OF RESTITUTION § 14(1)). Put another way, "[i]f defendants received the proceeds *in good faith* and without *any notice* of any wrong *and credited them* on an indebtedness *due them*, plaintiff is not entitled to recover them back." *Carlisle v. Norris*, 215 N.Y. 400, 415 (1915) (emphases added) (quoted in *Banque Worms*).

*Banque Worms* was one of the first appellate cases to apply the doctrine to a mistaken wire transfer. As discussed above (at 37), the debtor in that case initially intended to make the payment at issue to Banque Worms, but the originating bank failed to follow the debtor's instruction to cancel the payment order. The Court of Appeals held that the funds had been discharged for value, and therefore did not need to be returned, because Banque Worms "receive[d] money to which it [was] entitled and ha[d] no knowledge that the money was erroneously wired" before it "credited"

the funds to its account. *Id.* at 373, 364.

Thus, the discharge-for-value defense has three elements. First, the transferee must be *entitled* to the funds at the time of the transfer. Second, the transferee cannot have *notice* of the mistake. Third, the transferee must *discharge* the funds *for value*. The defendants have not satisfied their burden on any of these elements. The record shows that the defendants had no entitlement to the funds at the time of the mistaken overpayment, that they had both constructive and actual notice of the mistake, and that they never discharged the debt.

### A.   Defendants Were Not Entitled To The Transferred Funds.

To invoke the discharge for value rule at all, a party must be "entitled" to the funds at the time of the erroneous transfer. *Banque Worms*, 77 N.Y.2d at 373; *see also A.I. Trade*, 1997 WL 291841, at *4 ("The discharge for value rule contemplates that at the time of the erroneous transfer the transferee/beneficiary have some present entitlement to the funds."). This does not simply mean that a debt exists (which will be true anytime the discharge-for-value rule is invoked); it means that the defendant must have a legitimate claim to *immediately* receive the funds.

Defendants had no such claim. Under the Credit Agreement, the loan was not set to mature for another three years. And the Agreement *prohibited* a prepayment of the principal absent three-days' notice from Revlon. *See* pp. 4 *supra*. Indeed, several of the custodians and trustees acknowledged that the mistakenly transferred funds were not "due" to the defendants at the time of the transfer. *See, e.g.*, PX 113 at 861 ("[W]e were due USD 65,047.50 *in interest*. Then they paid us USD 7,510,866.73. (emphasis added)); PX 1309 at 461 ("We received *interest which we were due* and the principal by mistake." (emphasis added)).

That makes this case different from those where courts have deemed the discharge-for-value defense applicable. Most of those cases—including *Banque Worms*—involve

40

revolving credit lines in which payment on the loan is, for all intents and purposes, *always* payable. *See, e.g.*, 77 N.Y.2d at 364. In that circumstance, it is perfectly reasonable for the debtor to make a substantial (or even full) payment at any time, and the lender should be free to immediately put those funds back into circulation through other facilities. But where, as here, the transferee has no present entitlement to the funds, it *cannot* discharge the debt for value. In fact, that is a key difference between a revolving credit line and a syndicated term loan (the Revlon loan). Unlike a revolving loan, where the borrower can pay down its balance at any time, a syndicated term loan is a loan financed by a group of lenders, which can only be repaid off according to a specified payment schedule, governed by a single agreement (here, the Credit Agreement).

This Court was also correct to wonder whether defendants "act[ed] as 'good faith' recipients of the funds given that they filed a lawsuit seeking to accelerate payment of the same debt[.]" Dkt. 28; *see* pp. 30 *supra*. The fact that defendants sought to *accelerate* the debt on August 12—even assuming they did so without knowing about the payment—is a clear acknowledgment that they were not *presently* entitled on August 11, or even on August 12, to a full paydown of the debt. And certainly, defendants would not be entitled to Citibank's *own* funds to discharge Revlon's debt. As a matter of law, these facts are all fatal to their defense.

### B.      Defendants Had Notice Of Citibank's Mistake.

The defendants had notice of Citibank's mistake from the moment they received the payment. Under New York law, constructive notice of a mistake is sufficient to defeat a discharge-for-value defense. But in any event, defendants had both constructive and actual notice.

### 1.      Constructive Notice Bars A Discharge-For-Value Defense.

This Court asked the parties to address "[w]hat kind of notice of mistake is required under New York law when applying the discharge for value rule—constructive or actual?" Dkt. 28 at 2.

41

Only constructive notice is required.

As discussed below, this specific question was not before the Court of Appeals in *Banque Worms*. But *Banque Worms* expressly adopted the articulation of the discharge-for-value rule in Section 14 of the Restatement of Restitution. *See* 77 N.Y.2d at 367. The commentary to that section explains that rule applies only "[i]f the transferee . . . does not know *or suspect*" the error. RESTATEMENT (FIRST) OF RESTITUTION § 14 cmt. b (1937) (emphasis added). The most recent version of the Restatement likewise explains that a "[a] person has notice of a fact if the person either knows the fact *or has reason to know it*," meaning that the "facts known to the person would make it reasonable to infer the existence of the fact, *or prudent to conduct further inquiry* that would reveal it." RESTATEMENT (THIRD) OF RESTITUTION § 69(2)-(3) (2011) (emphases added).

As the commentary further explains:

> *A broad definition of notice for [restitution] and similar purposes is widely accepted.* "Notice" is a legal category that combines actual knowledge with imputed knowledge. While imputed knowledge is described in practice under such various headings as "statutory notice," "record notice," "constructive notice," and "inquiry notice," or by reference to a person's "duty of inquiry," the different labels attach to what is essentially a common idea. In particular circumstances, and for a variety of reasons, *the law will treat a person as knowing a fact without requiring that such knowledge be proven directly.*

*Id.* cmt. a (emphases added).

New York's Appellate Division applied this principle to the discharge-for-value doctrine in *Golden Door V & I, Inc. v. TD Bank*, 123 A.D.3d 976 (2d Dep't 2014). The plaintiff (Golden Door) sought to recover funds that had been fraudulently transmitted by hackers to its account at the defendant (TD Bank), which returned the funds to the transferors. *Id.* at 976. Golden Door argued that TD Bank should not have returned the funds, because it was entitled to keep them under the discharge-for-value rule. *Id.* at 978. The Second Department disagreed, holding that TD

Bank "established that Golden Door had notice that the transfer … was given by 'mistake[.]'" *Id.* The court did not point to any evidence that Golden Door actually *knew* that the transfer had resulted from a hack. Instead, the court explained that "the transfer order indicated that the transferor . . . was not Golden Door's customer, was not indebted to Golden Door, and had no apparent relationship with it or its customer." *Id.* (citing *Banque Worms*, 77 N.Y.2d at 376). While the particular facts giving notice are different in this case, the same legal principal—actual knowledge is not required—applies.

The Sixth Circuit has expressly held that *Banque Worms* does not require actual notice. In *In re Calumet Farm, Inc.*, 398 F.3d 555 (6th Cir. 2005), a debtor (Calumet) "initiated the wire transfer of $77,301.58 . . . to its bank, First National Bank & Trust Company[,] . . . as a payment of interest on its outstanding debt of over $1 million to White Birch." *Id.* at 556. Calumet later "learned that $770,301.58, rather than $77,301.58, had mistakenly been transferred transferred[,]" but "White Birch refused to return the additional $693,000." *Id.* White Birch argued discharge for value, in part because it lacked actual notice of the mistake. *Id.* at 558.

The Sixth Circuit rejected this argument, holding that "[a]ny sensible application of the discharge-for-value rule . . . must account for constructive as well as actual notice of a mistake." 398 F.3d at 560. The court explained that "constructive notice of a mistake may [ ] occur *simply as a result of the size of the transfer* when considered in connection with the name of the originator." *Id.* (emphasis added). And as detailed further in Part II.C, the court held that the relevant "point in time by which notice of the mistake must be received" is not when the transferee receives the money, but rather when it "credits the debtor's account." *Id.* at 559-60. Because there was evidence that should have led White Birch to "at least *suspect* that it had erroneously received the additional funds," it "had prior notice of the mistake . . . for purposes of the discharge-for-

value rule[.]" *Id.* at 561-62 (emphasis added). *See also Qatar Nat'l Bank v. Winmar*, 650 F. Supp. 2d 1, 10 (D.D.C. 2009) ("[T]he discharge-for-value rule applies only if [the transferee] did not have actual or constructive notice before [the transferee] credited [the debtor's] account.").

This reading comports with the purpose of the rule. As *Banque Worms* explains, "the 'discharge for value' rule is simply a 'specific application of the underlying principle of bona fide purchase' set forth in section 13 of the Restatement[.]" 77 N.Y.2d at 367 (quoting RESTATEMENT (FIRST) OF RESTITUTION § 14 cmt. a). This is "[t]he principle that a person who *innocently* has acquired title to something for which he is paid value is under no duty to restore it to one who would [otherwise] be entitled to reclaim it." RESTATEMENT (FIRST) OF RESTITUTION § 13 cmt. a (emphasis added). The bona-fide-purchaser rule is a way of "determining which of two *innocent* persons should bear a loss which must be borne by someone." *Id.* (emphasis added).

For over a century and a half, New York courts have held that a purchaser with constructive knowledge of a potentially conflicting claim to a transferred interest is not a bona fide purchaser and cannot claim to have "innocently" acquired title: "where a purchaser has knowledge of any fact, sufficient to put him on *inquiry* as to the existence of some right or title in conflict with what he is about to purchase, he is presumed either to have made the inquiry, and ascertained the extent of such prior right, or to have been guilty of a degree of negligence equally fatal to his claim, to be considered as a *bona fide* purchaser." *Williamson v. Brown*, 15 N.Y. 354, 362 (1857) (emphasis added); *see also Anderson v. Blood*, 152 N.Y. 285, 293 (1897) (same); *Booth v. Ameriquest Mortgage Co.*, 63 A.D.3d 769, 769 (2d Dep't 2009) ("[I]f a purchaser or encumbrancer knows facts that would excite the suspicion of an ordinarily prudent person and fails to investigate, the purchaser or encumbrancer will be chargeable with that knowledge which a reasonable inquiry, as suggested by the facts, would have revealed[.]" (quotation marks and citation omitted)); *U.S. Bank*

*Nat'l Assoc. v. Jordan*, 176 A.D.3d 1523, 1525 (3d Dep't 2019) ("[A] person will not acquire bona fide purchaser status if, at the time of the purchase, he or she had actual or inquiry notice of the existence of some right, or some title, in conflict with that he or she is about to acquire." (quotation marks and alteration omitted)). The same is logically true of the discharge-for-value rule: "It is clear that when a beneficiary receives actual or constructive notice that funds were mistakenly transferred before he credits a debtor's account, he has not received the payment in good faith in discharge of the debt." *Qatar*, 650 F. Supp. 2d at 10 n.10 (quotation marks omitted).

This Court asked the parties to address whether the Court of Appeals' "holding in *Regatos v. N. Fork Bank*, 5 N.Y.3d 395, 404-05 (2005), that a bank customer's duty to notify the bank of any unauthorized transfer of funds under U.C.C. § 4-A-204 is triggered by 'actual,' not 'constructive' notice, applies to the 'discharge for value' rule[.]" Dkt. 28 at 2. In *Regatos*, the court held that the UCC's "one-year statute of repose . . . begin[s] to run" only "when the customer" "receives actual notice of the improper transfer" of funds from its account by the defendant bank. 5 N.Y.3d at 395-96. This provision is readily distinguishable for two reasons. First, the text of the statute of repose firmly supports an actual notice requirement: it provides that "the customer is precluded from asserting that the bank is not entitled to retain the payment unless the customer notifies the bank of the customer's objection to the payment within one year after the *notification [of the payment] was received by the customer*." UCC 4-A-505 (emphasis added). Second, the Court of Appeals grounded its holding in "the customer's right to *recover unauthorized payments*," finding that "the actual notice requirement provides the bedrock for the exercise of that right." *Id.* at 405 (emphasis added). The statute expresses a clear preference for the "recover[y] [of] unauthorized payments," not the retention of windfalls. *Id.*

In short, both the cases construing the discharge-for-value defense and the purposes of the

defense compel the conclusion that it is barred by either constructive or actual notice.

### 2.     Defendants Had Constructive Notice Of The Mistake.

The defendants had constructive notice of Citibank's mistake from the moment they received the payment—and certainly by the time they became aware of it. At minimum, "the facts known to the [defendants] would make it . . . prudent to conduct *further inquiry* that would reveal" the mistake. RESTATEMENT (THIRD) OF RESTITUTION § 69(3)(c) (emphasis added); *see also Williamson*, 15 N.Y. at 362. Every single fact surrounding the payment was consistent with the payment of interest only and inconsistent with the payment of principal.

First, before any of the defendants discovered the mistaken payments, each of the defendants or the defendants' funds received Calculation Statements clarifying that the lenders would receive only *interest payments* ("Libor Rate Interest Payment[s]" and "Interim Interest"). *See* pp. 15-16 *supra*. The statements made no mention of principal being paid, and specified amounts that were dramatically lower than the outstanding principal balance. These facts make this case analogous to *Golden Door*, where the Second Department found notice because "the transfer order" accompanying the mistaken payment should have led the beneficiary to suspect that it was fraudulent. 123 A.D.3d at 978. The evidence here is even clearer.

Second, a prepayment of the principal was prohibited by the Credit Agreement absent three-days notice from Revlon. *See* pp 18 *supra*. Revlon did not issue any such notice. *See* Revlon, Warren Dep. at 172:19-173:6. And as Citibank's expert, Mark Sunshine, explained: "Because lenders rely on [ ] prepayment notices, the lack of a prepayment notice is something that a reasonable lender would have considered." Sunshine Decl. ¶ 33. For that reason, nearly every defendant or defendant's custodian asked about a prepayment notice after receipt of the funds. *See e.g.*, Allstate, PX 13 at 56-58; Bardin Hill, PX 47 at 510; Brigade, PX 140 at 2229; HPS, PX 1207

at 5386; Symphony, PX 1328 at 237. And some defendants testified that checking for prepayment notices is a standard procedure after a paydown is received. *See* pp 18 *supra*.

Third, defendants understood that a full principal payment from Revlon on August 11, 2020 was *impossible*. Defendants knew that Revlon lacked the financial wherewithal to make the payment, having filed a 117-page complaint *the next day* through UMB Bank based on that precise allegation. *See* pp. 30 *supra*. Defendants were well aware that Revlon was trading at "substantially less than par"—"between 20 and 30 cents on the dollar" (Brigade, Frusciante Dep. at 196:4-14); that Revlon's liquidity was far less than the amount that was paid down on August 11 (PX 120 at 913); and that, according to defendants, Revlon was insolvent as of May 2020 and continued to be insolvent on (and past) August 11. PX 171 at ¶ 166; *see* pp. 31 *supra*. Simply put, because the defendants had no basis to believe that they *could* receive a full paydown on the Revlon, they should at least have *suspected* a mistake when they received payments totaling the amount of principal outstanding.

Finally, the size of the transfer alone would lead any reasonable individual to have that suspicion. As *Calumet* explains, "constructive notice of a mistake may [ ] occur simply as a result of the size of the transfer"—there, a payment ten times the intended amount. 398 F.3d at 560. And in *Qatar*, the court found constructive notice based on the fact that, "[l]ess than two months after [the transferee] received a payment of $474,677, it received a second payment of the exact same amount" that "substantially exceeded . . . [the amount] it was owed." 650 F. Supp. 2d at 10. This principle applies with greater force here, where defendants received "a full paydown at 100" of an amount nearly *100 times* the amount of accrued interest, from a debtor whose loan was "pricing around 24." PX 1333 at 444. At the very least, these extraordinary circumstances placed the defendants on inquiry notice that the overpayment was made by mistake.

### 3.     Defendants Had Actual Notice Of The Mistake.

The facts above were more than enough to require an inquiry into the nature of Citibank's payments. But no wide-ranging investigation was necessary here, because the defendants *actually* knew that the payments were mistaken. For one thing, Citibank *told* each of the defendants that they were a mistake, and there is no credible evidence that the defendants did not believe Citibank. *See* pp. 15-17 *supra*. But in any event, although the timing varied somewhat from defendant to defendant (*see* pp. 18-30 *supra*), every one of them either expressly or implicitly acknowledged that the payments were made by mistake:

- **Allstate's** portfolio manager, minutes after learning of the payment, said that it was "strange" and asked, "could this be a mistake?" PX 13 at 57. He recognized that "[t]here are no agent notices pertaining to principal paydowns"—only notices of "paying interest." *Id.* at 56. For that reason, Allstate initially planned to return the funds to Citibank. PX 21 at 167.

- **Bardin Hill's** Vice President said, upon learning of the August 11 payment, that "there was an erroneous principal payment for Revlon." PX 47 at 510. This was so obvious, in Bardin Hill's estimation, that an investigation into the error "would have been effectively pointless." Bardin Hill, Greene Dep. at 109:3-5

- **Brigade's** debt manager "understood" by the afternoon of August 12 that Citibank's Recall Notices indicated that the funds were sent "incorrectly." Brigade, Frusciante Dep. at 139:16-140:15. He then read the Calculation Statement, which said "nothing about the paydown of principal" and "everything about interim interest." *Id.* at 202:6-10. Brigade's custodian confirmed to Brigade that the "funds were released accidentally and are not the borrower's." PX 145 at 2247. On August 14, several Brigade employees took part in a chat with other investors, and one participant said: "[H]ow did Citi fkup so badly?" PX 122 at 1393.

- **Greywolf's** senior operations analyst recognized one hour after learning about the payment that Citibank "made an overpayment." PX 1126 at 780. One of Greywolf's analysts made a chart comparing the "Interest amount" with the "Actual overpayment amount." *Id*.

- **HPS's** employees said that Citibank "erroneously released paydown payment" (PX 1154 at 1128 they "fe[lt] really bad for the person that fat fingered a $900mm erroneous payment" (1165 at 1324), and they ridiculed Citibank for "accidentally sen[ding] $900 million out to people who weren't supposed to have it" (*Id.*)—a mistake they found "[u]nbelievable" (PX 1201 at 5042). HPS initially planned to

"send[] the erroneous paydowns back" (PX 1197 at 5020), but then decided to "take the money and run" (PX 1188 at 2031).

- **Medalist's** senior operations analyst believed that the transfer was made in error and authorized the return of the money for at least two of the Medalist CLOs. Medalist, Phipps Dep. at 124:7-15. But Medalist's CEO decided that although this response was an attempt to "do the right thing," Medalist would not return the funds to give Citibank "a taste of their own medicine." PX 1236 at 40.

- **New Gen's** executive said that the company had "received . . . the principal by mistake" (PX 1309 at 461), and another described it as a "big mistake" (PX 1311 at 901). New Gen initially planned to return the funds "and have [Citibank] send only the funds we are due," but decided against it based on counsel's advice. PX 1300.

- **Symphony's** fund administrators noted that, given Revlon's financial situation, "a full paydown . . . would be fairly unusual" (PX 1333 at 444), and its senior loan operations associate understood that Citibank said it "had made a mistake" (Symphony, Vaughan Dep. at 134:22-135:3).

- **Tall Tree's** managing member described Citibank's Recall Notice as a "notice of mistake" (Tall Tree, Lenga Dep. at 139:10-18), and it instructed its custodians to "treat Revlon as though nothing had happened" (PX 1463).

- **ZAIS's** executive initially instructed its custodians to "return a portion of the Revlon wire, as per the [recall] notice," because "that is principal paid in error." PX 1539 at 218. ZAIS initially instructed two of its trustees to return the funds— counsel felt differently. PX 1541 at 235.[4]

Not a single defendant has seriously contended that the August 11 Transfers may have been deliberate; they admitted just the opposite. Because the defendants had both actual and constructive notice of Citibank's mistake, they cannot rely on the discharge-for-value defense.

---

[4]     Several trustees and custodians for defendants' funds similarly acknowledged that the payment amounts were mistaken. *See* PX 1090 at 346 (email from Virtus on August 12 at 2:24 p.m., forwarding Citibank's Recall Notice and stating, "FYI if you guys also own Revlon, they only meant to pay interest"); PX 1507 at 1380 (email from U.S. Bank to Bardin Hill on August 12 referring to the transfer as an "erroneous principal payment for Revlon"); PX 1508 at 1494 (email from U.S. Bank to HPS on August 12: "[w]ires don't get applied until sufficient information is received from agents to book and take in"); PX 1503 (U.S. Bank internal chat messages stating "[C]iti sent funds by mistake" and acknowledging that "[i]f Revlon didn't send in the money, then it's Citi's money"); PX 97 at 2186 (e-mail from BNYM stating "Citi made a huge mistake – we should start reaching out to the clients on this list for approval to return the funds").

### C.      The Debt Has Not Been Discharged.

Even if the above facts were insufficient to place the defendants on notice of Citibank's mistake, defendants must nonetheless return the funds because they never discharged Revlon's debt. At no point in time did defendants apply the funds to credit Revlon's account. The entirety of Revlon's principal balance remained outstanding immediately after the payments, and is outstanding today.

The defendants' position in this case is that the mere *receipt* of Citibank's funds is sufficient to constitute a "discharge" under New York law. *See, e.g.*, PX 148 at 2261; Symphony, Caraher Dep. at 37:6-9; Def. RFA 7. That would mean that there is an immediate "discharge" every time a mistaken payment is made—before the recipient has any chance to suspect, much less know of, an error. Such a rule does not make sense, and it flatly contradicts the language of *Banque Worms* and the Restatement, both of which distinguish the act of receipt from the act of discharge: only "[a] creditor of another . . . who has *received* any benefit *in discharge of the debt*" may rely on the discharge-for-value defense. *Banque Worms*, 77 N.Y.2d at 367 (emphases added) (quoting RESTATEMENT (FIRST) OF RESTITUTION § 14(1)).

As the Sixth Circuit has explained, neither *Banque Worms* nor the Restatement addresses the "relevant event" establishing a discharge—that is, "the point in time by which notice of the mistake must be received" to bar the discharge- for-value defense. *Calumet*, 398 F.3d at 559; *see id.* ("[T]he question in [*Banque Worms*] was *whether* the discharge-for-value defense applies [to wire transfers], not *how* it applies."). But at minimum, the case law establishes that a defendant discharges a debt only if it takes some action (1) to "credit[]" the funds (to *discharge* them) (*Carlisle*, 215 N.Y. at 415); and (2) to "give[] value" for those funds (to discharge them *for value*) (RESTATEMENT (FIRST) OF RESTITUTION § 14 cmt. b). The discharge-for-value defense does not

apply if "the beneficiary receives notice of a mistake before the beneficiary of the transfer *credits the debtor's account*" and "*give[s] value* for the mistaken payment." *Calumet*, 398 F.3d at 560 (emphases added). *See also Qatar*, 650 F. Supp. 2d at 10 (rule did not apply absent "evidence that [beneficiary] credited [debtor's] account"); *NBase Commcn's v. Am. Nat'l Bank*, 8 F. Supp. 2d 1071, 1075 (N.D. Ill. 1998) ("The underlying principle is that 'a person who innocently has acquired the title to something *for which he has paid value* is under no duty to restore it to one who would be entitled to' it." (quoting RESTATEMENT OF RESTITUTION § 13 cmt. a)).

Depending on the identity of the beneficiary, the structure of the debt, and other relevant circumstances, a discharge may take a variety of forms. In *Calumet*, for example, the Sixth Circuit held that the discharge-for-value defense did not apply because the beneficiary "had notice before *crediting [the debtor's] account*," finding that the district court had "erred in focusing on when [the beneficiary] *received the funds*." 398 F.3d at 561 (first emphasis added). Other examples include triggering a right to a "set-off" of the funds under the governing credit agreement (*In re Awal BSC*, 455 B.R. 73, 93 (Bankr. S.D.N.Y. 2011)); "us[ing] a portion of the [transferred] funds to offset th[e] [underlying] debt" (*Bayerische Hypo-Und Vereinsbank, AG v. HSBC Bank*, 941 N.Y.S.2d 536, *2 (N.Y. Sup. Ct. 2011)); or using the funds to pay debts owed to others (*Colli v. Wirth*, 1996 WL 243237, at *9 (S.D.N.Y. May 10, 1996)).

The Court need not parse any such nuances here, however, because this is the easy case: The defendants did *nothing* to discharge Revlon's debt. To the contrary, after learning of the August 11 Transfers, the defendants instructed their trustees to leave the funds alone while they pretended to "investigate" the transfer. *See* pp. 18-30 *supra*. The few custodians who reflected the wired funds on their internal cash statements without defendants' knowledge (let alone their authorization) were directed to reverse that decision and leave the funds as they were when they

were received. *See* pp. 32 *supra*. Every single lender put the money in a suspense or segregated account, and each available monthly report reflects the Revlon loan as outstanding. *See* pp. 32 *supra*. Revlon, for its part, filed a Form 8-K Report on August 14, 2020, stating that "[a]s of August 12, 2020, the outstanding principal amount under the Credit Agreement was $888.6 million." PX 935 at 31161.

In short, the defendants did everything they could to *avoid* discharging the debt. And there is an obvious reason why: They knew that the overpayments were made in error, and they did not want to undermine the *UMB Bank* action, which was expressly premised on the fact that Revlon had not repaid the loan. *See* pp. 31 *supra*. In other words, the defendants tried to have it both ways: They took the position in this action that the loan was discharged, while taking the position in *UMB Bank* that Revlon had improperly *avoided* paying its creditors. That is not a good-faith approach. And good faith is the core of the discharge-for-value doctrine.

## CONCLUSION

The Court should enter judgment in Citibank's favor.

Dated: New York, New York          By: /s/ Matthew D. Ingber
       November 13, 2020

                                       Matthew D. Ingber
                                       Christopher J. Houpt
                                       Michael E. Rayfield
                                       Richard A. Spehr
                                       Allison J. Zolot
                                       Alina Artunian

                                     MAYER BROWN, LLP
                                     1221 Avenue of the Americas
                                     New York, New York 10020
                                     (212) 506-2500

                                     John F. Baughman
                                     Nathaniel E. Marmon
                                     Andrew H. Reynard

                                     THE LAW OFFICES OF JOHN F.
                                     BAUGHMAN, PLLC
                                     299 Broadway, Suite 207
                                     New York, NY, 10007
                                     (347) 241-6347

                                     *Attorneys for Plaintiff.*

53