**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Citibank August 11, 2020 Wire Transfers | No. 20 Civ. 06539 (JMF) |

## CITIBANK'S REPLY IN SUPPORT OF ITS
## PROPOSED FINDINGS OF FACT AND
## CONCLUSIONS OF LAW

MAYER BROWN LLP

Matthew D. Ingber
Christopher J. Houpt
Richard A. Spehr
Michael Rayfield
Allison J. Zolot
Alina Artunian
Luc W. M Mitchell

1221 Avenue of the Americas
New York, New York 10020
(212) 506-2500

THE LAW OFFICES OF JOHN F. BAUGHMAN, PLLC

John F. Baughman
Andrew H. Reynard

299 Broadway, Suite 203
New York, NY 10007
(347) 241-6347

*Attorneys for Citibank, N.A.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ........................................................................................................................3

I.       THERE IS NO GENUINE DISPUTE THAT CITIBANK SENT THE
AUGUST 11 TRANSFERS BY MISTAKE. ..........................................................3

II.      THE DISCHARGE-FOR-VALUE DEFENSE DOES NOT APPLY. ...................4

      A.      Defendants Were Not Entitled To The Transferred Funds. ........................5

      B.      Defendants Had Notice Of Citibank's Mistake. .........................................7

            1.      Constructive Notice Bars A Discharge-For-Value Defense. ...........7

            2.      Defendants Had Constructive Notice Of The Mistake. ................10

            3.      Defendants Had Actual Notice Of The Mistake. ..........................14

      C.      Defendants Never Discharged The Debt. .................................................20

            1.      Receiving A Payment Is Not A Discharge. ...................................20

            2.      Defendants Actively Avoided Discharging the Debt ....................23

III.     THE DEFENDANTS ARE PROPER PARTIES. .................................................26

CONCLUSION ..................................................................................................................30

# TABLE OF AUTHORITIES

**Cases**

*In re Awal Bank*,
  455 B.R. 73 (Bankr S.D.N.Y. 2011) ...................................................................22

*A.I. Trade Fin., Inc. v. Bank*,
  1997 WL 291841 (S.D.N.Y. June 2, 1997) ............................................................6

*Banque Worms v. BankAmerica Int'l*,
  77 N.Y.2d 362 (1991) .................................................................... *passim*

*Bayerische Hypo-Und Vereinsbank, AG v. HSBC Bank*,
  941 N.Y.S.2d 536 (N.Y. Sup. Ct. 2011) ..............................................................22

*In re Calumet Farm, Inc.*,
  398 F.3d 555 (6th Cir. 2005) .............................................................13, 22, 25

*Carlisle v. Norris*,
  215 N.Y. 400 (1915) ....................................................................21, 25

*Colli v. Wirth*,
  1996 WL 243237 (S.D.N.Y. May 10 1996) ..........................................................22

*Devaney v. Chester*,
  1989 WL 52375 (S.D.N.Y. May 10, 1989) ...........................................................19

*First Union National Bank v. A.G. Edwards & Sons, Inc.*,
  262 A.D.2d 106 (1st Dep't 1999) .....................................................................9

*Gen. Elec. Co. v. Am. Export Isbrandtsen Lines, Inc.*,
  37 A.D.2d 959 (2d Dep't 1971) ......................................................................26

*Golden Door V & I, Inc. v. T.D. Bank*,
  123 A.D.3d 976 (2d Dep't 2014) ......................................................................7

*Jackson v. Am. Cigar Box. Co.*,
  141 A.D. 195 (1st Dep't 1910) ......................................................................22

*Kennedy v. Adamo*,
  323 F. App'x 34 (2d Cir. 2009) .....................................................................19

*Kloepfer v. Honda Motor Co.*,
  898 F.2d 1452 (10th Cir. 1990) .....................................................................19

*Nat'l Bank of Commerce in N.Y. v. Nat'l Mechanics' Banking Ass'n of N.Y.*,
  55 N.Y. 211 (1873) ..................................................................................8

*Regatos v. N. Fork Bank*,
   5 N.Y.3d 395 (2005) ......................................................................................9

*Ripley v. Int'l Railways of Central Am.*,
   8 A.D.2d 310 (1st Dep't 1959) ....................................................................26

*Sheerbonnet, Ltd. v. American Express Bank, Ltd.*,
   951 F. Supp. 403 (S.D.N.Y. 1995) ............................................................29

*Stephens v. Board of Education of City of Brooklyn*,
   79 N.Y. 183 (1879) ......................................................................................8

*T.D. Bank, N.A. v. JP Morgan Chase Bank, NA*,
   2010 WL 4038826 (E.D.N.Y. Oct. 14, 2010) ...........................................26

*Vasquez v. HSBC*,
   2019 WL 2327810 (S.D.N.Y. May 30, 2019) ...........................................15

**Statutes**

UCC § 4-A-102 .................................................................................................29

**Other Authorities**

RESTATEMENT (FIRST) OF RESTITUTION § 14 ..................................................25

RESTATEMENT (THIRD) OF RESTITUTION § 69 ...................................................7

## PRELIMINARY STATEMENT

The defendants' brief is a 92-page distraction. At the end of the day, they have no answer to the question at the heart of this case: Why would Citibank intentionally pay $893 million of its own money, on a loan that Revlon had no ability to repay, only to then ask the recipients to return the funds less than 24 hours later? There is no way to rationalize that decision. Citibank could not have intended such a payment, and defendants must have known it was mistaken.

In four main respects, defendants' brief underscores Citibank's position. First, the defendants do not genuinely dispute that the August 11 Transfers were a mistake. Their brief does not even *contend* that the payments were intentional. Although they quibble with a few pieces of Citibank's evidence, neither their brief nor any of their witnesses attempts to cast doubt on the nature of the loan-processing error that resulted in the payment. The first of the two core issues this Court identified is all but resolved. There is no need for additional testimony on this subject.

Second, on the issue of actual notice, defendants disregard every internal communication in which they acknowledged that the transfers were (in their words) a "mistake," an "erroneous payment," an "overpayment," an "accidental" payment, and a "fat fingered" payment made to "people who weren't supposed to have it." Some defendants initially instructed their custodians and trustees to return the money and then reversed course, seemingly on direction from counsel. And many did not know about the payments until they received Citibank's Recall Notices, which stated unambiguously that the payments were mistaken. The defendants respond with entirely self-serving affidavits, which assert (using almost identical language) that if the facts were *different*, the witnesses *might* have believed that the payments were intentional. These affidavits only confirm that defendants did not *actually* draw that conclusion, and that the *actual* facts were more than enough to place them on notice. But regardless, these affidavits should not be credited over the clear, *contemporaneous* communications that defendants made in August 2020.

1

Third, when defendants address constructive notice, their consistent theme is that everything in this case should be read in isolation, divorced from context. That is the approach they take to *Banque Worms*, focusing myopically on a single sentence of dicta from that opinion, and asking the Court to disregard both the authorities *Banque Worms* adopted and those rejecting defendants' reading of it. Defendants take the same approach to the record. They claim, for example, that Citibank's Calculation Statements—which say that only interest would be paid, in an amount far lower than what they received—did not put them on notice because *those documents* did not say that the upcoming payments were a mistake. That is absurd. It is the *combination* of red flags—including the Calculation Statements, the size of the actual payment, the absence of a prepayment notice or disclosure by Revlon, and Revlon's inability to pay the principal—that would lead any reasonable lender to conclude that the payments were not intentional.

Finally, the defendants' theory would make the discharge-for-value rule virtually meaningless. Their position is that a "discharge" occurs when the lender receives the mistaken payment, even if the recipient takes no action to credit the debt, and even if it does not *know* that the payment has been transmitted. This rule cannot be squared with New York case law, which expressly distinguishes the act of receipt from the act of discharge. And it certainly cannot be squared with defendants' argument that actual notice is required to defeat the defense.

Defendants also half-heartedly assert that they are not proper parties because they are separate entities from the lenders that received the funds. That is irrelevant. The law requires "dominion" over the funds, not physical possession. It is undisputed that defendants had absolute authority to direct the lenders to repay the funds. The Court should enter judgment for Citibank.

Defendants do not contend that Citibank intentionally sent them the August 11 payments. Nor do they claim that they relied on those payments to their detriment. Their case rises and falls with the discharge-for-value defense. But they flunk each element of the defense: present entitlement to the funds, lack of notice, and an act of discharge for value. The evidence overwhelmingly demonstrates that Citibank is entitled to recover the funds, and that defendants— who have control and dominion over the funds—are the proper parties to effectuate that recovery.

## I. THERE IS NO GENUINE DISPUTE THAT CITIBANK SENT THE AUGUST 11 TRANSFERS BY MISTAKE.

Our brief demonstrated that on August 11, 2020, Citibank intended to pay only $7.8 million in accrued interest to Revlon's lenders. PB 7-9. Instead, as a result of human error, Citibank transferred $893 million of Citibank's own funds. PB 9-14. Defendants offer no basis to doubt this evidence. Their brief never *argues* that the August 11 Transfers were intentional. It makes only a few attempts to muddy the waters.

Defendants first assert (in italics) that "*Citibank intentionally processed the repurchases as if all 2016 Term Lenders were receiving full prepayment.*" DB ¶ 40. That is neither accurate nor relevant. Citibank did not "intentionally" process an actual prepayment to lenders; as defendants acknowledge in the very next sentence of their brief, Citibank "intended that the principal amounts be paid to a so-called 'Wash' account." *Id.* Those who processed the transaction have testified that the wash account "is not a bank account in the typical sense," but rather "an internal Citibank account . . . used for certain Flexcube transactions to account for internal cashless fund entries and

---

[1]    "PB __" refers to Citibank's Proposed Findings of Fact and Conclusions of Law (Dkt. 143). "DB __" refers to Defendants' Proposed Findings of Fact and Conclusions of Law (Dkt. 145). All other citations conform to those used in Citibank's opening brief.

3

. . . help ensure that money *does not leave the bank*." Fratta Decl. ¶ 22 (emphasis added); *see* Zeigon Decl. ¶ 21, Raj Decl. ¶ 10, Ravi Decl. ¶ 10. This process shows *why* the mistake happened, but it in no way suggests that the August 11 Transfers were intentional.

Defendants argue next that it is "well known in the industry" that "Citibank has a multitude of rigorous manual and automated controls in place to make sure payments are not made in error," including a "'six-eye' approval" policy, under which three people sign off on a transaction before it is executed. DB ¶ 41. That is true. PB 11. But it is equally true that, on August 11, those controls failed to detect the error. PB 14. All three people involved in the "six-eye" process testified that they intended to remit only accrued interest to lenders on August 11, but they all shared the misimpression that only a single box in Flexcube needed to be checked and populated to ensure that funds equal to the outstanding principal would be set to the wash account and not sent to lenders. Ravi Decl. ¶¶ 12-13; Raj Decl. ¶ 17; Fratta Decl. ¶¶ 30-35. That testimony is undisputed.

In short, the unrebutted evidence shows that the August 11 Transfers were mistaken.

## II.     THE DISCHARGE-FOR-VALUE DEFENSE DOES NOT APPLY.

Our opening brief demonstrated that defendants have failed to satisfy their burden on all three elements of the discharge-for-value defense. PB 39-52. But before addressing their responses on each element, it is worth responding to their broader position that "[t]his case is, in all material respects, identical to *Banque Worms*." DB ¶ 1. There are multiple critical differences.

In *Banque Worms*, the debtor (Spedley Securities) initially *intended* to make the payment at issue. 77 N.Y.2d at 364. The debtor here (Revlon) never intended to make a principal payment. PB 7. In *Banque Worms*, before the payment was made, the debtor changed its mind and instructed its bank (SPIB) to *cancel* the payment order and instead pay a different Spedley creditor, but the bank did not process the instruction in time. 77 N.Y.2d at 364. Because of that unique

circumstance, nothing was transmitted to the lender (Banque Worms) suggesting that the payment was an error. Here, by contrast, Citibank sent each of the defendants Calculation Statements indicating a payment of interest only, in an amount far less than what defendants actually received. PB 7-9. Banque Worms received nothing similar, and it "ha[d] no knowledge"—or any reason to suspect—"that the money was erroneously wired" before it "credited" the funds to its account. *Id.* at 364, 373. The defendants here had both actual and constructive knowledge of the error (PB 46-49)—they were not "*bona fide* creditors" (DB ¶ 1)—and they took no action to "credit" the funds or otherwise discharge them for value (PB 50-52). *Banque Worms* also involved a revolving credit line, under which the debt is always payable without advance notice. *See* 77 N.Y.2d at 364. This case involves a syndicated term loan with years left before maturity, under which principal payments must be made according to the terms of a Credit Agreement, which in turn requires a three-days' advance written notice before any prepayment, which was never issued (PB 17-18).

In short, the only meaningful similarity between this case and *Banque Worms* is that they both involved mistaken payments. When it comes to the elements of the discharge-for-value defense, the cases do not resemble each other.

## A. Defendants Were Not Entitled To The Transferred Funds.

Defendants had no present entitlement to the transferred funds: The Revlon loan was not set to mature for another three years; the Agreement prohibited a prepayment of principal absent three days' notice from Revlon; several custodians and trustees recognized that the funds were not "due" at the time of the August 11 Transfers; and the defendants confirmed that understanding by seeking to accelerate the debt on August 12. PB 30-31.

Defendants do not address the "entitlement" requirement in detail, presumably because they believe it is satisfied whenever a debt exists. *See, e.g.*, DB ¶ 1 (arguing that, as in *Banque*

*Worms*, "the amounts transferred were owed to the lender"). But by definition, a debt will *always* exist in some fashion whenever the discharge-for-value rule comes into play. That is why courts have held that "[t]he discharge for value rule contemplates that at the time of the erroneous transfer the transferee/beneficiary have some *present entitlement* to the funds" (*A.I. Trade*, 1997 WL 291841, at \*4 (emphasis added))—that is, a legitimate claim to *immediately* receive the funds.

Defendants attempt to distance themselves from this rule through a strained reading of the Credit Agreement. DB ¶¶ 16-18. They note that when Citibank sent the defendants the Calculation Statements, it specified an "Interest Due Period" that began on May 29, 2020 and ended on August 31, 2020. *E.g.*, PX 123; PB 8. Defendants then point out that the Credit Agreement "defines 'Interest Payment Date'" to include "the date of any repayment or prepayment" with respect to "any Loan" other than a revolving loan. DX 1044 at 41; *see* DB ¶ 16. Defendants contend that, in light of this provision, if "interest was due on August 11, 2020 (as Citibank's notices clearly stated), it could only be due as a result of prepayment of the principal." DB ¶ 17.

This argument involves two sleights of hand. The first is that Citibank did not designate August 11, 2020 as the "Interest Payment Date" under the Credit Agreement; the Calculation Statements referred to a three-month "Interest Due Period." The fact that both phrases include the word "Interest" does not mean that the Calculation Statements were referencing a different, *defined* term in the Credit Agreement. Second, the interest payment on August 11, 2020 was not "due" because the "Interest Payment Date" had arrived; the interest payment was made because certain lenders had rolled up their interest in the Revlon loan to a separate Revlon facility. Farrell Decl. ¶¶ 17, 21. If anything, defendants' argument highlights the fact that borrowers have leeway to pay interest when they want, and when they do, those changes do *not* involve prepayments (only

interim interest). Citibank never indicated that the *principal* was "due" on August 11. Defendants' brief does not contend that it was "presently entitled" to principal on that date.

**B.    Defendants Had Notice Of Citibank's Mistake.**

A recipient of mistakenly transferred funds may not keep them if it has notice of the mistake. Thus, even if defendants were correct that the mere receipt of funds constitutes a discharge (which they are not, *see* Part II.C.1 *infra*), they must return Citibank's funds because they had constructive notice of the mistake from the moment the funds arrived in their bank accounts. And they had actual notice of the mistake immediately upon learning of the payments.

**1.    Constructive Notice Bars A Discharge-For-Value Defense.**

We cited a multitude of authorities establishing that either constructive or actual notice is sufficient to bar a discharge-for-value defense. PB 41-45. Defendants rest their contrary argument on a single sentence of dicta in *Banque Worms*: "When a beneficiary receives money to which it is entitled and has no knowledge that the money was erroneously wired, the beneficiary should not have to wonder whether it may retain the funds." 77 N.Y.2d at 373. Even this sentence, however, only raises the question of what kind of "knowledge" is required under the discharge-for-value rule: "actual knowledge" or "imputed knowledge." RESTATEMENT (THIRD) OF RESTITUTION § 69.

*Banque Worms* did not resolve this issue—it was not before the court, because the recipient of the mistaken payment did not have *either* constructive or actual notice. But as defendants recognize, *Banque Worms* expressly adopted "the requirements set out in Section 14 of the Restatement of Restitution." DB ¶ 105; *see* 77 N.Y.2d at 367. Both the contemporaneous and current versions of the Restatement adopt a constructive notice standard. PB 42. New York's Appellate Division has done the same. *Golden Door V & I, Inc. v. T.D. Bank*, 123 A.D.3d 976 (2d Dep't 2014). That makes sense, because "the discharge for value rule is simply

a specific application of the underlying principle of bona fide purchase" (*Banque Worms*, 77 N.Y.2d at 367 (internal quotation marks omitted)), and 150 years of New York cases hold that a purchaser with constructive notice of a mistake is not a bona fide purchaser. PB 44-45.

Defendants address none of these precedents. They instead rely on the principle that the discharge-for-value rule "furthers the policy goal of finality in business transactions." DB ¶ 125 (quoting *Banque Worms*, 77 N.Y.2d at 373). But no case holds that "finality" is the *only* purpose that matters. *Banque Worms* itself began its analysis by describing New York's longstanding "'mistake of fact' doctrine, . . . which provides that 'money paid under a mistake of fact may be recovered back, however negligent the party paying may have been in making the mistake.'" 77 N.Y.2d at 366-77 (quoting *Nat'l Bank of Commerce in N.Y. v. Nat'l Mechanics' Banking Ass'n of N.Y.*, 55 N.Y. 211, 213 (1873)). The discharge-for-value doctrine is an attempt to *balance* this equitable principle against the need for finality in financial transactions, by permitting recipients of mistaken payments to keep the funds under *certain* circumstances: when they had a present entitlement to the funds, and discharged the debt without notice of the mistake.

Defendants contend that "[a] long line of cases has cited the same concerns with finality . . . as a justification for rejecting any duty of 'inquiry' as a condition for the retention of a payment or the discharge of a debt." DB ¶ 126. None of these cases, however, involved discharge for value. And in each, it would have been nearly impossible for the recipient of funds to determine whether the payor had proper title to the money. For example, in *Stephens v. Board of Education of City of Brooklyn*, 79 N.Y. 183 (1879), a case involving a fraudulent check, the Court of Appeals explained that "it is generally impracticable to trace the source from which the possessor of money has derived it." *Id.* at 187. The defendant did not need to return the plaintiff's money because it did not have "any information as to the source from which the money . . . was derived." *Id.* at 186.

Defendants then claim that "[c]ourts have cited *Banque Worms* as support for rejecting a 'constructive notice' standard in discharge for value cases." DB ¶ 127. But these cases are readily distinguishable for similar reasons. In *First Union National Bank v. A.G. Edwards & Sons, Inc.*, 262 A.D.2d 106 (1st Dep't 1999), for example, the plaintiffs "were allegedly defrauded of some $354 million" by third parties *Id.* at 106. The third parties then "invested the fraudulently obtained funds through defendant brokers," and the plaintiffs sued to recover the funds from the defendants. *Id.* The defendants did not have the money: they had invested it at the third-parties' request. And the defendants had no way of discovering the fraud: it was "not readily apparent from the complaint how an investigation by defendants would have uncovered the fraud by which the plaintiffs had been victimized." *Id.* at 107. That is nothing like the situation here, where Citibank's money has been sitting in suspense accounts since the August 11 Transfers, and the defendants had numerous sources from which they could determine that the payments were a mistake.

Defendants also rely on the Court of Appeals' opinion in *Regatos*, 5 N.Y.3d 395 (2005). DB ¶ 128. But as our brief explains (PB 45), the UCC provision at issue expressly imposed an actual notice requirement, and was grounded in the right of customers to recover unauthorized payments, not any right to retain windfalls. Notably, *Regatos* explained that although the UCC provision "was intended, in significant part, to promote finality of banking operations and to give the bank relief from unknown liabilities of potentially indefinite duration," "[t]his legislative purpose does not suggest that those interests alter (or should alter) the statute's fine-tuned balance between the customer and the bank as to who should bear the burden of unauthorized transfers." 5 N.Y.3d at 403. In the context of discharge for value, that balance favors a constructive notice rule.

### 2. Defendants Had Constructive Notice Of The Mistake.

At the moment they received the payments, the defendants had constructive notice of Citibank's error for at least four distinct reasons: (a) the Calculation Statements indicated that only interest was to be paid—in an amount far lower than the actual payments; (b) Revlon had not issued (and defendants never received) a notice of prepayment on the loan, as the Credit Agreement required; (c) defendants believed (and contended in *UMB Bank*) that Revlon lacked the liquidity to make a full prepayment on August 11; and (d) the size of the August 11 Transfers was itself a sufficient indication that Citibank had made a mistake. PB 47. Defendants' responses are meritless; they all generally rely on the theory that each relevant document, *in isolation*, did not reveal the mistake on its face. That is not how notice works.

***Calculation Statements***. Defendants' principal contention about the Calculation Statements is that "nothing *in the notices* gave any indication that the principal portion of the payments had been made in error." DB ¶ 50 (emphasis added); *see id.* ¶¶ 51, 53. This is not a serious argument. Citibank has never contended that the Calculation Statements identified an error *on their own*. Citibank does not tell lenders to be on the lookout for a mistaken payment; no bank does that. As Citibank's expert explained: "You don't put on calculation statements things that are not being calculated, not being sent." Sunshine Dep. at 78:14-21. The reason the Calculation Statements are critical is the *discrepancy* between the payments described in the statements and the payments defendants actually received. *See* PB 15-16.

Defendants argue next that the Calculation Statements indicated that "the August 11 Transfer was an intentional pre-payment of principal on the Term Loans," because interest would only be due under the Credit Agreement "if it were being paid in connection with a pre-payment of principal." DB ¶ 135; *see id.* at ¶ 50. This is another version of their argument, described above,

that the phrase "Interest Due Period" in the Calculation Statement was a reference to the "Interest Due Date" specified in the Credit Agreement. *See* pp. 6 *supra*. Again, there was no basis for the defendants to draw this connection. And in reality, they *did not* do so. PB 48-49. Not a single defendant's contemporaneous communications suggested that it believed the phrase "Interim Due Period" was an indication that a prepayment was forthcoming. When Citibank *does* intend to send principal, it makes that clear in the Calculation Statement. Farrell Decl. Exs. F, G (Calculation Statements "advis[ing] that the LIBOR outstanding loan . . . will be Repaid in full").

*No prepayment notice*. Another fact placing defendants on notice of the mistaken payment was that Revlon had not issued the written notice of prepayment required by the Credit Agreement. PB 46-47.[2] Defendants acknowledge that part of Citibank's role as agent includes "promptly" notifying lenders of any prepayment notice it receives from Revlon. DB ¶ 23. But they contend that "it is not unusual for a lender to receive a payment on an outstanding loan without an accompanying notice" (*id.* ¶ 135), and that "it is not at all unusual for notices to arrive late" (*id.* n.42). Defendants also downplay the significance of prepayment notices generally, claiming they "can be helpful for bookkeeping purposes, but they are not necessary for lenders to identify the payments as related to a specific loan." *Id.* ¶ 70.

This is all very misleading. As Citibank's expert explained: "[T]he lack of a prepayment notice is something that a reasonable lender would have considered." Sunshine Decl. ¶ 33; *see* Byrne Decl. at 2 ("Another red flag, if any defendant thought even for a minute that Revlon might have paid off the facility, is the absence of the required notice of prepayment . . . ."). But even if defendants were right, the absence of a prepayment notice is yet another indicia of error that gives

---

[2]     The Credit Agreement did not permit Revlon to waive this requirement. PX 485 § 2.11(a); *see also* Warren Dep. at 172:19-173:6.

rise, at least, to the need for an *inquiry*. Indeed, several defendants or their custodian *did* search for a prepayment notice after receiving the funds.[3] And there is no contemporaneous evidence that any defendant actually believed that a prepayment from Revlon was forthcoming. To the contrary, most defendants found it unusual that no prepayment notice was sent, but stuck their heads in the sand, seemingly at the advice of counsel. PB 18-30. To this day, the defendants have not received a prepayment notice on the Revlon loan—a fact that their brief fails to acknowledge.

**Revlon's inability to pay**. Defendants believed on August 11 that Revlon had nowhere near the cash required to make a full paydown of principal on the 2016 Term Loans. They now attempt to rewrite history, contending that "[i]t is simply nonsense to suppose that sophisticated lenders, familiar with [Revlon's] track record, would have doubted [its] ability to pay down the Term Loans." DB ¶ 136. And they devise from thin air a number of (internally contradictory) theories about how Revlon might have raised the funds to pay down the loan. DB ¶¶ 86-95. There is no evidence to support any of these theories.

Defendants speculate about what "sophisticated lenders" would have believed, but no lender—sophisticated or otherwise—could have really believed what defendants now say: that Revlon might have paid off the 2016 Term Loan to avoid that loan's potential springing maturity in November 2020. DB ¶¶ 89, 94. The springing maturity would occur on the 2016 loan, as well as several others, totaling well over a billion dollars. PX 934 at 31147.

---

[3] *See*, *e.g.*, Allstate, PX 13 at 56-57 (search for "more info" finds "no agent notices pertaining to the principal paydowns"); Bardin Hill, PX 47 at 510 (asking trustee if there had been "any notices saying there was a pay down"); Brigade, PX 115 at 871 (fund administrator requests "back up" documentation for transfer from Citibank); HPS, PX 1153 (asking if anyone had "see[n] any agent notices for a paydown"); Symphony, PX 1330 at 433 ("We did receive 3,275,717.03 but we do not have a notice to apply the funds. Can you provide a notice?").

If Revlon had nearly $900 million in cash, and its goal was to address near-term maturities, then repaying the term loan on August 11 would have been irrational. Repaying the *2021 Notes*, even at par, would have automatically extended the maturity of the 2016 loan, and the other loans, for only $387.2 million.[4] PX 934 at 31147. By contrast, paying $893 million to retire only the 2016 loan would have left the other liabilities still maturing in November 2020, with the notes only three months behind. In fact, the defendants believed that the springing maturity of the 2016 loan was a potential problem for Revlon precisely because it did *not* have nearly enough cash to pay it off. No investor who followed Revlon's capital structure as closely as these defendants did could have believed that Revlon would have paid off the 2016 loan three years early to avoid a springing maturity.

Moreover, on August 12, defendants filed a complaint through UMB Bank with 117 pages of allegations detailing *their view* about Revlon's supposed insolvency.[5] *See* PB 30. On that issue, too, defendants concocted a conspiracy theory: alleging that Revlon decided to repay only certain lenders who were connected to the UMB Bank litigation. DB ¶ 88. But the Credit Agreement expressly prohibits Revlon from unilaterally paying off individual lenders (PX 485 § 2.11(c)), as opposed to lender-initiated repurchases, which are expressly authorized, *id.* § 2.3.

***Size of the payment***. Finally, the sheer size of the payments the defendants received on August 11 was sufficient to put them on constructive notice of Citibank's error. PB 47. The Sixth Circuit recognized as much in *Calumet Farm*. *See* 398 F.3d 555 at 560 (6th Cir. 2005). But

---

[4]     In August 2020, Revlon was in the midst of a tender offer to repurchase those notes at a substantial discount to par. Revlon ultimately did retire the 2021 Notes at a discount to par.

[5]     To be sure, UMB conveniently dismissed that action four days before defendants filed their brief. See DB ¶ 78. But for purposes of this case, what matters is that the complaint reflects defendants' views on August 12 about Revlon's financial situation.

defendants attempt to turn this principle on its head, arguing that because "Citibank's error was unprecedented," they "would have had *no reason* to conclude that such an historic error had occurred." DB ¶ 75 (emphasis added). That is nonsensical. If the size of the payment was "historic," that was all the more reason for defendants to suspect that something was amiss and investigate it. Yet none of the defendants so much as called Revlon or Citibank when they became aware of the payments.

Defendants also point to the fact that "Citibank did not itself determine that the August 11, 2020 payments had been made in error until the next day" (DB ¶ 73), and argue that this is a reason to be "skeptical[]" that defendants should suspect the payments were in error (DB ¶ 134). Not so. The moment that Citibank found out about the *payment*—which it discovered during its standard review the next day of the previous day's transactions (Raj Decl. ¶ 24)—it concluded that it had been sent by mistake. PB 14. The reason Citibank did not find out about the payment on August 11 was simply that the controls surrounding the payment had failed and the next standard (post-payment) check did not occur until the start of business hours the next morning. Raj Decl. ¶ 23. There was less than one business hour between payment and discovery of the error (PX 446 at 1371), and less than six business hours between payment and delivery of a Recall Notice to each lender (PX 111 at 855).

### 3. Defendants Had Actual Notice Of The Mistake.

The parties' debate about the type of notice required is largely academic, because defendants had actual notice of the mistake immediately when they learned of the payments. PB 48-49. Defendants ignore *all* of their internal communications acknowledging the mistake, including those made before they were advised by counsel to keep the funds. PB 25-27, 29. Instead, defendants rely solely on their *post hoc* declarations—submitted last week—that they had no

"reason to believe that the payments had been made in error." DB ¶ 54. Three months and a day before submitting those declarations, when defendants first realized that Citibank had transferred them large sums of money, they had a very different take. At minimum, their reactions demonstrate willful blindness. *See, e.g.*, *Vasquez v. HSBC*, 2019 WL 2327810, at *17 (S.D.N.Y. May 30, 2019) ("[A] bank's willful ignorance of the most likely explanation for conduct [is] enough for it to have actual knowledge of the underlying fraud.").

Six of the ten defendants—Greywolf, Medalist, New Gen, ZAIS, Bardin Hill, and Tall Tree—did not even learn about the August 11 Transfers until *after* Citibank sent its first Recall Notice. *See* PB 20-21, 23, 25-29; DB ¶¶ 56-67. So their first notice of the *payments* was a notice that the payments were made in *error*. And their reaction was natural: Shortly after receiving the news, a Greywolf analyst wrote that Citibank "made an overpayment," and attached a helpful chart itemizing the "Actual overpayment amount." PX 1126 at 780. Medalist forwarded one of the Recall Notices to U.S. Bank, instructing it to "return [the principal amount of] $1,929,836.69 according to the following." PX 1228 at 018. (Only later did Medalist decide that the overpayments were "a good bargaining chip with Citi/Revlon," and reverse course. PX 1251 at 1767.) New Gen wrote that "[w]e received interest which we were due and the principal by mistake" (PX 1309 at 461), and initially planned to return the funds "and have [Citibank] send *only the funds we are due*" (PX 1300 at 013 (emphasis added)). ZAIS instructed its custodians to "return a portion of the Revlon wire, as per the [recall] notice," because "that is principal paid in error." PX 1539 at 218. Bardin Hill's VP said that "there was an erroneous principal payment for Revlon." PX 47 at 510. Tall Tree correctly called the Recall Notice a "notice of mistake." Tall Tree, Lenga Dep. at 139:10-18.

In truth, though, the defendants did not need the Recall Notices to determine that the August 11 Transfers were mistaken; the notices only confirmed the beliefs of the four defendants who learned of the transfers beforehand. The moment these defendants woke up on August 12, checked their records, and saw Calculation Statements specifying far smaller amounts than what they received, they were on actual notice that a mistake had occurred.

After reviewing a chart showing the receipt of more than $6 million, Catherine McCoy, Allstate's corporate representative, wrote: "So strange—could this be a mistake?" PX 13 at 57-58. McCoy attempted to walk back this email in her declaration: "To be clear, I did not believe that Citibank or Revlon had sent out a mistaken payment—I thought our bank loan operations team might have mistakenly reported a payment that had not actually been received." McCoy Decl. at ¶ 19. This reinterpretation is far from "clear." In that same email, McCoy immediately asked: "Did the CLO's *receive the same paydown*?" PX 13 at 57 (emphasis added). McCoy was therefore informed that one (possibly mistaken) payment had been received, and immediately asked whether other similar payments had been received—not whether the first payment had not, in fact, been received. And even crediting McCoy's about-face, at best she considered the payment so unusual that she assumed her operations team had made a mistake. That is not the reaction of one who is clear-eyed that the wire was an intentional prepayment.

Brigade received notice of the payment shortly after 10:00am on August 12, and as of the first Recall Notice, it was still "investigating" the transfer (PX 115 at 870; *see* PB 21)—hardly the response of a party that "assumed [that] Citibank [had] confirmed the transaction" and "concluded that . . . Brigade had received a paydown." DB ¶¶ 57-58. Even before receiving the Recall Notices, Brigade's corporate witness was questioning whether a paydown had occurred. PX 167 at 2703. After receiving the notices, Brigade "understood" them to mean that the funds were sent

"incorrectly" (Brigade, Frusciante Dep. at 139:16-140:15), and based on the Calculation Statement, Brigade concluded that Citibank had said "nothing about the paydown of principal and "everything about interim interest" (*id.* at 202:6-10). Brigade's custodian later confirmed that the "funds were released accidentally and are not the borrower's." PX 145 at 2247. Brigade sent emails to trustees, custodians, and collateral administrators *through August 17* saying that it was still "investigating" the wires—an investigation that did *not* include checking the maturity date of the Revlon loan (Brigade, Frusciante Dep. at 77:12-16); checking the price at which Revlon was trading (*id.* at 193:17-24); calling or emailing Citibank at the contact information noted on the Recall Notice (*id.* at 255:23-257:7); reaching out to Revlon about the payments (*id.* at 230:20-231:7); or in any way determining whether the payment was made using Citibank funds or Revlon funds (Brigade, Perkal Dep. at 69:3-21). The only apparent investigation Brigade *did* conduct was "going to all the custodians making sure they received the payment" (Frusciante Dep. 223:21-224:24) and—like many of its codefendants—conferring with counsel (*id.* 232:3-18, 233:13-23).

Symphony likewise noted the discrepancy between the Calculation Statements and the amounts received, and began an investigation (*see* PB 28)—a response inconsistent with Symphony's after-the-fact assertion that it "concluded that Symphony's clients had received full paydowns" because "the transfers occurred in a manner consistent with how borrowers make unscheduled paydowns." DB ¶ 64. Symphony's fund administrators understood fully that, in light of Revlon's financial state, a "full pay down . . . would be fairly unusual." PX 1333 at 444. And after receiving the Recall Notices, Symphony's senior loan associate understood them to indicate that Citibank "had made a mistake." Symphony, Vaughan Dep. at 134:22-135:3.

HPS's first reaction to the payments was that the Calculation Statement did "not indicate" a "full principal repayment" (PX 1207 at 5386)—a strange response, to say the least, if HPS

"believed the payments to be a paydown" (DB ¶ 61). If HPS held that belief, surely it would not have decided at first to "send[] the erroneous paydowns back" (PX 1197 at 5020), or joke that it had "take[n] the money and run" (PX 1188 at 2031), or mock Citibank for "fat finger[ing] a $900mm erroneous payment" to "people who weren't supposed to have it" (PX 1165 at 1324).

Not one of these communications is mentioned in defendants' brief. And their affidavits do not qualify as competent or credible evidence of what they believed. They repeatedly rely on what witnesses "would have" understood if the facts were different, stacking hypothetical upon hypothetical with remarkably similar language. Here are just a few examples:

- "Absent Citibank's assertion of error, it would have seemed far more likely to me that Citibank had made the August 11 payments on purpose." Allstate, McCoy Decl. ¶ 39.

- "Absent Citibank's assertion of error that I learned about on August 13, 2020, it would have seemed far more likely to me that Citibank had made the August 11 payments on purpose." Greywolf, Abrams Decl. ¶ 25.

- "Absent Citibank's assertion of error, it would have seemed far more likely to me that Citibank had made the August 11 payments on purpose but without a contemporaneous notice, than that Citibank had accidentally transferred millions of dollars to New Generation." New Gen, Dent Decl. ¶ 23

- "[A]bsent the recall notices, the possibility of mistake would not even have crossed my mind." Medalist, Phipps Decl. ¶ 25.

- "[A]bsent Citibank making that claim in its recall notice, I would have no reason to believe the payments were made by mistake." Tall Tree, Lenga Decl. ¶ 19.

- "Absent Citibank's assertion of error, it would have seemed far more likely to me that Citibank had made the August 11 payments on purpose but without a contemporaneous notice, than that Citibank had accidentally transferred tens of millions of dollars to multiple lenders in the exact amounts they were owed." ZAIS, Meneses Decl. ¶ 30.

- "But for those notices, I would not have thought that the transfer could have occurred by mistake." HPS, Crocombe Decl. ¶ 4.

- "It would not have even seemed plausible, but for those notices, that the payment had occurred by mistake." Bardin Hill, Greene Decl. ¶ 30

- "It would not have even seemed plausible to me, but for the fact that Citibank sent those notices, that the payment had occurred by mistake." New Gen, Dent Decl. ¶ 18.

- "It would not have even seemed plausible to me, but for the fact that Citibank sent those notices, that the payment had occurred by mistake." Medalist, Phipps Decl. ¶ 22.

These statements should all be stricken: "[S]peculative testimony concerning what a party would have done under different circumstances"—much less what they would have *thought* under certain circumstances—"is generally not admissible." *Devaney v. Chester*, 1989 WL 52375, at *5 (S.D.N.Y. May 10, 1989).[6] And they are inconsistent both with defendants' contemporaneous communications and their deposition testimony. But to the extent the Court considers these statements, they only drive home Citibank's position: that the Recall Notices, alone, were enough for defendants to at least *question* whether the payments were deliberate. Although many of the defendants *did* raise such questions, discovery has revealed that a significant portion of defendants' "investigation" into the August 11 Transfers involved privileged discussions with their counsel. Several of the defendants' corporate representatives were unable to explain the nature of their investigation because they were blocked by a privilege objection. *See* Symphony, Caraher Dep. at 32:19-33:18 (instructing Caraher not to answer how he learned about the August 11 Transfers, except to say that he "heard from counsel that there was potentially something nefarious going on, on the part of Citibank"); Allstate, McCoy Dep at 204:11-20; 252:3-21; Medalist, Phipps Dep. at 170:12-171:15; New Gen, Dent Dep. at 18:23-19:6; Tall Tree, Lenga Dep. at 129:18-132:2. This is another reason why defendants' after-the-fact testimony should be inadmissible.

---

[6]      *See also Kennedy v. Adamo*, 323 F. App'x 34, 35 (2d Cir. 2009); *Kloepfer v. Honda Motor Co.*, 898 F.2d 1452, 1459 (10th Cir. 1990)

Finally, defendants repeatedly complain (in italics) that the Recall Notices arrived "*almost 20 hours after the wire transfers cleared*." DB ¶ 83; *see also* DB ¶¶ 22, 74, 86, 116, 134 (same). It is unclear from this assertion how long defendants think it should have taken for Citibank to discover, confirm, and send 119 reports about the error to the numerous funds in the Revlon syndicate. Presumably, if Citibank had reported the error within an hour, defendants would have criticized it for jumping the gun without making a precise assessment of the error. But more importantly, nothing meaningful changed in the "*20 hours*"—five business hours—after the payments were transmitted. The defendants have never contended that they relied on the payments to their detriment. To the contrary, their position is that the time relevant to the discharge-for-value defense is the moment that the payments are received. That is wrong, as discussed next. But having taken that position, defendants cannot credibly claim to be prejudiced by the timing of the notices.

Because defendants had notice of Citibank's mistake, their defense is barred.

## C.     Defendants Never Discharged The Debt.

Our opening brief explained that defendants never discharged Revlon's debt; the whole principal balance remains outstanding. PB 50. Defendants have two main responses. First, they argue that the mere receipt of the payment qualifies as a discharge. Second, as a fallback, they argue that *Citibank* somehow discharged the funds for them. Both arguments fail.

### 1.     Receiving A Payment Is Not A Discharge.

Defendants argue that a debt is discharged "immediately upon payment and receipt of the disputed funds." DB ¶ 110. If that were true, a discharge may occur even when the recipient has not had a *chance* to investigate the payment's validity. A creditor could receive a payment, look at the documentation five minutes later, conclude immediately that the payment was made by mistake, and then (assuming constructive notice did not bar the defense) keep it anyway. That

would be a terrible rule. And if combined with defendants' position on actual notice, it would make the discharge-for-value doctrine worthless.

It is no surprise, then, that *Banque Worms* did not adopt this rule. It instead reaffirmed the Court of Appeals' prior articulation of the doctrine in *Carlisle v. Norris*, 215 N.Y. 400 (1915): "If defendants received the proceeds in good faith and without any notice of any wrong and *credited them on an indebtedness due them*, plaintiff is not entitled to recover them back." *Banque Worms*, 77 N.Y.2d at 368 (emphasis added) (quoting *Carlisle*, 215 N.Y. at 415 ). Apparently recognizing that this language is irreconcilable with their position, defendants attempt to dismiss *Carlisle* in a perplexing—but telling—footnote. They argue that it is "misguided" for Citibank to "rel[y] on *Banque Worms*' citation to the 100-plus year old decision in *Carlisle*"—as though a rule must be wrong if it is long-settled—because "*Banque Worms* did not cite *Carlisle* as the modern governing standard, but as part of its discussion as to why the discharge for value rule needed to be updated in the context of 'electronic funds transfer technology.'" DB ¶ 109 n.33.

That is wrong. *Banque Worms* cited *Carlisle* for the proposition "that New York, long ago, embraced the 'discharge for value' rule." 77 N.Y.2d at 368. In the *next* paragraph of the opinion, the court noted that "cases also can be cited where the language employed supports the contrary view." *Id.* at 368. The court found that "*[t]hese cases* . . . do not satisfactorily address the unique problems presented by electronic funds transfer technology." *Id.* at 368-69 (emphasis added). The court rejected those cases and adopted *Carlisle* and the Restatement. It never said that those authorities needed to be "updated" (DB ¶ 109 n.33); that is the view of the defendants alone.

Defendants contend that "numerous courts applying New York law have recognized that it is the payment of a debt that discharges it, not some subsequent action by the lender." DB ¶ 111. None of these cases addresses the *discharge for value* defense. Nor do they hold that a "discharge"

is accomplished by the mere receipt of funds; every mistake would be a windfall if that were true. In fact, one of the cited cases (five years older than *Carlisle*) describes a "debt" that is "fully paid *and discharged*." *Jackson v. Am. Cigar Box. Co.*, 141 A.D. 195, 197 (1st Dep't 1910).

Defendants turn next to a full-frontal assault on the Sixth Circuit's decision in *Calumet*— which even they agree flatly rejects their reading of *Banque Worms*. *See* DB ¶ 112; PB 50-51. *Calumet* held that the district court had "erred in focusing on when [the beneficiary] received the funds," and that a discharge for value occurs only if "the beneficiary of the transfer credits the debtor's account" and "give[s] value for the mistaken payment." 398 F.3d at 560-61. Defendants argue that "*Calumet* has never been cited by any New York court." DB ¶ 112. That is correct, presumably because New York courts have taken it as a given that a discharge for value requires a meaningful act on the part of the defendant, such as triggering a right to a "set-off" under the governing credit agreement (*Awal*, 455 B.R. at 93); "us[ing] a portion of the [transferred] funds to offset th[e] [underlying] debt" (*Bayerische*, 941 N.Y.S.2d 536, *2); or using the funds to pay debts owed to others (*Colli*, 1996 WL 243237, at *9). *See* PB 51. Notably, these cases all post-date *Banque Worms*, and none adopts defendants' reading of that case.

Defendants also contend that *Calumet* "departs from New York law," relying again on the "strong New York policy in favor of the finality of financial transactions." DB ¶¶ 112 & n.35. Defendants appear to be suggesting that New York is an outlier in this respect, but nothing in *Banque Worms* indicates that it was creating a new, state-specific rule, rejecting not only the prior New York cases that it said it was adopting but also the law of every other state. To the contrary, *Banque Worms* adopted the Restatement of Restitution (*see* 77 N.Y.2d at 367) and relied on sources ranging from the UCC, to an article in *Business Lawyer*, to a student note analyzing the "Approaches Taken in the United States and Internationally" to wire transfers (*id.* at 370-71).

In short, defendants have no authority for the proposition that New York, out of a misplaced and single-minded concern for "the finality of financial transactions," has departed from the standards in place around the globe, and has imposed a New York-only regime in which recipients of mistaken wire transfers are *always* allowed to keep them so long as there is some preexisting debt. Such a rule would not facilitate wire transfers; it would chill and cripple them.

## 2. Defendants Actively Avoided Discharging the Debt.

The facts related to the "discharge" element are straightforward. After learning about the August 11 Transfers, each defendant told its trustees to leave the funds unapplied. A few custodians reflected the transfer on their internal statements without defendants' knowledge or authorization, but they were instructed to reverse that decision and leave the funds in their original state. Each lender has placed the money in a suspense or segregated account, and each available monthly report describes the Revlon loan as outstanding. Defendants went to great lengths— including through frantic instructions to their custodians—to preserve the loan as outstanding. PB 18-30; *see, e.g.*, PX 145 at 248 (Brigade telling Virtus to make sure the amounts are "posted on the unapplied wires page," and to avoid having it "*credited to principal/interest accounts*," because "[w]e want to keep it unapplied until we resolve": "[w]e should still be reflecting the full Revlon position as outstanding and continue to count it towards our tests" (emphasis added)).

Unable to contest these facts, defendants attempt to shift focus to how *Citibank* reflected the August 11 Transfers in its records. In its complaint, Citibank explained that one of its duties as administrative agent "is to maintain a register listing the amount of each loan and payment." Compl. ¶ 13. Citibank stated that "[t]he register acts as the definitive record of amounts owed and received"; "[u]nder the Credit Agreement, the register is deemed 'presumptively correct absent demonstrable error,' and any error 'shall not in any manner affect the obligation of [Revlon] to

23

repay (with applicable interest) the Loans made to [Revlon] in accordance with the terms of th[e] Agreement." *Id.* ¶ 13 (quoting PX 485 § 2.8(c)-(d)). Citibank further asserted that it "never modified the register to reflect a full or partial discharge." *Id.* ¶ 22.

Defendants pounce on these allegations, contending that "Citibank's professed confidence that it 'never modified the register' has turned out to be false." DB ¶ 120. They point to an August 12, 2020 spreadsheet known as an OC Report, which shows the outstanding balance on the Revlon loan as "0.00." DB ¶¶ 119-23. Defendants argue that the OC Report *is* the register, and that therefore the "definitive record" of the Revlon loan shows that it was discharged. DB ¶¶ 26, 122.

Defendants are wrong for two reasons. First, an OC Report is not the Register. *See* Farrell Decl. at ¶¶ 14-16. An OC Report provides nothing more than a snapshot of how Flexcube, the loan-processing software Citibank used, records a particular loan at a given time. When Revlon executed the August 2020 roll up, it gave a written direction to Citibank to revise the Register to reflect the repurchase, and it attached a document showing that the Register should reflect an amount of $857,772,139.53 for the 2016 term loans. PX 283 at 50. To update Flexcube to match Revlon's direction letter, Citibank had to first amend the existing Flexcube record ("tranche") of the loan and rebuild a new Flexcube tranche. Defendants point to the superseded tranche, which was no longer the active record of the loan. By contrast, the new, active tranche showed a positive balance as of August 11, and therefore the Register did not reflect any payoff. PX 798.

In fact, defendants acknowledge that even if *no mistake* had been made, Citibank would still have needed to follow the same process, and so the August 12 OC Report would still have showed an outstanding balance of 0.00. DB ¶ 120 n.37 ("Citibank's 'mistake' was that it sent the principal to the Term Lenders, rather than to its internal wash account. But, *as planned from the start, it recorded the Term Loans as fully paid down in its records*, prior to building the

reconstituted loan in its system." (emphasis added)). In other words, by defendants' logic, Citibank would have discharged the Revlon loan even if it had *not* sent funds to the lenders.

Second, even if defendants were correct about the Register, the main question under the discharge-for-value doctrine is whether "the beneficiary of the transfer"—here, the defendants— "credits the debtor's account" and "*give[s] value* for the mistaken payment." *Calumet*, 398 F.3d at 560 (emphasis added); *see* RESTATEMENT (FIRST) OF RESTITUTION § 14 cmt. b ("[I]t would be inequitable to require restitution from the transferee since, in the surrender of the debt or lien, *he has given value* and acquired title to the money" (emphasis added)). A court must determine whether "*defendants* received the proceeds in good faith and without notice of any wrong, *and credited them* on an indebtedness due them." *Carlisle*, 215 N.Y. at 415 (emphases added).

The defendants also briefly contend that "many" or "several" of them "booked" the principal amounts as paydowns. DB ¶¶ 72, 124. They do not emphasize this point because it implicitly acknowledges that they had to do *something* beyond receiving the payments to discharge them for value. But again, those custodians who noted the transfer in their books were then instructed by the defendants to reverse that notation. That shows both that the debt was never discharged and that it would not be "inequitable to require restitution from the transferee[s]" (RESTATEMENT (FIRST) OF RESTITUTION § 14 cmt. b)—the defendants ultimately gave no value at all, but at the very least, they were able to unilaterally take back any value that might inadvertently have been given. Indeed, the defendants instructed the parties that had made those temporary bookings to reverse them. PX 21 at 165; PX 1334 at 447. Defendants offer no authority for the proposition that such a temporary, unauthorized "book[ing]" qualifies as a discharge for value.

Defendants have failed to satisfy each of the three elements of the discharge-for-value defense. Citibank is therefore entitled to return of the funds.

## III. THE DEFENDANTS ARE PROPER PARTIES.

Defendants contend that they are "not the proper defendants" because "they are not the entities that actually received the funds at issue in this case." DB ¶ 154. And for the same reason, they argue that Citibank cannot satisfy the elements of its claims because defendants did not "derive[] any direct benefit as a result of th[e] transfer." DB ¶¶ 142-53. But none of Citibank's claims requires that defendants physically receive the funds. When a plaintiff shows a defendant's "practical control" or "effectual" control, that is sufficient for restitution claims like unjust enrichment and money had and received. *Ripley v. Int'l Railways of Central Am.*, 8 A.D.2d 310, 316 (1st Dep't 1959). The same is true of the "dominion" element of a conversion claim, which does not require "actual physical possession" but only "dominion and control" of the property. *Gen. Elec. Co. v. Am. Export Isbrandtsen Lines, Inc.*, 37 A.D.2d 959 (2d Dep't 1971). Because such control exists here, "each cause[] of action turn[s] on a single inquiry": whether the payment was mistaken, "such that equity and good conscience demand restoration of the disputed property." *T.D. Bank*, 2010 WL 4038826, at *7; PB 35 & n.3.

It is undisputed here that defendants had absolute authority to direct their accounts to return the August 11 Transfers to Citibank. As detailed in Citibank's proposed findings of fact, (PB 4-7), every defendant testified to that fact:

- Allstate: "Q: Are you aware of any reason that if Allstate were ordered to return the funds to Citibank that it would not be able to return the funds from all of the lenders[?] . . . A: Not to my knowledge." McCoy Dep. at 288:19-289:2.

- Bardin Hill: "Q: [M]y question to you is, in the capacity as a manager of those funds, do you have the ability to direct the repayment of the Citi funds back to Citi? A: . . . I would say [Bardin Hill has] generally broad day-to-day managerial authority over those accounts and, again, subject to certain limitations, [Bardin Hill has] the ability to . . . direct and manage those funds." Greene Dep. at 35:6-20.

- Brigade: "Q: Is it your expectation that had you instructed [the trustees] to return the funds, they would have returned the funds? A: With a form of a letter of

authorization that would have had to come from senior people at Brigade." Frusciante Dep. at 221:7-222:12.

- Greywolf: "Q: Did anyone at Virtus or Citi question Greywolf's authority to direct [Virtus] not to send the money back? A: No. It never came up, but no. Q: So the question of whether or not Greywolf had that authority was never raised even by anyone. Is that right? A: Never raised by anybody." Josephson Dep. at 78:9-12.

- HPS: "Q: [C]ould [HPS], in fact, have instructed the custodians to release funds? A: Yes. Q: Does it [] have that authority today? A: Yes." Xanthakys Dep. at 139:10-16.

- Medalist: "Because we are able to direct the Trustee to withdraw funds in the CLO bank accounts and fund transactions and pay expenses, we are deemed to have custody." Phipps Dep. at 55:20-56:9.

- New Gen: "Q: Was it your understanding as of this time, that is, 2:00 and 3:00[pm] on August 12, that you had the authority to make the decision one way or another whether New Gen would return the funds? A: Yes." Beals Dep. at 60:18-23.

- Symphony: "Q: Symphony has the authority to give instruction to [a custodian] about what to do with the books and records vis-à-vis the 2016 Revlon term loan, right? A: I believe . . . [the custodian] would have followed what we told her." Vaughan Dep. at 118:4-12.

- Tall Tree: "Q: And if the TRO was lifted and the judge ordered Tall Tree to transfer the money . . . Tall Tree could give that instruction to U.S. Bank, correct? A: Generally yes . . . if Tall Tree is the manager, we would have generally the authority to direct that payment under the order to whoever we're ordered to send it to." Lenga Dep. at 161:22-162:10.

- Zais: "Q: And is it fair to say that ZAIS Group, LLC directs the activity of [the ZAIS CLOs]? A: I would say, yes." DiPoalo Dep. at 17:11-17.[7]

---

[7]    This testimony is consistent with the agreements governing defendants' relationships with the individual funds. *See e.g.*, Greywolf, PX 1441 at 2892 ("Greywolf is hereby appointed as collateral manager of the Issuer for the purpose of performing certain investment management functions . . . including without limitation, directing the investment and reinvestment of Collateral Obligations and Eligible Investments."); HPS, PX 1208 at 55570 ("SubCo hereby delegates to [HPS] . . . the power and authority to take any and all actions and make any and all decisions in [HPS'] discretion on behalf of SubCo with regard to all activities and matters that are related to . . . the Investments and SubCo's investment activities"); New Gen, PX 1312 at ("The Partnership will be managed and the conduct of its business will be controlled solely by the General Partner [New Generation Advisors]."); Symphony, PX 1360 at 2646 ("Client hereby constitutes and appoints Manager as Client's agent and attorney-in-fact with full power and authority for Client and on Client's behalf to buy, sell and otherwise deal in Securities for the Account."); Brigade, PX

Notably, some defendants *did* initially exercise this authority, instructing their clients to return the funds to Citibank after receipt of a Recall Notice. PX 1197; PX 1228 at 18; PX 1307 at 448; PX 1539 at 218. But ultimately, every defendant made the decision not to return Citibank's money. Some ordered third parties to retain the money until they received explicit direction from defendants. PX 1125; PX 1197 at 5019; PX 1308 at 453; PX 1335 at 454; PX 1531 at 3303. Some even threatened legal action against parties that did not comply. PX 152 at 2280. Regardless of whether those actions would have merit, they confirm the defendants' control. It is no coincidence that *all* of the funds (with very minor exceptions) managed by the defendants uniformly refused to return Citibank's money.[8]

It makes no difference that defendants are different *entities* from the lenders. This would matter if Citibank were attempting to pierce the corporate veil and hold defendants liable for the wrongdoing of the *lenders*. But here, it is the defendants who issued the direction not to return the mistaken payments. They cannot escape responsibility for their own misconduct.

---

218 at 9770 ("[T]o the extent the Collateral Manager [Brigade] determines it necessary or appropriate in the performance of any of its duties . . . the Collateral Manager shall have the power to . . . take such action and may exercise such discretion, issue directions and recommendations and make such determinations and calculations as the Collateral Manager determines appropriate on behalf of or in the name of the Issuer [Battalion CLO XI]"). *See also* PX 560 at 4433 ("Brigade Capital Management LP as Investment Manager On Behalf of its Various Funds and Accounts").

[8]    If Citibank had paid lenders *deliberately* (as the defendants say they assumed), there is no question that the lenders would have had to return the funds, because Citibank was not reimbursed by Revlon. *See* PX 485 § 2.18(f) ("[T]he Administrative Agent may assume that the Borrower is making such payment [of amounts due], and the Administrative Agent may . . . make available to the relevant Lenders their respective pro rata shares of a corresponding amount. If such payment is not made to the Administrative Agent by the Borrower within three days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each relevant Lender . . . such amount with interest thereon"). The only difference between the actual facts and the situation described in Section 2.18(f) is that, here, the payment that Revlon did not reimburse was one that Citibank *never intended* to make (and that, according to the defendants, was not due). That distinction makes the case for return even more, not less, compelling.

Finally, Defendants raise a cursory argument that Citibank's common law claims are preempted by Article 4-A of the UCC. DB ¶¶ 163-64. Not so. Citibank has the right to "resort to principles of law or equity" as long as the relevant "rights, duties, and liabilities" are not "inconsistent" with Article 4-A. UCC § 4-A-102 cmt. Defendants do not contend that Citibank's claims are inconsistent with Article 4-A. And they are not: While Article 4-A provides rules for the rights of transferors against their *own* banks (Article 4-A-303), and the rights of receiving banks against beneficiaries (Article 4-A-205), defendants have not identified any part of Article 4-A that addresses the circumstances here: a transferor seeking to recover mistaken payments from beneficiaries. Indeed, as the court explained in *Sheerbonnet, Ltd. v. American Express Bank, Ltd.*, 951 F. Supp. 403 (S.D.N.Y. 1995), *Banque Worms'* express rationale for affirming the discharge-for-value rule was that it would "supplement" Article 4-A: "Article 4-A ha[d] not completely filled the area of law surrounding funds transfers," and "common law and equitable principles . . . can *and should be used* to resolve conflicts between parties to this type of transaction" so long as they are not inconsistent with the UCC. *Id.* at 410 (emphasis added).

## CONCLUSION

The Court should enter judgment in Citibank's favor.

Dated: New York, New York
      November 20, 2020

By: /s/ Matthew D. Ingber

Matthew D. Ingber
Christopher J. Houpt
Michael Rayfield
Richard A. Spehr
Allison J. Zolot
Alina Artunian
Luc W. M Mitchell

MAYER BROWN LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 506-2500

John F. Baughman
Andrew H. Reynard

THE LAW OFFICES OF JOHN F.
BAUGHMAN, PLLC
299 Broadway, Suite 203
New York, NY, 10007
(347) 241-6347

*Attorneys for Plaintiff.*