**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|
CITIBANK, N.A., | |
| |
*Plaintiff,* | |
| |
| No. 20 Civ. 06539 (JMF) |
v. | |
| |
BRIGADE CAPITAL MANAGEMENT, LP, | |
| |
*Defendant.* | |

---

# BRIEF OF LOAN SYNDICATIONS AND TRADING ASSOCIATION, AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF

---

Ronald J. Mann
435 W. 116th Street
New York, NY 10027
(212) 854-1570
RMANN@LAW.COLUMBIA.EDU

Elliot Ganz
Loan Syndications and
  Trading Association
366 Madison Avenue
15th Floor
New York, NY 10017

*Attorneys for the Loan*
*Syndications and Trading*
*Association*

# TABLE OF CONTENTS

TABLE OF CONTENTS..............................................................................................i

TABLE OF AUTHORITIES ...................................................................................ii

INTEREST OF *AMICI CURIAE*...........................................................................1

SUMMARY OF ARGUMENT .................................................................................3

ARGUMENT............................................................................................................4

I.    Practical Aspects of Syndicated Lending Support the Return of Mistaken Payments ................................................................................................4

II.   Requiring Recipients to Return Mistaken Payments Conforms to Settled Market Expectations..............................................................................6

CONCLUSION ........................................................................................................8

**TABLE OF AUTHORITIES**

**Cases**                                                                 Page(s)

*Banque Worms v BankAmerica Int'l,*
      77 N.Y.2d 362 (1991) ................................................................3, 5-6

*Shipping Corp. of India, Ltd. v Jaldhi Overseas Pte Ltd.,*
      585 F.3d 58 (2nd Cir. 2009) ............................................................ 4, 6

*Winter Storm Shipping, Ltd. v TPI,*
      310 F.3d 263 (2nd Cir. 2002) .......................................................... 4, 6

# INTEREST OF *AMICUS CURIAE*[1]

The Loan Syndications and Trading Association ("LSTA") is a not-for-profit financial services trade association that represents a broad and diverse membership of over 530 firms involved in the origination, syndication, and trading of commercial loans. Its members include commercial banks, investment banks, broker-dealers, mutual funds, insurance companies, fund managers, hedge funds, and other institutional lenders, as well as services providers and vendors. Since before the turn of the century, the LSTA has served as the only trade association solely focused on the $1.2 trillion U.S. syndicated loan market. That industry supports 1,140 borrowers, contributes over $2.7 trillion in annual economic output, and employs over 10 million Americans. The LSTA's membership includes thought leaders from all sides of the market and the abiding interest of those members in the success of that market gives the LSTA a deep-seated and well-founded interest in promoting "a fair, orderly, efficient, and growing corporate loan market while advancing and

---

[1] This brief was not authored in whole or in part by counsel for a party. No person other than the *amicus* made a monetary contribution intended to fund the preparation or submission of this brief. The plaintiff is a member of the LSTA as are most of the defendants. The plaintiff is represented by one of its executives on the Board of Directors and Executive Board of the LSTA and one of the defendants is represented by one of its executives on the Board of Directors of the LSTA. Both those executives are former Chairs of the LSTA's Board of Directors. In accordance with the LSTA's long-standing policy, no representative of any of the parties to this litigation was involved in the decision to file this amicus brief.

balancing the interests of all market participants" (loan market participants commonly being referred to as "LMPs").  The LSTA has filed amicus briefs in numerous cases raising legal questions affecting the syndicated loan market.[2]

This case involves the obligation of lenders in a syndicated credit agreement to return funds sent to them by mistake. While largely automated, some transactions in the syndicated lending market require manual touches, so mistakes do happen. It is important to the stability of syndicated lending facilities and the secondary loan market that courts take a contextually informed approach when they respond to those mistakes. The position of the LSTA as a representative of the various stakeholders makes it uniquely suited to offer a balanced perspective on the problem.

The decision to file in this matter was not taken lightly, because member firms are parties on both sides of the case: Citibank on the plaintiff's side and eight of the defendants. Amicus filings are recommended by a litigation committee evenly split between representatives of buy-side and sell-side firms and subject to the approval of the LSTA's executive board, which is similarly split. Representatives of firms

---

[2] Those cases include, among others, Czyzewski v. Jevic Holding Corp., 137 S. Ct. 973 (2017); Bank of America, N.A. v. Caulkett, 575 U.S. 790 (2015); RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639 (2012); In re MPM Silicones, LLC, 874 F.3d 787 (2nd Cir. 2017); Marblegate Asset Mgmt., LLC v. Education Mgmt. Finance Corp., 846 F.3d 1 (2nd Cir. 2017); In re DBSD North America, Inc., 634 F.3d 79 (2nd Cir. 2011); and In re Enron Corp., 379 B.R. 425 (S.D.N.Y. 2007).

that are principals in the litigation do not participate in the decision. We believe that the LSTA's uniquely informed and balanced perspective will be useful to the Court.

## SUMMARY OF ARGUMENT

The parties offer a detailed analysis of the doctrinal attributes of *Banque Worms v BankAmerica Int'l*, 77 N.Y.2d 362 (1991), and the discharge-for-value rule it adopted; our filing does not repeat those arguments. Rather, this filing offers our perspective as the trade association solely focused on syndicated lending, the market in which the mistaken payment occurred. Specifically, we file this brief to explain to the Court why we believe it would be beneficial to the various participants involved in syndicated lending for the law to require the return of mistakenly transmitted payments like the one at issue here.

1.      Practical aspects of syndicated lending support the return of payments transmitted by mistake. While largely automated, some aspects of the market are operated manually rather than by automation, which can lead to occasional errors. The agents that handle the authorization and transmittal of payments operate on thin margins; obligating them to "insure" over those mistakes would be much more costly for borrowers and lenders wishing to transfer their interests in a syndicated facility than requiring recipients to return the mistaken payments.  LMPs recognize that principle, as participants routinely return or transfer portions of incorrect payments.

2.     Rules that courts establish for commercial transactions cause grave disruption when they fail to account for the context of the transactions to which those rules apply. *Compare*, *e.g.*, *Winter Storm Shipping, Ltd. v TPI*, 310 F.3d 263 (2nd Cir. 2002), *with*, *e.g.*, *Shipping Corp. of India, Ltd. v Jaldhi Overseas Pte Ltd.*, 585 F.3d 58 (2nd Cir. 2009). In this context, retention of the payments is the outcome that would disrupt expectations, raise costs, and chill both participation of banks acting as administrative agents and the liquidity of the secondary loan market. Compelling a return of the payments is the outcome that well-meaning actors in the market would expect, the outcome that would support the stability of syndicated lending transactions, and indeed the action that many of the recipients here took of their own volition.

## ARGUMENT

### I.     Practical Aspects of Syndicated Lending Support the Return of Mistaken Payments.

Several overlapping features of syndicated lending support an obligation to return mistaken payments.

First, while largely automated, some aspects of the market are handled manually. Payments are authorized and made through the activity of individuals typing information into electronic interfaces. Given the high volume of transactions in that market, even levels of extraordinary care may allow mistakes to occur from time to time: if personnel execute transactions correctly 99.9% of the time, a mistake

4

will plague one out of every 1000 transactions. That is not to say that mistakes happen every day.  It is, though, to say that mistakes of one sort or another can happen with sufficient frequency for market actors to expect them, to be consciously aware of the possibility that a strange or unexpected transmission in fact is mistaken, and to develop norms about how to respond to them.

Second, the administrative agents that handle the transmittal of payments to lenders under syndicated lending facilities operate on thin margins commensurate with their ministerial role. This benefits borrowers and those lenders who wish to transfer their interests in the loans and the related credit agreements. For that fee level to make sense, it has to be understood that administrative agents bear little or no risk, that they are not exposed to liability for sums hundreds if not thousands of times larger than the payments they are disseminating, perhaps millions of times larger than the fees paid for distributing those payments. Based on the current fee structure, reasonable administrative agents would not expect to insure the costs of those losses. That fee structure reflects an implicit understanding that the agents do not bear those risks, because counterparties promptly will return mistaken payments.[3] Thus, it should surprise no one that the syndicated loan market has, from

---

[3] The *Banque Worms* court rejected a similar argument. *Banque Worms*, *supra*, 77 N.Y.2d at 375. That decision did not hold those considerations irrelevant. Rather, it found them insufficient to justify wholesale rejection of the discharge-for-value rule. That finding rested in part on the court's assessment of doctrinal requirements

its inception, operated on that basis: loan market participants routinely return or redirect misdirected payments, payments in incorrect amounts, and payments made by mistake.

## II. Requiring Recipients to Return Mistaken Payments Conforms to Settled Market Expectations.

Courts on occasion have struggled in crafting rules to govern the high-stakes world of wholesale funds transfers. Among other things, decisions inconsistent with the norms and practices of parties that engage in particular transactions have led to dislocation for such transactions and turmoil in the courts. *Winter Storm Shipping, Ltd. v TPI*, 310 F.3d 263 (2nd Cir. 2002), offers a good example. The court in that case held that plaintiffs enforcing admiralty judgments could collect them from accounts of intermediary banks located in New York through which wire transfers of funds going to or from the defendants had passed. The "explosion" of litigation, "critical commentary," and other "unforeseen consequences of *Winter Storm*" led the Second Circuit to overrule that decision in *Shipping Corp. of India, Ltd. v Jaldhi*

---

and in part on two distinct factual conclusions: that banks easily could minimize the risks of the error made in that case; and that ordering a return of the payment would disrupt commercial expectations. *See id*. at 372-76. Our primary goal in this filing is to address those factual points as they apply to the Court's interpretation of the discharge-for-value rule in the context of mistaken payments. Specifically, we argue that it would not be easy to eradicate errors of the kind that occurred here (a point we address in the text above) and also that obligating recipients to return the funds would be less disruptive than allowing them to retain them (a point we address in Point II, *infra*).

*Overseas Pte Ltd.*, 585 F.3d 58 (2009). *See also Banque Worms*, *supra*, 77 N.Y.2d at 373 (noting importance of avoiding decisions that would "introduce confusion and danger into all commercial dealings").

Although the issues in those cases are remote from the issues before the Court in this case, the fallout from *Winter Storm* is directly relevant to the central point of our filing. Specifically, as we have explained above, experienced LMPs would expect recipients of mistaken payments of the kind at issue here to return them voluntarily. Indeed, we understand that many recipients returned a significant portion of the funds sent in this case.

To be clear, we offer our perspective on this transaction as an association pursuing the interests of all LMPs. It is unusual for the LSTA to file in a case, like this one, in which numerous members have direct interests on both sides of the matter. Notwithstanding the tension that it causes, the importance of this question to the stability of the industry and the clarity that we perceive in commercial expectations compel us to offer this brief. In the end, we believe that regular participants in the syndicated loan market would be surprised and disappointed to find that the law entitles recipients to keep such payments. We also are firmly convinced that a ruling validating the retention of the payments in this case would undermine the smooth functioning of syndicated lending and the ability to transfer and assume loans under credit agreements by encouraging the kind of non-

7

cooperative opportunistic behavior that destabilizes any market dependent on trust and transparency. If the Court is trying to find the answer most consonant with commercial expectations and least likely to disrupt, it should require defendants to return the payments.

## CONCLUSION

We respectfully submit that this Court should hold that the discharge-for-value rule does not justify defendants' retention of the mistaken Revlon payments.

Dated:  November 20, 2020
        New York, New York

Respectfully submitted,

RONALD J. MANN
435 W. 116th Street
New York, 10027
(212) 854-1570
rmann@law.columbia.edu

ELLIOT GANZ
Loan Syndications and
    Trading Association
366 Madison Avenue
15th Floor
New York, NY 10017
(212) 880-3000

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of November 2020, a true and correct copy of the foregoing Motion for Leave to File Brief of Amicus Curiae was filed with the Clerk of the United States District Court for the Southern District of New York via the Court's CM/ECF system and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operations of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

I hereby certify under penalty of perjury that the above document was sent using the mode of service indicated.

Dated:  November 20, 2020          Respectfully submitted,

/s/ *Ronald J. Mann*
Ronald J. Mann
435 W. 116th Street
New York, 10027
Tel: (212) 854-1570
Fax: (212) 854-7946
Email: rmann@law.columbia.edu