UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITIBANK, N.A., <br><br> *Plaintiff*, <br><br> v. <br><br> BRIGADE CAPITAL MANAGEMENT, LP, ALLSTATE INVESTMENT MANAGEMENT COMPANY, BARDIN HILL LOAN MANAGEMENT LLC, GREYWOLF LOAN MANAGEMENT LP, HPS INVESTMENT PARTNERS LLC, MEDALIST PARTNERS CORPORATE FINANCE LLC, NEW GENERATION ADVISORS LLC, SYMPHONY ASSET MANAGEMENT LLC, TALL TREE INVESTMENT MANAGEMENT LLC, ZAIS GROUP LLC, <br><br> *Defendant*. | No. 20 Civ. 06539 (JMF) <br><br> **AMENDED COMPLAINT** |

Plaintiff Citibank, N. A. ("Citibank"), by and through its attorneys, respectfully submits this amended complaint[1] against the defendants identified in paragraphs 8-17 below and alleges as follows:

**PRELIMINARY STATEMENT**

1. On August 11, 2020, an operational mistake caused Citibank to transfer approximately $900 million of its own money to parties that were not entitled to it. When Citibank discovered the mistake, it promptly asked the recipients to return its money. Defendants, however, have unlawfully attempted to capitalize on the mistaken overpayment. They have refused to return their share and instead converted approximately $501 million for their own use. Defendants'

---

[1] Citibank submits this amended complaint against all defendants in compliance with the Court's December 8, 2020 Order directing consolidation and the inclusion of additional jurisdictional allegations. Dkt No. 191. The changes submitted are intended only to address the specific issues identified by the Court, recognizing that no leave has been granted to make any additional revisions.

actions are not just unconscionable; they threaten the integrity of the administrative agency function and the trust in the global banking system.

2. Citibank's transfer was intended to pass through an interest payment from Revlon, on a loan for which Citibank acts as an administrative agent. Without justification, defendants have taken the baseless position that Citibank's overpayment, more than 100 times the amount of the intended transfer, served to pay off Revlon's entire principal balance as well—a balance that was not due for another three years, that Revlon did not have available, and that today reportedly trades at 30 cents on the dollar.

3. Defendants have refused to return Citibank's money despite crystal-clear evidence that the payments were made in error. Among other things, the payments were accompanied by calculation statements that showed the correct (and substantially smaller) amount as the "Total Due." Citibank advised defendants upon making the overpayment that it was, in fact, a mistake and that the funds needed to be returned. The Credit Agreement itself, which governs the payment schedules under the Lending Facility, makes clear that no such payment was then due, and that any prepayment would have required three-days' advance written notice. Revlon, too, stated publicly that it had made no principal payment on its debt. And the day after Citibank's payment, UMB Bank, purportedly as administrative agent for Brigade and other lenders, sued Revlon, claimed it had defaulted on its debt, and demanded in an acceleration notice that it immediately pay the entire balance—thereby conceding that Citibank's overpayment was not intended or understood to discharge Revlon's obligation, and trying to retroactively fabricate a "due and owing" obligation. Yet defendants continue to hold the funds unlawfully despite multiple requests from Citibank to return them.

4. Defendants have not offered a reasonable explanation for their unlawful retention of Citibank's money. For example, in response to Citibank's demand, Brigade asserted that "[i]t is not at all clear that the funds were sent as a result of 'clerical mistake'"—a self-serving statement that is irreconcilable with the notices of payment, the acceleration notice, and the very rationale underlying the UMB complaint: that Revlon lacks sufficient funds to repay its debt. Defendants have manufactured a story that defies belief: that the payment was a deliberate prepayment of the loan's entire principal balance, even though the governing Credit Agreement would not even have allowed such a payment without advance written notice.

5. Defendants have no claim to Citibank's money. They were not expecting Citibank's money. They should have known that a surprise repayment of principal could not be made under the governing Credit Agreement. And they were well aware that virtually no company, let alone a distressed retail and consumer company such as Revlon, would ever make such a substantial prepayment while dealing with the significant financial consequences caused by the ongoing pandemic.

6. Defendants' refusal to return money to which they are not entitled is unlawful. Under equitable principles as well as the doctrine of conversion, this Court should require defendants to return Citibank's money immediately. Any other outcome would threaten the stability of the banking system and the relationships between administrative agents and lenders, as it would reward bad actors that try to capitalize on operational mistakes. The global economy depends on financial institutions being able to efficiently make enormous numbers of payments every day. While the vast majority of these payments are seamless, the velocity and complexity of such transactions means that human and technological errors do occur at times. The legal system

needs to treat these as what they obviously are—mistakes—rather than as opportunities for unscrupulous actors to seize massive windfalls.

## PARTIES

7. Citibank, N.A. is a national bank organized under the laws of the United States and located in Sioux Falls, South Dakota.

8. Upon information and belief, Allstate Investment Management Company ("Allstate") is a corporation organized under the laws of Delaware. Upon information and belief, the direct and indirect members of Allstate are citizens of Delaware.

9. Upon information and belief, Bardin Hill Loan Management LLC ("Bardin Hill") is a limited partnership organized under the laws of Delaware and headquartered in New York.

10. Upon information and belief, Brigade Capital Management, LP ("Brigade") is a limited partnership organized under the laws of Delaware and headquartered in New York. Upon information and belief, the direct and indirect members of Brigade are citizens of New York, New Jersey, Connecticut, Colorado, South Carolina, Delaware, and Virginia.

11. Upon information and belief, Greywolf Loan Management LP ("Greywolf") is a limited partnership organized under the laws of Delaware. Upon information and belief, the direct and indirect members of Greywolf are citizens of Connecticut, New York, California, the Cayman Islands, and other foreign states.

12. Upon information and belief, HPS Investment Partners LLC ("HPS") is a limited liability company organized under the laws of Delaware and headquartered in New York.

13. Upon information and belief, Medalist Partners Corporate Finance LLC ("Medalist") is a limited liability company organized under the laws of Delaware.

14. Upon information and belief, New Generation Advisors LLC ("New Generation") is a domestic limited liability company organized under the laws of Massachusetts. Upon information and belief, the direct and indirect members of New Generation are citizens of Virginia and Massachusetts.

15. Upon information and belief, Symphony Asset Management LLC ("Symphony") is a limited liability company organized under the laws of California. Upon information and belief, the direct and indirect members of Symphony are citizens of New York.

16. Upon information and belief, Tall Tree Investment Management LLC ("Tall Tree") is a limited liability company organized under the laws of Delaware. Upon information and belief, the direct and indirect members of Tall Tree are citizens of Illinois, North Carolina, New Jersey, China, and Germany.

17. Upon information and belief, ZAIS Group LLC ("ZAIS") is a domestic limited liability company organized under the laws of Delaware. Upon information and belief, the direct and indirect members of ZAIS are citizens of Delaware.

## JURISDICTION AND VENUE

18. This Court continues to have subject-matter jurisdiction over the claims against Brigade—the original named defendant in this action—as well as Allstate, Greywolf, New Generation, Symphony, Tall Tree, and ZAIS pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000 and the parties are citizens of different states from Citibank, which is a citizen of South Dakota.

19. The parties are currently investigating whether there is diversity with respect to three of the defendants: Bardin Hill, HPS, and Medalist. Citibank will further amend the complaint if diversity is confirmed.

20. In any case, this Court has subject-matter jurisdiction over the claims against all defendants pursuant to the Edge Act, 12 U.S.C. § 632, because Citibank is a national banking association and this action is a civil suit at common law or in equity based on transactions involving Citibank's international banking and/or foreign financial operations. This suit arises from Citibank's processing of interest payments as part of its role as administrative agent on a $1.8 billion syndicated loan facility, pursuant to which Citibank routinely sends wire transfers to bank accounts in foreign countries and held by foreign entities. For example, payments directed to the defendants' funds were wired to bank accounts located in Luxembourg and Australia for funds managed by defendants HPS and Brigade, respectively. These international wires were both directed and transferred overseas.

21. Additionally, this Court has supplemental subject-matter jurisdiction over the claims set forth in this Amended Complaint pursuant to 28 U.S.C. § 1367 because they arise out of the same transaction or occurrences as the claims initially asserted against Brigade in this action.

22. This Court has personal jurisdiction over the defendants because defendants regularly conduct and transact business in the State of New York.

23. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because the defendants reside in this District. Venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because this is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, and a substantial part of property that is the subject of the action is situated.

## STATEMENT OF FACTS

### I.      Revlon's 2016 Loan

24.     In 2016, Revlon acquired Elizabeth Arden, Inc. The deal was partially facilitated by a seven-year, $1.8-billion loan. Defendants currently hold a portion of the loan. The Credit Agreement governs the term loans held by defendants.

25.     Citibank serves as the administrative agent and collateral agent for the loan. One of Citibank's many duties is to collect payments from Revlon to remit to the lenders under the Credit Agreement. Another is to maintain a register listing the amount of each loan and payment. The register acts as the definitive record of amounts owed and received. Under the Credit Agreement, the register is deemed "presumptively correct absent demonstrable error," and any error "shall not in any manner affect the obligation of [Revlon] to repay (with applicable interest) the Loans made to [Revlon] in accordance with the terms of th[e] Agreement."  § 2.8(c)–(d).

26.     Revlon is responsible for making periodic interest payments under the Credit Agreement. The agreement also *permits* Revlon to pay principal ahead of schedule but only if certain requirements are met. Under Section 2.11(a) of the agreement, any prepayment by Revlon of principal on Eurocurrency loans, like those at issue here, must be preceded by a detailed written notice three business days in advance.

### II.     The August 11 Transfer

27.     On August 11, 2020, several months of accrued interest came due under the Credit Agreement. The interest payment was to be processed by Citibank in its capacity as administrative agent. No other amount was due at the time, and Revlon transferred no additional funds to Citibank.

28.     The interest payment was processed by Citibank on August 11, 2020. Due to issues with the loan-processing system, the payment to each lender was on average more than 100 times the interest that was actually due. Defendants were lenders that received an overpayment.

29.     Around 5:30 p.m. on August 11, Citibank sent defendants notices of payment for each of the funds that defendants manage that held portions of the Revlon loan. The top of the notices identified the payment as a "Libor Rate *Interim Interest Payment*."  (Emphasis added.) The notices then provided that "[i]nterim interest is due as per the detailed calculation below." The calculations showed the principal of the loan held by each fund; the interest rate; the period of interest being paid; and the interest due. These notices expressly referenced the *intended* amount of the payment, which was far smaller than the actual payment.  For example, the notice sent to Brigade Opportunistic Credit LBG Fund LTD provided as follows (Exhibit A):

```
Interim interest is due as per the detailed calculation below :


        Interest Due Period : 29-MAY-2020 to 11-AUG-2020


LIBOR          Interest   Day       From        To       # of  Interest
Funded         Rate       Basis     Date        Date     days  Due
************************************************************************
17,085,488.60  4.25%      Actual/360  29-MAY-2020 02-JUN-2020  4    8,068.15
17,468,301.43  4.25%      Actual/360  02-JUN-2020 11-AUG-2020 70  144,356.10
```

30.     Beneath this was a row marked "Total Due," again stating the correct intended amount:

```
    Due Currency    : USD

    Total Due       : 152,424.25
```

31. The notices went on to state that "[w]e will credit your account representing the above Interim Interest." Fields captioned "Total Due" and "Credit Amount" yet again stated the intended payment amount. The above notice, for example, included the following section:

```
We will credit your account representing the above Interim Interest based on the
following instructions :

    Credit Date      : 11-AUG-2020

    Credit Currency  : USD

    Total Due        : 152,424.25

  Less :Tax Withholding  : 0.00

    Credit Amount    : 152,424.25
```

32. In short, this notice unambiguously informed Brigade that Citibank would be sending Brigade Opportunistic Credit LBG Fund LTD an interest payment of $152,424.25. But instead of sending the amount due, Citibank sent many multiples of that amount to Brigade—over $17 million in this case, more than 115 times the amount of "Interim Interest" specified in the notice. And the overpayment was made with Citibank's funds. As reflected in the below Payment Transaction, which was paired with the above $152,424.25 interest notice, the mistake was obvious: the transferred amounts did not match the "Total Due" for the "Interim Interest" stated in the notices.



33.     Defendants ultimately received 126 notices promising credit amounts totaling $4,774,088.95. And they received wire transfers totaling $557,558,375.74—$553,784,285.85 more than they were due.

### III.    Defendants' Conversion of Citibank's Funds

34.     Clearly, Citibank had made a mistake. Citibank did not intend to transfer more money than stated in the payment notices, let alone with its own funds. That was obvious from the language of the notices. But beyond that, a prepayment like the one that defendants assert occurred was not even permissible under the Credit Agreement. The balance of the loan is not due for another three years, and a prepayment of *any* amount is only permitted with "irrevocable written notice" from Revlon three business days in advance. § 2.11(a). No prepayment notice was issued, because no prepayment was made. Nor was there a payoff letter, which is market standard practice when payment of the full outstanding balance of a loan is intended. Furthermore, no principal payment was funded by Revlon. And Citibank never modified the register to reflect a full or partial discharge of principal in connection with the overpayment.

35.     As creditors woke up to find thousands if not millions more than expected in their bank accounts, the overpayment was covered widely by news outlets around the world. The *Wall Street Journal* reported that "Citigroup Pays Revlon Lenders Nearly $900 Million by Mistake."

*Bloomberg* and *Reuters* made similar reports. Revlon, for its part, publicly stated that "Revlon did not pay down the loan or any part of the loan." And all of the articles made clear that the payment was mistaken.

36. On both August 12 and August 13, 2020, Citibank sent notices to lenders asking for the funds to be returned, less the correct amount of interim interest reflected by the credit amount in the payment notices. Each notice advised that "[a]n additional amount was included in your interest payment in error and you were overpaid. Please return the amount listed below as soon as possible." And each notice followed with the specific amount owed Citibank. Many of Revlon's lenders, knowing they had received a mistaken overpayment, promptly complied and returned the funds.

37. Also on August 12, several other lenders—including, upon information and belief, defendants—took three actions that showed that they, like everyone else, understood that the amount of the payment was a clear mistake.

38. First, they purported to serve Revlon with a notice of an Event of Default under the 2016 loan. There would have been no reason to serve a notice of an Event of Default if the loan had just been paid in full.

39. Second, acting through UMB Bank, which claims to have been appointed successor administrative agent, they purported to accelerate the loan's principal. That acceleration notice was a clear admission that the lenders did not believe that the principal was repaid (or intended to be repaid) on August 11; if it had been, there would have been nothing to accelerate. Instead, the notice was a belated attempt to give defendants a pretext for holding on to the overpayment.

40. Third, UMB Bank, again claiming to be the administrative agent, filed a 117-page complaint accusing Revlon of improperly amending the Credit Agreement to *avoid* paying the

2016 lenders. *See* Complaint, *UMB Bank v. Revlon*, No. 20-cv-06352, Dkt. 1 (S.D.N.Y. Aug. 12, 2020). The complaint reconfirmed that the lenders were under no illusion that the loan had been fully repaid on August 11. Further, it alleged that Revlon was *unable* to repay the loan, because it was "insolvent and facing a severe liquidity crisis."

41. But rather than return the excess payment, defendants claimed it for themselves and their investors. In an e-mail to Citibank, Brigade gave the following rationale for refusing to return the funds:

> It is not at all clear that the funds were sent as a result of "clerical mistake". Moreover, whether sent in error or not, the funds were sent for the credit and account of Revlon such that the Credit Agreement provides for setoff. Additionally, the law may provide for a discharge for value of the loans, upon receipt of the funds, regardless of any error.

Other defendants provided similar instructions.

42. The response is largely incomprehensible. It is also clear that the payment did not "discharge" any debt—defendants were on notice that the payment was a mistake as soon as it received it, and no debt was ever "discharged" by the administrative agent, because no repayment of principal was ever intended. But in any event, this response makes clear that defendants have no intention of returning Citibank's money.

43. Defendants are currently holding approximately $501 million of Citibank's money to which they have no right, and know they have no right. That money must be returned immediately.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Unjust Enrichment

44. Citibank repeats, realleges, and incorporates by reference the foregoing allegations as though fully set forth in this paragraph.

45. Defendants were enriched at the direct expense of Citibank, by mistakenly receiving $501,286,786.09 of Citibank's money to which it was not entitled.

46. Equity and good conscience militate against permitting defendants to retain the misappropriated funds.

## SECOND CAUSE OF ACTION
### Conversion

47. Citibank repeats, realleges, and incorporates by reference the foregoing allegations as though fully set forth in this paragraph.

48. Defendants have and are continuing to exercise unauthorized dominion over specifically identifiable assets of Citibank, namely the $501,286,786.09 that was mistakenly transferred on August 11, 2020.

49. Despite Citibank's demands that defendants return the assets in question, defendants have refused to do so.

## THIRD CAUSE OF ACTION
### Money Had And Received

50. Citibank repeats, realleges, and incorporates by reference the foregoing allegations as though fully set forth in this paragraph.

51. On August 11, 2020, defendants mistakenly received $501,286,786.09 belonging to Citibank, and to which defendants had no claim.

52. Defendants benefitted, and continue to benefit, from the receipt of Citibank's money.

53. Under principles of equity and good conscience, defendants should not be permitted to keep Citibank's money.

## FOURTH CAUSE OF ACTION
### Payment By Mistake

54. Citibank repeats, realleges, and incorporates by reference the foregoing allegations as though fully set forth in this paragraph.

55. On August 11, 2020, Citibank mistakenly sent payments to defendants. The payments were intended to transfer the interim interest owed by Revlon to defendants. Instead, Citibank transferred an amount more than 100 times greater than the interest owed by Revlon, with the excess coming from Citibank's own funds.

56. Defendants derived a benefit as a result of the mistaken payments.

57. Equity demands restitution by defendants to Citibank.

## PRAYER FOR RELIEF

**WHEREFORE**, Citibank respectfully requests that this Court enter judgment in favor of Citibank and against Defendants:

A. Ordering Defendants to immediately return the misappropriated $501,286,786.09;

B. Declaring that Citibank is rightfully entitled to the misappropriated funds;

C. Ordering defendants to pay Citibank interest on the funds misappropriated by defendants for the duration that they remain with defendants;

D. Ordering defendants to pay damages reflecting their misconduct to Citibank;

E. Awarding reasonable costs and expenses incurred in this action, including attorneys' fees;

F. Awarding pre-judgment interest on all such damages, monetary or otherwise; and

G. Awarding further relief as the Court may deem just and proper.

Dated: December 8, 2020

| THE LAW OFFICES OF JOHN F. BAUGHMAN, PLLC | MAYER BROWN LLP |
|---|---|
| By: */s/ John F. Baughman*<br>John F. Baughman<br>Nathaniel E. Marmon<br>Andrew H. Reynard<br>299 Broadway, Suite 203<br>New York, NY, 10007<br>(347) 241-6347<br><br>*Attorney for Citibank, N.A.* | By: */s/ Matthew D. Ingber*<br>Matthew D. Ingber<br>Christopher J. Houpt<br>Richard A. Spehr<br>Michael Rayfield<br>Allison J. Zolot<br>Alina Artunian<br>Anjanique M. Watt<br>Luc W.M. Mitchell<br>1221 Avenue of the Americas<br>New York, New York 10020<br>(212) 506-2500<br><br>*Attorneys for Citibank, N.A. with respect to claims against defendants Brigade, Allstate, Bardin Hill, Greywolf, New Generation, and ZAIS.* |