UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE CITIBANK AUGUST 11, 2020　　　　　No. 1:20-cv-06539 (JMF)
WIRE TRANSFERS

### Declaration of Vincent Farrell

Vincent Farrell declares, pursuant to 28 U.S.C. § 1746:

1.　My name is Vincent Farrell.  I am the head of North American Loan Operations at Citibank.  I work at Citibank's office in New Castle, Delaware.

2.　I understand that this declaration serves as my direct testimony at trial.

3.　I use the term "August 11 Wire Transfers" to refer to a series of payments that Citibank sent out that day in connection with the "2016 Revlon Term Loan."

### My Background & My Department

4.　Apart from a brief stint at an unsuccessful startup, I have worked at Citibank, exclusively in loan operations roles, since my graduation from the University of Delaware in 1999.

5.　I have been in my current role for approximately ten years.  I have eight direct reports and oversee approximately 100 Citibank employees, as well approximately 85 employees of contractors working with Citibank.  I report to Brendan Zeigon, the Global Head of Loan and Credit Risk Management Services Operations.

6.　The Loan Operations group is responsible for trade support, loan servicing, and payment processing.  Loan Operations handles responsibilities for Citibank in its roles as lender, administrative agent, and trading counterparty.

7.      One of the sub-groups within Loan Operations is the Asset-Based Transitional Finance (ABTF) team.  It focuses on processing and servicing for "asset-based" loans.  The ABTF team is managed by Vincent Fratta.

8.      The ABTF team includes employees of Wipro Limited ("Wipro") who are based in India.  The Wipro employees that work on Citibank matters work exclusively for Citibank and have Citibank email addresses.  Because they work exclusively for us, they keep U.S. business hours.

9.      The Deal Closing Team (the "DCT") is also part of Loan Operations.  The DCT handles new and amended transactions as advised by the front office.  Dureyea Garnett is the head of the DCT.

**Loan Documentation**

10.     Citibank maintains a variety of records relating to loans in the regular course of its business.  These records are created and maintained by people with knowledge of the contents at or near the time the documents were created.

11.     One important set of records is what are known as the "Administrative Details" forms.  These are usually prepared by fund managers and given to Citibank.  They list information relating to each lender holding a position in a loan.  Citibank relies on the information in Administrative Details forms to administer loans.  They are stored and used in the ordinary course of business at Citibank.

12.     An example, the administrative details for a CLO ("TCI Symphony CLO 2017-1") managed by defendant Symphony Asset Management, LLC is attached.  [Ex. A (PX 0591).][1]  The

---

[1] I have reviewed examples of similar forms for other lenders and fund managers that have been marked as PX 0486 (Allstate); PX 1577 (Bardin Hill); PX 0597 (Brigade); PX 0599 (Greywolf); PX 0491 (HPS); PX 0602 (Medalist); PX 0603 (New Gen); PX 0507 (Tall Tree); PX 0604 (Zais).

form is on Symphony letter head and provides contact information at Symphony email addresses and offices. This is typical. Administrative Details forms almost always provide contact information for fund managers, not underlying investors. We rely on fund managers to provide information and to settle trades. When we need action from a lender, we contact the corresponding fund manager.

13. Loan Operations uses a software application called Flexcube. It is a processing system used in connection with the various aspects of loan operations. Flexcube is an Oracle product.

14. Flexcube includes a database of information relating to loans. Using an SAP application called Business Objects, it is possible to access that database to create what is known as an "Operation Contact" Report (an "OC Report"). An OC Report is a point in time record of the composition of a lender syndicate for a particular loan.

15. In connection with certain loans, Citibank also maintains what is known as the "Register." A Register lists information relating to a loan, including the identity of the lenders (called "investors") that, in aggregate, hold the loan, the fund managers acting for each lender, and the amounts outstanding on the loan.

16. A Register is not the same thing as an OC Report. Although an OC Report may be used in creating a Register, other steps are required before a Register can be completed. At times, an OC Report may reflect the same information as the Register, but this will not be the case when there are outstanding settlements relating to secondary trading on a loan, or when a loan is in the process of being rebuilt, a procedure I describe in further detail below.

**The August 11 Rollup**

17.     The August 11 Wire Transfers were made in connection with what is known as a "rollup" transaction. At a high level, a rollup is a transaction where a lender exchanges one loan for another, usually without cash physically being exchanged with respect to outstanding principal. The "August 11 Rollup" was this type of transaction. Lenders managed by Angelo, Gordon and Co. ("Angelo, Gordon") were exchanging their positions in the 2016 Revlon Term Loan for positions in a different Revlon facility. The remaining lenders would continue to hold a pro rata share of the 2016 Revlon Term Loan based on a slightly reduced principal balance. One feature of a rollup transaction like this is that lenders are paid accrued interest at the time of the exchange; in this case, the Angelo, Gordon lenders would receive accrued interest. To facilitate timely and accurate payments, and streamline processing, we agreed with the client to pay interest to all lenders as well.

18.     The August 11 Rollup was not the first rollup done with respect to the 2016 Revlon Term Loan. There was one in May 2020. There also was a rollup in June 2020 on a different tranche. In these cases, Revlon paid, and Citibank distributed, accrued interest through the date of the rollup to all lenders.

19.     To effectuate the rollup transaction in Flexcube, the team "took down" the existing tranche of the Revlon 2016 Term Loan and "rebuilt" a new tranche in the system. This was done because the number of lenders was being reduced (due to the exit of the Angelo, Gordon lenders) and calculations relating to the details of the loan had to be revised (because the remaining lenders' pro rata shares had changed). To facilitate timely and accurate payments to all lenders, we agreed with Revlon to pay accrued interest to all lenders of record on the date of the rollup. These procedures were not unique to the August 11 Rollup or to Revlon.

20. The 2016 Revlon Term Loan had different tranche numbers before and after the August 11 Rollup. The tranche number for the 2016 Revlon Term Loan before the August 11 Rollup was 001BTPR201420001. The tranche number after the rollup is 001BTPR202250002.

21. In connection with the August 11 Rollup, Revlon gave instructions relating to the "repurchase" component of the transaction in what is called a "Direction Letter." [Ex. B (PX 0283A).] This letter was addressed to the CRMS Department and also sent to two email distribution lists within departments that report to me.

22. The Direction Letter defined August 11 as a "Repurchase Date." It also attached a spreadsheet "setting forth the principal amount of the Term Loans held by each Lender . . . after giving effect to all the Term Loan Repurchases to be effectuated on the Repurchase Date." The attached spreadsheet shows that only five lenders (all managed by Angelo, Gordon and Co.) were part of the rollup. The remainder were intended to remain as lenders in the 2016 Revlon Term Loan, which is identified as "TLB" in the spreadsheet attached to the Direction Letter.

## The August 11, 2020 Wire Transfers

23. I was not personally involved in making the August 11, 2020 wire transfers and my knowledge surrounding the events of August 11, 2020 was mainly gathered after the fact. However, people who were involved report to me and I am familiar with Citibank's records relating to the transaction, all of which are records created and maintained in the regular course of business. I have also, as part of my duties, reviewed and become very familiar with the events of that day.

24. Citibank employees in my department began working on matters relating to the August 11 Rollup at approximately 4:00 p.m. that afternoon. At 4:01 p.m., Dorothy Lee-Murray,

who is on the DCT, advised several groups in my department that there would be "a Rollup Repurchase for Revlon TL 2016." [Ex. C (PX 0418).]

25. It is standard practice (generally and not just with respect to the Revlon loan) for Citibank to provide Calculation Statements prior to making payments. A Calculation Statement contains information about the wire transfer, such as its purpose and amount. It also specifies the date and recipient of the wire transfer, as well as the loan to which the payment relates.

26. On August 11, my team generated Calculation Statements for every payment intended to be made in connection with the August 11 Rollup. An example is attached. [Ex. D (PX 0678A).][2] In this example, the Calculation Statement shows that Citibank intended to pay TCI Symphony CLO 2017-1 "Interim Libor Interest" of $29,544.59 on August 11.

27. As is standard practice, on August 11, Calculation Statements were distributed before the wire transfers were sent. They are, in effect, a notice that the wire transfer is coming.

28. Later, when the wire transfers themselves were sent, the Transfer Confirmations were generated. They include the SWIFT messages used to send the individual wire transfers.[3] An example is attached. [Ex. E (PX 0648).] In this example, the Transfer Confirmation shows that Citibank actually paid TCI Symphony CLO 2017-1 $3,411,436.99—more than one hundred times what was intended.

29. The credit amount on the Calculation Statement should match the credit amount on the Transfer Confirmation. For the August 11 Wire Transfers, these Credit Amounts do not match. This reflects the errors made in sending the August 11 Wire Transfers.

---

[2] I have reviewed examples of examples of similar statements sent to other lenders and fund managers that have been marked as PX 0511 (Allstate); PX 0596 (Bardin Hill); PX 0891 (Brigade); PX 0605 (Greywolf); PX 0530 (HPS); PX 0616 (Medalist); PX 1297 (New Generation); PX 0552 (Tall Tree); PX 0681 (Zais).

[3] I have reviewed examples of similar confirmations generated for other lenders and fund managers that have been marked as PX 0722 (Allstate); PX 0596 (Bardin Hill); PX 0446 (Brigade); PX 0605 (Greywolf); PX 0520) (HPS); PX 0615 (Medalist); PX 0618 (New Generation); PX 0549 (Tall Tree); PX 0681 (Zais).

30.     The August 11 Wire Transfers were intended to include only interest.  Thus, the Calculation Statements sent that day only refer to interest.  When Citibank intends to make a payment that includes both principal and interest, the Calculation Statement will include separate lines listing the amount of principal being paid and the amount of interest being paid.  I am unaware of any situation where Citibank would intend to wire out principal but not list it in the Calculation Statement.

31.     This is true for the 2016 Revlon Term Loan.  That loan requires quarterly payments of both principal and interest.  Prior to sending such payments, Citibank sends Calculation Statements which list separate amounts of interest and principal.  Examples of Calculation Statements showing the principal and interest breakdowns for payments made to TCI Symphony CLO 2017-1 on the 2016 Revlon Term Loan are attached.  [Ex. F (PX 1569); Ex. G (PX 1570).]

**August 12, 2020**

32.     I became actively involved in matters related to the August 11 Wire Transfers on August 12, 2020.  I have remained involved ever since.

33.     That morning, I received a Skype message from Vincent Fratta that alerted me to a loan processing error made the day before.  At that time, he and I believed there was a "tech issue." [Ex. H (PX 0788).]  Nevertheless, I instructed Mr. Fratta to elevate the matter and to contact our boss, Brendan Zeigon to alert him to the issue.  I was copied on Mr. Fratta's email to Mr. Zeigon. [Ex. I (PX 0383).]

34.     At 12:21 p.m., I sent an email to Mr. Zeigon, Gennadiy Makovoz, a manager in the Information Services Group, and others, informing them that, "Tech is now citing a user omission in the processing [as] the cause." [Ex. I (PX 0383).]  Mr. Makovoz responded to this email at 12:35pm and indicated that he would follow up.

35. At 3:36 p.m., I received an email from Mr. Makovoz, where he confirmed that the cause of the issue was not a technical issue, but "lack of system feature set knowledge and deficiency in existing maker/checker process." [Ex. I (PX 0383).] In other words, Mr. Makovoz confirmed that the cause of the issue was human error. I understood at this time that the Wipro employee creating the transaction failed to suppress Flexcube's default instruction, and that resulted in the overpayment being sent to lenders. I also understood that employees at Wipro and Citibank who were responsible for checking the transaction also missed that the transaction had not been configured correctly.

36. This error resulted in Citibank sending out $893 million more than was intended. The money sent in error was Citibank's own money.

37. As part of our inquiry into what happened, I asked the team to prepare a spreadsheet listing the amounts wired out. The spreadsheet and its cover email are attached. [Ex. J (PX 0346A).][4] The total amount wired is listed in Column I. The principal and interest components are listed in Columns J and K, respectively.

### Efforts to Recover the Money Wired in Error

38. At the same time that we were investigating how this error occurred, Citibank also sent recall notices to the lenders. These notices were sent in the regular course of business and created by people with knowledge of the contents at the time the materials were created.

---

[4] This spreadsheet was prepared by the "Oracle FSGU Consulting" team. These are Oracle employees who are seconded to Citibank to support our use of Flexcube. These employees work in Citibank offices, have Citibank email addresses, and access to Citibank systems. It is a regular part of their job to create documents such as PX 0346A, they have knowledge of the contents at the time they are created, and these records are maintained at Citibank in the regular course of business.

39. The first set of recall notices was sent at approximately 2:25 p.m. on August 12. An example is attached. [Ex. K (PX 0828).][5] It states:

> Please be advised that on August 11th 2020 regarding "REVLON TERM LOAN 2016 – Global Amount 893,944,008.52" we have paid Interest accrual from May 29th to August 11th. Your share of Principal amount was also released erroneously.
>
> Share Amount: 3381892.4
>
> Please return the principal portion of the payment you received to the below instructions as soon as possible.

40. The second set of recall notices was sent at approximately 6:00 p.m. on August 12. An example is attached. [Ex. L (PX 0678B).][6] It states:

> Please be advised that on August 11th 2020 regarding "REVLON TERM LOAN 2016 – Global Amount 893,944,008.52", we have paid Interest accrual from May 29th to August 11th. An additional amount was included in your interest payment in error and you were overpaid. Please return the amount listed below as soon as possible.
>
> Amount Paid in Error: $3,381,892.40

41. The third set of recall notices was sent on August 13. An example is attached. [Ex. M (PX 0678C.][7] It states:

---

[5]   I have reviewed examples of similar notices sent to other lenders and fund managers that have been marked as PX 0816 (Allstate); PX 0802 (Bardin Hill); PX 0880 (Brigade); PX 0838 (Greywolf); PX 0862 (HPS); PX 0876 (Medalist); PX 0884 (New Generation); PX 0801 (Tall Tree); PX 0797 (Zais).

[6]   I have reviewed examples of similar notices sent to other lenders and fund managers that have been marked as PX 0696 (Allstate); PX 0592 (Bardin Hill); PX 891 (Brigade); PX 0605 (Greywolf); PX 0728 (HPS); PX 0616 (Medalist); PX 1301 (New Generation); PX 0554 (Tall Tree); PX 0682 (Zais).

[7]   I have reviewed examples of similar notices sent to other lenders and fund managers that have been marked as PX 0693 (Allstate); PX 0592 (Bardin Hill); PX 0891 (Brigade); PX 0732) (HPS); PX 0616 (Medalist); PX 1310 (New Generation); PX 0799 (Tall Tree); PX 0682 (Zais).

> Please be advised that on August 11th 2020 regarding "REVLON TERM LOAN 2016 – Global Amount 893,944,008.52", we have paid Interest accrual from May 29th to August 11th. An additional amount was included in your interest payment in error and you were overpaid. Please return the amount listed below as soon as possible.
>
> Amount Paid in Error: $3,381,892.40

42. Additional recall notices were sent on August 17 and August 18. An example is attached. [Ex. N (PX 0678D).] [8] It states:

> I am writing to follow-up on communications various personnel within Citi have sent to you on August 12, 2020, and thereafter. As you are aware, on August 11, 2020, Citibank funds were mistakenly remitted to you. To be clear, those funds belong solely to Citibank; they are not borrower or Revlon 2016 Term Loan facility funds. In view of this mistaken transfer, you are legally obligated to return those funds and, as is standard industry practice when fund transfers occur mistakenly, we expect that you will return those funds to Citibank immediately. To date, you have failed to return Citibank's funds, and Citibank is prepared to take legal action to recover its funds. In the meantime, please be advised that the transfer, use or dissemination of Citibank's funds would constitute serious misconduct in violation of law. Accordingly, in the event you do not immediately return Citibank's funds, we demand that you refrain from any transfer, use or dissemination of those funds. You are also instructed to preserve and maintain all documents relating to this matter. Citibank reserves all rights and remedies with regard to this matter.

43. In addition to sending the notices, I and members of my team repeatedly reached out to fund managers to try to recover the mistakenly transferred funds. As far as I know, at no time has any defendant fund manager indicated that they (the fund managers) were not authorized to act on behalf of their client lenders. More specifically, at no point has any defendant fund manager advised that they were not authorized to discuss the subject of whether the mistakenly transferred funds could be returned or referred us to a lender to discuss this subject. In my experience it is standard to have such discussions.

44. As to the defendants, however, we encountered resistance to our attempts to recover Citibank's money.

45. For example, on August 13, I and my team made repeated efforts to contact people at Brigade. Both I and my colleague Nikhil Sonawala spoke to a man named Jeff Frusciante, who I understand is in Brigade's operations department. In my conversation with Mr. Frusciante, I

---

[8] I have reviewed examples of similar notices sent to other lenders and fund managers that have been marked as PX 0694 (Allstate); PX 0592 (Bardin Hill); PX 0156 (Brigade); PX 0605 (Greywolf); PX 0730 (HPS); PX 0616 (Medalist); PX 1305 (New Generation); PX 0774 (Tall Tree); PX 0682 (Zais).

asked him to confirm that Brigade had received recall notices for all the funds it manages, and he said that it had. I also emphasized to him that this was an urgent matter and asked if Brigade was going to return the money. Mr. Frusciante told me that the matter was still being considered and that he would have to get back to me. At no point did he tell me that Brigade believed it did not have to return the money because it (or its lenders) had discharged Revlon's debt.

46. It was difficult to reach anyone at HPS. My colleague Nikhil Sonawala left four voicemails on August 13 and did not get a response. [(Ex. O (PX 0372).]⁹ Eventually I reached a man named Jamie Donsky at HPS and I spoke to him later that afternoon. I explained to him that this was an urgent matter and followed up with an email providing more information. [(Ex. P (PX 0369).] Mr. Donsky said he would check with others at HPS and come back to me with an update. He never did.

47. I and my team reached out to Symphony on August 13. As reflected in our contemporaneous emails, we sent at least four separate emails and made telephone calls that were not answered. [Ex. Q (PX 0331).] Out of the blue, Symphony sent us an email asking us to stop "harassing" them. This was puzzling because we had never had the chance to speak to anyone at Symphony and had not received a response to any of our emails.

**Prepayments**

48. From time to time, borrowers prepay loans. In my experience, borrowers typically send notices before making a prepayment. When Citibank is acting as administrative agent, and it receives a prepayment notice from a borrower, we forward this information to lenders promptly,

---

⁹ Mr. Sonawala reported to me on his efforts to contact HPS via a Skype chat. Citibank maintains and stores Skye chat records in the ordinary course of busines and they reflect communications made by people with knowledge at or near the time of the chats.

either the same day or the next, by sending it to the recipients designated on the applicable Administrative Details form.

      49.    Revlon did not provide Citibank with a prepayment notice in connection with the August 11 Wire Transfers. Nor did it provide funds to make a prepayment.

      I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 13, 2020
       New Castle, Delaware

                                                    Vincent Farrell