UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE CITIBANK AUGUST 11, 2020 WIRE TRANSFERS | No. 1:20-cv-06539 (JMF) |

**Declaration of Vincent Fratta**

I, Vincent Fratta, declare pursuant to 28 U.S.C. § 1746 as follows:

1. My name is Vincent "Vinny" Fratta. My business address is 1 Penns Way, Newcastle, Delaware. I am a Loan Agency Senior Manager in Citibank's Global Loans Operations Group, focusing on North America. In this role, I am a part of the Asset-Based Transitional Finance group, also referred to as ABTF, which is one of several groups within Citibank's Global Loans Operations group. I have worked in different positions at Citibank for more than 14 years.

2. As a Senior Manager working in Citibank's Global Loan Operations group, my responsibilities include the operational aspects of deals in which Citibank acts as the administrative agent or holds a lending position. This involves handling new loan requests, new borrowings, payments, and the collection and distribution of interest and principal. I also oversee certain loan processing activity, including wire transfer activity.

3. On August 11, 2020, I was one member of a 3-person team responsible for mistakenly wiring $893,944,008.52 (the "overpayment") to lenders in a Revlon 2016 term loan administered by Citibank as administrative agent ("Revlon loan"). That amount was equal to the outstanding principal balance on the Revlon loan. My intention that day, as the final approver of the wire transfers at issue, was to transfer to the Revlon lenders only interim interest in the amount

1

of $7,809,594.19, and to reflect a non-cash transfer of $893,944,008.52 to an internal account maintained by Citibank from which no third-party payments could be made because the account does not contain any funds.

4.     I understand that this declaration serves as my direct testimony at trial, but I am also informed that I may be asked to supplement my testimony to address other matters raised in the case.

**Background**

5.     I reside in Smyrna, Delaware and work in New Castle.  In 2003, I graduated with a B.A. from the University of Delaware, where I majored in finance and minored in economics. From 2004 to 2005, I worked at ING Direct in a customer service and sales role.

6.     I joined Citibank in 2006 as an employee in loan operations for the Global Loans Operations group.  The loan operations team performs a variety of operational duties related to the managing of syndicated loans, including acting as an administrative agent on different types of loans and managing back-office functions for loans on which Citibank is the originator.  In the context of syndicated lending, from an operational standpoint an administrative agent acts as the liaison between the borrower of the loan and the lenders in the syndicate.  The Global Loans Operations group also manages trading positions for these loans.

7.     In 2007, I was promoted to the team leader for the administrative agent team, and in 2008, I was promoted to manager for the loan reconciling ("loan recon") and disclosure teams. Loan recon is responsible for reconciling all cash breaks—where the cash "in" does not match the payment sent "out"—for the administrative agent operations team.  The disclosure team is responsible for distributing to customers the financial documents listed in each credit agreement on loans in which Citibank acts as the administrative agent.

8. In 2009, I was promoted to manager for the loan originations team. This group is responsible for carrying out the operational aspects of deals in which Citibank is the lender, not the agent. In 2012, I was promoted to my current role as the manager of Citibank's ABTF team.

9. The ABTF team serves two principal functions—both operational. The first is to perform all the administrative agent functions in loans in which Citibank is administrative agent, and the second is to perform all administrative functions for loans in which Citibank is a lender and another bank is the administrative agent. As discussed, those functions include processing interest and principal payments, sending notices, overseeing wire transfers, and performing daily cash reconciliations to match expected or intended payments with actual payments—whether incoming or outgoing.

10. I report to Vincent Farrell, the Director of North American Loan Operations. Our ABTF team consists of approximately six Citibank employees based in Delaware and nine Wipro Limited ("Wipro") employees based in India, all of whom report to me. Wipro is an independent company that we have used since 2009 to assist with certain operational functions within our group; among other things, Wipro carries out transactions within our loan product processing software, processes wire transfers, renewals, and interest payments, and performs daily cash reconciliation work. This specific Wipro team works exclusively for Citibank and has Citibank email addresses. Because the team works exclusively for us, they keep U.S. East Coast business hours. I have visited Chennai twice to meet the team there, once in 2009 and once in 2013. Although they have management lines within their own organization, I am listed as the business contact and manager for those nine employees. They work under my supervision.

11. I also work closely with the Deal Closing Team, or "DCT," at Citibank. The DCT handles the closings of certain deals such as corporate actions or restructurings. After DCT books

a transaction, my team handles the day-to-day activity of that loan going forward, which may include processing payments on the day the transaction is booked.

**Six-Eyes Approval Process**

12.     Citibank has a "six eyes" approval process that ABTF follows before executing wire payments in transactions in which Citibank serves as administrative agent.  The six-eyes approval process means what its name suggests—there are three individuals, or six eyes, involved in reviewing and executing a wire transfer.  In the first step of this process, a "maker" manually inputs payment information into a loan product processing program, called Flexcube, that Citibank uses for, among other things, initiating and executing wire payments.  The maker is the first set of eyes, and in most cases is a Wipro employee.  The second step of the process involves a "checker," who checks, or verifies, the maker's work.  The checker is also typically a Wipro employee and acts as the second set of eyes on the transaction.  The third and final step of the process requires an "approver" in the Delaware-based Citibank team to act as a final check on the work of the maker and checker; we are the third set of eyes—the fifth and sixth eyes—on the transaction.  Once a member of the Delaware-based Citibank team approves the transaction in writing, typically the Wipro checker executes the transaction.  For the August 11 wire transfer, I was the approver on the transaction.  Santhosh Ravi, at Wipro, was the maker, and Arokia Raj, also at Wipro, was the checker.

13.     The details of the six-eyes approval process are contained in the ABTF-Fund Sighting Process Description Document, dated June 15, 2020.  A copy of this policy is attached as Exhibit A (PX 479).  I am familiar with this policy and have used it in the regular course of my work as the Citibank employee responsible for managing ABTF transactions.  The relevant provision of the policy requiring a six-eye approval for all ABTF transactions is from the ABTF-

Fund Sighting Process Description Document (Exhibit A (PX 479) at Citi00001861; Exhibit B (PX 430) at Citi00001263) and is set forth below:

| Team / Process | Approver | Delaware Approvals Borrowing & Manual Payments | | | Delaware Approvals Lender / Participant payments | | | Wipro Approvals Borrowings | | | Wipro Approvals Lender Payments / Participant Payments | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Limit | Systemic | 6 Eye | Limit | Systemic | 6 Eye | Limit | Systemic | 6 Eye | Limit | Systemic | 6 Eye |
| Agency | Level 1 | <= 10 MM | x | | Not Applicable | | | Not Applicable | | | <= 10 MM | x | |
| | Level 2 | <= 50 MM | x | | | | | | | | <= 50 MM | x | |
| | Level 3 | > 50 MM | x | | | | | | | | > 50 MM | x | |
| ABTF (Agented) | Level 1 | <= 10 MM | x | x | Not Applicable | | | <= 10 MM | x | x | <= 10 MM | x | x |
| | Level 2 | <= 50 MM | x | x | | | | <= 50 MM | x | x | <= 50 MM | x | x |
| | Level 3 | > 50 MM | x | x | | | | > 50 MM | x | x | > 50 MM | x | x |
| ABTF (Non-Agented) | Level 1 | Not Applicable | | | Not Applicable | | | <= 10 MM | x | | Not Applicable | | |
| | Level 2 | | | | | | | <= 50 MM | x | | | | |
| | Level 3 | | | | | | | > 50 MM | x | | | | |

14. On August 11, 2020, we followed the six-eye approval process in connection with the August 11 wire transfers.

**Knowledge of Revlon Loan**

15. Prior to August 11, 2020, I had general awareness that ABTF previously had wired interest payments related to the Revlon loan, but I was otherwise unfamiliar with the background of the Revlon loan other than that Citibank was the administrative agent. Prior to August 11, I was not aware that lenders had raised any questions about Citibank's status as administrative agent. I did not know about the existence or details of any amendments to the governing credit agreement ("Credit Agreement"). I do not recall whether I ever reviewed the Credit Agreement. I do not recall whether I had discussions with the DCT or any of our "front office" colleagues—those who interact directly with the lenders—about the Revlon loan in general, but I know I did not have any conversations with them about the August 11, 2020 transaction other than those described in this statement. And I didn't know that any interim interest was going to be paid to lenders, or the reasons why interim interest was going to be paid, until August 11. I didn't need to know any of this information in order to do my work managing the ABTF group.

**August 11, 2020**

16.     On August 11, 2020, at 5:49 p.m., I received a Skype chat from my colleague Joshua Kaufmann, who asked if I had seen the "Revlon FS," which I understood to be a Revlon "fund sighting" transaction.  (Skype chats occur in the ordinary course of our business; they tend to be faster than email and therefore sometimes a more efficient form of communication.)  It was the first time I had heard that any transaction involving the Revlon loan would take place on August 11.  "FS" or "fund sighting" refers to any transaction in which we are sending cash out of the bank, "transferring" an amount to our internal account (which we call a "wash" account), or both.  I will describe the wash account in more detail below.  As I discuss below, here we were doing both.  A copy of the Skype chat from Mr. Kauffman is attached as Exhibit C (PX 322).

17.     I also received a Skype chat from Mr. Raj, the Wipro checker, at 5:51 p.m. asking me to review the "FS" and providing a loan identification number.  A copy of this Skype chat is attached as Exhibit D (PX 789).

18.     Around the time I received the chat from Mr. Kauffman, I opened an email chain that started with a 4:02 p.m. email from Dorothy Lee-Murray, a member of Citibank's DCT, instructing my team and others that "there will be a Roll-up Repurchase for Revlon TL 2016 scheduled to close either 8/11/2020 or 8/12/2020."  The email further stated "Please pay the Principal to the Wash Account when accrued interest is processed effective 8/11/2020."  A copy of this email is attached as Exhibit E (PX 469) at Citi00001765.

19.     Emails such as this one—what we refer to as a "handoff"—are sent in the normal course of business at Citibank.  It is among the ways that we receive operational instructions related to a transaction.

6

20. My first reaction was to send a chat to Mr. Kauffman, asking why "P," referring to the principal amount on the Revlon loan, was being set to our internal wash account. He explained that "it's another one of those Roll-ups they were doing on the TL before…[s]o TL isn't going away but lenders are being paid out so I think DCT will build the new tranche with the remaining lenders." Ex. C (PX 322). I understood "TL" to mean "term loan."

21. Based on this chat and Ms. Lee-Murray's email, I understood the following. First, this was a "rollup transaction." I did not know the details around the rollup—who was rolling up, why they were rolling up, the specific loan into which they were rolling up—and those details weren't relevant to the specific work of ABTF operations. I did know that the lender composition of the Revlon loan would be changing, and that the remaining Revlon loan lenders would continue to hold a pro rata share of the Revlon loan based on a new, slightly reduced principal balance.

22. To process this from an operational standpoint, Citibank needed to "[re]build the new tranche with the remaining lenders" (using Mr. Kaufmann's words) in our Flexcube system to account for the slightly reduced principal balance resulting from the rollup transaction. ABTF's role in this process was to use the Flexcube system to both execute the payment of interim interest to all lenders and internally set the principal balance of the Revlon loan to Citibank's non-cash "wash account." The wash account is not a bank account in the typical sense. It is an internal Citibank account that shows journal entries. It is used for certain Flexcube transactions to account for internal cashless fund entries and it is also used to help ensure that money does not leave the bank. Once the wash account transaction is completed, the DCT manually rebuilds the loan to reflect the modified principal balance. ABTF is not involved in that aspect of the rebuild process.

23. The wash account does not contain any funds and it is impossible to make a payment to a third party out of the wash account.

24.     Second, in reviewing this email from Ms. Lee-Murray, it was this rollup transaction that initiated the process of ABTF executing a payment of interim interest to all lenders on August 11.  It was clear to me that the only amount that Citibank intended to pay to lenders—that is, the only amount of money that was "going out the door"—was the interim interest that accrued between the last interest payment date and August 11.

25.     And third, consistent with this being a rollup transaction, Ms. Lee-Murray was instructing my team to "[p]lease pay the Principal to the Wash Account when accrued interest is processed effective 8/11/2020."  Ex. E (PX 469) at Citi00001765.  This meant, again, that the outstanding principal balance was not to be paid to the lenders—it was to be set to Citibank's wash account.  Also, Ms. Lee-Murray was reminding us that no payment of interim interest should be paid until "DCT confirms" and until "accrued interest have been received from the borrower."  The instruction not to pay interest until it is "received from the borrower" is consistent with our standard practice:  we typically would not make a payment until that payment is funded by the borrower.

26.     I continued to review the email chain and noticed that, at 4:54 p.m., Joshua Kaufmann informed ABTF, among others, that "Interest funds are in.  ABTF team. Please proceed per Dorothy's instructions below."  Ex. E (PX 469) at Citi00001761-62.  I understood that Citibank had received the accrued interim interest amount, and that my team had now been instructed to prepare the transaction—payment of the interim interest to lenders, with principal going to the wash account—in accordance with Ms. Lee-Murray's instructions.

27.     Based on this email chain, I understood that, at 5:45 p.m., as part of the six eye approval process that I previously described, Santhosh Ravi, the assigned "maker" at Wipro responsible for preparing the transaction for processing, emailed Arokia Raj, the Wipro "checker,"

requesting that Mr. Raj approve the transaction. Mr. Ravi used a loan identifier—001BDLL201480094—and explained to Mr. Raj the basics of the transaction: "Principle to Wash A/c & Interest to DDA A/c." I understood Mr. Ravi to be saying that he set up the transaction so that principal would be set to the internal wash account and not sent to lenders, and that interest—funded by Revlon—would be sent to Citibank's "Demand Deposit Account" for distribution to lenders. The "DDA" account is the Citibank operations account that collects payments from third parties (here, Revlon) and from which payments to lenders can be made.

28. I then read a 5:47 p.m. email from Mr. Raj, the Wipro checker, in which he sent the transaction to me for review and approval. He stated in his email "**NOTE:** Principal set to Wash and Interest Notice released to investors." I understood this to mean that Mr. Raj had performed his "checker" responsibility of reviewing the transaction created by the "maker," and that he wanted to reinforce that the outstanding principal balance would be set to Citibank's internal wash account and not sent to lenders. He was also indicating that "interest notice"—in this case a calculation statement notifying lenders that an interim interest payment would be made on August 11—had been released to lenders. He also attached a payment confirmation showing that Revlon had paid the interim interest amount of $7,809,594.19 to Citibank for distribution to lenders. A copy of this email is attached as Exhibit F (PX 471).

29. After receiving Mr. Raj's 5:47 p.m. email, I began to review the transaction as the final step in the six eye approval process. I understood the purpose the transaction—to pay interim interest to lenders and to set the outstanding principal balance to our internal wash account for purposes of our back-office rebuild of the Revlon loan. No amount of principal was to be paid to lenders.

30. As part of my review, I looked at the attachment to Mr. Raj's email. I confirmed that Citibank had received from Revlon the full amount of the interest payment. Ex. F (PX 471). I also accessed our Flexcube system to confirm that the transaction had been correctly input. I observed several screens, including the following (Exhibit G (PX 366) at Citi00000541):

| | | | | | Drawdown |
|---|---|---|---|---|---|
| BDLL | Borrower LIBOR Drawdown Prod | | | | |
| 001BDLL201480094 | | | 001BDLL201480094 | | |
| 024462 | | REVLON CONSUMER PRODUCTS CORP | | | |
| Facility Name | REVLON TERM LOAN 2016 | | | | |

GL Detail

| Component | Internal GL | | Overwrite default settlement instruction |
|---|---|---|---|
| COLLAT | | 🔍 | ☐ |
| COMPINTSF | | 🔍 | ☐ |
| DEFAUL | | 🔍 | ☐ |
| DFLFTC | | 🔍 | ☐ |
| FRONT | | 🔍 | ☐ |
| FUND | | 🔍 | ☐ |
| INTEREST | | 🔍 | ☐ |
| PRINCIPAL | 3003000023 | 🔍 | ☑ |
| | | 🔍 | ☐ |

31. There can be hundreds of wire transactions processed every day using our Flexcube system. Almost all of those transactions involve Citibank paying funds to a third party by releasing those funds from the Citibank DDA to the third party's bank account. Flexcube therefore has a "default settlement instruction" that is relevant here: a payment amount entered into Flexcube will be released as a wire payment unless the maker suppresses, or overrides, the default option. In order to suppress the payment and override the default option, Flexcube requires that we check certain boxes to "[o]verwrite default settlement instruction"—meaning that, if the box is checked and populated with the internal wash account number, we will not default to a release of funds to the third party's bank account.

32. When I looked at the screen above, I noticed that the "principal" box had been checked and populated with the internal wash account number. I believed in that moment that we were overriding the default settlement instruction as to the outstanding principal balance of the Revlon loan, meaning that the principal amount would not be sent to the lenders, but rather would be set to Citibank's internal wash account. Because we did not check the "interest" box, I believed that the approximately $7.8 million in interim interest payment would not be suppressed and would be released to the lenders as intended.

33. It was based on this understanding that I responded to Mr. Raj's email at 5:54 p.m. and wrote, "Looks good, please proceed. Principal is going to wash." Ex. E (PX 469) at Citi00001760. I expected that upon receipt of my email, Mr. Raj would execute the transaction and both release the interest to the lenders and set the principal balance to Citibank's internal non-cash wash account.

34. At 6:08 p.m., I received an email from Mr. Raj informing me (and others) that the transaction had been executed: "Josh, Principal set to wash and Interest paid to investors with Invoice." Ex. H (PX 419) at Citi00001108. Upon reading this email, it was my understanding that we executed the transaction as instructed and intended, with interest being paid to the lenders and principal being set to Citibank's internal wash account.

35. As I discovered the next day, unfortunately I was wrong. The system default was not suppressed as expected, and the amount of the principal balance that was intended for the wash account as a journal entry was instead paid out of the DDA as an overdraft.

**August 12, 2020**

36. At 9:37 a.m. on August 12, 2020, I received an email from Mr. Raj in which I first learned that there was a problem with the wire transfers processed on August 11. A copy of this email is attached as Exhibit I (PX 1574). Mr. Raj sent me the following message: "Principal was set to wash and only Interest was set to DDA. But, it looks like fund has gone out along with principal. Can you please review and advice if this need to be raised to tech." He attached a screen shot reflecting an overpayment to one of the lenders, Brigade Distressed Value Master Fund Ltd.

37. I was shocked when I read Mr. Raj's email. My first reaction was reflected in a 9:51 a.m. chat to Mr. Raj, in which I said "Oh my" and asked Mr. Raj a number of questions: Did we have proof that the wires went to the specific lender identified in his email? Did it go to all lenders? How much was the overpayment? How many lenders were involved? I also suggested to Mr. Raj that this might be a "tech issue," asked him to send all screenshots to our technology group for escalation, and asked him to confirm "the total amount of principal out the door." He told me that $893,944,008.52 had been released to lenders. A copy of this chat is attached as Exhibit J (PX 463) at Citi00001655.

38. At 10:46 a.m., Mr. Ravi emailed technical support, copying me, to inform them that "we have processed principal to wash and Interest to DDA however funds has gone out along with principal in the below transaction." A copy of this email is attached as Exhibit K (PX 367).

39. As I was communicating with Mr. Raj, I also sent a Skype chat to my supervisor, Vincent Farrell, Head of North American Loan Operations to say "bad news…principal to wash, wires looks like they went out the door." A copy of this communication is attached as Exhibit L (PX 788). I then sent Mr. Farrell an additional chat to confirm "principal out the door when it was supposed to be sent to wash for Revlon restructure." A copy of this communication is attached as

12

Exhibit M (PX 349). I understood the severity of the problem and the importance of moving quickly to make sure that everyone on the team knew. Mr. Farrell told me to quickly send a note to Brendon Zeigon, the Global Head of Loan Operations and Credit Risk, as well as the "business." When he said the "business," I understood that he meant the people at Citibank who work in the front office and are the points of contact for the Revlon loan. It was important that they were up-to-date before any lenders called. We also wanted to make sure that they learned about this from us, and not from a lender. Dorothy Lee-Murray confirmed in a later email that we should reach out to the business "in case they receive calls from the lenders." A copy of this email is attached as Exhibit N (PX 396).

40. Even though I asked Mr. Raj to escalate the issue to our technical support group, I separately flagged the issue. At 10:26 a.m., I sent an email to Vikas Khanna and Daya Satyanarayana, members of our technology support group, and explained what I understood to be the issue with the previous day's wire transfers: "Yesterday we processed a payment with Principal to the wash and Interest to be sent to lenders. All details in the front end screens yesterday [led] us to believe that the payment would be handled in that manner . . . screenshots provided below indicate[] that the wash account . . . is present and boxes checked appropriately for the principal components." A copy of this email is attached as Exhibit O (PX 366) at Citi00000541. At this point in time, I believed that the mistake was caused by a glitch with the Flexcube system and not human error.

41. I then forwarded my email to members of my team, with the subject line, "Urgent Wash Account Does Not Work." I continued to believe that there was a technical glitch with Flexcube and wanted to alert my broader loan operations team: "Flexcube is not working properly, and it will send your payments out the door to lenders/borrowers. The wash account selection is

13

not working. This lead to ~1BN going out the door in error yesterday for an ABTF Deal, Revlon." Ex. O (PX 366) at Citi00000541.

42.     Having raised the issue with our technical support group and alerting my colleagues to what I believed was an issue with Flexcube, I emailed Brendon Zeigon as requested by Mr. Farrell. A copy of this email is attached as Exhibit P (PX 388). The subject of the email was "Revlon Near Miss – Flex Tech Issue." "Near miss" is a term that the bank uses to describe situations in which cash has been erroneously sent out the door. My understanding is that it is called a "near" miss because when errors like this happen, our expectation and experience is that we will receive the money back. In any event, what I explained to Mr. Zeigon was that "cash was sent to lenders on our Revlon Term Loan yesterday in error. A transaction processed yesterday was intended to have interest sent to lenders and to have the principal suppressed and set to internal accounts. Proper procedures were followed and the visible screens in the front end of Flexcube displayed information properly leading us to believe that the principal payments would be suppressed and not sent to the external lenders in the deal." I believed at the time that proper procedures had, in fact, been followed to accomplish what I had intended: to send interest to lenders and to set principal to the wash account. I still didn't know the source of the problem and continued to suspect that it was a technical glitch with Flexcube.

43.     I was soon told otherwise. At 10:50 a.m., I joined a call with a number of Citibank colleagues, including technical support, to discuss what technical support had learned that morning. The email with the dial-in instructions for this call is attached as Exhibit Q (PX 299) at Citi00000083. Coming out of that call, my understanding was that technical support had identified the problem as a user issue arising out of the failure to check and populate the "Fund" and "Front" boxes in Flexcube. As I stated earlier, the maker, Mr. Ravi, checked only the "Principal" box,

14

which I believed was sufficient to override the default settlement instruction and to set the outstanding principal balance to the wash account. This call was followed up with an email from Sarada Das at 12:21 p.m. stating that "wash account was not maintained for FUND component in settlement overwrite, thus funds released to investors." Ex. Q (PX 299).

44. Throughout the day, I engaged in a number of other communications about the cause of the mistaken payment, including with my colleague Mr. Raj (Exhibit J (PX 463)) and technical support. It was based on those discussions that I started to understand that the error was caused not by a Flexcube glitch, but rather a by human error in our six-eye approval process.

45. I also emailed our "front office" colleagues, Phillip Fletcher, Emily Gust, and Sydney Flynn to explain what had happened:

> Reaching out to you since you have been working with our Deal Closing Team on the recent restructure for Revlon's Term Loan. During our processing and internal rebooking of this Agented deal, we had a processing error, which lead to the full principal amount of the loan outstanding being sent via wire to all of the lenders in the deal. Each of the 315 lenders received their pro rata share of 893,944,008.52 as of 8/11/20 of the full amount of the loan, which is incorrect. We intended to only remit their share of interest and not the principal.
>
> We will be contacting the lenders asking them to return their share of this erroneous payment as soon as possible.

A copy of this email is attached as Exhibit R (PX 436).

46. As the day wore on, I accepted that the mistake had not been caused by any sort of glitch, but rather by human error, and that I was one of the humans responsible for that error. At 4:03 p.m. on August 12, I forwarded an email to Mr. Farrell and attached our Fund Sighting Manual, which is our written procedure that set forth precisely what steps were necessary to ensure that the principal amount was suppressed and not sent to lenders. I reviewed this manual sometime

during the day on August 12. A copy of this email, along with the attached Fund Sighting Manual, is attached as Exhibit B (PX 430) at Citi00001257. The relevant excerpt is below:

> **TO SUPRESS INTEREST AND PRINCIPAL ON A FUND SIGHTING CONTRACT**
>
> When Principal needs to be suppressed, ALL of the below field must be set to the wash account:
> FRONT
> FUND
> PRINCIPAL

47. As I explained in a Skype chat to Mr. Farrell that afternoon, the "procedure doc spells out pretty facking clearly on how to process this sort of transaction, ugh." Ex. S (PX 476).

48. As I confirmed through my review of the Fund Sighting Manual, the mistake that I made on August 11 was approving a transaction in which the "Principal" box was checked and populated with the wash account number, but the "Fund" and "Front" boxes were not. I believed on August 11 that checking and populating the "Principal" box would be sufficient to set the principal balance to the wash account, but I was wrong. I don't recall whether I had previously approved transactions in which one payment (interest) was leaving the bank and another component (principal) was being set to our internal wash account and not sent to lenders, but regardless, our written procedures were clear on what was required to execute the transaction as intended. Those procedures were unfortunately not followed here, and I did not consult them before approving the August 11 wire transfers. In retrospect, I wish I had.

49. I have been asked many times whether Flexcube has any control mechanism to prevent funds from mistakenly leaving Citibank, and the answer is yes. But the problem here is that this control—in the form of a "stop sign"—asks only that we confirm that we intend to wire

16

payments outside of Citibank. An example of how this stop sign looks is below (Exhibit T (PX 294) at Citi00000031):



50. We did intend to wire payments outside of Citibank—in this case, though, only interim interest. Because the control doesn't indicate the amount that will be released, or even whether it is interest or principal, that control feature didn't say that more than $893 million would be released, and it therefore didn't prevent the transaction from moving forward.

17

51. I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 13, 2020
New Castle, Delaware

*Vincent Fratta* (signature)

Vincent Fratta