UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE CITIBANK AUGUST 11, 2020
WIRE TRANSFERS

No. 1:20-cv-06539 (JMF)

**Declaration of Arokia Raj**

I, Arokia Raj, declare pursuant to 28 U.S.C. § 1746 as follows:

1.      My name is Arokia Raj.  I am a Team Manager at Wipro Limited ("Wipro").  In this role, I work with Citibank's Asset-Based Transitional Finance group, also referred to as the ABTF group, which is within Citibank's Global Loans Operations group.  My business address is Wipro Limited, CDC 5, Block S7, Floor 5, Elcot SEZ, Sholinganallur, Chennai, Tamil Nadu - 600 119.  I have worked at Wipro for approximately nine and a half years.

2.      As a Team Manager at Wipro, I am responsible for, among other things, carrying out transactions arising out of Citibank's role as administrative agent.  On August 11, 2020, I assisted with the processing of interest payments made pursuant to a 2016 term loan for Revlon administered by Citibank ("Revlon loan").

3.      I understand that this declaration serves as my direct testimony at trial, but I am also informed that I may be asked to supplement my testimony to address other matters raised in the case.

1

**Background**

4.      I am a citizen of India and I reside in Chennai, India.  In 2009, I earned a Bachelor of Science degree from St. Joseph's College, Trichy.  I then earned an M.B.A. from Sathyabama University in Chennai in 2011.

5.      After completing my MBA in 2011, I joined Wipro as a loan administrator.

6.      Since joining Wipro, I have been promoted several times and now work as a Team Manager.  In this role, I report to Ankit Jhalani at Wipro and have six direct reports.  I also report to Vincent Fratta, who is a senior manager in Citibank's Global Loans Operations group, based in Delaware.  My responsibilities include carrying out and overseeing transactions within Citibank's loan product processing software, such as wire transfers, renewals, and interest payments.  I also perform or supervise daily cash reconciliation work.  The Wipro ABTF team only processes transactions for Citibank.  Because we only serve Citibank, we keep U.S. business hours even though we are based in India.  (Throughout this declaration, all referenced times are in Eastern Daylight Time.)

7.      Wipro performs part of what Citibank terms a "six-eye" approval process for all wire transfers arising out of Citibank's role as administrative agent on ABTF transactions.  First, a Wipro "maker" inputs processing instructions for a payment, or set of payments, in Flexcube, the loan-processing system that Citibank uses for creating and executing wire payment transfers.  That means that Wipro confirms the source of the funds to be distributed, the amount of those funds, the value date and settlement instructions, and selects the appropriate contract reference based on the borrower's instructions that we receive via Citibank.  The maker is the first set of eyes in Citibank's "six-eye" approval process.  After a "maker" builds a transaction in Flexcube, a Wipro "checker" then checks the accuracy of the maker's work.  The checker acts as the second

set of eyes on the transaction.  Finally, the details of the transaction as built and checked are sent to Citibank where an "approver"—a Citibank on-shore employee—acts as the third and final set of eyes and verifies that the information is correct before a wire transfer is executed.

**August 11, 2020**

8.      On August 11, 2020, I was the "checker" for a transaction involving the Revlon loan.  Prior to that, I had worked on a set of transactions for the Revlon loan in June.

9.      At 4:02 p.m., I received an email from Dorothy Lee-Murray, a member of Citibank's Deal-Closing Team, instructing my team and others that "there will be a Roll-up Repurchase for Revlon TL 2016 scheduled to close either 8/11/2020 or 8/12/2020."  The email further stated "Please pay the Principal to the Wash Account when accrued interest is processed effective 8/11/2020."  I received this email as a member of the GL US ABTF email group; it was the first time I learned about this transaction.  A copy of this email is attached as Exhibit A (PX 469).

10.      Based on this email, I understood that there were two components to this transaction.  First, Citibank would be making an interest payment to the Revlon lenders that day. Second, Citibank would, at the same time and as part of the same transaction, set an amount equal to the principal balance in an internal Citibank "wash" account.  The wash account is not a bank account in the ordinary sense.  It is an internal Citibank account that shows journal entries. It is used for certain Flexcube transactions to account for internal cashless fund entries and it is also used to help ensure that money does not leave the bank.  I understood from the instructions that only interest was to be paid to lenders.

11.      This transaction, like all loan-processing transactions, would be executed through Flexcube, a system that I am familiar with and have used for approximately nine and a half years.

12.     At 4:54 p.m., I received an email from Joshua Kaufmann in which he stated that "Interest funds are in.  ABTF team.. Please proceed per Dorothy's instructions below."  Ex. A (PX 469) at Citi000001762.  I understood that my team was being instructed to prepare the interest payment to be wired to lenders and to set the principal to Citibank's internal wash account per Ms. Lee-Murray's instructions.

13.     At around 5 p.m. that day, I asked Santhosh Kuppusamy Ravi to be the maker on this transaction.  Mr. Ravi subsequently began to prepare the transaction at my direction.

14.     Processing a transaction of this type includes multiple steps.  These steps include creating an interest schedule, setting up invoices to send to lenders, inputting payment instructions, and then fund sighting to release the wire transfer to the lenders.

15.     When processing a payment, Flexcube gives the user various boxes to check depending on whether any of Flexcube's "default settlement instructions" should be suppressed or overridden.

16.     Here, the "default settlement instruction" was that any interest and principal amounts that we input into Flexcube would be released unless we checked the appropriate box on the appropriate Flexcube screen to override the default instruction.  These boxes include, among others, "Principal," "Fund," and "Front."

17.     Between approximately 5:15 p.m. and 5:45 p.m., Mr. Ravi and I communicated by telephone as he built the transactions.  During that period, I reviewed the override instructions to make sure that the principal amount would be suppressed and would not leave the bank.  In order to suppress this amount, and set it to Citibank's wash account, I believed that we needed to check only the box labeled "Principal."  I therefore looked to see that the "Principal" box was checked when reviewing the transaction.  It was, and I approved it in Flexcube.  At the time, I did not know

that the "Front" and "Fund" boxes also needed to be checked in order to suppress the principal payment.  Again, at all times I intended for Citibank to send only interest to lenders and to set the principal to the internal wash account.

18.     At 5:45 p.m., I received an email from Mr. Ravi asking me to approve the transaction 001BDLL201480094. He added the following note:  "Principle to Wash A/c & Interest to DDA A/c."  This email was a required part of the six-eye review.  In this email, A/c stands for "account" and DDA refers to the "Demand Deposit Account," which is the Citibank operations account that is used to collect payments from customers such as Revlon and make wire transfers to lenders.  It is an external-facing account.  Mr. Ravi included a screenshot of the payment-processing browser.  Ex. A (PX 469) at Citi000001760-61.  I reviewed the transaction upon receiving Mr. Ravi's 5:45 p.m. email.

19.     At 5:47 p.m., I emailed Vincent "Vinny" Fratta (the approver from Citibank in Delaware) and requested six-eye review and approval for the transaction processed.  I stated in my email "**NOTE:** Principal set to Wash and Interest Notice released to Investors."  When I wrote this, I understood that only the interim interest payment Citibank received from Revlon would be released to lenders.  A copy of this email is attached as Exhibit B (PX 471).

20.     I followed up with Mr. Fratta in a 5:51 p.m. Skype chat to make sure he had seen my email. I asked him to review the transaction.  A copy of this chat is attached as Exhibit C (PX 789).  Mr. Fratta confirmed that the transaction "looks good" and said "sending email."  Ex. C (PX 789).

21.     Mr. Fratta responded to my email at 5:54 p.m. and stated "Looks good, please proceed.  Principal is going to wash."  Ex. A (PX 469) at Citi000001760.  I then approved the transaction using Flexcube.  Before the transaction was executed, a final pop-up notice, which we

refer to as a "stop sign," appeared, asking me to confirm that I wished to send funds out of the bank. As shown below, it states "Account used is Wire Account and Funds will be sent out of the bank. Do you want to continue?" The "stop sign" did not indicate the amount that would be "sent out of the bank," or whether it constituted an amount equal to the intended interest payment, an amount equal to the outstanding principal on the loan, or a total of both. Below is an example of what the stop sign looks like (Ex. D (PX 294) at Citi0000031).



When I clicked "YES" and released the funds, my clear understanding was that I was releasing only the interim interest payment to lenders, and that the principal would be set to the internal wash account as instructed. That was the transaction I intended to authorize, and that I believed I had authorized.

22.     At 6:08 p.m., I emailed Josh Kaufmann, Dorothy Lee-Murray, and the remainder of the team to tell them that "Principal set to wash and Interest paid to investors with Invoice." Ex. E (PX 419) at Citi00001108. When I sent this email, I believed that the transaction had been completed consistent with the instructions we had received, with interim interest being paid to lenders and the principal being set to the wash account, thereby "remaining" within Citibank.

23.     I finished working at approximately 6:10 p.m. on August 11 and did not check email or do any other work until I started work again on August 12 at 9 a.m.

**August 12, 2020**

24.     One of Wipro's responsibilities is to reconcile outstanding cash breaks relating to ABTF deals.  This process helps to ensure, among other things, that payments coming into the bank from the borrower are equal to payments going out to the lender for ABTF deals in which Citibank acts as administrative agent.  The ABTF team generally performs these reconciliations the day after processing a transaction using the cash break manager (CBM) application, which enables the team members to verify, investigate, match and add comments and status regarding the outstanding cash breaks related to the previous day's processing.  Usually the credits and debits "automatch."  A cash break exists when those numbers do not match.  If there is a cash break, we investigate to learn the reason for the break.

25.     On August 12, I started working at around 9 a.m.  When I reviewed the CBM application that morning as part of my normal responsibilities, I discovered a significant number of cash breaks on the Revlon loan transaction from the previous day.  Although it is not uncommon to have cash breaks, I was surprised because the differences between the credits and debits were numerous and in amounts that I viewed as significant.  I started to look at the difference between the interim interest amount intended to be released to lenders, and the total amount of funds actually distributed to the lenders.  I added the principal amount to the interest amount for these investors and realized that the amount constituting the outstanding principal balance of the Revlon loan—that is, the amount intended to be set to the internal wash account—had been mistakenly wired to the investors.

26.     At 9:37 a.m., I emailed Mr. Fratta to share this news.  I told him that "Principal was set to wash and only Interest was set to DDA.  But, it looks like fund has gone out along with

principal.  Can you please review and advice if this need to be raised to tech."  A copy of this email is attached as Exhibit F (PX 1574).

27.    I instructed Mr. Ravi to submit an incident report called a "tech ticket," which he promptly did.  A copy of this email is attached as Exhibit G (PX 367).  He told the Citibank technical assistance group that "[w]e have processed principal to wash and Interest to DDA however funds has gone out along with principal in the below transaction."  Ex. G (PX 367) at Citi00000552.  I received this email as part of the GL US ABTF group.

28.    At 10:33 a.m., Mr. Fratta then sent out an email to various Citibank email distribution lists comprised of employees within our loan operations group who worked with Flexcube, explaining that  "Flexcube is not working properly, and it will send your payments out the door to lenders/borrowers.  The wash account selection is not working.  This lead to ~1BN going out the door in error yesterday for an ABTF Deal, Revlon."  A copy of this email is attached as Exhibit H (PX 366).  This email was consistent with my understanding at the time that there had been a technical glitch within Flexcube.

29.    I came to understand later that day that the mistake had been caused by human error, including my own.  Had any of the members of Citibank's "six-eye" review team checked (or directed to be checked) the "Front" and "Fund" boxes in Flexcube, the principal would have been set to the internal Citibank wash account as intended.  Instead, an amount equal to the total outstanding principal balance on the Revlon loan was released to lenders in error.

30.     I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Dated:  November 13, 2020
          Chennai, India

Arokia Raj