UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE CITIBANK AUGUST 11, 2020 WIRE TRANSFERS | No. 1:20-cv-06539 (JMF) |

### Declaration of Brendan Zeigon

Brendan Zeigon declares, pursuant to 28 U.S.C. § 1746:

1.      My name is Brendan Zeigon.  I am the Global Head of Loan and Credit Risk Management Services Operations at Citibank.  I work at Citibank's office in New Castle, Delaware.

2.      In connection with this litigation, I previously submitted three declarations to the Court, dated August 17, 2020, August 19, 2020, and August 20, 2020.  I also testified as Citibank's 30(b)(6) witness in a deposition on October 9, 2020.

3.      I understand that this declaration serves as my direct testimony at trial, but I am also informed that I may be asked to supplement or amend my testimony to address other matters raised in the case.

4.      I use the term "August 11 Wire Transfers" to refer to a series of payments that Citibank sent out that day in connection with the "2016 Revlon Term Loan."

5.      A significant portion of the funds sent via the August 11 Wire Transfers was sent in error.  Citibank intended to wire out only $7,809,594.19, but sent $901,753,602.71 instead, a difference of approximately $893,944,008.52.  This was a mistake.

1

### My Background & My Department

6. I have worked in the financial services industry since graduating from Gettysburg College in 1998. I began my career at Natixis Bank, and went on to work at JPMorgan Chase, Wachovia, SAC Capital, and Goldman Sachs, mainly in back-office roles. In 2018, I joined Citibank as Global Head of Loan Operations. I gained additional responsibilities as the head of Credit Risk Management Services in 2019.

7. In my current role, I oversee several groups and approximately 900 people report up through me.

8. One group that I supervise is Loan Operations. This group has processing and administrative responsibilities when Citigroup acts as a lender, a trading counterparty, or an administrative agent. Vincent Farrell is the Head of Loan Operations North America. There are other heads for other regions.

9. The Credit Risk Management Services ("CRMS") Department also reports to me. CRMS stores various records relating to loans, among other things.

### The August 11 Wire Transfers

10. August 11, 2020 was my first day back in the office, following vacation. I was not personally involved in making the August 11, 2020 wire transfers. However, the people who were involved all report to me, and I am familiar with Citibank's records relating to the transaction, which are records created and maintained in the regular course of business. I have also, as part of my duties as manager of the department, as well as in my role as Citibank's Rule 30(b)(6) witness, become very familiar with the events of that day. What happened was a mistake, and it is an important part of my job for me to understand what happened.

2

11.     I have previously described for the Court, and testified at my deposition about, two types of documents created in connection with the August 11 Wire Transfers. These documents—"Calculation Statements" and "Transfer Confirmations"—are created in the regular course of business at Citibank.[1]  I am familiar with these documents and what they are used for. They are prepared in the ordinary course of business as part of our loan servicing procedures.

12.     It is standard practice for Citibank to provide Calculation Statements prior to making payments. A Calculation Statement contains information about the wire transfer, such as its purpose and amount. It also specifies the date and recipient of the upcoming wire transfer, as well as the loan to which the payment relates.

13.     Later, when the wire transfers themselves are sent, it is standard practice to generate Transfer Confirmations. They include the actual SWIFT messages used to send the individual wire transfers.

14.     A comparison of Exhibits PX 0678A and PX 0648 illustrates the error made on August 11. Both of these documents relate to the wire transfer sent to the TCI-Symphony CLO 2017-1 Ltd. (the "Symphony CLO").

15.     The Calculation Statement [Ex. A (PX 0678A)] sent prior to the August 11 Wire Transfer sent to the Symphony CLO:

- Identifies the payment as "Interim Libor Interest;" and
- Specifies the amount of the planned payment as $29,544.59.

16.     The corresponding Transfer Confirmation [Ex. B (PX 0648)], however, shows that the amount transferred was $3,411,436.99. This demonstrates that the amount transferred to the

---

[1]     Sample Calculation Statements and Transfer Confirmations were attached to each of the Declarations that I previously submitted in this case.

Symphony CLO was more than 100 times what was intended. Similar mistakes were made in connection with all the payments made on August 11.

**August 12, 2020**

17. I became actively involved in matters related to the August 11 Wire Transfers on the morning of August 12, 2020. I have remained significantly involved ever since.

18. At 10:48 a.m., I received an email from Vincent Fratta with the subject line, "Revlon Near Miss – Flex Tech Issue." [Ex. C (PX 0383).] Mr. Fratta wrote: "cash was sent to lenders on our Revlon Term Loan yesterday in error. A transaction processed yesterday was intended to have interest sent to lenders and to have the principal suppressed and sent to internal accounts. Proper procedures were followed and the visible screens in the front end of Flexcube displayed information properly leading us to believe that the principal payments would be suppressed and not sent to the external lenders in the deal."

19. My immediate reaction was that we needed to figure out what had gone wrong and to get the money back. At 10:58 a.m., I responded to Mr. Fratta's email and said, "Ok, not good. Please elevate this to Oracle asap – need them to understand root cause and why this started happening . . . Claw back the funds and keep us posted on progress." [Ex. D (PX 0392).]

20. When I told Mr. Fratta to elevate the matter to "Oracle," what I meant was that he should contact a dedicated team of Oracle employees who are seconded to Citibank and who work in Citibank offices. This team, which is headed up by Vikas Khanna, is embedded at Citibank and its members have Citibank email addresses and access to Citibank systems.

21. By mid-afternoon, the team had a basic understanding of what had happened. At 3:36 pm, I received an email sent from Gennadiy Makovoz explaining the situation. [Ex. C (PX 0383).] Mr. Makovoz is a manager in the Information Services Group ("ISG"). He explained that

4

the "root cause" of the error was "lack of system feature set knowledge and deficiency in existing maker/checker process"—in other words, human error. More specifically, as Mr. Makovoz explained, the issue was "not using correct procedure in overwriting settlement instructions." Put simply, the people executing the August 11 Wire Transfers did follow the proper procedures and did not check certain boxes in Flexcube and input the internal wash account number. As a result, Citibank transferred out an amount equal to the outstanding principal on the 2016 Revlon Term Loan as well as accrued interest. All that was supposed to be sent was the interest.

22. I continued to learn more throughout the day on August 12. At 10:50 p.m. that night, I emailed Eleanor Drew, Santo Trombetta, Mark Malin, Stuart Riley, and Shahmir Khaliq, all senior executives at Citibank, to set forth what we understood about the mistake. [Ex. E (PX 0473).] Bullet points I included in that email provide a good summary of the events leading to the error:

- Maker/checker (WIPRO) failed procedural steps hence principal amount of 893MM was erroneously released to 315 lenders on 8/11.

- Citi VP conducted a visual check of the pending transaction and thought that the principal was going to be suppressed as intended.

- Transaction processing was completed prior to 6 pm on 8/11, and all payments, including erroneous principal components were paid to lenders.

- Production Support and Flexcube Dev team confirmed root cause of the issue was due to manual processing error.

23. The funds wired out on August 11 came from two sources. The amounts sent for interest payments came from Revlon. The additional funds, in the amount equal to outstanding principal, were Citibank's own money. Revlon did not ask Citibank to disburse this money, and Citibank itself did not intend to do so.

**Efforts to Recover the Money Wired in Error**

24. As reflected in the first email I sent after learning about the mistake that occurred on August 11 (*see* ¶ 19 above), I gave instructions that my team should claw back the funds. Over the next several days, Citibank sent out four sets of "Recall Notices." The team also reached out directly (via both phone and email) to individual fund managers.

25. Throughout this process, my team kept me advised of efforts to recover the funds sent in error. Exhibit F is an example of this. [PX 0304.] In that email, at 10:32 a.m. on August 13, Nikhil Sonawala, who works in loan operations, reported to me that 13 lenders had already returned more than $25 million.

26. I have continued to remain involved ever since.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 13, 2020
Hockessin, Delaware

_____
Brendan Zeigon