UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re:* | Case No. 1:20-cv-06539 (JMF) |
| *Citibank August 11, 2020 Wire Transfers* | **DECLARATION OF RICHARD BRAM SMITH** |

## DECLARATION OF RICHARD BRAM SMITH

I, Richard Bram Smith, being duly sworn, state the following under penalty of perjury:

1.      I am a resident of the State of New York, over the age of 18, and competent to make this statement.

## I.      Assignment

2.      I have been retained by Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel ) in the above-captioned matter on behalf of their Clients, Brigade Capital Management LP, HPS Investment Partners LLC, Symphony Asset Management LLC, Bardin Hill Loan Management LLC, Greywolf Loan Management LP, ZAIS Group LLC, Allstate Investment Management Company, Medalist Partners Corporate Finance LLC, Tall Tree Investment Management LLC, and New Generation Advisors LLC (together, "Defendants").

3.      I have been asked by counsel for Defendants in this matter to opine as to (a) what a reasonable lender would conclude upon the receipt of payments by wire transfer such as those at issue in the case (the "August 11 Transfers"), and (b) how surrounding circumstances and events would affect lenders' understanding as to whether such transfers were purposeful payments on outstanding loans or transfers made erroneously by a bank.  I was also asked by counsel for Defendants to respond to the Rebuttal Report of Mark A. Sunshine, dated November 2, 2020 (the "Sunshine Report"), and the Rebuttal Report of John Byrne, dated November 2, 2020 (the "Byrne Report").

4.      After analyzing the issues in this case, I concluded that (a) a reasonable lender would not believe the August 11 Transfers were paid in error; and (b) that issues identified by Citibank would not cause a lender to believe that the payments were paid in error.  Nothing in the Sunshine Report or the Byrne Report caused me to change my opinions.

5.      Unless stated otherwise, I provide my expert opinion testimony based on the evidentiary record, derived from the documents referred to below and in **Appendix B** to this Declaration, as well as my own knowledge and experience in the US corporate loan market.  I reserve my right to amend my testimony to reflect any new information made available to me throughout the process of this litigation.

6.      I offer no legal opinions in this testimony.  To the extent I refer to legal or regulatory terms or obligations, such as due diligence obligations, it is based upon my experience with such terms or obligations from a lender's perspective.

## II.      **Qualifications**

7.      I am currently an affiliate Managing Director at SEDA Experts, LLC ("SEDA"), a consulting firm that provides independent advice, data analytics, and valuation services to corporations, government agencies, and regulatory bodies in the financial services industry.

8.      I have more than 40 years of experience in the US corporate loan market, both as the Executive Director of the Loan Syndications and Trading Association ("LSTA"), the leading advocate for the U.S. syndicated loan market, and as a senior executive in three leading financial institutions—Bear Stearns, Morgan Stanley, and Bankers Trust.

9.      The LSTA is an industry organization comprised of banks, institutional investors, broker/dealers, underwriters, and other service providers.  The mission of the LSTA is "to promote a fair, orderly, efficient, and growing corporate loan market while advancing and

balancing the interests of all market participants."[1]  Citigroup Inc. is a member of the LSTA and was throughout my tenure as Executive Director.

10.     Prior to my 10 years as Executive Director of the LSTA, I served on the LSTA board and as Treasurer.  In September of 2008, I assumed the position of Executive Director and managed the association through the challenging period surrounding the Great Financial Crisis of 2008/09 until 2018.  I worked closely with members to keep the secondary loan market functioning as well as educating Congress and regulators as to the impact of new regulations on the loan market.

11.     Prior to joining the LSTA in September 2008, I worked for Bear Stearns as a senior managing director in the Leveraged Finance Group for five years where, among other duties, I managed the Loan Capital Markets and Sales effort in the United States and Europe.  At Morgan Stanley, where I was a managing director from 1996 to 2003, I established and managed their Global Loan Business.  Prior to that, from 1978 to 1996, I worked at Bankers Trust (the last 5 years of which as a managing director), where I was responsible for managing loan syndications, sales, and trading.  During my time with these banks, I was involved in hundreds of commercial loan transactions, often as Administrative Agent.  My activities at the banks included originating new loans, negotiating directly with borrowers, coordinating with internal risk and credit departments, and explaining credit documents to investors.

12.     On behalf of the LSTA, I have also (a) testified on risk retention proposals in regards to CLO structures before the House Subcommittee on Capital Markets, and (b) provided comments regarding the Credit Risk Retention rule to the Office of the Comptroller of the Currency ("OCC"), Federal Deposit Insurance Corporation ("FDIC"), Securities and Exchange

---

[1]  DX-1019 (LSTA, "About," https://www.lsta.org/about/ (last visited Oct. 27, 2020)).

Commission, Board of Governors of the Federal Reserve, Federal Housing Finance Agency, and

Office of General Counsel for the Department of Housing and Urban Development.

13.     As the Executive Director of the LSTA, I was a frequent speaker in global

conferences presenting the U.S. Loan Market and The Corporate Loan Market.

14.     In the last five years, I have acted as an expert witness in litigation concerning

loan syndication industry standards in the U.S. District Court, Eastern District of Michigan,

Southern Division.

15.     I received my master's degree in business administration from Harvard Business

School in 1978, my master's degree in international relations from the Fletcher School of Law

and Diplomacy, Tufts University in 1971, and obtained my undergraduate degree from the

United States Air Force Academy in 1970.

16.     I am being paid through SEDA Experts at the rate of $1,200 per hour for my

engagement as an expert in this matter.  My compensation is not dependent on the outcome in

this matter.

17.     My *curriculum vitae* (including a list of all publications that I authored in the last

ten years and a list of all cases in which I testified as an expert at trial or by deposition in the last

four years) is attached as **Appendix A**.

III.     **Background for Opinions**

A.     **Key Events**

18.     On September 7, 2016, a Term Credit Agreement (the "Credit Agreement")

among the borrower ("Revlon Consumer Products Corporation," the holding company "Revlon,

Inc.," collectively "Revlon" or "Borrower"), several banks and other financial institutions

(collectively the "Lenders"), and Citibank, N.A. as Administrative Agent and Collateral Agent

("Citibank" or "Administrative Agent"), was executed for a total commitment amount of $1.8 billion ("Term Loan").[2]

19.     On May 7, 2020, the first amendment to the Credit Agreement was executed among Revlon and the Lenders, and acknowledged by Citibank in its role as Administrative Agent and Collateral Agent.[3]  Among other things, the Amendment established Term Loans with an extended maturity date relative to the Term Loans that were issued in 2016 (the "Extended Term Loans").[4]

20.     On August 11, 2020 Citibank issued payments by wire transfer totaling $901,753,123.52 to all of the approximately 315 Lenders on the Term Loan facility under the Credit Agreement.[5]  The payment made to each Lender equaled the outstanding principal owed to that Lender plus the accrued interest through the date of payment.[6]  Approximately $520 million was wired to Lenders that are managed by Defendants.[7]

---

[2]   *See* DX-0909 (Term Credit Agreement as of September 7, 2016 (the "Credit Agreement")); *see also* Zeigon Dep. 55:3-10, 76:5-17 (explaining Citibank's responsibilities as administrative agent).

[3]   *See* DX-0323 (Amendment No. 1 to Credit Agreement (the "Amendment")).  I understand that the validity of the Amendment is currently being disputed in a separate litigation. For purposes of this Report, I assume that the Amendment is valid.

[4]   *Id.*

[5]   *See* DX-0588 at Citi00000658; *see also* Transcript of Deposition of Brendan Zeigon (Citibank 30(b)(6)), dated October 9, 2020 ("Zeigon Dep.") at 106:9-13, 125:14-18.

[6]   Zeigon Dep. 107:12-18, 108:16-22; Transcript of Deposition of Vincent Fratta (Citibank), dated October 12, 2020 ("Fratta Dep.") at 184:14-22.

[7]   Zeigon Dep. 82:23-83:3.

21.     With each wire transfer, Citibank sent to each Lender (a) a transaction confirmation matching the amount of the payment made ("Confirmation"),[8] and (b) a calculation statement, containing a calculation of the "[i]nterim interest . . . due" ("Calculation Statement").[9]

22.     On the afternoon of August 12, 2020, Citibank sent notices to the Lenders stating that amounts paid to Lenders on August 11, 2020 were erroneous.[10]  Specifically Citibank noted in at least some notices that the "principal portion" for the 2016 Revlon Term Loan had been paid in error.[11]

23.     On August 12, 2020, UMB Bank, National Association ("UMB Bank") filed a complaint against Revlon, Citibank, and other parties relating to the May 2020 transaction whereby the Credit Agreement was amended.[12]

---

[8]  *See, e.g.*, DX-1064 (Zeigon TRO Decl. Ex. B).

[9]  *See, e.g.*, DX-1063 (Zeigon TRO Decl. Ex. A); *see also* DX-0367 at MEDALIST_CITI_00000010.

[10]  *See, e.g.*, DX-1065 (Zeigon TRO Decl. Ex. C) (Citibank notice of error sent August 12, 2020); DX-1066 (Zeigon TRO Decl. Ex. D) (same).

[11]  *See, e.g.*, DX-0534 at ALLSTATE_CITI_00000010 (error notice stating "Your share of Principal amount was also released erroneously. . . . Please return the Principal portion of the payment you received to the below instructions as soon as possible); DX-0536 at GREYWOLF_CITI_00000033 (similar).  Citibank internal documents also show that the amount it claims was paid in "error" represented the outstanding principal.  *See, e.g.*, DX-0379 (Fratta Dep. Ex. 2) at Citi00000884 (Aug. 12, 2020 email from V. Fratta to B. Zeigon noting "A transaction processed yesterday was intended to have interest sent to lenders and to have the principal suppressed and sent to internal accounts.  Proper procedures were followed and the visible screens in the front end of Flexcube displayed information properly leading us to believe that the principal payments would be suppressed and not sent to the external lenders in the deal. . . . . Principal Amount sent in error: $893,944,008.52").  However, after a discussion between Mr. Fratta, who initially approved the language for the error notice, and his supervisor, Mr. Farrell, in which Mr. Farrell said that the notice should refer to the payment in "more generic" terms, DX-0488 at Citi00001830, it appears that Citibank revised the language in the notices to refer to an "overpayment."  *See, e.g.*, DX-0500 at Citi00004645, '647 (attaching revised notices).

[12]  Complaint, *UMB Bank, Nat's Ass'n v. Revlon, Inc. et al.*, Case No. 20-cv-06352-LGS (S.D.N.Y. Aug. 12, 2020).

24.     On August 17, 2020, Citibank filed a complaint against Brigade Capital

Management, LP, an investment manager that manages multiple credit investment vehicles (e.g.,

Collateralized Loan Obligations "CLOs"), investment funds, and separately managed accounts

that are Lenders under the Credit Agreement (the "Brigade Action").[13]

25.     On August 19, 2020, Citibank filed a second complaint against HPS Investment

Partners, LLC and Symphony Asset Management, LLC, investment managers that manage

additional Lenders under the Credit Agreement (the "HPS & Symphony Action").[14]

26.     On August 20, 2020, Citibank filed a third complaint against several additional

asset managers that manage additional Lenders under the Credit Agreement (the "Bardin Hill et

al. Action").[15]

27.     In total, through its three complaints, Citibank sued 12 separate investment

managers that manage approximately 130 separate Lenders to Revlon.[16]

B.     **2016 Term Loan Facility Description**

28.      The 2016 Term Loan Facility was issued under the Credit Agreement for $1.8

billion and was signed by Revlon as Borrower, Citibank as Administrative and Collateral Agent,

other agents, and Lenders.  It had a 7-year maturity with intermediate amortization payments and

was secured by many of Revlon's assets.  Like many syndicated loans, it was prepayable at any

---

[13]   DX-1061 (Complaint, *Citibank, N.A. v. Brigade Capital Management*, dated August 17, 2020 (hereafter, "Brigade Complaint")).

[14]   DX-1070 (Complaint, *Citibank, N.A. v. HPS Investment Partners, LLC et al.*, dated August 19, 2020).

[15]   DX-1071 (Complaint, *Citibank, N.A. v. Bardin Hill Loan Management LLC, et al.*, dated August 20, 2020).

[16]  Two Defendants (Highland Capital Management Fund Advisors LP and InvestCorp Credit Management US LLC) subsequently settled their suits with Citibank.  *See* DX-1073 (order of dismissal against Highland Capital Management Fund); DX-1092 (order of dismissal against Investcorp Credit Management).

time.[17]  For purposes of this discussion I will focus on the Eurocurrency loan because, at the time

of the loan prepayment, the entire loan was accruing interest at the Eurocurrency borrowing rate.

I will address the interest setting and payment mechanics of the Eurocurrency borrowings as well

as the optional prepayment provision.[18]

29.     **Interest Period** - Under the Credit Agreement, Section 2.1, the Borrower had the

option to choose, among other rates, a Eurocurrency borrowing rate which is the Eurocurrency

Base Rate plus the applicable margin.  The Eurocurrency Base rate is the London Interbank

Offered Rate as provided by ICE Benchmark Administration and published by Bloomberg.[19]  In

this case, the borrower could choose the interest period it desired, either one, two, three, or six

months and, if all the lenders agreed, 12 months. [20]

30.     **Interest Payments** - Interest payments were due at the end of the Interest Rate

Period if the period was three months or less as it was the case here.[21]  There is no provision in

the Credit Agreement for interim payments of interest under a Eurocurrency Loan.  Payment of

interest prior to the Interest Payment Date is only associated with prepayment (or repayment at

maturity) of principal, in whole or part.[22]  In that case, the interest paid would be the interest that

had accrued on the loan that was prepaid through the day that the principal was repaid.

---

[17]     *See, e.g.*, DX-0909 (Credit Agreement) at SMITH_CWT_000078 (Section 2.11); DX-1020 (Revlon, Inc. (Form 10-Q), dated Sept. 30, 2016) at SMITH_CWT_000825 ("Products Corporation may voluntarily prepay the 2016 Term Loan Facility without premium or penalty . . . ."); Transcript of Deposition of Justin Tichauer (Citibank), dated October 20, 2020 ("Tichauer Dep."), at 45:12-23, 47:7-13.

[18]     DX-0909 (Credit Agreement) at SMITH_CWT_000078 (Section 2.11).

[19]     *Id.* at SMITH_CWT_000028 ("Eurocurrency Base Rate," "Eurocurrency Loans," and "Eurocurrency Rate" definitions).

[20]     *Id.* at SMITH_CWT_000042-43 ("Interest Period" definition).

[21]     *Id.* at SMITH_CWT_000042 ("Interest Payment Date" definition).

[22]     *See also* Tichauer Dep. 68:17-21.

31.     **Optional Prepayments** - Optional prepayments were allowed under the Credit Agreement.[23]  As defined in Section 2.11, the borrower had the ability to prepay all or part of the loan at any time without premium or penalty if done 6 months after the initial loan was made which was the case here.[24]

IV.    **Basis for Opinions**

    A.    **A reasonable lender would not believe the August 11 Transfers were paid in error.**

        1.    The transfers were precisely in the amount of principal and accrued interest owing to each lender

32.     After 5:00 pm on August 11, 2020, each of the approximately 315 Term Lenders to Revlon received a payment via a wire transfer that was equal to exactly the amount of outstanding principal on that Lender's loan plus the interest that had accrued from the last interest payment through August 11.[25]

33.     In my opinion, a reasonable lender receiving such a payment would have no reason to ask whether the payment had been made in error, and no reason to suspect that any error had occurred.  The reason is very simple:  payments made in the exact amounts of principal outstanding and accrued interest owing under a loan are indicative of prepayments or, if not scheduled or anticipated, prepayments.  Indeed, throughout my 40-plus years in the loan industry, I cannot recall a single instance in which a bank erroneously paid the exact amount owing to a large group of syndicated lenders.  Indeed, every instance I recall in which a bank paid the exact amount owing to a large group of syndicated lenders was in connection with a

---

[23]   *See, e.g.*, DX-1020 (Revlon, Inc. (Form 10-Q), dated September 30, 2016) at SMITH_CWT_000825 ("Products Corporation may voluntarily prepay the 2016 Term Loan Facility without premium or penalty . . . .").

[24]   DX-0909 (Credit Agreement) at SMITH_CWT_000078 (Section 2.11).

[25]   Fratta Dep. 184:8-22; Zeigon Dep. 107:12-18, 108:16-22.

prepayment.  When a payment precisely matches the amount owing, and includes the correctly

calculated accrued interest as per the Calculation Statement, there is no reason to second guess

that the payment is a prepayment on the loan.

34.    Prepayments of principal on loans are common events.[26]  In this case, such a

prepayment was specifically contemplated by, and permitted by, Section 2.11 of the Credit

Agreement, titled "Optional Prepayments."

35.    Additionally, the payments here did not include any of the typical indicia of a

mistaken payment.[27]  They were from Citibank, which had long acted as Administrative Agent

under the Credit Agreement.  The Transaction Confirmation and Calculation Statement both

specifically referenced the Revlon Term Loans, the borrower and the credit facility appropriate

for each of the Lenders, and the amounts—matching the amounts outstanding on the loans and

accrued interest—did not suggest any typical type of error, such as a misplaced decimal point or

digit, a double-entry of a single payment, or a transposition of numbers.

> 2.    <u>A prepayment of principal would be the only basis for making an interest
> payment on August 11, which was in the middle of an interest period under
> the Credit Agreement.</u>

36.    The Credit Agreement is the document that governs the borrower/lender

relationship and is thus the primary basis for a lender's expectations.  As excerpted below, the

---

[26]    *See* DX-0324 (S&P Market Intelligence, Leveraged Commentary & Data (LCD): Leveraged Loan Primer) at 19 ("Prepayments/Non-Call Features").

[27]    Tichauer Dep. 141:2-10 ("Q. And you have no reason to believe that any lender would have had reason to believe that Citibank was going to make a $900 million mistake, do you?  A. Again, I don't – you know, don't invest in term loans, I don't hold term loans. I don't know – I don't know what the lenders were thinking or expecting. ***But no***.") (emphasis added); Transcript of Deposition of Eric Warren (Revlon 30(b)(6)), dated October 23, 2020 ("Warren Dep."), at 93:3-10 ("Q. Is there anything in this notice that would suggest to a lender that the payment was made by mistake? . . . A.  I don't see anything that would indicated this payment was made by mistake.") (objection omitted).

Credit Agreement includes a clear definition of Interest Payment Date, which describes when interest will be paid on the loans and thus sets Lenders' expectations as to when to expect to receive such payments.

37.     I understand that in May 2020, Revlon opted to determine the applicable interest rate on the Term Loans by referencing Eurocurrency Loans that would mature on August 31, 2020.[28]  As a result, as of August 11, the next day defined to be an Interest Payment Date under the Credit Agreement was August 28.[29]  August 11, accordingly, was in the middle of the interest period.

38.     The only way August 11 could have been an Interest Payment Date is if Citibank, on behalf of Revlon, was making a prepayment on that date.  With respect to the Term Loans, the Credit Agreement defines "Interest Payment Date" as follows:

> (a) as to any ABR Loan (other than a Swingline Loan), the last Business Day of each March, June, September and December to occur while such Loan is outstanding and the final maturity date of such Loan, (b) as to any Eurocurrency Loan having an Interest Period of three months or less, the last day of such Interest Period, (c) as to any Eurocurrency Loan having an Interest Period longer than three months, each day that is three months or a whole multiple thereof after the first day of such Interest Period and the last day of such Interest Period and (d) as to any Loan (other than any Revolving Loan that is an ABR Loan but, for the avoidance of doubt, including any Swingline Loan in accordance with Section 2.8(a)), the date of any repayment or prepayment made in respect thereof.

None of subsections (a), (b), nor (c) could apply here, where there was an interest payment in the middle of a Eurocurrency Loan's interest period like the August 11 Transfers.  Subsection (a) does not apply to Eurocurrency Loans.  Subsection (b) applies to Eurocurrency loans having an

---

[28]  *See, e.g.*, DX-1018 at BRIGADE_CITI_00010681; DX-0909 (Credit Agreement) at SMITH_CWT_000071 (Section 2.1).

[29]  Because the last day of the interest period, August 31, was a bank holiday in London, the payment date would be August 28, 2020.  *See* DX-0712 at Citi00001648 (Aug. 14, 2020 email chain discussing maturity date for 2016 Term Loan).

interest period of three months or less, which would describe the one at issue, but as previously stated, the August 11 Transfers were not received on "the last day of such Interest Period." Subsection (c) applies to Eurocurrency loans having an interest period longer than three months, which was not the case, nor was it the case, again, that the August 11 Transfers were received on "the last day of such Interest Period."  Thus, the only way that August 11 could have been an Interest Payment Date is if subsection (d) applied: "as to any Loan . . . , the date of any repayment or prepayment made in respect thereof."

39.     Citibank witnesses were also unable to identify any other provision of the Credit Agreement that would permit Revlon to make a prepayment of interest under the Term Loan, or make a payment of interest on a date that was not an Interest Payment Date.[30]  Nor would such a provision make sense.  Because interest does not ordinarily compound within an interest period, there is no good reason for a borrower to make an "interim" interest payment independent of a prepayment of principal.

40.     Accordingly, if an interest payment were made in the middle of an interest payment period, the natural conclusion would be that the interest payment was being made in connection with a prepayment of principal.

41.     That is exactly what happened here—i.e., interest was paid mid-period.  A reasonable lender would conclude that the interest payment was made in connection with a prepayment of principal, as that would be the only reason that such a payment would be made in

---

[30]  *See, e.g.*, Zeigon Dep. 71:19-72:3 ("Q. Okay. Do you know if there's anything in the credit agreement that would permit Revlon to make a prepayment of interest under the term loan? A. I don't. Q. Do you know if there's anything in the credit agreement that would permit Revlon to make a payment of interest on a date that was not an interest payment date. A. I don't."); *see also* Tichauer Dep. 68:17-21 ("Q. Have you ever, Mr. Tichauer, seen in a credit agreement a provision that provides for the optional prepayment of accrued interest but not principal? A. Not that I recall.").

the middle of a payment period.  Under the terms of the Credit Agreement, August 11 could be

an Interest Payment Date only if principal, and the corresponding accrued interest, were being

prepaid.[31]

42.     Indeed, the interest Calculation Statement received by each lender expressly

stated that interest was "due" on August 11.[32]  Absent a payment of principal on that date, no

interest would be due on that day.  There is no provision in the Credit Agreement that permits or

authorizes an early payment of interest unaccompanied by a payment of principal on a

Eurocurrency loan.  By indicating that interest was ***due*** on August 11 (no less than six times), the

Calculation Statement implied that a principal payment would accompany the accrued interest.

43.     As noted in Paragraph 31 above, unlike prepayment of interest, which is not

provided for by the Credit Agreement (and would be atypical in any event), the Credit

Agreement expressly permitted the prepayment of principal, which would be accompanied by

the corresponding accrued interest.  As a result, a reasonable lender would see that the timing of

the payment—in the middle of a Eurocurrency interest period—indicated that the payment would

include principal.  And, as noted above, the payment did include principal in the exact amount

owing to each lender under their loans.

44.     It has been my experience and would be the experience of many of the lenders

and fund managers, including Defendants in this case, to have seen many term loans prepaid

_____

[31] DX-0909 (Credit Agreement) at SMITH_CWT_000042 ("Interest Payment Date"
definition).

[32]   Although the head of Citibank's asset-backed transitional finance team, Vincent
Fratta, testified that the language on the Calculation Statement was standard, Fratta Dep. 83:17-
84:13, 165:16-23, a lender would not be in a position to know the intent behind the calculation
statement and could only evaluate the language on the face of the document.  Revlon's
Treasurer, Eric Warren, also noted that "if I received this notice and it said interest is due in
multiple places, the expectation would be that interest is due."  Warren Dep. 87:24-88:9.

over their careers by borrowers actively managing their debt service.  In stark contrast, in all my

years of banking, I do not remember a single instance when a borrower prepaid interest on

LIBOR-based loan or loan tranche (as was the case here with respect to the Eurocurrency Loan)

before the interest was due.  It defies common sense that a borrower would prepay only the

interest because there is normally no economic reason to do so.  The only instances, in my

experience, when interest is prepaid ahead of the next Interest Payment Date is when the loan

undergoes some kind of restructuring, repricing, refinancing—none of which any of the Lenders

would have reason to expect in this instance—or when a borrower is prepaying or repaying its

principal back to lenders.

45.      Citibank has multiple times stated that accrued and unpaid interest was *due* on

August 11, 2020, in support of Citibank's assertion that the Lenders should have known that a

payment of principal in excess of the purportedly due interest must have been paid in error.  In

the first complaint filed with the Court, Citibank stated that "[o]n August 11, 2020, several

months of accrued interest came due under the Credit Agreement [and that n]o other amount was

due at the time."[33]  Thereafter, in a September 10, 2020 letter to the Court,[34] Citibank wrote that

"As defendants are well aware, the 2020 Amendment to the Credit Agreement specifies that any

loan roll-ups require immediate payment of 'all accrued and unpaid interest owing by the

Borrower under the Existing Credit Agreement with respect to any Existing Term Loan'; thus,

the exercise of repurchase rights causes interest to come due on the date of repurchase."[35]  This is

---

[33]   DX-1061 (Brigade Complaint) ¶ 15.

[34]   DX-1077 (Citibank's Letter to Judge Furman, dated Sept. 10, 2020 [Dkt. 64]) at 3 n.2.

[35]   *See, e.g.*, DX-1068 (Aug. 18, 2020 Hr'g Tr.) ("The second relevant fact is that, as I mentioned, the interest was the only thing that was actually due and payable on that date."); DX-1061 (Brigade Complaint) at ¶ 15 ("On August 11, 2020, several months of accrued interest came due under the Credit Agreement. The interest payment was to be processed by Citibank in

incorrect, and inaccurately quotes the Amendment.  The actual language of the Amendment

makes clear that the requirement to pay interest to all Term Lenders was a one-time event and

does *not* apply upon the repurchase of loans after closing of the transaction on May 7, 2020.  The

Amendment states:  "**On the Amendment Effective Date**, all accrued and unpaid interest owing

by the Borrower under the Existing Credit Agreement with respect to any Existing Term Loan

(or portion thereof, if applicable) shall be paid in full in cash immediately prior to the **2020**

**Conversion**."  Based on this provision, in my opinion, the Term Loan Lenders would not expect,

on August 11, 2020, a payment of interim interest unless in conjunction with a prepayment of

principal on the loan.

46.     Counsel for Revlon (Paul Weiss) expressly recognized this when they wrote, in

connection with an June 2020 roll-up transaction that involved a separate tranche of loans (i.e.,

extended term loans not held by Lenders managed by Defendants), that "only the accrued

interest on the loans being rolled-up will need to be paid."[36]  Counsel for Citibank (Latham &

---

its capacity as administrative agent. No other amount was due at this time . . . ."); DX-1067
(Memorandum of Law In Support of Citibank's Application for a Temporary Restraining Order
[Dkt. 9]), at 1 ("On August 11, 2020, an operational mistake caused Citibank to mistakenly
transfer hundreds of millions of dollars to creditors rather than the actual amounts due on that
date."); *id.* at 2 ("On August 11, 2020, Revlon was required to remit interest payments that
Citibank would then remit to creditors in its status as administrative agent.  [DX-1062] Zeigon
Decl. ¶ 19. The interest payment totaled $1,501,145.27. *Id.* ¶ 17. No other amount was due at the
time. *Id.* ¶ 19.").

[36]  DX-0340 (Zeigon Dep. Ex. 4) at REVLON_CWT_000048; *see also* Zeigon Dep.
90:8-14 ("Q. Is there anything in the credit agreement that requires either Revlon or Citibank to
pay interest to lenders other than the lender engaged in the rollup transaction itself? . . . A. I'm
not sure") (objection omitted).  Revlon also did not believe there was any obligation to pay
interim interest in connection with the repurchase. *See, e.g.*, Warren Dep. 46-49:11-20 ("Q. . . .
there was no reason why Revlon wanted to pay interest to all of the lenders, including those who
were not having their loans repurchased. Correct? . . . A. Revlon did not request for the entire
tranche to be paid accrued interest."); *id.* at 50:11-23 ("Q. You are not aware of any obligation
that Revlon was under in the credit agreement to pay interest to the term lenders who were not
having their loans repurchased. Correct? In June of 2020? . . .  A. I am not familiar with any such
requirement.") (objection omitted).

Watkins) explained in response that all Term Lenders would be paid accrued interest, *not because it was required under the Credit Agreement*, but because "Citi's system does not have the infrastructure to support non pro rata activity on both principal and interest amounts."[37]

47.    The June roll-up involved $236 million of the extended term loans that were being rolled up and $30 million in such loans that were not.[38]  Because of limitations in Citibank's systems, Citibank had to pay interim interest to all lenders holding the extended term loan as per the email exchange above. The lenders in the original, non-extended 2016 Term Loan—a group that includes the Lenders managed by Defendants in this action—did not receive interim interest at that time because they were not in that tranche.[39]  In August, several lenders managed by Angelo Gordon purchased non-extended 2016 Term Loans in the secondary market specifically to have them paid off at par and rolled-up into the BrandCo loan.[40] Citibank still had the same operational problem it did in June.  In August, however, the problem was much more significant because the vast majority of the 315 lenders in the tranche at issue (*i.e.*, the non-extended loans) were uninvolved in the roll-up transaction.[41] Nevertheless, Citibank paid over $7

---

[37]   DX-0340 (Zeigon Dep. Ex. 4) at REVLON_CWT_000038; *see also* Zeigon Dep. 57:15-58:9 (explaining that Citi's loan processing software, Flexcube, requires that Citibank "rebuild . . . the transaction because the lender syndicate has changed"); *id.* at 90:15-91:23 (explaining that Citibank would have to rebook transactions because Citibank's "system doesn't allow [Citibank] to just amend the transaction by just taking a lender out or a series of lender out"); *id.* at 118:24-120:14.

[38]   DX-0340 (Zeigon Dep. Ex. 4) at REVLON_CWT_000041-42.

[39]   *See id.* at '043-44 (listing lenders participating in June roll-up).

[40]   DX-0339 at Citi00001197-98 (Aug. 4, 2020 email from M. Bernstein (Angelo Gordon) to Paul Weiss (counsel for Revlon) noting that "[w]e are in the process of closing the 2016 TL purchase and have heard the agent is awaiting borrower consent to the transfer to AG. We are not otherwise a current 2016 lender so consent is required.  Can you please have Revlon consent tomorrow so we can close the trade and then do the roll-up later this week?").

[41]   Zeigon Dep. 125:14-18; *see also* DX-0338 at REVLON_CWT_000138-39 (showing only 5 lenders participated in the roll-up transaction).

million in interim interest, the vast bulk of which went to Lenders wholly unconnected to the
roll-up, such as the Lenders managed by Defendants in this case.[42]  So it seems clear, as was
confirmed by Revlon's Treasurer in his deposition, that an interest payment was not due on
August 11, 2020 to any Lenders managed by Defendants, but was nonetheless made solely
because of a shortcoming in Citibank's operational systems.[43]

48.     Just as importantly, even assuming that Revlon's repurchase of Term Loans did
cause an interim interest payment to be "due" (and, as noted, the Credit Agreement does not so
provide), Lenders had no notice that Revlon was repurchasing Term Loans on August 11 (or
otherwise).  As noted by Revlon and Citibank witnesses, Lenders would not have otherwise been
aware of the repurchases or that they should expect an interest payment.[44]  It bears noting that, if
it intended to pay only interest to the Lenders, Citibank could have notified the Lenders that an
off-cycle, unprecedented interest payment not envisioned by the Credit Agreement was going to
be paid on August 11.  Citibank, however, did not do that.[45]

       3.     <u>An error of this magnitude would be largely unprecedented, and lenders</u>
          <u>understand that sophisticated banks like Citibank have controls in place to</u>
          <u>prevent such errors from occurring.</u>

---

[42]   Fratta Dep. 61:5-17.

[43]   Warren Dep. 48:12-49:20, 52:4-19.

[44]   *See* Zeigon Dep. 127:25-128:4 ("Q. Okay. So to – to your knowledge, prior to August
11th [Defendants] would have no way to know that there was going to be a repurchase, right? A.
I believe that's correct, yes."); Warren Dep. 52:20-53:8 ("Q. And those lenders who received the
interest payment but were not having their loans repurchased, you are not aware of anything in
the credit agreement that would have put those lenders on notice that they were going to receive
an interest payment. Correct? . . . A. I am not familiar if there is any language in the credit
agreement that would have provided them notice that they were going to receive interest.").

[45]   Warren Dep. 34:10-17, 35:14-37:12 (testifying that Revlon was not aware of any
requirement to notify lenders of repurchases nor any attempt to do so by Revlon or Citibank).

49.    In my experience, the loan market expects cash payments from Administrative Agents on loans to be accurate and correct, especially when these payments match to the penny what each lenders' records show is owing.  The loan market has a high degree of confidence that these payments are accurate and correct, in my opinion, because they expect that global, large sophisticated banks like Citibank have rigorous control and approval procedures in place to ensure that outgoing cash payments are correct.

50.    Further, in my experience, large banks like Citibank, depending on the amount of the cash transfers, require several different approvals. This often requires multiple approvals by different individuals. Lenders know and rely on large banks having stringent and rigorous internal controls in place to ensure no cash is inadvertently sent out of the bank and that the amount sent is correct.  The loan market also knows, in my experience, that the various federal and state regulators, including the OCC, the Federal Reserve, and the FDIC, focus on banks' procedures and control processes in the loan administration department and money transfer areas as part of their review of banks' risk management systems to ensure they are adequate and that robust controls are in place.

51.    In addition, international institutions like the Basel Committee on Banking Supervision published a revised version of the document called Core Principles for Effective Banking Supervision in September 2012 (originally issued in 1997, and revised in 2006) defining the "minimum standard for sound prudential regulation and supervision of banks and banking systems" and requirements for banks to ensure that they appropriately manage, among other areas, operational risk, liquidity risk, and credit risk.[46]

---

[46]   DX-0316 (Basel Committee on Banking Supervision, Core Principles for Effective Banking Supervision (Sept. 2012)).

52.     These Principles are designed to ensure accuracy and minimize mistakes, especially large ones, and regulators and supervisors, including the International Monetary Fund, and the World Bank, use these Principles in evaluating the effectiveness of the controls and procedures banks have in place. The loan market, in my opinion, knows in general that banks operate under strict supervision, both internal and external, and comply with concepts like checks and balances, 4 eyes (two people needed to approve certain transactions), separation of critical functional areas, and appropriate organizational structure as defined in such regulators guidelines.[47] Thus, the loan market has the expectation that monies transferred by banks to them in connection with loans are not transferred in error.

53.     Evidence in this case, unsurprisingly, shows that Citibank had extensive controls to prevent erroneous wire transfers from being made.  It had technical controls to prevent payments of a mistaken amount caused by erroneous data entry.[48]  Citibank also required a "six eye" procedure, by which at least three individuals were required to authorize a wire transfer.[49] For an error like the August 11 Transfers to occur, both technical controls had to fail and at least three individuals made human error.[50]  A reasonable lender would not likely have known the

---

[47]     *See, e.g.*, *id.* at Principle 26 (identifying as an "essential criteria" of Principle 26, that the bank will have internal controls that address, among other things, "checks and balances (or 'four eyes principle'): segregation of duties, cross-checking, dual control of assets, double signatures").

[48]     Zeigon Dep. 249:20-250:2 ("[Q.] Does Citibank have controls in place to prevent the bank from erroneously making wire transfers?  A. Specifically loan operations because that's the area I work in, yes, there are – there are controls and procedures to be followed, et cetera, et cetera.").

[49]     Zeigon Dep. 259:12-260:4; Fratta Dep. 95:5-97:21 (describing controls in place while executing the August 11 Transfers).

[50]     Zeigon Dep. 260:17-261:24 ("Q. And in order for this mistake to be made it would have to be the case that all three of them failed to observe the error and which boxes were checked, right? A. That's correct.  Q. So in this particular case three people, the maker, the

exact procedures that Citibank had in place, but would have reasonably expected that Citibank would have extensive controls such that a *series* of mistakes, resulting in erroneous wire transfers equal to the amount owing to each lender, would be highly improbable.

54.     Of course, even with controls in place, banks do make erroneous payments from time to time.  The payments at issue here, however, had no indicia of such an error.  First, as noted above at paragraph 31, the payments here matched the exact amounts owing on the loans—both principal and interest were paid in the correct amounts.[51]  Thus there was no data entry error or other mistake that might be discernible from the amount paid.  Nor did the payments come from an unfamiliar source or reference an unknown facility—these Lenders knew that Citibank had long acted as agent with respect to the Revlon Term Loans, and they all held Revlon Term Loans.

55.     Second, the magnitude of Citibank's asserted error highlights what an unprecedented error this would be.  As Brendan Zeigon, Citibank's Global Head of Loan Operations, testified in this case, he has never seen—in his 22 years in banking—an error of this size.[52]  Mr. Zeigon further testified that multiple federal agencies, including the OCC, the Federal Reserve, and the FDIC are investigating this incident.[53]  Even Citibank's other witnesses could not recall an instance when Citibank unintentionally made a wire transfer over $890

---

checker and the six-eye, all failed to catch which boxes had been checked in the system, is that right? A. That's right."); *see also id*. 266:4-267:7 (describing technical controls to prevent "fat finger" mistakes, which would prevent Citibank from making a payment greater than the value of the loan); *id.* at 267:8-22 (acknowledging that Citibank had technical controls to prevent a scriveners error); *id.* at 267:24-268:11 (explaining the six eye approach was also intended as a control to prevent errors from occurring).

[51]   *See also* Fratta Dep. 66:9-14, 71:19-72:4; Zeigon Dep. 169:10-22.

[52]   Zeigon Dep. 282:21-24.

[53]   Zeigon Dep. 281:3-22.

million—particularly one where the amounts transferred to the recipient were equal to the
amount owing to the recipient on an outstanding debt obligation.[54] As noted by Revlon's
Treasurer, market participants could never have foreseen this sort of error.[55]

56.     Mr. Sunshine and Mr. Byrne contend that mistakes—including, apparently,
mistakes of the type asserted by Citibank in this case—are common in the context of electronic
funds transfers.  Mr. Sunshine claims that large wire errors happen with "surprising frequency,"
and that lenders should expect wire processing errors based on a failure to "check the boxes."
Based on my many years of experience in the syndicated loan market, I believe that contention is
wholly without basis.

57.     It is certainly true that in the millions of wire transfers completed each year,
mistakes do occur.  Scriveners make errors.  Amortizations can be miscalculated.  Payments can
go to the wrong party.  And similar such errors occur.  Such errors, however, tend to be small in
size and easy to identify.  To the extent that mistakes occur, it is mistakes such as those.[56]

---

[54]   Fratta Dep. 57:15-19 ("Q. Have you ever seen a situation in all your years at Citibank
where the bank mistakenly paid lenders the outstanding principal on loans? A. I don't – I don't
recall."); *id.* at 59:11-60:2, 75:4-8; Tichauer Dep. 141:20-143:22.

[55]   Warren Dep. 142:7-143:16 (testifying that the reaction at Revlon upon learning about
the August 11 transfers was "astonishment," and that "the fact that Citibank, one of the most
prestigious and certainly largest money center banks in the United States would have made such
a payment using their own balance sheet" are circumstances that "probably no market participant
would have believed that to be possible," and "a series of events that I think no one could have
foreseen"); *id.* at 179:21-180:5.

[56]   The errors identified by Mr. Sunshine refer to types of mistakes that are more
immediately obvious, such as where the payment is more or less than the amount owed or sent to
the wrong transaction counterparty.  For example, Mr. Sunshine identifies a $6 billion "mistake"
made by Deutsche Bank in 2015, and a €28 billion transfer made by Deutsche Bank in 2018.
However, both of those mistakes were "fat finger" mistakes that resulted in payments or transfers
that exceeded the amounts that were owed.

Mr. Sunshine also identifies payments to 100,000 homeowners by Rust Consulting Inc. in
2013 and an error by KfW in 2017.  The erroneous amount of payment would be obvious to the

58.     The circumstances of this case, however, are entirely different.  Here, assuming that Citibank erred as it asserts, more than 300 lenders were paid approximately $900 million, each in the exact amount owing to that lender.  Such an error is not only uncommon, it is largely unheard of.  In all my years as a participant in the syndicated loan market, I never observed such an error.  As noted above in Paragraph 55, Citibank witnesses testified that they could not recall similar errors.  Mr. Fratta also noted that he was "shocked" upon learning of the mistake.[57]  And in no uncertain terms, Eric Warren, the corporate treasurer of Revlon, testified: "the fact that Citibank, one of the most prestigious and certainly largest money center bank in the United States would have made such a payment using their own balance sheet.  Those facts and

---

recipient in both instances:  the homeowners received less than what they were owed in the Rust Consulting case, while the 2017 KfW error involved a technical error that "repeated single payments multiple times."

Mr. Sunshine also identified a $37 million error by Bank of America in 2019, and a $73 million error by Deutsche Bank in 2008.  However, both of those scenarios involved payments to the wrong counterparty and thus would also have been obvious to the recipient upon receipt that the funds were sent in error.

Two of the errors identified by Mr. Sunshine involve claims by customers against their bank for the bank's improper handling of the account, rather than arising from the mistaken payments directly.  For example, the $16 million error made by Morgan Stanley Smith Barney in 2014 involved an instance when Morgan Stanley sent money from the wrong accounts and comingled funds, while the "errors" by USAA involved an instance where USAA was not honoring customers' requests—made before automatically scheduled payments were scheduled to be paid—to stop those payments.  Those types of banking errors are not analogous to the issue here.

Finally, Mr. Sunshine identifies a $426 million payment  by KfW to Lehman Brothers in 2008, which involved a payment on a currency swap transaction.  However, that case involved unique circumstances in which a regular payment was sent in connection with a swap after the counterparty had filed for bankruptcy, preventing KfW from receiving the dollars it was owed in exchange for the Euros it had paid on the swap.      Thus, in all of these instances, the purported error would have been immediately obvious to the recipient or involved transactions that are wholly unlike the FedWire transfers used to execute the August 11 Transfers.

[57]   *Id.* at 196:10-197:4.

circumstances are such that I believe probably no market participant would have believed that to be possible."[58]

59.      While Mr. Sunshine asserts that such errors are common, he was able to identify only *three* errors, at any point in time, that were as large in dollar amount as the error asserted in this case, and none of them has anything to do with corporate loan payments via Fedwire transfers.  Compared to the 63 million electronic fund transfers per year that Mr. Sunshine identified in his report, it is clear that the chances of an error of this magnitude are infinitesimal.  Moreover, each of those three incidents, wholly unlike the August 11 Transfers, was immediately identifiable as a mistake because the payments exceeded the amounts that were due.  The two Deutsche Bank errors involved "fat finger" mistakes, where the amount transferred exceeded the amount that was owed, while the KfW error involved a repeating payment.  Neither is relevant here.  As Mr. Fratta, head of the loan operations group responsible for the payment, testified, the August 11 Transfers did not involve a "fat finger" mistake.[59]  The August 11 Transfers also did not involve an instance of a repeating payment and matched the amount of principal and accrued interest held by each Lender.

60.      Mr. Sunshine further asserts that overpayments equal to the principal amount are not "unusual."[60]  Mr. Sunshine did not cite a single example or single source for his opinion in

---

[58]   Warren Dep. 143:2-9.

[59]   Fratta Dep. 153:21-154:11.

[60]   Mr. Sunshine also opined in his rebuttal report that "often 'check the box' wire processing errors result in amounts equal to principal being transferred in error."  However, a reasonable lender would have no way of knowing what type of processing system the agent bank used to initiate payments and whether or not the payment of principal and interest was the result of failing to "check the box."  To the contrary, as outlined above, a reasonable lender would expect that a bank has internal controls to prevent against these types of errors.  *See supra* ¶¶ 50-52.

his rebuttal report, though I understand that he identified certain errors during his deposition. In any event, in my opinion, Mr. Sunshine is incorrect when he suggests that erroneous payments equaling principal and accrued interest on syndicated loans are not "unusual," and that reasonable lenders should expect such mistakes. As noted above, in my many years in the syndicated loan market, not once did I experience an entire syndicated loan being erroneously fully paid down, with the correct amount of principal and accrued interest being paid to each lender. To say that such a complete paydown would be "unusual" would be a substantial understatement—an erroneous complete prepayment of this type is unheard of.

61.     Mr. Byrne adds in his Rebuttal Report that had the payments at issue in this case been processed through the DTCC system, they would have "automatically been pulled back." I do not understand the import of Mr. Byrne's assertion because loan payments are not processed through DTCC. His assertion is a complete red herring which has nothing to do with how the August 11 Transfers were sent, and it provides no support for an assertion that errors of the type asserted here are common.

      B.     **Issues identified by Citibank would not cause a lender to believe that the payments were received in error.**

           1.     <u>Failure to receive timely notice of voluntary prepayment is not an indication of payment error.</u>

62.     In its legal papers, Citibank argues that the Revlon Lenders would have known that the August 11 payments were made in error because the Calculation Statements sent to Lenders included only an interest calculation and no indication that principal was to be paid at the time. Based on my experience, that assertion is incorrect, and inconsistent with what a reasonable lender in receipt of one of the transfers would have believed.

63.     First, the primary indicator of what a payment constitutes is the payment itself. In this case, the payments received equaled principal and interest, exactly. A lender would consider

that the most important evidence of what the payment was intended to be.  And here, a reasonable lender would conclude that the payment was intended to be a prepayment of the loaned amount.

64.     Notices (like the Calculation Statements here), in contrast, are a secondary source of information.  While they provide useful information—in this case, for example, showing how the accrued interest was determined—notices are often incomplete, late, and sometimes not provided at all.  Sometimes, for example, notices are sent to the wrong party.  Such errors in providing notice are not uncommon, and for that reason custodians, administrators, investment managers, and other parties that track payments are often in the position of requesting notices after, and sometimes well after, payments are received.  The failure to receive a complete or timely statement is not typically indicative of error, and would not cause a lender to believe that a payment was made in error.

65.     For these reasons, the loan market, in my opinion, places greater reliance and credibility on actual cash transfers received than it does on notices.  Notices have a greater probability of being late, inaccurate, incomplete, wrong or just missing than mistakes in wire transfers of cash in connection with loans.  This is not surprising, given that notices are not subject to the rigorous controls and approval processes applied to wire transfers of cash payments. In my experience, it would be much more likely for an administrative agent to mistakenly omit notices than to mistakenly prepay nearly nine hundred million dollars.

66.     Second, the Calculation Statements received by the Lenders are not inconsistent with, and certainly do not preclude in any way, the concurrent payment of principal; they say nothing at all about the payment of principal. As described above, they calculate accrued interest, and state (six times) that the interest is "due" off-cycle, which would be the case only if a

prepayment of principal was accompanying that payment of accrued interest.  A reasonable lender would not, based on my experience, conclude upon receipt of the interest calculation that a prepayment of principal would be erroneous.  Lenders might request a further notice corresponding to the principal payment for the purposes of bookkeeping, but the initial absence of such notice would not be indicative of error for the reasons just noted.

67.     I understand that Citibank has also argued that the wire transfers at issue here could not have been made in connection with a prepayment because Section 2.11 of the Credit Agreement, the section that addresses prepayments, has certain notice requirements that were not fulfilled here.  Based on my experience, this contention is incorrect for several reasons.  First, the primary notice requirement in Section 2.11 is notice from the Borrower (Revlon) to the Administrative Agent (Citibank).  The Lenders in receipt of the wire transfers would have no knowledge of such a notice, and no reason to believe that it was or was not provided.[61]  Second, section 2.11 states that the Administrative Agent, after receiving notice from the Borrower, should "promptly notify each relevant Lender thereof."  While using the word "promptly," the Credit Agreement does not prescribe any manner or time within which the notice must be shared.[62]  More importantly, as noted above, it would not be uncommon for an agent in Citibank's position to delay the sharing of such notice past the time of payment.[63]  Third, as previously noted, the wording of the Calculation Statement was not only consistent with a

---

[61]   Tichauer Dep. 49:14-21, 52:3-53:15.

[62]   Tichauer Dep. 53:24-55:6, 56:8-20, 57:22-58:9 ("[Q.] . . . My question is, you are not aware of any communication by Citi to lenders, outside of the credit agreement, as to what a notice is supposed to look like in the context of an optional prepayment . . . A. I am not aware.").

[63]   Tichauer Dep. 58:10-64:13 (testifying that he does not know what "prompt" means under the Credit Agreement, including whether a seven day delay could be considered "prompt" notice).

prepayment of principal, it was actually indicative that principal was being prepaid in line with the Credit Agreement language.  Finally, no reasonable lender would believe that a lack of notice would invalidate a prepayment of debt or indicate error.

>2.   <u>Revlon's financial condition did not preclude the company's payment of amounts owing on the loans.</u>

68.     Citibank has argued that Lenders in receipt of the wire transfers must have known they were made in error because Revlon did not have enough cash on hand to purchase all of the Term Loans.  Based on my years of experience in the loan market, I know that this is not an accurate statement.  Lenders knowledgeable about Revlon's financial condition, including its available cash,[64] would not have considered those facts to present an impediment to Revlon's ability to prepay the Term Loans.  There are several reasons for this.

69.     First, a company's ability to extinguish its debt is not limited to cash on its balance sheet, even in the event a company is insolvent.  Companies often engage in refinancing transactions through which they raise sufficient funds to retire outstanding debt, even though the cash would otherwise be unavailable to complete such loan prepayments.[65]  Pointing solely to the company's liquidity position paints a wholly incomplete picture of a company's ability to repay its loans.

70.     In the case of Revlon, one needs look no further than a few months ago to find an example of such a transaction.  In May 2020, Revlon raised almost $1 billion in new money through an extensive transaction.  (The transaction, of course, is the very one that UMB Bank, on

---

[64]   Revlon, and public companies generally, do not report cash on a daily basis.  Warren Dep. 174:23-175:4.  Nor are they required to publicly report material developments before they occur.  Lenders on August 11 would not know how much cash Revlon had available nor would they know if Revlon recently successfully raised capital in order to satisfy the term loans.

[65]   Tichauer Dep. 178:5-13 (testifying that borrowers, such as Revlon, will hire firms to help restructure debt obligations to avoid filing for bankruptcy).

behalf of current Lenders, is challenging.)  Through that transaction, Revlon, which was

certainly facing liquidity issues  at the time,[66] was able to (a) satisfy at par more than $950

million in term loans under the Credit Agreement, (b) retire at par another $200 million credit

facility, for which it *also* paid a $33.5 million prepayment premium and $10.3 million in

"lenders' fees," meaning that Revlon actually paid significantly *above* par, (c) retire at par $50

million of unsecured bonds, and (d) fully repay another $41.5 million revolving credit facility.[67]

Shortly thereafter, on May 28, Revlon prepaid approximately $65 million in revolving loans in

full as well.[68]  Thus, in May of this year, Revlon was able to raise enough money to pay off at

par more than $1 billion in debt.[69]

71.     Second, as compared to other companies, Revlon would be even more likely to

engage in such a transaction to pay off its term loans.  Revlon is majority owned by Ronald

Perelman, through his holding company McAndrews & Forbes.  The market is well aware that

Revlon has long been Mr. Perelman's prized possession; indeed, his daughter (Debra Perelman)

---

[66]  Warren Dep. 114:12-18 (Revlon Treasurer testifying that "in May liquidity at Revlon was tight").

[67]  DX-1052 (Zeigon Dep. Ex. 3) at -0030 (Revlon 10-Q) (noting that Revlon "used a portion of the proceeds from the 2020 BrandCo facility to fully repay the entire principal amount outstanding under its 2019 term loan facility totaling $200 million, plus approximately $1.3 million of accrued interest outstanding thereon, as well as approximately $33.5 million in prepayment premiums, $10.3 million in lenders' fees, $0.3 million in legal fees, and approximately $2 million in other third-party fees"); *id.* at -0031 (noting that "[t]he 2020 Incremental Facility was repaid in full and the commitments thereunder [were] terminated on May 28, 2020"); Warren Dep. 115:5-9 ("[Q.] Notwithstanding the liquidity issues, Revlon was successful in raising quite a bit of money in May 2020, were they not? A. Yes."); *id.* at 115:10-116:23.

[68]  DX-1052 (Zeigon Dep. Ex. 3) at -0031 (Revlon 10-Q, June 30, 2020); Warren Dep. 134:10-15.

[69]  Warren Dep. 25:3-10 (testifying that Revlon repurchased between $800 and $900 million of 2016 Term Loans since May 2020); *id.* at 26:17-27:11 (testifying that Revlon's repurchases in June 2020 were at par); *see also id.* at 116:11-23.

is the CEO of Revlon.  Since as far back as 2003, Mr. Perelman has lent and/or injected hundreds

of millions of dollars into Revlon "to keep the company from running out of cash while it

negotiates with lenders."[70]  Mr. Perelman is well known for engaging in complex financial

transactions in order to extend the runway of his shareholdings in his companies, including with

respect to Revlon itself.[71]

72.     The point goes beyond the fact that Revlon's executive management would be

motivated to continue to manage its capital structure and avoid default and a resulting

bankruptcy.  Revlon's multi-billionaire sponsor provided Revlon with an enhanced ability to

raise capital, as well as potential access to assets beyond those reflected on its balance sheet.

Thus it would be entirely plausible to a lender familiar with Revlon and Mr. Perelman that, in

order to save his equity stake in the company, Mr. Perelman would make use of other assets to

satisfy Revlon obligations.[72]  And widely-issued press reports—including reports released

around the time of the August 11 payments—indicate that Mr. Perelman has been liquidating

substantial assets, making available cash to further invest in equity in Revlon, including by

---

[70]   DX-1021 (*Perelman to Aid Revlon With Loan of $125 Million*, New York Times, Nov. 14, 2003); *see also* DX-900 (*Perelman's Love Affair With Revlon Is a Cautionary Tale on Debt*, Wall Street Journal, Sept. 20, 2006).

[71]   According to Bloomberg's Revlon Credit Primer: "Financial difficulties in the early 2000s led to a string of Mafco-supported initiatives aimed at putting Revlon on more solid financial footing, including the extension of almost $300 million in loans and credit availability in 2003 and participation in a $50 million rights offering. In early 2004, Mafco exchanged much of the debt it held into equity, including $285 million of 8.625% notes, while 2008 saw the investor participate in a follow-up rights offerings and extend a subordinated term loan."  DX-1022 (*Revlon Credit Primer*, Bloomberg Intelligence) at Section 15.

[72]   Warren Dep. 108:20-109:7 (testifying that MacArthur & Forbes, which owns approximately 85% of Revlon, has "supported the company over time"); *id.* 110:5-17 ("Q. The prospect of MAFCO financially supporting Revlon is something that the market – it is something that the market considers over time.  Is that fair? . . . A. I think it is fair to say that any financial sponsor, when a market is valuing an operating company, the expectation would be that the sponsor will be supporting all of its operating companies.").

satisfying Revlon's obligations.  For example, according to an August 11, 2020 article in *Vanity Fair*, Mr. Perelman recently sold interests in several businesses, including his share of AM General, the maker of Humvee vehicles.[73]  Later articles have referred to the sale of other holdings, including artwork, yachts, and personal residences.  As Revlon's Treasurer testified, the use of the monetized proceeds is not publicly reported.[74]

73.     Third, lenders familiar with Revlon would understand that the company and Mr. Perelman would be particularly motivated to extinguish the 2016 Term Loans.  While the Term Loans originally had a maturity of seven years, as of August 2020 (and still today), the loans were facing an accelerated maturity date in November 2020 given the company's liquidity, measured in the manner prescribed in the Credit Agreement (the "Springing Maturity").  Through the summer, and just prior to the August 11 payments, the company had publicly announced steps it was taking to address the Springing Maturity, including the hiring of PJT Advisors, a firm specializing in restructuring transactions.  Revlon's 2016 Term Lenders knew that, in light of this Springing Maturity, their loans would likely be Revlon's next debt obligations to mature, and thus they had to be dealt with—either by prepayment or some other way—in order to prevent a bankruptcy and the destruction of the company's equity.[75]

---

[73]  DX-0904 (*Revlon's Ron Perelman Yearns for a "Simpler Life" Amid Business Sell-Off*, Vanity Fair, Aug. 11, 2020).

[74]  Warren Dep. 112:13-114:10 ("Q. But, Mr. Warren, you would also agree with me, the market doesn't know what Mr. Perelman or MAFCO intends or is doing with the proceeds of this monetization process; correct? . . . A. I don't believe the market would have clairvoyance relative to what the intentions are for MAFCO and the selling of these assets.") (objection omitted).

[75]  As it turns out, just two days ago, on November 11, 2020, Revlon announced that it would, once again, pay par plus accrued interest to extinguish a substantial debt issuance—this time, more than $100 million of its 2021 Notes.  Indeed, Revlon is paying off the bonds specifically to avoid the springing maturity of the 2016 Term Loans discussed in this paragraph. *See, e.g.*, DX-1127 (Press Release, *Revlon Announces Final Results and Expiration of Amended*

74.     In my view, the lenders would reasonably expect this prepayment to be another example of Revlon's creativity in refinancing debt in difficult times.

75.     Mr. Sunshine is dismissive of reasonable lenders giving thought—which he terms "speculation"—to such issues.  Once again, Mr. Sunshine is inappropriately focused on the period after Citibank sent the recall notices.  In my view, it would be entirely reasonable, indeed the natural thing for a lender to do, to consider such issues when an unanticipated payment— which appeared to be a permitted prepayment of principal under the Credit Agreement—was received on August 11.  One of the first questions a lender would ask upon receipt of such payment might be, "Why did Revlon prepay the loan now?"  As noted above in Paragraphs 69- 73, there could be several explanations for such a payment.  Indeed, in weighing the possibility that Mr. Perelman had shored up Revlon through the extension of additional debt or the infusion of new equity—something he had done several times in the past—against the possibility that Citibank had made an historic error by paying out nearly a billion dollars to hundreds of lenders, I do not believe that any Lender would contemplate a bank error as a serious possibility under these circumstances.

### 3.     The trading price of the loans is not indicative of the price at which the company would repurchase the loans.

76.     I understand that Citibank has contended that the Lenders that received payments must have been aware of an error because Revlon would not have repaid the 2016 Term Loans at par on August 11, 2020 when the loans were trading at a substantial discount to par on that date. The trading price of Revlon's term loans, however, would not be indicative of the price the company would be willing to pay for those loans.

---

*and Restated Exchange Offer and Concurrent Consent Solicitation*, dated Nov. 12, 2020).  This was not noted in my reports because it occurred after the reports were completed.

77.     First, the market for Revlon term loans was not necessarily a robust market.  To the extent the loans were thinly traded, any significant purchase such loans would immediately drive up the trading price.  Moreover, once it was disclosed that Revlon (or McAndrews & Forbes, as the company's sponsor) was making the purchase to support the company's equity, the trading price would undoubtedly spike.  As a result, were Revlon to resort to the open market in order to purchase its debt, the trading price at the start of a purchasing campaign would not remain in effect as the company continued its purchases.

78.     Second, the trading price on August 11 was not indicative of the level at which Lenders would be willing to sell their Term Loans.  After all, the Lenders in this case were holding their loans on August 11—they were not sellers at the current trading price.

79.     Third, as reviewed in paragraph 64 above, Revlon has recently paid par for several different debt issuances, including paying off in full 2016 Term Loans held by other Lenders in May 2020.  Presumably, to the extent these debt issuances were trading, they all would have sold at discounts to par.  Revlon's own conduct demonstrates that the company was nonetheless willing to pay par for such obligations in order to ensure orderly and complete purchases.

80.     Fourth, a prepayment of the entire issuance at par would be the fastest way to extinguish the remainder of the 2016 Term Loans.  As discussed above, Revlon may have been motivated to complete the purchases quickly to resolve the Springing Maturity looming over the company in the short term.  Similarly, Revlon and Citibank were well aware that UMB Bank was preparing to file a legal action relating to the May 2020 transaction, and a prompt purchase of the 2016 Term Loans could avoid such a legal action, as well as acceleration of payments on the loans.

81.     Fifth, Revlon would not be permitted to purchase all of the 2016 Term Loans on the open market.  The definition of "Open Market Purchase" in the Credit Agreement limits such purchases to 20% of the principal amount of all outstanding Term Loans.  Accordingly, to the extent that Revlon was purchasing the full tranche of loans—as appeared to be the case on August 11—it would not be able to do so through market purchases executed at below-par trading prices.

82.     In addressing Revlon's motivation to pay down the loans, Mr. Sunshine incorrectly asserted in his rebuttal report that, if there were truly a possibility of Mr. Perelman stepping up to inject more capital into Revlon, then Revlon's debt would not be trading at such discounted levels.  Mr. Sunshine's statement reflects a lack of understanding as to how prices are determined on the secondary market.  As noted above in Paragraphs 71-72, based on Mr. Perelman's history with Revlon, it was certainly possible that he would arrange, and potentially participate in, a transaction to protect the value of his equity in Revlon.  As is always the case, however, different investors would have different views of the likelihood of Mr. Perelman taking such steps.  As a result, while the trading price of Revlon debt might account for such a possibility, it would not be based on a universal conclusion that Mr. Perelman would contribute or arrange capital to ensure the payment of any Revlon debt.

V.     **Rebuttal to Citibank's Experts**

83.     Based on my evaluation of the opinions expressed by Mr. Sunshine and Mr. Byrne in their respective reports, I further note that:

(a)     Prior to receiving Citibank's recall notices, reasonable lenders would not believe that the payments were made in error;

(b)     Lenders would have reason to contemplate why Revlon would pay down the loans and financing transactions that would enable such payments;

(c)     Errors of the nature asserted by Citibank here are extremely rare; and

(d)     Finality is an important policy consideration with respect to wire transfers.

A.      **Events after receipt of recall notices are not within the scope of my opinions.**

84.     To the extent Mr. Sunshine and Mr. Byrne offer opinions concerning the period after Citibank sent the recall notices on the afternoon of August 12, approximately 20 hours after the Lenders received the payments by wire transfer, such testimony exceeds the scope of my opinion.  I am not offering any opinion regarding period following receipt of the recall notices; to the contrary, my opinions address only the period up until the recall notices were received.

85.     I understand that Citibank sent the recall notices to the Lenders to advise the Lenders of Citibank's assertion that the payments were made in error.  In my view, the sending of the recall notices is an important juncture because, prior to then, the Lenders had no reason to believe that any portion of the payments were made by mistake.  Neither Mr. Sunshine nor Mr. Byrne state that, prior to receipt of the recall notices, any of the Lenders indicated an awareness or belief that the payments were made in error.[76]  That is consistent with my opinion that, prior to receipt of the recall notices, the Lenders would not believe that the payments were made in error.[77]

---

[76]   While Mr. Sunshine and Mr. Byrne may suggest that Lenders had a duty or obligation to investigate because the amount on the interest calculation form did not match the amount of the payment, they have not yet identified a single lender that, prior to receiving the recall notice, raised any concern that the payment was erroneous.

[77]   Vincent Fratta, head of the loan operations group that was responsible for making the August 11 Transfers, testified that Citibank sent out the error notices because he could not assume the Lenders would conclude that the funds needed to returned unless they received that notice.  Fratta Dep. 205:16-206:5, *id*. at 206:6-21 ("Q. So you wanted them to get notices alerting them that they had received money by mistake and that they should send it back. Right? A. Yes.  Q. And that's because you didn't expect they would reach that conclusion or take that action without getting notices telling them. Right?  . . . A.  Correct.  The notices – the recall notices need to go to the lenders so they know that they need to send that money back to us.") (objection omitted).

86.     I agree with Mr. Byrne's assertion in his rebuttal report that "Citi's error notice recalling the funds changed everything." After receipt of such notices, lenders would have a basis for contemplating that Citibank had erred.  Before receipt of those notices, there would not be any basis for believing that the payments had been made by mistake.

B.     **Prior to receiving Citibank's recall notices, reasonable lenders would not believe that the payments were made in error.**

1.     <u>The Calculation Statement, far from suggesting error, was consistent with a prepayment of principal on August 11, 2020.</u>

87.     Both Mr. Sunshine and Mr. Byrne may assert that the Lenders should have known that there was an error because the amount on the Calculation Statement—i.e., the determination of accrued interest through August 11, 2020—did not match the amount on the Transaction Confirmation, which represented the actual amount of each payment, totaling accrued interest plus the outstanding principal balance for each Lender.  That assertion is incorrect for several reasons.

88.     First, the amount computed on each Calculation Statement was the correct amount of accrued interest through August 11.  Each Calculation Statement also indicates the amount of principal outstanding owed to each Lender.  Together, the two amounts equal precisely the amount indicated on the Transaction Confirmation and paid to each Lender.[78]

89.     Second, each Calculation Statement expressly states (multiple times) that it was determining the amount of interest "due" to be paid to the Lender.  Under the Credit Agreement, interest would be "due" on August 11, 2020, only if Revlon were making a principal prepayment

---

[78]     *See, e.g.*, DX-1063 (Zeigon Decl. Ex. A); *see also* DX-0367 at MEDALIST_CITI_00000010.

that day.[79]  Accordingly, it would be reasonable for a lender receiving such a statement to believe that the lender would be receiving a prepayment of principal that day.  Again, the Calculation Statement was therefore consistent with—indeed, appeared to indicate—a prepayment of principal on August 11.

90.     Mr. Sunshine may argue that a lender should have been on notice of an error[80] because the Calculation Statement was sent before the wire payment and thus set the lender's expectation for the subsequent payment amount.  Whether the Calculation Statement preceded or arrived with the payment, however, is irrelevant.  Either way, it indicated to lenders how the interest portion of the payment was computed by Citibank.  The principal portion, of course, did not require computation.  Nothing about the Calculation Statement precludes an accompanying payment of principal; indeed, as just noted, it was entirely consistent with a principal prepayment.

91.     Mr. Sunshine may argue that Revlon could have made a prepayment of interim interest on August 11, and thus the Lenders need not have expected an accompanying principal payment.  That would be incorrect under the Credit Agreement and inconsistent with market practices.  The Credit Agreement specifically provides for the optional prepayment of principal,

---

[79]  *See supra* ¶¶ 37-38 (explaining the definition of Interest Payment Date in the Credit Agreement).

[80]  Notably, while Mr. Sunshine argued in his rebuttal report that a lender should have been on notice of an error, he appeared to concede that a lender would not be able to determine what the error was—in this case, the asserted overpayment—and would only be able to reach that conclusion once the recall notice advising of such an error was received.   As noted above, until the receipt of a recall notice, "the primary indicator of what the payment constitutes is the payment itself," whereas notices are a "secondary source of information."  *See supra* ¶¶ 63-64.  Thus, if a lender perceived any error—which I do not believe would be the case—the error would be in the notice, not in the payment amount.

which would be accompanied by payments of accrued interest.[81]  And the definition of Interest

Payment Date in the Credit Agreement provides for the payment of interim interest when

principal prepayments are made.[82]  In contrast, the Credit Agreement does not provide for

optional prepayments of interest only.[83]  Nor would it make sense to include such a provision, as

borrowers enjoy no economic advantage from making prepayments of interim interest for loans

structured like those in the Credit Agreement.[84]

92.     Mr. Sunshine has also contended that the 2016 Term Lenders once before

received an interim interest payment without accompanying principal, on May 7, 2020.  As

explained above, the Amendment to the Credit Agreement plainly states that "all accrued and

unpaid interest" would be paid "[o]n the Amendment Effective Date," which was May 7.[85]  This

was a one-time payment of accrued interest, plainly specified in the Amendment.  This stands in

stark contrast to any interim interest payment on August 11, when there was no loan document

suggesting that an interest payment would be made on that day.[86]

---

[81]     *See* DX-0909 (Credit Agreement) at SMITH_CWT_000078 (Section 2.11).

[82]     DX-0909 (Credit Agreement) at SMITH_CWT_000042.

[83]     Justin Tichauer, the Citibank managing director who signed the Amendment to the Credit Agreement, testified that he has never seen a provision in a credit agreement that permits a borrower to prepay interest absent a prepayment of principal, Tichauer Dep. 68:17-21; 69:15-71:10, and is not aware whether—outside the credit agreement—a borrower can make an optional prepayment of accrued interest but not principal.  *Id.* at 68:22-69:6.

[84]     Eric Warren, Revlon's Treasurer, testified that Revlon does not typically make prepayments of interest and did not request that interest be prepaid to all Lenders.  Warren Dep. 49:11-25.

[85]     *See supra* ¶ 45.

[86]     Mr. Sunshine appears to take the position that the Calculation Statement represents "notice" of a an "off-cycle" interest payment, and thus the Lenders would know that they were receiving an interim interest payment without the usual accompanying principal.  Sunshine Report ¶ 31.  The Calculation Statement, however, hardly constitutes such a notice.  It does not assert, as suggested in Paragraph 48, that this payment was "an off-cycle, unprecedented interest

93.     Moreover, the inclusion of a specific provision in the Amendment to the Credit Agreement providing for interim interest to be paid "[o]n the Amendment Effective Date," further underscores that the payment of interim interest would not be expected, or would even be permitted, under the Credit Agreement.  Stated differently, if the Credit Agreement permitted payment of interim interest, there would be no need to include this language in the Amendment.

94.     To be clear, there would be absolutely no reason for the Lenders to anticipate an interim interest payment, unaccompanied by a prepayment of principal, on August 11, 2020.  In the middle of a Eurocurrency loan period—as August 11 was—the only reason for interim interest to be paid before maturity of the outstanding Eurocurrency loan would be a prepayment of principal.[87]

2.     The absence of prepayment notice did not indicate any error.

95.      Mr. Sunshine contended that Lenders would be on notice of error when the payments were received because they did not receive prepayment notices in advance of the August 11, 2020 transfers,   In making this argument, Mr. Sunshine is relying on notice requirements in Section 2.11(a) of the Credit Agreement.

96.     That is a misreading of Section 2.11(a).  That section does *not* require three-days advance notice to lenders prior to optional prepayments.  To the contrary, the section requires Revlon (the borrower) to provide such notice to the administrative agent (which Revlon asserted to be Citibank at the time).  Thus, the advance notice of prepayment referenced in that section

---

payment not envisioned by the Credit Agreement."  Citibank, of course, sent no such notice, nor any kind of notice indicating that the August 11 payment would not include a prepayment of principal.

[87]   Citibank's argument that the Lenders must have known of the asserted error as soon as they received the funds on August 11 is hard to square with the fact that Citibank itself did not determine there was an error until the following morning, approximately 15 hours after the payments were sent.  Zeigon Dep. 186:13-22, 187:8-189:14.

would go from Revlon to Citibank, and the individual syndicate lenders would have no way of knowing whether such a notice was sent.

97.     The section further provides that the administrative agent should "promptly" notify the lenders upon receipt of such a notice.  But, in contrast to three-day requirement for the borrower to provide notice to the administrative agent, there is no specified time for the administrative agent to notify the lenders, nor is there any required form for such notice.[88] Indeed, Mr. Tichauer, the Citibank managing director who signed the Amendment to the Credit Agreement, testified that he was not aware what period of time constituted "prompt" notice under the Credit Agreement,[89] or whether Citibank would be compliant with Section 2.11(a) if it provided notice of prepayment to lenders seven days after receiving a notice from Revlon.[90]  Mr. Tichauer also could not explain the form that the notice needed to take,[91] or whether Citibank complied with its notice obligations by sending out the Transaction Confirmation.[92]

### C.     Importance of finality with respect to wire transfers.

98.     Mr. Byrne has argued that erroneous payments must be returned because, otherwise, people would spend an enormous amount of time fighting over entitlement to erroneous payments.  This policy rationale  is without basis.

99.     Mr. Byrne bases his policy argument on the types of mistakes noted above at Paragraph 57—errors of miscalculation or recipients that are easy to discern and to remedy.  In

---

[88]     Justin Tichauer testified that Revlon was not required to provide the Section 2.11 notice to lenders, and conceded that he did not know of any requirements regarding when Citibank would have to advise lenders of such a notice.  Tichauer Dep. 51:25-52:18; 53:3-17.

[89]     *Id.* at 59:17-60:4.

[90]     *Id.* at 60:22-62:18, 64:7-13.

[91]     *Id.* at 53:24-54:5, 57:22-58:9.

[92]     *Id.* at 228:13-229:7.

those instances, the errors, which tend to be small in size, are obvious from the face of the wire transfer itself.

100.    This case is materially different.  Here, hundreds of lenders were paid through the Fedwire system, the exact amount that they were owed in transactions that purported to be payments in connection with those very obligations.  As I have explained, before Citibank sent the recall notices more than 20 hours after the payments were made, there was no basis for the Lenders to believe that the payments had been made in error.  In fact Citibank did not discover a mistake had been made until the day after the transfers were made.[93]  To the contrary, it would have appeared to them that they received complete payments on their valid loans to Revlon.

101.    Under these circumstances, the most important policy concern is finality of payment.[94]  Lenders should not be left to second guess the validity of payments that appear to be made in satisfaction of outstanding loans.  In other words, when lenders receive payments on their loans without manifest error, which was not present here, they should be able to treat those

---

[93]    Fratta Dep. 192:15-193:5.

[94]    Indeed, one of the Core Principles of the FedWire Funds Service, through which the August 11 Transfers were made, is that the "[t]he system should provide prompt final settlement on the day of value . . . "  DX-0165 (*FedWire Funds Service:  Assessment of Compliance with the Core Principles for Systematically Important Payment Systems* (Revised July 2014)) at 23; *see also id.* ("Payment to the receiving participant over the Fedwire Funds Service is final and irrevocable upon the crediting of the receiving participant's account, or when the payment order is sent to the receiving participant, whichever is earlier."); *id.* at 18 ("Funds transfers over the Fedwire Funds Service settle in central bank money with immediate finality.").  Citibank also explains the importance of finality of Fedwire transactions in its marketing material.  *See* DX-0140 (Citi, Transaction Services:  United States of America Country Profile), at 6 ("The Fedwire system is a real-time gross settlement system (RTGS) operated by the United States Federal Reserve Banks that enable financial institutions to electronically transfer funds between its member participants. The system is highly secure with funds being transferred immediately, along with limited detailed remittance information. ***Once funds are received by the receiving bank, settlement is final***. . . . Operated by the Clearing House Association, CHIPS is a large dollar funds transfer network owned by financial institutions, which uses a real-time netting system and provides for finality of payment at the time of release.").

payments as final without the need to undertake an examination to determine that the payment was made as intended.  This is especially the case when the payments received are from the correct borrower, via the long time agent bank, and in precisely the correct amount owed.

102.    First and foremost, lenders should have the confidence to rely upon the validity of payments received on outstanding debts, particularly when the amounts received precisely match the amounts owed.  Lenders should not be left to second-guess payments that are not erroneous on their face.  As I have explained in detail, the payments here did not have such manifest indicia of error.

103.    Second, flowing from the first point, lender in receipt of payments must be free to redeploy those funds to their most useful purposes.  To the extent that lenders are required to delay the investment of funds—as I understand has been the case here—the money received is not put to effective use.  This adversely impacts lenders, of course, because they are not then free to allocate the funds to maximize return to their investors.  Borrowers are also negatively impacted when loan payments are delayed because lenders would charge more (e.g., through an increase in the interest rate) for loans to compensate them for the illiquidity of the loan repayments.  Over time, new loan issuance could be reduced because fewer investors would buy loans due to the illiquid nature of the repayments.  It similarly hurts borrowers by rendering less liquid the market for syndicated loans.

104.    Third, many lenders in the market for syndicated loans are investors such as pension funds, insurance companies, and structured investment vehicles, such as collateralized loan obligations ("CLOs"), that may have many investors of their own.  When these investors receive payments on loans, they put the cash to work by investing the funds overnight, reinvesting in new loans, or making distributions. In the case of CLOs, which represent

41

approximately about 50% of the leveraged term loan market,[95] their indentures are very prescriptive in what a CLO is allowed/required to do with cash proceeds.  Under certain circumstances, those payments may be deposited into accounts and paid out in accordance with elaborate waterfall provisions.  Whether and when such payments are distributed may depend on the timing of receipt relative to the distribution dates provided in CLO documentation.

105.    Finality is important, then, to enable the proper redeployment of invested funds, to encourage participation in loan markets, to increase availability of capital for borrowers, and to prevent unwieldy recoupment processes that can disrupt the operation of important loan market participants.

VI.    **Conclusion**

106.    For the reasons I set forth above, a reasonable lender in the position of the Lenders in this case would not believe, upon receiving a wire transfer on August 11, 2020, that the payment had been made erroneously.  When a lender (a) receives payment on an outstanding loan, (b) the payment precisely matches the amount of principal and interest owed to that lender, and (c) the payment is received in the middle of an interest period, thereby indicating that it is a prepayment of principal, a reasonable lender would not believe that the payment was a mistake. To the contrary, a reasonable lender would understand that it had received a full payment in discharge of the borrower's obligation to that lender.  That is all the more true here, where the payments made—if in error—would constitute an error of potentially unprecedented magnitude.

* * *

*[Signature Page Follows]*

---

[95]    DX-0310 (Guggenheim, *Understanding Collateralized Loan Obligations* (May 2019)).

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  November 13, 2020
      White Plains, New York

                                      _____
                                        Richard Bram Smith

## APPENDIX A

## CURRICULUM VITAE OF RICHARD BRAM SMITH

### R. BRAM SMITH
(914) 391-4945
bsmith@sedaexperts.com

**SEDA EXPERTS**, New York, NY - Jun 2020 to Present
*Managing Director*
Member of the senior executive professional team providing expert testimony and advisory services in the areas of financial services.

**LSTA**, New York, NY - Sept/2008 to Jan/2018
*Executive Director*
Trade association for the US corporate loan market. 400+ members including banks, investment managers, law firms, and vendors. Managed the LSTA through the Great Financial Crisis of 2008/09. This included keeping the loan secondary functioning and providing information to Congress and regulators as to the impact of new regulations on the loan market. Testified before the House Subcommittee on Capital Markets on risk retention proposals in regard to CLO structures, met with many regulators and committees on impact of proposed regulations and laws on loan market. Successfully lead LSTA's effort to overturn Fed's regulation regarding risk retention at the DC Appellate Court.

**BEAR STEARNS**, New York, NY - March 2003-June 2008
*Senior Managing Director*
Managed the loan capital markets group and loan sales force in the US and Europe as part of the Leveraged Finance Group. Worked closely with the distressed bank loan group to expand their effort into Europe.

**MORGAN STANLEY**, New York, NY - March 1996 to Feb 2003
*Managing Director*
Started and managed Morgan Stanley's Global Loan business, including loan syndications, loan capital markets, and loan sales and trading. This included developing a business plan, setting up approval processes with other areas of the firm, and hiring people. By coordinating with the Credit group, Investment Banking, and the High Yield Desk, Morgan Stanley's loan group became a major force in the loan market.

**BANKERS TRUST COMPANY**, New York, NY - July 1978 to Feb 1996
*Managing Director* for last 5 years
Head of loan syndications, loan capital markets, and loan sales and trading 1994-1996
Head of loan capital markets 1992-1993
Sales manager of loan sales force.  1990-1991
Loan salesman. 1986-1990

Team leader in Northern Division of National Banking Group. 1984-1986
Lender and relationship manager in Northern Division of National banking Group. 1978-1984

**EDUCATIONAL BACKGROUND**
Harvard Business School   MBA. 1978 - Boston MA
Fletcher School of Law and Diplomacy, Tufts University
MA International Relations. 1971 - Medford MA
US Air Force Academy BS International Relations 1970 - Colorado Springs CO

**MILITARY SERVICE**
US AIR FORCE.   Last rank achieved; Captain     June 1970-June 1976
Helicopter Pilot in Air Rescue and Recovery Service Feb 1974 to Jun 1976
Undergrad pilot school.        Sep 1972 to Feb 1974
Air Intelligence Officer.        Sep 1971 to Sep 1972
Air Intelligence School.        Mar 1971 to Sep 1972
Graduate School                July 1970 to Mar 1971

**OTHER ACTIVITIES AND BOARDS**
Board of Directors of NY Association of Graduates New York, NY - Sept 2018 to present
Board of Directors and second round investor in Black Mountain Systems
Chairman of the board and board member of United Way of Scarsdale -Edgemont New York, NY
Pack Leader and Den leader of Cub Scout Pack 60, Scarsdale, NY - Sept 86 to June 95

**EXPERT TESTIMONY AND CONSULTING ENGAGEMENTS**
- *In re: Dow Silicones Corporation*, case number 1:95-bk-20512 (2018): US District Court Eastern District Michigan Southern Division – Retained by Wilmer Hale, to opine on the meaning of default interest and compound interest for a defaulted loan as generally understood by the secondary loan market, provided expert testimony on behalf of claimants in the form of an expert report.

**OTHER TESTIMONY AND ADVISORY**

- *LSTA Risk Retention Testimony* before the House Subcommittee on Capital Markets, April 12, 2011 – Testified on risk retention proposals in regard to CLO structures; April 12, 2011
- Provided comments on behalf of The Loan Syndications and Trading Association ("LSTA") to the Office of the Comptroller of the Currency, Federal Deposit Insurance Corporation, Securities and Exchange Commission, Board of Governors of the Federal Reserve, Federal Housing Finance Agency, and Office of General Counsel Department of Housing and Urban Development, *Re: Notice of Proposed Rulemaking, Credit Risk Retention SEC (Release No. 34-64148; File No. S7-14-11); FDIC (RIN 3064-AD74); OCC (Docket No. OCC-2011-0002); FRB (Docket No. 2011-1411); FHFA (RIN 2590-AA43); HUD (RIN 2501-AD53),* September 2, 2011

- Provided comments on behalf of The Loan Syndications and Trading Association ("LSTA") to the Legislative and Regulatory Activities Division Office of the Comptroller of the Currency, Federal Deposit Insurance Corporation, Securities and Exchange Commission, Board of Governors of the Federal Reserve, Federal Housing Finance Agency, and Office of General Counsel Department of Housing and Urban Development, *Re: Credit Risk Retention; Joint Further Notice of Proposed Rulemaking SEC (File No. S7-14-11); FDIC (RIN 3064-AD74); OCC (Docket Number OCC-2013-0010); FRB (Docket Number R-1411); FHFA (RIN 2590-AA43); HUD (RIN 2501-AD53),* June 25, 2014
- Provided comments on behalf of The Loan Syndications and Trading Association ("LSTA") to the Securities and Exchange Commission, *RE: Open-End Fund Liquidity Risk Management Programs; Re-Opening of Comment Period for Investment Company Reporting Modernization Release (File Number S7-1615)*, January 13, 2016

## REPRESENTATIVE PRESENTATIONS

- Moderated presentation *Delayed Compensation for Primary and Secondary Trade Settlements* - LSTA and LMA Joint Conference, New York, May 19, 2016
- Presented *Welcome Address and Introduction,* LSTA and LMA US and European Loan Market Conference, London, March 8, 2017
- Presented *Introduction and LMA update, The U.S. And European Secondary Markets in 2017, LSTA Update on Delayed Settlement Compensation,* the LMA & LSTA Secondary Market Seminar, London, March 9, 2017
- Presented *The Loan Syndications and Trading Association* at The Times They Are a-Changin': A Roadmap to Operational and Settlement Excellence*,* New York, April 4, 2017
- Presented *Welcome and Introduction,* LMA & LSTA Secondary Market Seminar, New York, May 23, 2017
- Presented *Investing in the US Loan Market*, Tokyo, June 6, 2017
- Moderated presentation *Opportunities in the US Loan Market Today* and *The Corporate Loan Market in a Global Context* - Investing in the US Loan Market, Hong Kong, June 8, 2017
- Presented *The Loan Syndications and Trading Association* at ten LSTA Annual Conferences in New York, from 2008 through 2018
- Presented *The Loan Syndications and Trading Association* at eight LSTA Loan Conferences in Tokyo, from 2008 through 2018
- Presented *The Loan Syndications and Trading Association* at several LSTA Conferences in Hong Kong, Seoul, and Sydney, from 2008 through 2018

# APPENDIX B

## LISTING OF DOCUMENTS RELIED UPON

**Agreements:**

TERM CREDIT AGREEMENT among REVLON CONSUMER PRODUCTS CORPORATION, as the Borrower, REVLON, INC., as Holdings, THE LENDERS PARTY HERETO and CitibankBANK, N.A., as Administrative Agent and Collateral Agent Dated as of September 7, 2016.

AMENDMENT NO. 1 TO CREDIT AGREEMENT, among REVLON, INC., a Delaware corporation ("Holdings"), REVLON CONSUMER PRODUCTS CORPORATION, a Delaware corporation (the "Borrower"), the other Loan Parties and the Lenders party hereto, and acknowledged by CitibankBANK, N.A., as Administrative Agent and Collateral Agent, Dated as of May 7, 2020.

**Pleadings:**

Complaint and exhibits thereto, *Citibank, N.A. v. Brigade Capital Management, L.P.*, Case No. 20-cv-06539 (S.D.N.Y. Aug. 17, 2020)

Complaint and exhibits thereto, *Citibank, N.A. v. Bardin Hill Loan Management LLC et al.*, Case No. 20-cv-06713 (S.D.N.Y. Aug. 20, 2020)

Complaint, *Citibank, N.A. v. HPS Investment Partners LLC et al.*, Case No. 20-cv-06617 (S.D.N.Y. Aug. 19, 2020)

Complaint, *UMB Bank, National Association v. Revlon, Inc.*, Case No. 20-cv-06352 (S.D.N.Y. Aug. 12, 2020).

Citibank's Application for a Temporary Restraining Order and Preliminary Injunction and supporting papers thereto, *Citibank, N.A. v. Brigade Capital Management, L.P.*, Case No. 20-cv-06539 (S.D.N.Y. Aug. 17, 2020) [Dkt. Nos. 6-9]

Citibank's Application for a Temporary Restraining Order and Preliminary Injunction and supporting papers thereto, *Citibank, N.A. v. Bardin Hill Loan Management LLC et al.*, Case No. 20-cv-06713 (S.D.N.Y. Aug. 21, 2020) [Dkt. Nos. 7-10]

Citibank's Application for a Temporary Restraining Order and Preliminary Injunction and supporting papers thereto, *HPS Investment Partners LLC et al.*, Case No. 20-cv-06617 (S.D.N.Y. Aug. 19, 2020) [Dkt. Nos. 8-11]

Letter from R. Loigman to J. Furman, dated Aug. 18, 2020 [Dkt. No. 22]

Letter from C. Houpt (Mayer Brown) to J. Furman, dated Aug. 18, 2020 [Dkt. No. 23]

Letter from R. Loigman to J. Furman, dated Aug. 18, 2020 [Dkt. No. 24]

Transcript of Hearing, dated Aug. 18, 2020

Letter from M. Ingber to J. Furman, dated Aug. 24, 2020 [Dkt. No. 41]

Letter from M. Ingber to J. Furman, dated Sept. 10, 2020 [Dkt. No. 64]

Notice of Dismissal as to Defendant Highland Capital Management Fund Advisors LLP, dated Aug. 27, 2020 [Dkt. No. 49]

Citibank's Notice of Dismissal of Complaint Against Defendants InvestCorp Credit Management US LLC, dated Oct. 14, 2020 [Dkt. No. 111]

**Deposition Transcripts and Exhibits:**

Deposition transcript of Brendan Zeigon (Citibank 30(b)(6)), dated October 9, 2020, and exhibits thereto

Deposition transcript of Vincent Fratta (Citibank), dated October 13, 2020, and exhibits thereto

Deposition transcript of Justin Tichauer (Citibank), dated October 20, 2020, and exhibits thereto

Deposition transcript of Eric Warren (Revlon 30(b)(6)), dated October 23, 2020, and exhibits thereto

**Articles and Internet Sources**:

Revlon Inc., Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, for the quarterly period ended September 30, 2016 (Form 10-Q)

Revlon Inc. and Revlon Consumer Products Corporation, Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, for the quarterly period ended March 31, 2020 (Form 10-Q)

Revlon Inc. and Revlon Consumer Products Corporation, Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, for the quarterly period ended June 30, 2020 (Form 10-Q)

Revlon Lender Presentation, April 2020

S&P Market Intelligence, *Leveraged Commentary & Data (LCD): Leveraged Loan Primer*

Basel Committee on Banking Supervision Consultative Document Core Principles for Effective Banking Supervision Issued for comment by 20 March 2012

New York Times, *Perelman to Aid Revlon with Loan of $125 Million* (Nov. 14, 2003).

WSJ, *Perelman's Love Affair With Revlon Is a Cautionary Tale on Debt* (Sept. 20, 2006)

*FedWire Funds Service:  Assessment of Compliance with the Core Principles for Systematically Important Payment Systems* (Revised July 2014)

Citi, Transaction Services:  United States of America Country Profile

*Oops! Deutsche Bank makes €28 billion transfer in error*, The Local DE (Apr. 20, 2018)

Bloomberg Intelligence, *Revlon Credit Primer* (Jan. 25, 2019)

*Understanding Collateralized Loan Obligations*, Guggenheim (May 2019)

CNBC, *Why Marc Lasry Sees More Opportunity Overseas Than At Home* (June 20, 2019)

Vanity Fair, *"Many, Many States Have Explicitly Rejected Revlon": With Revlon For Sale, the Hostile Takeover Era Ron Perelman Started Comes to an End* (Nov. 15, 2019)

Vanity Fair, *Will Revlon Be Next in Ron Perelman's 2020 Sell-Off* (Aug. 4, 2020)

S&P Global Market Intelligence, *Revlon Faces Lender Block Of Note Exchange, Potential Lawsuit* (Aug. 10, 2020)

Reorg, *Revlon Working with PJT Partners as Financial Advisor as Company Seeks to Avoid Nov. 16 Springing Maturity on 2016 Term Loan* (Aug. 11, 2020)

Vanity Fair, *Revlon's Ron Perelman Yearns for a "Simpler Life" Amid Business Sell-Off* (Aug. 5, 2020)

Bloomberg, *Ronald Perelman Aims to Sell Art Worth Hundreds of Millions, Pare Debt* (Aug. 27, 2020)

Vanity Fair, *How Much of Ron Perelman's $3 Billion Art Collection Is He Getting Rid Of?* (Aug. 28, 2020)

Jefferies, *Retail Update: Mass Beauty Moderates Further; Skincare Turns Negative* (Sept. 1, 2020)

Wall Street Journal, *Revlon Faces Debt Crunch After Bond Exchange Fails* (Sept. 14, 2020)

BNA, *Citi to Pay $400 Million OCC Fine Over Risk-Management Issues* (Oct. 7, 2020)

New York Times, *Citigroup is fined $400 million over 'longstanding' internal problems* (Oct. 7, 2020)

Wall Street Journal, *Regulators Fine Citigroup $400 Million Over 'Serious Ongoing Deficiencies'* (Oct. 7, 2020)

LSTA, "About," https://www.lsta.org/about/ (last visited Oct. 27, 2020).

**Expert Reports:**

Rebuttal Report of Mark A. Sunshine, dated November 2, 2020, and exhibits and documents relied upon thereto

Rebuttal Expert Report of John Byrne, dated November 2, 2020, and exhibits and documents relied upon thereto

**Bates Stamped Documents:**

Citi00000003 - 004
Citi00000068 - 072
Citi00000164 - 164
Citi00000231 - 232
Citi00000244 - 244
Citi00000254 - 255
Citi00000380 - 382
Citi00000400 - 401
Citi00000410 - 411
Citi00000464 - 468
Citi00000485 - 485
Citi00000592 - 593
Citi00000657 - 658
Citi00000696 - 697
Citi00000707 - 772
Citi00000770 - 772
Citi00000884 - 884
Citi00001069 -1069
Citi00001101 -1102
Citi00001185 - 1208
Citi00001239 - 1263
Citi00001594 - 1601
Citi00001648 - 1653
Citi00001654 - 1656
Citi00001657 - 1664
Citi00001672 - 1676
Citi00001729 - 1735
Citi00001829 - 1830
Citi00001832 - 1847
Citi00001848 - 1861
Citi00001862 - 1872
Citi00001874 - 1894
Citi00004636 - 4648
REVLON_CWT_000037 - 055
REVLON_CWT_000136 - 142
ALLSTATE_CITI_00000008 - 008
ALLSTATE_CITI_00000010 - 010
BRIGADE_CITI_00010681
GREYWOLF_CITI_00000033 - 034
MEDALIST_CITI_00000007 - 008
MEDALIST_CITI_00000010 - 011
NEWGEN_CITI_00000009 - 010