UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re:* | Case No. 20-cv-6539 (JMF) |
| *Citibank August 11, 2020 Wire Transfers* | **DECLARATION OF PIETRO U. VINELLA** |

## <u>DECLARATION OF PIETRO U. VINELLA</u>

I, Pietro U. Vinella, being duly sworn, state the following under penalty of perjury:

1.      I am a resident of the State of California, over the age of 18, and competent to make this statement.

## I.      SCOPE OF EXPERT TESTIMONY

2.      My name is Pietro (Peter) Vinella. I am currently a Managing Director at PVA Toucan International, LLC ("PVA"), an expert services and consulting firm that provides independent litigation support and advisory services to corporations, government agencies, and regulatory bodies involved in the financial services industry.

3.      I have been asked by counsel for Defendants to offer my opinions regarding whether a person of reasonable skill, experience, and knowledge working the back-office of an investment manager (such as the Defendants) on behalf of a lender or their agents would accept the wire transfers that were sent by Citibank on August 11, 2020 to the Lenders of the Revlon Loans[1] (the "Citi Payments") as an early paydown the Revlon Loan in full and/or would or would not believe the payment was sent in error.

---

[1]    The "Revlon Loans" are issued pursuant to the "TERM CREDIT AGREEMENT among REVLON CONSUMER PRODUCTS CORPORATION, as the Borrower, REVLON, INC., as Holdings, THE LENDERS PARTY HERETO and CITIBANK, N.A., as Administrative Agent and Collateral Agent", dated as of

4.      In this Declaration, I set forth the independent opinions and conclusions that I have reached and the basis for those opinions using the information currently available to me. Such opinions and conclusion are based on my experience as reflected in my Curriculum Vitae, attached as Exhibit A, and as described below in § II, as well as my experience in the financial services industry generally. A list of documents, facts, and other data that I relied upon in forming my opinions is attached as Exhibit B hereto. I reserve the right to supplement or revise my opinions and/or conclusions should any additional documents or other information be provided to me.

5.      I offer no legal opinions in this Declaration. Any legal terms of art that may appear in this Declaration are used as terms commonly understood in financial services industry or as they are used in the vernacular. Additionally, any interpretations of legal agreements I might provide herein are based on my experience implementing and carrying out terms set forth in such agreements from an operational, not legal perspective. In short, I am not offering any legal opinions regarding such agreements nor am I qualified to do so.

6.      When I refer to industry standards, I am referring to customs, practices, and standards of care regarding the U.S. financial services industry and, in particular, those pertaining to syndicated loans such as those at issue in this matter unless otherwise noted.

## II.      PROFESSIONAL QUALIFICATIONS

7.      I have more than 35 years of experience in the financial services industry, including as the chief executive of an affiliate of a nationally-chartered bank (Wilmington Trust Company) offering corporate trust and fund administration services to issuers of and investors in

---

September 7, 2016 and later amended on or about May 7, 2020 (the amended agreement is referred to herein as "Credit Agreement").

structured financial products such as collateralized loan obligations ("CLOs") and syndicated loans such as those at issue in this matter, as a senior executive at two major broker-dealers (Smith Barney Shearson and Drexel Burnham Lambert ("DBL")), and as a consultant to over 150 financial services clients around the world, including, without limitation, central banks, government agencies, and top-tier commercial banks, broker-dealers, and institutional investors.

8.      During this time, I have worked extensively in the areas of interest in this matter including investments; quantitative analysis; risk management; back-office processing; and technology development and management across a broad array of investment products including, without limitation, fixed-income securities such as CLOs, syndicated loans, and their derivatives. In particular, I have extensive experience with loan administration including acting in a role similar to that of Citibank (*i.e.* acting as the "Agent Bank") and that of the lenders (*i.e.* acting as a "Loan Administrator").

9.      Examples of such experience relevant to this matter include the following:

a.      I was a co-founder and the CEO/President of Wilmington Trust Conduit Services ("WTCS"), a subsidiary of Wilmington Trust Corporation, the holding company of a nationally-chartered bank, Wilmington Trust Company ("Wilmington Trust"). During my tenure, which I held between 2006 and 2009, I supervised all aspects of a corporate trust business of nearly 125 staff who supported approximately 20 deals with assets totaling over US$18 billion, the majority of which involved syndicated loans such as those at issue in this matter. WTCS provided a broad range of administrative, trustee, custody, trade processing, accounting, and risk management services supporting the issuance and servicing a form of fixed-income securities known as *structured credit products*. Relevant to this matter, WTCS acted as trustee, collateral administrator, custodian, issuing and paying agent, loan servicer, and registrar in nearly all these

engagements. WTCS also offered loan agency services similar to those provided by Citibank in this matter as well as loan administration and fund administration services to fund managers such as Defendants. Additionally, I was Wilmington Trust's representative to the Loan Syndications and Trading Association ("LSTA") and the Loan Market Association ("LMA"), the two leading syndicated loan industry associations in the U.S. and Europe, respectively;

b.   While at Smith Barney Shearson, I was head of taxable fixed-income propriety trading. In this capacity, I oversaw the investment of the firm's capital in a variety of fixed-income securities and their derivatives, including, but not limited to: U.S. government securities, mortgage-backed securities, corporate bonds, listed interest rate futures and options, and over-the-counter ("OTC") interest derivatives such as interest rate swaps. I subsequently established and supervised the firm's OTC interest rate trading and sales desk;

c.   At DBL, I acted in a number of roles involving fixed-income securities. This included overseeing U.S. government securities research provided to both the DBL trading desks as well as institutional clients. I was subsequently promoted to head the taxable fixed-income research department. In both roles, I was responsible for supervising the delivery of quantitative research to internal traders as well as institutional clients as well as managing the development, acquisition, and the operations of technology supporting the delivery of these services;

d.   As a consultant, I oversaw the operations and risk management functions of Fifth Third Bank's ("Fifth Third") treasury department under the supervision of the U.S. Federal Reserve Bank ("Fed").[2] At the time, Fifth Third, the then tenth largest bank in the U.S., had to

---

[2]   A bank's treasury department is typically tasked with funding and managing the bank's balance sheet. This typically involves, without limitation: borrowing funds and lending

restate its earnings to address a number of operational failures and subsequently entered into a memorandum of understanding (or MOU) with the Fed to address these issues. Reporting to the bank's chief operating officer and representatives of the Fed, I was tasked under that MOU with: (a) establishing an independent back-office dedicated to supporting the treasury department's business; (b) establishing market, credit, and operational risk management practices dedicated to monitoring the treasury department; and (c) implementing front-, middle-, back-office systems to support these new functions. During the approximately three years it took to complete this work, I also managed a team of approximately ten consultants from my company who acted as the department's back-office operations and risk management teams in addition to investigating and resolving the various problems that led to the MOU. This work was eventually turned over to Fifth Third staff over the course of the three years. During this time, I also drafted the treasury department's various investment, operations, and risk management policies and procedures. My team and I also had to provide the Fed with weekly status and performance reports concerning the department's daily operations and risk management as well as progress reports on the system implementation until these functions were handed off to bank staff;

e.   As a consultant, I lead various projects involving the specification and design, implementation, and subsequent operation of trading, trade processing, and risk management for major financial institutions around the globe. My clients have included, without limitation: ABN AMRO, the American Stock Exchange, Bank of America, Banque Paribas, Barclays, the central banks of Colombia and the Philippines, Citibank, Daiwa Securities, Deutsche Bank, Fifth Third

---

excess cash, managing the asset/liability profile of the bank's balance sheet, managing the bank's investment portfolio, and trading in the secondary market.

Bank, Fogafín (the FDIC equivalent in Colombia), Lehman Brothers, Merrill Lynch, the New York Stock Exchange, Salomon Brothers, Société Générale, and Yamaichi Securities. My responsibilities on these engagements included one or more of the following: (a) drafting requirements, specifications, business and technical architectures, and test specifications, (b) vetting potential vendor solutions, (c) developing code and test cases, and/or (d) overall project management;

  f. As a testifying expert, I have testified in 20 matters involving many of the issues in dispute in this matter, including, without limitation, the generally accepted industry customs, practices, and standards of care pertaining to syndicated loans such as those at issue in this matter. In those matters that proceeded to trial, I was recognized by the court as an expert and the full scope of my testimony was accepted on all occasions.

  10. I have testified before the U.S. Congress regarding over-the-counter, fixed-income derivatives trading and the potential regulation thereof. I also authored a whitepaper regarding the vulnerability of the U.S. financial system that was read into the U.S. Congressional record shortly after 9/11. Additionally, I have worked with the U.S. Congress and Government Accountability Office ("GAO") on a variety of issues involving the U.S. financial system, including, without limitation, issues involving syndicated loan, CLO's, and other financial products in connection the "Troubled Asset Relief Program" or "TARP", following the collapse of Lehman Brothers in the fall of 2009. I also have coauthored a book on operational risk management, and I have authored numerous articles in the areas of litigation, finance, technology, and mathematics, including a solicited op-ed piece for the *New York Times*. Additionally, I have been quoted numerous times in the mainstream and trade press, including an appearance on *ABC Nightly News with Peter Jennings*.

11.     I have a master's degree in mathematics and a bachelor's degree in applied mathematics from the University of California at Berkeley. I am currently a Ph.D. candidate in mathematics at the University of California at Berkeley concentrating on partial differential equations and optimal control theory as well as the mathematics underlying mathematical finance and economics. I plan to file my dissertation, which is entitled, "Coefficient Control Problems for Elliptic PDE," this year and complete my degree. I am also currently a graduate research affiliate of the U.C. Berkeley Center for Risk Management Research.

12.     I am being paid through SEDA Experts at the rate of $850 per hour for my engagement as an expert in this matter. My compensation is not dependent on the outcome in this matter.

13.     My *curriculum vitae* (including a list of all relevant publications that I authored in the last ten years and a list of all cases in which I testified as an expert at trial or by deposition in the last four years) is attached as Exhibit A.

## III.    SUMMARY OF MY OPINIONS AND CONCLUSIONS

14.     Based on the material that I reviewed in connection with this matter  (which are listed in Exhibit B hereto) as well as my experience as a loan agent and a loan administrator (in addition to my general experience in the financial services industry), it is my opinion that a person of reasonable skill, experience, and knowledge working the back-office of an investment manager (such as the Defendants) on behalf of a lender or their agents should and would accept the wire transfers that were sent by Citibank on August 11, 2020 to the Lenders of the Revlon Loans (the "Citi Payments") as an early paydown the Revlon Loan in full and should and would not believe the payment was sent in error.

15.     Additionally, I have reviewed two putative expert reports submitted on behalf of Plaintiff, Citibank N.A. ("Citi") in this matter, Rebuttal Expert Report of John Byrne, dated November 2, 2020 ("Byrne Report") and Rebuttal Expert Report of Mark A. Sunshine, also dated November 2, 2020 ("Sunshine Report").  Based on this review, it is my opinion that many of the issues that may be raised by Messrs. Byrne and Sunshine do not apply and/or are not relevant to syndicated loans and loan administration.

16.     Specifically, it is my opinion that:

a.   There is nothing about the Citi Payments which, on their face, should or would prompt a person of reasonable skill, experience, and knowledge to conclude that they were sent in error. In fact, I never experienced such a "mistake" or even heard of one over the course of my 35-year career.

b.   Loan notices, including, but not limited to prepayment notices, such as those at issue in this matter, are not uniform in format or appearance. Thus, it is often difficult to draw any inferences from notices as to their scope and purpose one way or the other. Consequently, I expect that a person of reasonable skill, experience, and knowledge should and would believe that the Citi Payments were proper, and not sent in error;

c.   Inclusion of an interest calculation in a notice is not inconsistent with and does not preclude a principal payment in addition to an interest payment. To the contrary, based on my experience, the receipt of an unscheduled interim interest payment, such as the Citi Payment, is indicative of principal paydown;

d.   It is not unusual for a loan payment notice to be received after a payment or to be missing. Nor is a late or missing payment notice indicative of payment error. In fact, back-office staff rarely, if ever, conclude that a payment may have been made in "error" simply due to

a missing payment notice. Moreover, a lender's request for a missing notice is generally for bookkeeping purposes and not to validate a payment, especially if it believes in accordance with generally accepted industry customs, practices, and standards of care that it received a proper payment; and

      e.  In their reports, Messrs. Byrne and Sunshine referred to various processing and financial services industry standards of care, which in my experience, do not apply to syndicated loans (such as those at issue in this matter) or are simply wrong and/or irrelevant.

## IV.   OPINIONS AND CONCLUSIONS

### A. On their Face, Nothing in the Record Available to the Lenders at the Time the Payments were Made Indicates that the Citi Payments were Sent in Error

17.     There is nothing about the Citi Payments which, on its face, should or would prompt a person of reasonable skill, experience, and knowledge working in the back-office to conclude that they were sent in error. It is not disputed that Citi, purporting to act as the Agent Bank, sent a payment to the correct lender account in an amount which equaled both total unpaid interest and outstanding principal as of the effective date as stated on the Calculation Statement. Again, nothing that points to a payment sent in error.

18.     Even if a lender's back-office system showed a cash reconciliation break because the payment was unanticipated (the reconciliation between the cash held in a bank account with the back-office system's record of that account), I would expect that its back-office staff would and should follow generally accepted industry customs, practices, and standards of care to resolve the break. Looking at the Calculation Statement, the simple addition of the interest amount with the amount of principal outstanding that is also included in the statement (labeled as Libor Funded) would resolve the break. Here I agree with the opinions expressed by Mr. Smith and I would then expect that the staff should and would enter a payment into its books and

records system in the amount of the computed interest and outstanding principal thereby closing the break and, thus, deeming the Citi Payments to be correct and proper.[3]

19.     Therefore, it is my opinion that a person of reasonable skill, experience, and knowledge working in the back-office should and would consider the Citi Payments to be proper on their face and not sent in error barring any notice of error from Citi to the contrary.

20.     Mr. Byrne has asserted that the Calculation Statement is "out of line with the amount actually paid," and Mr. Sunshine has claimed that there was a discrepancy between the Calculation Statement and the Transaction Confirmation. Those are two ways of saying the same thing, and they are both wrong. As explained herein, the Calculation Statement was not misaligned with the amount actually paid, which is the exact amount set forth in the Transaction Confirmation. The Calculation Statement sets forth both the accrued interest and principal amount and, even if that were not the case, they incorrectly assume that the computation of interest precludes a contemporaneous payment of principal. In reality, the opposite is true. Computation and payment of interim interest is entirely consistent with the prepayment of principal.

**B.   There Are No Generally Accepted Industry Standards Regarding the Format and Appearance of Loan Notices and They Are Often Incomplete, Sent Late, or Sometimes Not Sent at All**

21.     In their reports, Messrs. Byrne and Sunshine claimed that the Calculation Statement clearly indicates that it only notices an interim interest payment. However, based on my reading of the statement as well as on my experience acting in a similar role to Citi (*i.e.* as an

---

[3]   It is my experience that it is part of the back-office's function to resolve operational breaks. Once resolved, they no longer consider them to be a break unless noticed otherwise.

Agent Bank) as well as that of back-office of a lender (*i.e.* a Loan Administrator), I would disagree.

22.     There is no industry standard regarding the format of a loan payment notice. It is completely up to the discretion of the Agent Bank which varies from bank to bank. In fact, based on my experience, an individual Agent Bank can change the format of a notice without prior notice to the lenders and formats have even changed from notice to notice for no apparent reason.

23.     There is nothing about the notice in this case that suggests mistake. Looking at copy of Calculation Statement included in the record as DX-0367 at Medalist_Citi_00000010, the header does not have language explicitly stating that the statement notices an interest-only payment. To the contrary, the header includes the unremarkable "RE" line: REVLON TERM LOAN 2016 TERM LOAN.

24.     The line following the header reads

> <B>Libor Rate Interim Interest Payment</B>

which is followed by

> Please be advised that Interim Libor Interest will be paid on the LIBOR outstanding under the above referenced facility
>
> Effective Date: 11-AUG-2020
> Libor Currency: USD
> Libor Amount: 893,944,008.52
> Maturity Date: 31-AUG-2020

Here, the "Effective Date" is the interest computation date, and the Libor Amount is the total amount of outstanding principal.

25.     The statement then displays the interest calculation based on the amount of outstanding principal owed to this specific lender which is $1,929,836.69 which the statement labels LIBOR Funded. The computed interest due amounts to $16,859.27.

26.     Again, while the notice does repeatedly state that interest is "due," this is a concept that is entirely consistent with a prepayment of the loan; moreover, there is nothing that explicitly states that this is an interest-only payment.

27.     This calculation is followed by a heading which reads

<B>Funds Movement<B>

which is followed by

We will credit your account representing the above Interim Interest based on the following instructions:

Credit Date: 11-AUG-2020
Credit Currency: USD
Total Due: 16,859.27
Less: Tax Withholding: 0.00

28.     This indicates that $16,859.27 in interest is "due" and will be credited to this lender's account on 11-AUG-2020. However, it does not explain why the interest is "due"; nor does the notice state that the interest amount is the total amount that will be credited. A back-office professional would simply have no reason to conclude that this statement would be inconsistent with a payment of principal.

29.     Moreover, based on my experience, this Calculation Statement could be read as a confirmation of the calculation of the interest payment the lender is to receive and not the total amount of the payment. This is especially true since the payment is an unexpected payment of "interim interest" (as opposed to a regularly scheduled interest payment pursuant to the Credit Agreement). As such, the most obvious purpose of the statement is the display and verification

of that calculation. In addition, summing the calculated interest and the outstanding principal as stated in the Calculation Statement (as labeled, "LIBOR Funded" in the statement) results in the exact amount of each of the Citi Payments. This too would be a common-sense calculation since this was an unscheduled payment, which, in my experience are virtually always due to a principal paydown, which I believe are consistent with the opinions offered by Mr. Smith.  As such, given its "interim" nature, a lender would expect to see a payment which contained both interest and principal.

30.     Therefore, it is my opinion that it is unreasonable to assume that a person of reasonable skill, experience, and knowledge working in the back-office should and would consider the Calculation Statement, which does not purport to title or limit itself to an interest payment, to pertain only to an interim interest payment or to otherwise preclude the full payment of outstanding interest and principal of the Revlon Loan.

### C.  The Notice of an Interest Calculation Is Not Inconsistent with and Does Not Preclude a Principal Payment in Addition to an Interest Payment

31.     Receiving a notice (such as the Calculation Statement in this matter) from an Agent Bank that shows the interest amount to be paid as of some effective does not preclude payment of principal in the same wire. In my experience, I have seen (a) a single notice resulting in single combined payment of interest and principal, (b) a single notice resulting in two payments: an interest payment *and* a principal payment, (c) two notices resulting in a single payment of interest and principal, or (d) two notices and two payments. In short, the industry standard is that there is no industry standard.

32.     As I discussed above in Section IV.C herein, I believe that Calculation Statement can reasonably be interpreted as a single notice of a single payment of both interest and

principal.[4] Even if the Calculation Statement were a notice of a pending interest payment only, it does not preclude a late or missing notice for the payment for principal which will be included in the same payment as that of the interest.[5]

33.     The fact that the Calculation Statement does not explicitly state that the principal amount will be wired is not an indication of a payment error.[6] Indeed, notices are often received days and even weeks after a payment has been made and sometimes not sent at all.

34.     Therefore, it is my opinion that a person of reasonable skill, experience, and knowledge working in the back-office should and would consider the Citi Payments, on their face, to be proper whether or not he or she believed they were in receipt of a principal payment notice beforehand.

---

[4]   It is important to note that this is no calculation of outstanding principal barring a prepayment. In other words, the fact that the Calculation Statement only presents a calculation of the interest accrued since the last effective date is not surprising.

[5]   It is important to note that in my experience, processing and transmitting a loan notice typically involves a system which is different from the wire payment system. As such it is not surprising to receive a notice after having received a payment or even not receiving any notice at all. I agree with Mr. Smith's opinion that a lender will typically look to the payment itself as the most important indication of its purpose and scope, especially given the size of the Citi Payments.

[6]   As discussed above in § IV.C herein, a back-office person of reasonable skill, experience, and knowledge could consider the Calculation Statement to be a single notice noticing a single combined payment of interest and principal.

### D.  Messrs. Byrne and Sunshine May Refer to Various Processing and Standards of Care That Are Not Generally Accepted Industry Standards for Syndicated Loans or are Simply Wrong

#### 1.  It Is Not Generally Accepted Custom or Practice for Back-office Staff to Simply Honor a Recall Request Without Prior Approval From Management

35.     I would disagree with any suggestion that it is custom and practice for a back-office staff to "honor" a recall request. That is just not the job of a back-office professional. Rather, it is my experience that a financial institution would train all of its back-office staff to escalate any issues regarding material payments so that the institution may first determine any rights it may have to such money before honoring such a request. This is especially true following the unexpected receipt of a large sum.

36.     In fact, as a general matter, it is my experience that back-office staff or managers do not take upon themselves to reach any conclusion regarding the propriety of the delivery or whether to return the money, one way or the other in the event of an unexpected receipt of large sums (such as those at issue in this matter). Rather, they escalate the issue and consult with front-office colleagues. This is especially true in the event that the back-office functions are provided by a third-party agent.

37.     As such, it is my opinion that a person of reasonable skill, experience, and knowledge working in the back-office should and would not take it upon themselves to "honor" a recall request, but would escalate the matter for resolution.

#### 2.  It Is Not Generally Accepted Custom or Practice to Assume Error Based on Incomplete Notices

38.     In his report, Mr. Byrne incorrectly conflates various reconciliations which are performed for different purposes using different datasets.  But more importantly, these types of

reconciliations do not apply to syndicated loans in my experience. Further, Mr. Byrne wrongly attaches duties to the lenders associated which such reconciliations that are not generally accepted loan industry standards based on my experience. The fact that notice is late or missing is not unusual as discussed in Section IV.B herein. Additionally, the fact that back-office professional may request supporting documentation, including a prepayment notice, following the receipt of a principal payment, in my experience, is done for book-keeping purposes and not to perform a notice versus payment reconciliation.

39.     Therefore, it is my opinion that a person of reasonable skill, experience, and knowledge working in the back-office should not and would not consider the Citi Payments to be sent in error simply because it was not accompanied by a prepayment notice. Additionally, it is my opinion that such a person should and would understand that a request for such notice would not indicate a suspicion on the part of a lender that the Citi Payments were sent in error.

### 3.  It Is Not Generally Accepted Custom or Practice for Banks to Simply "Check the Box" to Release a Principal Payment

40.     Mr. Sunshine' has opined that "[o]ne of the most common 'check boxes' in loan payment systems is one for principal payment (in full or in part) and as a result one of the most common payment errors is to either pay principal that is not intended to be paid, or to omit to pay principal that is due and payable and was intended to be included in the applicable electronic funds transfers."  Based on my experience, I disagree.

41.     Based on my experience, financial institutions such as Citi implement a number of controls to prevent faulty payments generally. One such control is commonly referred to as a "four eye approval process" in which a wire request must be approved by two conflict-free professional (*i.e.* four eyes) prior to submitting the wire for execution. In fact, I understand that Citibank may employ a "six-eye" process in this regard.

42.     Additionally, in my experience using, installing, and developing payment systems, these systems typically have a number of programmatic controls to prevent erroneous or fraudulent payments. Typically, user must have specific privileges to enter or approve payment requests and approve the release of any payments. Generally, a user must establish their credentials as part of the login *and* the payment process.[7]

43.     In other words, after logging in, most payment system requires additional authentication *and* confirmation for a user to enter, approve, or release on a wire-by-wire basis. Further, authorized users typically have a limit on the size and frequency of payments they may enter, approve, or release. In fact, most payments require additional approval for very large payments enter by staff (as opposed to being generated by a system).

44.     In short, it is virtually inconceivable that the Citi loan processing would simply send wires in the amount of the Citi Payments based on a single clerk "checking a box" (or failing to check a box). Consequently, it is my opinion that it is not a generally accepted industry custom or  practice to simply release a principal payment by simply "checking a box."

### 4. Mr. Byrne Discusses Issues that Are Not Relevant to Syndicated Loans or Loan Administration in Addition to Making Unsubstantiated Claims

45.     The Byrne Report refers to customs, practices, and standard of care which do not apply to syndicated loans or their process. As an example (and without limitation), Mr. Byrne discussed DTCC claw backs. I am very familiar with these claw backs and the DTCC generally and these have nothing to do with syndicated loans. The DTCC claw backs pertain to public

---

[7]     In addition to requiring a valid username and password, most payment system require an additional authentication to enter.

securities registered at the DTCC which are subject to number of federal and state statutes and laws as well as regulations promulgated by government and industry bodies.

46.     Syndicated loans on the other hand, are legal agreements that are not generally subject to the same laws and regulations as public securities.  It is notable that Mr. Byrne did not reference standards suggested by either the LSTA or the LMA, the two principal industry associations.  The reason is simple, neither the LSTA nor the LMA support Mr. Byrne regarding generally accepted business practices and operations involving syndicated loans.

47.     Additionally, both Messrs. Byrne and Sunshine have claimed (without limitation) that financial institutions such as Citi frequently make faulty payments and that the operational controls commonly implemented by these institutions are intended to discover these problematic payments *after the fact*. Based on my extensive experience, I disagree.

48.     I have extensively studied, written, and spoken on the subject operational controls and operational risk management (the discipline concern with measuring and mitigating the risk of a financial loss to operational failures and faulty processing). I have also worked closely with U.S. and foreign governments and government agencies regarding such controls in the context of protecting national and international financial systems.

49.     Based on this experience, payments made by financial institutions are nearly uniformly accurate and proper and errors of this magnitude are extremely rare given the billions of transactions processed each day.  Moreover, operational controls governing such payments are intended first to *prevent* errors from occurring and, second, should an error occur, reducing its impact on the financial institution, its counterparties, and the financial system as a whole. In the world portrayed by Messrs. Byrne and Sunshine, there would be a complete lack of faith in the integrity of global financial system and economic activity would come to virtual standstill – if a

party could not reasonably assume that monies its pays or receives is correct, commerce would simply stop.

* * *

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  November 13, 2020
       Oakland, California

_____
Pietro (Peter) U. Vinella

**EXHIBIT A. *CURICULUM VITAE* OF PIETRO (PETER) VINELLA**

**SUMMARY**

Peter U. Vinella has more than 35 years of experience in the financial industry as a consultant and as an executive with leading financial institutions and government agencies. Mr. Vinella has extensive testifying experience acting as an expert for both plaintiff and defendant over more than 40 engagements. He has authored over 60 expert reports, declarations, and affidavits and has given over 300 hours of arbitration hearing, trial, and deposition testimony in state and federal court and before international arbitration panels. He has also provided testimony in the Philippines, the Cayman Islands, and Ireland. He has been qualified to testify in state and federal courts and has not had any of his testimony excluded. This includes testifying at trial and hearings eight times including two jury trials. Mr. Vinella is also currently providing consulting services to central banks and government agencies as well as major financial institutions.

His areas of expertise include trading and investment management, risk management, quantitative analyses, operations, trading and investment-related accounting, technology (including software development), trust administration, fund administration, mathematics, probability, and statistics. He has first-hand experience with a wide range of investment products, including equities, debt instruments, repo and securities lending, listed and OTC derivatives (such as interest rate, total return, asset, and credit default swaps), commercial and consumer loans, and structured credit products such as CDOs and MBS. He has also developed business plans and strategic marketing plans for leading financial institutions and their vendors, including JP Morgan, Daiwa Securities, Smith Barney, ADP, Sun Microsystems, Perot Systems, and Sybase. Additionally, he has extensive experience in international markets and has worked extensively outside of the United States.

Prior to forming PVA Toucan with his partner, Dr. Jeanette Jin, Mr. Vinella was a managing director first at LECG and then Berkeley Research Group (BRG) where he provided expert testimony and advisory services in regard to a host of matters primarily involving financial services and technology matters. At LECG, Mr. Vinella was also responsible for managing the firm's financial services practice, which consisted of over 125 individuals and generated 20 percent of the company's profits. Both Mr. Vinella and Dr. Jin continue to provide testimony and advisory services through BRG as affiliates.

Prior to his work in litigation support and dispute resolution, Mr. Vinella was a founder, co-owner, and CEO of Wilmington Trust Conduit Services (WTCS), a subsidiary of Wilmington Trust Corporation, the Federal Reserve–regulated bank holding company of Wilmington Trust Company. He was responsible for overseeing all aspects of WTCS, including business administration, sales, operations, research, production technology, and software development. WTCS provided a wide range of administrative, trustee, custodial, operations, accounting, and risk management services to issuers and managers of and investors in credit and structured credit transactions. WTCS also provided fund administration services

to hedge funds and private equity funds investing in loans, distressed assets, and structured products.

Before joining Wilmington Trust in 2006, Mr. Vinella was the founder and CEO of PVA International/Toucan Partners, a New York-based consultancy focused on capital markets and risk management. During his 11-year tenure, PVA/Toucan was engaged in more than 100 projects with more than 50 clients on four continents, including money center banks, international brokerages, central banks, government agencies, and investment managers.

Having begun his career in finance in the early 1980s at the risk management boutique BARRA (now part of Morgan Stanley), Mr. Vinella has also held a number of senior positions at leading Wall Street firms, including trader and trading manager, chief information officer, and head of fixed income research. Earlier in his career, he founded Berkeley Investment Technologies (BIT), an early pioneer in algorithm trading and one the first financial services firms to employ UNIX-based distributed systems, relational database management systems, object-oriented architecture, and real-time analytical systems.

Mr. Vinella is a member of the U.C. Berkeley Center for Risk Management Research which promotes research in and education about serious issues in the field of financial risk management. He holds a master's degree in mathematics and a bachelor's degree in applied mathematics from the U.C. Berkeley. He is currently completing his Ph.D. in mathematics at U.C. Berkeley where he frequently presents seminars on various aspects of mathematical finance, stochastic dynamical systems, and non-linear analysis. He also taught mathematics at California State University at Hayward and was a NASA Junior Research Fellow.

Mr. Vinella has coauthored two books with Jeanette Jin (the COO of WTCS) on governance and operational risk management, one published through Risk Waters and the other in manuscript form. He has authored numerous articles in the areas of litigation, finance, technology, and mathematics, including a solicited op-ed piece for the *New York Times* on algorithmic trading. Additionally, he is often quoted in the mainstream and trade press, including an appearance on *ABC Nightly News* with Peter Jennings in regard to the vulnerability of the U.S. financial system to terrorist attacks. He has also worked with the U.S. Congress and GAO on a variety of issues including TARP/EESA, program trading, derivatives regulations, and the impact of September 11 on the U.S. financial system.

**EDUCATION**

University of California, Berkeley

Ph.D. program (current), Graduate Department of Mathematics. Advanced to degree with expected graduation date of December 2020 (previously attended Ph.D. program in applied mathematics from September 1978–January 1981).

M.A., Mathematics, 2015.

A.B., Applied Mathematics, 1978.

**PRESENT EMPLOYMENT**

PVA Toucan LLC, Oakland, California
*Managing director*, January 2015–present

Consultant providing advisory services to financial services companies, financial institutions, and government agencies.

U.C. Berkeley Center for Risk Management Research, Berkeley, California
*Affiliated graduate student*, October 2012–present

Member of the research team exploring various quantitative methods to measure and control risk in financial markets, and the extension of these quantitative methods to other contexts.

**PREVIOUS POSITIONS**

Berkeley Research Group, Oakland, California
*Managing director*, October 2010–December 2014

Member of the senior professional team providing expert testimony and advisory services, primarily in the areas of financial services and technology.

LECG, Emeryville, California
*Managing director*, 2009–2010

Member of the senior professional team providing expert testimony and advisory services primarily in the areas of financial services and technology. Also managed the company's financial services practice, which consisted of over 125 individuals and generated 20 percent of the company's profits.

Wilmington Trust Conduit Services, LLC, New York, New York
*President and CEO*, 2006–2009

A founder and owner of WTCS, responsible for overseeing all aspects of Wilmington Trust Conduit Services. WTCS was a roughly125-person operation that was a subsidiary of Wilmington Trust Corporation, the bank holding company of Wilmington Trust Company, a regional bank located in Wilmington, DE providing retail banking, wealth management services, and corporate trust services to clients in the US and Europe.

WTCS provided a wide range of administrative, trust, custodial, operations, accounting, reporting, and risk management services to issuers and managers of and investors in credit and structured credit transactions.

Also, was responsible for overseeing WTCS's technology and software development effort that consisted of a staff of 10 production support engineers and 45 developers, 35 of whom were located in Tianjin, China.


Toucan Partners/PVA International, Inc., New York, New York
*CEO*, 1995–2006

Founder and CEO of a 30-person, $3- to $5-million-a-year management consulting firm focusing on critical capital market issues concerning trading, risk management, operations, and technology. Managed and/or took part in over 100 projects for over 50 leading financial institutions on four continents, many with project budgets of over $60 million.

Major assignments included the pre-acquisition assessment and valuation and post-acquisition integration planning in regard to Bankers Trust's acquisition of Nat West Markets equity and OTC derivatives businesses; supervising the launch of a primary dealership for Société Générale; acting as the interim CEO in a joint venture with a subsidiary of CEMEX; acting as the interim CEO of an online treasury service joint venture between JP Morgan, Citi, and Cargill, and developing a five-year, strategic fixed income business plan for ADP, which resulted in approximately $300 million of acquisitions.

Oversaw and led the development of a detailed project execution and management methodology that included outsourcing risk and cost analysis, vendor vetting and selection, and project risk management.


Smith Barney Shearson, New York, New York
March 1993–August 1995

*Trading manager and Arbitrage trader*, Taxable Fixed Income Department, 1994–1995

Reported to the head of Capital Markets and was responsible for identifying and executing proprietary trades, primarily in the interest rate cash and derivatives markets. Developed and implemented the group's analytic tools and support systems. Liaised with the sales force and clients to communicate trade ideas. Was responsible for developing a new business unit within the division (the Portfolio

Strategies Group) as well as launching the Interest Rate Derivatives Trading and Sales unit. Also responsible for training the sales staff and MBA recruits in fixed income and derivatives trading and quantitative analysis.

*Chief information officer*, Capital Markets Division, 1993–1994

Reported to the head of Capital Markets and was responsible for overseeing the planning, implementation, and delivery of technology-based services supporting the global capital markets businesses. Was responsible for managing a $250 million budget.

Additionally, headed the planning, budgeting, and fitting out of four large trading floors comprising more than 1,200 trading seats.

Managed the post-acquisition integration of the Shearson fixed income businesses, operations, and technologies. This included implementing comprehensive MBS trading and research capabilities.


Berkeley Investment Technologies, Inc. /Drexel Burnham Lambert, Berkeley, CA, Lafayette, CA, and New York, NY, 1986–1993

Co-founded and managed an independent consultancy specializing in risk management, quantitative analytics, automated statistical-based trading, and trading systems development, primarily in equity cash and derivatives markets.

In the fall of 1988, BIT became an independent operating unit within Drexel Burnham Lambert (DBL), providing advanced technology services to DBL's primary dealer. Over time, BIT expanded these services to included fixed income research and extended these expanded services to other DBL fixed income trading desks and its institutional clients. Its clients included over 200 top-tier institutional investment managers, such as Fidelity, Putnam, the World Bank, and the Bundesbank.

The company was later integrated into another DBL legal entity, Nameloc, which was essentially an internal hedge fund run by several DBL traders. Finally, BIT, along with other assets of Nameloc, was spun-off just prior to DBL's bankruptcy and the company, again, operated under the BIT brand. At the time of my departure in 1993, the company had stabilized at 45 employees and about $7 million in annual revenues.


*Executive vice president*, BIT, director of Business Development, 1990–1993

Co-managed daily operations of the firm. Directed all sales and marketing activities. Acted as the primary management consultant and client liaison as well as the principal software architect and quantitative analyst. Oversaw all software development.


*Executive vice president*, Nameloc, 1989–1990

Responsible for managing the technology, fixed income research, and business development activities of an internal DBL hedge fund with $50 million in trading capital.

*Head of Taxable Fixed Income Research*, DBL, 1990

Responsible for overseeing the day-to-day analysis, operations, and technology of DBL's Fixed Income Research Department, which had a staff of more than 150 professionals, 200 institutional clients, and an annual budget of over $70 million.

*Principal and senior scientist*, BIT, 1986–1989

Managed the daily operations of the firm. Principal quantitative analyst and chief software developer.

BARRA, Berkeley, California
*Senior quantitative analyst*, 1984–1986

Performed a number of quantitative analysis and software development duties focusing on the computer application of Modern Portfolio Theory. Specialized in international equity markets, including those in the United Kingdom and Japan.

California State University Hayward
*Lecturer/assistant professor*, Mathematics and Computer Science, 1982–1984

Taught both graduate and undergraduate courses in pure and applied mathematics.

Virtual Microsystems, Berkeley, California
*Programmer/Analyst*, 1982–1984

Developed system-level code supporting virtual and physical coprocessors running on a variety of mini-computers and operating systems produced by Digital Equipment (DEC). The work involved developing device drivers under the RSTS, RMS, and RT11 operating systems interfacing with Z80 and 8088 coprocessors along with developing I/O and memory management facilities for the coprocessors.

University of California, Berkeley, California
*Teaching assistant*, 1980–1981

Taught undergraduate calculus courses for non-majors.

NASA Ames, Mountain View, California
*Junior research fellow*, Computation Fluid Dynamics Division, 1980–1981

Research topic was the application of holographic interferometry to modeling transonic airflow.

Data Dynamics, Mountain View, California
*Senior mathematician*, 1978–1980

Civilian contractor to the National Security Administration (NSA) and the U.S. Air Force responsible for the development and implementation of mathematical models and algorithms simulating satellite orbits and n-body celestial mechanics.

## CURRENT AND PAST PROFESSIONAL MEMBERSHIPS

American Mathematical Society

Society of Industrial and Applied Mathematics

International Association of Quantitative Finance

The Charter Hill Society (UC Berkeley)

Friends of Berkeley Mathematics (UC Berkeley)

Berkeley Science Network (UC Berkeley)

Securities Industry and Financial Markets Association (past)

European Securitization Forum (past)

Loan Syndication and Trading Association (past)

International Swaps and Derivatives Association (member of the FpML Loan Agent Bank Communication Working Group) (past)

## EXPERT TESTIMONY

- *Raza Khan, et al. v. Vishal Garg, et al, Index No. 652334/2013.* Supreme Court for the State of New York, County of New York (July 2020–Present). Provided expert testimony on behalf of plaintiffs in the form of two expert reports in a matter alleging the misappropriation, misuse, and improper disclosure of intellectual property regarding loan origination, servicing, securitization, and asset management.

- *Trading Technologies International, Inc. v. IBG LL, et al. Case No.: 10 C 715.* U.S. District Court, Northern District of Illinois, Eastern Division (April 2019–present). Provided expert testimony on behalf of defendants in the form of written declarations regarding a patent dispute involving electronic trading systems.

- *Defender Ltd. v. HSBC Institutional Trust Services (Ireland) Ltd. Record No 2013/12439P.* The High Court (Commercial), Dublin, Ireland (August 2017–present). Provided expert testimony on behalf of plaintiffs in the form of an expert report about various aspects of custody services in regard to an investment fund managed by Bernie L. Madoff Securities.

- *Fixed Income Shares: Series M, et al. v. Citibank N.A. Case No. 14-cv-9373-JMF.* U.S. District Court, Southern District of New York (January 2015–present). Provided expert testimony on behalf of plaintiffs in the form of deposition testimony and an expert report regarding various aspects of trust administration, securitization, secondary loan markets, valuation, and custody in regard to a RMBS issuance.

- *Peterson, et al. v. Islamic Republic of Iran, et al. Case No.: 13 CIV 9195 (KBF).* U.S. District Court, Southern District of New York (June 2014–present). Provided expert testimony on behalf of plaintiffs in the form of two declarations regarding various aspects of international payment systems and correspondent banking.

- *The Water Works Board of the City of Birmingham, et al., v. US Bank National Association. Civil Action No. 17-4113.* U.S. District Court, District of South Dakota (April 2019–October 2020). Provided expert testimony on behalf of plaintiffs in the form of deposition testimony and two expert reports regarding various aspects of trust administration with regards to fixed-income securities issued by a tribal entity.

- *Several related patent disputes between Investors Exchange LLC. and Nasdaq, Inc.* before the Patent Trial and Appeal Board of the U.S. Patent and Trademark Office (all November 2018–November 2019). Provided expert testimony on behalf of the patent owner in the form of written declarations and depositions regarding the technical design and functionality of electronic order routing and matching systems.

  - *CBM2018-00029* (patent 7,747,506)
  - *CBM2018-00038* (patent 7,895,112)
  - *CBM2018-00039* (patent 7,933,827)
  - *CBM2018-00041* (patent 8,244,622)
  - *CBM2018-00042* (patent 8,386,362)
  - *CBM2018-00045* (patent 7,647,264)
  - *CBM2019-00001* (patent 8,280,797)
  - *IPR2018-01796* (patent 8,117,609)

- *Several related patent disputes between Miami International Securities Exchange, LLC., et al. and Nasdaq, Inc.* before the Patent and Appeal Board of the U.S. Patent and Trademark Office (all November 2018-2019). Provided expert testimony on behalf of the patent owner in the form of written declarations and depositions regarding the technical design and functionality of electronic order routing and matching systems.

  - *CBM2018-00020* (patent 8,386,371)
  - *CBM2018-00021* (patent 6,618,707)
  - *CBM2018-00030* (patent 7,921,051 B2)
  - *CBM2018-00031* (patent 7,246,093)
  - *CBM2018-00032* (patent 7,933,827)

- *UBS Securities LLC and UBS AG. (London Branch) v. Highland Capital Management, L.P. et al. Index Nos. 650097/2009, 650752/2010 and 652646/2011 (I.A.S. Part 60, Friedman, J.).* Supreme Court of the State of New York, County of New York (January 2013–July 2018). Provided expert testimony on behalf of defendants in the form of two expert reports, deposition testimony, and trial testimony regarding various aspects of trust administration, securitization, secondary loan markets, valuation, and custody in regard to a hybrid CLO warehouse.

- *Bangko Sentral ng Pilipinas v CCK Financial Solutions Pty Ltd* (May 2017–November 2017). Provided expert testimony on behalf of defendants in the form of two expert reports and hearing testimony regarding a failed software installation.

- *Lehman Brothers Holdings Inc., in its capacity as Plan Administrator on behalf of Lehman Brothers Special Financing Inc. v. Federal Home Loan Bank of New York, Adv. No. 15-01110 (SCC).* New York Southern Bankruptcy Court (October 2014–April 2017). Provided expert testimony on behalf of defendants in the form of a declaration, two expert reports, and deposition testimony regarding the replacement value of a portfolio of over 350 interested swaps.

- *Primeo Fund v. Bank of Bermuda (Cayman) Limited et al. Cause No: FSD 30 OF 2013 – AJJ.* Grand Court of the Cayman Islands (July 2015–January 2017). Provided expert testimony on behalf of plaintiffs in the form of two expert reports and trial testimony about various aspects of custody services in regard to a hedge fund managed by Bernie L. Madoff Securities.

- *Lynn Tilton, et al, (Respondents). SEC Administrative Proceeding File No. 3-16462* (August 2016–November 2016). Provided expert testimony on behalf of respondents in the form of an expert report and trial testimony on behalf of respondents regarding generally accepted corporate trust customs and practices with regard to CLOs.

- *Kenneth M. Krys and Christopher Stride as Joint Liquidators of Sphinx Funds et al. v. Robert Aaron; Guy Casanova; Derivatives Portfolio Management LLC et al., Case No.: 1:14-cv-02098.* U.S. District Court for the District of New Jersey (January 2012–June 2015). Provided expert testimony on behalf of plaintiffs in the form of an expert report and trial and deposition testimony on behalf of plaintiffs regarding various regulatory aspects and standards of care with regard to fund administration.

- *Jackson Square Partners, LLC. v. Delaware Investment Partners*. American Arbitration Association (May 2015–August 2015). Provided expert testimony on behalf of plaintiffs in the form of declaration in a dispute regarding fund administration industry standards of care in connection with a management buy-out.

- *Deutsche Bank, N.A. v. Bank of America, N.A. et al. Civil Action No. 09-cv-9784 (RWS)* and *BNP Paribas v. Bank of America, N.A. et al. Civil Action No. 09-CV-9783 (RWS).* U.S. District Court, Southern District of New York (January 2010–April 2015). Provided expert testimony on behalf of plaintiffs in the form of an expert report and deposition testimony regarding various aspects of trust administration, securitization, secondary mortgage markets, and custody in regard to a defaulted ABCP program.

- *Residential Capital, LLC et al. ("Debtors"), Case No. 12-12020 (MG).* U.S. Bankruptcy Court, Southern District of New York (April 2012–January 2014). Provided expert testimony on behalf of a creditor, Financial Guarantee Insurance Corp (FGIC), in the form of an expert report regarding various aspects of trust administration, securitization, valuation, and monoline insurance in regard to the issuance of 190 CDOs.

- *EPLG, LLC (as trustee for the QR liquidating Trust) v. Citibank, N.A. and U.S. Bank. N.A. Case No. 09-10589 (MTW), Jointly Administered, Adv. No. 11-50603 (MTW)*. U.S. Bankruptcy Court for the District of Delaware (April–September 2013). Provided

expert testimony on behalf of defendants in the form of an expert report and deposition testimony regarding various aspects of municipal securities issuance, credit enhancement, and trust administration in regard to a defaulted obligor of an industrial revenue bond.

- *Leveraged Innovations et al. v. NASDAQ OM Group Inc. et al., Civ. No. 1:11-cv-3203 (KBF)*. U.S. District Court, Southern District of New York (June 2011–February 2013). Provided expert testimony in the form of declarations on behalf of plaintiff with respect to alleged patent violations in regard to leveraged electronic traded funds.

- *Research Associates, LLC v. Wisdom Tree Investments, Inc. et al., Case No. SACV11-01846 DOC (ANx)*. U.S. District Court, Central District of California, Southern Division (June–November 2012). Provided expert testimony in the form of declarations on behalf of plaintiff with respect to alleged patent violations in regard to financial index and portfolio construction based on fundamental data.

- *UFCW et al. v. Wells Fargo, N.A. et al., Case No. 2:2009-cv-00668*. U.S. District Court for the District of New Jersey (August 2011–January 2012). Provided expert testimony in the form of a declaration, reports, and deposition testimony on behalf of plaintiffs regarding various duties and responsibilities with respect to the discretionary investment of complex securities including RMBS and CMBS.

- *Ezra K. Nilson et al. v. JPMorgan Chase Bank, N.A. et al., Case No. 1:09-cv-00121*. U.S. District Court, District of Utah, Northern Division (April 2010–November 2011). Provided expert testimony in the form of a declaration and a deposition on behalf of plaintiffs, regarding various aspects of syndicated loan and loan administration practices and procedures.

- *Lehman Brothers Holdings, Inc. et al., Debtors and Lehman Brothers, Inc., Debtor (Chapter 11. Case No. 08-13555 and Case No. 08-01420 (JMP) SIPA)*. U.S. Bankruptcy Court, Southern District of New York (November 2009–July 2010). Provided expert testimony on behalf of Barclays Capital, Inc. in the form of expert reports and deposition testimony regarding various aspects of SEC Rule 15c3 in support of the Trustee's Motion for Relief Pursuant to Sales Order.

- *Lehman Brothers Holdings, Inc. et al., Debtors and Lehman Brothers, Inc., Debtor (Chapter 11. Case No. 08-13555 and Case No. 08-01420 (JMP) SIPA), Customer Claim No. 900007799 of Westernbank Puerto Rico (Account No. 6670010), Customer Claim No. 900007798 of Westernbank International, a division of Westernbank Puerto Rico (Account No. 6813650)*. U.S. Bankruptcy Court, Southern District of New York (November 2009–May 2010). Provided expert testimony on behalf of Westernbank in the form of declarations regarding various aspects of customer accounts and repurchase in support of the bank's efforts to recover funds seized by the Lehman Brothers' Trustee.

- *Lehman Brothers Holdings, Inc. et al., Debtors and Lehman Brothers, Inc., Debtor (Chapter 11. Case No. 08-13555 and Case No. 08-01420 (JMP) SIPA), Customer Claim No. 900007799 of Westernbank Puerto Rico (Account No. 6670010), Customer Claim No. 900007798 of Westernbank International, a division of Westernbank Puerto Rico (Account No. 6813650)*. U.S. Bankruptcy Court, Southern District of New York (July 2010–July 2011). Provided expert testimony on behalf of the FDIC regarding various aspects of customer accounts and repurchase

agreements in support of the bank's efforts to recovery Westernbank funds seized by Lehman Brothers' Trustee.

- *Prophet Capital Management, LTD v. Prophet Equity, LLC and Robert Epstein, Civil Action No. A 09 CA 316 LY.* U.S. District Court, Western District of Texas, Austin Division (July 2010–March 2011). Provided expert testimony on behalf of plaintiffs in the form of reports and deposition testimony regarding name confusion, prime brokerage, risk management, and trading related to hedge funds.

- *Citadel Investment Group et al. v. Mikhail Malyshev and Jace Kohlmeier.* American Arbitration Association (December 2009–August 2010). Produced hearing and deposition testimony on behalf of plaintiffs in a dispute regarding misappropriation of intellectual property and trade secrets by ex-employees. Testified before the arbitration panel and in depositions. Specific issues for opinion included: finance theory and underlying mathematical techniques supporting high-frequency trading, trading and risk management strategies, software development, and trading management.

- *Jeffery E. Schuss et al. v. Penfield Partners, L.P. et al* (*C.A. No 3132-VCP*). Chancery Court of the State of Delaware, New Castle County (November–December 2009). Provided expert testimony on behalf of defendants in the form of a report and a deposition with regard to an alleged breach of fiduciary duties on the part of a hedge fund's managing partner concerning payment-in-kind distributions.

- *Several related Controladora Comercial Mexicana matters.* Provided expert testimony through affidavits, declarations, and expert reports on behalf of defendant with regard to the defendant's defaulting on a number of exotic derivative transactions. Spoke to the appropriateness of such transactions, their inherent risk and return, and general market practices regarding derivatives sales to corporate clients. Additionally, developed over a dozen exotic valuation models in connection with verifying plaintiffs' damages claims. The work was performed in connection with the following suits (all September 2009–September 2010):

  o *Barclays Bank PLC v. Controladora Comercial Mexicana S.A.B. DE C.V.* Supreme Court of the State of New York, County of New York
  o *J. Aron and Company v. Controladora Comercial Mexicana S.A.B. DE C.V.* Supreme Court of the State of New York, County of New York
  o *JPMorgan Chase v. Controladora Comercial Mexicana S.A.B. DE C.V.* Supreme Court of the State of New York, County of New York
  o *Merrill Lynch Capital Markets AG and Merrill Lynch Capital Services, Inc. v. Controladora Comercial Mexicana S.A.B. DE C.V.* Supreme Court of the State of New York, County of New York

- *Cantor Fitzgerald, L.P. v. Iris Cantor, Market Data Corporation, Rodney Fisher, and CFI. Chancery Court of the State of Delaware, New Castle County* (November 1998–August 1999). Provided expert testimony in court and through depositions on behalf of the defendants with regard to the alleged theft and improper use of intellectual property. Defendants were accused of improperly copying the designs and specifications of an automated bond and financial futures trading system.

- *O'Connor and Associates v. David Garbaze et al. U.S. District Court, Northern District of Illinois* (August 1988). Provided expert testimony in court and through

depositions on behalf of the defendants with regard to the alleged theft and improper use of intellectual property by ex-employees. Defendants were accused of improperly copying and using option valuation and risk management algorithms along with system designs and specifications.

## CONGRESSIONAL TESTIMONY AND ADVISORY

- *Government Accountability Office* (October 2008–January 2009). Facilitated several conferences with GAO staff helping to educate them on various economic and operational aspects of structured financial products in connection with the Troubled Asset Purchase Program.
- *Government Accountability Office* (November 2001–March 2002). Performed research and analysis for the GAO in regard to the September 11 terrorist attacks and the resulting impact on the U.S. financial system and infrastructure.
- *House Subcommittee on Communications Technology and the Internet* (November 2001). Prepared a whitepaper on the vulnerability of the U.S. financial system to terrorist attack. Read into the Congressional Record by Congressman Ed Markey (D-MA).
- *House Subcommittee on Telecommunications* (September 1995). Testified before the committee on the uses of over-the-counter derivatives in regards to possible regulation.

## REPRESENTATIVE PUBLICATIONS

(1)    *Survey of the Mathematical Foundations of Continuous-Time Finance*, master's thesis, University of California, Berkeley, December 2015.

(2)    *Corporate Governance and Operational Risk Management – A Practical Guide*, Peter Vinella and Jeanette Jin, J. Wiley and Sons (not released).

(3)    *Operational Risk—Practical Approaches to Implementation*, Ellen Davis (ed.), with Jeanette Jin (Chapter 6), Risk Books, March 2005.

(4)    Reprint of the *Operational Risk 101* Series (translated into Chinese), *Banking Today* (Hong Kong), November 2005.

(5)    Reprint of the *Operational Risk 101* Series, *Derivatives Portal* (online journal), June 2005.

(6)    Reprint of the *Operational Risk 101* Series, *Banking Risk* (online journal), June 2005.

(7)    *Operational Risk 101 – Management by Fact* (part 6 of a series), GT News, April 2005.

(8)    *Operational Risk 101 – Roles and Responsibilities* (part 5 of a series), GT News, March 2005.

(9)    Solicited Comments to the Draft Agency White Paper on the Sound Practices to Strengthen the Resilience of the U.S. Financial U.S. System, GT News, March 2005.

(10)    *Operational Risk 101 – Tackling Basel II* (part 4 of a series), GT News, February 2005.

(11)    *Operational Risk 101 – Operational Risk in terms of Operational Performance* (part 3 of a series), GT News, January 2005.

(12)    *Operational Risk 101 – Demystifying KPI and KRI* (part 2 of a series), GT News, December 2004.

(13)    *Operational Risk 101 – Basic Definitions* (part 1 of a series), GT News, November 2004.

(14)    *Describing a Formal Foundation for KPI and KRI*, Operational Risk, November 2004.

(15)   *Protecting the U.S. Financial System from Terrorist Attacks,* Bank Systems and Technology (Reprint). Read into the Congressional Record by U.S. Congressman Edward Markey during a hearing the House Subcommittee on Finance and Telecommunications, March 2002.

(16)   *Protecting the U.S. Financial System from Terrorist Attacks*, GT News (reprint), February 2002.

(17)   *The Trading and Risk Management ASP Directory,* Derivatives Strategy, December 2000.

(18)   Online Risk Management: A Theory of eVolution, MiddleOffice, Spring 2000.

(19)   *One e Too Many,* FOW, March 2000.

(20)   [No title], FOW, December 1999.

(21)   *Whoaaaah,* MiddleOffice, Winter 1999.

(22)   *Bank Bashing,* FOW, October 1999.

(23)   *Rio Aggrandisement,* FOW, September 1999.

(24)   *Joseph Jett's Phantom Bets,* Derivatives Strategy, May 1999.

(25)   *Mathematica for Dummies,* Derivatives Strategy, February 1999.

(26)   So, You're in the Market for a Risk Management System, FOW, September 1998.

(27)   *Black and White on Wall Street Review,* Derivatives Strategy, April 1998.

(28)   *JP Morgan's FourFifteen,* Derivatives Strategy, December 1996.

(29)   *Suggestion for Financial Derivative Regulation and Legislation,* PVA White paper. Presented to the House of Representatives Subcommittee on Finance and Telecommunications, June 1994.

## REPRESENTATIVE PRESENTATIONS

(1)   *The Challenges of LIBOR-Related Litigation*, Association of Corporate Counsel, April 24, 2012

(2)   *LIBOR – What is It, How Does it Work, and Why is it Important?* Financial Institutions Committee, State Bar of California, August 8, 2012

(3)   Panelist, *The Future of Structure Products "What's Next?"* European CLO and Structured Product Summit, October 2008, Monte Carlo, Monaco

(4)   Panelist, *Investor Reporting and Deal Surveillance*, Global ACBP and SIVs Summit, September 2007, Paris, France

(5)   Panelist, *Basel II Impact on CDOs, Credit Derivatives and Structured Credit Products in Europe*, European CDOs, Credit Derivatives and Structured Credit Products Summit, September 2007, London, England

(6)   Panelist, *Views on the Loan Market and Trends in Collateral,* CDO World 2007, March 2007, New York, NY

(7)   Conference co-chair and panelist, *The CDO Secondary Market: Liquidity and Transparency*, European CLO and Structured Product Summit, October 2008, Monte Carlo, Monaco

(8)   Panelist, 7th Annual CDO Summit, December 2007, Dana Point, CA

(9)   Panelist, 6th Annual CDO Summit, December 2006, Dana Point, CA

(10)   *Corporate Governance as a Key Value Driver,* SAS Financial Services Executive Summit, June 2005, Cary, NC

(11)   Integrating Corporate Governance and Operational Risk Management, Enterprise Risk Management Symposium, May 2005, Chicago, IL

(12)   *Establishing a Formal System of Internal Control for Modeling Operational Risk,* Financial Engineering Practitioners Seminar (Columbia University), March 2005, New York, NY

(13)   *Op Risk Management and Streamlining Trade Processing,* BEA Financial Services Seminar, February 2004, New York, NY

(14)   *September 11th and the Possible Regulatory Response,* Wall Street and Technology's Disaster Recovery and Business Continuity Conference, February 2002, New York, NY

(15)   *The Need to Apply Quality Systems to Risk Management Practices*, 3rd Annual Derivatives Expo, May 2001, New York, NY

(16)   Panelist, 2000 Derivatives Hall Fame Roundtable, August 2000, New York, NY

(17)   Personal remarks, Managed Funds Association – Annual Forum, July 2000, Chicago, IL

(18)   Panelist, Derivatives Strategies ASP Roundtable, May 2000, New York, NY

(19)   *Will the Internet Put You Out of Work? (Oh Yeah and Sooner Than You Think),* 9th Annual International Derivatives Exhibition, March 2000, Frankfurt, Germany

(20)   *The Global Risk Management Decision,* Merrill Lynch Risk Conference, January 1999, New York, NY

(21)   *Risk Management Issues – Part 2,* Informix Risk Management Seminar, November 1998, New York, NY

(22)   *Risk Management Issues,* Informix Executive Dinner, December 1997, New York, NY

(23)   Presentation to the FIS Sales Force and Account Management Team, ADP/ICI *iMPACT* Product Premier, September 1996, New York, NY

(24)   *Betting the Ranch,* Risk Management Seminar – Securities Industry Institute, Wharton Business School, University of Pennsylvania, March 1996, Philadelphia, PA

(25)   *Automated Trading and Pre-Trade Compliance,* NASDR Technology Forum, December 1995, Washington, DC

**EXHIBIT B. LISTING OF DOCUMENTS AND SOURCES RELIED UPON**

**Documents:**

Expert Report of Richard Bram Smith, dated October 27, 2020

Rebuttal Expert Report of Mark A. Sunshine, dated November 2, 2020

Rebuttal Expert Report of John Byrne, dated November 2, 2020

Term Credit Agreement among Revlon Consumer Products Corporation, Revlon, Inc., the Lenders Party Hereto, and Citibank N.A. dated September 7, 2016

Amendment No. 1 to Credit Agreement among Revlon Inc., Revlon Consumer Products Corporation, The Other Loan Parties And The Lenders Party Hereto, and acknowledged by Citibank, N.A. dated May 7, 2020

MEDALIST_CITI_00000010