UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re:*<br><br>*Citibank August 11, 2020 Wire Transfers* | Case No. 1:20-cv-06539 (JMF)<br><br>**DECLARATION OF MATT PERKAL** |

### **DECLARATION OF MATT PERKAL**

I, Matt Perkal, being duly sworn, state the following under penalty of perjury:

1. I am a resident of the State of South Carolina, over the age of 18, and competent to make this statement.

I. **Introduction**

2. I am a partner and senior analyst at Brigade Capital Management, LP ("Brigade"). I have worked at Brigade for ten years and have been a partner for approximately three years. I submit this declaration as my testimony in support of Brigade's defense to claims asserted by Plaintiff Citibank, N.A. ("Citibank") in this action.

3. I am familiar with and have first-hand knowledge of the facts set forth in this declaration. Among other things described below, I am familiar with our clients' holdings in 2016 Term Loans and their role as lenders to Revlon, as well as the events surrounding Citibank's transfer of funds in repayment of those loans on August 11, 2020.

4. The payments at issue in this case were received by Revlon lenders managed by Brigade on the evening of August 11, 2020. When I learned about the payments the next day, I did not believe they were made by mistake. The payments had looked like a valid loan prepayments—they precisely matched the amount owed to each lender and they were made in the middle of an interest period when interim interest alone would not be paid unless Revlon

were prepaying the loans.  To be clear, until we received Citibank's recall notices on August 12, the concept of a massive bank error was not a possibility that even crossed my mind.

II.     **Background**

5.      Brigade specializes in credit investment.  This means that we primarily invest in loans, bonds, and credit derivatives of corporations and municipalities in North America, South America, Europe, and Asia.  Brigade invests money on behalf of its clients, which include a wide array of entities such as public and private pension funds, collateralized loan obligations ("CLOs"), and managed private investment funds.

6.      Our clients' money and investments are not held by Brigade itself, but by entities separate and distinct from Brigade (each a "Client Fund" and collectively, the "Client Funds").  The Client Funds receive funds when cash distributions are made on their investments.  The Client Funds are not Brigade subsidiaries; we have a contractual relationship with each of them, which is distinct for each Client Fund depending on the terms in the investment management agreement or collateral management agreement that we have negotiated with the client.

7.      The Client Funds that held 2016 Term Loans include certain CLOs, collateralized debt obligations ("CDOs"), private funds, and separately managed accounts ("SMAs"):  Eight CLOs managed by Brigade invested in the 2016 Term Loans: ACIS CLO 2014-5 Ltd. ("CLX5"), Battalion CLO VII Ltd. ("CLO7"), Battalion CLO VIII Ltd. ("CLO8"), Battalion CLO X Ltd. ("CL10"), Battalion CLO IX Ltd. ("CLO9"), Battalion CLO XI Ltd. ("CL11"), Battalion CLO XII Ltd. ("CL12"), and Battalion CLO XIV Ltd. ("CL14").  Two CDOs managed by Brigade invested in the 2016 Term Loans:  Brigade Debt Funding I , Ltd. ("CLB1"), and Brigade Debt Funding II, Ltd ("CLB2").  Four private funds managed by Brigade invested in the 2016 Term Loans:  Brigade Credit Fund II Ltd. ("BCF2"), Brigade Distressed Value Master Fund Ltd.

("DSTR"), Brigade Opportunistic Credit LBG Fund Ltd. ("LBNK"), and Brigade Leveraged Capital Structures Fund Ltd.[1] Twenty-eight SMAs managed by Brigade invested in the 2016 Term Loans: Big River Group Fund SPC LLC ("BIGR"), Blue Falcon Limited ("BLUE"), Brigade Diversified Credit CIT ("BCIT"), City of Phoenix Employees' Retirement Plan ("COPX"), Delta Master Trust ("DLTA"), FCA Canada Inc. Elected Master Trust ("JCAN"), FCA US LLC Master Retirement Trust ("JEEP"), FedEx Corporation Employees' Pension Trust ("FEDX"), Future Directions Credit Opportunities Fund ("AMPI"), Goldman Sachs Trust II – Goldman Sachs Multi-Manager Non-Core Fixed Income Fund ("GS40"), Illinois State Board of Investment ("ISBI"), JPMorgan Chase Retirement Plan Brigade ("JPRP"), JPMorgan Chase Retirement Plan Brigade Bank Loan ("JPBD"), Los Angeles County Employees Retirement Association ("LCRA"), Mediolanum Best Brands ("MIFL"), New York City Fire Department Pension Fund, Subchapter 2 ("NYCF"), New York City Police Pension Fund, Subchapter 2 ("NYCP"), Northrop Grumman Pension Master Trust ("GRUM"), Panther BCM, LLC ("NOCA"),[2] SC Credit Opportunities Mandate LLC ("SACR"), SEI Global Master Fund Plc the SEI High Yield Fixed Income Fund ("SGMF"), SEI Institutional Investments Trust-High Yield Bond Fund ("SIIT"), SEI Institutional Managed Trust – Multi-Strategy Alternative Fund ("SIMO"), SEI Institutional Managed Trust-High Yield Bond Fund ("SIMT"), Teachers' Retirement System of the City of New York ("NYCT"), The Coca-Cola Company Master Retirement Trust ("SODA"), and SEI Investments Canada Company - U.S. High Yield Bond Fund ("SEIC").[3]

---

[1] Brigade Leveraged Capital Structures Fund Ltd. holds the 2016 Term Loans through a total return swap ("TRS") account.

[2] Panther BCM, LLC holds some of the 2016 Term Loans through a TRS account.

[3] True and correct copies of the investment management agreements ("IMAs"), collateral management agreements ("CMAs"), and indentures governing Brigade's relationship with these entities are available at DX-0320 (NOCA

8. In my role as a partner, I make investment recommendations within my sectors across all of our Client Funds. My responsibilities include, for example, analyzing whether and when to invest in various debt instruments (such as the 2016 Term Loans at issue in this case), determining the price at which our clients should be willing to invest, assessing whether our clients should join syndicates relating to these investments, determining if and when such investments should be sold and at what price, and if necessary, directing litigation concerning these investments to enforce our clients' rights.

### III. The Revlon 2016 Term Loans

9. In 2016, Revlon issued approximately $1.8 billion of debt pursuant to a credit agreement (the "2016 Credit Agreement"). A true and correct copy of the 2016 Credit Agreement is DX 0909. At the outset, and for several years thereafter, Citibank served as the lenders' agent under the 2016 Credit Agreement. Client Funds managed by Brigade have been longtime lenders to Revlon, being some of the initial purchasers of the 2016 Term Loans upon issuance in July 2016.

10. Revlon granted extensive liens on its assets to serve as a security for the 2016 Term Loans under a collateral agreement (the "2016 Collateral Agreement"). The collateral

---

IMA); DX-0200 (CLO9 Indenture); DX-0910 (BLUE IMA); DX-0221 (CL10 Indenture); DX-0137 (AMPI IMA); DX-0222 (CL10 CMA); DX-0186 (CLO7 Indenture); DX-0187 (CLO7 CMA); DX-0225 (SIMO and SMT IMA); DX-0272 (CL12 Indenture); DX-0304 (CL14 Indenture); DX-0252 (CL11 Indenture); DX-0292 (CLB2 Indenture); DX-0268 (CLB1 Indenture); DX-0197 (CLO9 CMA); DX-0247 (CLO8 CMA); DX-0246 (CLO8 Indenture); DX-0130 (BIGR IMA); DX-0312 (CLX5 IMA); DX-0235 (GS40 IMA); DX-0276 (COPX IMA); DX-0282 (CLB1 CMA); DX-0139 (SODA IMA); DX-0911 (DLTA IMA); DX-0290 (CLB2 CMA); DX-0305 (CL14 CMA); DX-0251 (CL11 CMA); DX-0273 (CL12 CMA); DX-0138 (FEDX IMA); DX-0275 (SIIT IMA); DX-0322 (BCF2 IMA); DX-0133 (DSTR IMA); DX-0912 (LBNK IMA); DX-0217 (JCAN IMA); DX-0216 (JEEP IMA); DX-0234 (ISBI IMA); DX-0307 (GRUM IMA); DX-0288 (NYCF, NYCP, and NYCT IMA); DX-0132 (LCRA IMA); DX-0127 (JPRP IMA); DX-0913 (JPBD IMA); DX-0306 (MIFL IMA); DX-0914 (SEIC IMA); DX-0915 (SGMF IMA).

included a first-priority lien in the intellectual property of Revlon's beauty brands, which was the most valuable security that Revlon could provide.

11. As of August 11, 2020, 42 clients for which Brigade acts as investment manager held 2016 Term Loans issued by Revlon under the 2016 Credit Agreement. Those clients, accordingly, were lenders to Revlon at that time. Out of the entire facility, Brigade's clients held approximately $211,227,472.72 of the 2016 Term Loans.[4]

12. I understand that Citibank is asserting that it intended to pay interest to all of the 2016 Term Lenders on August 11, 2020, because Revlon was repurchasing 2016 Term Loans from selected lenders on that day. I had no reason to believe that Revlon was conducting such a repurchase on that day, nor that interest would be paid to Brigade's clients even if such repurchases were made. Citibank never provided any notice to Brigade that such repurchases were going to occur or that interest was being paid in connection with repurchases.

IV. **The Revlon 2016 Term Loans Are Paid Down on the Evening of August 11, 2020**

13. At around 2:00 p.m., EDT on August 12, 2020, I learned that the entire balances of the 2016 Term Loans held by Brigade's clients had been paid off on August 11, 2020. Neither I, nor, to my knowledge, any one of my colleagues, believed the payments to have been made in error before seeing Citibank's recall notice.

14. Later that afternoon, I learned that at around 2:23 p.m., EDT—almost 20 hours after the payments had cleared the day before—Citibank sent a message to Brigade stating that the payments had been made in error. A true and correct copy of the message is DX-0593. I understand that at the time, Citibank had not provided any explanation of how or why such a

---

[4] Approximately $36,575,975.20 of that amount is held by Brigade's clients through TRS accounts.

payment could have been made in error or why it took Citibank almost 20 hours to communicate to Brigade regarding the purported error.

15. As I describe in greater detail below, before learning about the recall notice, the concept of an error did not even cross my mind.

16. When I learned of Citibank's "error notices," I did not know what to make of them. Once we received those notices, however, it was apparent to me and my colleagues that Citibank was claiming it was entitled to the return of the funds and that there would be a dispute, even possibly litigation. Therefore, on August 13, in order to be prudent, Brigade instructed the custodians holding our clients' Revlon loans to freeze the August 11 payments in place.

V. **I Did Not Believe the Payments Were A Mistake**

17. I understand that Citibank is alleging that Brigade knew or should have known the payments were a mistake as soon as the payments were made to its clients. I disagree. Neither Brigade nor its Client Funds were on notice of any alleged mistake when the payments were received or when Brigade learned about the payments, both of which happened before Citibank sent its communication of error during the afternoon of August 12, 2020. There were various reasons why a mistaken payment would not have been a plausible conclusion prior to learning of Citibank's allegation, and the concept that Citibank would pay Revlon's debt with its own funds would be outlandish. Even upon receiving the communication of error, it was still difficult for me to fathom how an error could have occurred. I assume Citibank has comprehensive internal controls. To be clear, while I was confused after receiving the recall notices, the thrust of my testimony is that before learning of those notices, it was clear to me that the transfers were an intentional pre-payment of the Term Loans, and I did not give any thought whatsoever to a bank error and had no reason to believe there was any such error.

      a.    **The payments were in the exact amount of outstanding principal and accrued interest owed to each client that was a Revlon lender**

18. Each Client Fund that received a payment on August 11, 2020, received the exact amount that was owed to that client—precisely the amount of outstanding principal and accrued interest to that date. To me, that indicated that Revlon had intentionally paid the full loan to each lender that received payments.

19. It was inconceivable to me that Citibank would accidentally pay each lender exactly the amount of principal and interest owing to each lender. Although I have heard of miscalculated interest payments (*e.g.*, where an interest payment amount was off due to a miscalculation), I have never before seen or heard of a prepayment of a syndicated loan, at par plus accrued, that turned out to be a mistake.

      b.    **The payments were received in the middle of an interest period, which is consistent with—and highly indicative of—a prepayment of the loan**

20. On August 11, 2020, I knew it was not a scheduled interest payment date on the 2016 Term Loans. I did not expect an interest payment on that day.

21. I am familiar with the material terms of the 2016 Credit Agreement and the 2016 Term Loans. While only specified dates are scheduled interest payment dates, I knew that Revlon had the option of making an optional prepayment of the 2016 Term Loans at any time, and that such an optional prepayment would have to be accompanied by a payment of accrued interest through that date of payment.

22. As a result, the payment on August 11, on a date when no interest payment was anticipated or due, would not, in my understanding, have been a payment solely of accrued interest. Rather, because accrued interest was calculated on the full amount of each lender's loan, such a payment would make sense—and be consistent with the terms of the Credit Agreement and the 2016 Term Lenders' expectations generally—only if each lender receiving

the payment received the full amount of its 2016 Term Loan.  Coupled with the fact that the payment was in the exact amount of interest and principal owing, I had no reason to think that it was anything other than an intentional prepayment of the 2016 Term Loan.

    c.    **I presumed that Citibank, a huge, sophisticated financial institution, has many protections in place to prevent sending out erroneous payments.**

23. I knew that Citibank is one of the largest, most sophisticated financial institutions in the world.  As such, I presumed Citibank has many levels of internal controls in place to prevent mistaken payments, particularly mistaken payments of funds from Citibank's own balance sheet.  Thus, prior to hearing of Citibank's allegation of mistake, the notion of mistake did not enter my mind.

24. Upon receiving Citibank's communication of error during the afternoon of August 12, I still found it hard to fathom how this error could have occurred in light of the presumed comprehensive internal controls Citibank had in place.  Citibank's notice, although it was delivered the next day, included no explanation whatsoever of the alleged error.  Thus, even after receipt of the notice, I was not convinced Citibank had made the payments by mistake.

25. I later learned that *all* 2016 Term Lenders were paid par plus accrued interest—*i.e.*, that this was a $900 million alleged mistake.  In my twelve years in the financial industry, I have never heard of a mistake of this magnitude—let alone from one of the most sophisticated and established financial institutions in the world.

26. When Citibank made the payments on August 11, it was purporting to act as administrative agent for the 2016 Term Lenders, whose primary function is to process and administer payment between the borrower, Revlon, and the 2016 Term Lenders.  In this context, it was my expectation that Citibank's internal controls would be particularly focused to ensure Citibank did not wire its own funds.  Citibank's assertion that it used its own funds to pay

Revlon's debt, notwithstanding its purported role as administrative agent, made its assertion of error all the more perplexing and difficult to understand.

      d.    **Revlon's past conduct concerning the 2016 Term Loans suggested that the payment could have been made willfully to prevent enforcement action on the part of the 2016 Term Lenders.**

27. When I first learned about the payments to our clients, I was not aware that Revlon had paid off *all* of the 2016 Term Lenders. I only knew that *Brigade's* Client Funds' 2016 Term Loans had been paid off in full. Thus, one thought that entered my mind was that Revlon paid off Brigade's Client Funds' 2016 Term Loans in order to reduce beneath 50% the 2016 Term Lenders that had objected to and were planning on enforcing rights with respect to an unlawful May 2020 Transaction ("May 2020 Transaction"). Indeed, Revlon has a recent history of doing just that: *i.e.*, willfully seeking to manipulate votes under the 2016 Credit Agreement to suppress the rights of the 2016 Term Lenders.

28. In order to explain my thinking at the time I learned of the August 11 transfer, it is necessary to provide some background that I was aware of at that time. In April of 2020, Revlon determined it would transfer collateral away from the 2016 Term Lenders (as it had done previously in 2019, albeit, on a smaller scale). In order to release the liens on the collateral that secured the 2016 Term Loans, Revlon needed to amend the 2016 Credit Agreement. However, in order to amend the 2016 Credit Agreement, Revlon needed votes of a *majority* of the 2016 Term Lenders.

29. A majority of the 2016 Term Lenders, however, opposed the transaction. Specifically, to protect the interests of our clients, Brigade and other 2016 Term Lenders formed a lender group ("Lender Group"), owning more than half of the then-outstanding 2016 Term Loans and opposed Revlon's actions to siphon away collateral that was providing essential security for payment of the 2016 Term Loans.

30. Recognizing that the Lender Group could block the transaction, Revlon purported to create a new revolving loan to tip the vote calculation in favor of amending the 2016 Credit Agreement. I believe that this new revolver was created solely to impact the voting. It came into existence on the day the vote was to occur and was left outstanding for approximately three weeks until it was repaid (in full, at par, prior to maturity). Revlon and Citibank counted these illegitimate votes and facilitated the transaction.

31. Thus, as of the time I learned of the August 11 transfer, I understood that very recently, Revlon and Citibank engaged in a practice designed to manipulate the calculation of a majority of 2016 Term Lenders. I thought it was possible that Revlon was engaging in a similar strategy, tactically paying off targeted 2016 Term Lenders on August 11, 2020, to impair the legal rights of the majority (by reducing them to a minority).

32. My thinking was also informed by my understanding that, following the May 2020 Transaction, Revlon undoubtedly knew that the Lender Group was preparing to enforce rights and remedies and to, more broadly, challenge the transaction. First, I knew that prior to Revlon proceeding with the May 2020 Transaction, the Lender Group objected vociferously to the collateral stripping. I also knew that, thereafter, it was widely known in the marketplace that the Lender Group had remained organized, with legal representation, and planned on enforcing rights and remedies. Indeed, by way of one example, on August 10, 2020, S&P Global Market Intelligence released an article reporting that: "[A] group of lenders is also preparing a lawsuit against [Revlon] for a recent recapitalization transaction, alleging that the deal involved creditor vote manipulation and violated the terms of its 2016 Credit Agreement, two of the sources said."[5]

---

[5] Alexander Saeedy, *Revlon Faces Lender Block of Note Exchange, Potential Lawsuit*, S&P Global Market Intelligence (August 10, 2020, 2:01 P.M. EST), available at DX-1053.

33.     Second, I was also aware that, although Citibank had submitted its resignation as administrative agent after the May 2020 Transaction, it then refused to complete standard documentation to facilitate a transition to UMB Bank, which the lenders had appointed as successor agent as permitted under the Credit Agreement. During those negotiations, Citibank was demanding a release, immunizing Citibank from liability for its role in the May 2020 Transaction. UMB Bank steadfastly and appropriately refused to grant such a release. UMB Bank's appropriate refusal to grant Citibank a release was another reason that I believed that Revlon surely knew the Lender Group was planning an enforcement action.

34.     This is yet another reason why the timing of the payments on August 11, 2020 did not seem coincidental or mistaken at all: I considered that Revlon was paying down at least some of the 2016 Term Loans to reduce the Lender Group beneath a majority threshold in order to prevent legal action because, as Revlon surely would understand, UMB Bank would enforce rights only with a direction from a *majority* of 2016 Term Lenders. Moreover, because lenders managed by Brigade are the largest group of 2016 Term Lenders, I believed that Revlon could be focused on paying off their loans to prevent Brigade from supporting the UMB Action. So when I learned about the payments that were received on August 11, I considered specifically that the payments could be another (willful and voluntary) attempt by Revlon to manipulate the percentage of lenders willing to challenge Revlon's conduct, including by paying off Brigade's Client Funds' 2016 Term Loans, potentially leaving the balance of the Lender Group with less than a majority of 2016 Term Loans and hindering UMB Bank's anticipated enforcement actions.

e. **Prepayment was a possibility in light of the fact that Revlon anticipated acceleration of the 2016 Term Loans and, in any event, the 2016 Term Loans were subject to a springing maturity in November 2020.**

35. Independent from the fact that Revlon knew the Lender Group was preparing for an impending acceleration of the 2016 Term Loans (which would threaten to "cross default" Revlon's other funded indebtedness), I also knew that Revlon was facing a potential "springing maturity" of the 2016 Term Loans in November 2020 (*i.e.*, later this month).[6] Thus, I believed that Revlon (and its controlling shareholder) had every reason to satisfy the 2016 Term Loans to guard against their equity interests in Revlon being extinguished by a bankruptcy filing.

36. The 2016 Term Loans, on their face, mature no later than 2023.[7] However, these loans have a so-called "springing maturity" on November 16, 2020 (which was just over three months from August 11) unless a certain set of conditions are met.[8] Thus the 2016 Term Loans had the nearest maturity in the Revlon capital structure. The fact that the 2016 Term Loans were an impending maturity for Revlon—in and of itself—was sufficient for me to consider prepayment as a possible step undertaken by Revlon.

---

[6] Revlon announced on November 11 that it would complete an exchange offer for $236 million aggregate principal amount of the 5.75% Senior Notes due 2021 ("2021 Notes") to avoid the springing maturity. Together with the exchange, Revlon will repay the remaining $106.8 million principal amount of the 2021 Notes at par and with accrued interest. Those notes were trading at prices in the 20s around August 11, and in the 30s in November when the par repayment was announced.

[7] DX-1035, Revlon 2016 10-k, *available at* https://investors.revlon.com/node/12796/html ("The 5.75% Senior Notes mature in 2021, the 2016 Revolving Credit Facility matures no later than 2021, the 2016 Term Loan Facility matures no later than 2023 and the 6.25% Senior Notes mature in 2024.").

[8] *Id.* ("Principal and Maturity: On the Elizabeth Arden Acquisition Date, Products Corporation entered into the 2016 Term Loan Agreement, for which Citibank, N.A. acts as administrative and collateral agent and which has an initial aggregate principal amount of $1,800.0 million and matures on the earlier of: (x) the seventh anniversary of the Elizabeth Arden Acquisition Date; and (y) **the 91st day prior to the maturity of Products Corporation's 5.75% Senior** Notes if, on that date (and solely for so long as), (i) any of Products Corporation's 5.75% Senior Notes remain outstanding and (ii) Products Corporation's available liquidity does not exceed the aggregate principal amount of the then outstanding 5.75% Senior Notes by at least $200.0 million. The loans under the 2016 Term Loan Facility were borrowed at an original issue discount of 0.5% to their principal amount."); ("In February 2013, Products Corporation completed its offering (the "2013 Senior Notes Refinancing"), pursuant to an exemption from registration under the Securities Act,) of $500.0 million aggregate principal amount of the 5.75% Senior Notes. The 5.75% Senior Notes are unsecured and were issued under the 5.75% Senior Notes Indenture to investors at par. The 5.75% Senior Notes mature on February 15, 2021.") (emphasis added).

37.     Consistent with the foregoing, I knew that Revlon was working with an investment banker in order to address debt maturities, including the 2016 Term Loans.  On the evening of August 11, 2020, I reviewed an article published by *Reorg Research*, titled "Revlon Working With PJT Partners as Financial Advisor as Company Seeks to Avoid Nov. 16 Springing Maturity on 2016 Term Loan, ABL Revolver."  The article stated that "Revlon is working with PJT Partners as financial advisor to evaluate options regarding its capital structure."[9]

38.     It is my understanding that, in order to avoid the November 2020 springing maturity, Revlon has sought to extend the impending maturity of its unsecured bonds.[10]  Specifically, in the summer of 2020, Revlon launched an exchange offer "to exchange its unsecured 5.75% notes due February 2021 for new 5.75% notes due 2024 for 75 cents on the dollar."[11]  My understanding is that, to complete that exchange, Revlon needed the consent of a majority of 2016 Term Lenders to complete such an offer, and the 2016 Term Lenders did not provide that consent.  Accordingly, as of August 11, the November 2020 springing maturity was an impending, unresolved issue for Revlon.[12]

      f.     **Revlon's liquidity issues did not suggest that the payment was a mistake.**

39.     On August 11, I was aware of other facts relevant to Revlon that suggested prepayment of the 2016 Term Loans was entirely possible.  Thus, once again, prior to Citibank's assertion of error, there was no reason for me to contemplate that the payments were made in error.

---

[9] DX-0359, Harvard Zhang, *Revlon Working With PJT Partners as Financial Advisor as Company Seeks to Avoid Nov. 16 Springing Maturity on 2016 Term Loan, ABL Revolver*, Reorg Research (Aug. 11, 2020 4:30 p.m. ET).
[10] Under the 2016 Credit Agreement, Revlon's unsecured bonds could trigger the November 2020 springing maturity.
[11] DX-0359, Harvard Zhang, *Revlon Working With PJT Partners as Financial Advisor as Company Seeks to Avoid Nov. 16 Springing Maturity on 2016 Term Loan, ABL Revolver*, Reorg Research (Aug. 11, 2020 4:30 p.m. ET).
[12] *Id.* (showing the exchange offer failed).

13

40.     Just a few months ago, in May 2020, Revlon was successful at raising nearly $1 billion notwithstanding its financial constraints.  As I knew on August 11, and as Revlon had previously reported publicly, in connection with that capital raise, Revlon satisfied, at par, approximately $953 million in 2016 Term Loans.  Revlon also reported publicly and I understood that in May 2020, Revlon also (a) repaid at par a $65 million revolver it issued that month, (b) repaid at par, and made a "make whole" payment (*i.e.*, paid the present value of all future interest payments that otherwise would have been paid) on $200 million in term loans issued by the Company in 2019, (c) repurchased at par approximately $50 million of 5.75% unsecured bonds (and repurchased another $62.8 million in such notes), and (d) fully repaid a $41.5 million Asset-Based Revolving Credit Facility.[13]  Moreover, on November 11, 2020, Revlon announced that it would, once again, pay par plus accrued interest to extinguish debt—this time, $106.8 million of its 2021 Notes, which the company agreed to repay in order to avoid the springing maturity of the 2016 Term Loans.  A true and correct copy of Revlon's press release is DX-1127.

41.     Also, it was and has always been possible that Revlon's longtime sponsor, Ronald Perelman, would be a source of capital.  Mr. Perelman, a well-known multi-billionaire, owns almost 90% of the stock of Revlon's parent company Revlon, Inc. through his company MacAndrews & Forbes LLC ("MacAndrews & Forbes").[14]  His daughter, Debra Perelman, currently serves as the CEO of Revlon, Inc.  I thought it was possible that Mr. Perelman might have elected to deploy capital he controlled to pay off some or all of the Revlon debts.  In the market, as is often the case with "family owned" businesses, many suspect that Mr. Perelman

---

[13]  DX-1052, Revlon 10Q at 26.
[14]  DX-1041, Revlon 2019 10K, at 5 (showing MacAndrews & Forbes beneficially owning 46,223,321 out of 53,069,832 shares of Revlon, Inc.'s Class A common stock, as of December 31, 2019), at 7 ("MacAndrews & Forbes . . . [is] a corporation beneficially owned by Ronald O. Perelman.").

14

would never let Revlon fail (which would mean his equity interests would be cancelled). It is well known in the industry that Revlon is very important to Mr. Perelman, as he has owned and nurtured the company for over 35 years. He claims that this is the one investment that "most defined" him.[15] Indeed, the view that Mr. Perelman would not let Revlon fail is so widely shared that the market has even coined a phrase to refer to this possibility: "The Perelman Put,"[16] meaning Mr. Perelman would do everything he can to preserve his ownership of Revlon.

42. In addition, in the days leading up to the August 11, 2020 wire transfers, it was widely reported in the news that Mr. Perelman was monetizing various assets and I thought it plausible that Mr. Perelman used some of those proceeds to satisfy debt at Revlon. I remember reading press coverage discussing Mr. Perelman monetizing assets such as his art collection, his stakes in AM General and Scientific Games, Merisant, and several other undisclosed portfolio companies. Generally speaking, on August 11, I perceived Perelman as being an executive capable of raising capital and satisfying his companies' obligations in order to preserve his ownership interests in his companies.

g. **The market prices of Revlon's debt and equity did not suggest the payment was a mistake.**

43. On August 11, I was well aware of the trading prices for Revlon's equity and debt. Those prices had little to do with whether Revlon would prepay the loans at par, and thus gave me no reason to believe that that prepayment of the 2016 Term Loans was in error. I say that for several reasons, all of which were apparent to me when I learned of the August 11 payments.

---

[15] DX-1029, Nikhil Deogun, *Perelman's Love Affair With Revlon Is a Cautionary Tale on Debt*, Wall Street Journal (Sept. 20, 2006 12:01 a.m. ET), https://www.wsj.com/articles/SB115870581124368129.
[16] *Id*.

44.     First, on August 11, the Revlon stock was trading at a significant positive value, reflecting the equity market's view that the company would satisfy its debt.

45.     Second, trading in Revlon loans was extremely thin, and thus the market for those loans was largely illiquid.  The loans were exchanged in low volumes and only had limited numbers of interested buyers and sellers.  Indeed, the term "trading price" is not really accurate in this context because there were so few sales at the indicated level.  Because there was no steady supply of buyers or sellers, any significant loan purchase would alert the market, and the price of the 2016 Term Loans would quickly shoot up.  The price would rise even higher if the market participants knew it was Revlon, Perelman, or McAndrews & Forbes that was purchasing the loans in an effort to support the company's equity.  As a result, if Revlon were to start making open market purchases, the price of the 2016 Term Loans would quickly rise, and Revlon would end up paying far more than suggested by the depressed trading price.

46.     Third, the trading price on August 11 was not indicative of the level at which Brigade's Client Funds would be willing to sell.  In fact, I advised Brigade's Client Funds to hold their loans precisely because I did not believe the trading price of the 2016 Term Loans reflected their fair value.

47.     Fourth, as stated earlier, I was aware that Revlon had recently repaid debt at par despite the fact that the debt was trading at discounts at the time, including paying off in full the 2016 Term Loans held by other Lenders in May 2020.  I have noted several other repayments of Revlon's debt at par, at or around the same time, in paragraph 40 above.

48.     The bottom line, as I understood well on August 11, is that neither the equity market nor the debt market is a compelling indicator of Revlon's ability or willingness to repay

its debt at par. I had no reason to associate these trading prices with Revlon's ability to repay its loans on August 12.

## VI. **Brigade Authorized Filing of the UMB Action, on Behalf of Its Clients, on July 30, 2020**

49. I understand that Citibank has alleged that Brigade would not have directed UMB to file the lawsuit against Citibank and Revlon on August 12, 2020 had we believed that the 2016 Term Loans were actually paid off. Additionally, Citibank has alleged that UMB filed the action on August 12 to somehow take advantage of the fact that Citibank had paid down the 2016 Term Loans. These assertions are entirely baseless. As noted above, for months prior to the August 11, 2020 payments on the 2016 Term Loans, Brigade and other 2016 Term Lenders were planning to instruct UMB Bank, the successor administrative agent under the 2016 Credit Agreement, to exercise rights and remedies, including filing a lawsuit against Revlon, Citibank, and other parties with respect to the May 2020 Transaction.

50. On July 30, 2020, Brigade provided UMB Bank a direction and indemnification letter to: (1) file a complaint against Citibank and Revlon for the illegal transfer of collateral, (2) notice an event of default under the 2016 Credit Agreement, and (3) accelerate the outstanding obligations under the 2016 Term Loan. My understanding was that this direction would be acted on by UMB Bank as soon as practicable after the date Brigade provided the direction, including when a majority of 2016 Term Lenders had submitted similar direction. Of course, the 2016 Term Loans had not been paid off when Brigade authorized the UMB Action on July 30, 2020.

51. I understood that UMB Bank was ultimately prepared to commence legal action on August 12, 2020, having received direction from a majority of 2016 Term Lenders that morning. My understanding is that the complaint was filed at approximately 2:00 pm ET on August 12, 2020.

52. While certain representatives of Brigade knew before I did, none of the Brigade representatives who directed the UMB Bank action knew of the August 11 payments prior to the filing of the complaint. Thus, Brigade's direction to file the UMB Action was not related in any way to the receipt of August 11 payments or the discharge of the 2016 Term Loans.

53. Finally, I understand Citibank has suggested that Brigade stands to realize outsized economic gains by retaining the payments. This is not true. Indeed, the legal expenses that have been incurred to date and will be incurred through trial may exceed the economic benefits that Brigade might realize as a result of its Client Funds retaining the payment. To be certain, Brigade is very proud to defend against Citibank's claim in furtherance of Brigade's duties to its Client Funds, pursuant to what I am advised to be policy-driven law from New York's highest court, which is inherently the right thing to do.

*       *       *

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*[Rest of page intentionally left blank – signature on following page]*

Dated: November 12, 2020
       Johns Island, SC

*/s/ Matthew Perkal*

Matthew Perkal