UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re:*  *Citibank August 11, 2020 Wire Transfers* | Case No. 1:20-cv-06539 (JMF)  **DECLARATION OF STEVEN ABRAMS** |

## DECLARATION OF STEVEN ABRAMS

I, Steven Abrams, being duly sworn, state the following under penalty of perjury:

1. I am a resident of the State of New York, over the age of 18, and competent to make this statement.

I. **Introduction**

2. I am a Managing Director and Portfolio Manager at Greywolf Capital Management LP ("Greywolf"). I have worked at Greywolf since 2004 and have been a portfolio manager for approximately eight years. I submit this declaration as my testimony in support of Greywolf's defense to claims asserted by Citibank, N.A. ("Citibank") in this action.

3. I have first-hand knowledge of the facts set forth in this declaration. Among other things described below, I am familiar with our clients' participation as lenders in the 2016 Term Loans, and the events surrounding Citibank's transfer of funds in repayment of those loans on August 11, 2020.

4. As I will discuss in greater detail below, Citibank transferred funds to Greywolf's clients, late on August 11, 2020, in the exact amounts those clients were owed on the 2016 Term Loans. The funds were accepted for deposit into the clients' accounts, and the transfers were not accompanied by any notice, or indication of any sort, that they had been sent by mistake. It was not until the next day that Citibank first circulated "error notices" claiming that there had been a mistake. There is no reason that I would conclude, without those "error notices," that the

1

Case 1:20-cv-06539-JMF   Document 207   Filed 12/09/20   Page 2 of 10

payments were made by mistake.  When I learned of the transfers, it was after Citibank had sent its "error" notices, and, even then, I was skeptical that one of America's largest and most sophisticated banks accidentally paid off our loans.  Never in my career do I recall having seen a bank accidentally pay down an entire syndicated loan, in the exact amounts owed to each lender.

II.     **Background**

5.      Greywolf is a collateral manager for certain collateralized loan obligations ("CLOs").  At the time of the August 11 Transfer, three CLOs managed by Greywolf were invested in the 2016 Term Loans.  These three CLOs are Greywolf CLO II, Ltd. ("Greywolf CLO II"), Greywolf CLO IV, Ltd. (Re-issue) ("Greywolf CLO IV"), and Greywolf CLO V, Ltd. ("Greywolf CLO V").  In its role as collateral manager, Greywolf selected investments for these CLOs.

6.      These three CLOs—like all of the CLOs for which Greywolf acts as manager—are separate legal entities.  They are not Greywolf subsidiaries; Greywolf has a contractual relationship with each of them to provide specified management services.  True and correct copies of the collateral management agreements and indentures governing Greywolf's relationship with each CLO are included in the exhibits submitted to the Court.[1]

7.      In my role as a portfolio manager, I have responsibility for investment decisions for Greywolf's CLOs, including the three CLOs listed above. My responsibilities include, for example, analyzing whether and when to invest in various loans (such as the 2016 Term Loans at issue in this case), determining the price at which our clients should be willing to purchase the loans (whether at new issue or in the secondary market), determining if and when such loan

---

[1] *See, e.g.,* DX-0258, DX-0296, DX-1128, DX-0261, DX-0308, DX-0309.

obligations should be sold and at what price, and if necessary, directing litigation concerning these loan obligations to enforce our clients' rights.

III.  **The Revlon 2016 Term Loans**

8.  As of August 11, 2020, three CLOs for which Greywolf acts as collateral manager held 2016 Term Loans issued by Revlon under the 2016 Credit Agreement. Those clients were lenders to Revlon at that time. Out of the entire facility, Greywolf's clients held approximately $15,920,138.89 of the 2016 Term Loans.[2] As of the morning of August 11, 2020, the next scheduled interest payment date was not until the end of August.

9.  I was not aware that Citibank intended to repurchase 2016 Term Loans from selected lenders on August 11, or that it planned to pay interest to all of the 2016 Term Lenders in connection with such a transaction. Citibank did not provide advance notice to me that such repurchases were going to occur or that interest was being paid in connection with repurchases. It is my understanding, in any event, that the exercise of repurchase rights by a lender does not cause interest to become due immediately for all lenders under the 2016 Term Credit Agreement.

10. I am aware from my work on the Revlon 2016 Term Loans, that the 2016 Term Lenders had been harmed by a series of transactions by Revlon and Citibank to strip away the collateral securing payment of the 2016 Term Loans, and my views as to what Citibank intended, when I learned of the August 11 payments, were informed by that background. Specifically, in August 2019, Revlon borrowed $200 million from a third party and pledged collateral for this new loan by transferring some of the intellectual property securing the 2016 Term Loan out of reach of the 2016 Term Lenders' collateral package. In May 2020, Revlon undertook a much

---

[2] *See, e.g.,* DX-0783, DX-0657, DX-0655. Each of exhibits contain true and correct copies of emails that I or my colleagues at Greywolf received.

larger collateral-stripping transaction. This collateral-stripping transaction was the subject of a separate lawsuit filed by UMB Bank as successor agent to Citibank against Revlon, Citibank, and others.

IV. **The August 11 Transfer**

11. On the afternoon of August 11, 2020, around 6:00 p.m. EDT, three CLOs managed by Greywolf – Greywolf CLO II, IV, and V – received wire transfers totaling their respective outstanding principal and accrued interest under the 2016 Term Loan. The funds were accepted for deposit into each of these clients' accounts, which are all administered by the fund administrator Virtus. The description in the wire transfers stated the payments were in connection with the 2016 Term Loan.[3]

12. The amounts that each client received were identical to the outstanding principal and accrued interest owed under the 2016 Term Loans as of August 11, 2020. The specific amounts owed to and received by the clients are as follows:[4]

| Lender Name | Amount of Principal Outstanding as of August 11, 2020 ($) | Amount of Accrued Interest Outstanding as of August 11, 2020 ($) | Total Amount of Principal and Interest Outstanding as of August 11, 2020 ($) | Total Wire Payment by Citibank on August 11, 2020 ($) |
|---|---|---|---|---|
| GREYWOLF CLO IV, LTD. (RE-ISSUE) | 4,812,500.00 | 42,042.53 | 4,854,542.53 | 4,854,542.53 |
| GREYWOLF CLO II, LTD. | 3,888,888.89 | 33,973.77 | 3,922,862.66 | 3,922,862.66 |
| GREYWOLF CLO V, LTD. | 7,218,750.00 | 63,063.80 | 7,281,813.80 | 7,281,813.80 |

---

[3] *See, e.g.*, DX-0880.
[4] *See, e.g.*, DX-0783, DX-0657, DX-0655.

13. The transfers were not accompanied by any notice of mistake nor other documentation indicating that the funds had been sent in error.

14. I learned of the August 11 payments on the 2016 Term Loans, and that Citibank circulated notices the following day claiming those payments had been made by mistake, on the morning of August 13, 2020. That morning, I participated in a conference call with other managers whose clients were 2016 Term Lenders and with Quinn Emanuel, which had previously been retained by UMB Bank. During that call, I emailed my colleagues to seek confirmation as to whether our clients had been paid on the 2016 Term Loans.

15. Specifically, at 11:05 a.m. EDT that morning, I emailed my colleagues Michael Josephson and Milan Bull (and copied my colleague Bill Troy), asking them if Greywolf's CLOs had received payments pursuant to the 2016 Term Loans. A true and correct copy of this email is included in DX-0630. Not receiving a response, I followed up again with these same colleagues at 11:08 a.m. EDT. A true and correct copy of this email is included in DX-0628. At 11:10 a.m. EDT, I followed up again with these same colleagues and instructed my colleagues not to send any money back. A true and correct copy of this email is included in DX-0629.

16. By 11:14 a.m. EDT, I still did not receive a response, so at that time I followed up with another email to these same colleagues, but I also added my colleagues Ryan Roudenis and Andrew Marcellus to the email thread, and also copied our "Settlements" email list. *See* DX-0630. In that email, I instructed my colleagues not to send any money back from the Revlon term loan paydown. If Greywolf's clients were paid the amount outstanding on their loans, and those payments had not been made in error, then clearly Greywolf's CLOs were entitled to retain those monies. And even if Citibank had made those payments in error—something I was skeptical of—I believed Greywolf may have had the right to retain that money given it was

5

exactly the amount owed to Greywolf's CLOs, but I wanted to consult with counsel and others in my organization prior to making any final determination.

17. Not hearing anything, I called Mr. Josephson sometime between 11:15 a.m. and 11:30 a.m. EDT to ask him to reach out to Virtus regarding the 2016 Term Loans paydown.

18. At approximately 11:40 a.m. ET on August 13, 2020, Mr. Josephson forwarded me an email from Virtus which described that two of our three CLOs that held 2016 Term Loans had been fully paid down under the 2016 Term Loans. A true and correct copy of this email is included in DX-1107. I understood from the email that Virtus had sent back funds to Citibank that had been received by Greywolf CLO IV, which I believed was in response to the error notice that Citibank had sent by that time. Virtus sent this money back without Greywolf's approval. If Virtus had asked, I would not have approved a return of funds to Citibank. A little later that day, I learned that Greywolf CLO II had in fact received a full pay down under the 2016 Term Loans.

V. **Prior to Citibank's Recall Notice, I Would Not Have Believed the Payments Were Mistaken**

19. Prior to receiving Citibank's "error notices," I would not have believed that the payments had been made by mistake. As detailed above, the payments were received, and accepted for deposit into our clients' accounts, late in the day on August 11, 2020. The payments were made without any accompanying "error notice," and without any other indication of a mistake. While I personally learned of those payments at around the same time that I learned that Citibank, the day after the August 11 payments, had sent notices claiming that the funds had been sent by mistake, I certainly would not have believed that a mistake had occurred in the absence of those notices. That is because there were several reasons that the August 11 payments appeared to be intentional paydowns of the 2016 Term Loans.

      a.      **The payments were received in the middle of an interest period, which is highly indicative of a prepayment of the loan**

20. Each client that received a payment on August 11, 2020, received the exact amount that was owed to that client—precisely the amount of outstanding principal and accrued interest to that date. To me, that would have provided a strong indication that Revlon was intentionally paying down the full loan to each lender that received payments.

21. Indeed, I would not have believed that Citibank would have accidentally paid our clients, or the larger universe of lenders who held 2016 Term Loans, exactly the amounts they were owed in principal and interest on outstanding loans. In my entire career, I don't recall having ever seen an accidental complete prepayment of a syndicated loan.

22. Interest was not scheduled to be paid on the 2016 Term Loans until the end of August. There was no interest payment scheduled on August 11, 2020. Nevertheless, in connection with the August 11 Transfer, Citibank sent a notice saying that interest was "due." *See, e.g.*, DX-0865.

23. The only apparent reason that interest would have become "due" on August 11 under these circumstances is if the full loan was being paid down. In my experience, it is not uncommon for a loan to be prepaid; and, when it is, interest becomes due and is typically paid at the same time.

      b.      **I presume that Citibank, a huge, sophisticated financial institution, has many protections in place to prevent sending out significant erroneous payments.**

24. I have long presumed that Citibank, as one of the largest and most sophisticated financial institutions in the world, has multiple levels of internal controls and safeguards in place to prevent significant mistaken payments.

25. Absent Citibank's assertion of error that I learned about on August 13, 2020, it would have seemed far more likely to me that Citibank had made the August 11 payments on

7

purpose, than that Citibank had accidentally transferred tens of millions of dollars to multiple lenders in the exact amounts they were owed.

      c.    **Revlon's alleged liquidity issues would not have led me to believe that the paydown was a mistake.**

26.    On August 11, I was aware of other facts relevant to Revlon that suggested prepayment of the 2016 Term Loans was quite plausible, regardless of any financial difficulties Revlon was reported to be having in that period. Thus, once again, prior to Citibank's assertion of error, there was no reason for me to contemplate that the payments were made in error.

27.    As an initial matter, Greywolf's clients were paid a total of $15,920,138.89, which was well within the amount that a large company like Revlon, even with its financial strains, could have paid, without much difficulty.

28.    Another reason I would not have considered an intentional prepayment to have been implausible is because it was certainly possible that Revlon could have raised the capital to pay off the Term Loans. For example, I was aware that, as recent as May 2020, Revlon raised over $800 million despite reported liquidity constraints.

## VI.    The Revlon Term Loan Paydown is Currently Being Held Pending Resolution of this Lawsuit.

29.    As discussed above, I would have had no reason to believe that the August 11 payments were made in error without Citibank's error notices. However, having received Citibank's error notices, it was apparent to me that Citibank was claiming it was entitled to the return of the funds and that there may be a dispute, even possibly litigation.

30.    Therefore, the money has been frozen until the issue is sorted out, and, indeed, the funds now remain in suspense pursuant to a Temporary Restraining Order issued in this case on or around August 20, 2020.

VII. **Greywolf's Direction to UMB Bank Was Unrelated to the August 11 Payments**

31. The filing of the UMB action against Revlon, Citibank, and others and the accompanying notice of acceleration on August 12, 2020, was not an indication that managers like Greywolf knew the 2016 Term Loans had not been paid off as of that date.

32. Greywolf signed and submitted forms directing UMB to commence the action and accelerate the 2016 Term Loans on August 6, 2020. The direction to UMB occurred well before the August 11 payments and, of course, that direction was wholly unrelated to payments that were not made until five days later. At the time the UMB complaint was filed, I was not even aware – and I do not believe that anyone at Greywolf was aware – of the August 11 payments.

\* \* \*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*[Rest of page intentionally left blank – signature on next page]*

9

Dated:  November 12, 2020
       Harrison, New York


_____
Steven Abrams