UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re:*  *Citibank August 11, 2020 Wire Transfers* | Case No. 1:20-cv-06539 (JMF)  **DECLARATION OF SCOTT CROCOMBE** |

### DECLARATION OF SCOTT CROCOMBE

I, Scott Crocombe, being duly sworn, state the following under penalty of perjury:

1. I am a resident of the State of Connecticut, over the age of 18, and competent to make this statement.

### I. Introduction

2. I am a Managing Director in the public credit team at HPS Investment Partners, LLC ("HPS"). I joined HPS in September of 2019. I submit this declaration as my testimony in support of HPS's defense to claims asserted by Citibank, N.A. ("Citibank") in this action.

3. I have first-hand knowledge of the facts set forth in this declaration. Among other things described below, I am familiar with our clients' holdings in 2016 Revlon Term Loans and their role as lenders to Revlon, as well as the events surrounding Citibank's transfer of funds in repayment of those loans on August 11, 2020.

4. The HPS personnel who were processing the August 11 transfer on the morning of August 12, made no indication to me or, as far as I am aware, anyone else at HPS, that those payments were made by mistake, as I would have expected had they perceived such an occurrence. When I learned that some of the 2016 Term Lenders not advised by HPS had received payments, I did not think the payments would have been the result of an error by Citibank. When I later received confirmation that Citibank had in fact paid down the accounts

1

of clients managed by HPS, I also learned that Citibank, a day after the August 11 Transfer, had sent notice asserting that the payments were made in error. But for those notices, I would not have thought that the transfer could have occurred by mistake.

II. **Background**

5. By way of background, HPS specializes in credit investments, both private and public. We manage various strategies across the capital structure that range from syndicated leveraged loans and high yield bonds to privately negotiated senior secured debt and mezzanine investments. HPS invests money on behalf of its clients, which include a wide array of entities such as insurance companies, Collateralized Loan Obligations ("CLOs"), and managed investment funds.

6. Our clients' money and investments are not held by HPS itself, but by client entities, which are separate from HPS (each a "Client Fund" and collectively, the "Client Funds"). The Client Funds receive funds when their investments receive cash distributions. The Client Funds are not HPS subsidiaries; HPS or an HPS affiliate[1] has a contractual relationship with each of them, which is distinct for each Client Fund depending on the terms in the investment management agreement ("IMA") or collateral administrative agreement ("CAA") that we have negotiated with the client. True and correct copies of the investment management agreements or collateral management agreements, as applicable, governing HPS's relationships with each Client Fund that is a 2016 Term Lender are attached to this declaration.[2]

---

[1] In some instances, an HPS affiliate, rather than HPS, enters into an investment management agreement with a Client Fund.

[2] DX-0148 (Collateral Administration Agreement among Highbridge Loan Management 2013-2, Highbridge Principal Strategies, and Bank of New York Mellon), DX-0153 (Investment Management Agreement between Highbridge Principal Strategies and Highbridge Loan Management 3-2014); DX-0154 (Collateral Administration Agreement among Highbridge Loan Management 3-2014, Highbridge Principal Strategies, and Bank of New York Mellon); DX-0166 (Investment Management Agreement between Zurich American Life Insurance and Highbridge Principal Strategies); DX-0167 (Collateral Administration Agreement among Highbridge Loan Management 4-

7.      The Client Funds that held the 2016 Term Loan include certain private funds, CLOs and separately managed accounts ("SMAs").

8.      In my role as a Managing Director in the public credit team, I work with our public credit research analysts to vet and execute investment ideas. I also assist in managing various public credit portfolios for different Client Funds. My responsibilities include analyzing which borrowers to advance credit to and, if necessary, administering the enforcement of our clients' rights and remedies, among other things.

III.    **The Revlon 2016 Term Loans**

9.      In 2016, Revlon issued approximately $1.8 billion of debt pursuant to the 2016 Credit Agreement. A true and correct copy of the 2016 Credit Agreement is DX-1033. At the outset, and for several years thereafter, Citibank was appointed and served as the lenders' agent under the 2016 Credit Agreement.

---

2014, Highbridge Principal Strategies, and US Bank, N.A.); DX-0185 (Investment Management Agreement between Zurich American Insurance and Highbridge Principal Strategies); DX 0189 (Collateral Administration Agreement among Highbridge Loan Management 6-2015, Highbridge Principal Strategies, and US Bank, N.A.); DX 0192 (Collateral Administration Agreement among Bank of America, N.A., Watford Asset Trust I, and US Bank, N.A.); DX 0203 (Investment Management Agreement between Arch Investment Holdings IV LTD and Highbridge Principal Strategies); DX 0204 (Investment Management Agreement between Highbridge Principal Strategies., LLC and Highbridge Loan Management 7-2015, Ltd.); DX 0205 (Collateral Administration Agreement among Highbridge Loan Management 7-2015, Highbridge Principal Strategies, and Bank of New York Mellon); DX 0212 (Investment Administration Agreement between HPS Investment Partners and HPS Loan Management 9-2016); DX 0214 (Indenture among HPS Loan Management 9-2016, Ltd, HPS Loan Management 9-2016, LLC, and US Bank, N.A.); DX 0215 (Collateral Administration Agreement among Highbridge Loan Management 9-2016, HPS Investment Partners, and US Bank, N.A.); DX 0226 (Collateral Administration Agreement among Highbridge Loan Management 9-2016, HPS Investment Partners, and US Bank, N.A.); DX 0227 (Administration Agreement between Citibank, N.A. and HPS Loan Management 10-2016); DX 0228 (Investment Management Agreement between HPS Investment Partners, LLC, and HPS Loan Management 10-2016); DX 0229 (Indenture among HPS Loan Management 10-2016 Ltd, HPS Loan Management 10-2016 LLC, and Citibank, N.A. ); DX 0230 (Management Agreement among HPS Investment Partners, Cardinal Fund, and HPS GP); DX 0239 (Investment Management Agreement between HPS Investment Partners, LLC, and HPS Loan Management 11-2017); DX 0240 (Indenture among HPS Loan Management 11-2017 Ltd, HPS Loan Management 11-2017 LLC, and US Bank, N.A. ); DX 0242 (Collateral Administration Agreement among HPS Loan Management 11-2017 Ltd., HPS Investment Partners CLO (US), and US Bank, N.A.); DX 0253 (Administrative Agreement between Highbridge - GIM Credit and BNP Paribas Securities); DX 0262 (Investment Management Agreement between Highbridge Principal Strategies, LLC and Highbridge Loan Management 4-2014, Ltd.); DX 1028 (Indenture among Highbridge Loan Management 7-2015 Ltd, Highbridge Loan Management 7-2015 LLC, and Bank of New York Mellon).

10. Revlon granted extensive liens on its assets to serve as security for the 2016 Term Loans. The collateral included a first-priority lien on some of Revlon's most valuable assets—the intellectual property of Revlon's various brands.

11. As of August 11, 2020, approximately 18 clients for which HPS acts as investment manager held 2016 Term Loans. Those clients, accordingly, were lenders to Revlon at that time. HPS's clients held approximately $134,073,920.65 of the 2016 Term Loans.

IV. **The Revlon 2016 Term Loans are Paid Down on the Evening of August 11, 2020**

12. At approximately 4:45 P.M. EDT on the afternoon of August 12, I spoke to my colleague Rolando Villanueva, a Co-Portfolio Manager of the HPS Large Cap Loan portfolios on a phone call. We discussed his learning that some of the 2016 Term Lenders not advised by HPS, including those advised by Investcorp, had been paid off. He also said he was checking with Marc Sikoscow, one of our traders, to see whether HPS's Client Funds were paid off too. Mr. Sikoscow had not yet responded to this inquiry.

13. At this time, I did not think that any payments to other 2016 Term Lenders or any payments to HPS's Client Funds on behalf of the 2016 Term Loans would have been the result of an error by Citibank. Rather, I considered possible reasons as to why Revlon was paying off certain Term Loans. In particular, I thought it was possible that Revlon was strategically paying off the loans of certain of the 2016 Term Lenders, because a majority of the 2016 Term Lenders, including HPS (on behalf of its clients), had objected to a transaction Revlon advanced in May 2020 in which Revlon transferred away the 2016 Term Lenders' collateral (the "May 2020 Transaction"), and were planning to file suit. By paying off or purchasing the loans of select 2016 Term Lenders, Revlon could, in theory, reduce below 50% the 2016 Term Lenders who could otherwise direct their successor administrative agent, UMB Bank, to file suit. Indeed, in connection with the May 2020 Transaction, Revlon had similarly sought to influence the

4

accounting for a majority of the 2016 Term Lenders by creating a new loan facility for the purpose of impacting the vote.  Mr. Villanueva and I discussed the matter for approximately fifteen minutes.

14.    At or around 5:00 P.M. EDT, on a separate phone call, Mr. Sikoscow notified me that the entire balance of the 2016 Term Loans held by HPS's Client Funds had been paid off on the evening of August 11, and that Citibank sent a message to HPS on the afternoon of August 12 claiming that the principal portion of the payments had been made in error.  Prior to hearing about those notices, I did not think that the August 11 Transfer could have occurred by mistake.

V.    **HPS Authorized Filing of the UMB Action, on Behalf of Its Clients, on July 31, 2020**

15.    I understand that Citibank has alleged that UMB filed the action on August 12 to somehow take advantage of the fact that Citibank had paid down the 2016 Term Loans.  I disagree with the premise of this assertion.  For many weeks prior to the August 11, 2020 payments on the 2016 Term Loans, HPS and other 2016 Term Lenders were planning to instruct UMB Bank, the successor administrative agent under the 2016 Credit Agreement, to exercise rights and remedies, including filing a lawsuit against Revlon, Citibank, and other parties with respect to the May 2020 Transaction.  I believe that Citibank should have been aware that many of the 2016 Term Lenders were unhappy with the May 2020 Transaction and were preparing an impending lawsuit.  Various constituencies of the 2016 Term Lenders declared an event of default prior to the May 2020 Transaction, demanded that Citibank (at that time, the lenders' administrative agent) not facilitate the May 2020 Transaction; appointed UMB as successor agent; and refused to approve Citibank's inappropriate demands for a release.  Moreover, the dispute was covered in the press.

16.    On July 31, 2020, HPS provided UMB Bank direction and indemnification letters to: (1) file a complaint against Citibank and Revlon for the illegal transfer of collateral, (2) notice

an event of default under the 2016 Credit Agreement, and (3) accelerate the outstanding obligations under the 2016 Term Loan.  My understanding was that this direction would be acted on by UMB Bank as soon as practicable after HPS provided the direction, including when a majority of 2016 Term Lenders had submitted similar direction.  Of course, the 2016 Term Loans had not been paid off when HPS authorized the UMB Action on July 31, 2020.

17. On the morning of August 12, I understood that UMB Bank was prepared to commence legal action, having received direction from a majority of 2016 Term Lenders.  My understanding was that the complaint was being filed shortly after 12:00 P.M. EDT that day.  At approximately 2:00 P.M. EDT, I received confirmation that the complaint had been filed.

18. Although others at HPS knew that the funds had been received on the morning of August 12, neither I nor, to my knowledge, any of the HPS representatives that were involved with directing the UMB Action knew of the August 11 payments prior to the filing of the complaint.  HPS's direction to file the UMB Action was not related in any way to the receipt of August 11 payments or the discharge of the 2016 Term Loans.

*   *   *

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: November 12, 2020
       Westport, CT

_____
Scott Crocombe