UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re:* <br><br> *Citibank August 11, 2020 Wire Transfers* | Case No. 1:20-cv-06539 (JMF) <br><br> **DECLARATION OF JOHN GREENE** |

### DECLARATION OF JOHN GREENE

I, John Greene, being duly sworn, state the following under penalty of perjury:

1.    I am a resident of the State of Maryland, over the age of 18, and competent to make this statement.

I.    **Introduction**

2.    I am a Partner and Portfolio Manager at Bardin Hill Investment Partners LP ("Bardin Hill"). I have worked at Bardin Hill since 2001 and have been a partner for ten years. I submit this declaration as my testimony in support of Bardin Hill's defense to claims asserted by Citibank, N.A. ("Citibank") in this action.

3.    I have first-hand knowledge of the facts set forth in this declaration. Among other things described below, I am familiar with our clients' holdings in the 2016 Term Loans and their role as lenders to Revlon, as well as the events surrounding Citibank's transfer of funds in repayment of those loans on August 11, 2020.

4.    I want to be clear upfront that at the time Citibank made payments to Bardin Hill's clients on August 11, 2020, there was no indication that those payments were a mistake. And when I first learned of those payments the following afternoon, it was my belief that they were intentional paydowns of our clients' 2016 Term Loans. The first time I considered that a mistake was even a possibility was when I later learned that Citibank had circulated notices approximately 20 hours after the transfers asserting the payments were made in error.

1

II.     **Background**

5.      Subsidiaries of Bardin Hill are collateral managers for certain collateralized loan obligations ("CLOs"). Bardin Hill's affiliated management companies manage investments for the CLOs. Ten CLOs managed by Bardin Hill affiliates invested in the 2016 Term Loans. The CLOs (which I will refer to as "clients") are Halcyon Loan Advisors Funding ("HLA") 2013-1 Ltd., Halcyon Loan Advisors Funding 2013-2 Ltd., Halcyon Loan Advisors Funding 2014-1 Ltd., Halcyon Loan Advisors Funding 2014-2 Ltd., Halcyon Loan Advisors Funding 2014-3 Ltd., Halcyon Loan Advisors Funding 2015-1 Ltd., Halcyon Loan Advisors Funding 2015-2 Ltd., Halcyon Loan Advisors Funding 2015-3 Ltd., Halcyon Loan Advisors Funding 2017-1 Ltd., and Halcyon Loan Advisors Funding 2017-2 Ltd.

6.      Our clients – including the ten CLOs that invested in the 2016 Term Loans – are not Bardin Hill subsidiaries or affiliates; we have a distinct contractual relationship with each of them. They have bank accounts at Deutsche Bank (Halcyon Loan Advisors Funding 2014-1 Ltd. and Halcyon Loan Advisors Funding 2015-2 Ltd.) and U.S. Bank (all others), which is where these ten clients received payments from Citibank on August 11, 2020.[1]

7.      In my role as a portfolio manager, I manage a portfolio of credit investments for different clients. I helped evaluate the investment in the 2016 Term Loans and became more involved as a result of the collateral-stripping transaction I describe below. My responsibilities include, for example, analyzing whether and when to invest in various debt instruments (such as

---

[1] True and correct copies of the collateral management agreements ("CMAs") and indentures governing Bardin Hill affiliates' relationships with each lender are available at DX-0141 (HLA 2013-1 CMA); DX-0142 (HLA 2013-1 Indenture); DX-0144 (HLA 2013-2 CMA); DX-0145 (HLA 2013-2 Indenture); DX-0156 (HLA 2014-1 CMA); DX-0157 (HLA 2014-1 Indenture); DX-0160 (HLA 2014-2 CMA); DX-0161 (HLA 2014-2 Indenture); DX-0169 (HLA 2014-3 CMA); DX-0170 (HLA 2014-3 Indenture); DX-0188 (HLA 2015-1 CMA); DX-0191 (HLA 2015-1 Indenture); DX-0193 (HLA 2015-2 CMA); DX-0194 (HLA 2015-2 Indenture); DX-0198 (HLA 2015-3 CMA); DX-0199 (HLA 2015-3 Indenture); DX-0238 (HLA 2017-1 CMA); DX-0243 (HLA 2017-1 Indenture); DX-0259 (HLA 2017-2 CMA); DX-0260 (HLA 2017-2 Indenture).

the 2016 Term Loans at issue in this case), assessing whether our clients should join syndicates relating to these loans, determining if and when such loan obligations should be sold and at what price, and, if necessary, directing litigation concerning these loan obligations to enforce our clients' rights. In particular, I specialize in stressed and distressed investments.

III. **The Revlon 2016 Term Loans**

8. The ten CLOs managed by Bardin Hill affiliates that held 2016 Term Loans on August 11, 2020, were lenders to Revlon at that time. Out of the entire facility, Bardin Hill's clients held approximately $45,624,008.29 of the 2016 Term Loans.[2]

9. The 2016 Term Loan was issued in connection with Revlon's acquisition of Elizabeth Arden, and was secured by, among other things, Revlon's intellectual property. Bardin Hill's clients purchased the 2016 Term Loans between July 22, 2016 and October 27, 2017.

10. The last scheduled interest payment under the 2016 Term Loan before the August 11 payments was on May 29, 2020. Following the May interest payment, the next day on which interest was due under the 2016 Term Loan was August 28, 2020.

11. I did not know, prior to this litigation, that Revlon was planning to repurchase 2016 Term Loans from select lenders on August 11, 2020, or that it was planning any interest payment in connection with such a transaction. Citibank never provided any notice to Bardin Hill that such repurchases were going to occur or that interest was being paid in connection with repurchases.

---

[2] True and correct copies of the interest calculation statements showing each client's holdings are included in DX-0612 at BARDIN_CITI_00000659 (HLA 2013-1); DX-0612 at BARDIN_CITI_00000657 (HLA 2013-2); DX-0637 at BARDIN_CITI_00000666 (HLA 2014-1); DX-0612 at BARDIN_CITI_00000654 (HLA 2014-2); Citi00005250 (HLA 2014-3); Citi00004577 (HLA 2015-1); Citi00004701 (HLA 2015-2); Citi0004723 (HLA 2015-3); Citi00004732 (HLA 2017-1); Citi00004741 (HLA 2017-2).

12. By the time of the August 11 transfers, I was familiar with actions that Citibank and Revlon had taken in prior months to the detriment of the 2016 Term Lenders. Specifically, Citibank and Revlon had taken steps to strip away the collateral securing payment of the 2016 Term Loans. In August 2019, Revlon borrowed $200 million from a third party and pledged collateral for this new loan by transferring some of the intellectual property securing the 2016 Term Loan to subsidiaries whose assets did not secure the 2016 Term Loan. In May 2020, Revlon undertook a much larger collateral-stripping transaction, this time working with Citibank to amend the 2016 Credit Agreement to authorize such a transaction, notwithstanding opposition by a majority of the 2016 Term Lenders. In order to effect the amendment and transaction over the objection of those lenders, Revlon, with Citibank's assistance, created new loans so that the new lenders could vote on the amendment authorizing the collateral stripping, thereby obtaining the required 50% consent. Fifteen business days later, Revlon terminated the new loans. This collateral-stripping transaction was the subject of a separate lawsuit filed by UMB Bank as successor agent to Citibank against Revlon, Citibank, and others.

## IV. **The August 11 Transfer**

13. On the afternoon of August 11, 2020, around 5:30 p.m. EDT, all ten of the CLOs holding 2016 Term Loans received wire transfers equal to their respective outstanding principal and interest. The funds were accepted for deposit into each of the clients' accounts at either Deutsche Bank or U.S. Bank.

14.     The description in the wire transfers stated that the payments were in connection with the 2016 Term Loan.[3]  The approximate amounts owed to and received by the clients are as follows:

| Lender Name | Principal Outstanding as of August 11, 2020 | Accrued Interest Outstanding as of August 11, 2020 | Total Payment by Citibank on August 11, 2020 |
|---|---|---|---|
| Halcyon Loan Advisors Funding 2013-1 Ltd. | $2,117,500.00 | $18,498.72 | $2,135,998.72 |
| Halcyon Loan Advisors Funding 2013-2 Ltd. | $6,164,712.46 | $53,855.61 | $6,218,568.07 |
| Halcyon Loan Advisors Funding 2014-1 Ltd. | $5,185,038.90 | $45,297.08 | $5,230,335.98 |
| Halcyon Loan Advisors Funding 2014-2 Ltd. | $7,139,849.73 | $62,374.52 | $7,202,224.25 |
| Halcyon Loan Advisors Funding 2014-3 Ltd. | $7,374,070.29 | $64,420.70 | $7,438,490.99 |
| Halcyon Loan Advisors Funding 2015-1 Ltd. | $4,857,005.00 | $42,431.34 | $4,899,436.34 |
| Halcyon Loan Advisors Funding 2015-2 Ltd. | $4,895,506.49 | $42,767.69 | $4,938,274.18 |
| Halcyon Loan Advisors Funding 2015-3 Ltd. | $4,911,086.54 | $42,903.80 | $4,953,990.34 |
| Halcyon Loan Advisors Funding 2017-1 Ltd. | $1,600,452.38 | $13,981.73 | $1,614,434.11 |
| Halcyon Loan Advisors Funding 2017-2 Ltd. | $1,378,786.51 | $12,045.23 | $1,390,831.74 |

15.     The transfers were sent by wire to the same banks, and same accounts, as all past payments by Citibank in connection with the 2016 Term Loans.  The transfers were not accompanied by any notice of mistake or other documentation indicating that the funds had been sent in error.

16.     Deutsche Bank and U.S. Bank applied the full payments for all ten CLOs to the 2016 Term Loan.  Deutsche Bank then also applied the payments for Halcyon Loan Advisors

---

[3] True and correct copies of the transaction confirmations are available at DX-0873 at Citi00005263 (HLA 2013-1); DX-0869 at Citi00005269 (HLA 2013-2); DX-0867 at Citi00005277 (HLA 2014-1); DX-0868 at Citi00005285 (HLA 2014-2); DX-0862 (HLA 2014-3); DX-0872 (HLA 2015-1); DX-0874 (HLA 2015-2); DX-0875 (HLA 2015-3); DX-0870 (HLA 2017-1); DX-0871 (HLA 2017-2).

Funding 2014-1 Ltd. and Halcyon Loan Advisors Funding 2015-2 Ltd. on August 11, 2020 to the principal and interest sub-accounts.

17. I first became aware that Bardin Hill clients received wires related to the 2016 Term Loan on the afternoon of August 12, 2020. My colleague Phil Raciti called me at around 6:00 p.m., EDT. In this initial call, Mr. Raciti told me that all of our CLOs had been fully paid down by Revlon on August 11, 2020. I was surprised to hear about the payment since we had not been expecting to be paid down that day, but I immediately thought that the payment was related to the UMB Action.

18. At this time, I believed the UMB complaint had been filed prior to the receipt of the payments, as Bardin Hill had authorized the filing on August 10. Starting from that understanding, I thought that perhaps Citibank had agreed to assist Revlon with the May collateral-stripping transaction only in return for a large indemnity from Revlon or its sponsor, Ronald Perelman. I thought that the filing of the lawsuit had perhaps triggered the indemnity and caused Mr. Perelman or one of his portfolio companies to kick in money to pay off the 2016 Term Loan.

19. I did not know at the time I learned of the paydown that all lenders had been repaid. So I also thought it was possible that perhaps Revlon – similar to when it had issued new loans in order to manipulate the vote on amending the Credit Agreement in May 2020 – was trying to "pick off" smaller lenders to prevent a majority of lenders from authorizing UMB to proceed with the suit. None of the theories I discussed with Mr. Raciti involved the possibility that Citibank had sent the funds by mistake.

20. While I thought of various possible reasons for the decision by Revlon and Citibank to pay down the Term Loans, I did not view it as a possibility that Citibank had made

the transfers by mistake. Although I now know that my conversation with Mr. Raciti, in which we discussed the above possible motivations for Citibank and Revlon to pay down the Term Loans, took place after Bardin Hill clients received recall notices, I did not know about those notices at the time of this conversation.

21. On my call with Mr. Raciti, we also discussed a few other ideas about why Revlon had paid us down, but the indemnity theory seemed most likely to me at the time. In my experience with restructuring work and distressed assets, agent banks and trustees do not take aggressive actions that could place them at risk for litigation without indemnities. I have never seen an agent bank act as aggressively as Citibank did in connection with the May collateral-stripping transaction, so it was (and still is) my belief that Citibank received an indemnity from some combination of parties involved in the transaction.

V. **Citibank's "Error" Notices**

22. I first became aware that Citibank was claiming the payments were made by mistake when I saw an article or blog post from the Wall Street Journal on August 13, 2020,[4] stating that Citibank had was asserting that the funds were paid by mistake.[5] I then confirmed internally that Bardin Hill had received error notices.

23. Of course, based on what Citibank was claiming, I began to consider, for the first time, that it might be possible that the payment was made in error. But there were several reasons that such an error still seemed unlikely, particularly because Citibank did not provide any explanation for its supposed mistake.

---

[4] At my deposition, I testified that the first I became aware of a mistake was after reading an "article or blog in the Wall Street Journal" on the night of August 12th. *Id.* 68:24-69:13. After my deposition, I recalled that I read the article on the 13th rather than on the 12th.

[5] A true and correct copy of the article I read is available at DX-1126 (Becky Yerak and Alexander Gladstone, *Citigroup Pays Revlon Lenders Nearly $900 Million by Mistake*, Wall Street Journal, (Aug. 13, 2020 8:42 p.m. ET), https://www.wsj.com/articles/citigroup-pays-revlon-lenders-nearly-900-million-by-mistake-11597360983.)

24. For instance, there was no interest payment due on August 11, 2020, yet Bardin Hill's clients received interim interest payments with principal in full. In my experience, the most likely reason for an off-period interest payment is a pre-payment. Indeed, under the Credit Agreement, the only reason for an interest payment on August 11 would be if Revlon were paying principal at that time. And the statement that accompanied the full principal payment said that interest was "due" that day, which would be the case only if Revlon were prepaying principal then.

25. I also find it difficult to believe that a bank like Citibank could accidentally transmit large sums of money, particularly in the specific amounts owed to the recipients. In my entire career, I have never seen any financial institution make any comparable mistake.

26. It became apparent to me and my colleagues, based on Citibank's "error" notices, that Citibank was claiming it was entitled to the return of the funds and that there would be a dispute, even possibly litigation. Therefore, in order to be prudent, Bardin Hill instructed Deutsche Bank and U.S. Bank to freeze the August 11 payments in place in unapplied wires accounts belonging to each client on August 13, so that the money would be frozen until the issue was sorted out. The funds now remain in those accounts pursuant to a Temporary Restraining Order issued in this case on August 21, 2020. As part of the decision to freeze the payments, Deutsche Bank's application of funds to the principal and interest sub-accounts was reversed on August 13, 2020 in anticipation of possible litigation, and not because Bardin Hill considers the 2016 Term Loan to still be outstanding.

27. I consider the 2016 Term Loans to be paid off for all Bardin Hill clients, and indeed generally view loans as paid off upon receipt of the outstanding amounts owed.

VI. **Prior to Citibank's Recall Notice, There Was No Reason to Believe the Payments Were Mistaken**

28. There were many reasons that it seemed clear, prior to Citibank sending its error notices on August 12, that the August 11 transfer was an intentional pre-payment on the Term Loans. As detailed above, the payments were received, and accepted for deposit into our clients' accounts, late in the day on August 11, 2020. The payments were made without any accompanying "error notice," and without any other indication of a mistake.

29. As explained above, as soon as I learned that our clients had received the funds, I immediately viewed the payments as a full paydown on the loans, and thought of a number of reasons that might explain Revlon's decision to make those paydowns. In this period, it did not even occur to me that Citibank would have, or could have, sent the money by mistake.

30. It was not until approximately 20 hours after the payments were made that Citibank started sending notices claiming that the payments were mistaken. It would not have even seemed plausible, but for those notices, that the payment had occurred by mistake.

   a. **The payments were in the exact amount of outstanding principal and accrued interest owed to each client that was a Revlon lender**

31. Each client that received a payment on August 11, 2020, received the exact amount that was owed to that client—precisely the amount of outstanding principal and accrued interest to that date. To me, that provided strong indication that Revlon was intentionally paying down the full loan to each lender that received payments.

32. Indeed, it would have been inconceivable to believe that Citibank would have accidentally paid lenders exactly the amounts they were owed in principal and interest on outstanding loans. In my entire career, I have never before seen an accidental complete prepayment of a syndicated loan across multiple clients.

b. **The payments were received in the middle of an interest period, which is highly indicative of a prepayment of the loan**

33. As I discuss above, interest was not scheduled to be paid on the Term loans until the end of August. There was no interest payment scheduled on August 11, 2020. Nevertheless, the August 11 transfer was accompanied by a notice saying that interest was "due." In my experience, interim interest is only paid when there is a prepayment of the loan or an update or amendment to the contract. Given that the payment included the exact amount of outstanding principal along with the interest amount, it seemed obvious that, of those possibilities, this was a full prepayment of the loan. In my experience, most loans are prepaid; and, when they are, interest becomes due and is typically paid at the same time.

34. The fact that the August 11 transfer did not also have accompanying principal payment notices would not signal that the transfer had happened by mistake. As explained above, the payment of interim interest, with notices saying that interest was "due," is consistent with a corresponding payment of principal. In any case, it is not uncommon for payment notices to be sent after a payment is made, including up to several days later. In my experience, it is very rare that such a payment turns out to have been made in error, and the absence of a notice therefore does not signal to me that a transfer occurred by mistake.

c. **I presumed that Citibank, a huge, sophisticated financial institution, has many protections in place to prevent sending out erroneous payments.**

35. I have long presumed that Citibank, as one of the largest and most sophisticated financial institutions in the world, has multiple levels of internal controls and safeguards in place to prevent mistaken payments.

36. Absent Citibank's assertion of error, it would seem far more likely to me that Citibank had made the August 11 payments on purpose but without a contemporaneous notice,

10

than that Citibank had accidentally transferred tens of millions of dollars to multiple lenders in the exact amounts they were owed.

### d. **Revlon's alleged liquidity issues did not suggest that the payment was a mistake.**

37. It would also be entirely plausible that Revlon could pay the Term Loans, regardless of its financial difficulties.  As an initial matter, Bardin Hill's clients were paid a total of $45,624,008.29, which was well within the amount that a large company like Revlon, even with its financial strains, could have paid, without much difficulty.

38. Another reason I did not think that prepayment was implausible is because it was certainly possible that Revlon could have raised the capital to pay off the 2016 Term Loans. Indeed, as recent as May 2020, Revlon raised nearly $1 billion despite reported liquidity constraints.  I am aware that, in connection with that transaction, Revlon publicly reported that it satisfied approximately $953 million of 2016 Term Loans at par, repaid at par a $200 million term loan issued in 2019, including a "make whole" premium, repurchased at par approximately $50 million of unsecured bonds, and, several weeks thereafter, repaid at par (and prior to maturity) a $65 million revolver.  Revlon, and its long-time sponsor, Ronald Perelman, are famous for effecting strategic transactions, and keeping Revlon alive and out of bankruptcy. Indeed, the price for Revlon's publicly-traded common stock on August 11 reflected hundreds of millions of dollars of market capitalization, which suggests at least the potential to satisfy all of Revlon's liabilities in full.

## VII. **Bardin Hill's Direction to UMB Bank Was Unrelated to the August 11 Payments**

39. I also understand that Citibank has argued that that the filing of the UMB action against Revlon, Citibank, and others and the accompanying notice of acceleration on August 12,

2020, was an indication that managers like Bardin Hill knew the 2016 Term Loans had not been paid off as of that date. That is wrong.

40. Bardin Hill signed and submitted forms directing UMB to commence the action and accelerate the 2016 Term Loans on August 10, 2020. The direction to UMB occurred before the August 11 transfer and, of course, was wholly unrelated to payments that were made the following day. At the time the UMB complaint was filed, I was not aware of the August 11 transfer.

\*   \*   \*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*[Rest of page intentionally left blank – signature on following page]*

Dated: November 12, 2020
       Owings Mills, Maryland

_____
John Greene