UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

*In re:*

*Citibank August 11, 2020 Wire Transfers*

Case No. 1:20-cv-06539 (JMF)

**DECLARATION OF CATHERINE MCCOY**

## DECLARATION OF CATHERINE MCCOY

I, Catherine McCoy, being duly sworn, state the following under penalty of perjury:

1.      I am a resident of the State of Illinois, over the age of 18, and competent to make this statement.

I.      **Introduction**

2.      I am an employee of Allstate Insurance Company ("AIC") and am a Portfolio Manager with Allstate Investment Management Company ("AIMCO") and Allstate Investments, LLC ("AILLC").  AIMCO and AILLC are investment advisors and affiliates of AIC.  I have been employed by AIC since 2014 and have served as a portfolio manager for approximately five years.  I submit this declaration as my testimony in support of AIMCO's defense to claims asserted by Citibank, N.A. ("Citibank") in this action.

3.      I have first-hand knowledge of the facts set forth in this declaration.  Among other things described below, I am familiar with our clients' holdings in the 2016 Revlon Term Loans, and the events surrounding Citibank's transfer of funds in repayment of those loans on August 11, 2020.

4.      At the time Citibank made payments to bank accounts held by clients of AILLC and AIMCO on August 11, 2020, there was no indication that Citibank made those payments by mistake.  And when I first learned of those payments the following morning, it was my belief that they were an intentional paydown of our clients' Term Loans.  The first time I considered

1

that a mistaken payment was even a possibility was when I later learned that Citibank had circulated notices approximately 20 hours after the transfers were made asserting the payments were made in error.

II.     **Background**

5.      AIMCO is the collateral manager for certain collateralized loan obligations ("CLOs") and AILLC is an investment advisor for Allstate entities.  Five CLOs for which AIMCO serves as collateral manager and two insurance companies for which AILLC acts as investment adviser invested in the 2016 Term Loans.  In these roles, AIMCO and AILLC select investments for these entities consistent with the clients' investment guidelines and policies.  The entities (which I will refer to as "clients") that held the 2016 Term Loans are AIC, Allstate Life Insurance Company ("ALIC"), AIMCO CLO 2015-A, AIMCO CLO 2017-A, AIMCO CLO 2018-A, AIMCO CLO 2018-B, and AIMCO CLO 10.

6.      The client lenders – including the seven entities that invested in the 2016 Term Loans – are not AIMCO or AILLC subsidiaries; AIMCO and AILLC have a distinct contractual relationship with each of them.[1]

7.      In my role as a portfolio manager, I manage credit investments for different clients including the entities at issue in this case.  I was specifically responsible for the Revlon credit.  My responsibilities include, for example, analyzing whether and when to invest in various debt instruments (such as the 2016 Term Loans at issue in this case), determining the price at which our clients should be willing to purchase the loans, assessing whether our clients

---

[1]  True and correct copies of the collateral management agreements ("CMA") and investment management agreements ("IMA") governing AIMCO and/or AILLC's relationship with each lender are available at DX-0269 (AIC and ALIC IMA); DX-0206 (AIMCO CLO 2015-A CMA); DX-0207 (AIMCO CLO 2015-A Indenture); DX-0244 (AIMCO CLO 2017-A CMA); DX-0245 (AIMCO CLO 2017-A Indenture); DX-0270 (AIMCO CLO 2018-A CMA); DX-0271 (AIMCO CLO 2018-A Indenture); DX-0301 (AIMCO CLO 2018-B CMA); DX-0300 (AIMCO CLO 2018-B Indenture); DX-0922 (AIMCO CLO 10 CMA); DX-0923 (AIMCO CLO 10 Indenture).

should invest in a syndicated loan, determining if and when such loan obligations should be sold and at what price, and if necessary, recommending litigation concerning these loan obligations to enforce our clients' rights.

III. **The Revlon 2016 Term Loans**

8.      As of August 11, 2020, seven entities for which AIMCO and AILLC act as collateral/investment manager held 2016 Term Loans issued by Revlon under the 2016 Credit Agreement.  Those clients, accordingly, were lenders to Revlon at that time.  Out of the entire facility, AIMCO and AILLC's clients held approximately $10,544,028.76 of the 2016 Term Loans.

9.      AIMCO and AILLC's clients purchased the 2016 Term Loans between July 2016 and January 2020.

10.      The last scheduled interest payment under the 2016 Term Loan before the August 11 payments was on May 29, 2020.  Following the May interest payment, the next day on which interest was due under the 2016 Term Loan was August 28, 2020.

11.      I did not know that Revlon was conducting a selective repurchase on August 11, 2020, or planning any interest payment.  Citibank did not provide advance notice to AIMCO or AILLC that such selective repurchases were going to occur or that interest was being paid in connection with repurchases.

12.      By the time of the August 11 transfers, I was aware of events in the preceding months involving a dispute between Revlon and Citibank and the 2016 Term Lenders. Specifically, Revlon and Citibank had taken steps to strip away the collateral securing payment of the 2016 Term Loans.  In August 2019, Revlon borrowed $200 million from a third party and pledged collateral for this new loan by transferring some of the intellectual property securing the

2016 Term Loan out of reach of the 2016 Credit Agreement.  In May 2020, Revlon undertook a much larger collateral-stripping transaction, this time working with Citibank to amend the 2016 Credit Agreement to authorize such a transaction, notwithstanding opposition by a majority of the 2016 Term Lenders.  In order to effect the amendment over the objection of those lenders, Revlon and Citibank created new loans so that these new lenders could vote on the amendment authorizing the collateral stripping, and thereby cross the required 50% threshold, and then terminated those new loans.  This collateral-stripping transaction was the subject of a separate lawsuit filed by UMB Bank as successor agent to Citibank against Revlon, Citibank, and others.

IV.    **The August 11 Transfer**

13.    On the afternoon of August 11, 2020, all seven AIMCO and AILLC clients received wire transfers totaling their respective outstanding principal and accrued interest.  The funds were accepted for deposit into each clients' accounts, which are all maintained at Bank of New York Mellon.  The description in the wire transfers stated that the payments were in connection with the 2016 Term Loan.[2]

14.    The amounts that the clients received were identical to the outstanding principal and accrued interest owed under the 2016 Term Loan as of August 11, 2020.[3]  The amounts owed to and received by each client are as follows:

| Lender Name | Principal Outstanding as of August 11, 2020 | Accrued Interest Outstanding as of August 11, 2020 | Total Payment by Citibank on August 11, 2020 |
|---|---|---|---|
| AIMCO CLO 2015-A | $994,711.38 | $8,689.91 | $1,003,401.29 |
| AIMCO CLO 2017-A | $1,107,794.84 | $9,677.82 | $1,117,472.66 |

---

[2]   True and correct copies of those transfer confirmations are available at DX-0508 at Citi00029369 (AIC); DX-0509 at Citi00029377 (ALIC); DX-0606 at Citi00029353 (AIMCO CLO 2015-A); DX-0607 at Citi00029337 (AIMCO CLO 2017-A); DX-0528 at Citi00029361 (AIMCO CLO 2018-A); DX-0608 at Citi00029345 (AIMCO CLO 2018-B); DX-0036 (AIMCO CLO 10).

[3]   True and correct copies of the payment notices showing how much principal and interest was owed to each client are available at DX-0027 (ALIC); DX-0050 (AIC); DX-0051 (AIMCO CLO 2015-A); DX-0049 (AIMCO CLO 2017-A); DX-0023 (AIMCO CLO 2018-A); DX-0007 (AIMCO CLO 2018-B); DX-0009 (AIMCO CLO 10).

| | | | |
|---|---|---|---|
| AIMCO CLO 2018-A | $810,340.06 | $7,079.22 | $817,419.28 |
| AIMCO CLO 2018-B | $798,421.37 | $6,975.20 | $805,396.47 |
| AIMCO CLO 10 | $735,503.94 | $6,425.44 | $741,929.38 |
| Allstate Life Insurance Company | $760,928.88 | $6,647.56 | $767,576.44 |
| Allstate Insurance Company | $5,336,328.29 | $46,618.76 | $5,382,947.05 |

15.     The transfers were sent by wire to the same banks and accounts as all past payments by Citibank had been made in connection with the 2016 Term Loans.  The transfers were not accompanied by any notice of mistake or other documentation indicating that the funds had been sent in error.

16.     Bank of New York Mellon tagged the funds received to the 2016 Term Loan on August 11, 2020 for all five CLOs, meaning that the funds were identified as relating to the 2016 Term Loan.  Bank of New York Mellon then also applied the payments to the five CLOs to the appropriate principal and interest sub-accounts.[4]  Our bank loan operations team tagged the funds received by AIC and ALIC to the 2016 Term Loan's CUSIP identifier.

17.     I first became aware that AIC and ALIC received wires related to the 2016 Term Loan on the morning of August 12, 2020.  Kevin Roth, one of my colleagues in portfolio management, copied me on an email chain in which Chiara Feijoo, a member of our bank loan operations team, asked if we were expecting a "large unscheduled paydown on 8/11 for Revlon." A true and correct copy of this email chain is included in DX-0542 at ALLSTATE_CITI_00000058.

18.     Blake Fairbanks, another member of our bank loan operations team, then emailed us a screenshot showing the payments made to AIC and ALIC and stating that "[t]he cash

---

[4]  True and correct copies of the cash flow statements showing this application are available at DX-0621 (AIMCO CLO 2015-A); DX-0622 (AIMCO CLO 2017-A); DX-0623 (AIMCO CLO 2018-A); DX-0626 (AIMCO CLO 2018-B); DX-0404 (AIMCO CLO 10).

description noted Revlon, and the amounts appear to tie to a full paydown with interest." *Id.* at ALLSTATE_CITI_00000057-58.

19.     At first, I thought Ms. Feijoo and Mr. Fairbanks might have mistakenly reported that the insurance companies had received funds, because we were not scheduled to be paid either interest or principal and because it did not make sense that the insurance companies would receive a paydown but not the CLOs.  I replied "So strange—could this be a mistake? Did the CLO's receive the same paydown?" *Id.* at ALLSTATE_CITI_00000057.  To be clear, I did not believe that Citibank or Revlon had sent out a mistaken payment—I thought our bank loan operations team might have mistakenly reported a payment that had not actually been received.

20.     Mr. Roth then asked Ms. Feijoo and Mr. Fairbanks if there was "a Fed Reference number on the incoming wires?"  A true and correct copy of this email chain is included in DX-0494.  If there were such numbers, that would confirm that the payments had in fact been made.

21.     Mr. Fairbanks then sent us a screenshot showing the full wires, including the Fed Reference numbers.  *See* DX-0542 at ALLSTATE_CITI_00000056.  With the Fed Reference numbers in hand, I knew that Ms. Feijoo and Mr. Fairbanks had not made any mistake and that the payments had in fact been received.

22.     It was also clear to me, as soon as I knew that the money had been received, that Citibank had sent those funds as full paydowns of the 2016 Term Loans.  Indeed, Citibank had paid the exact amount of principal and interest owed to of AIC and ALIC, which caused me to conclude – in the same email chain – that it "seem[ed] very unlikely" that the funds had been transferred by mistake.  *Id.*

23.     I was even more certain that Citibank had sent the funds as an intentional paydown of the Term Loans when Ms. Feijoo later confirmed, at 12:51 p.m., that "[w]e did

receive full payoffs in the CLO's as well." *Id.*  That left no doubt in my mind that AIMCO and

AILLC's clients had received a full paydown on the 2016 Term Loan.  All of our clients had

been paid principal and interim interest owed to the penny.

24.     Shortly after this email exchange, Mr. Roth and I spoke by telephone.  We

discussed several possibilities as to why Revlon had repaid our clients' loans.  The theory that

we agreed at the time was most likely was that Revlon and Citibank were attempting to

manipulate the voting rights of the 2016 Term Lenders (as they had in connection with the May

collateral-stripping transaction) by paying off certain of the smaller lenders directing the UMB

Bank Action.  We agreed that it was possible that Revlon and Citibank had chosen to pay off

AIMCO and AILLC's clients, in part, due to The Allstate Corporation's pre-existing banking

relationships with Citibank.

V.     **Citibank's "Error" Notices**

25.     I first became aware that Citibank had sent "error notices" claiming the payments

were made in error around 4:58 p.m., CDT on August 12, 2020, when Stacy Zbaraz in bank loan

operations circulated an email from Markit attaching several such notices.  A true and correct

copy of that exchange is available at DX-0569.  As noted above, that was several hours after I

had already concluded that the payments were genuine paydowns on the 2016 Term Loans.

26.     Even after I reviewed the recall notices, I was not convinced that Citibank had, in

fact, paid the money in error.  Of course, based on what Citibank was telling us, I began to

consider, for the first time, that it might be possible that the payment was made in error.  But

such an error still seemed unlikely, particularly because Citibank did not provide any explanation

for its alleged mistake.

27.     Also, there was no interest payment due on August 11, 2020, yet AIMCO and

AILLC's clients received interim interest payments with principal in full.  In my understanding,

borrowers only make interim interest payments if they are made in connection with prepayments

of principal or an amendment of the loan documents.  Here, since the payments were

accompanied by the exact amount of outstanding principal each lender was owed, a prepayment

was the most likely reason for the interim interest.

28.     I also find it difficult to believe that a bank like Citibank could accidentally

transmit large sums of money, particularly in the specific amounts owed to many recipients.  In

my entire career, I have never seen any financial institution make such a "mistake."

29.     It became apparent to me and my colleagues, once we received Citibank's "error"

notices, that Citibank was claiming it was entitled to the return of the funds and that there would

be a dispute, even possibly litigation.  Therefore, in order to be prudent, AIMCO and AILLC

instructed Bank of New York Mellon to hold the August 11 payments in place in suspense

accounts belonging to each client on August 13 so that the money would not be returned to

Citibank, sent to investors through the CLO's waterfalls, or re-invested.  That way, the money

would be held until the matter was sorted out, and, indeed, the funds now remain in suspense

pursuant to a Temporary Restraining Order issued in this case on August 21, 2020.  As part of

the decision to place the payments in suspense accounts, Bank of New York Mellon's

application of funds to the principal and interest sub-accounts was reversed on August 13, 2020

in anticipation of possible litigation, and not because AIMCO or AILLC consider the 2016 Term

Loans to still be outstanding.

30.     I consider the 2016 Term Loans to be paid off for all AIMCO and AILLC clients,

and indeed generally view loans as paid off upon receipt of the outstanding amounts owed.

VI.     **Prior to Citibank's Recall Notice, There Was No Reason to Believe the Payments Were Mistaken**

31.     To be clear, I did not believe, and had no reason to believe, prior to receiving Citibank's error notices, that the payments were a mistake.  As detailed above, the payments were received, and accepted for deposit into our clients' accounts, late in the day on August 11, 2020.  The payments were made without any accompanying "error notice," and without any other indication of a mistake.

32.     As I explain above, it was clear to me, as soon as I received confirmation that our clients had received the funds, that they had been paid on purpose.

33.     It was not until approximately 20 hours after the payments were made that Citibank started sending notices claiming that the payments were mistaken.  There were various reasons why no one at AIMCO or AILLC would have had any reason to conclude that there had been a mistake before receiving that notice.  It would not have even seemed plausible, prior to that time, that the payment had occurred by mistake.

     a.     **The payments were in the exact amount of outstanding principal and accrued interest owed to each client.**

34.     Each client that received a payment on August 11, 2020, received the exact amount that was owed to that client—precisely the amount of outstanding principal and accrued interest to that date.  To me, that provided strong indication that Revlon was intentionally paying down the full loan to each lender that received payments.

35.     Indeed, it would have been inconceivable to believe that Citibank would have accidentally paid our clients, or the hundreds of 2016 Term Lenders, exactly the amounts they were owed in principal and interest on outstanding loans.  In my entire career, I have never before seen an accidental complete prepayment of a syndicated loan.

b.      **The payments were received in the middle of an interest period, which is highly indicative of a prepayment of the loan.**

36.      As I discuss above, interest was not scheduled to be paid on the 2016 Term Loans until the end of August.  There was no interest payment scheduled on August 11, 2020.  Nevertheless, the August 11 transfer was accompanied by a notice saying that interest was "due."  The most likely reason that interest would have become "due" on August 11 is if the principal balance of the 2016 Term Loans was being repaid.  Indeed, in my experience, it is not uncommon for a loan to be prepaid; and, when it is, any accrued interest becomes due and is typically paid at the same time.

37.      The fact that the August 11 transfer was not accompanied by a principal prepayment notice did not in any way suggest that the payment was by mistake.  As explained above, the payment of interim interest, with notices saying that interest was "due," is consistent with a corresponding payment of principal.  In any case, it is not uncommon in my understanding for payment notices to be sent after a payment is made, including up to several days later.  It is very rare, however, that such a payment turns out to have been made in error, and the absence of a notice therefore did not signal to me that a transfer occurred by mistake.

c.      **I presume that Citibank, a huge, sophisticated financial institution, has many protections in place to prevent sending out erroneous payments.**

38.      I have long presumed that Citibank, as one of the largest and most sophisticated financial institutions in the world, has multiple levels of internal controls and safeguards in place to prevent mistaken payments.

39.      Absent Citibank's assertion of error, it would have seemed far more likely to me that Citibank had made the August 11 payments on purpose but without a contemporaneous notice, than that Citibank had accidentally transferred hundreds of millions of dollars to multiple lenders in the exact amounts they were owed.

    d.    **Revlon's alleged liquidity issues did not suggest that the payment was a mistake.**

40.    On August 11, I was aware of other facts relevant to Revlon that suggested prepayment of the 2016 Term Loans was quite plausible, regardless of any financial difficulties Revlon was reported to be having in that period.  Thus, once again, prior to Citibank's assertion of error, there was no reason for me to contemplate that the payments were made in error.

41.    As an initial matter, Allstate's clients were paid a total of $10,636,142.57, which was well within the amount that a large company like Revlon, even with its financial strains, could have paid, without much difficulty.

42.    It was also entirely possible that Revlon could have raised the capital to pay off all of the 2016 Term Loans.  Indeed, as recently as May 2020, Revlon raised nearly $1 billion despite reported liquidity constraints.  In connection with that transaction, Revlon publicly reported that it satisfied approximately $953 million of 2016 Term Loans at par, repaid at par a $200 million term loan issued in 2019, including a "make whole" premium, repaid at par approximately $50 million of unsecured bonds, and, several weeks thereafter, repaid at par (and prior to maturity) a $65 million revolver.

43.    Revlon, and its long-time sponsor, Ronald Perelman, are famous for effecting strategic transactions, and keeping Revlon alive and out of bankruptcy.  Indeed, the price for Revlon's publicly-traded common stock on August 11 reflected hundreds of millions of dollars of market capitalization, which suggests at least the potential to satisfy all of Revlon's liabilities in full.

VII.    **AIMCO and AILLC's Direction to UMB Bank Was Unrelated to the August 11 Payments**

44.    I also understand that Citibank has argued that that the filing of the UMB action against Revlon, Citibank, and others and the accompanying notice of acceleration on August 12,

2020, was an indication that managers like AIMCO and AILLC knew the 2016 Term Loans had not been paid off as of that date.  That is wrong.

45.     AIMCO and AILLC signed and submitted forms directing UMB to commence the action and accelerate the 2016 Term Loans on August 7, 2020.  The direction to UMB occurred well before the August 11 transfer and, of course, was wholly unrelated to payments that were not made until a week later.

\*          \*          \*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*[Rest of page intentionally left blank – signature on following page]*

Dated:  November 12, 2020
           Wilmette, IL

_Catherine McCoy_
Catherine McCoy