UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re:*<br><br>*Citibank August 11, 2020 Wire Transfers* | Case No. 1:20-cv-06539 (JMF)<br><br>**DECLARATION OF GEORGE XANTHAKYS** |

# DECLARATION OF GEORGE XANTHAKYS

I, George Xanthakys, being duly sworn, state the following under penalty of perjury:

1. I am a resident of the State of New York, over the age of 18, and competent to make this statement.

## I. Introduction

2. I am a Senior Vice President in the operations group at HPS Investment Partners, LLC ("HPS"). I have been employed at HPS since 2007. I submit this declaration as my testimony in support of HPS's defense of claims asserted by Citibank, N.A. ("Citibank") in this action.

3. From the outset, I want to make clear that at the time Citibank made payments to bank accounts held by clients of HPS on August 11, 2020, there was no indication that those payments had been made by mistake. And when I first learned of those payments the following morning, it was my belief that the payments were a prepayment of our clients' Term Loans. Even after I learned that Citibank had told us the payments were made by mistake, I found it hard to believe that such a mistake would have been possible for a sophisticated financial institution such as Citibank. Never in my career have I seen a bank accidentally pay down an entire syndicated loan, in exactly the right amounts to each lender, by accident.

4.  As a Senior Vice President in HPS's operations team, I have first-hand knowledge of the facts set forth in this declaration. I have knowledge regarding HPS's internal structure and operations. I am also aware of our clients' holdings in Revlon Consumer Products Corporation ("Revlon")'s $1.8 billion term loan facility issued in 2016 (the "2016 Term Loans," the holder of which, the "2016 Term Lender"). I have similar knowledge regarding our clients' receipt of payments on August 11, 2020, each in the amount of the outstanding principal and accrued interest Revlon owed to those clients.

II. **Background**

5.  The Client Funds that held the 2016 Term Loan include certain private funds, collateralized loan obligations ("CLOs") and separately management accounts ("SMAs"). Four private funds managed by HPS or its affiliates invested in the 2016 Term Loans: Liquid Loan Opportunities Master Fund LP (FKA) Highbridge Liquid Loan Opportunities Master Fund LP (Highbridge Capital Management LLC), GIM Credit Master Lux S.A.R.L. (FKA) HPS GIM Credit Master Lux S.A.R.L. (FKA) Highbridge GIM Credit Master Lux S.A.R.L., Institutional Credit Fund Subsidiary LP (FKA) HPS Institutional Credit Fund Subsidiary LP, and Cardinal Fund LP. Ten CLOs managed by HPS or its affiliates invested in the 2016 Term Loans: HPS Loan Management 2013 2 Ltd (FKA) Highbridge Loan Management 2013 2 Ltd (FKA Lombardi 2013 2 LLC), HPS Loan Management 3 2014 Ltd (FKA) Highbridge Loan Management 3 2014 Ltd, HPS Loan Management 4 2014 Ltd (FKA) Highbridge Loan Management 4 2014 Ltd, HPS Loan Management 5 2015 Ltd (FKA) Highbridge Loan Management 5 2015 Ltd, HPS Loan Management 6 2015 Ltd (FKA) Highbridge Loan Management 6 2015 Ltd, HPS Loan Management 7 2015 Ltd (FKA) Highbridge Loan Management 7 2015 Ltd., HPS Loan Management 8 2016 Ltd (FKA) Highbridge Loan

Management 8 2016 Ltd, HPS Loan Management 9 2016 Ltd, HPS Loan Management 10 2016 Ltd, and HPS Loan Management 11 2017 Ltd (FKA) Jordy Warehouse 2016 Ltd.  Four SMAs managed by HPS or its affiliates invested in the 2016 Term Loans: Watford Asset Trust I, Zalico VL Series Account 2, Zurich American Insurance Company, and Arch Investment Holdings IV Ltd.

6.  HPS's front office is responsible for making investment determinations on behalf of our clients.  Our back office (which we also call middle office) is responsible for the day-to-day support of trade activity and provides ongoing support and maintenance of the positions within the investment portfolios.  It also serves as the primary point of contact for prime brokers, custodians, and other service providers.  Our back office is assisted by third-party fund administrators such as Harmonic Fund Services ("Harmonic") as well as third party vendors such as Indus Valley Partners ("IVP"), in carrying out several of its administrative functions.  We also use various custodians, such as U.S. Bank, BNP Paribas, and Bank of New York to hold our clients' investments.  My position and function places me within HPS's back office.

III. **The Revlon 2016 Term Loans**

7.  In 2016, Revlon issued approximately $1.8 billion of debt pursuant to a credit agreement (the "2016 Credit Agreement").  Citibank served as the lenders' administrative agent under the 2016 Credit Agreement.

8.  As of August 11, 2020, the 18 clients identified above for which HPS acts as investment manager held the 2016 Term Loans issued by Revlon.  Those clients, accordingly, were lenders to Revlon at that time.  Out of the entire facility, HPS's clients held approximately $134,073,920.65 of the 2016 Term Loans.[1]

---

[1] *See* Exhibit A.

3

9. August 11, 2020 was not a scheduled interest payment date on 2016 Term Loan.

## IV. **The Payoff of the 2016 Term Loans**

10. At some point between 5:00 P.M. and 6:00 P.M. EDT on August 11, 2020, each of HPS's clients that held 2016 Term Loans received, by wire transfer, a payment of the outstanding principal and accrued interest owed to each such lender.[2] These payments matched the amount of principal outstanding under the 2016 Credit Agreement and all accrued interest as of August 11, 2020, down to the penny.[3] The payment confirmations stated the payments were made on account of the Revlon 2016 Term Loans. A true and correct copy of one of the payment confirmations is DX-0033 at Citi00002322. The funds were accepted for deposit into each of these clients' accounts. The payments were neither preceded by nor accompanied by any indication from Citibank that they were being made in error.

11. Because our internal accounting system did not expect either interest or principal payments on the 2016 Term Loans on August 11, 2020, the payments were automatically marked in our cash reconciliation platform, known as Recon, as "break items." Once the payments were marked as "break items," they were annotated in Recon so that our fund administrators such as Harmonic or HPS's operations group would see that details needed to be gathered so the payment could be accounted for with the appropriate accounting entries. This process is a routine part of the operations group's job function, and happens daily for various types of payments, which almost universally have not been made in error.

12. At or around 5:00 A.M. on August 12, 2020, employees at Harmonic's Dublin office noticed the complete paydown on the 2016 Term Loans for accounts that they administered while reconciling the cash movement for the day before. Because the payment was

---

[2] *Id.*
[3] *Id.*

4

not scheduled (neither interest nor principal), Harmonic marked the payments as break items, and elevated the payments to HPS. A true and correct copy of the email is DX-0663 at HPS_CITI_00005384.

13. At or around 8:00 A.M. on August 12, 2020, my colleague in the operations team, Michael Davids, started his daily cash reconciliation process. As required by our cash reconciliation procedures, Mr. Davids logged into Recon and reviewed the outstanding break items on HPS's accounts that need to be resolved, such as the paydown on the 2016 Term Loans. As part of his responsibility, he would add his comments to the break items and issue instructions on how to resolve them. Recon recorded the time of his comments. Mr. Davids' comments were at approximately 8:32 A.M., which confirms that, before Citibank sent its "error notices," he was recommending that the payments be booked as pre-payment on the loans.[4] A true and correct copy of the screenshot reflecting his comment is DX-1129.

14. At or around 12:02 P.M. on August 12, 2020, Ms. Byrne of Harmonic emailed me and others at HPS's middle office that there was a break item on the 2016 Term Loans, because they received "full principle [sic] repayment plus interest" on August 11 and that they had requested notices from Citibank so that they could book the paydown with the appropriate documentation. A true and correct copy of the email is DX-0489 at HPS_CITI_00053020.

15. At or around 1:06 P.M. on August 12, 2020, I emailed U.S. Bank to ask them to apply the unapplied cash that came in on August 11, 2020, which included the paydown on the 2016 Term Loans. A true and correct copy of the email is DX-0504 at HPS_CITI_00001712. In response, Craig Pence at U.S. Bank told me that they received the paydown "late evening after 6

---

[4] At my deposition, I testified that the first time anyone at HPS's operations department, which includes Mr. Davids, learned about the August 11 payments was 3:15 P.M. on August 12. After my deposition, I accessed the Recon system and saw that Mr. David had actually commented on the payment earlier, at around 8:30 a.m.

when people are gone for the day," and that they were working to get the notices from Citibank so that they could book the paydown. *Id.*

16. Based on the above communication, I was aware that Revlon had made payments on the 2016 Term Loans, and that U.S. Bank, as a custodian for our clients, was collecting supporting documents in order to book the payments. None of the fund administrators or custodians raised the possibility of error to me, and it did not occur to me that the payments could have been made by mistake.

17. To be certain, the concept of error never crossed my mind before seeing Citibank's error communication, which was sent later on August 12. Nor did anyone suggest error to me.

V. **Citibank's Assertion of Error**

18. At or around 2:23 P.M. on August 12, 2020, Citibank sent a message to our inbox for loan notices which we would monitor through a platform called Markit Loan Notice Manager. The message stated that part of the wire payments that Citibank had made on August 11, 2020 had been "released erroneously." A true and correct copy of the message is DX-0413 at CITI00029627. The message did not provide any explanation of how or why such a payment could have been made in error, or why it was being sent almost a day after the payments were completed. Despite receiving this message, I was not aware of it until later because I do not regularly check that inbox.

19. At or around 4:50 P.M. on August 12, 2020, my colleague Marc Sikoscow emailed me and my colleagues asking if anyone had seen the agent notice for the paydown on the 2016 Term Loans. A true and correct copy of the email is DX-0557 at HPS_CITI_00001127. At the time, I was not aware of any agent notice so I did not respond to this email.

20. At or around 5:01 P.M. on August 12, 2020, my colleague George Daniolos responded to Mr. Sikoscow's question and forwarded an error communication from Citibank stating that the principal amount of the August 11 paydown was released erroneously. A true and correct copy of the email is DX-0558 at HPS_CITI_00001128. I then received another email from Michael Davids at 5:04 P.M. EDT where he attached an error message from Citibank stating that the principal portion of the payment on the 2016 Term Loans received by one of our clients, Zurich American Insurance Company, was released erroneously. A true and correct copy of this email is DX-1099 at HPS_CITI_00001145. This is the first time I saw or became aware of an error message from Citibank.

21. Even after seeing this message, an error still seemed implausible. I have worked in the operations of financial institutions for 17 years and understand that sophisticated financial institutions such as Citibank have many levels of internal controls in place to prevent issuing wire payments by mistake. Moreover, I would presume that an agent or a borrower would not place its own cash, from its own balance sheet, in a payment account more than the amount that is due on a loan. In other words, if Revlon or Citibank intended to pay only interest, I would presume they would not place any of their own cash above and beyond the interest amount in the payment account. It is simply operationally implausible. Therefore, it was very difficult to believe that such a significant payment was made in error. Indeed, after (and only after) I had learned of Citibank's claim of error, I remarked to my colleagues "[t]hey meant to pay interest, but they paid interest and our entire principal? Damn" with surprise, because I did not, I still do not, understand how this mistake could be possible given the extensive internal controls that I presume a sophisticated financial institution like Citibank would have. A true and correct copy of the email is DX-0560 at HPS_CITI_00001139.

VI. **I Did Not Believe the Payments Were A Mistake**

22. I had no reason to think that it was even a possibility that Citibank had transferred the funds by mistake prior to seeing the notification of error in the afternoon of August 12, 2020. The absence of a principal payment notice did not suggest to me that the payment was made in error. We have received payments without notices in the past. But that fact did not and does not suggest error. The supporting documents are important for our accounting purposes because if we do not have supporting documents to back up any incoming or outgoing payments, we will need to rely on the bank statement to present to the auditors of such transactions, which can be a lengthy and laborious process. Receiving a payment without a notice is a relatively common event; certainly far more common than receiving erroneous payments of the type and amount asserted by Citibank here. Notices are occasionally received after payments are made, often several days after payment. When we search for missing notices, that is not an indication of any expectation that the payments received were in error. It is simply a commonplace routine to ensure documentation for payments received is as detailed and complete as possible.

23. To be clear, in my 17 years of career in fund operations, I have seen mistaken payments. For example, I have seen instances where an agent miscalculated the interest payment and overpaid us, and we caught the mistake on its face. I have also seen cases where the agent mistakenly paid us funds that were due to another entity, and we caught the mistake because the payment instructions were intended to another lender. However, I have never seen any payments to HPS's clients that matched the total outstanding principal amount owed, the accrued interest amount owed, and the loan description, but were then later recalled as mistaken payments.

\*   \*   \*

Dated: November 12, 2020
       New York, New York

_____
George Xanthakys

# Appendix A

| Lender Name | Amount of Principal Outstanding as of August 11, 2020 ($) | Amount of Accrued Interest Outstanding as of August 11, 2020 ($) | Total Amount of Principal and Interest Outstanding as of August 11, 2020 ($) | Total Wire Payment by Citibank on August 11, 2020 ($) |
|---|---|---|---|---|
| Arch Investment Holdings Iv Ltd | 493,341.71 | 4,309.89 | 497,651.60 | 497,651.60 |
| Liquid Loan Opportunities Master Fund LP (FKA) Highbridge Liquid Loan Opportunities Master Fund LP (Highbridge Capital Management LLC) | 16,248,944.68 | 141,952.59 | 16,390,897.27 | 16,390,897.27 |
| HPS Loan Management 3 2014 Ltd  (FKA) Highbridge Loan Management 3 2014 Ltd | 5,980,656.27 | 52,247.68 | 6,032,903.95 | 6,032,903.95 |
| HPS Loan Management 2013 2 Ltd  (FKA) Highbridge Loan Management 2013 2 Ltd (FKA Lombardi 2013 2 LLC) | 5,122,945.64 | 44,754.62 | 5,167,700.26 | 5,167,700.26 |
| HPS Loan Management 5 2015 Ltd  (FKA) Highbridge Loan Management 5 2015 Ltd | 5,923,507.04 | 51,748.42 | 5,975,255.46 | 5,975,255.46 |
| HPS Loan Management 4 2014 Ltd  (FKA) Highbridge Loan Managment 4 2014 Ltd | 6,404,778.80 | 55,952.86 | 6,460,731.66 | 6,460,731.66 |
| Zalico Vl Series Account 2 | 619,095.48 | 5,408.49 | 624,503.97 | 624,503.97 |
| Zurich American Insurance Company | 14,510,050.25 | 126,761.41 | 14,636,811.66 | 14,636,811.66 |
| HPS Loan Management 6 2015 Ltd  (FKA) Highbridge Loan Management 6 2015 Ltd | 7,281,666.74 | 63,613.45 | 7,345,280.19 | 7,345,280.19 |
| HPS Loan Management 7 2015 Ltd  (FKA) Highbridge Loan Management 7 2015 Ltd | 6,307,249.94 | 55,100.84 | 6,362,350.78 | 6,362,350.78 |
| Gim Credit Master Lux Sarl (FKA) HPS Gim Credit Master Lux Sarl (FKA) Highbridge Gim Credit Master Lux Sarl | 30,471,105.53 | 266,198.96 | 30,737,304.49 | 30,737,304.49 |
| Watford Asset Trust I | 8,887,156.98 | 77,639.19 | 8,964,796.17 | 8,964,796.17 |

**Appendix A**

| Lender Name | Amount of Principal Outstanding as of August 11, 2020 ($) | Amount of Accrued Interest Outstanding as of August 11, 2020 ($) | Total Amount of Principal and Interest Outstanding as of August 11, 2020 ($) | Total Wire Payment by Citibank on August 11, 2020 ($) |
|---|---|---|---|---|
| Institutional Credit Fund Subsidiary LP (FKA) HPS Institutional Credit Fund Subsidiary LP | 3,500,699.94 | 30,582.50 | 3,531,282.44 | 3,531,282.44 |
| HPS Loan Management 8 2016 Ltd (FKA) Highbridge Loan Management 8 2016 Ltd | 1,925,000.00 | 16,817.01 | 1,941,817.01 | 1,941,817.01 |
| HPS Loan Management 9 2016 Ltd | 5,582,960.23 | 48,773.36 | 5,631,733.59 | 5,631,733.59 |
| HPS Loan Management 10 2016 Ltd | 6,737,500.00 | 58,859.55 | 6,796,359.55 | 6,796,359.55 |
| HPS Loan Management 11 2017 Ltd (FKA) Jordy Warehouse 2016 Ltd | 4,836,683.42 | 42,253.80 | 4,878,937.22 | 4,878,937.22 |
| Cardinal Fund LP | 3,240,577.88 | 28,310.05 | 3,268,887.93 | 3,268,887.93 |