UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re:* | Case No. 1:20-cv-06539 (JMF) |
| *Citibank August 11, 2020 Wire Transfers* | **DECLARATION OF SCOTT CARAHER** |

## DECLARATION OF SCOTT CARAHER

I, Scott Caraher, being duly sworn, state the following under penalty of perjury:

1.      I am a resident of the State of New York, over the age of 18, and competent to make this statement.

I.      **Introduction**

2.      I am a portfolio manager and co-head of investments at Symphony Asset Management LLC ("Symphony").  I am also head of loans at Symphony.  I have worked at Symphony for 18 years and I have been co-head of investments for approximately two years.  I submit this declaration as my testimony in support of Symphony's defense to claims asserted by Citibank in this action.

3.      I have first-hand knowledge of the facts set forth in this declaration.  Among other things described below, I am familiar with the 2016 Term Loans held by our clients as of August 11, 2020, as well as the events surrounding Citibank's transfer of funds paying down those loans that day.

4.      When I learned of the August 11 transfers, I did not believe they had occurred by mistake.  In fact, I was confident that the transfers, which were equal to the outstanding principal and interest on the 2016 Term Loans held by Symphony's clients, were an intentional pre-payment of those loans.  Given our past experience with Revlon and Citibank, moreover, I

continue to believe – regardless of any "error notices" that Citibank circulated after the August 11 transfer – that those payments were intentional.

II.  **Background**

5.     Symphony specializes in credit investment and fixed income.  This means that we primarily invest in loans, bonds, and other credit derivatives of corporations in dollar-denominated debt from around the world.  Symphony invests money on behalf of its clients, which include a wide array of entities such as public pension funds, CLOs, mutual funds and private funds.

6.     Our clients' money and investments are not held by Symphony itself, but by third-party trustees, custodians, and/or collateral administrators that are not affiliates of Symphony. The clients receive funds when their investments receive cash distributions.  The clients are third parties with whom we have contractual relationships.  These contractual relationships are set out in the applicable investment management agreements or collateral management agreements.[1]

7.     The clients that held the 2016 Term Loans include certain collateralized loan obligations ("CLOs"), private funds, mutual funds, and separately managed accounts ("SMAs"). The clients that held 2016 Term Loans are:

- Ten CLOs managed by Symphony that invested in the 2016 Term Loans: California Street CLO IX Limited Partnership, California Street CLO XII Ltd. (F/K/A) Symphony CLO XII Ltd., Symphony CLO XIV Ltd., Symphony CLO XV Ltd., Symphony CLO XVI Ltd. (F/K/A) Symphony XVI Funding LLC,

---

[1]   True and correct copies of these documents are available at DX-0131, DX-0134, DX-0136, DX-0143, DX-0146-47, DX-0149-52, DX-0155, DX-0162-64, DX-0171-77, DX-0179-84, DX-0195-96, DX-0201-02, DX-0208-11, DX-0218-19, DX-0223-24, DX-0231-33, DX-0237, DX-0250, DX-0287, DX-0317.

Symphony CLO XVII Ltd., TCI-Symphony CLO 2016-1 Ltd., Symphony CLO XVIII Ltd., SCOF-2 Ltd., and TCI-Symphony CLO 2017-1 Ltd.

- Ten mutual funds managed by Symphony that invested in the 2016 Term Loans: Nuveen Senior Income Fund, Nuveen Diversified Dividend and Income Fund, Nuveen Floating Rate Income Fund, Nuveen Floating Rate Income Opportunity Fund, Nuveen Credit Strategies Income Fund, Nuveen Symphony High Yield Income Fund (F/K/A/) Nuveen Symphony Credit Opportunities Fund, Nuveen Symphony Floating Rate Income Fund, Nuveen Short Duration Credit Opportunities Fund, Principal Funds Inc. Diversified Real Asset Fund, Goldman Sachs Trust II – Goldman Sachs Multi-Manager Non-Core Fixed Income Fund.

- Six separately managed accounts managed by Symphony invested in the 2016 Term Loans: Municipal Employees' Annuity & Benefit Fund of Chicago, Symphony Floating Rate Senior Loan Fund, Principal Diversified Real Asset CIT (F/K/A) Diversified Real Asset CIT, Menard Inc., Pensiondanmark Pensionsforsikringsaktieselskab, BayCity Alternative Investment Funds SICAV-SIF – BayCity US Senior Loan Fund (F/K/A) Symphony Alternative Investment Funds SICAV-SIF – Symphony US Senior Loan Fund.

- Four private funds managed by Symphony invested in the 2016 Term Loans: BayCity High Yield Income Fund LP (F/K/A) BayCity Credit Opportunities Fund LP, BayCity Long-Short Credit Master Fund Ltd. (F/K/A/) Symphony Long-Short Credit Master Fund Ltd., BayCity Senior Loan Master Fund Ltd. (F/K/A) Symphony Senior Loan Master Fund Ltd., Nomura Multi-Managers Fund Global Bond.

8.      In my role as co-head of investments, I set strategy for the credit investments held by Symphony clients.  My responsibilities include, for example, analyzing whether and when to invest in various debt instruments (such as the 2016 Term Loans at issue in this case), and determining if and when such investments should be sold and at what price.

III.    **The Revlon 2016 Term Loans**

9.      In 2016, Revlon issued approximately $1.8 billion of debt pursuant to a credit agreement (the "2016 Credit Agreement").[2]  At the outset, and for several years thereafter, Citibank served as the lenders' agent under the 2016 Credit Agreement.

10.     Revlon granted extensive liens on its assets to serve as collateral for the 2016 Term Loans under the 2016 Credit Agreement.  The collateral included a first-priority lien in the intellectual property of Revlon's beauty brands, which was the most valuable security that Revlon could provide.

11.     As of August 11, 2020, approximately 30 Symphony clients held 2016 Term Loans issued by Revlon under the 2016 Credit Agreement.  Those clients were lenders to Revlon at that time.  Out of the entire facility, Symphony's clients held approximately $109 million of the 2016 Term Loans.

12.     I was not aware that Citibank intended to repurchase 2016 Term Loans from selected lenders on August 11, nor that it planned to pay interest to all of the 2016 Term Lenders in connection with such a transaction.  Citibank did not provide advance notice to Symphony that such repurchases were going to occur or that interest was being paid in connection with repurchases.  It is my understanding, in any event, that the exercise of repurchase rights by a

---

[2]  *See* DX-0053 (2016 Credit Agreement).

lender does not cause interest to become due immediately for all lenders under the 2016 Credit Agreement.

IV.     **The Revlon 2016 Term Loans are Paid Down on the Evening of August 11, 2020**

13.     On the morning of August 12, 2020, following a call with counsel at Arnold & Porter, I called John Vaughan, who works in the back office at Symphony.  I asked him whether any of our clients that were 2016 Term Lenders had received paydowns on the 2016 Term Loans.  Before I reached out to Mr. Vaughan, I did not know whether or not our clients' loans had been paid down.

14.     At my direction, Mr. Vaughan and, I believe, others working in operations, contacted the trustees, custodians, and collateral administrators who have custody of our clients' assets to determine whether our clients had received paydowns on the 2016 Term Loans.  During multiple phone calls during the morning and early afternoon of August 12, Mr. Vaughan informed me that our clients had, on August 11, received full paydowns, including principal and interest on the 2016 Term Loans.

15.     Upon learning that Citibank had transferred the outstanding amounts on the Term Loans to Symphony's clients, it was clear to me that the transfers on August 11 were intended as a complete paydown of those loans held by Symphony clients.  As I discuss further below, based on my experience, the transfers occurred in a manner consistent with the off-cycle paydown of loans generally.  It is also unheard of, in my experience, for a loan agent to accidentally pay a lender in the exact amount owed, and there was no reason for me to conclude that such an unprecedented mistake had occurred here.  Also, given the history of the 2016 Term Loans, I had in mind various possible reasons as to why Revlon and Citibank had decided to pay down the 2016 Term Loans held by Symphony's clients.

16.     I learned later on August 12 that Citibank had sent recall notices, many hours after it transferred the funds on August 11, claiming that those transfers had occurred by mistake. Citibank gave no explanation of how or why such a mistake could have occurred, and I continued to believe that the payments were intentional.

17.     I was made aware of the error notices on a phone call with Mr. Lee and Mr. Vaughan, who work in Symphony's back office, the afternoon of August 12, 2020.  On that call, I instructed Mr. Lee and Mr. Vaughan to direct the various trustees, custodians, and collateral administrators not to return the funds.

18.     I consider the 2016 Term Loans to be paid off for all Symphony clients and indeed generally view loans as paid off upon receipt of the outstanding amounts owed.

V.     **I Did Not Believe the Payments Were A Mistake**

19.     There are several reasons why I was confident, upon learning of the August 11 transfers, that Revlon had intentionally paid down the 2016 Term Loans.  Indeed, based on what I have seen during almost 20 years working in the loan markets, Citibank made the transfers exactly in the manner that an administrative agent would ordinarily go about making an optional pre-payment during an interim period on a pending loan.  I strongly disagree with any suggestion by Citibank that Symphony nevertheless knew or should have known that those transfers had occurred by mistake (even assuming there was a mistake, of which I remain highly skeptical).

a.     **The payments were in the exact amount of outstanding principal and accrued interest owed to each client that was a Revlon lender.**

20.     Each client received the exact amount it was owed in the August 11, 2020 transfer.  In my experience, when a borrower or its administrative agent pays the exact amounts owed in outstanding principal and interest, that is a clear indication that the loan is being paid down.  I have never, in almost 20 years in the industry, seen such a transfer made by accident.

     b.     **The payments were received in the middle of an interest period, which is consistent with—and highly indicative of—a prepayment of the loan.**

21.     I am familiar with the material terms of the 2016 Credit Agreement and the 2016 Term Loans and I do not expect interest payments outside month or quarter-end. I assume that payments that occur other than at the end of the month are a paydown. I also knew that Revlon, as is often true for lenders, had the option of making a prepayment of the 2016 Term Loans at any time under the Credit Agreement.

22.     In my experience, it is not uncommon for lenders to make unscheduled paydowns of outstanding loans, and, when they do, it is standard for them to transfer all amounts outstanding on the loan, including principal and interest. As a result, when I became aware of the payment on August 12, it was my immediate and natural conclusion that Revlon was exercising its option of prepaying the 2016 Term Loans held by Symphony's clients.

23.     The fact that the August 11 transfers were not accompanied by principal payment notices was not an indication of any mistake. From my experience, it is common for a principal payment to occur without an accompanying notice. And the fact that a notice may be initially missing in no way signifies that the payment was sent in error.

     c.     **I presumed that Citibank, a huge, sophisticated financial institution, has many protections in place to prevent sending out erroneous payments.**

24.     I have long presumed that Citibank, as one of the largest financial institutions in the world, has many levels of internal controls in place to prevent mistaken payments. That is an additional reason that I considered it implausible that Citibank had paid Symphony's clients, in the exact dollar amounts they were owed in outstanding principal and interest, by mistake.

25.     At the time we received the error notices from Citibank, I did not know whether 2016 Term Lenders managed by other firms had also been paid down. Over the course of the following two days, I learned that *all* 2016 Term Lenders were paid par plus accrued interest—

*i.e.*, that this was a $900 million alleged mistake.  It seemed even more unlikely that a paydown

on that scale, to that many lenders, could have been by mistake.  I have never heard of a mistake

of this magnitude—let alone from one of the most sophisticated and established financial

institutions in the world.

        d.      **Revlon's past conduct concerning the 2016 Term Loans suggested that the payment could have been made willfully to prevent enforcement action on the part of the 2016 Term Lenders.**

      26.     As I mention above, when I first learned about the payments to our clients, I was

not aware that Revlon had paid off *all* of the 2016 Term Lenders.  I only knew that *Symphony's*

clients had been paid off.  Based on that understanding, the first explanation that occurred to me

as to why Revlon had paid down those 2016 Term Loans was that it was a strategic maneuver,

like other maneuvers Citibank and Revlon had made in the recent past, to avoid getting sued for

their misconduct in the preceding months related to the 2016 Credit Agreement.

      27.     Specifically, I thought that Revlon and Citibank, by paying out Symphony's

lenders, were seeking to reduce the number of lenders otherwise prepared to authorize a lawsuit

below the 50% threshold required to direct such a filing.  I thought that partly because Revlon

has a recent history of trying to manipulate votes in that way.

      28.     By way of background, in April of 2020, Revlon decided to strip a portion of the

collateral backing the Term Loans away from the 2016 Term Lenders, in order to make that

collateral available as support for new loans from other lenders.  In order to release the liens on

the collateral that secured the 2016 Term Loans, however, Revlon needed to amend the 2016

Credit Agreement, which required the votes of a *majority* of the 2016 Term Lenders.

      29.     The problem for Revlon was that a majority of the 2016 Term Lenders opposed

the transaction.  Specifically, to protect the interests of our clients, Symphony and other 2016

Term Lenders formed a lender group ("Lender Group"), owning more than half of the then-

outstanding 2016 Term Loans, and opposed Revlon's effort to amend the 2016 Credit Agreement for the purpose of siphoning away collateral backing the 2016 Term Loans.

30.      Recognizing that the Lender Group could block the transaction, Revlon purported to create a new revolving loan, and to thereby create new lenders to participate in the vote, to create a majority to support amending the 2016 Credit Agreement.  Revlon and Citibank counted these votes, and proceeded with their loan-stripping transaction in May 2020.  Around this time, MacAndrews & Forbes LLC ("MacAndrews & Forbes"), the controlling shareholder of Revlon, reached out to me and offered to buy certain Revlon bonds held by Symphony's clients at par that were at the time trading at approximately 60 cents on the dollar to induce Symphony to help effectuate this collateral-stripping transaction.

31.      Following the May 2020 transaction, Revlon knew that the Lender Group was preparing to enforce rights and remedies and challenge the transaction.  First, prior to Revlon proceeding with the May 2020 Transaction, the Lender Group objected vociferously to the collateral stripping.  Thereafter, the Lender Group had remained organized, with legal representation, and planned on suing to enforce its rights and remedies.

32.      In addition, although Citibank had submitted its resignation as administrative agent, it then refused to complete standard documentation to facilitate the transition to UMB Bank, which the lenders had appointed as successor agent as permitted under the 2016 Credit Agreement.  During those negotiations, Citibank was demanding a release, immunizing Citibank from liability for its role in the May 2020 Transaction.  UMB Bank steadfastly and appropriately refused to grant such a release.  Citibank's demand for a release, and UMB Bank's appropriate refusal to grant it, made clear to Citibank and Revlon that the Lender Group was planning an enforcement action.

33.     When I learned that Citibank had made the August 11 transfers, I thought of this recent history, and thought that Revlon and Citibank were likely once again taking steps to manipulate the calculation of a majority of 2016 Term Lenders, this time to avoid getting sued. Indeed, paying off 2016 Term Loans that were trading at a steep discount, to advance their own purposes, was completely consistent with past practices.  I believed that Revlon was likely paying down at least some of the 2016 Term Loans to manipulate the percentage of lenders willing to challenge Revlon's conduct, including by paying off Symphony's clients' 2016 Term Loans.  This would potentially leave the balance of the Lender Group with less than a majority of 2016 Term Loans and hinder UMB Bank's ability to proceed with an enforcement action.

e.     **Revlon's liquidity issues did not suggest that the payment was a mistake.**

34.     It was also certainly possible in my view that Revlon could have paid the 2016 Term Loans, regardless of its financial difficulties.  The fact that a borrower may be in distress or even insolvent does not preclude it from satisfying a debt.  Insolvent debtors routinely satisfy their obligations, and are incentivized to do so as long as possible, in order to extend the runway for shareholders.  For years, I have known that Revlon has been suffering from financial problems but Revlon managed to pay debt notwithstanding its difficulties.

35.     Just a few months ago, in May 2020, Revlon successfully raised nearly $1 billion. In connection with that capital raise, Revlon exchanged, at par, approximately $953 million in 2016 Term Loans.  There are other examples of Revlon paying outstanding debts, including at par, notwithstanding its liquidity issues.  For example, I understand that in May 2020, Revlon (a) repaid at par the $65 million revolver it issued that month, (b) repaid at par $200 million in term loans issued by the Company in 2019, (c) repaid at par approximately $50 million of 5.75%

unsecured bonds (and purchased another $62.8 million in such notes), and (d) fully repaid a $41.5 million Asset-Based Revolving Credit Facility.[3]

36.     Revlon's ability to pay loans to avoid bankruptcy is enhanced by the fact that its longtime sponsor, Ronald Perelman, is well known to have a net worth of several billion dollars. Mr. Perelman owns almost 90% of the stock of Revlon's parent company through his company MacAndrews & Forbes,[4] and his daughter, Debra Perelman, currently serves as the CEO of Revlon, Inc.  I thought it was entirely possible that Mr. Perelman might have elected to deploy capital he controlled to pay off some or all of the Revlon debts.  I suspected that, as is often the case with "family owned" businesses, Mr. Perelman would never let Revlon fail (which would mean his equity interests would be cancelled).

37.     I did not doubt that Mr. Perelman could and would save Revlon by injecting capital, if necessary.  He is well known for finding ways to pay down loans where necessary to preserve his businesses, including Revlon.

38.     As noted above, only a few months prior to the August 11 payments, representatives of MacAndrews & Forbes approached me to offer to pay off at par certain unsecured Revlon bonds that my clients had invested in.  At that time, the relevant Revlon bonds were trading at around 60 cents on the dollar.  These persons implied that Ronald Perelman would supply the necessary funding to make the payment.

39.     Given this experience, I did not think for a second that Revlon could not, or would not, find the necessary capital to pay down the Term Loans, if Mr. Perelman thought it would be to Revlon's advantage to do so.  It was clear to me, when I learned that Citibank had

---

[3]  DX-0916, Revlon 10-Q, ending June 30, 2020 at 26.
[4]  DX-1041, Revlon 2019 10-K, at 5 (showing MacAndrews & Forbes beneficially owning 46,223,321 out of 53,069,832 shares of Revlon, Inc.'s Class A common stock, as of December 31, 2019), at 7 ("MacAndrews & Forbes . . . [is] a corporation beneficially owned by Ronald O. Perelman.").

transferred the exact amounts owing to Symphony's clients, that Revlon, perhaps with the assistance of MacAndrews & Forbes and/or Mr. Perelman, had made the decision to pay down those loans and had raised or located the funds necessary to do so.

VI.    **Symphony Authorized Filing of the UMB Action, on Behalf of Its Clients, on July 30, 2020**

40.    On July 30, 2020, Symphony provided UMB Bank a direction and indemnification letter to file the complaint in the UMB action.  My understanding was that this direction would be acted on by UMB Bank as soon as practicable after the date Symphony provided the direction, including when a majority of 2016 Term Lenders had submitted similar direction.  Of course, the 2016 Term Loans had not been paid off when Symphony authorized the UMB Action on July 30, 2020.

*        *        *

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  November 13, 2020
              Westerly, Rhode Island

/s/ Scott Caraher
Scott Caraher

Dated:   December 1, 2020
         Westerly, Rhode Island

Scott Caraher