UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re:* | Case No. 1:20-cv-06539 (JMF) |
| *Citibank August 11, 2020 Wire Transfers* | **DECLARATION OF WILLIAM LENGA** |

## DECLARATION OF WILLIAM LENGA

I, William Lenga, being duly sworn, state the following under penalty of perjury:

1.      I am a resident of the State of Illinois, over the age of 18, and competent to make this statement.

## I.      **Introduction**

2.      I am the managing member at Tall Tree Investment Management, LLC ("TTIM"). I founded TTIM in 2005 and have been the managing member since its inception.  I submit this declaration as my testimony in support of TTIM's defense to claims asserted by Citibank, N.A. ("Citibank") in this action.

3.      I have first-hand knowledge of TTIM's clients' participation in the $1.8 billion term loan facility issued by Revlon pursuant to a 2016 Credit Agreement (the "2016 Term Loans," each holder of which is a "2016 Term Lender") and the events surrounding Citibank's transfer of funds in repayment of those loans on August 11, 2020.

4.      At the time Citibank made payments to TTIM's clients on August 11, 2020, there was no indication that those payments had been made by mistake.  When I first learned of those payments the morning of August 13, 2020, it was my belief that they were an intentional paydown of our clients' 2016 Term Loans.  After I learned later that Citibank was claiming it made the payments by mistake, I found it hard to believe.  Never in my career have I seen a bank accidentally pay down an entire syndicated loan.

II.    **Background**

5.      Three collateralized loan obligations ("CLOs") managed by TTIM invested in the 2016 Term Loans.  These are Lockwood Grove CLO, LTD ("Lockwood Grove"), Evans Grove CLO, LTD ("Evans Grove"), and Monarch Grove CLO, LTD ("Monarch Grove" and together with Lockwood Grove and Evans Grove, the "Grove CLOs").  TTIM is the collateral manager for the Grove CLOs, which means that TTIM, among other things, selects and manages investments for the Grove CLOs.

6.      The Grove CLOs are the entities that invested in the 2016 Term Loans.  Like all of the CLOs for which TTIM acts as manager, the Grove CLOs are not TTIM subsidiaries, and TTIM has a contractual relationship with each of them to provide specified management services.  True and correct copies of the collateral management agreements and indentures governing TTIM's relationship with each of the Grove CLOs have been submitted to the Court as Exhibits DX-1101 through DX-1106.

7.      In my role as managing member of TTIM, I manage the overall business enterprise of the firm, I handle investor relations, and I'm the senior portfolio manager for TTIM's clients.  My responsibilities include, for example, determining (i) whether and when to invest in various debt instruments (such as the 2016 Term Loans at issue in this case); (ii) the price at which our clients should be willing to purchase and sell loan obligations; and (iii) if necessary, whether and when to commence litigation concerning these loan obligations to enforce our clients' rights.

III.    **The Revlon 2016 Term Loans**

8.      As of August 11, 2020, three above listed CLOs for which TTIM acts as collateral manager held 2016 Term Loans issued by Revlon under the 2016 Credit Agreement.  Those

clients were lenders to Revlon at that time.  Out of the entire facility, the Grove CLOs held

approximately $3,850,000 of the 2016 Term Loans.  The 2016 Term Loans are governed by the

2016 Credit Agreement.[1]

9.      The 2016 Term Loan was issued in connection with Revlon's acquisition of

Elizabeth Arden, and was secured by substantially all of Revlon's (and its subsidiaries') personal

and real property, including all intellectual property.  The Grove CLOs purchased the 2016 Term

Loans between July 22, 2016 and November 15, 2016.

IV.    **The August 11 Transfer**

10.     On the evening of August 11, 2020, the Grove CLOs each received wire transfers

in the exact amount of their respective outstanding principal and accrued interest through that

date under the 2016 Term Loan.  The funds were accepted for deposit into each of these clients'

accounts, which are all maintained at U.S. Bank.  The description in the wire transfers stated the

payments were in connection with the 2016 Term Loan.[2]

11.     The specific amounts owed to and received by the Grove CLOs are as follows:

| Lender Name | Amount of Principal Outstanding as of August 11, 2020 | Amount of Accrued Interest Outstanding as of August 11, 2020 | Total Amount of Principal and Interest Outstanding as of August 11, 2020 | Total Wire Payment by Citibank on August 11, 2020 |
|---|---|---|---|---|
| LOCKWOOD GROVE CLO LTD | 2,887,500.00 | 25,225.52 | 2,912,725.52 | 2,912,725.52 |
| MONARCH GROVE CLO LTD | 481,250.00 | 4,204.25 | 485,454.25 | 485,454.25 |
| EVANS GROVE CLO LTD | 481,250.00 | 4,204.25 | 485,454.25 | 485,454.25 |

---

[1]  A true and correct copy of the 2016 Credit Agreement was submitted to the Court as DX-0053 (Citi00001904).
[2]  Copies of the wire confirmations were produced by Citibank in this action and were submitted to the Court as DX-0005, DX-0876, DX-0877.

12.     The transfers were sent by wire to the same trustees and accounts as all past payments by Citibank to the Grove CLOs in connection with the 2016 Term Loan.  The transfers were not accompanied by any notice of mistake or other documentation indicating that the funds had been sent in error.

13.     I learned of the August 11 payments on the 2016 Term Loans around 9:20 AM CDT on the morning of August 13, 2020 when I participated in a call with TTIM's counsel from Arnold & Porter.  I was not aware that Citibank had circulated any error notices at that time.  It was my belief, based on my understanding that the loans had been paid down in their full amounts, that Revlon had made an intentional prepayment on the 2016 Term Loans.

14.     Later that morning, I reached out to my colleague, Brian Buscher, and asked him to confirm what was then my understanding, namely that the Grove CLOs had received full paydowns on their 2016 Term Loans.  It is my understanding that Mr. Buscher then called U.S. Bank, the trustee and collateral administrator for the Grove CLOs, and asked for such confirmation.  He then logged into his account on US Bank's Pivot website and reviewed a recall notice regarding the amount transferred to Lockwood Grove (the "Lockwood Recall Notice").  I first became aware of the Lockwood Recall Notice around 9:30 AM CDT.  The Lockwood Recall Notice stated that the principal payments that Citibank had made on August 11, 2020 had been "released erroneously."  The notice gave no explanation of how or why such a payment could have been made in error, or why it was being sent almost a day after the payments were completed.[3]  TTIM was unable to find any notices concerning Evans Grove or Monarch Grove.[4]

---

[3]  A true and correct copy of Lockwood Recall Notice is DX-0876 (Citi000029455).
[4]  DX-0702 (TALLTREE_CITI_00000039) is a true and correct copy of an email exchange between Mr. Buscher and individuals at U.S. Bank that I was copied on.  In that email, individuals at U.S. Bank confirmed that they were only able to locate notices for Lockwood Grove.

15.     Around 9:42 AM CDT, I instructed Mr. Buscher to reach out to U.S. Bank again, with instructions not to return the funds to Citibank.  At 9:57 AM CDT, Mr. Buscher sent an email to Michael Pellegrino, Myron Rogers, and Joseph Allen at U.S. Bank and copying me.[5] That email attached the Lockwood Recall Notice and directed U.S. Bank not to return or book the funds and instead leave them unapplied.  The email also requested that U.S. Bank provide TTIM with (i) all notices that were received in the preceding days regarding the Grove CLOs and (ii) information reflecting the exact amounts of principal and interest that were received by the Grove CLOs on August 11, 2020.  At 11:29 AM CDT, U.S. Bank confirmed that all three Grove CLOs received full paydowns.[6]

16.     I made the decision to direct U.S. Bank not to return the funds to Citibank because TTIM's clients were paid the full amounts outstanding on their loans and I believe they are entitled to retain those funds.  Similarly, I decided to direct U.S. Bank not to book the funds because it was apparent to me once we received the Lockwood Recall Notice, that Citibank was claiming it was entitled to the return of the funds and that there would be a dispute, even possibly litigation.  The August 11 payments were placed in suspense accounts belonging to each client so that the money would not be returned to Citibank, sent to investors through the Grove CLOs' waterfalls, or re-invested.  That way, the money would be frozen until the issue was sorted out, and, indeed, the funds now remain in suspense pursuant to a Temporary Restraining Order issued in this case.

17.     I consider the 2016 Term Loans to be paid off for the Grove CLOs, and I generally view loans as paid off upon receipt of the outstanding amounts owed.

---

[5]  A true and correct copy of the referenced email communication is DX-0662 (TALLTREE_CITI_00001441).
[6]  *Id.* at TALLTREE_CITI_00001439.

18.     To this day, U.S. Bank has not been able to provide TTIM with any notices sent by Citibank concerning the 2016 Term Loans held by Evans Grove and Monarch Grove.

19.     Before I became aware of the Lockwood Recall Notice, I did not believe that Citibank had paid the money in error.  And absent Citibank making that claim in its recall notice, I would have no reason to believe the payments were made by mistake.  To the contrary, the payments appeared to be prepayments on the 2016 Term Loans.

20.     Even after I learned about the Lockwood Recall Notice, I was not convinced that Citibank had, in fact, paid the money in error.  Of course, based on what Citibank was telling us, I began to consider for the first time that it might be possible that the payment was made in error. But there were several reasons that such an error seemed unlikely.

21.     For instance, there was no interest payment due on August 11, 2020.  I am familiar with the material terms of the 2016 Credit Agreement and the 2016 Term Loans.  On August 13, 2020, I reviewed the 2016 Credit Agreement and a rate notice sent by Citibank on May 27, 2020.  Based on these documents, I determined that no interest payment was scheduled until August 31, 2020.[7]

22.     Nevertheless, the Grove CLOs received interim interest payments on August 11, 2020 along with full principal paydown.  In my experience, borrowers do not make interim interest payments unless they are made in connection with prepayments of principal or changes to the loan documents (which are not relevant here).  Indeed, the 2016 Credit Agreement allows for the unscheduled prepayment of interest only in connection with the repayment and/or prepayment of principal.[8]  And the interest calculation statement that accompanied the payment

---

[7]  I understand that Citibank later changed this interest payment date to August 28, 2020 because August 31, 2020 was a banking holiday in London.
[8]  DX-0053, 2016 Term Credit Agreement §§ 1.1, 2.11.

said that interest was "due" that day, which would be the case only if Revlon were prepaying principal.[9]

23.      I was not aware that Citibank intended to repurchase 2016 Term Loans from selected lenders on August 11, or that it planned to pay interest to all of the 2016 Term Lenders in connection with such a transaction.  Citibank did not provide advance notice to TTIM that such repurchases were going to occur or that interest was being paid in connection with repurchases.  It is my understanding, in any event, that the exercise of repurchase rights by a lender does not cause interest to become due immediately for all lenders under the 2016 Credit Agreement.

## V.    **Prior to Citibank's Recall Notice, I Had No Reason to Believe the Payments Were Mistaken**

24.      There are several reasons why I believed the August 11 Transfer was an intentional paydown and not a mistake payment, except for the fact that Citibank later sent the Lockwood Recall Notice on August 12, 2020.  As detailed above, the payments were received, and accepted for deposit into our clients' accounts, late in the day on August 11, 2020.  The payments were made without any accompanying "error notice," and without any other indication of a mistake.

### a.    **The payments were in the exact amount of outstanding principal and accrued interest owed to each client.**

25.      Each client that received a payment on August 11, 2020, received the exact amount that was owed to that client—precisely the amount of outstanding principal and accrued interest to that date.  To me, that provided a strong indication that this was an intentional paydown of the full loan to each lender that received payments.

---

[9]  DX-0035 (Citi00002343) is a true and correct copy of the interest calculation statement sent by Citibank to U.S. Bank as trustee and collateral administrator for Lockwood Grove.

26.     Indeed, it would have been inconceivable for me to believe that Citibank would have accidentally paid all of the lenders exactly the amounts they were owed in principal and interest on outstanding loans, using Citibank's own money.  In my entire career, I have never before seen an accidental complete prepayment of the exact amounts owed on a syndicated loan.

b.   **The payments were received in the middle of an interest period, which is highly indicative of a prepayment of the loan.**

27.     As I discuss above, on August 13, 2020, I reviewed the 2016 Credit Agreement and other loan documents and determined that there was no interest payment scheduled on August 11, 2020.  I also reviewed the section of the 2016 Credit Agreement that permits Revlon to make optional prepayments and determined that the 2016 Credit Agreement only allows for the unscheduled prepayment of interest in these circumstances in connection with the repayment and/or prepayment of principal.[10]

28.     That is significant since the August 11 payments were accompanied by a notice saying that interest was "due."  The only apparent reason that 100% of accrued interest would have become "due" on August 11, 2020 is the full loan was being paid down.

29.     The fact that the August 11 payments were not accompanied by principal payment notices was not an indication of any mistake.  As discussed above, the payment of interim interest, with notices saying that interest was "due," is consistent with a corresponding payment of principal.  In any case, it is not uncommon in my experience for payment notices to be sent after a payment is made, including up to several days later.  It is very rare that such a payment turns out to have been made in error, and the absence of a notice therefore does not signal to me that a transfer occurred by mistake.

---

[10]   DX-0053, 2016 Term Credit Agreement §§ 1.1, 2.11.

c.   **I presume that Citibank, a huge, sophisticated financial institution, has many protections in place to prevent sending out erroneous payments.**

30.   I have long presumed that Citibank, as one of the largest and most sophisticated financial institutions in the world, has multiple levels of internal controls and safeguards in place to prevent mistaken payments, particularly mistaken payments from the financial institution's own funds.

31.   It seemed far more likely to me that Citibank had made the August 11 payments on purpose but without a contemporaneous notice, than that Citibank had accidentally transferred hundreds of millions of dollars to multiple lenders in the exact amounts they were owed.

d.   **Revlon's alleged liquidity issues did not suggest that the payment was a mistake.**

32.   It was also certainly possible in my view that Revlon could have paid the 2016 Term Loans, regardless of its financial difficulties.  Indeed, it is entirely possible that Revlon could have, through various means, secured the funds to pay the larger amount due across all of the 2016 Term Loans.

33.   Revlon did something similar in May of 2020, when it raised nearly $1 billion despite reported liquidity constraints.  And Revlon's long-time sponsor, Ronald Perelman, is famous for effecting strategic transactions, and keeping Revlon alive and out of bankruptcy.  Indeed, it was, and still is, my understanding that Mr. Perelman intended to be a source of capital for Revlon.

34.   TTIM selected the 2016 Term Loans, in part, because of TTIM's experience with Mr. Perelman and the expectation that he would never let Revlon default on its loans (which would mean his equity interests would be cancelled).  And the price for Revlon's publicly-traded common stock on August 11, 2020 reflected hundreds of millions of dollars of market

capitalization, which suggests to me at least the potential to satisfy all of Revlon's liabilities in full.

35.     While it is true that a prepayment by Revlon would likely be disclosed publicly, such disclosure was not required before the transaction took place, and indeed would likely have happened days after the transaction, as was the case with Revlon's April 17, 2020 Amendment to its Revolving Credit Agreement, which was disclosed publicly in an 8-K filing six days after the transaction occurred.[11]

*     *     *

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*[Rest of page intentionally left blank.  Signature on next page.]*

---

[11]   *See* Revlon, Inc. April 23, 2020 8-K,
https://www.sec.gov/Archives/edgar/data/887921/000095014220001238/eh2000667_8k.htm

Dated:  November 12, 2020
        Union Pier, MI

William Lenga