UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re:*<br><br>*Citibank August 11, 2020 Wire Transfers* | Case No. 1:20-cv-06539 (JMF)<br><br>**DECLARATION OF MELROSS MENESES** |

## DECLARATION OF MELROSS MENESES

I, Melross Meneses, being duly sworn, state the following under penalty of perjury:

1. I am a resident of the State of New Jersey, over the age of 18, and competent to make this statement.

### I.  Introduction

2. I am a Senior Analyst at ZAIS Group, LLC ("ZAIS"). I have worked at ZAIS since 2014 and have been a senior analyst for approximately two years. I submit this declaration as my testimony in support of ZAIS's defense to claims asserted by Citibank, N.A. ("Citibank") in this action.

3. I have first-hand knowledge of the facts set forth in this declaration. Among other things described below, I am familiar with our clients' holdings as lenders in the 2016 Revlon Term Loans, and the events surrounding Citibank's transfer of funds in repayment of those loans on August 11, 2020.

4. As I will discuss in greater detail below, Citibank transferred funds to ZAIS's clients, late on August 11, 2020, in the exact amounts those clients were owed on the Terms Loans. The funds were accepted for deposit into the clients' accounts, and the transfers were not accompanied by any notice, or indication of any sort, that they had been sent by mistake. It was not until nearly 20 hours later that Citibank first circulated "error notices" claiming that the

1

money had been paid by mistake. I personally learned of the August 11 transfer and the error notices at around the same time on August 12, but – if not for those notices – it would have seemed obvious to me that the transfer was intended as a pre-payment on the Term Loans, and would not even have occurred to me that the transfer could have been by mistake.

II.     **Background**

5.      ZAIS is a collateral manager for certain collateralized loan obligations ("CLOs"). Nine CLOs managed by ZAIS invested in the 2016 Term Loans. These CLOs, which are our clients, are ZAIS CLO 1, Limited, ZAIS CLO 2, Limited, ZAIS CLO 5, Limited, ZAIS CLO 6, Limited, ZAIS CLO 7, Limited, ZAIS CLO 8, Limited, ZAIS CLO 9, Limited, ZAIS CLO 11, Limited, and ZAIS CLO 13, Limited.

6.      These nine CLOs—like all of the CLOs for which wholly owned subsidiaries of ZAIS act as manager—are separate and distinct legal entities. The CLOs themselves are not ZAIS subsidiaries. ZAIS subsidiaries have contractual relationships with each CLO. True and correct copies of the collateral management agreements ("CMAs") and indentures governing the ZAIS subsidiaries' relationships with each CLO are identified below.[1]

7.      In my role as a senior analyst, I am responsible for a portfolio of credit investments for various clients, including the CLOs at issue in this case. In particular, I am responsible for following the Revlon credit. My responsibilities include making recommendations about whether and when to invest in various debt instruments (such as the

---

[1] See DX-0158 (ZAIS CLO 1 CMA); DX-0159 (ZAIS CLO 1 Indenture); DX-0168 (ZAIS CLO 2 CMA); DX-0918 (ZAIS CLO 2 Indenture); DX-0220 (ZAIS CLO 5 CMA); DX-0920 (ZAIS CLO 5 Indenture); DX-0248 (ZAIS CLO 6 CMA); DX-0919 (ZAIS CLO 6 Indenture); DX-0256 (ZAIS CLO 7 CMA); DX-0255 (ZAIS CLO 7 Indenture); DX-0266 (ZAIS CLO 8 CMA); DX-0267 (ZAIS CLO 8 Indenture); DX-0280 (ZAIS CLO 9 CMA); DX-0279 (ZAIS CLO 9 Indenture); DX-0298 (ZAIS CLO 11 CMA); DX-0299 (ZAIS CLO 11 Indenture); DX-0314 (ZAIS CLO 13 CMA); DX-0313 (ZAIS CLO 13 Indenture).

2016 Term Loans at issue in this case), monitoring our clients' investments, and advising as to whether such loan obligations should be sold and at what price.

III. **The Revlon 2016 Term Loans**

8. As of August 11, 2020, the above nine entities for which ZAIS subsidiaries act as collateral manager held 2016 Term Loans issued by Revlon under the 2016 Credit Agreement (the "Term Loans"). Those clients were lenders to Revlon at that time. Out of the entire facility, ZAIS's clients held approximately $15,600,780.52 of the 2016 Term Loans. True and correct copies of the payment notices showing the holdings of each client are identified below.[2]

9. The 2016 Term Loan was entered into in connection with Revlon's acquisition of Elizabeth Arden, and was secured by Revlon's intellectual property.

10. The last interest payment under the 2016 Term Loan before the August 11 payments was on May 29, 2020. Following the May interest payment, the next day on which interest was due under the 2016 Term Loan was August 28, 2020.

11. I had no idea, prior to this litigation, that Citibank had planned to repurchase 2016 Term Loans from selected lenders on August 11, or that it was planning to pay interest to all of the Term Lenders in connection with such a transaction. Citibank never provided notice to ZAIS that such repurchases were going to occur or that interest was being paid in connection with repurchases.

IV. **The August 11 Transfer**

12. On the afternoon of August 11, 2020, around 5:30 p.m., all nine ZAIS clients received wire transfers totaling their respective outstanding principal and interest. The funds were accepted for deposit into each of these clients' accounts, which are maintained at Bank of

---

[2] *See* DX-0881 (ZAIS CLO 1); DX-0857 (ZAIS CLO 5); DX-0853 (ZAIS CLO 6); DX-0854 (ZAIS CLO 7); DX-0855 (ZAIS CLO 8); DX-0852 (ZAIS CLO 11); DX-0858 (ZAIS CLO 13).

3

New York Mellon (CLOs 1, 2, 7, and 9) and U.S. Bank (CLOs 5, 6, 7, 11, and 13).  The description in the wire transfers stated the payments were in connection with the 2016 Term Loan.  True and correct copies of the transfer confirmations for each client are identified below.[3]

13.     The amounts that each client received were identical to the outstanding principal and accrued interest owed under the 2016 Term Loans as of August 11, 2020.  The specific amounts owed to and received by the clients are as follows:

| Lender Name | Principal Outstanding as of August 11, 2020 | Accrued Interest Outstanding as of August 11, 2020 | Total Payment by Citibank on August 11, 2020 |
|---|---|---|---|
| ZAIS CLO 1, Limited | $950,347.23 | $8,302.34 | $958,649.57 |
| ZAIS CLO 2, Limited | $972,222.23 | $8,492.44 | $980,715.67 |
| ZAIS CLO 5, Limited | $1,465,754.87 | $12,805.00 | $1,478,559.87 |
| ZAIS CLO 6, Limited | $2,430,555.56 | $21,233.60 | $2,451,789.16 |
| ZAIS CLO 7, Limited | $3,893,811.53 | $34,016.77 | $3,927,828.30 |
| ZAIS CLO 8, Limited | $2,439,188.98 | $21,309.03 | $2,460,498.01 |
| ZAIS CLO 9, Limited | $1,469,465.65 | $12,837.42 | $1,482,303.07 |
| ZAIS CLO 11, Limited | $989,717.23 | $8,646.28 | $998,363.51 |
| ZAIS CLO 13, Limited | $989,717.23 | $8,646.28 | $998,363.51 |

14.     The transfers were sent by wire to the same banks and accounts as all past payments by Citibank in connection with the 2016 Term Loan.  The transfers were not accompanied by any notice of mistake nor other documentation indicating that the funds had been sent in error.  Upon receipt of the payment, the clients' trustees, who handle the CLOs' bank accounts, did not notify anyone at ZAIS that they believed they had received a mistaken payment.  I am not aware of anyone at ZAIS nor at our clients' banks having reached the conclusion that the payment was made in error on August 11.  Identified below are true and correct copies of examples of the daily cash reports for August 11, which were circulated to me

---

[3] *See* DX-0878 (ZAIS CLO 1); DX-0857 at Citi00005960 (ZAIS CLO 5); DX-0853 at Citi00005969 (ZAIS CLO 6); DX-0854 at Citi00005978 (ZAIS CLO 7); DX- (ZAIS CLO 8); DX-0852 at Citi00005942 (ZAIS CLO 11); DX-0858 at Citi00005948 (ZAIS CLO 13).

and others at ZAIS on August 12 (and are circulated each day in the ordinary course of our business), in which the trustees recorded the receipt of the transfers.[4]

15.     On the afternoon of August 12, 2020 at 3:06 p.m., I received an automated email from Wall Street Office (ZAIS's loan management system) attaching a recall notice for Zais CLO 7. A true and correct copy of that email is DX-0540. I do not recall exactly when I opened and reviewed the notice, but it was later the same day.

16.     As I was thinking about whom I should speak to about the recall notice, a conference call with other managers whose clients were Term Lenders was scheduled for the morning of August 13, 2020. I decided to seek guidance regarding the notice at that time.

17.     While I understood from the recall notice that Citibank had apparently sent some money in relation to the Revlon Term Loans, I learned of the full extent of the August 11 payments on the 2016 Term Loans on the morning of August 13, 2020. That morning, I participated in a conference call with other managers whose clients were Term Lenders and with Quinn Emanuel, which had previously been retained by UMB Bank. Shortly after the call, I received confirmation that our clients had been paid off.

18.     I learned on a later call with the investment committee that Marta Kuder and Elizabeth DiPoalo of ZAIS's back office had, after receiving the recall notices from Citibank, instructed U.S. Bank and Bank of New York Mellon to return the funds.

19.     I understand that Bank of New York Mellon sent the funds back to Citibank pursuant to our back office's instructions for CLO 2 and CLO 9. None of the funds for the seven other CLOs were returned. I also understand that Ms. DiPoalo instructed Bank of New York

---

[4] *See, e.g.*, DX-0596 (ZAIS CLO 1); DX-0594 (ZAIS CLO 2); DX-0613 (ZAIS CLO 7).

Mellon to attempt to claw back those funds that had been sent to Citibank for CLO 2 and CLO 9. Citibank has not returned those funds.

20. It was clear, in light of its recall notices, that Citibank was claiming it was entitled to recall the funds it had transferred on August 11, and that there would be a dispute, even possibly litigation. Therefore, in order to be prudent, ZAIS instructed Bank of New York Mellon and U.S. Bank to freeze the August 11 payments in place in unapplied cash accounts belonging to each client on August 13 so that the money would be frozen until the issue was sorted out.

21. I consider the 2016 Revlon Term Loan to be paid off for CLOs 1, 5, 6, 7, 8, 11, and 13, and indeed generally view loans as paid off upon receipt of the outstanding amounts owed.

## V. **Prior to Citibank's Recall Notice, There Was No Indication the Payments Were Mistaken**

22. There was nothing about the August 11 Transfer, other than the error notices that Citibank sent the following day, that gave any indication that the transfer could have been by mistake. As detailed above, the payments were received, and accepted for deposit into our clients' accounts, late in the day on August 11, 2020. The payments were made without an accompanying "error notice," and without any other indication that they had occurred by mistake.

23. It was not until approximately 20 hours later that Citibank started sending notices claiming that the payments were mistaken. It would not have even seemed plausible to me, but for the fact that Citibank sent those notices, that the payment had occurred by mistake.

    a. **The payments were in the exact amount of outstanding principal and accrued interest owed to each client.**

24. Each client that received a payment on August 11, 2020 received the exact amount that was owed to that client—precisely the amount of outstanding principal and accrued

interest to that date. To me, that would provide strong indication that Revlon was intentionally paying down the full loan to each lender that received payments.

25. It would have been inconceivable to believe that Citibank would have accidentally paid all of our clients, or the larger universe of lenders on the Revlon Term Loans, exactly the amounts they were owed in principal and interest on outstanding loans. I have never before seen a bank or any financial institution send the exact amounts owed on outstanding loans by mistake.

      b. **The payments were received in the middle of an interest period, which is highly indicative of a prepayment of the loan.**

26. Interest was not scheduled to be paid on the Term Loans until the end of August. There was no interest payment scheduled on August 11, 2020. Nevertheless, the August 11 Transfer was accompanied by a notice saying that interest was "due." The only apparent reason that interest would have become "due" on August 11 is if the full loan was being paid down. In my experience, it is not uncommon for a loan to be prepaid; and, when it is, interest becomes due and is typically paid at the same time.

27. The fact that the August 11 Transfer occurred without a separate principal payment notice also would not have indicated any mistake. As explained above, the payment of interim interest, with notices saying that interest was "due," is consistent with a corresponding payment of principal. In any case, it is not uncommon in my experience for payment notices to be sent after a payment is made, including up to several days later.

28. Sometimes, payments are made without any notice at all. For example, in a credit that I used to cover, White Birch Paper, the borrower made an unscheduled full paydown of loans held by ZAIS clients without sending any payment notice to me, or to anyone at ZAIS – either before or after the payment. In my experience, it is very rare that a payment made without

a notice turns out to have been made in error, and the absence of a notice therefore does not signal to me that a transfer occurred by mistake.

    c. **I presume that Citibank, a huge, sophisticated financial institution, has many protections in place to prevent sending out erroneous payments.**

29. I have long presumed that Citibank, as one of the largest and most sophisticated financial institutions in the world, has multiple levels of internal controls and safeguards in place to prevent mistaken payments.

30. Absent Citibank's assertion of error, it would have seemed far more likely to me that Citibank had made the August 11 payments on purpose but without a contemporaneous notice, than that Citibank had accidentally transferred tens of millions of dollars to multiple lenders in the exact amounts they were owed.

    d. **Revlon's alleged liquidity issues did not suggest that the payment was a mistake.**

31. There are additional reasons that it would have seemed entirely plausible to me that Revlon would pay down the Term Loans, regardless of its financial difficulties.

32. As an initial matter, ZAIS's clients were paid $15,737,070.66, which was well within the amount that a large company like Revlon, even with its financial strains, could have paid without much difficulty.

33. Another reason I would not consider prepayment to have been implausible or even unlikely is that it was certainly possible that Revlon could have raised the capital to pay off the Term Loans.  Indeed, as recently as May 2020, Revlon raised nearly $1 billion despite reported liquidity constraints.  In connection with that transaction, Revlon publicly reported that it satisfied approximately $953 million of 2016 Term Loans at par, repaid at par a $200 million term loan issued in 2019, including a "make whole" premium, repurchased at par approximately

8

$50 million of unsecured bonds, and, several weeks later, repaid at par (and prior to maturity) a $65 million revolver.

34.  Revlon, and its long-time sponsor, Ronald Perelman, are famous for effecting strategic transactions, and keeping Revlon alive and out of bankruptcy.  Indeed, the price for Revlon's publicly-traded common stock on August 11 reflected hundreds of millions of dollars of market capitalization, which suggests at least the potential to satisfy all of Revlon's liabilities in full.

## VI. ZAIS's Direction to UMB Bank was Unrelated to the August 11 Payments

35.  I also understand that Citibank has argued that that the filing of the UMB action against Revlon, Citibank, and others and the accompanying notice of acceleration on August 12, 2020, was an indication that managers like ZAIS knew the 2016 Term Loans had not been paid off as of that date.  That is wrong.

36.  ZAIS signed and submitted forms directing UMB to commence the action and accelerate the 2016 Term Loans on August 10, 2020.  The direction to UMB occurred before the August 11 transfer and, of course, was wholly unrelated to payments that were not made until the following day.  At the time the UMB complaint was filed, I was not even aware of the August 11 transfer.

\*     \*     \*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: November 12, 2020
       Toms River, NJ

_____
Melross Meneses