UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re:* | Case No. 1:20-cv-06539 (JMF) |
| *Citibank August 11, 2020 Wire Transfers* | **DECLARATION OF JEREMY PHIPPS** |

## DECLARATION OF JEREMY PHIPPS

I, Jeremy Phipps, being duly sworn, state the following under penalty of perjury:

1.      I am a resident of the State of Georgia, over the age of 18, and competent to make this statement.

## I.      Introduction

2.      I am a managing director and the Chief Investment Officer at Medalist Partners Corporate Finance LLC ("Medalist").  I have worked at Medalist or its predecessors since 2006 and have been the chief investment officer for approximately two years.  I submit this declaration as my testimony in support of Medalist's defense to claims asserted by Citibank, N.A. ("Citibank") in this action.

3.      I have first-hand knowledge of the facts set forth in this declaration.  Among other things described below, I am familiar with our clients' participation as lenders in the 2016 Term Loans, and the events surrounding Citibank's transfer of funds in repayment of those loans on August 11, 2020.

4.      As I will discuss in greater detail below, Citibank transferred funds to Medalist's clients, late on August 11, 2020, in the exact amounts those clients were owed on the Term Loans.  The funds were accepted for deposit into the clients' accounts, and the transfers were not accompanied by any notice, or indication of any sort, that they had been sent by mistake.  It was not until nearly 20 hours later that Citibank first circulated "error notices" claiming that there had

1

been a mistake.  Even though I personally learned of the August 11 transfers and the error

notices at around the same time on August 13, my initial reaction to learning of the transfers was

that we were getting paid down intentionally, notwithstanding Citibank's claims of error.  That

seemed more plausible to me than a large, leading global bank accidentally paying down an

entire syndicated loan, in the exact amounts owed to each lender.  There was certainly no

indication at the time our clients received the funds that the transfer had been made by accident.

II.     **Background**

5.      Medalist is a collateral manager for certain collateralized loan obligations

("CLOs").  Three CLOs managed by Medalist invested in the 2016 Term Loans.  These three

CLOs are JMP Credit Advisors CLOIIIR Limited ("CLO3"), JMP Credit Advisors CLOIV

Limited ("CLO4"), and JMP Credit Advisors CLOV Limited ("CLO5").  In its role as collateral

manager, Medalist selects investments for these CLOs.

6.      These three CLOs—like all of the CLOs for which Medalist acts as manager—are

separate entities.  They are not Medalist subsidiaries; Medalist has contractual relationships with

each of them to provide specified management services.[1]

7.      In my role as a managing director and as Chief Investment Officer, I manage a

portfolio of credit investments for different clients, including the client funds at issue in this case.

My responsibilities include, for example, analyzing whether and when to invest in various debt

instruments (such as the 2016 Term Loans at issue in this case), calculating the price at which

our clients should be willing to purchase the loans, assessing whether our clients should join

syndicates relating to these loans, determining if and when such loan obligations should be sold

---

[1]  True and correct copies of the collateral management agreements ("CMA") and indentures governing Medalist's
relationship with each CLO are available at DX-265 (CLO3 CMA); DX-1122 (CLO3 Indenture); DX-1123 (CLO4
CMA); DX-1125 (CLO4 Indenture); DX-0281 (CLO5 CMA); DX-1124 (CLO5 Indenture).

and at what price, and if necessary, directing litigation concerning these loan obligations to enforce our clients' rights.

III.     **The Revlon 2016 Term Loans**

8.       As of August 11, 2020, three CLOs for which Medalist acts as collateral manager held 2016 Term Loans issued by Revlon under the 2016 Credit Agreement.  Those clients were lenders to Revlon at that time.  Out of the entire facility, Medalist's clients held approximately $4,546,623.21 of the 2016 Term Loans.[2]

9.       The last scheduled interest payment under the 2016 Term Loan before the August 11 payments was on May 29, 2020.  Following the May interest payment, the next day on which interest was due under the 2016 Term Loan was August 28, 2020.

10.      I was not aware, as of August 11, that Citibank intended to pay interest to all of the 2016 Term Lenders on August 11, 2020, because Revlon was repurchasing 2016 Term Loans from selected lenders on that day.  Citibank did not provide notice to Medalist that such repurchases were going to occur nor that interest was being paid in connection with repurchases.

IV.     **The August 11 Transfer**

11.      On the afternoon of August 11, 2020, around 5:30 p.m., EDT, three CLOs managed by Medalist – CLO3, CLO4, and CLO5 – received wire transfers totaling their respective outstanding principal and interest under the 2016 Term Loan.  The funds were accepted for deposit into each of these clients' accounts, which are all maintained at US Bank. The description in the wire transfers stated the payments were in connection with the 2016 Term Loan.[3]

---

[2]  True and correct copies of the interest calculation statements showing the outstanding principal balances are available at DX-0859 at Citi00005485 (CLO3); DX-0544 (CLO4); DX-0860 at Citi00005494 (CLO5).
[3]  True and correct copies of documents showing the amounts transferred are available at DX-0859 at Citi00005490 (CLO3); DX-0544 (CLO4); DX-0860 at Citi00005499(CLO5).

12.     The amounts that the clients received were identical to the outstanding principal and accrued interest owed under the 2016 Term Loans as of August 11, 2020.  The specific amounts owed to and received by the clients are as follows:

| Lender Name | Amount of Principal Outstanding as of August 11, 2020 ($) | Amount of Accrued Interest Outstanding as of August 11, 2020 ($) | Total Amount of Principal and Interest Outstanding as of August 11, 2020 ($) | Total Wire Payment by Citibank on August 11, 2020 ($) |
|---|---|---|---|---|
| JMP CREDIT ADVISORS CLO III R LTD (FKA) JMP CREDIT ADVISORS CLO III LTD | 1,925,000.00 | 16,817.01 | 1,941,817.01 | 1,941,817.01 |
| JMP CREDIT ADVISORS CLO IV LTD | 1,929,836.69 | 16,859.27 | 1,946,695.96 | 1,946,695.96 |
| JMP CREDIT ADVISORS CLO V LTD | 680,007.74 | 5,940.62 | 685,948.36 | 685,948.36 |

13.     The transfers were sent by wire to the same bank and the same accounts as all past payments by Citibank in connection with the 2016 Term Loan.  The transfers were not accompanied by any notice of mistake nor other documentation indicating that the funds had been sent in error.

14.     I learned of the August 11 payments on the 2016 Term Loans, and that Citibank circulated notices the following day claiming those payments had been made by mistake, on the morning of August 13, 2020.  That morning, I participated in a conference call with other managers whose clients were 2016 Term Lenders and with Quinn Emanuel, which had previously been retained by UMB Bank.  During that call, I inquired internally at Medalist about whether our clients had been paid on the Term Loans.[4]

15.     On August 13, 2020, at around 11:08 a.m., EDT, I e-mailed an internal listserv at Medalist to ask whether the CLOs we manage had received payment on the 2016 Term Loans.[5] Miranda Wenderdaum, who is an operations analyst at our firm, confirmed to me at 11:09 a.m.,

---

[4] *See* DX-0677.
[5] *Id.*

EDT, that our clients had in fact received payment.  She told me that "it was a mistake and they [Citibank] asked us to return funds,"[6] which was a reference to a notice from Citibank on the afternoon of August 12, the day after the payments were made, making that request.

16.     At 11:12 a.m., EDT, I told Ms. Wenderdaum to contact U.S. Bank immediately and to instruct them not to return the money.[7]  Medalist's clients were paid the amounts outstanding on their loans and I believe they were entitled to retain those monies.

17.     Three of our clients, CLO3, CLO4, and CLO5, were 2016 Term Lenders.  Ms. Wenderdaum told me at 11:20 a.m., EDT, that the money paid to CLO4 had already been returned to Citibank on her instructions.[8]  Apparently, after learning of Citibank's recall notice, Ms. Wenderdaum gave an instruction to return those funds, even though she did not have authority as an operations analyst to direct the return of funds without seeking approval from the investment committee.  I told Ms. Wenderdaum to do what she could to retrieve those funds, but the wire transfer for CLO4 had already completed.[9]  The wire transfer from CLO3 and CLO5 had not completed and we were able to cancel those transactions.  The August 11 payments made to CLO3 and CLO5 were therefore retained.

18.     Even though I learned about the payments and the error notices around the same time, I was still skeptical that the payments had been made by mistake.  Despite what Citibank's error notices claimed, I thought that Revlon had intentionally paid down the loans of either all the Term Lenders, or certain Term Lenders, in order to shrink the majority of lenders directing the UMB lawsuit into a minority of outstanding debt.  This was my initial reaction in a phone conversation with Craig Kitchin, who is the President and Chief Financial Officer at Medalist, on

---

[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.*

August 13, following our call with managers for other 2016 Term Lenders.  I thought that the

error notice might have been just a tactic to avoiding the UMB Bank lawsuit without having to

make the payment.

19.     I was also skeptical because I did not think it was plausible that a bank like

Citibank could make an accidental payment of hundreds of millions of dollars.  I was weighing

probabilities and, notwithstanding the error notice, it still seemed to me more likely that Revlon

had made an intentional paydown than that Citibank had accidentally transferred hundreds of

millions of dollars to multiple lenders in the exact amounts they were owed.

20.     I consider the 2016 Term Loans to be paid off for CLO3 and CLO5.  Nonetheless,

it was apparent to me and my colleagues, based on Citibank's error notices, that Citibank was

claiming it was entitled to the return of the funds and that there would be a dispute, even possibly

litigation.  Therefore, in order to be prudent, Medalist instructed U.S. Bank to hold the August 11

payments so that the money would not be returned to Citibank nor re-invested.  That way, the

money would be frozen until the issue was sorted out, and, indeed, the funds now remain in

suspense pursuant to a Temporary Restraining Order issued in this case.

V.      **Prior to Citibank's Recall Notice, There Was No Reason to Believe the Payments
        Were Mistaken**

21.     There was nothing about the August 11 transfer, other than the error notices that

Citibank sent the following day, that gave any indication that the transfer could have been by

mistake.  As detailed above, the payments were received, and accepted for deposit into our

clients' accounts, late in the day on August 11, 2020.  The payments were made without any

accompanying "error notice," and without any other indication of a mistake.

22.     It was not until approximately 20 hours later that Citibank started sending notices

claiming that the payments were mistaken.  It would not have even seemed plausible to me, but

for the fact that Citibank sent those notices, that the payment had occurred by mistake. There were several reasons why mistake struck me as unlikely.

23.     *First*, the payments were in the exact amount of outstanding principal and accrued interest owed to each of our clients. The numbers were exactly correct. In my experience in the syndicated loan market, I have never seen a payment made in the exact amounts that later turned out to be a mistake.

24.     *Second*, I had been expecting to be fully paid down on our clients' investment in the 2016 Term Loans. That was in fact our investment thesis. We knew that Revlon itself was a distressed company but we also knew that Ronald Perelman takes a personal interest in his and his family's ownership and management of Revlon. We expected either Mr. Perelman himself to be a source of capital or for him or Revlon to succeed in raising the necessary capital to fully repay our loans.

25.     *Third*, Citibank is one of the largest and most sophisticated financial institutions in the world. I presume they have many levels of internal controls and safeguards to prevent accidental transfers of money, much less accidental transfers on this order of magnitude. Therefore, absent the recall notices, the possibility of mistake would not even have crossed my mind.

VI.     **Medalist's Direction to UMB Bank was Unrelated to the August 11 Payments**

26.     I also understand that Citibank has argued that that the filing of the UMB action against Revlon, Citibank, and others and the accompanying notice of acceleration on August 12, 2020, was an indication that managers like Medalist knew the 2016 Term Loans had not been paid off as of that date. That is wrong.

27.     I signed and submitted forms directing UMB to commence the action on August 4, 2020.  I signed those forms for Medalist, in its role as manager to the three CLOs that held 2016 Term Loans.  The direction to UMB occurred well before the August 11 Transfer and, of course, was wholly unrelated to payments that were not made until a week later.  At the time the UMB complaint was filed, I was not aware of the August 11 transfer.

*       *       *

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*[Rest of page intentionally left blank – signature on following page]*

Dated:  November 12, 2020
       Alpharetta, Georgia

_____

Jeremy Phipps