UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – x

In re                                                           :

                                      No. 20 Civ. 6539 (JMF)

CITIBANK AUGUST 11, 2020 WIRE TRANSFERS.   :

– – – – – – – – – – – – – – – – – – – – – – – x

DECLARATION OF MARK A. SUNSHINE

Direct Trial Testimony Rebutting the Expert Report
of Defense Expert R. Bram Smith and Responding
to Replies by Smith and Peter U. Vinella

November 13, 2020

MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500

THE LAW OFFICES OF JOHN
  F. BAUGHMAN, PLLC
299 Broadway, Suite 207
New York, NY 10007
(347) 241-6347

Attorneys for Plaintiff Citibank, N.A.

I, Mark A. Sunshine, declare pursuant to 28 U.S.C. § 1746 as follows:

1. My name is Mark Sunshine.  I reside in Boca Raton, Florida.  I have worked in the financial industry for more than 36 years.

2. I submit this testimony in response to the anticipated testimony of Richard Bram Smith and Peter U. Vinella, who have been identified by defendants as witnesses to provide expert testimony in this case.  My testimony responds to Mr. Smith's opinions, as reflected in the Expert Report of Richard Bram Smith dated October 27, 2020 (Smith Report), the Reply Expert Report of Richard Bram Smith, dated November 6, 2020 (Smith Reply Report), and his deposition testimony from November 10, 2020.  My testimony also responds to Mr. Peter U. Vinella's opinions, as reflected in the Reply Expert Report of Peter U. Vinella, dated November 6, 2020, and his deposition testimony from November 9, 2020.

3. At a high level, I understand that in connection with the payment of interest under the relevant September 7, 2016 Credit Agreement ("credit agreement"), Citibank wired significant excess funds in error (the "overpayment"[1]) to all lenders ("lenders") in the 2016 Revlon term loan at issue ("Revlon loan").  Citibank initiated these mistaken wires late in the New York banking day on August 11, 2020.  Citibank initially detected the error by approximately 9:30 a.m. EDT on August 12, 2020, and first requested return of the overpayment in writing at approximately 2:20 p.m. EDT on the same day.

---

[1] The defined term "overpayment" is being used in this declaration for ease of understanding.  However, use of this word is not meant to imply that the funds transferred in such payment were Revlon's property or a prepayment of any of Revlon's debt.  Instead, the funds transferred in such payment were Citibank's property and sent to the lenders by Citibank in error.

I.      **Summary of Qualifications**

4.      I have extensive experience in electronic payment processing and funds transmissions.  For more than 36 years, I have worked as an investment banker, senior executive officer, consultant and/or a lawyer.  I have personally participated in more than a thousand commercial loan transactions, many of which were syndicated among or between lenders.  I have served on several Boards of Directors, including as an inside director, an outside director, and as a director for mid-sized and small not-for-profit institutions.  My experience includes acting as a senior executive officer of financial institutions that both received funds in error and sent funds to other entities in error, and both purchased and syndicated loans to other lenders.  The first time I was asked to help recover funds sent in error was in 1986.  Over the course of my career, I estimate that I have been a primary participant in recovering, or returning, funds sent in error scores of times.  In virtually all of the instances in which I was involved in resolving a payment error, it was in the context of loan transactions, including syndicated loan transactions.

5.      Prior to attending law school at the University of Michigan, I earned my undergraduate degrees in Accounting and Economics from the University of Pennsylvania's Wharton School and Faculty of Arts and Sciences, respectively.

6.      I began my investment-banking career at Prudential-Bache Securities, Inc., where I was an associate in the Financial Institutions and Structured Finance Groups.  I was at Pru-Bache from 1986 to 1989.  While at Pru-Bache, I often dealt with, and assisted in, electronic funds transfer issues.  Some of these issues related to payments made, or received, in connection with syndicated loans and asset based commercial loans, including where amounts equal to the outstanding principal on a loan were sent out in error.  In that capacity, from time to time I worked closely with the then-Treasurer of Pru-Bache and the then-Treasurer of The Prudential Insurance Company of America, on electronic funds transfer matters and issues.

7.      After Pru-Bache, I joined Oppenheimer & Co. Inc. in 1989 as a Vice President, and later became a Senior Vice President and a shareholder of the firm.  I left Oppenheimer in 1994. While at Oppenheimer, my responsibilities included working with operations to ensure transactions and trades were received, or sent, in the correct amounts.  From time to time, payment errors occurred and, on several transactions, I was the Oppenheimer officer who contacted the applicable counterparty and resolved the issue (on fixed income and preferred stock transactions and trades).  In this role, I sometimes acted on behalf of borrowers who were investment banking clients of the firm in interactions with administrative agents on syndicated loans.

8.      I am the founding member and former managing member of Westwood Capital, LLC, which I founded in 1994 when I left Oppenheimer.  I worked there until 2003.  Westwood Capital was a New York-based broker-dealer that specialized in providing strategic advisory and capital raising services to financial institutions, including acting as a private placement agent on numerous securitizations and other structured financings.  At Westwood Capital, I was the Finance and Operations Officer responsible for funds transfers.  From time to time, funds transfers had errors and I was the officer responsible for resolving those issues.  Also, as an investment banker and consultant at Oppenheimer, I assisted financial institutions in resolving funds transfer errors. We also had a joint venture with Cigna where we originated and managed mortgage and stretch mortgage commercial real estate loans, some of which were syndicated and some of which from time—to—time had payment processing issues and errors, including wire transfer errors.

9.      In 2003, I founded FCC, LLC, d/b/a First Capital where I worked until 2010.  At First Capital, I was a Director, member of the ad hoc Executive Committee of the Board of Directors, Chief Financial Officer, Chief Operating Officer and President.  First Capital was an asset based commercial lender and factor, and during my tenure there we processed tens of

thousands of inbound and outbound wires relating to debt obligations and loans. Also, at any given time, First Capital provided back-office services for approximately 30 domestic depositories, which included the provision of electronic funds transfer services. It was a relatively common event for funds to be sent in error (most often sent to First Capital in error rather than First Capital making the error). During my entire tenure, all of First Capital's back office operations staff reported to me, including those individuals who processed wire transfers and did payment processing and reconciliations. I also supervised the groups that acted as administrative agent for syndicated loans. Errors and omissions occurred in connection with electronic funds transfers associated with these loans.

10.     I was also the President and CEO of Siemens First Capital, a joint venture between an indirect finance subsidiary of Siemens A.G. and First Capital. Siemens First Capital processed a large number of electronic funds transfers for Siemens A.G. and its affiliates and subsidiaries. Erroneous fund transfers were a relatively frequent occurrence at Siemens First Capital. Both First Capital and Siemens First Capital purchased syndicated loans and were also loan syndicators. The back office staff responsible for processing electronic funds transfers reported to me. It was a regular occurrence for Siemens First Capital to have issues, errors and omissions in connection with the payment processing of loans, all of which were in whole, or in part, syndicated among lenders.

11.     I was the founder and former CEO and Chairman of the Board of Directors of Veritas Financial Partners and its predecessor entities, where I worked from 2011 until 2014. Similar to First Capital and Siemens First Capital, Veritas provided loans to businesses secured by the borrower's assets. Veritas both purchased loan syndications and sold loan syndications to other financial institutions, and at times amounts transferred in connection with such syndicated loans

were in error.  My job responsibilities at Veritas included supervising the processing of thousands

of inbound and outbound electronic funds transfers for Veritas' own account and for other financial

institutions.  As was the case at First Capital and Siemens First Capital, amounts transferred via

electronic funds transfer sometimes were for the wrong amount.

12.     From 2011 until 2015, I was a Managing Director at StoneCastle Securities, a

securities firm that specializes in providing financial advisory services and investment capital to

community banks and other non-bank financial services companies.

13.     From time to time I provide consulting and strategic advisory services to

companies, including companies in the financial services sector.  At times, in this capacity, I have

been asked to help resolve electronic funds transfer issues and errors.  These issues and errors have

included assisting in the reconciliation and recovery of funds sent in error among and between

lenders in syndicated loans.

## II.     Opinions

14.     Mr. Smith has opined that "a reasonable lender would not believe the August 11

transfers were paid in error."  I disagree with Mr. Smith.  In my opinion, a reasonable lender would

have no doubt that the August 11 transfers were made in error.

15.     First and foremost, a reasonable lender would have understood that the August 11

transfers were made in error based on a comparison of the "calculation statement," which was sent

by Citibank prior to the wire transfer, and the SWIFT confirmation, which reflected the amount

actually transferred.  A reasonable lender would have also considered:  (1) the absence of a

prepayment notice; (2) the recall notice sent by Citibank at 2:22 p.m. on August 12; (3) the

subsequent recall notices sent by Citibank in the evening of August 12 as well as on August 13

and August 17; and (4) the disclosure to the lenders that the amount mistakenly wired was

Citibank's money and not Revlon's.  Moreover, a reasonable lender would not consider speculative

theories over these facts and instead would have further considered Revlon's actual financial condition, Revlon's pending bond exchange offer (at a meaningful discount, which effectively precluded a prepayment of principal at par on the Revlon loan during the pendency of such exchange offer), and research reports from industry sources such as Moody's that suggested Revlon was a deeply financially troubled entity.  Further, if the recipient of the August 11 transfers had any questions—either for Citibank about whether the August 11 transfers were in fact a mistake, or for Revlon about whether Revlon obtained financing and intended to fully pay down a $900 million loan—a reasonable lender would put those questions to the relevant parties.

A.   A Reasonable Lender Would Consider the Discrepancy Between the Calculation Statement and the SWIFT Confirmation

16.   The concept of an electronic funds payment error is a common sense concept in both theory and application.  The receiver of funds is on notice that an error may have occurred any time it receives a pre-wire communication from the sender of the wire that sets forth an amount meaningfully different from the amount actually sent.  This simple concept is used by essentially *all* entities that receive electronic funds transfers on a regular basis.

17.   On August 11, 2020, at approximately 5:30 p.m., Citibank sent the calculation statements to the lenders.  I reviewed several of these notices.  The calculation statements communicated how much each lender should expect to receive from Citibank, how this amount was calculated and how it should be applied, *i.e.,* interest on the Revlon loan.  There is nothing missing from the calculation statements; they provided a reasonable set of expectations for the lenders that only interest was intended to be paid.

18.   For example, the calculation statement received by New Generation Loan Fund Limited Partnership made clear that it should expect a wire in the amount of $23,900.15 for the interest accrual period beginning on May 29 and ending on August 11.  PX 1297. Further, the

calculation statement sets forth the applicable interest rate (4.25%), the basis for calculation (Actual/360), the number of days in the applicable accrual period (74) and the principal amount funded ($2,735,788.12). Any reasonable lender, given that amount of detail, would expect a wire transfer for $23,900.15 and would understand that it was an interest payment only.

19.     To the extent that funds arrived that were materially different than $23,900.15, any reasonable lender would know that something was wrong. This is exactly what happened here.

20.     Mr. Smith suggests that Citibank did not inform the lenders that an "off-cycle" interest payment was taking place. But that assertion ignores the plain language of the calculation statement, which states that interim interest was being sent by Citibank. A reasonable lender would view the section of the calculation statement titled "Funds Movement," which says that Citibank "will credit your account representing the above Interim Interest based on the following instructions…" as providing notice of an "off-cycle" interest payment.

21.     Mr. Smith further suggests that there was nothing in the calculation statement that precluded the concurrent payment of principal. I agree with Mr. Smith; there is nothing that *precluded* the concurrent payment of principal in the calculation statement. But there is also nothing in the calculation statement that suggests that Revlon *was* making a concurrent payment of principal. The purpose of a pre-wire communication is to let the receiver know what the sender is going to do—here, pay interest—not to let the receiver know what is *not* happening, what might *not* occur, or what funds the receiver should *not* expect to receive. In my experience, this is a point that any reasonable lender, in any type of lending facility, would understand.

22.     After receiving a pre-wire communication, and roughly simultaneous with the wire transfer process, lenders also expect to receive a communication from their bank (or other entity) that sets forth the amount of the electronic funds transfer that has actually occurred or is in process.

The calculation statement was sent by Citibank and received by the lenders on August 11 at approximately 5:30 p.m. EDT.  Approximately 30 minutes after Citibank sent the calculation statements to lenders, the lenders received an auto-generated SWIFT confirmation reflecting the amount sent.  I reviewed several of these SWIFT confirmations.

23.     The SWIFT confirmation is a transfer receipt that merely lets the receiver know what happened in its account, and nothing more.  It is a record of what took place.  It does not in any way confirm that Citibank sent the correct amount, and is akin to the receiver logging into an on-line access portal for their account and seeing that funds had been transferred (similar to the on-line account access that we have all become familiar with as consumers).

24.     Because amounts referenced in the SWIFT confirmation were more than 100 times greater than amounts referred to in the calculation statement, the lenders had written notification, with specificity, that what they received was not what Citibank intended to send.  As a result, any reasonable lender would have concluded that something was wrong in connection with the wire.

25.     It has been suggested by defendants that a lender could just as easily have assumed that the *calculation statement* was wrong, rather than that the wire was erroneous.  In my opinion, under the circumstances here that is not a reasonable assumption to make.  The circumstances that lenders would have known about and considered include:  (i) the absence of a prepayment notice; (ii) Revlon's poor financial condition, operating losses, negative cash flow and unsustainably high leverage; (iii) the very low trading price of the Revlon loan; (iv) the absence of any disclosure by Revlon about its intent to prepay approximately $900 million of debt; (v) the defendants' substantial work preparing the UMB complaint seeking *recovery* of the outstanding principal of the Revlon loan balance on August 12; (vi) the defendants' decision to authorize delivery of a notice of acceleration on August 12; and (vii) the fact that Revlon was in the process of executing

a concurrent bond exchange offer at a discount which essentially precluded a large scale voluntary repayment of principal to the lenders.  And, if the question is (inconceivably, in my opinion) a "toss up," then a reasonable lender would ask basic questions of Citibank or Revlon to ascertain whether the amount was paid in error—a simple process (usually a single phone call) that I undertook many times throughout my career.  In my opinion, a reasonable lender would not simply assume that the SWIFT confirmation reflected a valid and completely out of the blue paydown of Revlon's debt.  It is unthinkable to me, based on my experience, that a reasonable lender would believe that Revlon paid down a nearly $900 million loan at 100 cents on the dollar without notice or prior disclosure, while simultaneously executing an exchange offer on approximately $500 million of bonds at a meaningful discount.

26.     Mr. Smith makes a few additional points regarding the calculation statement that compel a response.  First, he opines that the sender of funds may not *always* provide a pre-wire communication.  In my experience, it would be unusual not to send a pre-wire notice, but that point seems irrelevant to me because notice was provided in this case.

27.     Second, Mr. Smith opines, based upon his reading of the Credit Agreement, that reasonable lenders would have concluded that the wire was not erroneous because no borrower would prepay interest in the absence of prepayment of principal.  I disagree.

28.     While the Credit Agreement requires payment of interim interest in connection with a prepayment of principal, it does not *prohibit* payment of interim interest without an accompanying prepayment of principal.  It is custom and practice in the finance industry that unless a credit agreement expressly prohibits prepayment, the borrower has the right to prepay such amounts, in whole or in part, before the date such amounts are due and payable.  As a result, a

reasonable lender would understand prepayment of interest is allowed, regardless of whether it is accompanied by a principal prepayment.

29.     It is also my understanding that interim interest was actually paid, without a corresponding prepayment of principal, in May 2020 in connection with an amendment to the 2016 Revlon term loan.  That established a reasonable expectation on the part of the lenders that Revlon could again make an interim interest payment.  I disagree with Mr. Smith that it was a "one time event"; the Credit Agreement does not say that, and in fact Section 2.3(a) and Exhibit H (Repurchase Notice) expressly contemplate future repurchases, or rollups, like the one that occurred in May 2020.

30.     In sum, because the calculation statement and the SWIFT confirmation were different by a material amount, a reasonable lender receiving the August 11 transfers would have understood that something was "wrong" and that an error has occurred, and that the most likely error was that a mistaken amount was sent.

**B.      A Reasonable Lender Would Have Considered That There Was No Pre-Payment Notice**

31.     The Credit Agreement requires a notice to be provided by Revlon to Citibank before noon, at least three business days prior to making a prepayment of principal.  (PX 556, Section 2.11(a).)  Citibank is then required, by the same provision, to provide "prompt" notice to the lenders.

32.     I agree with Mr. Smith that sometimes prepayment notices are not provided by borrowers.  But this is not the relevant issue.  The relevant issue is that the lack of a prepayment notice is something that a reasonable lender would have considered in processing the incoming payment and assessing whether it was an error.

33.     Because lenders rely on prepayment notices, the lack of a prepayment notice is something that a reasonable lender would have considered.  A reasonable lender would not speculate, as Mr. Smith does, that because notices of prepayment are occasionally not sent, they were free to assume that Revlon and Citibank did not send a notice as required by the Credit Agreement, and that Revlon prepaid the full principal balance of the Revlon loan.  It is especially incongruous to suggest that lenders reasonably could rely on what they did not receive when compared to what they actually did receive, in this case conflicting pre-wire communications and SWIFT confirmations, as well as the recall notices, as discussed in greater detail below, which made it clear that a mistake had occurred.

C.     A Reasonable Lender Would View the Recall Notices as Confirmation That Funds Were Sent in Error

34.     The first recall notice was delivered to the lenders on August 12 at approximately 2:22 p.m. EDT, approximately five-and-a-half business hours after the funds were sent, and provided essential details to the lenders about the overpayment.  I reviewed several of these recall notices, and have reviewed numerous recall notices over my 36-year career in the financial industry.

35.     The first recall notice specifically informed the lenders that the calculation statement was correct and that the mistake was an overpayment of funds.  It also unambiguously informed each lender that the excess amount was mistakenly wired, and asked for its return.  The subsequent recall notices sent on August 12, 13, and 17 provided further information to the lenders that the amount had been mistakenly wired.

36.     There were no other important details that were missing from the first recall notice that a reasonable lender would need to conclude that the overpayment was sent in error.

     D.    A Reasonable Lender Would Also Consider That The Overpayment Was Made With Citibank's Own Funds

37.    Additional communications by Citibank made clear to the lenders that it was Citibank's funds wired in error, and that Revlon had nothing to do with the mistake.  (PX 1151.) A reasonable lender would have understood that Citibank did not intend to pay down Revlon's debt with its own money.

38.    Some of Citibank's communications were by email, and I understand that others were by telephone.  Not all of the lenders accepted or returned Citibank's calls (PX 56, PX 1244, PX 1310), but Citibank communicated that the overpayment was made with Citibank's own money.

39.    Mr. Smith ignores that the overpayment is Citibank's property and not Revlon's. For Mr. Smith's opinion to make sense—that a reasonable lender would believe this payment was in fact a full prepayment and not an error—a lender would have had to conclude that Citibank intentionally decided to pay off the Revlon loan using its own funds, and then decided the very next day to recall those funds.  I disagree with Mr. Smith that a reasonable lender would believe this; in my experience they would not.

     E.    A Reasonable Lender Would Not Give Weight to Speculative Theories

40.    Mr. Smith offers an opinion as to what a reasonable lender could have speculated, but that is not an accurate description of the analysis that a reasonable lender would engage in when deciding whether and how to process a loan payment.  That is especially so where objective facts were known to lenders, such as Revlon's reported poor financial position and ongoing operating losses, the low trading price of the Revlon loan, Moody's expression of skepticism about Revlon's ability to meet its obligations, and the fact that Revlon was simultaneously engaged in

an exchange offer for other debt at a meaningful discount to par.  At the very least these factors should have raised serious questions about Revlon's ability to pay down the principal of the loan.

41.     Mr. Smith describes several speculative theories in his report, among them that Revlon may have obtained financing to pay down the loan despite its poor financial situation; that Revlon's lack of available cash to repay the Revlon loan would not impair Revlon's ability to use available cash to repay it; that a company's liquidity position "paints a wholly incomplete picture of a company's ability to repay its loans"; that Revlon is Mr. Perelman's "prized possession"; and that because Mr. Perelman's daughter runs Revlon, Mr. Perelman may have sold off personal assets to infuse Revlon with money.  The type of speculation that Mr. Smith engages in is, in my experience, discouraged at financial institutions, including those at which I have worked and with whom I have consulted over the years.  These speculative theories are not the "stuff" of fact-based and logical decision-making by a reasonable lender.

42.     As previously discussed, when the lenders received the SWIFT confirmation, they were on notice that an error occurred.  At that time they were also in a position to observe that no prepayment notice had been received. When the lenders received the first recall notice at approximately 2:22 p.m. on August 12, they had confirmation that funds were sent to them in error. And when defendants were subsequently contacted by Citibank by phone and email, they received further confirmation that the overpayment was made in error and learned that the overpayment was Citibank's property and not Revlon's funds.

43.     If a lender were to weigh speculative theories against facts (which in my experience does not happen), in my opinion a reasonable lender also would have considered that it was unlikely that Revlon had the financial resources to prepay the full amount of principal, and therefore more likely that Citibank made an error.  According to Mr. Smith, the defendants were

14

aware of steps that Revlon was taking to address its financial issues.  Therefore, they would have been aware of, among other things, the relatively low secondary market trading price of the Revlon loan, the contents of Revlon's public disclosures (and the absence of disclosures about new financing to pay down a $900 million loan), and the contents of analyst reports analyzing Revlon's financial position.  In just one example, on August 5, Moody's published a report that confirmed a "Caa3 with negative outlook" credit rating on Revlon debt.[2]  Moody's further stated that Revlon was distressed credit, in default, had no reasonable alternatives but to raise additional funds, was experiencing negative cash flow and maintained unsustainable levels of debt.

44.    The Moody's report emphasized that Revlon debt was trading at a significant discount to par because of these issues and debtholders were at risk of being impaired in future exchange offers.  Moody's even identified acquisition event risk as a material factor because of the controlling stake owned by MacAndrews & Forbes and Mr. Perelman.

45.    Reasonable lenders would have understood that the factors identified by Moody's meant that there was a strong correlation between low secondary market trading prices of Revlon debt and Revlon's lack of ability to meet its obligations on a full and timely basis.

46.    Moreover, Mr. Smith's conjecture about where and how Revlon might have had the liquidity to repay its loan, and the possibility that somehow Mr. Perelman was going to pump cash into Revlon to cure billions of dollars of defaulted debt, would have been considered by the marketplace prior to August 11 and reflected in the trading price of Revlon's loan.  The very low trading price of Revlon's loan thus indicates that investors generally rejected Mr. Smith's hypothesis that Revlon could have had secret and undisclosed sources of cash, including other companies controlled by Mr. Perelman, or Mr. Perelman himself.

---

[2] https://www.moodys.com/research/Moodys-says-Revlons-debt-swap-offer-considered-to-be-a--PR_429933

47.    In short, it is my opinion that a reasonable lender would not have considered these speculative theories in determining whether or not there had been an error.  And if any lender had questions about the overpayment, a reasonable lender would put those questions to the relevant parties.

F.    Reasonable Lenders Know That Wire Errors, Even Large Wire Errors, Happen With Surprising Frequency

48.    Mr. Smith says that Citibank's error is largely unprecedented in magnitude and therefore a reasonable lender would not assume that the overpayment was made in error.  I disagree.  Although $893 million is of course a significant amount of money, wire errors, in all sizes, are a regular occurrence in the marketplace.

49.    In my experience at First Capital, Siemens First Capital and Veritas, errors in electronic funds transfers were a daily occurrence.  Errors occurred because of computer issues (computers not talking to one another correctly), human error and/or mistake on the part of the applicable clearing bank and/or wire transfer system that we could not trace.  Many of the errors were the result of human error or system flaws at money center banks and sometimes the resulting wire errors were for millions—even hundreds of millions—of dollars.

50.    What reasonable lenders do not know ahead of time, however, is what sort of error will happen, who will make the mistake, and the magnitude of the error.  But reasonable lenders know, and expect, that errors will take place.

51.    I disagree with Mr. Smith's opinion that the magnitude of Citibank's error is virtually unprecedented.  A quick news search uncovers the reporting of many large electronic

funds transfer errors including:  (i) a $6 billion mistake made by Deutsche Bank in 2015,[3] (ii) a $37 million error made by Bank of America in 2019,[4] (iii) a $16 million error made by Morgan Stanley Smith Barney in 2014,[5] (iv) a $72.5 million error mistake by Deutsche Bank in 2008,[6] (v) a payment error of Goldman Sachs and Morgan Stanley made to 100,000 homeowners in 2013 of indeterminate amount,[7] (vi) an error involving 66,000 customers made by USAA Federal Savings Bank from 2011 to 2015,[8] (vii) a $5.4 billion error made by KfW (an institution owned by the German Government) in 2017,[9] (viii) a $426 million error made by KfW in 2008,[10] and (xi) a €28 billion error made by Deutsche Bank in 2018.[11] Of course, precisely because errors are so routine, and so routinely corrected, only a small fraction are reported in the news media. And although I don't know the details of each of these errors, that is not the point; the point is that large errors do happen.

52.     Mr. Smith also opines that that a reasonable lender can expect that the internal controls of large institutions are such that incoming wires will almost always be correct.  I disagree, for three reasons.

---

[3] "Deutsche Bank accidentally sent hedge fund $6 billion in 'fat finger' mistake," *The Tell*, October 19, 2015, Joseph Adinolfi, (accessed on 10/31/2020).

[4] "Woman finds $37 million in her bank account after clerical error – WGHP FOX 8 Greensboro," December 13, 2019, (accessed on 10/31/2020).

[5] "Morgan Stanley Smith Barney Settles CFTC Charges; Agency Says Firm Mistakenly Made Transfer From Customer-Secured Account, Fixed Error Next Day," *The Wall Street Journal*, March 27, 2014, Michael Calia.

[6] "Deutsche Bank sues Lehman Brothers to recover $73m that it transferred to them 'in error,'' *Daily Mail Reporter*, November 12, 2008, (accessed on 10/31/2020).

[7] "Foreclosure Payment Errors Cited," *Dow Jones*, May 8, 2013, Alan Zibel.

[8] "USAA to Pay $12 Million in Restitution to Customers, $3.5 Million Fine," *Dow Jones*, January 3, 2019.

[9] "Bank Known for Lehman Gaffe Moves Over $5.4 Billion in Error…," *Bloomberg Law*, March 24, 2017, Eyk Henning.

[10] "Uproar Over German Bank's Payout to Lehman," *The New York Times*, September 18, 2008, Nicholas Kulish, (accessed on 10/31/2020).

[11] "Deutsche Bank blames 'operational error' for accidental €28bn transfer," *Financial Times*, April 19, 2018, Laura Noonan.

53.     First, if Mr. Smith were correct, lending institutions would not need to invest millions of dollars each year in staff to process reconciliations, verifications and wire transfers. Instead, lenders would rely on inexpensive automated fund application programs without checking to see if such application of funds is correct or not, or even if the funds are theirs to keep.  But in my experience, that is not the case.

54.     Second, Mr. Smith cites the Basel Committee on Banking and Supervision, the OCC, the Federal Reserve and the FDIC and their focus on operational procedures and controls relating to electronic funds transfers.  The reason that these regulators concentrate on improving electronic funds transfer operational accuracy is because these electronic funds transfer systems are fallible, not because they are infallible.  Fallibility means that errors take place, and the regulators know it.  By pointing out the extensive regulatory oversight that is designed to prevent electronic fund transfer errors, Mr. Smith confirms that this is an area of operational risk and reasonable lenders know about this risk and the fact that mistakes occur.

55.     Third, Mr. Smith purports to list all of Citibank's internal controls that had to fail in order for the overpayment to have occurred.  But Mr. Smith ignores that for the August 11 error to have occurred, the breakdown in internal controls had to be unanticipated, unexpected and unique.  And that is the very nature of errors, meaning that if the party making the error could have anticipated the chain of events, it would have prophylactically addressed the problem and the error would not have happened.

G.      The Fact That The Overpayment Was Equal To The Principal Amount of the Revlon Loan Would Not Lead a Reasonable Lender to Conclude that the Overpayment was Intentional

56.     Mr. Smith opines that because the amount of the overpayment was essentially the same as the outstanding (but not due and payable) principal balance of the Revlon loan, a reasonable lender would immediately conclude that the overpayment was intentional.  Further, Mr.

Vinella similarly states that it is not customary practice of a bank to have a "check box" (or series of check boxes) for principal payments. I disagree.

57.    First, in my experience, the mistaken payment of principal not yet due and payable does occur, in part because common "check boxes" in loan payment systems are for principal payment (in full or in part). In fact, I have personally seen this exact type of error happen in connection with the processing of loan payments. I observed this type of principal payment errors at Pru-Bache, Westwood Capital, First Capital, Siemens First Capital and Veritas. Institutions that made electronic funds errors of this type, which I helped to resolve, include The Bank of New York, Bank of America, Siemens Financial, West LB Bank and DZ Bank. Unfortunately, from time to time a mistaken payment of an amount that appeared to be a principal payment, but was an error, even happened at First Capital, and were caused by individuals who reported to me.

58.    When lenders received the Citibank overpayment and the calculation statement that made no mention of payment of principal, reasonable lenders should have immediately known that an error took place. In my opinion, given that mistaken payments of principal do happen, as discussed, the fact that the overpayment matched the outstanding and unpaid principal amount (which was not due and payable on August 11) would not lead a reasonable lender to conclude that the payment was made in error.

59.    One final point: part and parcel of a "check the box" principal payment error made by an agent bank is that the magnitude of the error is going to be large when measured relative to interest payments. Rather than a large error being an indicator of an intentional payment, in my experience it is a clear indication of a possible agent bank error. In my opinion, reasonable lenders know that this is the essence of one type of agent bank error.

60.     Since the Revlon loan was approximately $900 million, this simple "check the box" error was a $900 million error, which by anybody's estimation is big.  The magnitude of the difference between the calculation statement and SWIFT confirmation, and the fact that it approximately equaled the outstanding principal balance of the Revlon loan owned by the lenders should have put reasonable lenders on notice of an error.

*     *     *

61.     In sum, it is my opinion that a reasonable lender would have understood that the August 11 transfers involved an error, based on a comparison of the "calculation statement" and the SWIFT confirmation, and additionally, based on:  (1) the absence of a prepayment notice; (2) the recall notice sent by Citibank at 2:22 p.m. on August 12; (3) the subsequent recall notices sent by Citibank in the evening of August 12, as well as on August 13 and August 17; and (4) the disclosure to the lenders that the amount mistakenly wired was Citibank's money and not Revlon's. Further, a reasonable lender would not consider speculative theories when evaluating these facts. And to the extent a lender had any questions, a reasonable lender would put those questions to the relevant parties.

62.     I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 13, 2020

Mark Sunshine