UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – x

In re                                           :

                                                       No. 20 Civ. 6539 (JMF)

CITIBANK AUGUST 11, 2020 WIRE TRANSFERS.   :

– – – – – – – – – – – – – – – – – – – – – – – x


DECLARATION OF JOHN BYRNE


Direct Trial Testimony Rebutting the Expert Report
of Defense Expert R. Bram Smith and Responding
to Replies by Smith and Peter U. Vinella


November 13, 2020


MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500

THE LAW OFFICES OF JOHN
  F. BAUGHMAN, PLLC
299 Broadway, Suite 207
New York, NY 10007
(347) 241-6347

Attorneys for Plaintiff Citibank, N.A.

Contents

I. Preliminary Statement and Summary of Conclusions ........................................................ 1

II. Statement of Qualifications................................................................................................ 3

III. Wires Get Crossed ............................................................................................................. 7

IV. Payment Discrepancies And Anomalies Put Recipients On Notice
That Investigation And Reconciliation Are Required ...................................................... 10

    A. The vast discrepancy between what Citibank said it would
pay and what in fact it did pay .............................................................................. 10

    B. The absence of notice of prepayment on a loan with a
stated maturity of 2023 ......................................................................................... 12

V. Points Raised In the Smith And Vinella Replies .............................................................. 14

JOHN BYRNE makes the following declaration:

1. In this declaration I offer expert testimony to rebut, from the back-office perspective, opinions offered by defendants' proposed expert, Richard Bram Smith, in his report (the "Smith Report") dated October 27, 2020. I also address points made by Smith and by Peter U. Vinella in reply reports (the "Smith Reply Report" and the "Vinella Reply Report," respectively) they delivered November 6, 2020 after reading my report of November 2, 2020.

2. In this declaration, as in my report, I use capitalized terms as they are defined in the Smith Report and (except as noted) assume the accuracy of the facts recited in the Smith Report.

## I. Preliminary Statement and Summary of Conclusions

3. In every financial institution, whether a bank or a brokerage or a fund manager such as the defendants, there is a distinction between the front office and the back office. The front office generates the firm's revenue with activities such as sales and trading. The back office conducts the firm's operations, maintaining books and records and handling functions such as cash management, IT, facilities and compliance programs.

4. In my four-decade career I rose from a back-office clerk to some of the highest operations leadership positions in the industry. Smith's experience, by contrast, appears to be entirely front office, and that affects his report. For example, the Smith Report generally minimizes the frequency and severity of erroneous payments without acknowledging that most discrepancies are resolved without ever coming to the attention of the front office.

5. The core of Smith's opinion is: "A reasonable lender receiving such a payment would have no reason to ask whether the payment had been made in error, and no reason to suspect that any error had occurred." Smith notes that prepayments are "common" and are

permitted under the Revlon facility. He claims that "the payments here did not include any of the typical indicia of a mistaken payment."

6. From the very beginning, however, the payments of August 11 included two important "indicia of a mistaken payment." The Calculation Statement by which Citi advises the lenders of how much it plans to pay is massively out of line with the amount actually paid. A mismatch between the advised amount and the paid amount is an anomaly requiring investigation; something is not right. Another red flag, if any defendant thought even for a minute that Revlon might have paid off the facility, is the absence of the required notice of prepayment, again requiring additional investigation. No fund manager could reasonably have believed, the evening of August 11 or the morning of August 12, that the payment did not require investigation.

7. Even if a given fund manager did not understand the red flags raised August 11, which is hard to believe, Citi's error notice recalling the funds changed everything. An error notice is by far the most significant of the possible "indicia of a mistaken payment." An error notice, such as those delivered by Citibank the afternoon of August 12, is an overwhelming indicator of error and it is almost always honored. The red flags for error should already have triggered investigation to resolve anomalies; the error notice creates a strong presumption of error. The only alternative to returning the funds immediately would have been a brief investigation to confirm that there had been no payoff. That would have been as easy as asking Revlon, asking Citi, or determining whether Revlon had announced a payoff.

8. The fund managers who received the recall notice before they realized that they had been paid the previous day could not reasonably have believed for one minute that Revlon had paid off its debt – they were informed that the payments were mistaken before they were

informed that the payments had happened. And those fund managers who learned of the payment before receiving the recall notice were confronted with significant red flags and should have understood that something was seriously wrong with these payments, and that investigation and reconciliation would be required.

9. Smith's essential conclusion, that a reasonable lender would be free to accept the overpayment without a second thought, requires pretending that there is nothing anomalous in these red flags. But the red flags are real, and no reasonable party in defendants' position could fail to appreciate their significance. Because he effectively confines his analysis to August 11, Smith barely mentions the recall notice other than to acknowledge that, after the recall notice, "lenders would have a basis for contemplating that Citibank had erred." I would go further. A reasonable party in defendants' position would have understood that the recall notice gave rise to a duty to return the funds, or at the very least to investigate further to confirm whether the payment was intentional or by mistake.

## II.  Statement of Qualifications

10. I started working in the financial industry in 1981 and for more than 39 years, I have performed nearly every role of the middle and back office operations of financial institutions. Over the course of my career, I have been responsible for the execution of transactions, the maintenance of books and records, adherence to domestic and international banking regulations, management of back office personnel groups ranging in size from 20 to 1500 employees, and the adoption and implementation of new systems at the largest banks on Wall Street. My professional experience includes overseeing incoming and outgoing payments, implementing and enhancing operations systems to manage securities transactions and accompanying payments, and addressing issues with outgoing payments, such as payments made in error.

11. My first finance industry positions were on Wall Street where I worked at several firms, including EF Hutton, the Wall Street Clearing Company and Marine Midland Bank. In these roles, I was introduced to back office operations and worked in supervisory roles overseeing the execution of payments and transfers. I have been working in back office supervisory roles ever since.

12. In 1986, I joined Dillon Read & Co. where I ran the Corporate Trust business and various parts of the Cashiering Group. (Cashiering is responsible for receiving and delivering securities to and from the brokerage firm, and controlling the flow of money related to this movement of securities.) The Corporate Trust business at Dillon Read had oversight responsibility for accounts receivable and accounts payable and managed all facets of the securities-safekeeping and corporate-actions functions. Each of these groups was responsible for recording payments in and out of the company. During my tenure at Dillon Read, I was also personally responsible for the review and approval of payments leaving the firm in collaboration with the money management/treasury team.

13. In 1993, I joined Newbridge Securities. Newbridge was then a broker-dealer subsidiary of Citicorp performing correspondent clearing. It would later change its name to Citicorp Securities Services. My role at Newbridge, as at Dillon Read, included management of the securities-safekeeping and corporate-actions functions. At Newbridge, I was also actively involved in an enhanced control and governance management program. After Travelers and Citicorp merged in 1998 to form Citigroup, I was appointed chief operating officer of Citicorp Securities Services with comprehensive responsibility for the orderly wind-down of that line of business and of the broker-dealer itself.

14. I then joined Lehman Brothers in 2000 as the head of the Custody and Control team. When I joined Lehman, Lehman relied on another firm, Bear Stearns, for back office services. As head of Custody and Control, I collaborated with other senior leaders to implement a self-clearing back office technology system, using technology from Broadridge Financial Solutions to bring these services in-house. As in previous roles, I had oversight responsibility at Lehman for the departments covering corporate actions and income and tax processing of payments relating to corporate actions such as Bond Interest, Dividends, Bankruptcies, and many other types of corporate events. Additionally, I was responsible for ensuring that all activities occurred in accordance with firm policy and with local, federal and FINRA rules and regulations. I managed a team of approximately 50 people and oversaw the groups that were responsible for outgoing payments.

15. In 2003, I joined Bank of America Securities. My corporate title was principal and my functional title was group operations manager. In this role, I directed a global team across the United States, London, and India. My areas of responsibility included corporate actions, dividends, fixed income, and U.S. tax reporting. I also ran asset-services operations in support of the equities, fixed income, prime broker, and investment bank business units.

16. In 2007, I joined Deutsche Bank as the Global Head of Tax Operations. In my time at Deutsche Bank I was promoted several times and acquired the following titles: Global Head of Tax Operations, Global Head of Asset Services Change Program, Global Head of Asset Services Utility, Americas Head of Custody Operations, Americas Head of Trust & Securities Services Operations, and Americas Head Securities Services. In these roles, I reduced operational errors by 80% globally through the use of risk hierarchy metrics and improved reporting within divisions. I also spearheaded the establishment of a daily health check and oversight process

intended to identify and alert management to concerns across people, processes and technology. At Deutsche Bank, I had oversight responsibly for 1,500 employees across Asia, Europe and the Americas and sat on various regional and global governance committees.

17. In 2015, I joined UBS AG as Executive Director in the company's Regulatory Strategy Group and was responsible for coordinating the establishment of a shared services company, a UBS unit providing support to UBS companies worldwide. I subsequently moved to the operations team and served as Regional Head of Securities Settlements Utility. In this capacity, I led a team of approximately 25 employees across the US with oversight responsibility for our outsourced operations teams. I also sat on the company's Risk and Governance Committees.

18. In 2017, I joined Sionic as a Managing Partner and Co-Head of Banking and Capital Markets. Sionic provides consultancy services on business strategy as well as operating principles and assists with the implementation of robust operational business platforms to tier 1 and 2 financial services institutions. In this role, I have consulted with some of the largest banks on Wall Street regarding their operations systems, people strategy, risk mitigation and regulatory compliance.

19. In addition to my work experience, from the 1990s to mid-2000s, I served on the Board of Directors of the Securities Industry and Financial Markets Association ("SIFMA") in the Corporate Actions Division. SIFMA is an industry organization that establishes best practices in the financial services industry and advocates for the adoption of regulations to improve the operations of these institutions. I also previously held a FINRA Series 99 Certification, although this has now lapsed as I am now a consultant and not employed by a registered broker-dealer.

20. My formal training since high school includes attendance at the Kingsborough Community College in the 1980s and numerous programs at the New York Institute of Finance. I have also undertaken independent programs in areas such as Six Sigma, program and project management, global leadership, and risk and governance. In addition, I have participated throughout my career in company-sponsored training on subjects such as leadership, business processes and the regulatory environment. In 2014, Deutsche Bank sponsored my participation in a six-month program at the London School of Business.

21. At every step in my career path, including at Sionic, I have been involved in the recovery of mistaken payments, often as the one principally responsible for overseeing the resolution of payments sent in error. These mistaken payments have occurred on syndicated loans, bonds, equities, tender offers – every imaginable transaction type. I have managed through thousands of error payments, including at least several instances in which the mistaken payments measured in the hundreds of millions of dollars.

22. I have never in my career experienced litigation resulting from an error payment that was subject to a recall notice. I am keenly aware of the frequency with which erroneous payments occur and the steps that financial institutions take once the error is identified. It has been my experience that the recipients of erroneous payments resulting from back office mistakes return the funds promptly and without the need for litigation.

### III. Wires Get Crossed

23. Smith describes a theoretical world in which it is highly improbable that errors occur because the sender is a big bank, and so (according to Smith) the defendants could reasonably think it improbable that this payment was in error. But that ignores the number of transactions big banks make every day and the inevitability of human error. Human error is why reconciliation is such an important back-office function at every financial institution.

24. Nine-figure errors, such as the error in this case, are certainly infrequent, but they are not unheard of. I have personally been involved in the resolution of several erroneous payments in amounts in excess of $100 million. Nor is it a frequent occurrence that an agent, intending to pay only interest, by mistake pays an amount equal to the entire amount of principal and interest, but I have seen it happen. (I was at Dillon Read. The borrower was the Brazilian government. We recovered every penny accidentally paid out promptly and without litigation.)

25. In fact, and contrary to a theme of Smith's testimony, erroneous payments are quite common. I know that because I have helped to resolve thousands of them over the course of my career. To understand why errors remain common in modern times, it is important to understand the massive number of payments made every day:

Daily payment volumes of market leaders

| Provider | Payment type | FY volume | Daily volume | FY value | Daily value | Notes |
|---|---|---|---|---|---|---|
| SWIFT (SWIFTNet FIN) | Intnl wire trfs/messages | 8.45B | 33.6M | $1.25Q | $5T | volumes - 2019; values - 2015 |
| FEDWire | USD Fed funds | 167M | 0.67M | $695B | $2.7B | volumes & values - 2019 |
| DTCC | Securities | 654M | 2.6M | $2.15T | $8.6B | volumes & values - 2019 |
| Euroclear | Securities | 239M | 1.0M | EUR 837T | EUR 3.4T | volumes & values - 2020 |

*no data on what % of volumes involve payments as opposed to messages
Q - quadrillion
B - billion
T - trillion

(Chart by Sionic; data sources in Appendix A.) I never seen an estimate of the rate of error payments, presumably because the speedy private resolution of errors means there is no data on the issue. Given these volumes, however, it clearly does not take a high error rate to demonstrate that erroneous payments are a regular occurrence. Because error payments are a frequent fact, there are established industry norms governing how to address them.

26. For example, in 2012, DTCC (the largest global securities depository) created a Post Payable Adjustment Task Force in conjunction with industry participants to specifically address the ongoing issue with incorrect payment allocations and what are known as post payable adjustments. As a result of the task force's efforts, DTCC (as a self-regulatory

8

organization) filed a rule change with the SEC requiring parties within the income distribution lifecycle to inform DTCC within 90 days of the initial incorrect payment or the required corrections ("clawback" or additional payment), in order for DTCC to systemically process the adjustments to accounts of DTCC participants. This rule was subsequently modified in 2018 to permit credit adjustments (payment of additional cash) to occur up to a year after the initial payment; however, DTCC and its participants have still agreed to the 90-day window for the reversal (debit) of an incorrect payment from the initial date. The August 11 payments would have automatically been pulled back had they gone through DTCC. The fact that DTCC implemented a rule giving effect to the industry norm of returning mistaken payments further underscores the reality that erroneous payments are a common occurrence.

27.     Electronic funds transfer does not have DTCC's automatic clawback rules, but there is a system, rooted in industry custom and practice, for the recovery of erroneous payments. That system is built around the reconciliation process at senders and receivers. All financial institutions, within their finance and/or operations teams, are required to perform bank reconciliations and accrual reconciliations daily, and many perform this on an intraday basis. The fundamental purpose of the reconciliation process is to ensure that expected incoming and outgoing payments match the actual bank activity. Errors and anomalies are often uncovered in the reconciliation process. Protocols vary from institution to institution, but fundamentally it is the responsibility of the "Recon" group in the sending or receiving institution to identify the "break" and immediately assign ownership for research and resolution. Typically, the receiving institution will place the transaction in a suspense account and/or holding account while the research is being performed. Further, where applicable, clients and internal management will be notified of these breaks as they occur. Moreover, based on my experience, large value payments

will get immediate attention and escalation at least in part because the greater the payment the greater the risk to the institution.  Recon must be done on all payments, incoming and outgoing, that present anomalies or discrepancies.  It is industry practice that the sender reconciles and the payee also recons – and then segregates and investigates any discrepancies.  It is industry practice that Recon is needed because errors happen.  It is industry practice that, if the recon process determines that a payment is erroneous, the payment should be returned.

### IV.  Payment Discrepancies And Anomalies Put Recipients On Notice That Investigation And Reconciliation Are Required

28.   Perhaps because of Smith's front-office perspective, a serious flaw in his testimony is his failure to address a key industry norm ingrained in back-office culture.

29.   When an incoming payment has any sort of discrepancy or anomaly, the recipient has a duty, imposed by industry custom and practice, to investigate and to reconcile.  (Some institutions will have a threshold, say $25 or $50, below which discrepancies may be ignored.  The industry norm permits this.)  If the investigation shows that a payment was made in error, the recipient has a duty, again imposed by industry custom and practice, to return it.

30.   Because of this industry norm, a reasonable fund manager would have understood immediately that the August 11 payments required investigation and recon.  There are two key anomalies or red flags requiring investigation before a reasonable fund manager could treat the payments as in order.

#### A.  The vast discrepancy between what Citibank said it would pay and what in fact it did pay

31.   Smith dismisses the Calculation Statement as "a secondary source of information," with "the payment itself" serving as "the primary indicator of what a payment constitutes." Smith says that "notices are often incomplete, late, and sometimes not provided at all" and that "errors in providing notice are not uncommon."

10

32. This may be how it looks from the front office. In the back office, what matters is that the payment and the Calculation Statement are in vastly different amounts and cannot be reconciled with the information at hand. One or the other must be wrong, and that requires investigation. Every day in every back office of any size there are discrepancies that have to be resolved. Most of them are resolved without ever coming to the attention of the front office. The fact that the payment amount is 115 times greater than the amount shown on the Calculation Statement is an enormous discrepancy and at the very least requires investigation and recon. The goal of the investigation is to determine whether the payment was erroneous, not necessarily the hows and whys of any error.

33. Smith claims that the Calculation Statements were "not inconsistent with, and certainly do not preclude in any way, the concurrent payment of principal." Vinella agrees, stating that the Calculation Statement "does not preclude payment of principal in the same wire." Even if that's true, that's not the question or the point. Even if a defendant did not see the Calculation Statements as proof that the payments were erroneous, at the very least they created a dramatic discrepancy between the amount the Calculation Statement said would be paid and the amount actually paid. As Smith acknowledges, the Calculation Statements "say nothing at all about the payment of principal." In fact, they say nothing at all about tens of millions of dollars in unexplained payments. That means one of three things. The payment is wrong, or the Calculation Statement is wrong, or (as Smith seems to suggest) there is a missing notice inexplicably not sent prior to the payment. That anomaly or discrepancy has to be the subject of investigation and recon. We would investigate a discrepancy of a thousand dollars; a multi-million dollar discrepancy calls out for urgent action.

11

### B. The absence of notice of prepayment on a loan with a stated maturity of 2023

34. As Smith notes, the full prepayment of all sums owed under the facility would have required advance notice from Revlon to Citi for "prompt" forwarding to lenders. This makes sense. Fund managers desire advance notice of prepayment to allow themselves time to plan to reinvest the funds and to alert their custodians to expect a payment. Borrowers and/or agents generally comply with such advance-notice requirements. Full-balance prepayments are planned events at least several days in the making. The borrower and/or the agent will have a checklist or process or procedure to identify things to be done, including compliance with any notice requirement. That there was no prepayment notice here is another anomaly requiring investigation and recon. If a fund manager thought that the loan might have been prepaid in full, it would have been a simple matter to check with the agent or the borrower to find out what happened and to request any missing notices. Mr. Vinella agrees that, if "the defendants may have thought there was a payment error, it would have been industry standard for them to contact Citi and ask them if there was, in fact, an error." It would also have been a simple matter to check for announcements or 8-K filings. Here, such a check would have clearly demonstrated the high unlikelihood that Revlon would have had the ability to prepay the entire outstanding principal balance of the loan on August 11. A look at Revlon's then-recent SEC filings would instead have shown a quarterly report on form 10-Q filed August 6, 2020 in which Revlon reported substantial losses and more than $1.5 billion in negative equity. I do not claim to be a credit expert, but it is evident that that sort of financial reporting would make it improbable that the loan had been paid off at par, again requiring investigation before we conclude that the payments were intended and not erroneous.

35. Either of these anomalies on its own would be a red flag for error, requiring investigation and recon work. Taken together, the conclusion would have been inescapable for a reasonable fund manager: something was seriously wrong with these payments.

36. Even if we dismiss these red flags as Smith does, Citi's promptly-issued recall notices change everything. As any reasonable industry participant would know, under industry custom and practice, a prompt recall notice claiming error must be honored, or at the very least an investigation undertaken into the facts and circumstances of the payment. That entails, at the minimum, confirming with the agent and/or the borrower whether the payment was intended.

37. As I framed out in the previous section, erroneous payments happen all the time. I have personally managed, over my 40-year career, numerous teams acting as paying agent and/or as receiver; and over the course of those years, I have managed through thousands of erroneous payments, including several in excess of $100 million. I cannot recall a financial institution such as the defendants in this case defying a prompt recall notice, and especially not when the payment in question had red flags for error. Any reasonable party in the defendants' position would have known that retaining the funds in these circumstances would reflect a dramatic departure from industry norms.

38. Counsel has advised me that many of the defendants learned of the recall notice before or at the same time as they learned of the payments. These fund managers could not reasonably have believed that Revlon had paid off its debt – they knew that the payments were mistaken no later than they knew the payments had happened. The defendants who learned of the payments before Citi issued the recall notice faced red flags indicating that investigation and reconciliation was needed before they could safely and reasonably conclude that the payments were not erroneous and were in fact intended to retire Revlon's debt.

13

39. The prompt return of error payments is required by industry custom and practice. It has to be that way. For one thing, erroneous payments are sufficiently common that if recovering every erroneous payment required more than a notice, paying agents would have little time for anything else. The paying function is at best a low-margin business; no one would undertake the business if the inevitable errors could result in huge losses. Furthermore, banks and many of their counterparties are regulated entities required to reconcile their books every night for capital reporting purposes; the prompt investigation, reconciliation and repayment of erroneous payments are required for companies to keep their books balanced and accurate.

V.   **Points Raised In the Smith And Vinella Replies**

40. Smith calls my brief discussion of DTCC's clawback rules a "red herring." Not at all. Of course the August 11 payments did not go through DTCC. The point is that errors are common enough that DTCC invested significant effort into creating a means to implement the industry norm – not disputed by Smith or Vinella – that errors should be corrected. DTCC, whose transactions are predominantly related to securities and predominantly standardized, saw enough errors to adopt an error-correction process. Syndicated loans, by contrast, do not have the same level of standardization, complicating efforts to automate processes, which in turn can be expected to increase the possibility of error.

41. I agree with Smith that finality is desireable. The goal of finality, however, must fall away where, as here, a clear error is promptly identified.

42. Mr. Vinella argues that a missing payment notice would not typically lead the back office to "conclude" that a payment had been made in error. Mr. Vinella misses the point. At a minimum, a disconnect between the advised amount and the paid amount is an anomaly that requires investigation and reconciliation, especially given the size of the discrepancy here. He argues further that "a lender's request for a missing notice is generally for bookkeeping purposes

14

and not to validate a payment," especially if the lender has no reason to believe that the payment was not proper. That's not this case. Even defendants who learned of the payment before receiving the recall notice would have confronted the red flags I have discussed. The point of asking the borrower or an agent for a missing notice is not necessarily to "validate" a payment but instead to reconcile the mismatch between the advised and paid amounts. Vinella dismisses that function as "bookkeeping", but keeping accurate books-and-records is a core function of the back office and it often requires reconciliation.

43.    Vinella claims that the back office must "consult with front-office colleagues" before returning an erroneous payment. That was not true in any of the institutions where I worked in my decades in the industry and I have never heard of any institution with such a policy. On the contrary, the vast majority of erroneous payments are resolved exclusively in the back office and never come to the attention of the rest of the institution.

44.    Smith agrees with my remark that the recall notice "'changed everything.'" He continues: "After receipt of such notices, lenders would have a basis for contemplating that Citibank had erred." That is clearly correct – and makes clear that defendants who read the recall notice before they learned of the payments would not have been able, even for a minute, to suppose that there was nothing wrong with the payment. But even the defendants who learned of the payment earlier on August 12 had only a few hours at most to ponder (in the face of red flags requiring investigation) the possibility that Revlon might have paid its debt. That possibility was closed when Citi sent the error notice.

I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions.  Executed on November __13__, 2020.

_____
JOHN BYRNE