

Mayer Brown LLP
1221 Avenue of the Americas
New York, NY 10020-1001
United States of America

T: +1 212 506 2500
F: +1 212 262 1910

mayerbrown.com

**Matthew D. Ingber**
Partner
T: +1 212 506 2500
Mingber@mayerbrown.com

December 15, 2020

<u>VIA ECF</u>

Hon. Jesse M. Furman
United States District Court
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

Re: <u>In re Citibank August 11, 2020 Wire Transfers,
No. 1:20-cv-06539-JMF (S.D.N.Y.)</u>

Dear Judge Furman:

The Court directed the parties to submit supplemental briefing on the legal elements of Citibank's individual causes of action, and the evidence supporting these elements. Tr. 227:10-228:18. In particular, the Court asked the parties to focus on whether Citibank has satisfied the element of "dominion and control" for Citibank's claim for conversion, and the element of "benefit" for Citibank's claims of unjust enrichment, payment by mistake, and money had and received. Tr. 228:5-14. Part I below describes the governing law (first on conversion, and then on the remaining claims); Part II describes the relevant facts (in the same order).

In short, defendants are liable for conversion because the evidence has shown (and will show) that they have absolute authority to direct the funds they manage to return the money that Citibank mistakenly transferred on August 11, 2020 (the "August 11 Transfers"). Defendants are liable for the remaining three restitution claims because they receive fees, compensation, and other benefits that are directly tied to the value of the funds they manage; Brigade's witness could not have made this clearer, when he testified that retaining the August 11 Transfers would "result in a ***direct benefit to Brigade***." Tr. 455:6-23 (emphasis added).

For these reasons and those detailed in Citibank's pretrial briefs, the Court should enter judgment in Citibank's favor on each of its four claims.[1]

---

[1] Because the Court asked specifically about the "control" and "benefit" issues, we focus on the evidence relevant to those elements. For the sake of completeness, we address the remaining elements as well, but refer back to our pretrial briefing to the extent that a lengthy discussion would be repetitive; Citibank's briefs are cited as "Pl. Br." and "Pl. Reply," and defendants' briefs are cited as "Def. Br." and "Def. Reply." "Tr." refers to the trial transcript. If a defense witness has not yet testified live, we have cited the witness's declaration and other record evidence.

Mayer Brown is a global services provider comprising an association of legal practices that are separate entities including
Mayer Brown LLP (Illinois, USA), Mayer Brown International LLP (England), Mayer Brown (a Hong Kong partnership)
and Tauil & Chequer Advogados (a Brazilian partnership).

Hon. Jesse M. Furman
December 15, 2020
Page 2

## I.     Elements Of Citibank's Claims

Citibank alleges four causes of action under New York law: conversion, unjust enrichment, payment by mistake, and money had and received. Am. Compl. (Dkt. 193) ¶¶ 44-57. Because conversion is the only claim with a distinct element, we address it first.

### A.     Conversion

As Citibank's brief explains (Pl. Br. at 35 & n.3), a claim for conversion has two elements: "(1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Colavito v. N.Y. Organ Donor Network, Inc.*, 8 N.Y.3d 43, 50 (2006) (citations omitted).

***Plaintiff's possessory right or interest in the property.*** The first element of conversion is satisfied where a plaintiff has "ownership or an immediate superior right of possession to a specific identifiable thing." *Meese v. Miller*, 79 A.D.2d 237, 242 (4th Dep't 1981). That includes a sum of money: an "action will lie for the conversion of money where there is a specific, identifiable fund." *Lucker v. Bayside Cemetery*, 114 A.D.3d 162, 174 (1st Dept. 2013); *see also Jones v. McHugh*, 37 A.D.2d 878, 879 (3d Dep't 1971). This concept has been applied directly to mistaken wire transfers. *ADP Inv'r Commc'n Servs., Inc. v. In House Attorney Servs., Inc.*, 390 F. Supp. 2d 212, 224 (E.D.N.Y. 2005) ("ADP alleges . . . that it seeks a specifically identifiable sum of money sent by wire transfer . . . ADP also states the exact amount of the wire transfer . . . This Court finds then that ADP properly alleges an identifiable sum of money and therefore ADP's conversion claim does not fail as a matter of law." (alterations omitted)).

In their pretrial brief, defendants argued that "it is settled that a transferor loses title to funds upon the completion of a wire transfer." Def. Br. ¶¶ 143-44. But that is not the case for *mistaken* payments. As *Banque Worms* itself explains, "[w]hen a payment order has been accepted by the beneficiary's bank, cancellation or amendment of that payment order is not effective *unless, for example, the order was issued because of a mistake of the sender.*" *Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 373 (1991) (emphasis added). Most of the cases defendants cited do not address mistaken transfers, and the others expressly distinguish that situation.[2]

***Defendant's unauthorized dominion or interference***. The second element of conversion requires a defendant's "unlawful exercise of dominion and control over plaintiff's property." *Gen. Elec. Co. v. Am. Exp. Isbrandtsen Lines, Inc.*, 37 A.D.2d 959, 959 (2d Dept. 1971). "It is not necessary

---

[2]     *See, e.g.*, *Bank of N.Y. v. Norilsk Nickel*, 14 A.D.3d 140, 143 (1st Dep't 2004) (dispute over funds frozen mid-transfer); *Grain Traders, Inc. v. Citibank, N.A.*, 960 F. Supp. 784, 786 (S.D.N.Y. 1997) (same); *U.S. v. BCCI Holdings (Luxembourg), S.A.*, 980 F. Supp. 21, 27 (D.D.C. 1997) ("errors in the petitioners' payment orders" render made title improper); *Cumis Ins. Soc., Inc. v. Citibank, N.A.*, 921 F. Supp. 1100, 1111 (S.D.N.Y. 1996) ("no allegation that Citibank was served" with recall notice).

Hon. Jesse M. Furman
December 15, 2020
Page 3

that one take *actual physical possession* of property" to be liable for conversion. *Id.* at 959 (emphasis added); *see also Suzuki v. Small*, 214 A.D. 541, 556 (1st Dep't 1925) ("It is not necessary that one should take physical possession of property to be guilty of conversion."). Thus, a defendant may exercise control indirectly, through an agent or other third party, in which case both the agent and the principal are liable: "*Every* person is liable who *personally or by agent* commits an act of conversion, or who participates by *instigating, aiding, or assisting another*." *Aeroglide Corp. v. Zeh*, 301 F.2d 420, 422 (2d Cir. 1962) (emphases added); *see also Drozd v. Vlaval Const., Inc.*, 2011 WL 9192036, at *10 (E.D.N.Y. Oct. 18, 2011) (agent liable for conversion of funds on behalf of principal).

Nor is it necessary that the defendant *used* the subject property. *See Debobes v. Butterly*, 210 A.D. 50, 50 (1st Dep't 1924) ("It is not necessary in order to establish conversion to find a manual taking of the property or that it was applied to the use of the person who took it."). Instead, "it is sufficient if the person charged with conversion exercised dominion over the property to the exclusion of" the *plaintiff's* right to use it. *Id.*; *see also Gen. Elec. Co.*, 37 A.D.2d at 959. This makes sense, because the tort requires "dominion over the property *or interference with it[]* in derogation of *plaintiff's rights*." *Colavito*, 8 N.Y.3d at 50 (2006) (emphases added).

In their pretrial brief, defendants cited *Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A.,* 2002 WL 31174470 (S.D.N.Y. Sept. 26, 2002), and *Cachet Financial Service. v. MyPayrollHR,* 2020 WL 5232275 at *8 (N.D.N.Y. Sept. 2, 2020), for the proposition that "Citibank must prove that Defendants converted the property 'to their own use,'" and cannot do so because "the funds were sent to Defendants' client." Def. Br. ¶¶ 142, 146. But the Second Circuit has found "no merit" to the argument that, if a defendant "personally pocket[s] no money," he has not converted it "to his own use." *United States v. Santiago*, 528 F.2d 1130, 1135 (2d Cir. 1976) (defendant's diversion of money from union's "welfare fund" to union's "general fund" was conversion). "One's disposition of the property of another, without right, as if it were his own, is a conversion to one's own use. *Conversion to 'one's own use' means simply 'not to the use of the entruster.*'" *Id.* (emphasis added) (quoting *United States v. Goad*, 490 F.2d 1158, 1165 (8th Cir. 1974)).

### B.     Unjust Enrichment, Payment By Mistake, And Money Had And Received

Citibank's claims for unjust enrichment, payment by mistake, and money had and received (the "restitution claims") have similar elements and are commonly considered in tandem.

"To prevail on a claim for unjust enrichment under New York law, a plaintiff must establish: (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (quotation marks omitted); *see also Wells Fargo Bank, N.A. v. Burke*, 155 A.D.3d 668, 671 (2d Dep't 2017).

"The elements of payment by mistake are [1] that plaintiff made a payment under a mistaken apprehension of fact, [2] that defendant derived a benefit as a result of this mistaken payment, and [3] that equity demands restitution by defendant to plaintiff." *T.D. Bank, N.A. v. JP Morgan Chase*

Hon. Jesse M. Furman
December 15, 2020
Page 4

*Bank*, 2010 WL 4038826, at *5 (E.D.N.Y. Oct. 14, 2010) (citing *Ball v. Shepard*, 202 N.Y. 247, 253 (1911)); *see Blue Cross of Cent. N.Y., Inc. v. Wheeler*, 93 A.D.3d 995, 995 (4th Dep't 1983).

For money had and received, a plaintiff must prove that "(1) defendant received money belonging to plaintiff; (2) defendant benefitted from the receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 125 (2d Cir. 1984) (citing *Miller v. Schloss*, 218 N.Y. 400, 407 (1916)).

As explained in Citibank's pretrial briefing (Pl. Br. at 35 & n.3; Pl. Reply at 26), all three claims turn on the same basic inquiry in the context of a mistaken payment. In *T.D. Bank*, Judge Gleeson explained that a party's claims "for money had and received, payment by mistake, and unjust enrichment" had "been presented as separate causes of action, but all three are claims for restitution premised on the principle that recovery is to be had . . . according to what is equitable and good." 2010 WL 4038826, at *4. The court cited *Banque Worms* for the proposition that "similar rules have been applied in actions for money had and received, mistaken payment, and unjust enrichment." *Id.* (citing 77 N.Y.2d at 366). "All three causes of action turn on a single inquiry: whether [the defendant] has benefited from what is rightfully [the plaintiff's] such that equity and good conscience demand restoration of the disputed property." *Id.*

Put another way, Citibank's restitution claims have three elements that are common to all three causes of action: (1) Citibank plaintiff mistakenly sent a payment; (2) defendants benefitted from the payment; and (3) equity demands restitution.

***Plaintiff's mistaken payment.*** Citibank must prove that it made a payment under a mistaken impression of fact, including one "due to the negligence of the payor." *Manufacturers Hanover Tr. Co. v. Chem. Bank*, 160 A.D.2d 1113, 117 (1st Dep't 1990). Courts have recognized numerous kinds of mistakes by a plaintiff that give rise to a duty to return the funds, including paying twice on a single payment order (*Bank Sadaret Iran v. Amin Beydoun, Inc.*, 555 F. Supp. 770, 773 (S.D.N.Y. 1983)); issuing payments after stop-payment orders (*In re T.R. Acquisition Corp.*, 309 B.R. 830, 838-89 (Bankr. S.D.N.Y. 2003)); wiring ten times the intended amount due to a typing error (*In re Calumet Farm, Inc.*, 398 F.3d 555, 561 (6th Cir. 2005)); and transferring funds to the wrong bank (*A.I. Trade Fin., Inc. v. Bank*, 1997 WL 291841, at *5 (S.D.N.Y. June 2, 1997)).

Importantly, none of Citibank's claims requires that the mistaken payment be sent directly to the defendants *themselves*; as highlighted by the second element of a restitution claim, it is sufficient that the funds be paid to entities under the defendant's control or to defendant's benefit. "A person may be unjustly enriched not only where he receives money or property, but also where he otherwise receives a benefit." *Blue Cross*, 93 A.D.2d at 995. A payment-by-mistake claim requires only that the "plaintiff *made a payment* under a mistaken apprehension." *T.D. Bank*, 2010 WL 4038826, at *5 (emphasis added); *see also U.S. ex rel. Feldman v. City of N.Y.*, 808 F. Supp. 2d 641, 657 (S.D.N.Y. 2011). And although a claim for money had and received requires that the "defendant received money belonging to plaintiff" (*Aaron Ferer*, 731 F.3d at 125), courts have not interpreted that element to require *direct* receipt of the funds. It is "not necessary to establish that

Hon. Jesse M. Furman
December 15, 2020
Page 5

each defendant *personally* received a share of the [funds]"—for example, if "the whole proceeds were received by a common agent." *Nat'l Tr. Co. of N.Y. v. Gleason*, 77 N.Y. 400, 404 (1879) (emphasis added); *see also Town of Bleeker v. Balje*, 138 A.D. 706, 708 (3d Dep't 1910) ("It is unnecessary to trace the money which the defendant may have received, nor is it essential to . . . show that money itself was actually received."); *Ripley v. Int'l Railways of Cent. Am.*, 8 A.D.2d 310, 316 (1st Dep't 1959) (plaintiff may establish claim for money had and received by showing "effectual" or "practical control" over the payments transmitted).

**Benefit to defendant**. Citibank's three restitution claims require that the defendants "benefited" from the mistaken payment. *Kaye*, 202 F.3d at 616 (unjust enrichment); *U.S. ex rel. Ryan v. Staten Island Univ. Hosp.*, 2011 WL 1841795, at *5 (E.D.N.Y. May 13, 2011); *Aaron Ferer*, 731 F.2d at 125 (money had and received). But critically, the *manner* in which the defendant benefits is not a dispositive factor under New York law.

As the First Department has explained, "[i]t *does not matter* whether [a] benefit is *directly or indirectly* conveyed." *Manufacturers Hanover*, 160 A.D.2d at 117 (emphases added). What matters is whether the defendant received "*some* benefit" at plaintiff's expense. *Kaye*, 202 F.3d at 616 (emphasis added). In articulating this principle, New York courts have commonly cited the Restatement (First) of Restitution. *See, e.g.*, *Blue Cross*, 93 A.D.2d at 996. The commentary to Section 1 of that Restatement, titled "Unjust Enrichment," provides as follows:

> *What constitutes a benefit.* A person confers a benefit upon another if he gives to the other possession of or some other interest in money, land, chattels, or choses in action, performs services beneficial to or at the request of the other, satisfies a debt or a duty of the other, ***or in any way adds to the other's security or advantage. He confers a benefit not only where he adds to the property of another, but also where he saves the other from expense or loss. The word "benefit," therefore, denotes any form of advantage.*** The advantage for which a person ordinarily must pay is pecuniary advantage; it is not, however, necessarily so limited, as where a physician attends an insensible person who is saved subsequent pain or who receives thereby a greater chance of living.

RESTATEMENT (FIRST) OF RESTITUTION § 1 cmt. b (emphasis added).

Courts in this Circuit have therefore held that a defendant "benefits" from a mistaken payment where the plaintiff establishes *any* relationship between the plaintiff's payment and the defendant's compensation. For example, in *I.B. Trading, Inc. v. Tripoint Global Equities, LLC*, 280 F. Supp. 3d 524 (S.D.N.Y. 2017), investors in a Ponzi scheme brought a claim for unjust enrichment against several defendants, including a broker-dealer that "receive[d] a 5% commission based on the total amount of capital" obtained by the defendant who actually received the fraudulent payments. *Id.* at 532. The broker-dealer argued "that because the plaintiffs d[id] not allege that they paid [it] directly," it received no benefit at the plaintiffs' expense. *Id.* at 545. Judge Koeltl disagreed,

Hon. Jesse M. Furman
December 15, 2020
Page 6

explaining that "under New York unjust enrichment law plaintiffs need only plead that a defendant had received *some benefit*, meaning that direct dealings (contractual or otherwise) [a]re not required." *Id.* (emphasis original) (quotation marks omitted). Because "the defendants' compensation was directly tied to the amount of investment capital raised," "[p]lainly it would be against equity and good conscience" to allow them to avoid liability. *Id.* (quotation marks omitted).

Judge Seibel has sustained an unjust enrichment claim based on an even less direct benefit. In *In re DDAVP Indirect Purchaser Antitrust Litigation*, 903 F. Supp. 2d 198 (S.D.N.Y. 2012), the plaintiffs sued a drug manufacturer on the ground that the defendant's antitrust violations had inflated the price of drugs that the plaintiffs purchased through third parties. *Id.* at 204-06. The court found that, "despite not having direct dealings (contractual or otherwise) with Defendants, Plaintiffs plausibly conferred some benefit on Defendants, albeit indirectly, by purchasing [the drug] at elevated prices, and Defendants profited from the individual demand of the [drug] consumers, the ultimate victims of Defendants' unlawful conduct." *Id.* at 234. *See also Cox v. Microsoft Corp.*, 8 A.D.3d 39, 40 (1st Dept. 2004) (similar).

To be sure, New York law requires a showing of benefit that inures *to the defendant*, not merely to any third party with some conceivable relationship to the defendant. A good example is the Second Circuit's decision in *Kaye*, which this Court raised at the hearing last Wednesday.[3] In that case, the plaintiff (Kaye) claimed that she was defrauded into making a loan to the husband (Marc) of the defendant (Laura). 202 F.3d at 613-14 (Sotomayor, J.). The court held that Kaye had not "demonstrated that Laura received some benefit from Kaye's loan to Marc," and thus reversed a jury verdict in Kaye's favor on her claim for unjust enrichment. *Id.* at 616.

The court repeatedly emphasized that there was no evidence of *any* benefit to Laura; "Marc alone benefited from the money he borrowed from Kaye." *Id.* Part of the money went to replace "escrow funds" that he "illegally converted"; part "went toward rent for his office space"; and part "went to other small expenses" that he personally incurred. *Id.* "[T]he money went solely toward business-related rather than family-related expenses," and Laura "knew nothing about the loan before Kaye contacted her regarding repayment." *Id.* In other words, Marc had used the fruits of his illegal conduct to further a scheme in which only *he* benefited. The court noted Kaye's testimony that when she "spoke to Laura on the telephone, Laura 'acknowledged that the money was lent to the family,'" and that "but for Kaye's loan, her daughter would not have been able to continue at Duke University." *Id.* at 616. But this testimony could not establish a "specific and direct benefit" to *Laura*: "Kaye offered no evidence demonstrating that *Laura actually received any portion of the loan*, nor did she show that the loan *relieved Laura of any financial obligations* for which she otherwise would have been responsible." *Id.* at 616 (emphasis added).

At the hearing last Wednesday, defendants cited two cases on the issue of benefit; neither supports their position. Defendants first asserted that *Goldberg v. Gray*, 2016 WL 4099189 (N.D.N.Y. Aug. 2, 2016), "says unjust enrichment claims 'premised upon a management fee are precluded.'" Tr.

---

[3] The Court also referenced *Aaron Ferer* and *Ryan* (Tr. 227:5-228:11), cited above.

Hon. Jesse M. Furman
December 15, 2020
Page 7

223:5. That quote is misleading. Although the *Goldberg* court did dismiss an unjust enrichment claim that was premised upon a management fee, it did *not* do so on the theory that such fees do not provide a benefit. Instead, the court explained that where "*parties* execute[] a valid and enforceable written contract governing a *particular subject matter*, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded." *Id.* (emphases added). Because the plaintiff's "unjust enrichment claims [were] premised upon a management fee *governed by an enforceable contract*" that the plaintiff had entered into with the defendant, the plaintiff's "unjust enrichment claims [were] precluded." *Id.* (emphasis added). Thus, the claim in *Goldberg* was flawed not because a management fee was the form of benefit, but because the plaintiff had agreed in the contract to the very benefit that it challenged in court.

Second, the defendants cited *Vertex Construction Corp. v. T.F.J. Fitness L.L.C.*, 2011 WL 5884209 (E.D.N.Y. Nov. 23, 2011), for the proposition that "royalties and fees [are] indirect benefit[s] and therefore not sufficient." Tr. 233:7-10. This case, too, is plainly distinguishable. A construction company (Vertex) brought an unjust enrichment claim against a gym franchisor (Retrofitness), alleging that a franchisee (TFJ) had failed to pay Vertex for its work. 2011 WL 5884209, at *1. The court rejected this claim, explaining that "*any benefit conferred* was for TFJ, not Retrofitness." *Id.* at *4 (emphasis added). The complaint did "not allege that Retrofitness requested, approved, supervised, agreed to pay for, or assumed any other obligations with respect to the [work]." *Id.* at *5. And there was no allegation "that Retrofitness benefited from the construction work performed on its franchisee's property *at all*." *Id.* (emphasis added).

In the portion of *Vertex* referenced by the defendants, the court tried to "imagine an allegation that Retrofitness stood to benefit in some way from an increase in the value of TFJ's operations—royalties tied to TFJ's revenues, for instance—and that Vertex's work enhanced the value of TFJ's operations." *Id.* The court explained that "[a]llegations to that effect do not appear in the [complaint]," but noted that "they would likely not be sufficient." *Id.* This chain of causation—in which the plaintiffs' construction work generally enhanced the value of the franchisee's operations, leading to increased revenues, leading to increased royalties tied to those revenues—was entirely hypothetical in *Vertex*. But in any event, it is far more attenuated than an arrangement in which a defendant's fees are tied by formula to the performance of funds it manages. *See I.B. Trading*, 280 F. Supp. 3d at 545.

***Equity demands restitution.*** Although the "equity" element of a restitution claim is ordinarily a matter within the court's discretion, in the context of a *mistaken payment*, it is not treated as a standalone requirement. New York courts have adopted the "longstanding and well recognized" equitable "principle that a party who pays money, under a mistake of fact, to one who is not entitled to it should, in equity and good conscience, be permitted to recover it back." *Manufacturers Hanover*, 160 A.D.2d at 117. Thus, when considering cases involving mistaken payments, courts in this State "look to see if a benefit has been conferred on the defendant under mistake of fact or law, if the benefit still remains with the defendant, if there has been otherwise a change of position by the defendant, and whether the defendant's conduct was tortious or fraudulent.'" *Goel v. Ramachandran*, 111 A.D.3d 783, 791 (2d Dept. 2013) (quoting *Paramount Film Distrib. Corp. v.*

*State of N.Y.*, 30 N.Y.2d 415, 421 (1972)). If Citibank has satisfied the other elements of its claims, and the discharge-for-value defense does not apply, equity demands restitution.

## II.  Citibank Has Proven The Elements Of Its Claims.

### A.  Citibank Has Proven Its Conversion Claim.

***Plaintiff's possessory right or interest in the property.*** It is undisputed that on August 11, 2020, Citibank sent funds managed by the defendants about $501 million of its own money, and defendants have not genuinely disputed that this transfer was a mistake. *See* Pl. Br. at 37-39; Pl. Reply at 3-4; Ex. D to ECF No. 144 (stipulation to amount). Citibank has therefore proven that it has an "immediate superior right of possession" (*Meese*, 79 A.D.2d at 242) in a "specifically identifiable sum of money" (*ADP*, 390 F. Supp. 2d at 224). *See also Banque Worms*, 77 N.Y.2d at 373 (transfer of title not effective if it resulted from "a mistake of the sender").

***Defendant's unauthorized dominion or control over the property***. Defendants' only argument on the "control" element of conversion is that Citibank's "funds were transferred to Defendants' clients' accounts, not to Defendants, and those lenders continue to hold the funds to this day." Def. Br. ¶ 145. This argument fails as a matter of law: "It is not necessary that [defendants] take physical possession of property to be guilty of conversion." *Suzuki*, 214 A.D. at 556. Each defendant "exercised dominion over the [funds] to the exclusion of" Citibank (*Debobes*, 210 A.D. at 50), and "interfere[d]" with Citibank's possessory rights (*Calavito*, 8 N.Y.3d at 50). At minimum, the defendants "instigat[ed], aid[ed], or assist[ed]" their funds in maintaining the payments and refusing to return them to Citibank. *Aeroglide*, 301 F.2d at 422.

The record shows that every defendant had absolute authority to "instruct" or "direct" their funds to keep Citibank's money, and that they exercised this authority without hesitation. In some cases, defendants threatened legal action against third-parties that had decided the funds should be returned. And in describing the August 11 Transfers, several defendants even said that the funds had been paid to *them* (defendants), or described them as "our" funds.

The evidence on these points is unrebutted:

- **Brigade:** Jeffrey Frusciante, a bank debt manager at Brigade, testified that for "***all 42***" of the funds that received the August 11 Transfers, Brigade "***directed*** each of the trustees and custodians to retain the funds." Tr. 445:14-16 (emphases added). He testified that Brigade has full "***control***" over its "private funds as well as [its] CLOs," and that even as to the funds for which Brigade is nominally an "advisor," "***every single time*** [Brigade] gave the advice to not return the money that advice was followed," and every fund "specifically followed [Brigade's] advice with respect to the money transferred on August 11th." Tr. 443:18-445:16, 448:19-21 (emphases added). Frusciante was also asked about certain individual funds. As to one, he testified that Brigade "controls the activities" of that fund and "carr[ies] out investment decisions and operational due diligence." Tr. 396:6-12. As to another, he testified that "nobody works for Battalion CLO 8," because "[t]hat's not how

Hon. Jesse M. Furman
December 15, 2020
Page 9

a CLO works"—in other words, authority over their investment decisions rests with Brigade alone. Tr. 393:22-394:4. Mr. Frusciante even characterized one of the transfers as a "$5 million payment *that we had received* on a term loan." Tr. 339:1-2 (emphasis added).

- **HPS:** George Xanthakys, a VP at HPS, testified that HPS had the authority to instruct its trustees and custodians to "not release cash out of the account without direction from the manager." Tr. 638:5-9. And after the August 11 Transfers, HPS emailed its custodians instructing them to "*make sure no one returns this payment* unless directed by" HPS senior executives. PX 1197 (emphasis added). He also described the money received as "*our funds*" (PX 1150 (emphasis added)), and said he believed he "had the authority to tell BNP not to return the money that [he] described as [HPS'] money" (Tr. 648).

- **Allstate**: Catherine McCoy, a portfolio manager at Allstate, testified in her declaration that "AIMCO and AILLC *instructed* Bank of New York Mellon to hold the August 11 payments in place in suspense accounts." McCoy Decl. ¶ 29 (emphasis added). Following the August 11 Transfers, Allstate instructed its funds' custodians to "NOT to send back the principal funds received for Revlon." PX 21. She testified that, if ordered to do so, Allstate could return the funds to Citibank from all seven of the "clients" whose investments she manages. Tr. 753:10-753:3.

- **Bardin Hill:** John Greene, a portfolio manager at Bardin Hill, testified in his declaration that "Bardin Hill *instructed* Deutsche Bank and U.S. Bank to freeze the August 11 payments," and that he had "discussed a few other ideas about why Revlon had *paid us*." Greene Decl. ¶¶ 26, 21 (emphasis added). Bardin Hill also instructed its custodians to "NOT [ ] send back any funds on the Revlon [loan]." PX 43.

- **Greywolf:** Michael Josephson, a Greywolf employee, testified in his declaration that he "sent an email to Blesson Varghese at Virtus *instructing him not to make any cash movements* on the 2016 Term Loans." Josephson Decl. ¶ 14 (emphasis added). Josephson confirmed that he did so based on "clear" instructions from Steven Abrams, Greywolf's managing director—"do not send any money back on this payout"—and that he did not attempt to contact anyone at the CLOs, or Greywolf investors. Tr. 816:9-10, 821:1-21. In his email to custodians, Josephson instructed them to "NOT send any payments back that [Greywolf] received for Revlon," and to "not make any cash movements with regard to Revlon without checking with Greywolf first." PX 1125.

- **Medalist:** Jeremy Phipps, Medalist's Chief Investment Manager, testified in his declaration that he instructed one of his employees "to contact U.S. Bank immediately and to *instruct them not to return the money*" to Citibank. Phipps Decl. ¶ 16. He also testified that a Medalist employee's instruction to return the funds was inappropriate because she "didn't have authority to return that without direction from the investment committee." Tr. 858:4-9. And in response to an inquiry from Medalist following the August 11 Transfers, its custodians confirmed that they would "hold off on returning [Citibank's] funds until told otherwise." PX 1247.

Hon. Jesse M. Furman
December 15, 2020
Page 10

- **ZAIS:** Melross Meneses, a senior analyst at ZAIS, testified in his declaration that "ZAIS *instructed* Bank of New York Mellon and U.S. Bank to *freeze the August 11 payments in place*," and a senior ZAIS executive "*instructed* Bank of New York Mellon to attempt to claw back those funds that had been sent to Citibank for CLO 2 an CLO 9." Meneses Decl. ¶¶ 19-20 (emphases added).

- **New Gen:** Frederick Baily Dent, a portfolio manager at New Gen, testified that he told Darren Beals, another New Gen employee, "to contact Northern Trust and *instruct Northern Trust not to return the money*." Tr. 866:9-12 (emphasis added). Beals emailed New Gen's custodians to instruct them to "not send [back the funds] until you hear from me again." PX 1308.

- **Symphony:** Scott Caraher, the co-head of investments at Symphony, testified in his declaration that he "*instructed*" Eric Lee and John Vaughan, two Symphony employees "to *direct* the various trustees, custodians, and collateral administrators not to return the funds." Caraher Decl. ¶ 17 (emphases added). Lee understood this to mean that he should "*make sure* none of the client funds' custodians, trustees or fund administrators were planning to transfer the money back to Citibank." Lee Decl. ¶ 10 (emphasis added). Vaughan then emailed "the trustees, custodians, and collateral administrators *instructing them to hold the funds* in suspense accounts." Vaughan Decl. ¶ 22 (emphasis added). His message left no room for misinterpretation of the manager's authority: "NO FUNDS, EITHER IN WHOLE OR IN PART, SHOULD BE RETURNED TO CITICORP without *specific written instructions* from Symphony Asset Management LLC." PX 1342 (emphasis added). Symphony sent its custodians multiple emails to this effect. *See* PX 1330 ("Please confirm via email that no action will be taken until Symphony provides instruction"); PX 1333 ("Please do not DK the wires and wait for instruction from Symphony before any action is taken.").

- **Tall Tree:** William Lenga, Tall Tree's Managing Partner, testified in his declaration that he "made the decision to *direct* U.S. Bank not to return the funds." Lenga Decl. ¶ 16 (emphasis added). And Tall Tree went so far as to threaten its custodians with liability if they complied with Citibank's recall without Tall Tree's approval, writing that the manager would "hold [the custodian] responsible on behalf of our clients if any funds are returned without such *specific written instructions*." PX 1456 (emphasis added).

In short, the evidence establishes not only that defendants *had* control over Citibank's money, but that they *actually exercised* this control by specifically instructing their funds not to return Citibank's money. There is also no evidence that any of the funds questioned this authority; to the best of their ability, they complied with defendants' orders. This is a classic conversion claim.

Hon. Jesse M. Furman
December 15, 2020
Page 11

B. **Citibank Has Proven Its Claims For Unjust Enrichment, Payment By Mistake, And Money Had And Received.**

***Plaintiff's mistaken payment/equity***. As discussed above, if the Court finds that Citibank made the August 11 payments under a mistaken impression of fact, that would satisfy the first and third elements of its restitution claims. *See* pp. 3-4, 7-8 *supra*. And there is no genuine dispute on this point: The defendants cross-examined Citibank's employees for almost a full day, and elicited no testimony suggesting that Citibank intentionally transferred its own money on August 11.

***Benefit to defendant***. The record overwhelmingly demonstrates that defendants received "some benefit" at Citibank's expense (*Kaye*, 202 F.3d at 616)—a concept that "denotes *any form of advantage* (RESTATEMENT (FIRST) OF RESTITUTION § 1 cmt. b (emphasis added)).

There is one direct and straightforward benefit that is common to all defendants: Each defendant receives fees that are directly tied to the performance of the funds it manages, which is more than sufficient under New York law. *See, e.g.*, *I.B. Trading*, 280 F. Supp. 3d at 545. And beyond that, the receipt by defendants' funds of an amount equal to the full principal balance of the Revlon loan was plainly of value to the defendants—particularly when they were about to bring a complaint through UMB Bank that claimed damages based on the decreased value of the Revlon loan, and believed (according to the testimony in the record) that Citibank's mistaken payment provided them with leverage in connection with the UMB lawsuit.

Defendants elicited these facts primarily through Brigade, and it is undisputed that the other defendants are similarly situated. Frusciante testified that Brigade "is paid, in part, depending on how well [its funds'] investments do." Tr. 450:19-21. If those investments do well, "that's a ***direct benefit for Brigade***." Tr. 450:22-24 (emphasis added). Thus, because retention of the August 11 Transfers would "increase the average balance of the portfolio value," that would "result in a ***direct benefit to Brigade***." Tr. 455:2-9 (emphasis added). Frusciante also clarified that regardless whether the fund managed was a CLO, CDO, or private fund, an increased return "provides a ***direct benefit to Brigade***." Tr. 457:16-458:11 (emphasis added).

The record contains similar—and, in some cases, additional—facts as to the remaining defendants:

- **HPS:** HPS's Management Agreement with its Cardinal Fund LP specifies that it collects both an incentive and management fee based on a percentage of the net asset value of the fund. PX 1216, Schedule A; *see also* PX 1208 at 11-12 (providing for HPS to receive a "Management Fee" and an "Incentive Fee" based on the net asset value of fund). And Scott Crocombe, Managing Director at HPS, testified that keeping the money received from the August 11 Transfers would have "a ***direct impact*** on the P&L [profit and loss] of the public credit department" at HPS. Tr. 713:18-22 (emphasis added).

- **Allstate**: Allstate's Collateral Management Agreement with AIMCO CLO 2015-A states that it will collect a management fee based upon a "fee basis amount" calculated in part based on its collection of principal on loans. PX 34 § 8(a)-(b). Similar provisions are

Hon. Jesse M. Furman
December 15, 2020
Page 12

- present in Allstate's other agreements with its CLOs, which are under the common control of the Allstate corporation. PX 23 § 8(a)-(b); PX 30 § 8(a)-(b); PX 32 § 8(a)-(b); PX 33 § 8(a)-(b). Indeed, Allstate's only witness, McCoy, is directly employed by the Allstate Insurance Company. Tr. 738:24-739:1; *see also* PX 1644; PX 1644 A (corporate filings demonstrating that all Allstate entities are subsidiaries of the Allstate Corporation); *United States v. Hundley*, 2013 WL 12384285, at *6 (SDNY Oct. 8, 2013) (acknowledging "the economic reality that a parent and its wholly-owned subsidiary operate as a single economic unit and therefore *share economic harms and benefits*" (emphasis added)).

- **Bardin Hill:** Greene testified that, in addition to getting paid at par on a loan worth 30 cents on the dollar, Bardin Hill "charges management fees with respect to th[e] CLOs" it manages, and that those fees "are driven by the performance of the funds." Tr. 801:21-802:3.[4]

- **Greywolf:** The Collateral Management Agreement for Greywolf CLO II specifies that Greywolf will collect a management fee based upon a "fee basis amount" calculated in part based on its collection of principal on loans. PX 1142 § 8(a)-(d). The same arrangement is specified in Greywolf's agreement with Greywolf CLO V. PX 1141 § 8(a)-(d).

- **Medalist:** Medalist's Collateral Management Agreement with its JMP CLO 3 states that it will receive management fees, including an incentive fee, "to the extent that sufficient Interest Proceeds or Principal Proceeds are available" to the fund. PX 1249 § 8(a). Medalist's agreement with JMP CLO 5 contains an essentially identical provision. PX 1250 § 8(a). And Jeremy Phipps, Chief Investment Officer at Medalist, testified that its management fee is calculated based in part on the "unrestricted cash" held by the funds, and that the funds transferred on August 11 were categorized as "restricted" only because of this litigation. Tr. 853:19-854:8. One Medalist employee, soon after learning of the payments, described them as "a good bargaining chip with Citi/revlon." PX 1251.

- **New Gen:** New Generation, LLC, the defendant in this case, is a ***general partner*** of New Generation, LP, its fund. PX 1312; Tr. 865:2-4.

- **ZAIS:** ZAIS's Collateral Management Agreement with its ZAIS CLO 5 indicates that it receives management fees directly tied to the value of the CLO's portfolio. DX 220 § 8(a)-

---

[4] Greene also testified that collecting $45 million on the Revlon term loans would have "no impact" on the fees collected by Bardin Hill. Tr. 802:19. The argument that Bardin Hill received no benefit—despite the fact that its funds obtained a transfer equal to the outstanding principal on a loan that was trading at a substantially diminished price—strains credulity, but Citibank's ability to evaluate this testimony is limited because Bardin Hill was the only defendant to entirely redact the sections of its management agreements discussing its fee. *E.g.* PX 59 § 7. No other defendant has even suggested it would not benefit from the funds, despite ample opportunity to do so.

Hon. Jesse M. Furman
December 15, 2020
Page 13

> (d). Its agreements with other CLOs contain essentially identical provisions. DX 248 § 8(a)-(d); DX 256 § 8(a)-(d); DX 266 § 8(a)-(d); DX 298 § 8(a)-(d); DX 314 § 8(a)-(d).
>
> - **Symphony:** Symphony's Collateral Management Agreement with its Symphony CLO XV provides that Symphony's collateral management fees become payable where a debtor is credited with repaying an obligation "pursuant to an optional redemption on any date that is not [a] scheduled Payment Date." PX 1384 at § 8(b). Its agreements with other CLOs contain essentially identical provisions. *E.g.* PX 1387 § 8(b); PX 1389 § 8(b); PX 1391 § 8(b); PX 1395 § 8(b).
>
> - **Tall Tree:** Tall Tree's Collateral Management Agreement with its Evans Grove CLO provides that Tall Tree's fees are payable "to the extent that sufficient Interest Proceeds or Principal Proceeds are available" to the fund. PX 1486 § 9(b). Its agreements with other CLOs contain essentially identical provisions. PX 1490 § 9(b); PX 1494 § 9(b).

In sum, defendants receive payments that are tied directly to the performance of the funds that they manage—funds whose values would substantially increase by the unexpected receipt of the August 11 Transfers. Several defendants expressly conceded that they "benefited from," or were "impacted," by the August 11 Transfers. And several defendants have such close relationships with the funds that *any* benefit to the funds would, by definition, flow to the defendants. Citibank has more than established the "benefit" element of a restitution claim.

Citibank has satisfied the elements of each of its causes of action. For the reasons above and those previously briefed, the Court should enter judgment for Citibank.

Respectfully submitted,

/s/ Matthew D. Ingber

Matthew D. Ingber
Partner