UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

:          20-CV-6539 (JMF)

IN RE CITIBANK AUGUST 11, 2020 WIRE : 
TRANSFERS :      FINDINGS OF FACT AND
:        CONCLUSIONS OF LAW

-----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

INTRODUCTION ....................................................................................... 2

FACTUAL FINDINGS ............................................................................... 4

     A.    The 2016 Term Loan ................................................................... 4

     B.    The May and June 2020 Transactions .................................................. 7

     C.    The Events of August 11, 2020 ....................................................... 9

     D.    Citibank's Response to the August 11th Wire Transfers ....................... 16

     E.    Defendants' Responses to the August 11th Wire Transfers ................... 19

     F.    The *UMB Bank* Lawsuit ............................................................. 26

     G.    Procedural History .................................................................... 27

SUBJECT-MATTER JURISDICTION ...................................................... 28

CONCLUSIONS OF LAW ........................................................................ 34

     A.    The Elements of the Discharge-for-Value Defense ........................... 36

         1.    *Banque Worms* ...................................................................... 37

         2.    Whether the Defense Applies Only When a Debt Is "Due" .......................... 43

         3.    Whether Notice Is Evaluated at the Time of Payment or When Payment Is Credited . 46

         4.    Actual Notice vs. Constructive Notice .......................................... 54

     B.    Application of the Discharge-for-Value Rule to the August 11th Wire Transfers ........... 64

1.   The Evidence Demonstrates that Defendants Did Not Have Notice of the Mistake .... 64

    a.   Defendants Credibly and Persuasively Testified that They Reasonably Believed
the Payments Were Intentional Prepayments of the 2016 Term Loan .................... 65

    b.   The Lack of Notice Is Corroborated by Citibank's Own Witnesses........................ 70

    c.   The Lack of Notice Is Corroborated by the Documentary Record .......................... 71

2.   Defendants Satisfied Any Duty of Inquiry ................................................................ 77

3.   Citibank's Counterarguments Fail to Persuade.......................................................... 80

    a.   The Calculation Statements .................................................................................... 80

    b.   The Lack of Prepayment Notice ............................................................................. 85

    c.   The Size of the Overpayment ................................................................................. 86

    d.   Revlon's Financial State and the *UMB Bank* Lawsuit............................................. 89

    e.   Equitable and Policy Considerations ...................................................................... 93

CONCLUSION.................................................................................................................... 99

## INTRODUCTION

On August 11, 2020, Citibank N.A. ("Citibank"), acting in its capacity as Administrative Agent for a syndicated term loan taken out by Revlon, Inc. ("Revlon"), intended to wire approximately $7.8 million in interest payments to Revlon's lenders.  Instead, it made one of the biggest blunders in banking history: It mistakenly wired, in addition to Revlon's $7.8 million, almost *$900 million* of its own money as well.  The resulting payments equaled — to the penny — the amounts of principal and interest that Revlon owed on the loan to its lenders.  The question in this case is whether Citibank is entitled to get the money back or whether the lenders are allowed to keep it.

The law generally treats a failure to return money that is wired by mistake as unjust enrichment or conversion and requires that the recipient return such money to its sender. Under New York law (which applies here), however, there is an exception to this rule: The recipient is allowed to keep the funds if they discharge a valid debt, the recipient made no misrepresentations to induce the payment, and the recipient did not have notice of the mistake. As the New York Court of Appeals explained the exception: "When a beneficiary receives money to which it is entitled and has no knowledge that the money was erroneously wired, the beneficiary should not have to wonder whether it may retain the funds; rather, such a beneficiary should be able to consider the transfer of funds as a final and complete transaction, not subject to revocation." *Banque Worms v. BankAmerica Int'l*, 570 N.E.2d 189, 196 (N.Y. 1991).

Defendants in this case — ten investment advisory firms managing entities that, collectively, received more than $500 million of the mistaken August 11th wire transfers from Citibank — contend that this exception to the general rule, known as the "discharge-for-value defense," applies here and that Citibank is therefore not entitled to the return of its money. In December 2020, the Court held a bench trial to decide whether Defendants are correct.

For the reasons that follow, the Court concludes that Defendants are indeed correct. As the Court will explain, application of the discharge-for-value defense ultimately turns on whether Defendants (or, more precisely, their clients) were on constructive notice of Citibank's mistake at the moment they received the August 11th wire transfers. Based on the credible testimony of Defendants' employees and the documentary record, the Court concludes that they were not. Taken together, the evidence shows that the entities believed — in good faith and with ample justification — that the payments they received were prepayments in full of the Revlon loan. The real explanation for the payments — a banking error of perhaps unprecedented nature and

3

magnitude — understandably did not occur to them until, nearly a day later, Citibank itself

realized the error and sent notices demanding the money back.

Because the discharge-for-value defense applies, the Court holds that Citibank is not

entitled to its money back.  Instead, Defendants' clients are entitled to keep the money.

Accordingly, and for the reasons that follow, judgment will be entered in favor of Defendants.

## FACTUAL FINDINGS

Many, if not most, of the facts relevant to the resolution of this case are not in dispute. In

any event, pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure, the Court makes the

following findings of fact based on the testimony and exhibits at trial.[1]

### A.  The 2016 Term Loan

In 2016, Revlon took out a seven-year, $1.8 billion syndicated loan (the "2016 Term

Loan") pursuant to a credit agreement (the "2016 Loan Agreement").  PX485; *see also* DX1044

(the 2016 Loan Agreement as amended in 2020, or the "Amended Loan Agreement"); ECF No.

144-1 ("Stipulation"), ¶¶ 1-2.[2]  Citibank serves as the Administrative Agent for the loan.  Among

its duties, which are set forth in the Amended Loan Agreement, it receives payments from

Revlon and passes them on to the 2016 Term Loan lenders ("the Lenders"), including payments

of principal and interest.  Amended Loan Agreement, § 2.8, at -103-04.[3]  Defendants are Brigade

---

[1]     The Court ruled on most of the parties' objections to testimony and exhibits at trial.  To
the extent that the Court cites in this Opinion to any evidence to which a party objected, the
objection is overruled.  The Court need not and does not resolve the remaining objections.

[2]     "Tr. __" refers to the transcript of the trial, conducted from December 9 to 16, 2020;
PX__ refers to a Plaintiff's Exhibit; DX__ refers to a Defense Exhibit; and "Dep. Tr. __" refers
to a deposition transcript.  Because the pagination of DX1044 is inconsistent, references to it will
include the terminal digits of the Bates stamp located at the bottom center of each page.

[3]     There is some dispute with respect to whether Citibank validly remains the
Administrative Agent under the Amended Loan Agreement, the details of which are not pertinent

Capital Management, LP ("Brigade"), HPS Investment Partners, LLC ("HPS"), Symphony Asset

Management LLC ("Symphony"), Bardin Hill Loan Management LLC ("Bardin Hill"),

Greywolf Loan Management LP ("Greywolf"), ZAIS Group LLC ("ZAIS"), Allstate Investment

Management Company ("Allstate"), Medalist Partners Corporate Finance LLC ("Medalist"),

Tall Tree Investment Management LLC ("Tall Tree"), and New Generation Advisors LLC

("New Generation").  They are investment or collateral managers that maintain contractual

relationships with, and manage the funds for, entities that hold pieces of the 2016 Term Loan and

that have refused, to date, to return the funds Citibank wired on August 11, 2020 (the "Non-

Returning Lenders").[4]  In total, Defendants' clients were owed $558,558,375.74 in outstanding

principal and interest on the 2016 Term Loan as of August 11, 2020.  PX346A; Stipulation

¶¶ 15-16; ECF No. 142 ("Pl.'s Mem."), at 10.[5]

The 2016 Term Loan was set to mature on the earlier of September 7, 2023 (seven years

after the closing date) or the "Accelerated Maturity Date," which is "the date that is 91 days prior

---

to this case.  *See* Compl., *UMB Bank, Nat'l Ass'n v. Revlon, Inc.*, No. 20-CV-6352 (LGS)
(S.D.N.Y. Aug. 12, 2020), ECF No. 1 (PX171) ("UMB Compl.").  There is no dispute that
Citibank took all of the actions relevant to this case in its capacity as Administrative Agent.

[4]      The Non-Returning Lenders fall into four broad categories: private funds and mutual
funds; collateralized loan obligations (commonly known as CLOs) and collateralized debt
obligations (commonly known as CDOs); separately managed accounts; and insurance
companies.  *See* ECF No. 145 ("Defs.' Mem."), at 7-8 & n.4, app. B.  The differences among
these categories, and the differences among the relationships between Defendants and their
respective Non-Returning Lenders (referred to throughout this Opinion as Defendants' "clients"
for ease of reference), are immaterial for present purposes.  The Non-Returning Lenders are
listed, by associated Defendant, in an appendix to the parties' Stipulation at ECF No. 141-1.

[5]      As discussed below, a few of Defendants' Lender clients returned the funds they received
on August 11, 2020, after receiving notices about the mistake from Citibank (before receiving
contrary instructions from Defendants).  Accordingly, the amount that remains in dispute is
somewhat lower the total amount transferred to Defendants' clients.  *See* ECF No. 144-6
(seeking the return of funds totaling $504,169,401.45); Tr. 951-52 (testimony of Meneses); ECF

to the stated maturity" of a specified set of senior notes due in 2021 — defined as "the 2021

Notes" — "if, on such date, any 2021 Notes remain outstanding."  Amended Loan Agreement,

§ 1.1, at -24, -87.  Because the stated maturity date of the 2021 Notes is February 15, 2021, the

Accelerated Maturity Date for the 2016 Term Loan was November 16, 2020.  DX1032, at 17;

Amended Loan Agreement, § 1.1, at -24.[6]  Thus, the 2016 Term Loan was set to mature on

September 7, 2023, unless any 2021 Notes remained outstanding on November 16, 2020, in

which case the loan was to mature on that date — a feature known as a "springing maturity."  Tr.

888 (testimony of Warren).

Several provisions of the Amended Loan Agreement are particularly relevant to this case.

First, the Agreement provides that it is to be "governed by, and construed and interpreted in

accordance with, the laws of the state of New York."  Amended Loan Agreement, § 10.11,

at -213 (capitalization and emphasis omitted); *see also* Defs.' Mem. 9 (same).  Second, to the

extent relevant here, the Agreement defines the "Interest Payment Date" — that is, the date on

which an interest payment is due — as either "the last day of" each "Interest Period" (which in

this case meant August 28, 2020) or "the date of any repayment or prepayment" with respect to

---

No. 218 ("Phipps Aff."), ¶¶ 12, 17; Tr. 843 (testimony of Phipps); Tr. 823 (testimony of
Josephson).

[6]   Other preconditions were also necessary before the Accelerated Maturity Date could take
effect.  Amended Loan Agreement, § 1.1, at -24-25; Defs.' Mem. 10 n.6.  Revlon ultimately did
retire the 2021 Notes at a discount to par, meaning that the Accelerated Maturity Date did not
take effect.  ECF No. 164 ("Pl.'s Reply"), at 13 n.4.

the 2016 Term Loan.  Amended Loan Agreement, § 1.1, at -63.[7]  And finally, Section 2.11(a) of

the Agreement, titled "Optional Prepayments," provides in relevant part that Revlon

> may at any time and from time to time prepay any Tranche of . . . Loans, in whole or in part, . . . upon irrevocable written notice delivered to [Citibank] no later than 12:00 Noon, New York City time . . . three Business Days prior thereto . . . .  Upon receipt of any such notice [Citibank] shall promptly notify each relevant Lender thereof.

Amended Loan Agreement, § 2.11(a), at -105.  The Amended Loan Agreement does not define

the meaning of "promptly" for purposes of Section 2.11(a).

**B.  The May and June 2020 Transactions**

In the spring of 2020, Revlon's "liquidity position" was "extremely tight," so the

company sought to raise additional capital.  Tr. 880-81 (testimony of Warren).  Revlon

accomplished this through a series of transactions in May 2020 (together, "the May 2020

Transaction") that enabled it to obtain over $800 million in "new financing."  Tr. 881 (testimony

of Warren).  As part of the May 2020 Transaction, Revlon issued a "solvency certificate"

indicating "that the company is solvent and would be able to meet [its] liabilities or service those

liabilities as they come due."  Tr. 884 (testimony of Warren).  The May 2020 Transaction was

ultimately approved by a majority vote of Lenders, *see* ECF No. 212 ("Caraher Aff."), ¶ 30, and

Revlon issued a new $1.7 billion debt facility, *see* DX1052, at 24-25.[8]

Most relevant here, the May 2020 Transaction included an amendment to the 2016 Loan

Agreement to make collateral that had previously secured the 2016 Term Loan available instead

---

[7]     August 28, 2020 was deemed the last business day of the period under the Amended Loan Agreement because August 31, 2020, although a Monday, was a banking holiday in London, England.  ECF No. 216 ("Lenga Aff."), ¶ 21 n.7; *see also* ECF No. 210 ("McCoy Aff."), ¶ 10; ECF No. 205 ("Frusciante Aff."), ¶ 9.

[8]     Some Lenders challenge the legitimacy of this vote; that challenge was in part the subject of the *UMB Bank* lawsuit discussed below.  *See* Caraher Aff. ¶¶ 30-32.

as collateral for new loans from other lenders.  ECF No. 206 ("Perkal Aff."), ¶ 28; Caraher Aff.

¶ 28.  Some of the Lenders, including those associated with most, if not all, Defendants here,

opposed this amendment as an effort to "siphon away collateral that was providing essential

security for payment of the 2016 Term Loans."  Perkal Aff. ¶ 29.  They argued that the collateral

transfer violated the terms of the 2016 Loan Agreement and that the vote to approve the May

2020 Transaction was illegitimate.  *See, e.g,*, *id.* ¶¶ 29-31; Caraher Aff. ¶¶ 29-31.

The amendments to the 2016 Loan Agreement effected by the May 2020 Transaction also

included a new Section 2.3, which provided that "[e]ach BrandCo Lender shall have the right to

require [Revlon] to purchase its Term Loans pursuant to the terms of this Section . . . .  All Term

Loan Repurchases shall be made at par."  Amended Loan Agreement, ¶ 2.3, at -97.  That is, it

granted a subset of Lenders — "BrandCo Lenders," namely those lenders that assented to the

May 2020 Transaction "and were willing to participate in the new money portion of it," Tr. 930

(testimony of Warren) — what are known as "roll-up" rights.  *See* Amended Loan Agreement,

§ 2.3, at -97-98.  A "roll-up" is a transaction in which a lender exchanges one loan for another.

ECF No. 195 ("Farrell Aff."), ¶ 17.  As part of a "roll-up" transaction, the borrower usually pays

interim interest accrued as of the date of the transaction to the rolling-up creditor but does not

pay cash with respect to outstanding principal; instead, the principal of the existing loan is

exchanged for the principal of a new loan.  *Id.* ¶¶ 17, 19.

In June 2020, some BrandCo Lenders exercised their roll-up rights (the "June 2020

Transaction").  Significantly, however, these BrandCo Lenders belonged to a separate "tranche"

of the 2016 Term Loans from the tranche to which Defendants' clients belonged.  Specifically,

they owned "2020 Extended Term Loans" that were scheduled to mature in 2025 rather than

2023.  *See* Tr. 888, 892-894, 934-35 (testimony of Warren).  Given certain technical limitations

of Citibank's system for making payments, the most efficient way for Citibank to effect the

transaction was to pay interim interest accrued to all lenders that held 2020 Extended Term

Loans; paying only the rolling-up entities would have required a "very manual process."

DX340, at -2-3; *see also* Tr. 203 (testimony of Zeigon); Tr. 902-03 (testimony of Warren).

Thus, all Lenders in the tranche of 2020 Extended Term Loans received interim interest

payments when the BrandCo Lenders were rolled up.  *See* Tr. 892-94 (testimony of Warren).  By

contrast, Lenders in the tranche maturing in 2023 — including all of Defendants' clients — did

not receive interim interest payments.  *See id.*  Indeed, there is no evidence they even knew about

the transaction.  *See, e.g.*, Tr. 895 (testimony of Warren).

**C.  The Events of August 11, 2020**

The transfer payments made by Citibank to the Lenders on August 11, 2020, occurred in

connection with another "roll-up" transaction.  The August 11th roll-up transaction involved five

Lenders, all managed by Angelo, Gordon and Co. ("Angelo Gordon").  Farrell Aff. ¶¶ 17, 22; Tr.

909 (testimony of Warren).  The Lenders affiliated with Angelo Gordon were exchanging their

positions in the 2016 Term Loan for positions in a different Revlon credit facility.  Following

this exchange, the remaining Lenders would continue to hold a pro rata share of the 2016 Term

Loan on a slightly reduced principal balance.  Farrell Aff. ¶ 17.  As noted above, when a lender

rolls up and exchanges a position in one credit facility for another, it is typically paid the accrued

interest on the first facility at the time of the exchange.  Due to the same technical limitations of

Citibank's system that led to payment of accrued interest to all 2020 Extended Term Loan

Lenders as part of the June 2020 Transaction, Revlon agreed to pay accrued interest to *all* 2016

Term Loan Lenders to effect the Angelo Gordon roll-up transaction — even though the other

Lenders were not involved in the roll-up transaction and even though an interim interest payment

was not due under the Amended Loan Agreement until August 28, 2020.  *Id.*; *see* Tr. 201-04 (testimony of Zeigon); Tr. 902-03 (testimony of Warren).  To that end, on August 11, 2020, Revlon sent Citibank a "Direction Letter" instructing Citibank to effect the "repurchasing" of the Angelo Gordon Lenders' interests in the 2016 Term Loan as part of the roll-up transaction, defining August 11, 2020, as the "Repurchase Date."  Farrell Aff. ¶¶ 21-22; PX283A.  Citibank did not notify the Lenders that it would be rolling up the Angelo Gordon Lenders on August 11, 2020, and Defendants' witnesses consistently testified that they were not aware of the roll-up (let alone that interest would be paid in connection with the transaction).  Tr. 895 (testimony of Warren); Caraher Aff. ¶ 12; ECF No. 213 ("Dent Aff."), ¶ 9; Frusciante Aff. ¶ 10; ECF No. 209 ("Greene Aff."), ¶ 11; Lenga Aff. ¶ 23; McCoy Aff. ¶ 11; ECF No. 217 ("Meneses Aff."), ¶ 11; Perkal Aff. ¶ 12; Phipps Aff. ¶ 10.

Citibank's Asset-Based Transitional Finance ("ABTF") team, a subgroup of Citibank's Loan Operations group that is focused on processing and servicing of asset-based loans, was tasked with executing the roll-up transaction on Flexcube, a software application and loan product processing program that the bank uses for initiating and executing wire payments.  Farrell Aff. ¶¶ 7, 14; ECF No. 196 ("Fratta Aff."), ¶ 12.  On Flexcube, the easiest (or perhaps only) way to execute the transaction — to pay the Angelo Gordon Lenders their share of the principal and interim interest owed as of August 11, 2020, and then to reconstitute the 2016 Term Loan with the remaining Lenders — was to enter it in the system as if paying off the loan in its entirety, thereby triggering accrued interest payments to all Lenders, but to direct the principal portion of the payment to a "wash account" — "an internal Citibank account that shows journal entries . . . used for certain Flexcube transactions to account for internal cashless fund entries and . . . to help ensure that money does not leave the bank."  Fratta Aff. ¶ 22.  At around

4:00 p.m. on August 11, 2020, therefore, the ABTF team was informed that there would be a "Roll-up Repurchase for Revlon TL 2016 scheduled to close either 8/11/2020 or 8/12/2020" and was told to "pay the Principal to the Wash Account when accrued interest is processed effective 8/11/2020." *Id.* ¶ 18; *see also* PX469, at -1765.[9]

At 4:54 p.m., the ABTF team was told that Citibank had received from Revlon the funds to make the interest payments to the Lenders and was instructed to proceed.  PX469, at -1761-62; ECF No. 197 ("Raj. Aff."), ¶ 12; Fratta Aff. ¶ 26.  Several members of the ABTF team, including some of those involved in processing the August 11th wire transfers, are employees of Wipro Limited ("Wipro"), an entity based in India, who worked exclusively on Citibank matters and maintained Citibank email addresses.  Farrell Aff. ¶ 8; *see also* Raj Aff. ¶ 7.  After receiving the 4:54 p.m. email, Arokia Raj, a Wipro team manager and member of Citibank's ABTF team, directed Santhosh Kuppusamy Ravi, another Wipro employee, to begin processing the transaction according to the instructions the ABTF team had received.  Raj Aff. ¶ 13.  The ABTF team understood that they were expected to remit interest payments to the Lenders and to move an amount equal to the outstanding principal of the 2016 Term Loan — approximately $894 million — into Citibank's internal wash account; the principal was not to be sent to the Lenders or to leave the bank at all.  *See* Fratta Aff. ¶¶ 21-27; ECF No. 199 ("Zeigon Aff."), ¶ 5.  Placing the principal into the wash account would allow the loan to then be "rebuilt" to reflect a slightly smaller remaining principal balance following the roll-up of the Angelo Gordon Lenders

---

[9]      For convenience, all time references in this Opinion are to Eastern Daylight Time.

(although the task of rebuilding was assigned to someone other than the ABTF team).  Fratta Aff. ¶ 22.

The ABTF team must undertake a number of steps to process a transaction of this type, including creating an interest schedule, drafting invoices ("Calculation Statements") to be sent to lenders, and inputting payment instructions in Flexcube.  Raj Aff. ¶ 14; ECF No. 198 ("Ravi Aff."), ¶ 11.  The transaction was also subject to Citibank's "six-eye" approval procedure, which requires three people to review and approve a transaction before it is executed.  Under this procedure, (1) the "maker" — in this case, Ravi — first inputs the payment information into Flexcube; (2) the "checker" — here, Raj — then reviews and verifies the transaction; and finally (3) the "approver" — here, Vincent Fratta, a Citibank senior manager based in Delaware — serves as a final check on the maker and checker's work.  Fratta Aff. ¶¶ 1, 12.

Because the vast majority of wire transactions processed by Citibank using Flexcube involve the payment of funds to third parties, any payment entered into the system is released as a wire payment unless the maker suppresses the default option.  *Id.* ¶ 31.  Citibank's internal Fund Sighting Manual provides instructions for suppressing Flexcube's default.  PX430 at -1257; Fratta Aff. ¶ 46.  When entering a payment, the employee is presented with a menu with several "boxes" that can be "checked" along with an associated field in which an account number can be input.  *E.g.*, PX366, at -541.  The Fund Sighting Manual explains that, in order to suppress payment of a principal amount, "ALL of the below field[s] must be set to the wash account: FRONT[;] FUND[; and] PRINCIPAL" — meaning that the employee had to check all three of those boxes and input the wash account number into the relevant fields.  PX430, at -1257.  Notwithstanding these instructions, Ravi, Raj, and Fratta all believed — incorrectly — that the principal could be properly suppressed solely by setting the "PRINCIPAL" field to the

12

wash account.  Fratta Aff. ¶ 32; Ravi Aff. ¶ 12; Raj Aff. ¶ 17.  Accordingly, as Ravi built out the

transaction between 5:15 and 5:45 p.m. in his role as maker, he checked off only the

PRINCIPAL field, neglecting the FRONT and FUND fields.  Ravi Aff. ¶¶ 12-13; PX366,

at -541.  Figure 1, below, "is an accurate image of the Flexcube screen after [Ravi] input the

data."  Ravi Aff. ¶ 12; *see also* PX366, at -541.

**FIGURE 1**



At 5:45 p.m., Ravi emailed Raj for approval of the transaction, explaining that

"Princip[al] to Wash A[ccount] & Interest to DDA A[ccount]."  Ravi Aff. ¶ 13; PX469, at -1763.

The "DDA Account" referenced the Demand Deposit Account, which is an operational, external-

facing account used by Citibank to collect payments from customers and make transfers to

lenders.  Ravi Aff. ¶ 13.  After reviewing the transaction, Raj believed — incorrectly — that the

13

principal would be sent to the wash account and only the interest payments would be sent out to the Lenders.  Raj Aff. ¶ 17.  Raj then emailed Fratta, seeking final approval under the six-eye review process, explaining "**<u>NOTE</u>**: Principal set to Wash and Interest Notice released to Investors."  PX471, at -1784; Raj Aff. ¶ 19.  Fratta, also believing incorrectly that the default instructions were being properly overridden and the principal payment would be directed to the wash account, not to the Lenders, responded to Raj via email, noting, "Looks good, please proceed.  Principal is going to wash."  Fratta Aff. ¶¶ 32-33; PX469, at -1760.

Raj then proceeded with the final steps to approve the transfers, which prompted a warning on his computer screen — referred to as a "stop sign" — stating: "Account used is Wire Account and Funds will be sent out of the bank.  Do you want to continue?"  Raj Aff. ¶ 21; *see also* PX294.  But "[t]he 'stop sign' did not indicate the amount that would be 'sent out of the bank,' or whether it constituted an amount equal to the intended interest payment, an amount equal to the outstanding principal on the loan, or a total of both."  Raj Aff. ¶ 21; *see also* PX294.  Because Raj intended to release "the interim interest payment to [the] [L]enders," he therefore clicked "YES."  Raj Aff. ¶ 21.  Shortly after 6:00 p.m., Raj emailed confirmation of the transaction to the team, explaining that "Principal set to wash and Interest paid to investors with Invoice."  *Id.* ¶ 22; PX419, at -1108; *see also* Ravi Aff. ¶ 14; Fratta Aff. ¶ 34.  At 6:53 p.m., following standard procedure, Ravi sent Raj the back-up documentary support for the transaction, including the approval emails, a record of receipt of the interest payment from Revlon, and screenshots from Flexcube showing that the payments had been made.  Ravi Aff. ¶ 15.  Although these screenshots showed both $7.8 million in interest and $894 million in principal under the "Amount Paid" field, Ravi did not perceive anything to be amiss because he

understood — incorrectly — that the system reflected the principal as having been "paid" to the internal wash account.  *Id.*

The ABTF team was also responsible for generating and sending to the Lenders the Calculation Statements, which provided notice of the payment.  *See* Farrell Aff. ¶¶ 25-27; Fratta Aff. ¶ 28; Zeigon Aff. ¶ 12; Ravi Aff. ¶ 11; Tr. 86 (testimony of Farrell).  The Calculation Statements were sent to the Lenders through custodians, administrators, or trustees at approximately 5:30 p.m. on August 11, 2020 — shortly before the payments themselves.  *See* Farrell Aff. ¶ 27; *see also* Pl.'s Mem. 7-8.  Plaintiff's Exhibit 678A, an example of one of the Calculation Statements — the one sent to TCI-Symphony CLO 2017-1 Ltd., one of Symphony's clients — is attached as Appendix A.[10]  Each Calculation Statement provided: "Please be advised that Interim Libor Interest will be paid on the LIBOR outstanding under the above referenced facility," i.e. the 2016 Term Loan.  PX678A, at 1.  Each Statement then explained that "[i]nterim interest is due as per the detailed calculation below."  *Id.*  The "Interest Due Period" was then listed as "29-MAY-2020 to 11-AUG-2020."  *Id.*  After listing the applicable interest rate and number of days, each Statement then lists a "Total Due," followed by a dollar amount — in the case of the TCI-Symphony CLO 2017-1 Ltd. Calculation Statement, $29,544.59.  *Id.* at 2.  Next, each Calculation Statement explained that "[w]e will credit your account representing the above Interim Interest based on the following instructions," listing a "Credit Date" of "11-AUG-2020"; a "Total Due," followed by the same dollar amount; a deduction for tax withholding ($0 in the example); and finally a "Credit Amount" (in the example, $29,544.59 once again).  *Id.*  Shortly

---

[10]    *See also*, *e.g.*, PX511 (Allstate); PX596 (Bardin Hill); PX891 (Brigade); PX605 (Greywolf); PX530 (HPS); PX616 (Medalist); PX1297 (New Generation); PX552 (Tall Tree); PX681 (ZAIS).

after the wire transfers themselves were sent, Citibank also generated "Transfer Confirmations," i.e., SWIFT messages listing the amounts actually transferred to each recipient.  Farrell Aff. ¶ 28. The Transfer Confirmation sent to TCI Symphony CLO 2017-1 showed that $3,411,436.99 had been paid, more than one hundred times the "credit amount" listed in the earlier Calculation Statement.  PX648.[11]

## D.  Citibank's Response to the August 11th Wire Transfers

Around 9:00 a.m. the following day, August 12, 2020, as part of his normal responsibilities, Raj began reviewing the "cash break manager application" to identify any "cash breaks" — that is, discrepancies between credits and debits from the previous day's transactions. Raj Aff. ¶¶ 24-25.  This type of reconciliation activity is an important back office function at most financial institutions and is undertaken to ensure that anticipated incoming and outgoing payments match the actual banking activity.  ECF No. 226 ("Byrne Aff."), ¶ 27.  Raj quickly discovered a significant number of cash breaks in surprisingly large amounts and realized that amounts equal to the outstanding principal balance on the 2016 Term Loan had been transferred — not to the internal wash account, but to the Lenders — in addition to the intended interest payments.  Raj Aff. ¶ 25.  At 9:37 a.m., Raj emailed Fratta that "Principal was set to wash and only Interest was set to DDA.  But, it looks like funds ha[ve] gone out along with principal.  Can you please review and advi[s]e if this need[s] to be raised to tech."  PX1574, at -1594; Raj Aff.

---

[11]      *See also, e.g.*, PX722 (Allstate); PX596 (Bardin Hill); PX446 (Brigade); PX605 (Greywolf); PX520 (HPS); PX615 (Medalist); PX618 (New Generation); PX549 (Tall Tree); PX681 (ZAIS).

¶ 26.  Fratta expressed surprise and suggested in a chat with Raj that the principal payment could have been the result of a "tech issue."  Fratta Aff. ¶ 37; PX463, at -1655.

At 9:52 a.m., Fratta broke the news to his supervisor, Vincent Farrell, head of Citibank's North American Loan Operations, in a Skype chat.  "[B]ad news," he wrote.  "[P]rincipal to wash, wires look[] like they went out the door."  PX788, at -29469; Fratta Aff. ¶ 39.  Fratta followed up a few minutes later: "[Y]up, confirmed.  [P]rincipal out the door when it was supposed to be sent to wash for Revlon restructure."  PX349, at -393; Fratta Aff. ¶ 39.  At 10:26 a.m., Fratta emailed Citibank's technology support group: "Yesterday we processed a payment with Principal to the wash and Interest to be sent to lenders.  All details in the front end screens yesterday le[d] us to believe that the payment would be handled in that manner. . . .  Screenshots provided below indicating that the wash account . . . is present and boxes checked appropriately for the principal components."  PX366, at -541; Fratta Aff. ¶ 40.  Fratta then forwarded the same email to members of his team, with the subject line "Urgent Wash Account Does not Work." PX366, at -540-41.  He stated: "Flexcube is not working properly, and it will send your payments out the door to lenders/borrowers.  The wash account selection is not working.  This lead [sic] to ~1BN going out the door in error yesterday for an ABTF Deal, Revlon."  *Id.* at -541; *see* Fratta Aff. ¶ 41.

At 10:46 a.m., Ravi also emailed the technical support team, attaching screenshots of the Flexcube options that had been selected and explaining that "[w]e have processed principal to wash and Interest to DDA[,] however funds ha[ve] gone out along with principal in the . . . transaction."  Raj Aff. ¶ 27; Fratta Aff. ¶ 38; PX367, at -552.  Over the course of the day, Fratta learned that the principal payments — which were made with Citibank's own money, as Revlon had provided funds only for the interim interest payments to be made in connection with the roll-

up transaction — were not caused by a technical error, but by human error: the failure to select the FRONT and FUND fields when inputting the default override instructions in Flexcube. Fratta Aff. ¶¶ 43-44, 46, 48.  Around 1:53 p.m., Fratta emailed his front office colleagues working on the 2016 Term Loan and explained that, "[d]uring our processing and internal rebooking of this Agented deal, we had a processing error, which lead [sic] to the full principal amount of the loan outstanding being sent via wire to all of the lenders in the deal.  Each of the 315 lenders received their pro rata share of 893,944,008.52 as of 8/11/20 of the full amount of the loan, which is incorrect.  We intended to only remit their share of interest and not the principal.  We will be contacting the lenders asking them to return their share of this erroneous payment as soon as possible."  PX436; *see* Fratta Aff. ¶ 45.

At approximately 2:25 p.m., Citibank began sending notices (the "Recall Notices") to the Lenders explaining that funds had been transmitted erroneously.  Farrell Aff. ¶¶ 38-39; *see* Stipulation ¶ 17.  The first set of Recall Notices informed recipients that "we have paid Interest accrual from May 29th to August 11th.  Your share of Principal amount was also released erroneously."  Farrell Aff. ¶ 39.  After listing the recipient's share of the principal payment, each Recall Notice in the first tranche requested that the recipient "[p]lease return the principal portion of the payment you received . . . as soon as possible."  *Id.*[12]  At approximately 6:00 p.m. on August 12th, Citibank sent out a second set of Recall Notices, similarly listing an "Amount Paid in Error" and advising each recipient that "we have paid Interest accrual from May 29th to August 11th.  An additional amount was included in your interest payment in error and you were

---

[12]     *See also* PX797 (ZAIS); PX801 (Tall Tree); PX802 (Bardin Hill); PX816 (Allstate); PX828 (Symphony); PX838 (Greywolf); PX862 (HPS); PX876 (Medalist); PX884 (New Generation).

overpaid.  Please return the amount listed below as soon as possible."  Farrell Aff. ¶ 40.[13]

Citibank distributed a third set of Recall Notices the next day, August 13th, largely identical to

the second set of notices sent out the previous day.  Farrell Aff. ¶ 41.[14]  Finally, Citibank sent

additional follow-up Recall Notices a few days later, stating that "on August 11, 2020, Citibank

funds were mistakenly remitted to you.  To be clear, those funds belong solely to Citibank; they

are not borrower or Revlon 2016 Term Loan facility funds.  In view of this mistaken transfer,

you are legally obligated to return those funds and, as is standard industry practice when fund

transfers occur mistakenly, we expect that you will return those funds to Citibank immediately."

Farrell Aff. ¶ 42.[15]  Throughout this period, Citibank also made other efforts to contact the

Lenders and their related entities, including Defendants here, regarding return of the erroneous

transfers.  Farrell Aff. ¶¶ 43-47.

**E.  Defendants' Responses to the August 11th Wire Transfers**

Defendants, each of which managed or advised Non-Returning Lenders, learned of the

payments and of Citibank's subsequent Recall Notices in different ways and at different times in

the hours and days following the August 11th transaction.

---

[13]     *See also* PX554 (Tall Tree); PX592 (Bardin Hill); PX605 (Greywolf); PX616 (Medalist);
PX678B (Symphony); PX682 (ZAIS); PX696 (Allstate); PX728 (HPS); PX891 (Brigade);
PX1301 (New Generation).

[14]     *See also* PX678C (Symphony); PX592 (Bardin Hill); PX616 (Medalist); PX682 (ZAIS);
PX693 (Allstate); PX732 (HPS); PX799 (Tall Tree); PX891 (Brigade); PX1310 (New
Generation).

[15]     *See also* PX156 (Brigade); PX592 (Bardin Hill); PX605 (Greywolf); PX616 (Medalist);
PX678D (Symphony); PX682 (ZAIS); PX694 (Allstate); PX730 (HPS); PX774 (Tall Tree);
PX1305 (New Generation).

**Allstate**:[16] As of August 11, 2020, Allstate had seven Lenders as clients, which collectively held approximately $10.5 million of the 2016 Term Loan.  McCoy Aff. ¶ 8.  Allstate first learned of the payments the morning of August 12, 2020, when members of Allstate's bank loan operations team notified Catherine McCoy, an Allstate portfolio manager, and others, asking whether they "were expecting a large unscheduled paydown on 8/11 for Revlon?"  DX542, at -58.  Kevin Roth, another Allstate portfolio manager, responded that they were not.  *Id.*  A member of Allstate's bookkeeping team then replied, providing additional details on the transaction, noting that "the amounts appear to tie to a full paydown with interest.  There are currently no agent notices for this . . . ."  *Id.*  McCoy responded: "So strange — could this be a mistake?  Did the CLO's receive the same paydown?"  *Id.*  She followed up again a few minutes later: "Can you check and see if the CLOs received the same . . . ?  Not sure if this is in error, seems very unlikely."  *Id.* at-56; *see also* McCoy Aff. ¶ 19.  By 12:51 p.m., a member of the operations team confirmed that the CLOs had also received full payoffs and noted that "[t]here are no agent notices pertaining to the principal paydown.  However, there are notices reflecting the libor contract which was supposed to pay [from] 5/29/20 to 8/31/20 breaking and paying interest from 5/29/20 to 8/11/20."  *Id.*  Shortly thereafter, McCoy and Roth spoke by telephone and discussed the possibility that Revlon and Citibank had chosen to pay off all of Allstate's clients as part of an attempt to manipulate the voting rights of the Lenders.  *Id.* ¶ 24.

Allstate was sent a Recall Notice by 3:05 p.m. on August 12, 2020, PX2, of which McCoy was made aware by a member of Allstate's operations team at around 6:00 p.m., McCoy

---

[16]     Defendant Allstate Investment Management Co. ("AIMC") is an affiliate of Allstate Insurance Company, as is Allstate Investments, LLC ("AILLC").  AIMC is the collateral manager for five Lenders and AILLC is the investment advisor for two Lenders.  McCoy Aff. ¶ 5.  For ease of reference, AIMC and AILLC are referred to together as "Allstate" here.

Aff. ¶ 25; DX569.  Citibank sent another Recall Notice, as part of the second set of notices, to Allstate at 6:20 p.m.  PX8.  The next morning, Allstate informed its clients' trustee, Bank of New York Mellon ("BNYM"), that "[w]e are working with our legal team to get approval to return the funds" but instructed BNYM to "[pl]ease hold off until you hear from us."  PX21, at -167 (emphasis omitted).  By that afternoon, Allstate directed BNYM not to return the funds and confirmed that the funds would instead be held in suspense.  *Id.* at -166.  Citibank sent Allstate a third Recall Notice on August 13, 2020, PX18, as well as two additional follow-up emails in the following days, but by August 17, 2020, Allstate replied that "[i]t is not at all clear that the funds were paid in error.  We continue to analyze the situation."  PX22, at -267.

**Bardin Hill**: As of August 11, 2020, Bardin Hill had ten Lenders as clients, which collectively held approximately $45.6 million of the 2016 Term Loan.  Greene Aff. ¶ 8.  Citibank sent Bardin Hill a Recall Notice by 2:24 p.m. on August 12, 2020.  PX810.  At 4:46 p.m., Bardin Hill's vice president emailed U.S. Bank, the trustee for their clients, inquiring whether they "saw funds come in for Revlon recently and if you see any notices saying there was a pay down."  PX47, at -510.  U.S. Bank responded that "[i]t does look like there was an erroneous principal payment for Revlon" and attached two Recall Notices from Citibank.  *Id.*  Bardin Hill instructed U.S. Bank "[p]lease do not send back any funds."  PX57, at -800.

**Brigade**: As of August 11, 2020, Brigade had forty-two Lenders as clients, which collectively held approximately $211.3 million of the 2016 Term Loan.  Frusciante Aff. ¶ 8.  Brigade first learned of the payments on the morning of August 12, 2020, when it received an email from Virtus, LLC ("Virtus"), an administrator for several of Brigade's clients, attaching a cash flow statement indicating the payment and advising that "[w]e are reaching out to agent for below Revlon wire."  DX483; Frusciante Aff. ¶ 14.  By around 2:30 p.m., Jeffery Frusciante, a

bank debt manager at Brigade, messaged Brigade's internal counsel, asking: "Revlon full paydown?"  PX167.  Shortly thereafter, Frusciante noted that Citibank "just . . . sent a notice" advising that the share of principal was "released erroneously."  *Id.*  At 4:35 p.m., Virtus informed Brigade that Citibank had advised it that the funds had been released accidentally and belonged to Citibank rather than Revlon, but Brigade responded that "[i]t is unclear to us that this was an error or that the loan was not satisfied, in any event."  PX145, at -2247.  By that evening, Brigade had instructed its clients to retain the funds and carry them as a cash break.  PX110, 114, 116-18, 123, 126-27, 129-36, 139, 160, 162-63, 166.

**Greywolf**: As of August 11, 2020, Greywolf had three Lenders as clients, which collectively held approximately $15.9 million of the 2016 Term Loan.  ECF No. 214 ("Josephson Aff."), ¶ 7.  Greywolf learned of both the August 11th wire transfers and the Recall Notices for the first time on August 13, 2020.  Abrams Dep. Tr. 86.  At around 11:30 a.m. on that day, however, Greywolf learned from Virtus, the custodian for its clients' funds, that Virtus had already returned to Citibank the principal portion of the payment received by one of Greywolf's clients.  Josephson Aff. ¶¶ 15-16; DX655, at -594.  Greywolf instructed Virtus to "claw[] back" the funds it had returned, noting that Greywolf had never agreed to return of the funds, and instructed Virtus not to return any other principal payments received by Greywolf's other clients.  Josephson Aff. ¶¶ 15-16.  A few minutes later, a Greywolf analyst emailed Virtus inquiring about the August 11th wire transfers, noting that "[a]pparently [Citibank] made an overpayment" and that "[t]hey are looking to claw back the overpayment."  PX1126, at -780.

The analyst instructed Virtus: "PLEASE DO NOT RETURN ANY FUNDS RELATED TO REVLON." *Id.*

**HPS**: As of August 11, 2020, HPS had eighteen Lenders as clients, which collectively held approximately $134.1 million of the 2016 Term Loan.  ECF No. 208 ("Crocombe Aff."), ¶ 11.  Early on the morning of August 12, 2020, an HPS fund administrator emailed HPS noting the August 11th wire transfers and seeking confirmation that "there was a full princip[al] repayment on this instrument . . . as the notice below" — a reference to the Calculation Statement — "does not indicate it."  DX663, at -5386.  By that afternoon, HPS had learned through communications with the administrators of its funds that the full amount of principal plus interest had been received from Citibank the day before and that the administrators were awaiting further documentation before booking paydowns.  ECF No. 211 ("Xanthakys Aff."), ¶¶ 14-15; DX489, at -53020; DX504, at -1712.  HPS received a Recall Notice from Citibank by around 2:30 p.m., which was brought to the attention of HPS leadership by late that afternoon. Xanathakys Aff. ¶¶ 18-20; DX413; *see also* DX557; DX558; DX1099.  At 5:18 p.m., an HPS analyst sent an internal email, attaching a Recall Notice and indicating that "[w]e will be sending the erroneous paydowns back first thing tomorrow," but he was quickly overruled by a managing director, who indicated that the funds should not be returned unless otherwise directed by leadership and should "not [be] include[d] . . . in the cash reports so we don't invest it by accident."  PX1197.

**Medalist**: As of August 11, 2020, Medalist had three Lenders as clients, which collectively held approximately $4.5 million of the 2016 Term Loan.  Phipps Aff. ¶ 8.  Medalist first learned of the payments upon receiving a Recall Notice regarding the payment sent to one of its clients on the afternoon of August 12, 2020.  A Medalist vice president then forwarded the

notice to U.S. Bank, instructing them to "confirm we received the wire from Revlon & return [the principal amount]," later reiterating that "[w]e just need to return the principal amount." PX1228, at -18.  The following morning, Medalist's chief investment officer participated in a call with Lenders and counsel, Phipps Aff. ¶ 14, and subsequently instructed the vice president to contact U.S. Bank immediately and instruct it not to return the money, *id.* ¶ 16; DX677, at -1768. Although the payment to one of the Medalist's clients had already been returned, the transfers back to Citibank from the remaining two clients were cancelled before the transactions were completed, with Medalist instructing U.S. Bank to "[p]lease hold on to it for now.  It's fine if it sits unapplied."  PX1245, at -149; Phipps Aff. ¶ 17.

**New Generation**: As of August 11, 2020, New Generation had one Lender as a client, which held approximately $2.7 million of the 2016 Term Loan.  Dent Aff. ¶ 7.  New Generation received the Calculation Statement at around 5:30 p.m. on August 11, 2020, prior to the actual payment, and forwarded it to its custodian, Northern Trust.  PX1298; Beals Dep. Tr. 44-45.  New Generation first became aware of the size of the payment the following afternoon, upon receipt of Citibank's Recall Notice, which New Generation again forwarded to Northern Trust.  Beals Dep. Tr. 58; PX1300.  Northern Trust responded that "it would make sense to have our custody team return the original wire and have them send only the funds we are due," to which a New Generation employee agreed.  PX1300.  The following morning, however, after participating in a call with other Lenders and counsel, Frederick Dent, a portfolio manager at New Generation, directed that the funds not be returned to Citibank; instead, he directed that they be held in suspense.  Dent Aff. ¶¶ 13-15.

**Symphony**: As of August 11, 2020, Symphony had thirty Lender clients, which held approximately $109.7 million of the 2016 Term Loan.  ECF No. 219 ("Vaughan Aff."), ¶ 8.  On

the morning of August 12, 2020, Scott Caraher, Symphony's head of loans, directed John Vaughan, a back-office employee, to determine whether Symphony's Lender clients had received payments on the 2016 Term Loan the previous day.  Caraher Aff. ¶¶ 13-14.  Symphony staff then reached out to various client administrators and custodians, who confirmed that Symphony's clients had indeed received the full principal payment, along with interest, in several cases noting that they had not received supporting documentation or notice of the full paydown.  Tr. 985, 990-996 (testimony of Vaughan); Vaughan Aff. ¶ 14; *see also, e.g.*, DX640; DX577.  Symphony learned that some custodians had, on their own initiative, already applied the funds as a paydown in their records, and Symphony directed at least one such custodian, U.S. Bank, to do the same.  Vaughan Aff. ¶ 16; DX503; DX562, at -232, -235; DX721; DX640, at -619.  At 2:23 p.m., Citibank sent Symphony its first Recall Notice.  PX837; *see* Vaughan Aff. ¶ 20.  After learning of the notices, Caraher instructed his employees to direct the trustees, custodians, and administrators of their clients not to return the funds.  Caraher Aff. ¶ 17.

**Tall Tree**: As of August 11, 2020, Tall Tree had three Lenders as clients, which collectively held approximately $3.9 million of the 2016 Term Loan.  Lenga Aff. ¶ 8.  Tall Tree learned of the August 11th wire transfers the morning of August 13, 2020, after a call with counsel, and learned of the Recall Notices shortly thereafter.  *Id.* ¶¶ 4, 13-14; *see also* PX773.  In the following days, Tall Tree instructed its custodians to hold the funds in an unapplied account rather than returning them to Citibank. Lenga Aff. ¶¶ 15-16; *see* PX1463.

**ZAIS**: As of August 11, 2020, ZAIS had nine Lenders as clients, which collectively held approximately $15.6 million of the 2016 Term Loan.  Meneses Aff. ¶ 8.  ZAIS first learned of the August 11th wire transfers after receiving a Recall Notice from Citibank on August 12, 2020. *Id.* ¶ 15; DX540.  At approximately 9:00 a.m. on August 13, 2020, ZAIS back-office employees

instructed its custodians to return the funds — specifically the "principal paid in error."  PX1539, at -218.  After a call with other Lenders and counsel later that morning, however, ZAIS personnel followed up with the custodians and instructed them not to return the funds to Citibank.  PX1541.  The funds received by two of the clients had already been sent back, but the custodians were able to cancel the remaining payments.  Tr. 951-52 (testimony of Meneses).

## F.  The *UMB Bank* Lawsuit

As discussed above, several of the Lenders, including Defendants' clients, had objected to the May 2020 Transaction, contending that it was invalid under the terms of the 2016 Loan Agreement.  This dispute eventually gave rise to litigation, in which a sufficient number of Lenders — including those associated with most Defendants here — authorized UMB Bank, as the purported successor Administrative Agent on the 2016 Term Loan, to file a lawsuit against Revlon and Citibank, asserting a variety of claims stemming from the May 2020 Transaction. *See* UMB Compl.  The *UMB Bank* Complaint alleged that an event of default had already occurred on the 2016 Term Loan and thus sought to accelerate payment of the debt.  It also alleged that Revlon "was insolvent and facing a severe liquidity crisis compounded by the global COVID-19 pandemic."  *Id.* ¶ 166.  Notably, the *UMB Bank* Complaint was filed (in this Court) on August 12, 2020, at approximately 2:06 p.m. — roughly twenty hours *after* the August 11th wire transfers.  *See* DX1055.  The 117-page complaint, however, had been in the works for some time, and Defendants (with the exception of Tall Tree) had authorized the filing of the *UMB Bank* action between July 30 and August 10, 2020, before the August 11th wire transfers.  *See* Abrams Dep. Tr. 114 (Greywolf); Caraher Aff. ¶ 40 (Symphony); Crocombe Aff. ¶ 16 (HPS); Dent Aff. ¶ 27 (New Generation); Greene Aff. ¶ 40 (Bardin Hill); McCoy Aff. ¶ 45 (Allstate); Meneses Aff. ¶ 36 (ZAIS); Perkal Aff. ¶ 50 (Brigade); Phipps Aff. ¶ 27 (Medalist).  The *UMB*

*Bank* action was voluntarily dismissed on November 6, 2020.  Notice of Voluntary Dismissal,

*UMB Bank*, No. 20-CV-6352 (LGS) (S.D.N.Y. Nov. 6, 2020), ECF No. 17.

## G.  Procedural History

Citibank commenced this litigation on August 17, 2020 by filing suit against Brigade,

bringing claims of unjust enrichment, conversion, money had and received, and payment by

mistake.  ECF No. 1 ("First Compl."), ¶¶ 31-44.  The next day, following an emergency hearing,

the Court issued a temporary restraining order pursuant to Rule 65(b) of the Federal Rules of

Civil Procedure preventing "Brigade, its agents, servants, employees, officers and all persons and

entities in active concert and participation with them" from "removing, withdrawing,

transferring, assigning, or otherwise disposing of" the portion of the wired funds its affiliated

entities had received.  ECF No. 25, at 1-2.  Later that day, Citibank filed a second lawsuit

alleging substantially identical claims against HPS and Symphony, *see* 20-CV-6617, ECF No. 1;

*see also* 20-CV-6617, ECF No. 13 ("Second Compl."), and, following another emergency

hearing on August 19, 2020, the Court issued a similar temporary restraining order with respect

to the funds received by these Defendants' affiliated entities, 20-CV-6617, ECF No. 16.  Finally,

on August 20, 2020, Citibank filed a third lawsuit bringing the same claims against Bardin Hill,

Investcorp Credit Management US LLC ("Investcorp"), Greywolf, ZAIS, Allstate, Medalist, Tall

Tree, New Generation, and Highland Capital Management Fund Advisors LP ("Highland

Capital").  20-CV-6713, ECF No. 1 ("Third Compl.").  The next day, following yet another

emergency hearing, the Court issued another temporary restraining order as to these Defendants.

20-CV-6713, ECF No. 14.[17]  Thereafter, the Court also consolidated all three cases pursuant to

---

[17]     Citibank subsequently voluntarily dismissed its claims against Investcorp and Highland
Capital pursuant to Rule 41(a)(1)(A)(i).  *See* ECF Nos. 48, 110.

Rule 42(a)(2).  *See* ECF Nos. 28, 35.  On consent of the parties and on a finding of good cause,

the Court consolidated the hearing on any motion for a preliminary injunction with trial on the

merits pursuant to Rule 65(a)(2) and extended the temporary restraining orders through the date

of trial*, see* ECF No. 28, at 2; *see also* ECF No. 94, and subsequently through the date of this

Opinion, ECF No. 183.

In December 2020, the Court held a bench trial with direct testimony taken largely by

affidavit.  With agreement of the parties, the bench trial was conducted remotely using a Zoom-

based video-conferencing platform due to the ongoing COVID-19 pandemic.  *See* ECF No. 165.

## SUBJECT-MATTER JURISDICTION

Before the Court turns to the merits of the parties' dispute, it must address the issue of

subject-matter jurisdiction.  *See, e.g.*, *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (noting

that a federal court has an "independent obligation" to confirm its subject-matter jurisdiction).

Citibank initially invoked this Court's diversity jurisdiction under 28 U.S.C. § 1332(a).

*See* First Compl. ¶ 9; Second Compl. ¶ 11; Third Compl. ¶ 18.  In preparing for trial, however,

the Court concluded that Citibank had failed to establish the complete diversity necessary to

invoke diversity jurisdiction.  *See* ECF No. 177.  In particular, although Citibank had alleged that

it is a citizen of South Dakota, First Compl. ¶ 7, and that Defendants are citizens of other states,

*see id.* ¶ 8; Second Compl. ¶¶ 9-10; Third Compl. ¶¶ 9, 11-16, these allegations were insufficient

as a matter of law.  Notably, Citibank's First and Second Complaints alleged that Defendants

Brigade Capital Management, LP, HPS Investment Partners, LLC, and Symphony Asset

Management LLC — despite their names — are corporations, organized under the laws of states

other than South Dakota and with principal places of business in states other than South Dakota,

First Compl. ¶ 8; Second Compl. ¶¶ 9-10, and these allegations were admitted by Defendants,

ECF No. 128, ¶ 8; ECF No. 129, ¶¶ 9-10.  By contrast, the Defendants named in the Third

Complaint were all alleged to be limited liability companies or limited partnerships.  Third

Compl. ¶¶ 9, 11-16.  These allegations were also admitted.  ECF No. 130, ¶¶ 9, 11-16.

It is well established that a limited liability company ("LLC") is deemed to be a citizen of

each state of which its members are citizens.  *See, e.g.*, *Handelsman v. Bedford Vill. Assocs. Ltd.*

*P'ship*, 213 F.3d 48, 51-52 (2d Cir. 2000) (Sotomayor, J.); *see also Altissima Ltd. v. One*

*Niagara LLC*, No. 08-CV-756S(M), 2010 WL 3504798, at *2 (W.D.N.Y. Sept. 2, 2010) (noting

that every other Court of Appeals to have considered LLC citizenship has held that an LLC has

the citizenship of all of its members).  Thus, a complaint alleging diversity jurisdiction must

allege the citizenship of natural persons who are members of an LLC and the place of

incorporation and principal place of business of any corporate entities that are members of the

LLC (including the citizenship of any members of the LLC that are themselves LLCs).  *See*

*Handelsman*, 213 F.3d at 51-52; *see also, e.g.*, *In re Bank of Am. Corp. Sec., Derivative, &*

*ERISA Litig.*, 757 F. Supp. 2d 260, 334 n.17 (S.D.N.Y. 2010).  Similarly, it is well established

that for purposes of diversity jurisdiction, a limited partnership ("LP") is deemed to be a citizen

of each state of which its general and limited partners are citizens.  *See, e.g.*, *Handelsman*., 213

F.3d at 52 (collecting cases).  Thus, a complaint alleging diversity jurisdiction must allege the

citizenship of all partners of an LP.

As the parties acknowledged during a teleconference conducted on the record shortly

before trial, the initial complaints in this case did not meet these requirements.  *See* ECF No.

184, at 3-7.  The Third Complaint plainly fell short because it alleged that the named Defendants

are either LLCs or LPs, but it failed to allege the citizenship of Defendants' members and

partners.  And while the First and Second Complaints alleged that the named Defendants are

"corporations" (and would have properly pleaded their citizenship if they were, in fact, corporations), it was apparent that they, too, were LLCs or LPs.  Accordingly, the Court directed the parties to conduct an investigation into the citizenship of Defendants' constituent members to confirm that complete diversity existed among the parties and to amend the pleadings to accurately allege Defendants' citizenship.  *See* ECF Nos. 177, 184, at 7-8; *see also* ECF No. 191.[18]  Counsel ultimately confirmed that seven of the ten defendants are diverse from Citibank (namely, Allstate, Brigade, Greywolf, New Generation, Symphony, Tall Tree, and ZAIS).  *See* ECF No. 228.  Thus, it is plainly proper for the Court to exercise diversity jurisdiction with respect to Citibank's claims against these seven Defendants, as Citibank's claims against each Defendant are discrete and severable from its claims against the others.  *See United Republic Ins. Co. v. Chase Manhattan Bank*, 315 F.3d 168, 170 (2d Cir. 2003) (per curiam) ("If the district court determines that a party is nondiverse and dispensable, the court may sever that party and still preserve its judgment over the claims of the remaining parties."); *Samaha v. Presbyterian Hosp. in City of N.Y.*, 757 F.2d 529, 531 (2d Cir. 1985) (per curiam) (explaining that the question when diversity jurisdiction is challenged "by reason of the citizenship of some of the parties" is whether "they are indispensable parties, for if their interests are severable and a decree without prejudice to their rights can be made, the jurisdiction of the court should be retained and the suit dismissed as to them" (quoting *Horn v. Lockhart*, 84 U.S. (17 Wall.) 570, 579 (1873))).

The diversity statute may not provide jurisdiction with respect to Citibank's claims against the other three Defendants (namely, Bardin Hill, HPS, and Medalist) — as to which counsel was unable to obtain the necessary information, *see* ECF No. 228 — but the Court

---

[18]     Citibank and Defendants subsequently filed consolidated and amended pleadings with accurate jurisdictional allegations.  *See* ECF No. 193 ("Consol. Am. Compl."); ECF No. 234.

concludes that it can exercise jurisdiction over those claims due to another statute: the Edge Act.

To the extent relevant here, the Edge Act provides that,

> [n]otwithstanding any other provision of law, all suits of a civil nature at common law or
> in equity to which any corporation organized under the laws of the United States shall be
> a party, arising out of transactions involving international or foreign banking . . . or out of
> other international or foreign financial operations, either directly or through the agency,
> ownership, or control of branches or local institutions . . . in foreign countries, shall be
> deemed to arise under the laws of the United States, and the district courts of the United
> States shall have original jurisdiction of all such suits . . . .

12 U.S.C. § 632.  "For Edge Act jurisdiction to exist, three things must be true: first, the suit

must be a civil action; second, a 'corporation organized under the laws of the United States' must

be a party; and third, the suit must 'aris[e] out of transactions involving international or foreign

banking, or banking in a dependency or insular possession of the United States, or out of other

international or foreign financial operations.'"  *U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt.*

*LLC*, 826 F. App'x 115, 116 (2d Cir. 2020) (summary order) (quoting 12 U.S.C. § 632); *see Am.*

*Int'l Grp., Inc. v. Bank of Am. Corp.*, 712 F.3d 775, 781 (2d Cir. 2013) (holding that the Edge

Act requires that "the federally chartered corporation itself engage[] in the offshore banking

transaction," either in its own right or through a "foreign or territorial agency, branch, or

subsidiary," and does not encompass "any offshore banking transaction . . . regardless of whether

that corporation was involved in it").  Notably, "federal courts in this Circuit have consistently

interpreted the Edge Act's jurisdictional provision broadly, routinely applying Section 632, even

in cases based on state law causes of action and containing only an incidental connection to

banking law, and even though the international or foreign banking activity was not central to the

case."  *Bank of Am. Corp. v. Lemgruber*, 385 F. Supp. 2d 200, 214 (S.D.N.Y. 2005) (alterations

and internal quotation marks omitted) (collecting cases); *see also Dexia SA/NV v. Bear, Stearns*

*& Co.*, 924 F. Supp. 2d 555, 557 (S.D.N.Y. 2013) (explaining that the "arising out of" prong of

the Edge Act test "is read broadly in order to protect federally chartered banks engaged in international banking from variations in state law and the local prejudices of state and insular courts").

Applying these standards here, the Court concludes that it can exercise jurisdiction over the claims against all Defendants — including the three as to which complete diversity may be lacking — under the Edge Act.  For starters, the first two requirements of the Act are plainly met: This is a civil suit and "Citibank is a federally chartered U.S. bank."  *Wilson v. Dantas*, 746 F.3d 530, 535 (2d Cir. 2014).  As for the third, there are at least two ways in which Citibank's claims arise out of transactions it engaged in that involved international banking or other international financial operations.  First, three of the August 11th wire transfers, made to two Defendants (HPS and Brigade), were sent to foreign bank accounts.  *See* ECF Nos. 204, 223. Sending payments to a foreign bank account qualifies as a transaction involving international banking.  *See, e.g.*, *Pinto v. Bank One Corp.*, No. 02-CV-8477 (NRB), 2003 WL 21297300, at *3 (S.D.N.Y. June 4, 2003); *Nacional Financiera, S.N.C. v. Chase Manhattan Bank, N.A.*, No. 00-CV-1571 (JSM), 2001 WL 327159, at *4 (S.D.N.Y. Apr. 4, 2001).  And the size of the three payments at issue here — totaling approximately $41.9 million and constituting approximately 22.7% and 5.3% of the amounts transferred to HPS and Brigade, respectively, *see* PX346A; Pl.'s Mem. 10; Defs.' Mem. app. A — are plainly sufficient to support jurisdiction over Citibank's claims against these two Defendants.  *See, e.g.*, *Kirschner v. JPMorgan Chase Bank, N.A.*, No. 17-CV-6334 (PGG), 2018 WL 4565148, at *7 (S.D.N.Y. Sept. 24, 2018) (noting that "there is no threshold dollar amount or percentage required under the text of the Edge Act or Second Circuit case law" and finding that foreign ownership of 1.48% of the value of a loan was sufficient for jurisdiction); *Pinto*, 2003 WL 21297300, at *3 (finding jurisdiction under the Edge Act even

though "the five [foreign] transactions . . . represent[ed] a small portion of the total listed").  The

Court can then exercise supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over

Citibank's remaining claims because they all arise from the same case or controversy.  *See, e.g.*,

*Wilson v. Dantas*, No. 12-CV-3238 (GBD), 2013 WL 92999, at *8 (S.D.N.Y. Jan. 7, 2013),

*aff'd*, 746 F.3d 530; *Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, No. 11-CV-6212 (BSJ), 2011 WL

6778473, at *2 (S.D.N.Y. Dec. 20, 2011), *vacated on other grounds*, 712 F.3d 775.

Alternatively, and independently, the Court can exercise jurisdiction pursuant to the Edge

Act because the August 11th wire transfers were executed on Citibank's behalf by Wipro

employees stationed in India.  *See* Raj Aff. ¶¶ 4, 13-22; Ravi Aff. ¶¶ 4, 11-15.  The Edge Act

provides for jurisdiction with respect to transactions arising out of "international or foreign

financial operations," including "through the agency . . . or control of branches or local

institutions . . . in foreign countries."  12 U.S.C. § 632.  "The Edge Act does not define the term

'international or foreign financial operations,' nor has it been defined in [Second Circuit] case

law."  *Wilson*, 746 F.3d at 535; *see Salix Capital U.S. Inc. v. Banc of Am. Sec. LLC*, Nos. 13-CV-

4018 (NRB), 13-CV-7005 (NRB), 13-CV-2297 (NRB), 2013 WL 6847064, at *7 (S.D.N.Y. Dec.

30, 2013) ("Historically, cases have focused more on the 'transactions' prong of the Edge Act

than on the 'operations' one.").  But courts have recognized that the "'international or foreign

financial operations'" prong of the statute can provide jurisdiction distinct from, and in addition

to, the "international or foreign banking" prong.  *See, e.g.*, *Pinto*, 2003 WL 21297300, at *6; *In

re Lloyd's Am. Tr. Fund Litig.*, 928 F. Supp. 333, 341 (S.D.N.Y. 1996).  Here, Citibank

implemented the wire transfers (and generated the corresponding Calculation Statements that

preceded the payments) through its agents located in India.  Whether viewed as a foreign

banking transaction or a foreign financial operation, the fact that the August 11th wire transfers

were carried out by actors located in India provides an alternative, independently sufficient basis for the exercise of jurisdiction under the Edge Act.

Accordingly, notwithstanding the deficiencies in the jurisdictional allegations in Citibank's initial complaints, the Court concludes that it has subject-matter jurisdiction over Citibank's claims against all Defendants and may proceed to the merits

## CONCLUSIONS OF LAW

In an effort to get its money back, Citibank asserts four claims against Defendants: conversion, unjust enrichment, money had and received, and payment by mistake. *See* Consol. Am. Compl. ¶¶ 44-57. Under New York law, "[a] conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." *Colavito v. N.Y. Organ Donor Network, Inc.*, 860 N.E.2d 713, 717 (N.Y. 2006). To establish conversion, a plaintiff must show (1) its "possessory right or interest in the property" and (2) "defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Chefs Diet Acquisition Corp. v. Lean Chefs, LLC*, No. 14-CV-8467 (JMF), 2016 WL 5416498, at *7 (S.D.N.Y. Sept. 28, 2016) (internal quotation marks omitted); *accord Colavito*, 860 N.E.2d at 717. The other three causes of action share overlapping elements. *See, e.g.*, *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004) (unjust enrichment); *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 125 (2d Cir. 1984) (money had and received); *United States ex rel. Ryan v. Staten Island Univ. Hosp.*, No. 04-CV-2483 (JG) (CLP), 2011 WL 1841795, at *5 (E.D.N.Y. May 13, 2011) (payment by mistake). Effectively, each requires a plaintiff to prove that the defendant received a benefit from the plaintiff that equitable principles dictate should be returned.

34

Following trial, there is no dispute that the money at issue — the portion of the August 11th wire transfers that exceeded the interim interest payments Revlon intended to pay — belonged to Citibank and that it was transferred by mistake.[19]  That goes a long way toward establishing the elements of Citibank's claims.  Nevertheless, the question of whether Citibank has, in fact, established the elements is made close by its decision to sue Defendants, investment or collateral managers to the Non-Returning Lenders, rather than the Non-Returning Lenders to which the August 11th wire transfers were actually sent.[20]  Citing that fact, Defendants argue that Citibank failed to establish that *they* exercise "dominion" over the funds in question, as required for its claim of conversion, and failed to establish that *they* derived a direct benefit from the August 11th transfers, as required for Citibank's other three causes of action.  *See* ECF No. 227; Defs.' Mem. 78-91; ECF No. 163 ("Defs.' Reply"), at 28-29.  These arguments are not without force.

---

[19]     Earlier in the litigation, Defendants were not prepared to concede the point.  *See, e.g.*, ECF No. 44, at 12-13.  At the conclusion of trial, however, they did so, *see* Tr. 1214, and for good reason: The evidence is overwhelming that the members of the ABTF team who executed the payments intended for the principal portions of the transfers to be sent to Citibank's internal wash account and that the money was sent out of the bank only because the members of the team failed to enter the transaction properly in Citibank's Flexcube system.

[20]     Notably, the potential significance of Citibank's decision to sue Defendants rather than the Non-Returning Lenders themselves was raised in the very first conference held on August 18, 2020, *see* ECF No. 66 ("Aug. 18 Tr."), at 3, 7, and repeatedly thereafter, *see, e.g.*, ECF No. 28, at 2; ECF No. 103, at 4.  In fact, the week before trial, the Court went so far as to raise whether the Lenders were required parties under Rule 19 of the Federal Rules of Civil Procedure.  *See* ECF No. 176; ECF No. 184 ("Dec. 3 Tr."), at 9-12.  In response, Citibank explained only that "there were prudential reasons why nobody on either side wanted the [L]enders to be brought in if it could be avoided."  Dec. 3 Tr. 12.  (The Court ultimately agreed with the parties that Rule 19 did not require the Lenders to be joined for the case to proceed to trial.  *See* ECF No. 220 ("Dec. 7 Tr."), at 8-9; Dec. 3 Tr. 15-17, 26-29; *cf. Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 90 (2005) ("[Rule 19] address[es] party joinder, not federal-court subject-matter jurisdiction.").)

Ultimately, however, the Court need not decide these issues because it concludes that Defendants have established the elements of the discharge-for-value defense under New York law, which all parties agree is a complete defense to each of Citibank's causes of action.  *See, e.g.*, *BMO Harris Bank N.A. v. Salin Bank & Tr. Co.*, No. 1:18-CV-3263 (SEB) (TAB), 2020 WL 2571251, at *7 (S.D. Ind. May 21, 2020) ("[T]he discharge for value rule . . . allows a creditor to escape restitution where he has mistakenly received funds that discharged a debt owed to him so long as he was unaware of the transferor's error." (citing *Banque Worms v. BankAmerica Int'l*, 570 N.E.2d 189, 192 (N.Y. 1991)); RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 67 cmt. d (Am. Law Inst. 2011) ("The [discharge-for-value rule] cuts off what would otherwise be a valid restitution claim," including one "based on . . . mistake . . . .").[21]  Thus, it is to that defense that the Court now turns.

## A.  The Elements of the Discharge-for-Value Defense

The *Restatement (First) of Restitution*, adopted by the American Law Institute in 1937, sets forth the classic formulation of the discharge-for-value defense.  To the extent relevant here, Section 14 of the *Restatement* explains the defense as follows:

> A creditor of another or one having a lien on another's property who has received from a third person any benefit in discharge of the debt or lien, is under no duty to make restitution therefor, although the discharge was given by mistake of the transferor as to his interests or duties, if the transferee made no misrepresentation and did not have notice of the transferor's mistake.

RESTATEMENT (FIRST) OF RESTITUTION § 14(1) (Am. Law Inst. 1937).  The parties agree that New York has adopted this defense, and for good reason: The New York Court of Appeals settled that question in *Banque Worms*, 570 N.E.2d 189, after it was certified by the Second

---

[21]    Similarly, the Court need not and does not address Defendants' argument that Citibank's claims are precluded by the New York Uniform Commercial Code.  *See* Defs.' Mem. 91-92.

Circuit on appeal from a decision from this Court, *see Banque Worms v. Bank Am. Int'l*, 726 F.

Supp. 940 (S.D.N.Y. 1989), *aff'd sub nom. Banque Worms v. BankAmerica Int'l*, 928 F.2d 538

(2d Cir. 1991).  The parties further agree that *Banque Worms* still provides the governing

standards for the defense under New York law.[22]  But they disagree in several respects about

what those standards are — namely, (1) whether it applies only when a debt is actually due;

(2) whether the issue of notice is evaluated at the moment the payment is received or when it is

formally credited in some way; and (3) whether "notice" means actual notice or constructive

notice.  The Court will address each of these disagreements in turn.  But it is helpful to begin

with an in-depth summary of the three *Banque Worms* decisions.

### 1.  *Banque Worms*

  *Banque Worms* arose from a revolving credit agreement between Spedley Securities Ltd.

("Spedley"), an Australian company, and Banque Worms, a French bank.  The agreement had

been "routinely renewed every three months as it fell due" until March 1989, when Banque

Worms informed Spedley that it would not renew the agreement again and demanded "payment

of the outstanding debt on April 10, 1989, the due date."  *Banque Worms*, 928 F.2d at 539.  On

April 10, 1989, at 12:36 a.m., Spedley sent a telex to its bank, Security Pacific International

Bank ("Security Pacific"), directing it to wire $1,974,267.97 — the amount Spedley owed

Banque Worms — to Banque Worms's account at BankAmerica International ("BankAmerica").

*See Banque Worms*, 726 F. Supp. at 940; *Banque Worms*, 928 F.2d at 539.  But at 3:37 a.m. the

---

[22]  At least one New York state court has suggested that *Banque Worms*'s adoption of the discharge-for-value rule is "limited to mistakes of banks in making electronic wire transfers." *Fountoukis v. Geringer*, 822 N.Y.S.2d 644, 645 (App. Div. 2006).  Given that this case involves electronic wire transfers, the Court need not and does not decide whether or to what extent the rule applies to payments made by other means.

same day — three hours later — Spedley sent another telex to Security Pacific to "stop payment to Banque Worms and instead to make payment in the same amount to National Westminster Bank USA." *Banque Worms*, 928 F.2d at 539.  Notwithstanding this second instruction from Spedley, at 11:30 a.m., Security Pacific mistakenly wired $1,974,267.97 to BankAmerica for the account of Banque Worms.  *Id.*  Just over two hours later, at approximately 1:45 p.m., Security Pacific advised BankAmerica that the transfer made that morning had been a mistake and asked for the funds to be returned.  *See id.* at 540; *Banque Worms*, 726 F. Supp. at 940.  Expecting that BankAmerica would return the money later that day, Security Pacific then wired the $1,974,267.97 to National Westminster Bank USA in accordance with Spedley's second set of instructions.  *See Banque Worms*, 726 F. Supp. at 940.

In the litigation that followed, the Court was called upon to decide whether Security Pacific or Banque Worms was entitled to the money.[23]  As in this case, there was no dispute that the funds were wired to Banque Worms (or, to be more precise, its agent, BankAmerica) by mistake.  Invoking the discharge-for-value defense, however, Banque Worms argued that it was nonetheless entitled to keep the money because it had been a creditor with a right to the payment from Spedley.  In a ruling on cross-motions for summary judgment, Judge Patterson agreed.  There were, he explained, "no allegations of any misrepresentations" by either BankAmerica or

---

[23]     How the litigation was narrowed to that question is a more complicated tale that is not really relevant for present purposes.  In brief, BankAmerica returned the funds to Security Pacific, but subject to an indemnification from Security Pacific.  Banque Worms refused to give BankAmerica debit authorization for the funds, and BankAmerica demanded that Security Pacific give them back.  When Security Pacific refused, Banque Worms sued BankAmerica; BankAmerica, in turn, filed a third-party complaint against Security Pacific, and Security Pacific filed counterclaims against Banque Worms.  Thereafter, Security Pacific returned the money to BankAmerica, which recredited the funds to Banque Worms's account, and all claims by and against BankAmerica were voluntarily dismissed, leaving only the dispute between Security Pacific and Banque Worms.  *See id.* at 940-41; *Banque Worms*, 928 F.2d at 540.

Banque Worms.  *Banque Worms*, 726 F. Supp. at 942.  And while Security Pacific argued that Banque Worms was put on notice of the mistake only about two hours after the transfer was made, before the close of the business day, Judge Patterson concluded that did not suffice to defeat the defense.  "Notice to [BankAmerica] at 1:45 P.M.," he reasoned, "would only assist [Security Pacific's] position if [Banque Worms] then received notice and if the transaction was not yet complete at 1:45 P.M."  *Id.*  Relying on *Delbrueck & Co. v. Manufacturers Hanover Trust Co.*, 609 F.2d 1047, 1049-51 (2d Cir. 1979), however, Judge Patterson concluded that the wire transfer — pursuant to the Clearing House Interbank Payments System ("CHIPS") — was "irrevocable and final" as soon as it was made and that "[t]he 'final settling of the accounts' at the end of the day [was] 'mere bookkeeping.'"  *Banque Worms*, 726 F. Supp. at 942 (quoting *Delbrueck*, 609 F.2d at 1051).  "Accordingly, any awareness by [Banque Worms] of [Security Pacific's] mistake two hours after the funds were transferred by wire [was] not material."  *Id.*

On appeal, Security Pacific argued that Judge Patterson had erred in applying the discharge-for-value rule under New York law.  *Banque Worms*, 928 F.2d at 539.  Under New York law, Security Pacific contended, it was entitled to return of the payment made by mistake unless Banque Worms could show that it had relied on the payment to its detriment.  Br. Third-Party Def.-Appellant Security Pacific International Bank ("Security Pacific Br."), at 23-36, *Banque Worms*, 928 F.2d 538 (No. 90-7106).[24]  Separately, Security Pacific took issue with Judge Patterson's conclusion that the relevant moment in time for purposes of assessing notice in connection with the discharge-for-value defense was the moment of transfer.  Given that "a wire transfer is instantaneous," Security Pacific argued, "it made no sense for the district court to hold that the payment was final for notice purposes" at the moment it was made.  *Id.* at 47.  "[T]he

---

[24]     This brief appears in the record of this case at ECF Nos. 142-1 and 142-2.

district court's reasoning," Security Pacific continued, "effectively eliminates any 'window' at all" after the sending of the payment during which the sender could notify the recipient of the mistake. *Id.* Arguing that the relevant point in time was "the end of the business day when member banks settle the transactions for that day among themselves," and that BankAmerica's knowledge was imputable to Banque Worms under *Delbrueck*, Security Pacific contended that Banque Worms was put on notice of the mistake when, at 1:45 p.m. on the day of the transfer, it notified BankAmerica that it had sent the payment in error. *Id.* at 47 n.15.

Presented with these arguments, the Second Circuit described "[t]he sole issue presented" as "whether New York has adopted the *Restatement of the Law of Restitution*'s Discharge for Value rule." *Banque Worms*, 928 F.2d at 540. Concluding that the answer to that question was unclear, the Court certified the following question to the New York Court of Appeals:

> Whether in this case, where a concededly mistaken wire transfer by Security Pacific was made to Banque Worms, a creditor of Spedley, New York would apply the "Discharge for Value" rule as set forth at Section 14 of the *Restatement of Restitution* or, in the alternative, whether in this case New York would apply the rule that holds that money paid under a mistake may be recovered, unless the payment has caused such a change in the position of the receiving party that it would be unjust to require the party to refund.

*Banque Worms*, 928 F.2d at 541 (brackets omitted). The New York Court of Appeals accepted the certified question for review and, in a unanimous decision, held that New York recognized "the 'discharge for value' rule as set forth at section 14 of the Restatement of Restitution" *and* that the rule "should be applied in the circumstances in this case." *Banque Worms*, 570 N.E.2d at 198.

The state court began by recognizing that, "[i]n the area of restitution, New York has long recognized the rule that if A pays money to B upon the erroneous assumption of the former that he is indebted to the latter, an action may be maintained for its recovery" whether "the cause

of action has been denominated as one for money had and received, for unjust enrichment or restitution, or upon a theory of quasi contract." *Id.* at 191-92 (internal quotation marks and citations omitted). Over time, the court continued, "[t]his rule ha[d] evolved into the 'mistake of fact' doctrine, in which detrimental reliance is a requisite factor, and which provides that 'money paid under a mistake of fact may be recovered back, however negligent the party paying may have been in making the mistake, unless the payment has caused such a change in the position of the other party that it would be unjust to require him to refund.'" *Id.* at 192 (quoting *Nat'l Bank of Commerce in N.Y. v. Nat'l Mechanics' Banking Ass'n of N.Y.*, 55 N.Y. 211, 213 (1873)). At the same time, Section 14(1) of the *Restatement (First) of Restitution* had "established the 'discharge for value' rule" and "myriad" New York cases "arguably len[t] support to the proposition that New York, long ago, [had] embraced" the rule. *Id.* at 192-93.

Ultimately, the court concluded that cases rejecting the discharge-for-value rule in favor of a detrimental-reliance rule did "not satisfactorily address the unique problems presented by electronic funds transfer technology." *Id.* at 193. Looking for guidance to the then-new Article 4A of the Uniform Commercial Code, and its adoption by the New York State Legislature only one month earlier, the court reasoned that New York had endorsed "a number of important policy goals," including "[n]ational uniformity in the treatment of electronic funds transfers," as well as "speed, efficiency, certainty (i.e., to enable participants in fund transfers to have better understanding of their rights and liabilities), and finality." *Id.* at 195. Indeed, "[e]stablishing finality in electronic fund wire transactions was considered a singularly important policy goal," with deep roots in New York law. *Id.* "The 'discharge for value' rule," the Court concluded, "is consistent with and furthers the policy goal of finality in business transactions and may appropriately be applied in respect to electronic funds transfers." *Id.* at 196. More specifically,

41

"[w]hen a beneficiary receives money to which it is entitled and has no knowledge that the money was erroneously wired, the beneficiary should not have to wonder whether it may retain the funds; rather, such a beneficiary should be able to consider the transfer of funds as a final and complete transaction, not subject to revocation."  *Id.*

Significantly, the state court rejected as "unpersuasive" Security Pacific's argument that adopting the discharge-for-value defense and applying it to wire transfers "would undermine the low cost structure of wholesale electronic fund transfers and impose extraordinary risks upon banks implementing these enormously large transactions."  *Id.* at 197.  Looking again to Article 4A of the Uniform Commercial Code for guidance, the court reasoned that it was the banks that were in the best position to avoid a mistake in the first place.  "Article 4A," the court reasoned, "contemplates, in the first instance, that a mistake such as occurred here can be effectively held to a minimum through the utilization of 'commercially reasonable' security procedures in effecting wire transfers."  *Id.*  The court then identified examples of security procedures banks could use to "avoid a loss" or at least "minimiz[e]" the "[r]isk of loss," from verifying the authenticity of a payment order "through an agreed upon security procedure" to accepting a payment order "on the condition that it first receives payment from the sending bank."  *Id.* "These security procedures are for the purpose of verifying the authenticity of the order or detecting error in the transmission or content of the payment order or other communication."  *Id.*

Turning back to the dispute between Security Pacific and Banque Worms, the court concluded that "[a]pplication of the 'discharge for value' rule to the circumstances presented" was "particularly appropriate."  *Id.*  As the court noted, it was undisputed that Security Pacific had executed the order directing payment to Banque Worms even after it had received a countermanding order from Spedley.  And "it appear[ed] that, as a creditor of Spedley, Banque

Worms was a beneficiary entitled to the funds who made no 'misrepresentation and did not have notice of the transferor's mistake.'  Accordingly, [the court] conclude[d], in answer to the certified question, that the 'discharge for value' rule as set forth in section 14 of the Restatement of Restitution, should be applied in the circumstances in this case."  *Id.* at 198 (paragraph structure altered); *see id.* (answering the "certified question . . . as follows: New York would apply the 'discharge for value' rule as set forth at section 14 of the Restatement of Restitution").

Upon receiving this guidance from the New York Court of Appeals, the Second Circuit turned "to the facile task of applying the Discharge for Value rule to the facts of this case" and affirmed the district court.  *Banque Worms*, 928 F.2d at 541-42.  The Court summarized:

> It is undisputed that Security Pacific, acting on behalf of Spedley, mistakenly transferred a $1,974,267.97 payment to Banque Worms.  At the time it received the mistaken payment, Banque Worms was Spedley's *bona fide* creditor.  Further, Banque Worms made no misrepresentation regarding the transfer or its right to receive the funds and did not have notice of the transferor's error.

*Id.* at 541.  "Therefore," the Court concluded, "Banque Worms is entitled to retain the mistakenly transferred funds."  *Id.*

## 2.  Whether the Defense Applies Only When a Debt Is "Due"

As noted, the parties' first point of disagreement with respect to the contours of *Banque Worms* and the discharge-for-value defense is whether, to succeed, the defense requires that the funds in question be "due."  Citibank argues that to invoke the rule, a creditor must prove that it was "entitled to the funds at the time of transfer (they must be 'due,' not just outstanding)."  Pl.'s Mem. 2.  If that is correct, it follows that Defendants would not be entitled to invoke the defense because it is undisputed that the 2016 Term Loan was not "due" on August 11, 2020; indeed, the loan was not set to mature for another three years.  Defendants, however, have the better of the argument.

First and foremost, Citibank's argument finds no support in the language of Section 14 of the *Restatement*, which was explicitly adopted by the New York Court of Appeals in *Banque Worms*. Instead, the *Restatement* provides only that the defense may be available to "[a] creditor of another or one having a lien on another's property" — without further qualification. *Banque Worms*, 570 N.E.2d at 192 (alteration in original) (quoting RESTATEMENT (FIRST) OF RESTITUTION § 14(1)); *see also Greenwald v. Chase Manhattan Mortg. Corp.*, 241 F.3d 76, 81 (1st Cir. 2001) ("[S]ection 14 of the *Restatement* is explicit: so long as the creditor or lienor made no misrepresentation and did not have notice of the transferor's mistake, there is no duty of restitution." (internal quotation marks omitted)); *Catahama, LLC v. First Commonwealth Bank*, 601 F. App'x 86, 93 (3d Cir. 2015) ("The District Court properly applied the [discharge-for-value] rule because the transferee made no misrepresentations and did not have notice of the transferor's mistake." (internal quotation marks omitted)). Second, in their respective opinions in *Banque Worms*, both the Second Circuit and the New York Court of Appeals appear to focus on the recipient's status as a *bona fide* creditor that "entitles" it to the funds at issue, not on when the transfer occurred in relation to the payment schedule. *See Banque Worms*, 928 F.2d at 541 ("At the time it received the mistaken payment, Banque Worms was Spedley's *bona fide* creditor."); *Banque Worms*, 570 N.E.2d at 198 ("[A]s a creditor of Spedley, Banque Worms was a beneficiary entitled to the funds . . . ."). Third, none of the other leading cases applying the discharge-for-value rule suggest, let alone hold, that the defense includes a "present entitlement" element. *See, e.g.*, *In re Calumet Farm, Inc.*, 398 F.3d 555 (6th Cir. 2005); *Gen. Elec. Capital Corp. v. Cent. Bank* ("*GECC*"), 49 F.3d 280 (7th Cir. 1995); *Qatar Nat'l Bank v. Winmar, Inc.*, 650 F. Supp. 2d 1, 10 (D.D.C. 2009); *NBase Commc'ns, Inc. v. Am. Nat'l Bank & Tr. Co. of Chi.*, 8 F. Supp. 2d 1071 (N.D. Ill. 1998). And finally, there are cases applying the defense

where, as here, the recipient of the funds did *not* have a legal entitlement to them at the time of receipt.  *See, e.g.*, *Chase Manhattan Bank v. Burden*, 489 A.2d 494, 497 (D.C. 1985) (granting summary judgment for a defendant invoking the discharge-for-value defense even though the defendant, a limited partner, "may have had no legal claim to the $15,000 [mistakenly transferred], since . . . the general partner[] had complete discretion under the partnership agreement to distribute partnership capital").

In arguing that the discharge-for-value defense requires a showing that the money sent was "due" at the time it was sent, Citibank relies primarily on a single line in *Carlisle v. Norris*, 109 N.E. 564, 569 (N.Y. 1915), which is quoted in turn by the New York Court of Appeals in *Banque Worms*: "If defendants received the proceeds in good faith and without any notice of any wrong, *and credited them on an indebtedness due them*, plaintiff is not entitled to recover them back."  *Carlisle*, 109 N.E. at 569 (emphasis added), *quoted in Banque Worms*, 570 N.E.2d at 193; *see* Pl.'s Mem. 39.  In *Banque Worms*, however, the line appears only in a parenthetical following the citation to *Carlisle*, which the court identifies as one example of a case that "arguably lends support to the proposition that New York, long ago, embraced the 'discharge for value' rule."  *Banque Worms*, 570 N.E.2d at 193.  That is hardly a wholesale adoption of *Carlisle*, let alone a holding — in the face of the language of the *Restatement* (which was drafted more than two decades after *Carlisle* was decided) — that "an indebtedness due" is an element of the discharge-for-value rule.  Nor is it even clear that *Carlisle* itself — which says nothing about the timing of payments on the debts at issue — places the sort of weight on the "indebtedness due" language that Citibank ascribes to it.

The only other case Citibank cites, *A.I. Trade Finance, Inc. v. Petra Bank*, No. 89-CV-7987 (JFK), 1997 WL 291841 (S.D.N.Y. June 2, 1997), does not support its "indebtedness due"

argument either.  There, the court decided that the discharge-for-value rule did not apply, not because the indebtedness was not due at the time of the payment, but because the party invoking discharge for value was not a creditor within the meaning of the *Restatement* at all.  The plaintiff "creditor" merely had an order of attachment — stemming from other, still-ongoing litigation — on the assets of the defendant, which had received an allegedly mistaken transfer; it gave the plaintiff only "first dibs on [the defendant's] account *if* [the plaintiff] won its lawsuit on the merits."  *Id.* at *4.  Because the plaintiff's "claimed 'lien'" would not ripen until the "[p]laintiff obtain[ed] a judgment in its favor," it "did not create for [the defendant] any present debt, obligation or duty to [the plaintiff]" at all.  *Id.*  Thus, "at the time of the mistaken transfer, [the plaintiff] was not entitled to anything in [the defendant's] attached accounts."  *Id.*  Here, by contrast, there is no dispute that the Non-Returning Lenders were *bona fide* creditors of Revlon at the time that they received the August 11th wire transfers.  *See* Stipulation ¶¶ 15-16; Tr. 196-97 (testimony of Zeigon).

In sum, the Court concludes that the recipient of funds need not show that an outstanding debt was "due" when it received the funds in order to invoke the discharge-for-value defense. Instead, it is sufficient for the party invoking the defense to show that, at the time the funds were received, it was a *bona fide* creditor.  Defendants meet that burden here given their Non-Returning Lender clients' undisputed interests in the 2016 Term Loan on August 11, 2020.

### 3.  Whether Notice Is Evaluated at the Time of Payment or When Payment Is Credited

Next, the parties disagree about *when* the recipient of a mistaken payment must be on notice of the mistake for the discharge-for-value defense to fail: at the time the payment is received or when the payment is "credited" or "discharged."  Citibank argues that the relevant point in time is the moment when the debt is "discharged" — that is, when the funds are

"appl[ied]" to "credit [the debtor's] account."  Pl.'s Mem. 50; *see also id.* 50-52; Pl.'s Reply 20-25.  It argues, among other things, that finding the point at which the funds are received to be the critical moment "does not make sense" because "[t]hat would mean that there is an immediate 'discharge' every time a mistaken payment is made — before the recipient has any chance to suspect, much less know of, an error."  Pl.'s Mem. 50.  By contrast, Defendants maintain that a recipient's notice of mistake (or lack thereof) is evaluated "upon payment and receipt of the disputed funds, and not when the recipient later 'credits' the funds in its books."  Defs.' Mem. 54; *see also id.* at 52-60; Defs.' Reply 22-28.  On this issue, Defendants also have the better of the argument.

Indeed, Defendants' position is compelled by the Second Circuit's decision in *Banque Worms*.  There, as discussed above, Security Pacific (the transferor) contacted BankAmerica (Banque Worms's receiving agent) only about two hours after the wire transfer had been made — and several hours before the close of the same business day — and advised that the payment had been sent in error.  *See Banque Worms*, 726 F. Supp. at 940.  Yet, relying on the Second Circuit's holding in *Delbrueck* that "a CHIPS transaction is irrevocable and final once the transfer takes place," Judge Patterson held that "*any* awareness by [Banque Worms] of [Security Pacific's] mistake two hours after the funds were transferred by wire [wa]s *not material*."  *Id.* at 942 (emphases added) (citing *Delbrueck*, 609 F.2d at 1049-51).  Indeed, he dismissed Security Pacific's argument that notice received before the close of the business day would suffice to defeat the discharge-for-value defense: "The 'final settling of the accounts' at the end of the day," he wrote, "is 'mere bookkeeping.'"  *Id.* (quoting *Delbrueck*, 609 F.2d at 1051).  What is more, Judge Patterson reached this holding on summary judgment, without any discovery.  *See* Security Pacific Br. 1; Br. Pl.-Appellee Banque Worms at 4, *Banque Worms*, 928 F.2d 538 (No.

90-7106). In Judge Patterson's view, what Banque Worms knew after the payment was received and when Banque Worms knew it was irrelevant as a matter of law to the applicability of the defense.

That view was adopted by the Second Circuit on appeal. Notably, Security Pacific explicitly argued in its brief on appeal that Judge Patterson had erred in holding that the relevant point in time for notice purposes was the moment of receipt. That holding, Security Pacific argued, "made no sense" in the case of a wire transfer because it would effectively eliminate "any window" during which the sender of funds might notify the recipient of the mistake. Security Pacific Br. 47 & n.15 (internal quotation marks omitted). Additionally, Security Pacific argued before both the Second Circuit and the New York Court of Appeals that *Delbrueck*, on which Judge Patterson had relied for this point, was inapposite. *See id.* at 44-47; Reply Br. Third-Party Def.-Appellant Security Pacific International Bank ("Security Pacific CoA Reply"), at 24-25 & n.19, *Banque Worms*, 570 N.E.2d 189. Nevertheless, the Second Circuit affirmed the grant of summary judgment in Banque Worms's favor and rejected Security Pacific's arguments as "without merit." *Banque Worms*, 928 F.2d at 541-42. Granted, in doing so, the Second Circuit did not address the timing question as explicitly as Judge Patterson had. But given the undisputed fact that Security Pacific had notified Banque Worms's agent of the mistake within about two hours of the payment — and before the close of business — and given the absence of any discovery into what Banque Worms knew and when, it follows that the Second Circuit viewed the relevant time as the moment of payment.

That settles the matter for purposes of this case given that the Second Circuit's decision in *Banque Worms* is binding on this Court. But any doubt that the relevant time is the moment of payment is resolved by consideration of other authorities. First, other courts that have applied

the discharge-for-value rule have understood *Banque Worms* as holding that the moment of receipt of the funds is the critical point of analysis.  *See, e.g.*, *GECC*, 49 F.3d at 284 ("As the Court of Appeals [in *Banque Worms*] saw things, a creditor should be able to treat funds credited in apparent payment of a debt as irrevocably his, *unless news of the error precedes arrival of the funds*." (emphasis added)).  Second, an application of the discharge-for-value rule that equates the receipt of the funds at issue with a discharge for value is consistent with common understandings of "discharge" and giving "value."  *See, e.g.*, *M'Crea v. Purmort*, 16 Wend. 460, 474 (N.Y. 1836) ("The payment of the money discharges or extinguishes the debt; a receipt for the payment does not pay the debt, it is only evidence that it has been paid."); *Discharge*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "discharge" as "the payment of a debt"); *cf. Alden Auto Parts Warehouse, Inc. v. Dolphin Equip. Leasing Corp.*, 682 F.2d 330, 333 (2d Cir. 1982) (per curiam) ("[R]ecovery is ordinarily denied as against a third person who, as a result of a mistake in a transaction between two other persons, receives a payment from one of them in good faith in the ordinary course of business and for a valuable consideration.  Valuable consideration, of course, may consist of the third party's payment to either party to the contract at issue."  (internal quotation marks and citations omitted)).

In arguing that the relevant time is later, when the recipient of the funds "credits" the debtor's account, Citibank relies on *Calumet*, *Qatar*, and *NBase*, *see* Pl.'s Mem. 50-51, but that reliance is misplaced.  *Calumet*, interpreting Kentucky law, held that it was error to "focus[] on when [the transferee] *received the funds* rather than on when [the transferee] *credited* [*the debtor's*] *account*."  398 F.3d at 561.  In doing so, the Sixth Circuit acknowledged that "[i]solated language" in the New York Court of Appeals's *Banque Worms* decision "indicates that the notice must occur before the funds arrive," but concluded that the question in that case

49

"was *whether* the discharge-for-value rule applies in this setting, not *how* it applies."  *Calumet*,

398 F.3d at 559.  But *Calumet* did not consider, or even acknowledge, the district court and

Second Circuit decisions in *Banque Worms*, which necessarily *did* consider how the discharge-

for-value rule applied — including a determination that the point the funds were received was

the critical moment — in holding that Banque Worms successfully invoked it.  *Qatar*, applying

D.C. law, adopts *Calumet*'s reasoning on this issue, but similarly fails to consider either federal

court decision in *Banque Worms*.  *See Qatar*, 650 F. Supp. 2d at 9-10.  Most significantly,

*Calumet*'s analysis on this question relied in part on *NBase*, which explicitly "disagree[d] with

*Banque Worms*[]" on this point in interpreting Illinois law, and held that "creditors must have

given value (before receiving notice)" — where "giving value means crediting the debtor's

account" — "in order to avail themselves of the discharge for value rule."  8 F. Supp. 2d at 1076-

77.[25]  If anything, therefore, the cases on which Citibank relies confirm that, under New York

law, as interpreted by the Second Circuit, the relevant time is the moment of payment.

Finally, Citibank's argument cannot be squared with the New York Court of Appeals's

unambiguous rejection of a detrimental reliance standard or its strong emphasis on finality.  As

to the former, the court explained that "the 'discharge for value' rule . . . entitl[ed] Banque

Worms to retain the funds mistakenly transferred without the necessity of demonstrating

detrimental reliance."  *Banque Worms*, 570 N.E.2d at 191 (emphasis added).  Yet Citibank

---

[25]     Additionally, although *NBase* says that its analysis on this point "is solidly rooted in the
Restatement," 8 F. Supp. 2d at 1076, the current version of the *Restatement* explicitly rejects this
approach, *see* RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 67 cmt. h
("Such a test is rejected as arbitrary, difficult to verify, and subject to manipulation.  Most
importantly, the action of the payee's bookkeeper in posting a credit (whatever form that action
may take) is irrelevant to the underlying reason for granting an affirmative defense in these
cases.  By contrast, the consensus rationale relates directly to the payee's knowledge that a
payment has been received.").

argues that a defendant can invoke the defense "only if it [has taken] some action (1) to credit the funds (to *discharge* them); and (2) to give value for those (to discharge them *for value*)" — only if, that is, it has detrimentally relied on the payment.  Pl.'s Mem. 50 (citations, alterations, and internal quotation marks omitted).[26]  Notably, the *NBase* court candidly acknowledged this tension in the argument that Citibank presses, *see* 8 F. Supp. 2d at 1077 n.10. ("It strikes us that by holding that the discharge for value affirmative defense requires 'value' to have been given, one might argue that the defense is now the same as the 'change of position' affirmative defense."), but ultimately declined to address it because neither party had raised it, *see id.*  As for finality, Citibank's proposed rule would risk doing precisely what the New York Court of Appeals sought to avoid by adopting the discharge-for-value rule: It would risk "introduc[ing] confusion and danger into all commercial dealings."  *Banque Worms*, 570 N.E.2d at 195-96 (internal quotation marks omitted).

To see why that is true, one need only consider the record in this case.  The moment that the wired funds were received by the Lenders (or perhaps, in some instances, their agents) is easy to pinpoint.  By contrast, it is unclear — even after a six-day trial — what a "discharge" of the Revlon debt would have entailed, let alone how to pinpoint it in time.  Notably, Citibank's own position on what would have constituted a "discharge" of the Revlon debt has shifted over the course of the litigation.  Early on, Citibank insisted that the Non-Returning Lenders could not have discharged the debt because the official books and records for the 2016 Term Loan were

---

[26]     That Citibank's position is, at bottom, the detrimental-reliance standard rejected in *Banque Worms* is laid bare by the first line of its Proposed Conclusions of Law: "Under New York law, a party that transfers money by mistake is entitled to return of the funds *so long as the transferee has not relied to its detriment on the mistaken payment*."  Pl.'s Mem. 34 (emphasis added).  Needless to say, that is *precisely* the position that the New York Court of Appeals rejected.

maintained by Citibank itself, as Administrative Agent, in the form of the "Register."  *See, e.g.*,

ECF No. 23, at 2 ("[T]he official record of Revlon's debt under the Credit Agreement is the

Register, which is maintained by the Administrative Agent (Citibank), not by each lender; thus

[Defendants] had no ability to credit or discharge Revlon unilaterally."); *accord* Aug. 18 Tr. 18;

First Compl. ¶ 22.  Later, however, Citibank's position changed.[27]  At trial, for instance, Citibank

argued that the debt was not discharged until the funds at issue were "appl[ied]" to "credit

Revlon's account" in some way.  Pl.'s Mem. 50.  Yet even then, Citibank did not identify what

that meant in practice — the transfer of funds from a collection account into principal and

interest accounts? notations in books and records maintained by the Non-Returning Lenders'

custodians or trustees? notations in books and records maintained by the Non-Returning Lenders

or Defendants themselves?  *See, e.g.*, *id.* at 31-32 (focusing on the cash flow reports maintained

by the Non-Returning Lenders' custodians); Tr. 1148-49 (testimony of Lenga) (focusing on the

transfer of funds from the Non-Returning Lenders' collection accounts to principal and interest

accounts); Tr. 988-89 (testimony of Vaughan) (focusing on the books and records maintained by

Defendants).

---

[27]     It is hard to avoid the conclusion that Citibank's shift was a product of inconvenient facts
emerging during discovery — namely, facts suggesting, if not showing, that the "Register"
actually did, at some point on August 11 or 12, 2020, reflect a full paydown of the 2016 Term
Loan.  *See* Defs.' Mem. 61-65.  Whether or not that is the case, looking to the Register to
determine when the debt was discharged would be nonsensical here, as it would imply that only
Citibank, as the keeper of the official books and records, could discharge the debt by recording it
as such in the Register.  But of course, Citibank was also the transferor that made the payment by
mistake.  It cannot be that the transferor dictates when the transferee does or does not give value
in exchange for the payment for the purposes of notice of mistake.  Notably, Citibank itself now
argues that such a theory does not comport with the discharge-for-value rule.  *See* Pl.'s Reply 25
("[E]ven if [D]efendants were correct about the Register, the main question under the discharge-
for-value doctrine is whether the *beneficiary* of the transfer — *here, the defendants* — credits the
debtor's account and gives value for the mistaken payment." (emphases added) (internal
quotation marks and alterations omitted)).

Making matters worse, adopting Citibank's rule (whatever it is and would mean in practice) would presumably mean that the relevant moment in time would vary from creditor to creditor and require a fact-intensive inquiry in every case, at least in the syndicated loan context.[28]  Here, for instance, the relevant practices and procedures varied dramatically from Defendant to Defendant and Lender to Lender.  *See* Tr. 461-62 (testimony of Frusciante).  For example, Symphony's clients receive loan payments in accounts maintained at various banks.  Vaughan Aff. ¶ 9.  The client's agents — either custodians or trustees, depending on the type of client — are then responsible for applying the funds so that they are reflected in the client's "net asset value."  The custodian or trustee maintains the "official" books and records for the client.  Tr. 987-88 (testimony of Vaughan).  Symphony then books the payments in "shadow" books and records that it maintains.  Symphony then reconciles the two sets of books; for some clients, this occurs on a "T+0" basis, meaning payments are reflected in both sets of books on the same day, while for other clients this is done on a "T+1" basis, meaning Symphony's books are not updated until the following day.  Tr. 988-89 (testimony of Vaughan).  By contrast, Tall Tree outsources "middle office" services — including the maintenance of a second set of books and records and the reconciliation of such records with the "official" books maintained by their clients' trustees — to a separate entity, which is also responsible for receiving payment notices on Tall Tree's behalf.  Tr. 1145-46 (testimony of Lenga).  Some of Brigade's clients' fund administrators require notices before they will "apply[]" funds, while others do not.  Frusciante Aff. ¶¶ 29-30.

---

[28]     The point of "discharge" may well be readily identifiable in other contexts, where the law, custom, or practice requires, say, a creditor to provide the debtor an official record of a loan's payoff.  But there is no such law, custom, or practice in the syndicated loan context.  *See, e.g.*, Tr. 1233 ("[Court:] [A]s several witnesses testified in answer to questions that I posed, these loans, it is not as if the lender has to send a document back saying, okay, we have now written off your loan and we are done . . . .");  *accord* Tr. 1022-23 (testimony of Vaughan).

In addition, Brigade's CLO clients segregate the funds they receive into separate principal and interest accounts, but other Brigade clients do not.  Tr. 404-05, 410 (testimony of Frusciante). Similarly, whereas Allstate's insurance company clients never processed the funds received on August 11, 2020, the trustee for Allstate's CLO clients did apply the funds to those clients' separate principal and interest sub-accounts notwithstanding the absence of a payment notice referencing the principal payments, and was instructed by Allstate on August 13, 2020, to reverse that application and instead place the funds in suspense accounts.  Tr. 748-49 (testimony of McCoy); McCoy Aff. ¶ 29.

Faced with this variability, Citibank itself is forced to admit that, "[d]epending on the identity of the beneficiary, the structure of the debt, and other relevant circumstances, a discharge may take a variety of forms."  Pl.'s Mem. 51.  But notably, it ignores the logical implication of that admission.  Put simply, adopting Citibank's proposed rule would not be a recipe for promoting the "singularly important policy goal" of "finality in electronic fund wire transactions."  *Banque Worms*, 570 N.E.2d at 195.  It would be a recipe for litigation.

In short, the trio of *Banque Worms* opinions, individually and together, compel the conclusion that the relevant point in time for evaluating whether the recipient of funds sent by mistake is on notice of the mistake is the moment the payment is received.

### 4.  Actual Notice vs. Constructive Notice

The final legal issue in dispute is what *kind* of notice prevents an assertion of the discharge-for-value defense.  As a threshold matter, the two sides do agree on one aspect of the relevant analysis: that, in evaluating the issue of notice as to each Lender, the knowledge of the Lender *and* the knowledge of that Lender's agents (that is, the corresponding Defendant and the Lender's custodian, administrator, or trustee, as the case may be) are both imputable to the

Lender itself.  *See* Tr. 1278-79, 1282-83.  In other words, it does not matter whether a wire

transfer was sent directly to a Lender or was sent to an agent of the Lender.  Nor does it matter if,

for example, a Calculation Statement or a Recall Notice was sent in the first instance to a

Defendant or to a Lender's trustee and, only later, forwarded to the Lender itself.  That is, if a

Defendant or another agent of a particular Lender acquired knowledge within the scope of its

agency relationship with the Lender, that knowledge is imputable, at the moment it was acquired,

to the Lender itself.  *See, e.g.*, *Mediators, Inc. v. Manney (In re The Mediators, Inc.)*, 105 F.3d

822, 827 (2d Cir. 1997) (explaining that, under New York law, "the usual presumption" is that

the knowledge of agents acting within the scope of employment are imputed to the principal

absent exceptions not relevant here); *In re Parmalat Sec. Litig.*, 477 F. Supp. 2d 602, 609

(S.D.N.Y. 2007)  ("Under New York law, '[t]he general rule is that knowledge acquired by an

agent acting within the scope of his agency is imputed to his principal.'" (alteration in original)

(quoting *Center v. Hampton Affiliates, Inc.*, 488 N.E.2d 828, 829 (N.Y. 1985)); *Bloor v. Dansker*

*(In re Inv'rs Funding Corp. of N.Y. Sec. Litig.)*, 523 F. Supp. 533, 540-41 (S.D.N.Y. 1980)

(noting that "[t]he same rule applies to information received by corporate agents").

     This approach is consistent with, if not compelled by, *Banque Worms*.  As discussed

above, the payment in that case was not sent directly to the creditor, Banque Worms, but rather

to its receiving agent, BankAmerica.  *Banque Worms*, 928 F.2d at 539.  Approximately two

hours later, Security Pacific, the sender of the funds, notified BankAmerica, not Banque Worms,

that the funds had been sent in error and demanded their return.  *See id.* at 540; *Banque Worms*,

726 F. Supp. at 940.  There was no evidence in the record (or, at a minimum, none is reflected in

the trio of court opinions) indicating that Banque Worms itself learned of the payment or the

notice of error until the following day (when BankAmerica asked Banque Worms whether it

would consent to the debit to its account charged as a result of the return of the funds to Security

Pacific).  *See Banque Worms*, 928 F.2d at 539-40.  Yet none of the courts rested on that fact in

holding either that Banque Worms was not on notice of the mistake at the time of payment or

that the notice of error was (in Judge Patterson's words) "not material."  *Banque Worms*, 726 F.

Supp. at 942.  Instead, they treated the knowledge of BankAmerica as the knowledge of Banque

Worms for purposes of assessing whether the latter was on notice.  Any doubt on that score is

resolved by the fact that all three courts relied on *Delbrueck*, in which the Second Circuit

explicitly held that a wire transfer recipient's receiving agent's knowledge of the transfer is

imputed to the recipient.  *See* 609 F.2d at 1051-52; *see also* Security Pacific Br. 47 n.15

(observing on appeal that, under *Delbrueck*, BankAmerica's "knowledge as paying and receiving

agent for [Banque Worms] must be imputed to [Banque Worms]").

Imputing the knowledge of a lender's agents to the lender makes sense for practical

reasons as well.  First, without such imputation, lenders would be incentivized to take steps and

structure their operations to shield themselves from notice of mistaken payments — e.g., by

requiring payments to be routed to one agent and notices to another.  Second, determining

whether a particular lender was on notice of a mistaken payment would often require a rigorous,

fact-intensive investigation — and would undermine the goal of promoting the finality of

payments that the New York Court of Appeals prioritized in *Banque Worms*.  By way of

example, this case involves a single syndicated term loan with hundreds of Lenders, each of

which had its own idiosyncratic operations structure involving some combination of investment

advisors, fund administrators, custodians, and trustees.  Parsing the specifics of when each

Lender *and* each Lender's agent learned of particular facts and whether and when each

communicated these facts to the others would be a next-to-impossible task.  Application of the

discharge-for-value rule should not turn on such fact-intensive particulars.

While there is no disagreement between the parties here about whose knowledge counts

for notice purposes, there *is* sharp disagreement about the relevant standard for notice.

Defendants argue that, for the discharge-for-value defense to be defeated under New York law,

the creditor must have *actual* notice that the payment at issue was sent by mistake.  *See* Defs.'

Mem. 66-70; Defs.' Reply 8-12.  By contrast, Citibank contends that *constructive* notice suffices.

*See* Pl.'s Mem. 41-46; Pl.'s Reply 7-9.[29]  On this issue, Citibank has the better of the argument.

For starters, Defendants' assertions to the contrary notwithstanding, *see* Defs.' Mem 66-

67; Tr. 1267-68, the kind of notice that suffices to defeat the defense was not addressed, let alone

decided, in *Banque Worms*.  As discussed above, the district court decided the case on summary

judgment, prior to any discovery.  Further, the facts relevant to notice were undisputed: The only

notice of the mistaken payment was the communication from Security Pacific to BankAmerica at

1:45 p.m., approximately two hours after the payment, explaining that the transfer had been

made in error.  *Banque Worms,* 726 F. Supp. at 940.  There is no indication in any of the three

opinions that Banque Worms (or its receiving agent, BankAmerica) had any notice — whether

constructive or actual — prior to that communication.  Of course, that communication would

plainly have satisfied even an actual notice standard.  Yet, as discussed, the district court held

---

[29]     Arguably, the Court need not resolve this disagreement given its ruling on the relevant
time for assessing whether a lender is on notice for purposes of the discharge-for-value defense.
That is, it is borderline frivolous to argue that the Non-Returning Lenders were on *actual* notice
prior to the moment they received the first Recall Notices on August 12, 2020 — let alone that
they were on actual notice at the time the wire transfers were received on August 11, 2020.
Nevertheless, Citibank did not actually concede the point.  *See* Tr. 1287-90.  Accordingly, and in
the interest of comprehensiveness, the Court will address the issue.

that the communication was "not material" because it came too late, after the funds had been

received.  *Id.* at 942.  Not surprisingly, while Security Pacific raised the *timing* issue on appeal, it

did not raise the *kind* of notice required.[30]  Nor did the Second Circuit decide the question,

stating only that the recipient "did not have notice of the transferor's error."  *Banque Worms*, 928

F.2d at 541.  In other words, because the only notice came too late to be effective, the *Banque*

*Worms* courts had no occasion to consider what kind of notice would be sufficient to preclude

application of the discharge-for-value rule.

Other courts have addressed the issue and, notably, every one of them has concluded that

the relevant standard is constructive, not actual, notice.  In *Calumet*, for example, the Sixth

Circuit held that "[a]ny sensible application of the discharge-for-value rule . . . must account for

constructive as well as actual notice of a mistake."  398 F.3d at 560.  Similarly, the court in

*Qatar* concluded that "the discharge-for-value rule applies only if [the recipient] did not have

actual *or constructive* notice before [it] credited [the debtor's] account."  650 F. Supp. 2d at 10

(emphasis added).  The *Qatar* court reasoned that "[t]his approach is consistent not only with the

language in the Restatement but also with the official comment to [UCC] § 4A-303(a)," which

"states that the discharge-for-value defense applies if a mistaken payment is received 'in good

faith in discharge of the debt.'  It is clear that when a beneficiary receives actual *or constructive*

---

[30]      On appeal, Security Pacific did contend that Banque Worms knew or should have known
that Spedley was insolvent at the time of payment.  *See* Security Pacific Br. 41-50; Security
Pacific CoA Reply 25-29.  But that contention was not made in service of an argument that
Banque Worms was on notice of the mistake.  (After all, Banque Worms had demanded, and was
expecting, a full payoff of Spedley's debt.)  Instead, it was made in service of an argument about
equity; in Security Pacific's view, notice was irrelevant.  *See* Security Pacific Br. 41-42 ("The
district court erred . . . by misapplying applicable legal standards.  The proper inquiry under New
York law is whether 'it is just and equitable' for a recipient to retain mistakenly-transferred
funds, not whether [Banque Worms] knew of the mistaken payment . . . .").

notice that funds were mistakenly transferred before he credits a debtor's account, he has not

received the payment 'in good faith in discharge of the debt.'"  *Id.* at 10 n.10 (emphasis added)

(citation omitted) (quoting D.C. Code § 28:4A–303); *see also Michelin Tires (Can.) Ltd. v. First*

*Nat'l Bank of Bos.*, 666 F.2d 673, 682 (1st Cir. 1981) (applying the discharge-for-value rule

under Massachusetts law and holding "a person has notice of a fact when, from all the

information at his disposal, he has reason to know of it"); *Credit Lyonnais N.Y. Branch v. Koval*,

745 So. 2d 837, 841 (Miss. 1999) ("The discharge for value rule is [a] specific application of the

underlying principle of bona fide purchase.  It is appropriate then that we look to our precedents

regarding bona fide purchasers on the issue of notice.  Our statutory and case law indicates that

. . . where the purchaser has knowledge of facts which would cause a reasonable person to

inquire, he is charged with inquiry notice of those facts which could be uncovered by diligent

investigation." (internal quotation marks and citation omitted)).

      Although issued after the New York Court of Appeals's decision in *Banque Worms*, the

*Restatement (Third) of Restitution* also provides strong support for a constructive notice

standard.  It notes that "[a] broad definition of notice" in the context of "affirmative defenses to

[a claim in] restitution" — of which the discharge-for-value defense is one — is "widely

accepted."  RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 69 cmt. a.  The

*Restatement* explains:

> (1) As used in this Restatement, the expression "without notice" means without notice of the facts giving rise to the restitution claim against which a defense is potentially interposed.
>
> (2) A person has notice of a fact if the person either knows the fact or has reason to know it.
>
> (3) A person has reason to know a fact if
>
>     (a) the person has received an effective notification of the fact;

(b) knowledge of the fact is imputed to the person by statute (including provisions for notice by filing or recording) or by other law (including principles of agency); or

(c) other facts known to the person would make it reasonable to infer the existence of the fact, or prudent to conduct further inquiry that would reveal it.

*Id*. § 69.  The commentary to this section further explains that "[t]he usual effect of the law of notice is that knowledge is equated with reason to know," but "judgments about what a party had 'reason to know' rest on different kinds of evidence in different circumstances."  *Id.* cmt. c. "Much of the time the function of the law of notice is to authorize an inference by the finder of fact about what a purchaser actually knew or should at least have suspected," while "in other situations the law of notice — while employing the same vocabulary — is manifestly indifferent to questions of actual knowledge, . . . [and] impute[s] [knowledge] on the basis of a notification or a record, or on the ground that a purchaser has neglected reasonable steps that are appropriately required as a condition of protection."  *Id.*

That would be enough, but cases applying New York law in analogous contexts also favor adoption of a constructive notice standard.  Most notably, constructive notice is the standard that applies under the *bona fide* purchaser rule, of which the discharge-for-value rule is simply a "specific application" according to the *Restatement (First) of Restitution*. RESTATEMENT (FIRST) OF RESTITUTION § 14 cmt. a.  In *Fineberg v. Stone (In re Brainard Hotel Co.)*, 75 F.2d 481 (2d Cir. 1935) (L. Hand, J.), for instance, the Second Circuit considered whether a plaintiff hotel guest who had thousands of dollars in cash stolen from his room by a cashier employed at the hotel could recover in restitution from the defendant hotel the $4,900 deposited by the cashier in a till maintained by the hotel's assistant treasurer.  Judge Learned Hand concluded that the plaintiff could not.  "That the hotel was a purchaser for value there c[ould] be no doubt," as the cashier had embezzled $4,900 from the assistant treasurer's till and

had been ordered to restore it.  *Id.* at 482.  "The only question [wa]s whether it was also a bona

fide purchaser," which turned on whether the hotel had notice of the cashier's theft from the

plaintiff guest.  *Id.* at 482-83.  The question Judge Hand thus posed was whether "the

circumstances [were] such as to put [the defendant] on inquiry as to the source of the money?"

*Id.* at 483.  The court acknowledged that "the line . . . between suspicion and notice . . . must

confessedly be set ad hoc in each case," but ultimately concluded that the record before it did not

support a finding of notice.  *Id.*; *see also, e.g.*, *Williamson v. Brown*, 15 N.Y. 354, 362 (1857)

(opinion of Selden, J.) ("[W]here a purchaser has knowledge of any fact, sufficient to put him on

inquiry as to the existence of some right or title in conflict with that he is about to purchase, he is

presumed either to have made the inquiry, and ascertained the extent of such prior right, or to

have been guilty of a degree of negligence equally fatal to his claim, to be considered as a *bona

fide* purchaser."); *Booth v. Ameriquest Mortg. Co.*, 881 N.Y.S.2d 152, 153 (App. Div. 2009)

("[I]f a purchaser or encumbrancer knows facts that would excite the suspicion of an ordinarily

prudent person and fails to investigate, the purchaser or encumbrancer will be chargeable with

that knowledge which a reasonable inquiry, as suggested by the facts, would have revealed."

(internal quotation marks and citations omitted)).[31]

    Finally, adopting an actual notice standard would, at least in the wire transfer context,

effectively render the notice exception to the discharge-for-value defense a dead letter and lead

to perverse results.  Payments by wire are transmitted almost instantaneously.  If the law required

actual notice at the moment of receipt to defeat the discharge-for-value defense, the exception

---

[31]    Defendants contend that New York courts apply a constructive notice standard in the
*bona fide* purchaser context only where real property transactions are involved; by contrast,
"New York courts apply an actual notice standard" where "the acquired property is money or a
negotiable instrument."  Defs.' Reply 11.  That bright-line argument, however, is belied by
*Brainard*, which involved an exchange of cash, not real property.  *See* 75 F.2d at 482-83.

could generally apply only if the transferor transmitted a notice, either before or with the payment itself, announcing that the payment was made in error.  (That is actually how the Seventh Circuit has construed the defense.  *See GECC*, 49 F.3d at 284 ("[A] creditor should be able to treat funds credited in apparent payment of a debt as irrevocably his, *unless news of the error precedes arrival of the funds*." (emphasis added)).)  Needless to say, that is unlikely to happen in the real world because, in the case of a mistaken payment, the transferor itself is, almost by definition, unaware of the mistake at the time the payment is made.  (Were it otherwise, the transferor wouldn't send notice of the mistake with the payment; it would refrain from sending the payment at all.)  Thus, requiring actual notice of the mistake at the moment of receipt would render cases in which the transferee has notice of the mistake a null set and effectively read the notice-of-mistake exception to the discharge-for-value rule out of the rule altogether.  Additionally, applying a subjective, actual knowledge standard would reward wire transfer recipients who stuck their heads in the sand, and thus would incentivize them to take steps to ensure they avoid receiving actual knowledge of whether or not a payment was intended. In short, requiring actual notice of mistake makes neither good sense nor good policy.

Meanwhile, Defendants' arguments in favor of an actual notice standard are unconvincing.  Notably, when asked during oral argument at the close of trial, Defendants could point to no authority that has actually considered the question that has adopted an actual notice standard.  Tr. 1274 ("[Q:] [A]re there any cases that actually address the issue, discuss it, analyze it, and conclude that an actual notice standard is the relevant standard?  [A:] Your Honor, I cannot cite such a case.").  Defendants primarily hang their hats on one line in *Banque Worms*, namely, the New York Court of Appeals's observation that a *bona fide* creditor that received funds appearing to pay off a debt "should not have to wonder whether it may retain the funds."

570 N.E.2d at 196; *see* Defs.' Mem. 66-67.  But that throw-away phrase, from a passage in which the Court discussed the policy concerns at stake, does not support the weight Defendants place on it.  Among other things, where the recipient of a mistaken payment has constructive knowledge of the mistake, it is not required to "wonder whether it may retain the funds"; by definition, the recipient has reason *to know* of the mistake.  Defendants also cite *Regatos v. North Fork Bank*, 838 N.E.2d 629 (N.Y. 2005), *see* Defs.' Mem. 69-70; Defs.' Reply 10-11, but it is easily distinguished.  There, following certification of a question from the Second Circuit, the New York Court of Appeals adopted an actual notice standard for purposes of triggering the statute of repose under Article 4-A of the UCC.  *See Regatos*, 838 N.E.2d at 633-35.  But that standard was derived from the plain language of the relevant statute, *see Regatos v. N. Fork Bank*, 257 F. Supp. 2d 632, 645-46 (S.D.N.Y. 2003), and policy considerations that are not relevant here, *see Regatos*, 838 N.E.2d at 634-35.

    In sum, the notice required to defeat the discharge-for-value defense is *constructive* notice that the disputed payment was made by mistake.  As several of the previously cited authorities demonstrate, however, a constructive notice standard may itself take different forms.  *See, e.g.*, *Brainard*, 75 F.2d at 483; RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 69 cmt. c.  Defendants argue that if a constructive notice standard does apply, it requires that Defendants "reasonably should have known . . . that the funds had been sent by mistake."  Defs.' Mem. 71 (internal quotation marks omitted).  By contrast, relying heavily on Section 69(3)(c) of the *Restatement (Third) of Restitution and Unjust Enrichment*, Citibank argues for a form of "inquiry" notice — namely, that "the facts known to the defendants would make it prudent to conduct further inquiry that would reveal the mistake."  Pl.'s Mem. 46 (internal quotation marks, emphasis, and alterations omitted).  Ultimately, the Court need not and

does not decide between these two formulations of the constructive notice standard because, as

explained below, it concludes that, when the August 11th wire transfers were received,

Defendants did not have constructive notice of Citibank's mistake under either standard.

## B. Application of the Discharge-for-Value Rule to the August 11th Wire Transfers

In this case, it is undisputed that, as of August 11, 2020, the Non-Returning Lenders were

*bona fide* creditors of Revlon.  *See* Stipulation ¶ 15.  It is also undisputed that, on that date, each

of them was owed — in principal and interest — the exact amount of money received from

Citibank.  *See id.* ¶ 16.  And finally, it is undisputed that Defendants and their clients made no

misrepresentations to induce the mistaken wire transfers.  *See* DX1089, at 2.  Accordingly,

application of the discharge-for-value defense turns on whether, at or about 6:00 p.m. on August

11, 2020 — when the mistaken payments were received — each Non-Returning Lender was on

constructive notice of Citibank's mistake.

### 1. The Evidence Demonstrates that Defendants Did Not Have Notice of the Mistake

For several reasons, the Court concludes that the Lenders at issue in this case were *not* on

notice of Citibank's mistake and, thus, that the discharge-for-value defense applies.[32]

---

[32]     There appears to be little or no authority directly addressing the question of whose burden
it is to prove notice or lack thereof in connection with the discharge-for-value defense.  Given
that discharge for value is an affirmative defense, there is a strong argument that the burden is on
the defendant to prove lack of notice in order to qualify for the defense.  *Cf., e.g.*, *Qatar*, 650 F.
Supp. 2d at 8; *In re Awal Bank, BSC*, 455 B.R. 73, 93 (Bankr. S.D.N.Y. 2011).  That said, a
strong argument could also be made to impose the burden on the plaintiff to prove notice (or a
misrepresentation) once the defendant has proved the other elements of the affirmative defense
— if only because it would not involve proving a negative.  The Court has not found authority
supporting that proposition, but — as Defendants note — there are cases holding that where a
party is required to show that it lacked knowledge of something, the burden of proof on that
party is slight because the issue requires proof of a negative fact.  *See* Defs.' Mem. 70.  Here, the
Court need not and does not decide the question of burden because even if the burden is on
Defendants to prove lack of notice by a preponderance of the evidence, the Court finds that they
have met that burden.

### a. Defendants Credibly and Persuasively Testified that They Reasonably Believed the Payments Were Intentional Prepayments of the 2016 Term Loan

First and foremost, a representative from each Defendant testified that he or she did not know and had no reason to know that the August 11th wire transfers were mistaken — at least until the afternoon of August 12, 2020, when Citibank sent out the first of its Recall Notices. That is, every defense fact witness testified that (to the extent he or she knew about the transfers before learning of the Recall Notices) he or she believed in good faith that the payments were an intentional full paydown of the outstanding principal and interest on the 2016 Term Loan:

- **Allstate**: McCoy Aff. ¶¶ 4, 19, 22-23, 25, 27-28, 31-32, 34-43; Tr. 775-78, 781 (testimony of McCoy).

- **Bardin Hill**: *See, e.g.*, Greene Aff. ¶¶ 4, 20, 28-38; Tr. 803 (testimony of Greene).

- **Brigade**: *See, e.g.*, Frusciante Aff. ¶¶ 4, 18, 23-28; Perkal Aff. ¶¶ 4, 13, 15, 17-34; Tr. 415-22, 464, 469, 471-72, 486-87, 490 (testimony of Frusciante); Tr. 519-20, 567-69 (testimony of Perkal).

- **Greywolf**: *See, e.g.*, Josephson Aff. ¶ 4, 11, 18, 20-22.

- **HPS**: *See, e.g.*, Crocombe Aff. ¶¶ 4, 12-14; Xanthakys Aff. ¶¶ 3, 16-17, 21-23; Tr. 682 (testimony of Xanthakys); Tr. 725 (testimony of Crocombe).

- **Medalist**: *See, e.g.*, Phipps Aff. ¶¶ 4, 18-25; Tr. 854 (testimony of Phipps).

- **New Generation**: *See, e.g.*, Dent Aff. ¶¶ 4, 12-14, 17-22.

- **Symphony**: *See, e.g.*, Caraher Aff. ¶¶ 4, 14-15, 18-27; ECF No. 215 ("Lee Aff."), ¶¶ 5-6, 8; Vaughan Aff. ¶¶ 4, 13-14, 16, 18, 21, 24; Tr. 1108-09 (testimony of Caraher).

- **Tall Tree**: *See, e.g.*, Lenga Aff. ¶¶ 4, 12-13, 19-21, 24-31.

- **ZAIS**: *See, e.g.*, Meneses Aff. ¶¶ 4, 14, 22-26, 29-30; Tr. 947-48 (testimony of Meneses).

As one witness, a Bardin Hill partner and portfolio manager, put it: "Not in my wildest imagination . . . [did I suspect that the payments could have resulted from an error] . . . . That just — the thought literally never crossed my mind.  I still find it kind of mind-blowing in general."  Tr. 803 (testimony of Greene).  Along similar lines, many of these witnesses also

testified that none of the custodians, trustees, or administrators involved in receiving the payments or the notices related thereto identified the payments as having been made in error prior to receipt of Citibank's Recall Notices starting on the afternoon of August 12, 2020. *See, e.g.*, Frusciante Aff. ¶¶ 14-15, 18-19; Josephson Aff. ¶ 11; McCoy Aff. ¶¶ 13, 16; Xanthakys Aff. ¶ 16; Dent Aff. ¶¶ 4, 12; Vaughan Aff. ¶¶ 14, 16; Meneses Aff. ¶ 14; Tr. 334-35, 465-69 (testimony of Frusciante); Tr. 681-82 (testimony of Xanthakys); Tr. 990-95, 1015 (testimony of Vaughan).

Overall, this testimony was strikingly consistent — between direct examination and cross-examination and from one witness to another. The Court finds that it was both credible and persuasive. The Court bases that finding in no small part on its assessment of the witnesses' demeanor at trial. It also relies on the compelling — and consistent — reasons that the witnesses offered to explain their good faith beliefs.

*First*, the amounts received matched — to the penny — the amounts of principal and interest outstanding on the 2016 Term Loan for each Lender as of August 11, 2020. *See* Stipulation ¶ 16. As Defendants' witnesses explained, the payment of all outstanding principal and interest, on a date when such payment was not due, is the hallmark of an intentional early paydown of a pending loan. *See* Caraher Aff. ¶ 22; Frusciante Aff. ¶¶ 20, 27; Josephson Aff. ¶ 21; Lenga Aff. ¶¶ 28-29; McCoy Aff. ¶ 37; Meneses Aff. ¶ 26; Vaughan Aff. ¶ 18. And as Citibank's own witnesses acknowledged, the fact that the amount of the payments matched the amounts of principal and interest outstanding distinguishes Citibank's mistake here from a so-called "fat finger" mistake — the more typical form of a mistaken payment, such as payments to the wrong recipient or payments with the decimal point in the wrong place — that is obvious on its face. *See, e.g.*, Tr. 42-43 (testimony of Farrell); Tr. 169-71 (testimony of Fratta); Tr. 206-08

(testimony of Zeigon).  Notably, not one fact witness, on either side of this case, could recall a single other instance in which a bank had accidentally paid the exact amounts owing on outstanding loans.  *See, e.g.*, Tr. 35, 96 (testimony of Farrell); Tr. 145-46, 187 (testimony of Fratta); Tr. 209 (testimony of Zeigon); Lenga Aff. ¶¶ 4, 26; Caraher Aff. ¶ 20; Perkal Aff. ¶ 19; Greene Aff. ¶ 32; Xanthakys Aff. ¶ 3; McCoy Aff. ¶ 35; Dent Aff. ¶ 20; Meneses Aff. ¶ 25; Phipps Aff. ¶ 23; Josephson Aff. ¶ 20.  Given that early paydowns do happen, and a mistaken total paydown had perhaps never happened before, it was natural and reasonable for Defendants and their clients to conclude that the August 11th wire transfers were an intentional early paydown by Revlon.

The Lenders' inference of an intentional paydown from the fact that the payments matched the principal and interest outstanding would have been reasonable even if an interim interest payment had been due on August 11, 2020.  After all, a borrower can pay off the entirety of a loan even if an interest payment is due.  But the fact that no payment was due on August 11, 2020, lends additional force to the Lenders' inference.  That is, despite Citibank's efforts to suggest otherwise, *see, e.g.*, Pl.'s Mem. 9-10, 47, this is not a case where the Lenders were expecting to receive a small interest payment and then received a payment for many times the expected amount, a scenario in which a creditor might wonder if the borrower (or its paying agent) had accidentally selected the principal amount, rather than the interest amount, for payment.  Instead, the Lenders were expecting no payment at all, and the wire transfers came out of the blue.  (Remember: The Angelo Gordon Lenders were the only Lenders that had reason to know about the roll-up transaction.  Tr. 203-04 (testimony of Zeigon); Tr. 896 (testimony of Warren).)  And none of the Defendants knew that Citibank, due to technical limitations in its operations system, decided to effect the roll-up transaction by paying interim interest to all

Lenders.  *See, e.g.*, Dent Aff. ¶ 9; Caraher Aff. ¶ 12; Lenga Aff. ¶ 23; Meneses Aff. ¶ 11;

Frusciante Aff. ¶ 10; Greene Aff. ¶ 11; McCoy Aff. ¶ 11; Phipps Aff. ¶ 10.[33])  Put simply, where,

as here, a lender is minding her own business, and receives an unexpected and unscheduled

payment from a borrower that matches exactly the amount of the borrower's outstanding debt, it

is reasonable to assume that the borrower has intentionally paid off the debt.  In fact, it might

even be *un*reasonable to assume otherwise.

  *Second*, as surprising as an apparent early paydown from Revlon may (or should) have

been (more on that below), that explanation for the wire transfers was *far more* plausible than the

alternative explanation (accurate though it turned out it be): that Citibank or Revlon had wired

nearly $1 billion by mistake.  Citibank is one of the most sophisticated financial institutions in

the world.  Thus, Defendants and their clients could assume — and did, in fact, assume — that

the bank had effective internal controls to avoid significant mistakes.  *See* Caraher Aff.¶¶ 24-25;

Dent Aff. ¶ 22; Greene Aff. ¶¶ 35-36; Josephson Aff. ¶ 22; Lenga Aff. ¶¶ 30-31; McCoy Aff.

¶¶ 38-39; Meneses Aff. ¶¶ 29-30; Perkal Aff. ¶¶ 17, 23-24; Phipps Aff. ¶ 25; Xanthakys Aff.

¶ 21.  Notably, Citibank's own witnesses could not identify a single instance in which the bank

— or, indeed, any bank — had made an error of similar magnitude.  *See, e.g.*, Tr. 144 (testimony

of Fratta) ("[Q:]  Can you recall any instance in your 15-year career . . . in which Citibank made

a mistake in transferring more than $50 million?  [A:] I don't recall."); Tr. 208 (testimony of

Zeigon) ("[Q:] [I]n your 22 years in the industry, you are not aware of an error of this size having

---

[33]  Citibank and Revlon had effected a similar transaction in June 2020, but the interim
interest payments in that instance were sent only to Lenders that held 2020 Extended Term
Loans.  Defendants and their clients were not in that tranche and, thus, had no reason to know
about the unscheduled interim interest payments made in June 2020.  Tr. 892-95, 934-35
(testimony of Warren).  Even if Defendants or their clients did know about these payments, they
had no reason to know that the August 11th wire transfers were also made in connection with a
roll-up transaction or that they were supposed to be limited to interim interest accrued as well.

occurred anywhere, whether within Citibank or any other bank?  [A:] Correct.").  In other words,

the mistake here was the proverbial "Black Swan" event.  *See generally* NASSIM NICHOLAS

TALEB, THE BLACK SWAN: THE IMPACT OF THE HIGHLY IMPROBABLE (2007).  Given a choice

between assuming that Revlon had paid off the 2016 Term Loan early — as borrowers

sometimes do, *see* Dent Aff. ¶ 21; Tr. 719 (testimony of Crocombe); Tr. 859-60 (testimony of

Phipps); Tr. 875 (testimony of Dent); Tr. 1086 (testimony of Caraher), — and assuming that

Citibank or Revlon had mistakenly transferred over $900 million — something no bank may

have ever done before (and may never do again) — it would have been borderline irrational to

choose the latter.  *See, e.g.*, Lenga Aff. ¶ 31 ("It seemed far more likely to me that Citibank had

made the August 11th payments on purpose but without a contemporaneous notice, than that

Citibank had accidentally transferred hundreds of millions of dollars to multiple lenders in the

exact amounts they were owed.").

     *Third*, the Lenders' inference was rationally and reasonably based on the fact the

Calculation Statements, sent shortly before the payments, characterized the interest payments as

"due" — in each case, no fewer than six times, in fact.  *See, e.g.*, PX678A; *infra* app. A.

Critically, August 11, 2020, was *not* a scheduled interest payment date; the next scheduled

interest payment date was not until August 28, 2020.  *See* Lenga Aff. ¶ 21 & n.7; McCoy Aff.

¶ 10; Frusciante Aff. ¶ 9; *see also* DX1044 at -63 (defining "Interest Payment Date").  Instead,

under the plain terms of the Amended Loan Agreement, there was only one way in which

interest would have been "due" on August 11, 2020: If Revlon was prepaying principal.  *See*

Perkal Aff. ¶¶ 21-22; Lenga Aff. ¶¶ 28-29; Tr. 415 (testimony of Frusciante); *see also* Amended

Loan Agreement, § 1.1, at -63 (providing for when interest payments are due under the Amended

Loan Agreement).  Put differently, having been told that they were being sent a payment for

interest "due," a reasonable investor familiar with the terms of the Amended Loan Agreement could have reached only one conclusion: that the transfer included a prepayment of principal. *See* Tr. 471-72 (testimony of Frusciante); Tr. 568-69 (testimony of Perkal); Caraher Aff. ¶¶ 21-22; Frusciante Aff. ¶ 27; Greene Aff. ¶¶ 33-34; Josephson Aff. ¶ 21; Lenga Aff. ¶ 29; McCoy Aff. ¶¶ 36-37; Meneses Aff. ¶ 26; Vaughan Aff. ¶ 18; Xanthakys Aff. ¶¶ 21, 24-26.[34] Considering this fact together with the other reasons recipients of the August 11th wire transfers would have reasonably thought the payments were intentional — the fact that they equaled to the penny the amount of principal and interest outstanding and the fact that no bank had ever made a mistake of a similar nature or magnitude — it would have been downright irrational to conclude that a mistake had occurred.

### b. The Lack of Notice Is Corroborated by Citibank's Own Witnesses

That conclusion is consistent with, if not bolstered by, the testimony of Citibank's own witnesses. For instance, Citibank's own employees testified that one reason they sent the Recall Notices to the Lenders on August 12, 2020, was that they recognized the Lenders would not realize the transfers the previous day were mistaken otherwise. For example, Fratta, the manager of Citibank's ABTF team, acknowledged that "one of the reasons [he] thought it was necessary to send notices telling lenders that they had received money by mistake is because [he] did not expect that the lenders would reach that conclusion unless they were notified." Tr. 173; *see also*

---

[34]     Citibank's witnesses testified that (1) they used form templates to draft the language of Calculation Statements, *see* Tr. 154 (testimony of Fratta), implying that any "interest due" language should not be given the sort of weight Defendants ascribe to it and (2) from their perspective, the interest *was* due on that date, because Revlon had provided them with funds for the express purposes of passing them through to make interest payments to the Lenders, *see* Tr. 91-92, 101-02 (testimony of Farrell); PX289A; *see also* PX283A. But the notices speak for themselves, and Defendants would not have known that Citibank intended "due" to refer to Citibank's understanding of its own obligations to its client, Revlon.

Tr. 59-60 (testimony of Farrell).  Along similar lines, Brendan Tichauer, who signed the Amended Loan Agreement on Citibank's behalf, testified he was "not aware" of any steps that Citibank took to put lenders on notice of a mistake prior to sending the Recall Notices.  *See* Tichauer Dep. Tr. 135.  And even Citibank's expert witness, John Byrne, admitted that he was not aware of "anything that put the lenders on notice prior to receiving Citibank's recall notice on August 12th."  Tr. 1204; *see also id.* at 1203 (agreeing that he was "not aware of any steps that Citibank took to put the lenders on notice of error" prior to the sending of the Recall Notices).  Citibank's witnesses occasionally tried to qualify their remarks by saying that, in circumstances like those here, they "wouldn't assume anything."  Tr. 148-49 (testimony of Fratta); *accord* Tr. 38, 43-44 (testimony of Farrell).  But that is not enough to salvage Citibank's position.  By definition, assuming nothing is not the same as being on notice of something.

### c.  The Lack of Notice Is Corroborated by the Documentary Record

Finally, any doubt that Defendants genuinely believed the August 11, 2020 wire payments were intentional — and were justified in that belief — is resolved by a review of communications involving Defendants in the hours between receipt of the payments on the evening of August 11, 2020, and receipt of the first Recall Notices the next afternoon.  Indeed, the communications are noteworthy *both* for what they contain *and* for what they do not contain.

*First*, that record includes a slew of communications evidencing a contemporaneous belief on the part of the Lenders that the payments were a full paydown of the 2016 Term Loan:

- On August 12, 2020, at 11:24 a.m., an Allstate operations employee emailed a group of his colleagues, stating: "Please see holdings and cash received on 8/11.  The cash description noted Revlon, and the amounts appear to tie to a full paydown with interest."  PX13.

- On August 12, 2020, at 12:07 p.m., the same Allstate operations employee emailed a Citibank support email requesting a prepayment notice and observing: "We are under the impression these are full paydowns."  PX1.

71

- On August 12, 2020, at 5:36 a.m., an employee from Harmonic Fund Services emailed the Citibank support email, stating: "We see an amount of $3,531,282.44 being received by [HPS] effective 08/11/20, which would indicate a full principle [sic] repayment, plus accrued interest."  DX489.

- On August 12, 2020, at 1:14 p.m., a BNYM employee emailed operations employees at Symphony, stating in reference to the Revlon Term Loan: "A wire for this paydown and interest was received yesterday, and is posted to the account."  DX503.

- On August 12, 2020, at 2:30 p.m., Frusciante sent a Bloomberg chat message to a lawyer at Brigade, stating: "Revlon full paydown? . . . Seeing the cash for our funds now." PX167, at -2703.  Two minutes later, after confirming that Brigade had received the "[f]ull amount" of principal and interest "across all funds," Frusciante received Citibank's Recall Notice by email and promptly alerted the lawyer: "Citi just . . . sent a notice," followed by a copy of the Recall Notice.  *Id.* at -2704; *see* Tr. 365-70 (testimony of Frusciante).

- On August 12, 2020, at 11:29 a.m., an employee at Virtus, fund administrator for Brigade funds, wrote an email to Brigade: "Please see updated cash flow attached with Revlon paydown processed."  DX483, at 1.

- On August 12, 2020, at 2:17 p.m., in a Slack chat, Vaughan wrote to another Symphony operations employee: "hey Sam, revlon paid down in full today." DX1003, at -7241.[35] The other employee promptly responded: "hey john, thanks! i see the notice on IHS and also with other custodies [sic] too . . . . going to apply them shortly."  *Id.* at -7242.

- On August 12, 2020, at 11:45 a.m., Vaughan emailed a U.S. Bank employee: "[C]an you confirm that there was a full paydown on Revlon?  Cash should have hit on 8/11, along with interim interest."  PX1330, at -433-34.  After the U.S. Bank employee noted that more than $3.2 million had been received, but without "a notice to apply the funds," Vaughan responded: "[T]here are no paydown notices.  The payment matches our position — can you please apply the full paydown?"  *Id.* at -433.

On top of these communications involving the Lenders and their agents, Citibank's own employees' electronic messages corroborate that Defendants believed the loan had been paid down.  For example, on August 13, 2020, after Citibank had sent the Recall Notices, Farrell

---

[35]     The time stamp on the message is 6:17 p.m., because it reflects Universal Time, which appears to have been four hours ahead of the Eastern time zone on August 12, 2020.  *See id.* at -7239.  Vaughan's testimony regarding this chat and another, discussed below, makes plain that this message was sent at 2:17 p.m. Eastern time.  *See* Vaughan Aff. ¶¶ 17, 19; DX1002.

remarked to Zeigon in a chat that "Brigade . . . had some questions about the 36MM received *and initially thought the loan was paying off*."  DX668, at -565 (emphasis added).

*Second*, conspicuously *absent* from the record of communications in the hours between receipt of the payments on the evening of August 11, 2020, and receipt of the first Recall Notices the next afternoon are any communications reflecting a belief that the payments were made by mistake.  If the mistaken nature of the payments had been truly apparent when they were received, one would expect *some* such evidence; indeed, one would expect *a lot* of such evidence.  Yet there is nothing.  By contrast, as Citibank emphasized in its pretrial briefs, there are dozens of communications involving Defendants or their agents about Citibank's mistake *after* Citibank had sent the Recall Notices.  *See* Pl.'s Mem. 18-30.  Not surprisingly, given the nature and size of the mistake, many of these were quite colorful.  For example:

- From a Bloomberg chat among HPS employees on the afternoon of August 12, 2020 (PX1165):

  | DFREY5: | I feel really bad for the person that fat fingered a $900mm erroneous payment.  Not a great career move |
  |---|---|

  . . . .

  | JRABINOWIT12: | certainly looks like they'll be looking for new people for their Ops group |
  |---|---|
  | DFREY5: | How was work today honey?  It was ok, except I accidentally sent $900mm out to people who weren't supposed to have it |
  | DFREY5: | Downside of work from home.  maybe the dog hit the keyboard |
  | JRABINOWIT12: | the song "Had a Bad Day" playing the background |

- From a Bloomberg chat among HPS employees on the evening of August 12, 2020 (PX1164):

  | LUCIANTIRA: | They repaid us in full |
  |---|---|
  | CMATERN2: | the entire [Term Loan]? |

| | |
|---|---|
| LUCIANTIRA: | And then they said it was a mistake |

. . . .

| | |
|---|---|
| CMATERN2: | OMG |
| LUCIANTIRA: | All $135m |

. . . .

| | |
|---|---|
| CMATERN2: | wow |

. . . .

| | |
|---|---|
| MFOGEL11: | lol |
| CMATERN2: | somebody in the citi back office is probably sweating a bit right now |
| LUCIANTIRA: | Best day in public credit history from P&L standpoint |
| MFOGEL11: | lmao |

. . . .

| | |
|---|---|
| LUCIANTIRA: | I am at a loss |
| CMATERN2: | that will make WSJ headlines |
| DXU101: | Nice - epic fail |

- From a Bloomberg chat among New Generation employees on August 13, 2020 (PX1311):

| | |
|---|---|
| BDENT3: | supposedly revlon paid off our loan at par yesterday |
| MKOONTZ1: | no way really? |
| BDENT3: | potentially citi made a mistake in paying it off |
| BDENT3: | a big mistake considering $893m |

. . . .

| | |
|---|---|
| MKOONTZ1: | holy sht [sic] |
| BDENT3: | mistakes like this can be hard to undo |

. . . .

74

> MKOONTZ1:         wow
>
> . . . .
>
> BDENT3:            i dont know how you make an $893m mistake i think chance
>                    its revlon paying it..company not saying anything

- From an email commenting on a *Bloomberg News* article titled "Citi Asks Lenders to Return Mistaken $900 Million Revlon Payment": "[Y]ou definitely can't make this stuff up.  I know I haven't been in the industry that long — but from talking to some of the other analysts in the lender group — they've never seen anything like it.  Bizarre."  PX1544.

- From an email commenting on a *Wall Street Journal* article titled "Citigroup Pays Revlon Lenders Nearly $900 Million by Mistake": "Unreal... did you pay it back? As Steve Miller said, take the money and run."  PX1188.

Of course, in light of the Court's ruling that the relevant moment in time for purposes of evaluating notice is when the payments were received, these communications are not proof that the Lenders were on notice for purposes of the discharge-for-value rule.  *See Banque Worms*, 726 F. Supp. at 942.  In fact, in light of the Court's ruling, they tend to prove the opposite.  That is, the number and nature of these communications reinforce why the absence of such communications *before* the Recall Notices is so significant.

The Court highlighted this point during oral argument at the conclusion of trial and challenged counsel for Citibank to identify any evidence of Defendants describing the August 11th wire transfers as mistakes prior to receiving the Recall Notices.  *See* Tr. 1332-33.  In response, Citibank offered only two candidates: emails from Catherine McCoy, an Allstate portfolio manager; and a Slack conversation between Eric Lee and John Vaughan, operations employees at Symphony.  *See* Tr. 1305-06, 1333 (referencing PX13 and DX1002, respectively).  But neither withstands scrutiny.  In McCoy's case, she responded to an email about incoming wire payments to one Lender on the morning of August 12, 2020, by stating: "So strange — could this be a mistake?  Did the CLO's receive the same paydown?"  PX13.  Upon receiving

confirmation details of the wire payments, she followed up: "Can you check and see if the CLOs received the same or is there someone else that handles the CLOs?  Not sure if this is in error, seems very unlikely."  *Id.*  At trial, McCoy explained, credibly, that her reference to a "mistake" in the first email was not to Citibank or Revlon, but to the possibility that the report of funds received had been mistaken.  *See* McCoy Aff. ¶ 19; Tr. 755, 757.  Moreover, after seeing confirmation of the reported payments, she observed that it was "very unlikely" there was an error and directed her colleague to confirm by checking to see if Allstate's other Lenders had received a full paydown as well.  At most, therefore, McCoy's first email reflects a degree of uncertainty based on then-incomplete information.  Tr. 762.  Upon confirming that all of Allstate's Lenders had been paid the full amount of principal and interest outstanding, she became confident that Revlon had, in fact, intentionally prepaid the 2016 Term Loan in full.  *See id.* ¶¶ 21-23; Tr. 774-76.

In the second communication cited by Citibank, a Slack chat beginning at 12:51 p.m. on August 12, 2020, Vaughan messaged Lee, his supervisor who was on vacation at the time, about calls he was getting from Scott Caraher, a Symphony portfolio manager:

> VAUGHAN:          Man, drama with revlon
>
> VAUGHAN:          Full paydown
>
> VAUGHAN:          scott calling me a ton.
>
> . . . .
>
> LEE:                    just missed the pay down?  optional?
>
> LEE:                    any error?
>
> VAUGHAN:          It is sorta crazy
>
> VAUGHAN:          Was trading in the low 20's

LEE:                wow craZy.  Make sure ss [presumably an operations employee]
                    books it . . .

LEE:                otherwise [Scott] will ask tomorrow why there wasn't a bump

DX1002, at -7262-63.  Citibank seizes on Lee's use of the word "error," but as the context makes

plain, and Lee confirmed at trial, he was not referring to Citibank or Revlon, but to the

possibility that the operations team had failed to book the unexpected paydown upon receipt, as

was Symphony's practice.  *See* Lee Aff. ¶ 8; Tr. 1045-47, 1049, 1059-60.  Moreover, that one

word aside, the conversation as a whole is powerful evidence of the *lack* of notice.  After all,

Vaughan made clear that he viewed the payments as a "[f]ull paydown."  And when Vaughan

confirmed that the loan had been paid at par, Lee made plain that he too assumed that Revlon

had prepaid the loan in full, instructing Vaughan to make sure that the payment was booked.

Ultimately, even if Citibank's interpretations of the McCoy emails and the Vaughan-Lee

Slack chat were sound, the dearth of communications from the period before the Recall Notices

reflecting a belief on the part of the Lenders that the August 11th wire transfers had been made

by mistake would be compelling evidence that Defendants and their clients did not know of, or

even suspect, that there had been a mistake.  Two isolated examples of uncertainty about the

situation based on only partial information would hardly suggest the contrary.  The fact that

Citibank's interpretations do not withstand scrutiny is all the more telling.

### 2.  Defendants Satisfied Any Duty of Inquiry

For the foregoing reasons, the Court concludes that Defendants did not, and had no

reason to, know that the August 11th wire transfers were made by mistake.  That is sufficient for

Defendants to be entitled to the discharge-for-value defense, and to keep the funds, if the

relevant notice standard is the traditional constructive notice standard of "knew or should have

known."  But what if, as Citibank's expert suggested and the bank argues, the standard is

whether the facts known to the recipient of a payment would have made it "prudent to conduct further inquiry that would [have] reveal[ed]" the fact that the payment was made by mistake? RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 69(3)(c)c; *see* Tr. 148-49 (Fratta testifying that "[u]pon receipt of a payment without a notice" he "wouldn't assume anything," would "need clarifying details from the sender of the payment," and "would seek clarification"); Byrne Aff. ¶ 29 ("When an incoming payment has any sort of discrepancy or anomaly, the recipient has a duty, imposed by industry custom and practice, to investigate and to reconcile.").  Even then, Defendants would be entitled to the funds.

As an initial matter, for the reasons discussed above, it is far from clear that the facts known to any Defendant (or its agents) made it "prudent to conduct further inquiry."  But even assuming *arguendo* that there were sufficient red flags to trigger a duty of inquiry, it does not follow, as Citibank suggests, that that inquiry would have taken the form of contacting the bank to confirm whether the payments were intentional.  Pl.'s Reply 17; Tr. 148-49 (testimony of Fratta).  Indeed, Citibank's own expert, Byrne, testified that a reasonable inquiry could involve "many things."  Tr. 1167.  In the first instance, he explained, "[i]t's third-party market data, it's wisdom in some cases."  *Id.*  He then explained what he meant by "wisdom": "[I]f you are doing this day in, day out, every single day, you start to experience more and more problems and you will learn from those experiences and have things come up . . . and your wisdom gives you the ability to do a sanity check . . . as to whether or not the information that you are being told is sufficient."  Tr. 1207.  According to Byrne, it was only if the flags remained red after consulting *these* sources — market data and "wisdom" — that a reasonable investor would have consulted the sender of the funds to confirm whether the payments were intentional.  "[I]f the tools aren't available in-house or immediately to you," he testified, "*then* you go to the source . . . ."  Tr.

1167 (emphasis added); *see also* Tr. 629-30 (testimony of Xanthakys) (stating that, in the case of suspected mistake, "the investigation would have been the cash matches principal and interest").

Measured against Citibank's own expert witness's standards, many Defendants satisfied their duty to inquire — and their inquiries did not reveal the mistake.  That is, many Defendants, surprised by the unexpected payment, took or directed a closer look at the payments and the corresponding notices; confirmed that the payments were made with respect to the 2016 Term Loan and matched the outstanding principal and interest to the penny; and, applying their "wisdom" and experience, concluded that the payments were intentional full prepayments of the loan.  *See, e.g.*, Caraher Aff. ¶¶ 14-17.  Some also consulted "third-party market data" in the sense that they checked to see if other Lenders had also received a full paydown.  *See, e.g.*, Frusciante Aff. ¶¶ 17-18.  McCoy, for example, first directed her team to confirm that payments had in fact been received in the reported amounts, then confirmed that all of Allstate's Lender clients had also received full paydowns.  *See* McCoy Aff. ¶¶ 17-23.  On the basis of that inquiry, she was satisfied that Allstate's clients in fact had the entirety of their loans prepaid.  *See id.* ¶ 22.  Similarly, Caraher learned the morning of August 12th that "something" was going on with respect to the 2016 Term Loan, and he directed Vaughan to check with their Lender clients' custodians to "confirm whether [their] clients had received full principal and interest on the 2016 Term Loans."  Tr. 1098; Vaughan Aff. ¶ 13.  Vaughan then reached out by email and telephone to the custodians and reported back to Caraher that their clients had in fact received full payments of outstanding principal and interest.  Vaughan Aff. ¶ 14; Caraher Aff. ¶ 14.  Caraher testified that, in his experience, "when a borrower or its administrative agent pays the exact amounts owed in outstanding principal and interest, that is a clear indication that the loan is being paid down" and that he had "never, in almost 20 years in the industry, seen such a transfer

79

made by accident."  Caraher Aff. ¶ 20; *see also, e.g.*, Lenga Aff. ¶ 26 ("In my entire career, I have never before seen an accidental complete prepayment of the exact amounts owed on a syndicated loan.").

In short, the evidence shows that some Defendants conducted an inquiry and satisfied themselves that the payments were not mistakes without having to contact Citibank for confirmation.[36]  On Byrne's own view, that satisfied any duty of inquiry that a reasonable investor may have had.  It follows that, even if Defendants are charged with the knowledge that a reasonable inquiry would have yielded, as Citibank argued, Tr. 1262-63, they were not on notice that the payments were made by mistake.

### 3.   Citibank's Counterarguments Fail to Persuade

Citibank argues that a slew of red flags put Defendants on notice of the mistake.  But most of these purported red flags do not withstand scrutiny.  And even taking them together, they do not add up to notice of the mistake.  The Court will address each in turn.

#### a.   The Calculation Statements

First, Citibank contends the Calculation Statements that accompanied the August 11th transfers "clarif[ied]" that the lenders would receive "*only* interest payments."  Pl.'s Mem. 46 (emphasis added and omitted).  But that is not accurate.  The word "only" appears only in Citibank's briefing; it does not appear anywhere in the Calculation Statements themselves.

---

[36]      Some Lenders (or their agents) did contact Citibank due to the lack of a prepayment notice specifying the payment of interest.  *See, e.g.*, Frusciante Aff. ¶ 14; Xanthakys Aff. ¶ 14. Defendants, however, established that this was done to ensure proper bookkeeping rather than to determine whether the payment was intentional or mistaken.  *See, e.g.*, Tr. 354-55 (testimony of Frusciante); *see also* Vaughan Aff. ¶ 18; Xanthakys Aff. ¶ 22; *cf. Banque Worms*, 726 F. Supp. at 942 (describing "[t]he final settling of the accounts at the end of the day" as "mere bookkeeping" that was "not material" to whether Banque Worms had been on notice at the time of payment that Security Pacific had sent the wire transfer by mistake (internal quotation marks omitted)).

To be sure, the Calculation Statements did not say anything about the payment of principal; instead, they referred only to interest and included only the amount of the interim interest payment, a small fraction of the amount received by each Lender. *See, e.g.*, PX1298. But that fact did not provide, and should not have provided, notice of Citibank's mistake, for at least two reasons. First, much to the Court's surprise, the evidence presented at trial revealed that there is no standard format for payment notices — either across banks or within Citibank itself. *See, e.g.*, Tr. 1200-01 (Citibank's expert witness agreeing that payment notices are not consistent in form); *see also* Tr. 480-84, 496-502 (testimony of Frusciante); PX1629F; PX1629A; PX1629P; PX1629R; PX1629J, PX1629H, PX1629E, PX1629I. For instance, in January 2020, one of Brigade's clients received an unscheduled full paydown, including both principal and interest, on an unrelated loan; Bank of America sent the funds on January 8, 2020, but sent separate notices for the interest component and the principal component, on January 8, 2020, and January 10, 2020, respectively. *See* DX1143; DX1144; Frusciante Aff. ¶ 28; Tr. 378-85 (testimony of Frusciante). And closer to home, on at least one prior occasion when Citibank wired payments of interest without principal to the 2016 Term Loan Lenders — what it *intended* to do on August 11, 2020 — the notices included an entry, left blank, for "Total Principal Due," arguably signaling that no payment of principal was to be expected. *See, e.g.*, PX1629F (listing $72,274.86 in "Total Interest Due"; a blank field after "Total Principal Due"; and a "Credit Amount" of $72,274.86). Moreover, multiple witnesses testified that it is not uncommon, when interest and principal payments are made together on the same day, for the related payment notices to be "split" — that is for the administrative agent to send separate notices for the interest and principal portions of the payment. *See* Tr. 473-74, 500-01 (testimony of Frusciante); Tr. 1201 (testimony of Byrne); *see also, e.g.*, DX1143; DX1144.

Second, whereas most banks apparently have somewhat rigorous security controls to prevent mistaken payments — like the six-eye approval procedure that Citibank followed in connection with the August 11th wire transfers (albeit not with the desired effect) — they do not generally have such controls governing the creation and dissemination of payment notices. Testimony from witnesses for both sides largely confirmed that Citibank and other banks treat payment notices fairly casually and that mistakes in the content of payment notices are not uncommon. *See, e.g.*, Tr. 1057 (testimony of Lee) ("[Payment notices] are hard to rely on for sure."); Tr. 1062 (Lee testifying that Symphony uses an "antiquated" integration system such that they "hope" to properly sync only 85 to 90 percent of payment notices to their systems); Tr. 150-51 (Fratta testifying that Calculation Statements are generated automatically by Flexcube using template language); Tr. 1110 (Caraher testifying that a portfolio manager would not typically see payment notices and would not rely on them to conclude a loan had been paid off).

So too, it is not uncommon for payment notices to arrive late, or not at all. *See, e.g.*, Caraher Aff. ¶ 23; Frusciante Aff. ¶ 28; Greene Aff. ¶ 34; Lenga Aff. ¶ 29; McCoy Aff. ¶ 37; Meneses Aff. ¶ 28; Vaughan Aff. ¶ 25; Xanthakys Aff. ¶ 22; Tr. 95 (testimony of Farrell) ("[T]here's occasions where a receiver will get a payment and they may not have a notice for it."); Tr. 473 (testimony of Frusciante) ("[I]t's not something that's out of the ordinary for us to say, Okay, well, the notice hasn't been sent or, you know, it might not come at all.  That's not something on our side where we're you know, throwing up red flags . . . ."); Tr. 1057 (testimony of Lee) ("It's very commonplace that notices are late or re-sent . . . ."); Tr. 1201-02 (Citibank's expert witness, Byrne, testifying that he "would not" be surprised to see split notices for principal and interest arrive on different dates, "even where they both concern payments that are being made on the same date"); *see also* Tr. 38 (testimony of Farrell) ("[Q]: [If] Citibank gets a

payment without a notice . . . on those occasions you don't assume that the payment was by mistake, am I right[?] . . .  [A:]  Correct. . . .  [W]e don't make any assumptions about the nature of the payment."); Tr. 109-10 (testimony of Raj) (testifying that "[p]ayments can come without notices" and "sometimes the notices can arrive after you've received the payment"); Tr. 148-49 (testimony of Fratta) ("[Q:] Upon receipt of a payment without a notice you would not assume that that was a mistaken payment, would you?  [A:] I wouldn't assume anything.").

Given both the variability in content and timing of payment notices, and the lack of any rigorous controls over the creation and dissemination of such notices, a reasonable investor reviewing the Calculation Statements in this case would not have (and should not have) known upon later receiving the exact amount of principal and interest outstanding that the payment was by mistake.  Notably, Citibank's own witnesses conceded as much.  For example, Tichauer, Citibank's managing director who signed the Amended Loan Agreement, could not identify anything in the Calculation Statements that would have suggested error to the Lenders.  *See* Tichauer Dep. Tr. at 112-13 ("Q.  [I]s there anything in this notice that suggests to you, Mr. Tichauer, suggests to you that the notice was submitted in error?  A.  Again, I will caveat it the same way I have caveated all the answers to these type of questions, which is that I don't review these notices so it is hard for me to make an inference based on a suggestion one way or another. Like I said, I have to base it on kind of what the notice actually says.  I don't see anything in here saying that it is in error.").  Similarly, both Fratta and Farrell testified that they would not assume there was a mistaken payment if they received funds without a corresponding notice.  *See* Tr. 38 (testimony of Farrell) ("[Q:] [At your deposition you said] that there are times where you're working on the lender side at Citibank, and Citibank gets a payment without a notice; is that right?  [A:] Yes.  [Q:] And you told me also on those occasions you don't assume that the

payment was by mistake, am I right about that as well?  [A:]  Correct.  I told you that we don't

make any assumptions about the nature of the payment."); Tr. 148-49 (testimony of Fratta)

("[Q:]  Upon receipt of a payment without a notice you would not assume that that was a

mistaken payment, would you?  [A:] I wouldn't assume anything. . . .  [Q:] So, one thing you

would not assume is that money had been sent to you by mistake, correct?  [A:]  I wouldn't

assume anything, I would seek clarification."); *see also* Tr. 169 (testimony of Fratta) ("[I]t's not

an obvious mistake.").  And Citibank's witnesses agreed that they had never seen or heard of a

mistake like the one that occurred on August 11, 2020.

In fact, it would have been significantly more rational for the recipient of a Calculation

Statement to assume either that the statement itself was inaccurate or that Citibank had failed to

send a separate statement relating to the principal portion of the payment at the same time (or at

all) than it would have been to assume the Black Swan event that did give rise to this case —

namely, that Citibank had made an unprecedented mistake by paying off the entire outstanding

balance of the 2016 Term Loan.  *See* Tr. 96 (Farrell testifying that it is "a fair assumption" that

"mistakes with notices" are "certainly far more common than the mistake in payment of the

exact amount outstanding on principal on a term loan"); Tr. 145-46 (testimony of Fratta) ("[Q:]

Would it be fair to say that, based on your experience, mistakenly paying out the outstanding

principal amount on the loan would not be one of the most common payment errors you have

seen? [A:] I don't recall it happening . . . .  [Q:] Based on your experience that mistake is

shocking.  Fair way to put it?  [A:]  Sure.  [Q:]  You hadn't seen it before and you don't expect to

see it again.  Fair to say?  [A:]  Correct.").[37]  That is all the more true because, as discussed

---

[37]      At most, receipt of the Calculation Statements and no prepayment notice triggered a duty
to inquire.  But, as discussed above, Defendants and their clients satisfied any such duty.

above, the Calculation Statements referred — no fewer than six times — to the interest payment

being "due," and the only scenario in which interest could have been "due" under the plain terms

of the Amended Loan Agreement was if Revlon had been prepaying the outstanding principal of

the loan.  In short, the Calculation Statements in this case hurt — and certainly do not help —

Citibank's case that Defendants' clients were on notice of the mistake.

### b.  The Lack of Prepayment Notice

Second, Citibank contends that the Non-Returning Lenders were on notice of the mistake

because they did not receive a notice of prepayment, as required by the Amended Loan

Agreement.  Pl.'s Mem. 40, 46-47; Pl.'s Reply 5-6, 10-12.  This argument falls short for the

reasons discussed above: Contractual obligations notwithstanding, as a matter of custom and

practice, it is not uncommon for lenders to receive separate notices of principal payments and

notices of interest payments, to receive payment notices after the fact, or not to receive payment

notices at all.  But the argument is unavailing for another reason as well: Contrary to Citibank's

assertions, the Amended Loan Agreement did not actually require that a prepayment notice be

sent *to the Lenders* with, let alone before, a payment of outstanding principal.  Yes, the

Agreement did unambiguously require Revlon to provide three days' written notice "to the

Administrative Agent" — that is, to Citibank — before making any optional prepayment of the

2016 Term Loan, Amended Loan Agreement, § 2.11(a), at -105-06, and that did not happen.  But

there is no evidence in the record (or reason to believe) that Defendants or their clients were

aware of that fact.  And while Citibank was required, upon receipt of a prepayment notice from

Revlon, to notify each Lender "promptly," *id.*, that did not necessarily require notice before or

with the actual prepayment.  The Agreement does not include a definition of "promptly," and

Tichauer — the Citibank representative who signed the Amended Loan Agreement — conceded

that he did not know if Citibank's obligation to "promptly" notify the Lenders had to be satisfied prior to payment or could be satisfied up to seven days after; whether Citibank would notify the Lenders verbally, in writing, or otherwise; or whether the confirmation of payment that Citibank did send to the Lenders following the August 11th wire transfers satisfied the bank's notice obligations under the Agreement.  Tichauer Dep. Tr. at 53-55, 59-62, 228-29; *see also* Tr. 937 (testimony of Warren) ("I do not know the exact time limitation relative to the definition of the word 'promptly' within the credit agreement.").  It follows that Citibank reads too much into the absence of a prepayment notice when the Non-Returning Lenders received the August 11th wire transfers.[38]

### c.  The Size of the Overpayment

Next, Citibank contends that "the size of the transfer alone" — in the abstract and in relation to the amounts reflected on the Calculation Statements — would have led "any reasonable individual" to conclude there was a mistake.  Pl.'s Mem. 47.  But pointing to the relationship between the size of the payments and the amounts reflected on the Calculation Statements is merely a repackaged version of Citibank's arguments based on the Calculation Statements alone, and thus adds nothing.  As for the sheer size of the transfers in the abstract, Citibank has it exactly backwards, for two reasons discussed above.  First, given the well-known fact that banks have security procedures to ensure that they do not make mistakes of the sort that occurred here, and the lack of any precedent for such a mistake (which suggests that these procedures generally work, even if they did not do so here), it would have been virtually

---

[38]     As noted above, *see supra* note 36, some Defendants' clients (or their agents) contacted Citibank to inquire about the absence of a prepayment notice.  But multiple Defendants' witnesses testified credibly that they sought the notices strictly for bookkeeping purposes and not due to a concern that the payments had been made by mistake.  *See, e.g.*, Frusciante Aff. ¶¶ 28-29; Vaughan Aff. ¶ 25; Xanthakys Aff. ¶ 22.

inconceivable to a reasonable investor in Defendants' position that Citibank had wired nearly $900 million by mistake. As Fratta acknowledged, Citibank's mistake was "shocking," Tr. 145, and Citibank's other witnesses testified they had never seen a mistake of such size, *see* Tr. 109 (testimony of Raj); Tr. 208-09 (testimony of Zeigon); *see also* Tr. 1115 (testimony of Caraher) ("[Q:] Did you think it was even possible that Citibank had accidentally sent the exact outstanding principal amount of the loans . . . ? [A:] One of the most sophisticated institutions in the world . . . to send out the exact amount[, which] has never happened in the history of the loan market? No."); Lenga Aff. ¶¶ 30-31. Second, the amount of the payment here was far from arbitrary: It matched — to the penny — the amount of principal and interest outstanding on the 2016 Term Loan. As Citibank's own witnesses acknowledged, this was no "fat finger" mistake — such as a misplaced decimal point or double payment — that would have been immediately obvious to any recipient. Tr. 42-43 (testimony of Farrell); Tr. 169-71 (testimony of Fratta); Tr. 206-07 (testimony of Zeigon). To the contrary, it bore the hallmarks of an intentional prepayment. Again, not one witness, on either side of this case, could recall a single example in which a bank accidentally paid the exact amounts owing on outstanding loans. *See* Lenga Aff. ¶¶ 4, 26; Caraher Aff. ¶ 20; Greene Aff. ¶ 32; Vaughan Aff. 18; Tr. 96 (testimony of Farrell); Tr. 145, 187 (testimony of Fratta); Tr. 209 (testimony of Zeigon).

These facts easily distinguish this case from the hypothetical described in *Calumet* and the transaction at issue in *Qatar*. In *Calumet*, the recipient of the wire at issue was owed by the debtor slightly more than $1 million and received a $770,301.58 payment that was supposed to have been only $77,301.58. *See* 398 F.3d at 557. In discussing the relevant notice standard, the Sixth Circuit observed, correctly, that "constructive notice of a mistake may . . . occur simply as a result of the size of the transfer." *Id.* at 560. It then offered, by way of example, that the

recipient of the wire "assuredly would have had constructive notice of the mistake if the transfer had been, say, for $7.7 million — if, in other words, [the transferring bank] had made a two-digit error rather than a one-digit error." *Id.*[39]  That is no doubt true, but only because such a payment would have been more than seven times the amount of the outstanding debt — the equivalent, in this case, of Citibank having wired *in excess of $6.3 billion*.  Nothing in *Calumet* suggests that a creditor, upon receiving the exact amount of an outstanding debt, as Defendants' clients did here, would be on notice that it was by mistake.

Meanwhile, the payment at issue in *Qatar* bore two indicia of mistake that were absent from the payment here: It was an exact duplicate of the preceding payment made by the debtor (for a seemingly arbitrary amount, no less) *and* it exceeded the amount of the debt outstanding. The debt in that case arose from a renovation contract between Winmar, Inc. and Al-Jazeera. *See* 650 F. Supp. 2d at 3.  On December 8, 2005, Al-Jazeera directed Qatar National Bank ("QNB"), its agent, to wire $474,677 of its funds to Winmar, which QNB did.  *See id.*  Shortly thereafter, the parties' relationship soured and in early January 2006, Al-Jazeera terminated the contract.  *See id.* at 3-4.  Two weeks later, Winmar submitted a certification claiming that Al-Jazeera owed it a balance of $355,297.  *See id.* at 4.  Al-Jazeera then asked QNB to confirm that it had wired the $474,677 payment in December, but QNB mistook the query for a second payment order and promptly "wired a duplicate payment of $474,677" to Winmar.  *Id.*  Under these circumstances, the district court had little trouble finding that Winmar had constructive notice of the mistake: "Less than two months after [Winmar] received a payment of $474,677, it

---

[39]      It is immaterial for present purposes, but these observations were pure *dictum*.  The Sixth Circuit ultimately found, based on its holding that notice (or lack thereof) is to be assessed when "the beneficiary of the transfer credits the debtor's account," *id.* at 560, that the recipient of the mistaken payment had actual notice, *see id.* at 561-62.

received a second payment of the exact same amount.  That second payment substantially exceeded the $355,297 that Winmar had claimed it was owed in its January 23, 2006 certification.  These two undisputed facts show that Winmar had constructive notice that the second payment had to have been a mistake." *Id.* at 10.

In short, the lenders in *Qatar* and in the *Calumet* hypothetical had (or would have had) constructive notice because the payments they received were for arbitrary amounts that "substantially exceeded" the size of the outstanding debt.  *Id.*  Here, by contrast, the size of the payment was (or would have seemed to the Lenders) far from arbitrary; it matched — to the penny — the size of Revlon's outstanding debt on the 2016 Term Loan.  Far from signaling that the payment was a mistake, therefore, the size of the transfers in this case is a large part of what led the Lenders to reasonably believe that the transfer was an intentional prepayment.

### d.   Revlon's Financial State and the *UMB Bank* Lawsuit

In a related, but distinct vein, Citibank points to the size of the August 11th wire transfers in relation to Revlon's financial state as evidence of constructive notice of the mistake. "[D]efendants," it argues, "understood that a full principal payment from Revlon on August 11, 2020 was *impossible*."  Pl.'s Mem. 47.  As proof of that understanding, Citibank points, among other things, to the 117-page UMB Complaint — which was filed, at the direction of nearly all Defendants, at 2:06 p.m. on August 12, 2020, the very next day.  *See id.*  The UMB Complaint accused Revlon of improperly amending the 2016 Loan Agreement to avoid paying the Lenders, and alleged that Revlon had defaulted on the loan.  UMB Compl. ¶ 11.[40]  More significantly for

---

[40]      The same day, UMB served Revlon, also at Defendants' direction, with a Notice of Acceleration of the 2016 Term Loan.  PX172; Tr. 614-15 (testimony of Perkal); Tr. 728 (testimony of Crocombe).  Citibank points to that fact and the *UMB Bank* lawsuit as proof that the Lenders had not "discharged" the 2016 Term Loan as of the afternoon of August 12, 2020, when it sent Recall Notices to Defendants' clients and thus put them on actual notice of the

present purposes, it alleged that Revlon was *unable* to repay the loan because it was "insolvent and facing a severe liquidity crisis."  UMB Compl. ¶ 166; *see* PX120, at 1 (indicating that Revlon's total liquidity was under $400 million); Tr. 517 (testimony of Perkal) ([Q:] [O]n August 12th, you and your colleagues at Brigade believed that Revlon was insolvent, correct? [A:] That's correct."); Tr. 706 (Crocombe testifying that he believed Revlon was "likely insolvent" on August 11, 2020).  "Simply put," Citibank asserts, "because the defendants had no basis to believe that they *could* receive a full paydown on the Revlon [sic], they should at least have *suspected* a mistake when they received payments totaling the amount of principal outstanding."  Pl.'s Mem. 47.

This argument is not without some force, as a debtor's inability to fund a payment that the creditor then receives would undoubtedly raise a red flag in most instances.  But in the circumstances of this case, it is not enough to establish — by itself or in combination with the other facts cited by Citibank — that Defendants were on notice of the mistake.  Revlon was known to have paid off hundreds of millions of dollars in debt, some at par, even though its "liquidity position" had been "extremely tight," in the May 2020 Transaction.  Tr. 881 (testimony of Warren); *see*, *e.g.*, DX1052 at -28-30; Tr. 573-75, 578-84 (testimony of Perkal); Tr. 881-84, 936-37 (testimony of Warren).  More broadly, Revlon was known to have the financial backing of its billionaire sponsor, Ronald Perelman, and his holding company, MacAndrews & Forbes Inc., an investment firm that owned approximately 85% of Revlon's

---

mistake.  Pl.'s Mem. 30-31, 47; Pl.'s Reply 13.  Although there is some superficial appeal to that argument, it ultimately fails in light of the Court's conclusion above that the relevant point in time to assess notice is when the payments were received.  Put differently, whether or not Defendants (and their lawyers) had absorbed the legal significance of the payments when the UMB Complaint was filed on August 12, 2020, the 2016 Term Loan was "discharged" for purposes of the discharge-for-value rule the moment those payments were received.

equity.  *See, e.g.*, Perkal Aff. ¶ 41; Tr. 885-86 (testimony of Warren).  On that basis, several

defense witnesses testified to a belief that Perelman and MacAndrews & Forbes could have and

would have bailed Revlon out in August 2020 by providing enough financing to retire the

company's then-existing debt.  *See, e.g.*, Tr. 1149-50 (testimony of Lenga) ("[T]he first thing

that crossed my mind is that [Perelman and MacAndrews & Forbes] pulled another rabbit out of

their hat. . . .  [W]e've been surprised many times over the years that they were able to get some

sort of a refinancing or prop up one of their entities . . . in spite of a view that it was going to be

very difficult or impossible to do so."); *see also* Caraher Aff. ¶¶ 34-35; Dent Aff. ¶ 25; Greene

Aff. ¶ 38; Lenga Aff. ¶¶ 32-33; McCoy Aff. ¶¶ 42-43; Meneses Aff. ¶¶ 33-34; Perkal Aff. ¶¶ 39-

44; Phipps Aff. ¶ 24.  Given the reputations and history of Revlon and Perelman, these beliefs

were not unreasonable.

If anything, the imminent filing of the UMB Complaint made it even more reasonable for

Defendants and their clients to believe upon hearing about the wire payments that Revlon had

intentionally paid off the loan in full.  The UMB Complaint was the culmination of a bitter

dispute between Revlon and Citibank, on the one hand, and a group of Lenders holding a large

interest in the 2016 Term Loan, led by or including most Defendants here, on the other.  The

group of Lenders alleged that, in the May 2020 Transaction, Citibank and Revlon had improperly

manipulated the voting provisions of the 2016 Loan Agreement to gain approval of an

amendment that permitted Revlon to strip collateral backing the loans.  Caraher Aff. ¶¶ 27-28;

Crocombe Aff. ¶ 13; Greene Aff. ¶¶ 12, 19; McCoy Aff. ¶ 12; Perkal Aff. ¶¶ 28-30.  Through the

UMB Complaint — news of which appeared in the press on the afternoon of August 10, 2020,

just one day before the wire transfers at issue — the group of Lenders sought to replace Citibank

with UMB and to declare a default on the 2016 Term Loan.  *See* DX1053; *see also* Tr. 721-23

(Crocombe testifying to his belief that Revlon and Citibank knew of the imminent lawsuit on

August 11, 2020).  In that heated context, it was reasonable for the Lenders to believe — and

several did believe — that Revlon and Citibank, perhaps with the help of Perelman and

MacAndrews & Forbes, had figured out a creative way to pay down either enough of the Lenders

to prevent them from filing the *UMB Bank* lawsuit or the 2016 Term Loan altogether.  *See*

Caraher Aff. ¶ 33; Crocombe Aff. ¶ 13; Greene Aff. ¶ 19; McCoy Aff. ¶ 24; Perkal Aff. ¶ 31;

Phipps Aff. ¶ 18; Tr. 519-22, 576-77 (testimony of Perkal).[41]

In the final analysis, although the filing of the UMB Complaint only one day after the

August 11th wire transfers is an awkward look for Defendants, it does not undermine the Court's

conclusion that Defendants lacked constructive notice of Citibank's mistake.  Granted, taking

them out of context, it would be hard to reconcile the fact that, on August 11, 2020, Defendants

---

[41]     Several defense witnesses testified that, upon learning of the August 11th wire transfers,
they believed that Revlon might have selectively paid off only the group of troublemaking
Lenders.  That belief was arguably unreasonable insofar as the Amended Loan Agreement
provided that optional prepayments had to be made "on a pro rata basis."  DX1044, § 2.11(c), at
-106.  (The "roll-up" of the Angelo Gordon Lenders' interests — the transaction that Citibank
was trying to effect on August 11, 2020 — was accomplished pursuant to a different section of
the Amended Loan Agreement, which did not require pro rata payoffs.  *See id.* § 2.3, at -97-98.)
But it underscores the fact that they believed in good faith that the payments were an intentional
paydown and not the product of a mistake.  Moreover, these same Lenders were on the verge of
filing a lawsuit alleging that Revlon and Citibank had previously violated the 2016 Loan
Agreement.  That is, they did not think it was beyond Revlon and Citibank to violate the terms of
the Agreement.

Several defense witnesses also cited the "springing maturity" feature of the 2016 Term
Loan as a reason they believed that Revlon might have maneuvered to pay off its debt.  *See, e.g.*,
Perkal Aff. ¶¶ 35-38; Tr. 542-43, 551-53, 569-71 (testimony of Perkal); Tr. 719-21 (testimony of
Crocombe).  The Court does not doubt the good faith of this belief, but whether it was reasonable
is a different question, as Citibank made a forceful argument that, if Revlon's goal was to avoid
the springing maturity, it would have been economically more rational to do so by paying down
the 2021 Notes at par for approximately $387 million than by paying down the entirety of the
larger 2016 Term Loan.  *See* Pl.'s Reply 12-13.  Accordingly, the Court declines to put much, if
any, weight on the springing maturity rationale in evaluating whether Defendants' belief that the
payments were an intentional paydown of the 2016 Term Loan was reasonable.

genuinely believed that Revlon had intentionally paid off the entirety of the 2016 Term Loan with the fact that, only one day later, a lawsuit was filed, at Defendants' direction, seeking an acceleration of that same loan. But in context, these two facts can and do comfortably coexist. Defendants (with the exception of Tall Tree, which did not sign a direction letter authorizing the *UMB Bank* lawsuit) authorized the filing of the *UMB Bank* lawsuit days or weeks before it was filed. *See* Caraher Aff. ¶ 40; Crocombe Aff. ¶ 16; Dent Aff. ¶ 27; Greene Aff. ¶ 40; McCoy Aff. ¶ 45; Meneses Aff. ¶ 36; Perkal Aff. ¶ 50; Phipps Aff. ¶ 27; Abrams Dep. Tr. 114. And it is plain that the detailed, 117-page UMB Complaint was in the works, if not finalized, long before the August 11th wire transfers were received. Meanwhile, there is no evidence in the record regarding who actually performed the ministerial task of filing the UMB Complaint, let alone what that person knew or did not know about the August 11th wire transfers. Under these circumstances, and given the Court's independent assessment of the demeanor and credibility of the defense witnesses' testimony having presided at trial, the Court does not infer from the mere act of filing the Complaint that Defendants harbored any doubt about whether the payments were intentional.[42]

### e.  Equitable and Policy Considerations

Citibank's final two arguments — in one of which it is joined by *amici* — have less to do with the question of whether Defendants were on notice of the mistake and more to do with the soundness of the discharge-for-value rule. And they are squarely foreclosed by *Banque Worms*.

---

[42]     Notably, in view of the August 11th wire transfers, the UMB Complaint was never served. *See* Defs.' Mem. 77. Instead, counsel for UMB (and Defendants here) sought a stay of the litigation pending resolution of this case. Letter from Benjamin I. Finestone to Hon. Lorna G. Schofield, *UMB Bank*, No. 20-CV-6352 (LGS) (S.D.N.Y. Oct. 5, 2020), ECF No. 15. When that request was denied, Order, *UMB Bank*, No. 20-CV-6352 (LGS), (S.D.N.Y. Oct. 6, 2020), ECF No. 16, UMB voluntarily dismissed the lawsuit, Notice of Voluntary Dismissal, *UMB Bank*, No. 20-CV-6352 (LGS) (S.D.N.Y. Nov. 6, 2020), ECF No. 17.

First, during summations, counsel for Citibank argued that "equitable" considerations called for return of its money by Defendants' funds.  Tr. 1327.  "When a mistake happens," counsel asked, "should people be allowed to take advantage of that mistake or should they do the right thing and give the money back? . . .  [T]his was a mistake, it was an error, and [Citibank] should get the money back, and [Defendants] will still have the benefit of their bargain because they still have their loans."  Tr. 1327, 1332.  However forceful this argument may be in the abstract, the problem for Citibank is that the Court does not write on a blank slate.  Indeed, Security Pacific raised nearly identical equitable arguments in *Banque Worms*, and they did not carry the day.  *See, e.g.*, Br. Third-Party Def.-Appellant Security Pacific International Bank at 45, *Banque Worms*, 570 N.E.2d 189 ("[T]his is a case of a creditor desperate to recover from its debtor in the face of a failing estate who . . . now is fighting to keep the unjustifiable windfall it received by virtue of [Security Pacific's] mistake.  There is no way under New York law that such blatant opportunism should succeed."); Security Pacific CoA Reply 6 n.4 ("The court ordered restitution in *Mayer* [*v. Mayor of New York*, 63 N.Y. 455 (1875)] because the position of the city had not changed and it still had its claim against the true debtor, just as [Banque Worms] does here.").  To accept Citibank's argument that equity calls for return of the money it mistakenly wired would be to disregard the decisions of the New York Court of Appeals and the Second Circuit in *Banque Worms* — which the Court may not do.

In fact, if anything, the equitable case for returning the money to its sender here is even weaker than it was in *Banque Worms*.  Here, some of the money wired on August 11, 2020, came from Revlon; in *Banque Worms*, *all* of the transferred funds at issue belonged to Security Pacific,

the transferor bank, rather than to Spedley, the debtor.[43]  Here, Citibank began contacting

Defendants and their clients about the mistake approximately twenty hours after the payments

had been sent; in *Banque Worms*, the transferor notified the recipient of the mistake only about

*two* hours after the payment.  Here, after being notified about the mistake, some Defendants

directed that the disputed funds be held in suspense pending investigation; in *Banque Worms*, the

recipient's bank actually *returned* the funds to the sending bank upon being informed of the error

(albeit subject to an indemnity).  *See* 726 F. Supp. at 941.  Here, Citibank, as the Administrative

Agent, was a party to the Amended Loan Agreement and was familiar with its terms; in *Banque*

*Worms*, the transferor bank was a stranger to the loan agreement and to the creditor-debtor

relationship between Banque Worms and Spedley.  Here, Citibank was responsible for the fact

that the transaction was structured in a way that enabled the mistake (that is, due to the technical

limitations of its system, Citibank received Revlon's approval to pay interim interest to all

Lenders, not just those rolling up); in *Banque Worms*, the sending bank played no such role.  If

equity did not call for a different result in *Banque Worms*, it certainly does not here.

Second, Citibank contends that a rule favoring Defendants would make New York an

outlier and would be bad policy.  *See* Pl.'s Reply 23.  "Such a rule," the bank asserts, "would not

facilitate wire transfers; it would chill and cripple them."  *Id.*  This argument is echoed by the

arguments of *amici*: the Loan Syndications and Trading Association (the "LSTA"), as well as the

Clearing House Association LLC, Clearing House Payments Company LLC, and Bank Policy

Institute (collectively, "the Clearing House *amici*").  *See* ECF Nos. 171 ("LSTA Br."), 172

---

[43]     That is because, without waiting for BankAmerica to refund the mistaken wire and "despite the absence of sufficient cover in Spedley's account," Security Pacific sent a second payment, in the same amount, to National Westminster Bank USA, in order to comply with Spedley's second set of instructions.  *Banque Worms*, 726 F. Supp. at 940.

("Clearing House Br."). The LSTA, a trade association focused on syndicated lending, argues that "it would be beneficial to the various participants involved in syndicated lending for the law to require the return of mistakenly transmitted payments like the one at issue here" because "[t]he agents that handle the authorization and transmittal of payments operate on thin margins" and "obligating them to 'insure' over . . . mistakes would be much more costly for borrowers and lenders wishing to transfer their interests in a syndicated facility than requiring recipients to return the mistaken payments." LSTA Br. 3. Along similar lines, the Clearing House *amici* claim that "it is bad policy to subject banks that provide wire transfer services to expanded, potentially extraordinary liability for error in executing wire transfers" because "[d]oing so would undermine the critical role banks play in providing this essential, low-cost payment system to participants in the financial markets." Clearing House Br. 4-5.

Once again, the answer to this argument is *Banque Worms*. Indeed, Security Pacific made the exact same arguments on appeal from Judge Patterson's ruling in that case. "It is inconceivable," the bank argued, "that any intermediary CHIPS bank, in mistaken transfer cases, would knowingly undertake the enormous risk inherent in effectively insuring beneficiary credit decisions throughout the world for the minimal pricing structure now common in the industry." Security Pacific CoA Br. 50. A ruling in favor of Banque Worms, the bank continued, would "introduce chaos into the New York-centered wire-transfer banking system and particularly inhibit its ability to smoothly transfer, without fear of enormous losses and limitless international litigation, the trillions of dollars in funds it processes each year at minimal cost to users of that system." *Id.* at 51. Notably, in its opinion, the New York Court of Appeals acknowledged New York's role as "the national and international center for wholesale wire transfers" and accepted that "[t]he low cost of electronic funds transfers" was "an important factor in the system's

96

popularity." *Banque Worms*, 570 N.E.2d at 194.  And yet the Court found Security Pacific's policy argument "unpersuasive."  *Id.* at 197.  Mistakes by banks transferring money, the court reasoned, "can be effectively held to a minimum through the utilization of commercially reasonable security procedures in effecting wire transfers."  *Id.* (internal quotation marks omitted).  Where these security procedures are not followed, and a mistaken payment is sent, it is appropriate to impose "the loss . . . on the [transferor] bank."  *Id.*

That is enough to reject the policy arguments of Citibank and *amici*.  But not for nothing, the *Banque Worms* decision — or, to be more precise, the passage of time since the decision — casts considerable doubt on their assertion that the sky will fall for the New York banking industry if Defendants here prevail.  *Banque Worms* was decided by the New York Court of Appeals in 1991, nearly thirty years ago.  Although the Court's discussion above makes plain that the decision left some room for argument around the edges, it settled the core issue by unambiguously adopting the discharge-for-value rule.  That is, for nearly thirty years, the law in New York has been clear that banks making wire transfer payments to *bona fide* creditors bear a risk of loss should a mistake occur.  Even so, New York remains a "national and international center for wholesale wire transfers."  *Id.* at 194.  (No doubt, that is due in part to the fact that, as the cases cited above make plain, New York is hardly an outlier in adopting the discharge-for-value defense.)  And as the arguments of Citibank and *amici* attest, the fees for electronic funds transfers have remained low.  Empirically, the disastrous consequences predicted by Security Pacific nearly three decades ago — and predicted again here by Citibank and *amici* — have not come to pass.  In that sense, the *Banque Worms* court's conclusion that the transferor bank is the party best positioned to avoid error — and thus the party that should bear the risk of loss — appears to have been correct.

Here, there is no doubt that the party best positioned to avoid the error that occurred was Citibank.  The bank took that role seriously in adopting the six-eye approval process for wire transfers of the kind made here.  And while that process obviously failed in this instance, the unprecedented nature of the mistake in this case suggests that it has generally been successful. Moreover, banks could — and, perhaps after this case, will — take other relatively costless steps to both minimize the risk of errors and increase the probability of clawing back erroneous payments.  For example, banks could, either on their own, or through an industry association like the LSTA, create clear standards governing the content and timing of payment notices.  If a payment notice akin to the Calculation Statements here *always* preceded an actual payment by some specified interval (and banks adopted security procedures, akin to the six-eyes process, to ensure that they did), then the absence of such a notice would indeed raise a red flag that the payment was erroneous.  So too, if such notices *always* unambiguously and explicitly described the size and nature of the payment, the recipient of a payment that deviated from the notice would plainly be on notice of the mistake.  For example, one could imagine payment notices that stated something like: "You will shortly receive a wire payment of $X.  This payment is for interest only; it does not include any payment of principal.  If you receive more than $X, any excess would be the result of an error and you would not be entitled to keep it."  Suffice it to say, had the Calculation Statements in this case included simple and clear language along these lines, this costly litigation would almost surely have been avoided.  In short, although the mistake that gave rise to this case may be the proverbial Black Swan event, and the risk of a reoccurrence may therefore be small, the banking industry could — and would be wise to — eliminate the risk altogether by taking these or similarly modest steps.

**CONCLUSION**

At its heart, this case involves a clash between two basic intuitive principles.  On the one hand, if one party sends money to another by mistake, the latter should generally be required to give it back.  On the other hand, if one party owes money to another and pays that money back to the penny, the latter should generally be allowed to keep and use the money as it wishes, without fear that the former will develop a case of borrower's remorse and claim that the payment was by mistake.  How to reconcile these principles would be hard enough in the abstract.  It is even harder in an age when money can be transmitted from one party to another instantaneously and investors can, and often do, redeploy available funds almost as quickly.

Were the Court writing on a blank slate, it is far from clear that it would reconcile these principles in a way that allowed the Non-Returning Lenders to keep the money that Citibank indisputably transferred by mistake.  After all, Citibank realized its error and notified the Lenders within one day, and there is no evidence or suggestion that, in the intervening hours, the Non-Returning Lenders relied to their detriment on the belief that the transfers were an intentional, albeit unexpected, paydown of the 2016 Term Loan.

But the Court does not write on a blank slate.  Instead, it is bound by the decisions of the New York Court of Appeals and the Second Circuit in *Banque Worms*.  The New York Court of Appeals settled the question of whether lenders like those here must prove detrimental reliance in order to keep money that appears to be the payment on a *bona fide* debt.  They do not.  And in light of the *Banque Worms* opinions, the relevant time for evaluating whether a lender was on notice of a mistaken payment is clear.  It is when the payment is received.

These decisions compel the Court to conclude that the Non-Returning Lenders are entitled to keep the money that Citibank indisputably transferred by mistake on August 11, 2020.

That is, for the reasons discussed above, the Court finds that the Non-Returning Lenders were not on notice of Citibank's mistake when they received the transfers. The transfers matched — to the penny — the amount of principal and interest outstanding on the loan. The accompanying notices referred to interest being "due," and the only way in which that would have been accurate was if Revlon was making a principal prepayment. And it appears that no mistake of the size or nature of Citibank's had ever happened before. Faced with these circumstances, the Non-Returning Lenders believed, and were justified in believing, that the payments were intentional. Indeed, to believe otherwise — to believe that Citibank, one of the most sophisticated financial institutions in the world, had made a mistake that had never happened before, to the tune of nearly $1 billion — would have been borderline irrational.

Accordingly, and for the reasons discussed above, the Court holds that the August 11th wire transfers at issue were "final and complete transaction[s], not subject to revocation." *Banque Worms*, 570 N.E.2d at 196. **The Clerk of Court is therefore directed to enter judgment in favor of Defendants and to close this case.**

That said, Defendants and their clients are not yet necessarily free to do with the money what they want. Given the possibility of appeal, Defendants agreed on the record at the close of trial that, in the event of a ruling in their favor on the merits, the temporary restraining orders currently in effect should remain in place until the parties could brief, and the Court could decide, what impact the ruling has on them. *See* Tr. 1333-35. Accordingly, unless and until the Court orders otherwise, the temporary restraining orders at ECF No. 25; 20-CV-6617, ECF No. 16; and 20-CV-6713, ECF No. 14, remain in effect on Defendants' consent. Counsel shall promptly confer and, **within one week of the date of this ruling**, submit a joint letter either indicating agreement with respect to the impact of this ruling on the temporary restraining orders

(in which case, counsel shall also submit an agreed-upon proposed order consistent with their agreement) or proposing a briefing schedule to address the issue.

      SO ORDERED.

Dated: February 16, 2021
      New York, New York

                                       JESSE M. FURMAN
                                  United States District Judge

# Appendix A

DATE   : 11-AUG-2020

TO     : TCI SYMPHONY CLO 2017 1 LTD

ATTN   : TCI SYMPHONY CLO

RE     : REVLON TERM LOAN 2016
         TERM LOAN
         USD    896,265,941.01    CREDIT FACILITY
         DATED AS OF   07-SEP-2016

AGENT  : Citibank N.A

REF    : 001PDLL201485036

CUSIP  : 761520AY1

***Payment of the amount(s) specified in this notice is subject to the lender's
compliance with all its obligations under the subject credit agreement***

<B>Libor Rate Interim Interest Payment</B>
*******************************************************************************

Please be advised that Interim Libor Interest will be paid on the LIBOR
outstanding under the above referenced facility.

        Effective Date    : 11-AUG-2020

        Libor Currency    : USD

        Libor Amount      : 893,944,008.52

        Maturity Date     : 31-AUG-2020

Interim interest is due as per the detailed calculation below :

        Interest Due Period  : 29-MAY-2020  to  11-AUG-2020

| LIBOR<br>Funded | Interest<br>Rate | Day<br>Basis | From<br>Date | To<br>Date | # of<br>days | Interest<br>Due |
|---|---|---|---|---|---|---|
| 3,381,892.40 | 4.25% | Actual/360 | 29-MAY-2020 | 11-AUG-2020 | 74 | 29,544.59 |

PX 0678A

Due Currency        :  USD

Total Due           :  29,544.59

<B>Funds Movement</B>
**********************************************************************************

We will credit your account representing the above Interim Interest based on the
following instructions :

Credit Date         :  11-AUG-2020

Credit Currency     :  USD

Total Due           :  29,544.59

Less :Tax Withholding    :  0.00

Credit Amount       :  29,544.59

<B>Contact</B>
**********************************************************************************

If you have any questions on the above, please speak to a representative
at 302-894-6010.

Regards,

Investor Relations

Citibank N.A
1615 BRETT ROAD, OPS III
NEW CASTLE, DE  19720
Fax No:212-994-0961
Email: global.loans.support@citi.com

CONFIDENTIALITY NOTICE: The confidentiality of customer information is of the
utmost importance to Citigroup. Our ongoing interaction with you involves the
transmission of confidential information via facsimile. You are aware that
facsimile transmission is not secure and has risks of unauthorized access,
tampering and disclosure of your information. Therefore, your continuing to send
facsimile messages to us or providing your facsimile transmission number to us
for our use constitutes consent to our use of this method of data transmission.

Accordingly, we do not assume any liability whatsoever for breaches of
confidentiality, tampering, or non-receipt of your data for any reason, and you
agree to assume the risk of unauthorized access, tampering and disclosure of
your information