UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re Citibank August 11, 2020 Wire Transfers

No. 20 Civ. 06539 (JMF)

## CITIBANK'S MOTION FOR
## AN INJUNCTION PENDING APPEAL

MAYER BROWN LLP

Nicole A. Saharsky
Matthew D. Ingber
Christopher J. Houpt
Luc W. M. Mitchell
1221 Avenue of the Americas
New York, New York 10020
(212) 506-2500

THE LAW OFFICES OF JOHN F. BAUGHMAN, PLLC

John F. Baughman
Andrew H. Reynard
299 Broadway, Suite 203
New York, New York 10007
(212) 548-3212

HOGAN LOVELLS US LLP

Neal Kumar Katyal
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5528

*Attorneys for Citibank, N.A.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................3

ARGUMENT ..........................................................................................................4

I.     CITIBANK WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION ......4

II.    AN INJUNCTION WILL NOT INJURE THE DEFENDANTS, MUCH LESS
       SUBSTANTIALLY ..........................................................................................7

III.   CITIBANK IS LIKELY TO PREVAIL ON THE MERITS ...............................................8

       A.    The Second Circuit Likely Will Hold That The Discharge-For-Value
             Defense Requires A Present Entitlement To The Funds Mistakenly
             Transferred ...........................................................................................10

       B.    The Second Circuit Likely Will Hold That The Defendants Were On Notice
             Of The Mistake At All Relevant Times ...............................................12

       C.    The Second Circuit Likely Will Hold That A Separate Act Of Discharge Is
             Required Beyond Receipt Of The Payment ...........................................15

IV.    INJUNCTIVE RELIEF WOULD SERVE THE PUBLIC INTEREST ...........................17

CONCLUSION.....................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                                                  **Page(s)**

*A.I. Trade Fin., Inc. v. Petra Bank*,
   1997 WL 291841 (S.D.N.Y. June 2, 1997) ...........................................................................12

*In re Adelphia Commc'ns Corp.*,
   361 B.R. 337 (S.D.N.Y. 2007)...........................................................................................5

*Banque Worms v. Bank Am. Int'l*,
   726 F. Supp. 940 (S.D.N.Y. 1989) ...............................................................................11, 13

*Banque Worms v. BankAmerica Int'l*,
   77 N.Y.2d 362 (1991) .......................................................................3, 9, 11, 15, 16

*Banque Worms v. BankAmerica Int'l*,
   928 F.2d 538 (2d Cir. 1991)...........................................................................................16

*Brenntag Int'l Chems., Inc. v. Bank of India*,
   175 F.3d 245 (2d Cir. 1999)...........................................................................................5

*In re Calumet Farm, Inc.*,
   398 F.3d 555 (6th Cir. 2005) ...........................................................................................16

*Camreta v. Greene*,
   563 U.S. 692 (2011)...........................................................................................17

*Carlisle v. Norris*,
   215 N.Y. 400 (1915) .......................................................................................10, 11, 15

*In re Currency Conversion Fee Antitrust Litig.*,
   2010 WL 1253741 (S.D.N.Y. Mar. 5, 2010) ...........................................................................5, 7

*Ger-Nis Int'l, LLC v. FJB, Inc.*,
   2007 WL 656851 (S.D.N.Y. Mar. 1, 2007) ...........................................................................5

*In re Initial Pub. Offering Sec. Litig.*,
   728 F. Supp. 2d 289 (S.D.N.Y. 2010)...........................................................................5, 7

*Kidder, Peabody & Co. v. Maxus Energy Corp.*,
   925 F.2d 556 (2d Cir. 1991)...........................................................................................4

*Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*,
   577 U.S. 136 (2016)...........................................................................................5

*New York v. U.S. Dep't of Homeland Sec.*,
   974 F.3d 210 (2d Cir. 2020)...........................................................................................4

**TABLE OF AUTHORITIES**
**(continued)**

**Cases (continued)**                                                                                      **Page(s)**

*Nken v. Holder*,
    556 U.S. 418 (2009)...................................................................................................4

*Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of Va.*,
    144 F. Supp. 2d 241 (S.D.N.Y. 2001).......................................................................6

*SCANSCOT Shipping Servs. (Deutschland) GmbH v. Metales Tracomex Ltda*,
    2009 WL 10701802 (S.D.N.Y. Dec. 23, 2009) .......................................................8

*T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*,
    2010 WL 4038826 (E.D.N.Y. Oct. 14, 2010)...........................................................9

**Rules**

Fed. R. Civ. P. 62...............................................................................................................1, 4, 7

**Other Authorities**

Chris Dolmetsch, Katherine Doherty, & Jennifer Surane, *Citi Loses Bid to Recoup Massive
    Mistake in Surprise Ruling*, Bloomberg (Feb. 16, 2021), https://www.bloomberg.com/
    news/articles/2021-02-16/citigroup-loses-fight-to-get-back-millions-in-mistaken-transfer ...18

RESTATEMENT (FIRST) OF RESTITUTION (Am. Law Inst. 1937) ................................................9, 15

RESTATEMENT (THIRD) OF RESTITUTION (Am. Law Inst. 2011)...................................................13

**INTRODUCTION**

Last August, when first faced with this extraordinary case, this Court issued a common-sense order: Preserve the status quo and do not dissipate the funds that had been accidentally transferred from Citibank. That order provided a much-needed pause. Preventing the recipients from distributing the money ensured that any judgment for Citibank could be executed. The Court could require the defendants to return the funds. And the defendants could hardly complain at being told to wait. To their clients, the money represents a lottery-like windfall of hundreds of millions of dollars. They were not expecting to receive this money for several years, if at all.

Those very same equities support preserving the status quo during the appeal. Without an injunction—a continuation of the status quo—the defendants could, and might feel compelled to, immediately authorize distribution of the disputed funds to the accounts of hundreds of investors around the world. Those investors, in turn, could transfer the funds again, making Citibank's funds very difficult, if not impossible, to trace. If that happens, Citibank would suffer an immediate and irreparable injury. Even if Citibank prevailed at the Second Circuit, its victory would prove hollow. At the same time, the defendants cannot claim any meaningful harm from the brief delay of an appeal. The defendants did not anticipate receiving the funds at issue for years to come. Further, Citibank has expeditiously filed its notice of appeal, and it is prepared to move expeditiously in the Second Circuit, in order to minimize any delay.

In cases involving money judgments, the plaintiff is not entitled even to receive, let alone spend, its award while the appeal is pending. The defendant can obtain a stay pending appeal as of right, so long as it merely furnishes adequate security. *See* Fed. R. Civ. P. 62(b). Here, the lenders *hold* the funds—giving them even better security than would be required to stay a money judgment automatically. In short: Without an injunction, Citibank stands to lose any meaningful shot at successful recovery, while an injunction costs the defendants nothing at all.

1

Citibank also has a strong likelihood of prevailing on appeal, a separate factor that counsels in favor of preserving the status quo to make a decision in Citibank's favor meaningful. As the Court recognized, whether the discharge-for-value defense applies here is a close question. The case raises legal issues of first impression in this Circuit about important points of New York law that took this Court 100 pages to resolve. And the Court acknowledged that if it were "writing on a blank slate, it is far from clear" it would allow the defendants "to keep the money that Citibank indisputably transferred by mistake." Dkt. 243 (Op.) at 99. The Second Circuit may well decide this case differently on appeal—especially given that the key legal questions will be reviewed *de novo*. If this kind of legal dispute does not warrant an injunction to ensure meaningful consideration by the appellate court, then little does.

Lastly, the public interest strongly favors an injunction. This Court's ruling will have an enormous impact on wire transfers, the basic building blocks of the global financial system. The discharge-for-value defense is an exception to the general rule that money transferred by mistake must be returned. The decision in this case expands that defense, creating uncertainty about whether this Court's rule will apply in the next case involving a mistaken wire transfer. The financial industry thrives on stability. An appeal, regardless of its outcome, will produce an authoritative Second Circuit opinion that will dispel needless confusion. A brief delay to permit the Second Circuit to provide that certainty therefore is in the public interest.

Separately and together, these factors all favor maintaining the status quo. This Court should convert its existing temporary restraining orders into an injunction pending appeal. If the Court declines to do so, Citibank respectfully requests that the Court leave the temporary restraining orders in place briefly, long enough for Citibank to seek injunctive relief from the Second Circuit.

## BACKGROUND

Citibank is the administrative agent on a 2016 term loan to Revlon. The defendants are managers of dozens of funds that participate in the loan syndicate.

On August 11, 2020, Citibank attempted to make an interest payment on the loan consisting of $7.8 million of Revlon's funds. Citibank instead sent, with its own funds, an amount equal to the entire principal balance outstanding on the loan, about $893 million dollars. The next day, Citibank sent multiple recall notices telling the lenders of the mistake. Many lenders returned Citibank's money, but the defendants refused.

Citibank brought these consolidated actions seeking return of the funds. The defendants have now conceded that the payments were mistaken. But they interposed the "discharge-for-value" doctrine as an affirmative defense: When a creditor receives funds "in good faith and without any notice of any wrong and credit[s] them on an indebtedness due them," the transferor "is not entitled to recover them back." *Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 368 (1991).

Citibank argued that this defense is inapplicable. Revlon's debt was not due for another three years, and the defendants never "discharged" the debt—they instead placed the money in suspense accounts and have continued to accept interest payments from Revlon to this day. Further, Citibank argued that the defendants were on notice of Citibank's mistake from the moment their clients received the funds.

At the outset of this litigation, the Court entered temporary restraining orders (TROs) freezing the funds, preventing the defendants from disposing of them until the Court's decision in this matter. After a bench trial, the Court issued an opinion holding that the defendants are entitled to rely on the discharge-for-value defense and entered judgment in their favor. Op.; Dkt. 244.

Citibank has appealed the judgment, and it is prepared to move expeditiously in the Second Circuit. Citibank now moves for an injunction continuing to freeze the funds—essentially extending the TROs—pending its appeal.

## ARGUMENT

Federal Rule of Civil Procedure 62(d) empowers this Court to grant an injunction pending appeal. Fed. R. Civ. P. 62(d); *see Kidder, Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 564-65 (2d Cir. 1991). In deciding whether to maintain the status quo, the Court balances the four familiar equitable factors: (1) whether the party seeking an injunction will suffer irreparable injury absent the injunction; (2) whether the injunction will substantially injure other parties in the case; (3) whether the party seeking the injunction can show a likelihood of success on the merits; and (4) where the public interest lies. *See New York v. U.S. Dep't of Homeland Sec.*, 974 F.3d 210, 214 (2d Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)). Both individually and cumulatively, Citibank satisfies those factors. The Court should enter an injunction, on the same terms as the prior TROs, that will last through the final disposition of the appeal.

## I.      CITIBANK WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION

Citibank will suffer irreparable harm absent an injunction. Without an order freezing the mistakenly transferred funds, the lenders will be able to disperse the disputed funds through a byzantine network of investors around the world—many of which may transfer the funds *again* to yet more parties. If that happens, the defendants may well become powerless to return the disputed money, and Citibank likely would be unable to trace its funds absent 100-plus separate collection actions. In other words, even if Citibank prevailed in the Second Circuit, its victory likely would be a hollow one. This Court recognized that reality when it issued the TROs at the outset of this case, and nothing has changed since. The Court should maintain the status quo so that Citibank has a meaningful opportunity to appeal these weighty and complex issues to the Second Circuit.

4

Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). Likewise, "where the denial of a stay pending appeal risks mooting any appeal of significant claims of error, the irreparable harm requirement is satisfied." *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 348 (S.D.N.Y. 2007) (emphases omitted).

A party has shown irreparable harm when it claims title to specific funds and shows that, absent an injunction, the funds are at risk of dissipation. The "risk that defendant will have dissipated the [funds] without paying the plaintiff, leaving the plaintiff out of luck and out of money," is a sufficient risk of irreparable harm to justify an injunction. *Ger-Nis Int'l, LLC v. FJB, Inc.*, 2007 WL 656851, at *2 (S.D.N.Y. Mar. 1, 2007) (quotation marks omitted); *cf. Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 145-46 (2016) (where a plaintiff claims an equitable entitlement to specific funds, dissipation of funds generally defeats the equitable claim). When the transferees responsible for payment are "dispersed around the country," or the prevailing party on appeal "would need to institute collection actions in numerous jurisdictions" to recover its dissipated funds, the risk of irreparable harm—and the call for injunctive relief—becomes even greater. *In re Currency Conversion Fee Antitrust Litig.*, 2010 WL 1253741, at *2 (S.D.N.Y. Mar. 5, 2010); *see In re Initial Pub. Offering Sec. Litig.*, 728 F. Supp. 2d 289, 293 (S.D.N.Y. 2010) ("The Objectors are dispersed around the country and none has offered to guarantee payment of costs that might be assessed against them. In the event the Objectors are unsuccessful on appeal, plaintiffs would need to institute collection actions in numerous jurisdictions to recover their costs. As a result, there is a significant risk of non-payment."). Injunctions, in other words, "are [] appropriate to thwart a defendant from making

5

a judgment uncollectible." *Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of Va.*, 144 F. Supp. 2d 241, 248, 250 & n.9 (S.D.N.Y. 2001).

Absent an injunction, Citibank very well may be unable to trace and recover its funds, and any legal victory on appeal could prove meaningless. Right now, the disputed funds in this case sit within easy reach of the Court, in accounts tended by ten fund managers who have contractual control over the money—and which, in fact, decided not to return it to Citibank in August and have also been able to keep it in place since the TROs were entered. Without an injunction, the situation would become precarious. The money would move out of the defendants' control, to more than 100 clients, which may—and in some cases might be contractually required to—distribute the money further.[1] At that point, the defendants would become unable to return the funds, and Citibank would have little assurance that it could ever trace its money without over 100 separate collection actions against the defendants' clients, each with its own burdensome discovery. The Court should continue to maintain the status quo to ensure that the Court can grant effective relief if the Second Circuit reverses on appeal.

*Quantum* is particularly instructive. There, the court found that a defendant with "several subsidiaries, satellite offices and shell companies" threatened to become "judgment-proof" and render any judgment for the plaintiff "uncollectable." *Quantum*, 144 F. Supp. 2d at 246 & n.4. The plaintiff "face[d] irreparable harm," the court held, "in the form of an actual and imminent threat

---

[1]   In particular, nine defendants all use similar contracts providing that principal proceeds will be paid out quarterly. *See* Ex. A-1 (PX 26) at 42, 149-51; Ex. A-2 (PX 187) at 48, 189-92; Ex. A-3 (PX 1143) at 53-54, 204-07; Ex. A-4 (PX 1385) at 48, 190-91; Ex. A-5 (PX 1557) at 47, 196-99; Ex. A-6 (DX 214) at 52, 206-08; Ex. A-7 (DX 1101) at 24, 217-19; Ex. A-8 (DX 1122) at 49, 194-95; Ex. A-9 (PX 60) at 60. The tenth defendant holds "the sole discretion" to "distribute[]" all cash receipts "at any time." Ex. A-10 (PX 1312) at 2, 11.

that [the defendant's] companies . . . will either cease to exist . . . or go under of their own accord . . . , thereby making a judgment in [the plaintiff's] favor uncollectible." *Id.* at 248.

Here, if Citibank prevailed in the Second Circuit but did not have an injunction, it would need to trace its funds through more than "several" subsidiaries. Citibank would need to wade through over 100 transferees, most of which are vehicles that exist solely to distribute money to investors. Absent an injunction, the money could be transferred to innumerable destinations and jurisdictions around the world, including places where Citibank may not be able to avail itself of U.S. courts. *See In re Currency Conversion Fee Antitrust Litig.*, 2010 WL 1253741, at *2 ("significant risk of non-payment" when funds are "dispersed around the country"); *In re Initial Pub. Offering Sec. Litig.*, 728 F. Supp. at 293 (same); *cf.* Dkts. 194, 222 (describing destinations of wire transfers). Only an injunction can ensure that an appellate decision in Citibank's favor could be enforced.

## II.   AN INJUNCTION WILL NOT INJURE THE DEFENDANTS, MUCH LESS SUBSTANTIALLY

The defendants will not be harmed by an injunction. The defendants did not expect their clients to receive this money until 2023, and, given the uncertainties regarding the transfer, decided on their own not to redeploy the funds. Meanwhile, Citibank has made good-faith efforts to minimize any delay, including by immediately filing its notice of appeal. Citibank is also prepared to proceed expeditiously in the court of appeals.

In fact, if this were a case involving a traditional money judgment, Citibank would be able to post a bond or surety and receive an automatic stay under Rule 62(b). Here, however, the defendants have even better security than a bond: They already control the disputed assets. The defendants' strong security—plus the lack of any harm—militates in favor of granting an injunction to prevent the assets' dissipation pending appeal.

When "[d]efendants allege no independent source of harm that would result from a stay" or injunction beyond "the validity, or lack thereof of the [ownership of funds, which] is precisely what is at issue on appeal," there is no substantial injury. *SCANSCOT Shipping Servs. (Deutschland) GmbH v. Metales Tracomex Ltda*, 2009 WL 10701802, at *1 (S.D.N.Y. Dec. 23, 2009). And when funds have already been restricted during a district-court proceeding, "it is not clear what additional harm would result from the granting of Plaintiff's request for" an injunction during the appeal. *Id.*

There is no dispute that the August 11 transfers were a surprise windfall to the defendants and their clients. Before August 11, they had no expectation of Revlon's debt being fully paid down for at least another three years, and they had substantial doubt Revlon would pay at all. *See* Dkt. 164 at 12-13. The defendants will suffer no injury, substantial or minor, if the Court temporarily prevents them from dispersing their clients' unanticipated fortune while the Second Circuit considers whether they are entitled to keep it.

Notably, when the Court granted the TROs at the outset of this case, defendant Brigade never argued that it would suffer a specific harm if an injunction were entered. *See* Dkt. 22 at 5. Although Brigade argued that its clients were owed the money transferred, Brigade did not contend that they were due the money in August 2020, or that delaying receipt would cause any harm. *Id.* Brigade simply claimed that Citibank could afford to part with its money, not that the defendants' finances depended on it. *Id.*

## III.     CITIBANK IS LIKELY TO PREVAIL ON THE MERITS

Citibank can also show a substantial likelihood of success on the merits on appeal. Indeed, this is *precisely* the situation in which this Court should preserve the status quo to allow the Second Circuit to weigh in on a hotly contested legal question.

This is not a mine-run case in which the defendant disagrees with the application of settled law to the facts of the case. The legal issues are undisputedly complex and novel, prompting this Court to write a 100-page opinion. In interpreting New York law, this Court openly disagreed with other circuits that have addressed the discharge-for-value defense. The Second Circuit will review much of this case *de novo*. And this Court itself recognized that, were it writing on a blank slate, it might not reach its counterintuitive result. The Second Circuit may well reach a different conclusion about what its own precedents require, or it may certify one or more issues to the New York Court of Appeals, which would have greater flexibility interpreting its own precedents than this Court felt it did. Given the substantial questions involved in this case, the Court should grant an injunction and permit a meaningful appeal.

Citibank alleges four causes of action—unjust enrichment, money had and received, payment by mistake, and conversion. Each turns primarily on the same inquiry, which is whether Citibank's payment was mistaken, "such that equity and good conscience demand restoration of the disputed property." *T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*, 2010 WL 4038826, at *4 (E.D.N.Y. Oct. 14, 2010). The Court held that "there is no dispute that" Citibank had established that the August 11 transfers were made by mistake. Op. 35. Thus, the funds must be returned unless some exception to the general rule, such as the discharge-for-value defense, applies.

This Court applied the discharge-for-value defense, but the Second Circuit may well reach the opposite conclusion. Under New York law, the discharge-for-value defense is as follows:

> A creditor of another or one having a lien on another's property who has received from a third person any benefit in discharge of the debt or lien is under no duty to make restitution therefor, although the discharge was given by mistake of the transferor as to his interests or duties, if the transferee made no misrepresentation and did not have notice of the transferor's mistake.

*Banque Worms*, 77 N.Y.2d at 367 (quoting RESTATEMENT (FIRST) OF RESTITUTION § 14(1) (Am.

Law Inst. 1937)). Put another way, "[i]f defendants received the proceeds in good faith and without any notice of any wrong and credited them on an indebtedness due them, plaintiff is not entitled to recover them back." *Carlisle v. Norris*, 215 N.Y. 400, 415 (1915).

In the Second Circuit, Citibank anticipates arguing that the discharge-for-value defense requires a defendant to make three showings. First, the transferee must be entitled to the funds at the time of the transfer. Second, the transferee must not have notice of the mistake. Third, the transferee must discharge the funds for value. To maintain their victory on appeal, the defendants must prevail on *all* of these contested elements. But to secure reversal, Citibank must convince the Second Circuit to reverse on just *one* of them—and it is likely that will occur.

### A.   The Second Circuit Likely Will Hold That The Discharge-For-Value Defense Requires A Present Entitlement To The Funds Mistakenly Transferred

Citibank has argued that because the defendants were not entitled to the funds at the time of the transfer, the discharge-for-value defense does not apply. As this Court recognized, "it is undisputed that the 2016 Term Loan was not 'due' on August 11, 2020; indeed, the loan was not set to mature for another three years." Op. 43. The Court held, however, that the defendants did not have to demonstrate that they were "entitled to the funds at the time of transfer"; it was enough that the debt was "outstanding." *Id.* Whether the debt must be due at the time of transfer is a pure question of law that the Second Circuit will review *de novo*. And it is likely that the Second Circuit will reach a different conclusion than this Court.

Under New York law, the discharge-for-value defense applies only where the recipient has a present entitlement to the transferred funds. In *Carlisle*, the New York Court of Appeals held that a defendant may retain wrongfully transferred funds only if, at the time of receipt, an "indebtedness" was "due" to the recipients of the funds. 215 N.Y. at 400. That means that the debt actually has to be due at the time the mistaken payment is made. That rule makes sense, because

there is a vast difference between a debt being due (*i.e.*, it must be paid now) and a debt being outstanding (*i.e.,* it must be paid at some specified time in the future).

In *Banque Worms*, the New York Court of Appeals cited *Carlisle* with approval. *See* 77 N.Y.2d at 368. This Court declined to give weight to the language in *Carlisle*, because in *Banque Worms*, the language "appears only in a parenthetical following the citation to *Carlisle*, which [*Banque Worms*] identifie[d] as one example of a case that 'arguably lends support to the proposition that New York, long ago, embraced the "discharge for value" rule.'" Op. 45 (quoting *Banque Worms*, 77 N.Y.2d at 368). The Court stated that this "is hardly a wholesale adoption of *Carlisle*." *Id.* In the Second Circuit, Citibank anticipates arguing that *Banque Worms* did not need to "adopt" *Carlisle*; that decision already was a long-established New York precedent, and it remains good law today. The reason *Banque Worms* did not place more focus on *Carlisle* was that the "present entitlement" question was not before that court. The contractual maturity in *Banque Worms* was on the payment date, and the lender had expressly demanded payment on that date; thus, the money was "due" in every conceivable sense. *Banque Worms v. Bank Am. Int'l*, 726 F. Supp. 940, 940 (S.D.N.Y. 1989).

Even apart from *Carlisle*, *Banque Worms* itself strongly suggests that a present entitlement is required. This Court pointed to language in *Banque Worms* and the Restatement suggesting that the discharge-for-value defense "may be available to '[a] creditor of another or one having a lien on another's property'—without further qualification." Op. 44 (quoting *Banque Worms*, 77 N.Y.2d at 367). But the Court did not address other language from *Banque Worms* clarifying that the discharge-for-value defense requires "a beneficiary [to] receive[] *money to which it is entitled*." 77 N.Y.2d at 373 (emphasis added). That language makes the same point as the language from *Carlisle*, and it is consistent with the purpose behind the discharge-for-value defense. When a

creditor receives money to pay a debt that is immediately due, it can safely assume the money was not sent by mistake, unless other circumstances place it on notice of the mistake. By contrast, when a creditor receives payment for a debt that is not due, it cannot simply assume, without more, that the money was an off-schedule repayment of the entire loan. Instead, it is similarly situated to a party that is not owed money at all—a situation where everyone agrees the discharge-for-value defense plays no role.

As a court in this District confirmed, "[t]he discharge for value rule contemplates that at the time of the erroneous transfer the transferee/beneficiary have some present entitlement to the funds." *A.I. Trade Fin., Inc. v. Petra Bank*, 1997 WL 291841, at *4 (S.D.N.Y. June 2, 1997). This Court distinguished *A.I. Trade* on the ground that the plaintiff there "merely had an order of attachment" that would "not ripen until the plaintiff obtained a judgment in its favor," whereas the defendants here were *bona fide* creditors of Revlon. Op. 45-46 (quotation marks omitted and alterations incorporated). In the Second Circuit, Citibank plans to argue that the rules should be no different for an uncertain entitlement and a future entitlement; either way, there is no "present entitlement to the funds." Indeed, because of Revlon's financial difficulties, the defendants' ability to be repaid in full was no more certain than the *A.I. Trade* plaintiff's ability. The Second Circuit likely will agree.

### B. The Second Circuit Likely Will Hold That The Defendants Were On Notice Of The Mistake At All Relevant Times

Citibank has argued that the defendants were on inquiry notice at the time of the mistake, and that a reasonable inquiry would have led them straight to the mistake. Although this Court rejected that argument, it is likely that the Second Circuit will not. This is primarily a question of law, because it turns on the question of what notice is required under *Banque Worms*.

This Court correctly held that a defendant may not rely on the discharge-for-value defense if it had constructive notice of the mistake; actual notice is not required. Op. 63. Therefore, the issue becomes what "kind of constructive notice prevents an assertion of the discharge-for-value defense." *Id.* at 54 (emphasis omitted). The Court declined to decide whether constructive notice requires that the defendants *should* have known that Citibank had made a mistake, or also covers situations in which the set of facts available to them would "make it prudent to conduct further *inquiry* that would reveal the mistake." *Id.* at 63-64 (emphasis added). The Court instead concluded that the "[d]efendants did not have constructive notice of Citibank's mistake under either standard." *Id.* at 64.

The relevant question is whether an objectively reasonable person's ordinary inquiry would have led to his or her discovery of the mistake. RESTATEMENT (THIRD) OF RESTITUTION § 69(3)(c) (Am. Law Inst. 2011). The evidence shows that it would have: The defendants testified that, if they had not received the recall notices from Citibank, their own internal policies would have required them to obtain a prepayment notice and, if none existed, to contact Citibank. *See, e.g.*, Ex. B (Trial Tr.) at 354:1-355:12. Indeed, at least one defendant (HPS) had already emailed Citibank on the morning of August 12 asking for a prepayment notice. Ex. C (PX 1207) at 5386. The Court disparaged the search for a non-existent prepayment notice as "mere bookkeeping" (Op. 80 n.36), misreading a portion of *Banque Worms* that addressed whether the wire transfer was final under the payment system rules (726 F. Supp. at 942) as a holding that an inquiry is irrelevant to notice if it is motivated by bookkeeping discrepancies.

The Court also appears to have concluded that the "inquiry" that some of the defendants conducted on the morning of August 12 was complete before the recall notice arrived. Yet the record is clear that none of the defendants had resolved their doubts about the payment, let alone

proceeded with the ordinary-course booking of the payment, by that time. Trial Tr. 332:25-335:6, 627:22-628:16, 748:11-749:9, 996:9-997:20. Instead, they had escalated the matter to their front offices and begun to consult with legal counsel. Trial Tr. 373:18-374:3, 707:13-708:11, 747:10-748:3, 749:10-13, 1081:9-24. At least, that is what happened at four of the defendants. The other six, which the Court did not mention, conducted no inquiry at all; they were unaware that the wire transfers had even occurred until after they received written notification of the mistake.[2] And at least one defendant made the conscious decision not to call Citibank, precisely because it was afraid that Citibank would confirm that the August 11 transfers were mistaken. Ex. D (Abrams Dep. Tr.) at 22:19-23:10, 29:7-30:2.

Citibank respectfully disagrees with the Court's conclusion that a reasonable inquiry would not necessarily have involved "contacting the bank [or Revlon] to confirm whether the payments were intentional." Op. 78. The Court correctly noted, relying on Citibank's expert, that a reasonable inquiry may take different forms depending on the circumstances. *Id.* But at minimum, it must include resolving the very discrepancy that gave rise to the need for inquiry. As a general matter, the obvious, common-sense thing to do when taken by surprise by a payment from Citibank, on behalf of Revlon, would be to ask either Citibank or Revlon about the payment. That is particularly true where, as here, Citibank's calculation statements indicated that it would be paying only interest, and it had not sent a notice of prepayment of the principal. The only party that could adequately explain those circumstances was Citibank.

---

[2]    Bardin Hill, Trial Tr. 787:6-788:4; Greywolf, Trial Tr. 811:1-24; Medalist, Trial Tr. 838:23-839:21; New Gen, Trial Tr. 867:11-25; Tall Tree, Trial Tr. 1138:10-13; ZAIS, Trial Tr. 947:15-20.

**C.      The Second Circuit Likely Will Hold That A Separate Act Of Discharge Is Required Beyond Receipt Of The Payment**

Citibank has argued that the defendants were required to actively "discharge" the debt, not simply receive the payment, for the discharge-for-value defense to apply. Citibank explained that the defendants never discharged the Revlon debt: They ultimately chose not to apply the funds to credit Revlon's account, and the entirety of Revlon's principal balance remained outstanding immediately after the payments. The Court held that the mere receipt of Citibank's funds is sufficient to constitute a "discharge" under New York law (Op. 46-47), disagreeing with Citibank's argument that more is required. But the Second Circuit may well see things differently.

*Banque Worms*, quoting the Restatement, stated that only "[a] creditor of another . . . who has received any benefit in discharge of the debt" may rely on the discharge-for-value defense. 77 N.Y.2d at 367 (quoting RESTATEMENT (FIRST) OF RESTITUTION § 14(1)). Similarly, in *Carlisle*, the Court of Appeals held that a creditor may rely on the discharge-for-value defense if it "credited [the proceeds] on an indebtedness due." 215 N.Y. at 415. The terms "in discharge of the debt" and "credited" suggest that the creditor must take some act independent from passively receiving the money.[3]

Applying these principles, the Sixth Circuit has held "that the discharge-for-value defense will apply unless the beneficiary receives notice of a mistake before the beneficiary of the transfer *credits the debtor's account*," and that the district court had "erred in focusing on when [the

---

[3]      The Court also suggested that Citibank's proposed rule was not "solidly rooted in the Restatement." Op. 50 n.25. But it is quoted directly from the Restatement, which explains that discharge for value is based on the underlying principle that "it would be inequitable to require restitution from the transferee [who], in the surrender of the debt or lien, [ ] has given value and acquired title to the money." RESTATEMENT (FIRST) OF RESTITUTION § 14 cmt. b. The defendants have never contended that they "surrender[ed]" any debt or lien or otherwise "given value" for the payment.

beneficiary] *received the funds*." *In re Calumet Farm, Inc.*, 398 F.3d 555, 560 (6th Cir. 2005) (first emphasis added). The Sixth Circuit explained that its approach "is consistent with one of the underlying principles of the discharge-for-value rule; namely, that the creditor has *given value* for the mistaken payment." *Id.* (emphasis added). Although the Sixth Circuit was applying Kentucky law, it did not cite any Kentucky case on the defense, and it expressly determined that its analysis was consistent with *Banque Worms*. *See id.* at 559-60. It is likely that the Second Circuit will agree with the Sixth Circuit's reading of *Banque Worms*.

This Court held that the "[d]efendants' position is compelled by the Second Circuit's decision in *Banque Worms*." Op. 47. That reasoning puts considerable weight on a single paragraph that purports only to "apply[]" the state decision to the facts, not fill in gaps in the legal rule. While the *Banque Worms* plaintiff argued that the payment was not irrevocable under the payment system rules, it did not raise the argument, adopted in *Calumet* and other cases, that the defense requires proof of discharge (or, at a minimum, awareness of the payment) by the lender. And in any event, the Second Circuit did not say anything about whether discharge was required. It simply concluded, without analysis, that the beneficiary was "entitled to retain the mistakenly transferred" funds because it "did not have notice of the transferor's error" "[a]t the time it received the mistaken payment." *Banque Worms v. BankAmerica Int'l*, 928 F.2d 538, 541 (2d Cir. 1991). Here, Citibank has contended that a separate act of discharge was required; at minimum, the defendants had to credit Revlon's account. And, to the extent the Second Circuit is concerned about resolving this important issue based solely on a rule derived by implication from *Banque Worms*, it may choose to certify the question to the New York Court of Appeals—particularly given the need for uniformity on this important issue and the fact that multiple other states follow Citibank's proposed rule. *See* Op. 49-50.

This Court also rejected Citibank's reading in part because it "would presumably mean that the relevant moment in time would vary from creditor to creditor." Op. 53. Of course, it is possible that in a multi-recipient discharge-for-value case (of which this appears to be the first), facts may differ from one defendant to another. Even if streamlining factfinding were the overriding goal in designing substantive law, it is far from clear that assessing each lender's notice at the time of that lender's discharge would be any more complex than doing so at the time of each lender's receipt of the funds. In cases like this one, moreover, applying the discharge requirement would *simplify* the facts: It is undisputed not only that no defendant took action to discharge the debt, but that the defendants consciously abandoned their normal booking processes and put the money in suspense accounts, precisely because they knew that there was uncertainty.[4] Thus, a discharge requirement would entirely obviate the need to determine whether any defendant in this case was on notice.

For all these reasons, it is likely that the Second Circuit will hold that the defendants did not "discharge" the debt "for value."

## IV.   INJUNCTIVE RELIEF WOULD SERVE THE PUBLIC INTEREST

The public interest also strongly favors an injunction. The financial industry needs clarity regarding what legal rules apply to mistaken wire transfers. The industry will only get that clarity if and when the Second Circuit issues an authoritative opinion. Until it does so, another district court may adopt this Court's approach—or not. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case."); *see also* Op. 49-50. Financial institutions face uncertain risks of great magnitude. Thus, regardless of

---

[4]   Trial Tr. 373:18-25, 442:18-21, 637:6-15, 651:18-652:10, 747:15-748:6, 793:20-794:15, 798:5-20, 819:1-820:8, 826:7-827:12, 853:12-17, 869:13-871:6, 951:23-952:6, 996:25-997:16, 1148:16-24; Ex. E (Dent Decl.) ¶ 15.

the outcome of an appeal, an injunction preserving the status quo serves the public interest by ensuring that the Second Circuit can announce a uniform interpretation on a hotly contested point of law.

The ruling in this case may gravely impact the financial industry. Every day, financial institutions exchange billions of dollars via wire transfers, facilitating the quick and efficient flow of money between these institutions and their clients. Those transfers form the foundation of the global financial system. *See generally* Dkts. 171-72. Given the ubiquity and frequency of wire transfers, errors are inevitable. As three *amici* in this case—the Bank Policy Institute, The Clearing House Association LLC, and The Clearing House Payments Company LLC—have explained, "a ruling validating the retention of the payments in this case would undermine the smooth functioning of syndicated lending." Dkt. 171 at 7-8; *see id.* at 6 (noting the "'explosion' of litigation" and "unforeseen consequences" that can follow "decisions inconsistent with the norms and practices of parties that engage in particular transactions"). The costs of insuring against a "finders, keepers" marketplace would place a significant burden on the agents that handle the transmittal of payments (*id.* at 3-4), and would "impose broad and inequitable risks" upon them (Dkt. 172 at 3). And it only increases those costs if one side can win in the district court, and then run off with the amount in dispute.

Since the Court's ruling, industry commentators have expressed great concern about the possible effects of the Court's ruling. They have explained, for instance, that it "could [] have a lasting impact on the role administrative agents play in the syndicated loan industry by exposing them to higher operational and regulatory risks." Chris Dolmetsch, Katherine Doherty, & Jennifer Surane, *Citi Loses Bid to Recoup Massive Mistake in Surprise Ruling*, Bloomberg (Feb. 16, 2021),

https://www.bloomberg.com/news/articles/2021-02-16/citigroup-loses-fight-to-get-back-millions-in-mistaken-transfer.

But right now, the industry cannot even calculate the nature of the risks it is facing. The Court's opinion has expanded the discharge-for-value defense, contrary to the custom and practice in the industry of returning mistaken payments. If a similar case involving a mistaken wire transfer arises, the district court might follow this Court's approach. Or it might take the opposite tack. That continued uncertainty undermines the financial industry's ability to plan ahead. And that uncertainty will almost assuredly be resolved if the Second Circuit can hear this case on appeal and issue an authoritative opinion.

**CONCLUSION**

The Court should enter an injunction pending appeal ordering the defendants, their officers, agents, employees, successors, and all those in active concert or participation with them to immediately refrain from removing, withdrawing, transferring, assigning, or otherwise disposing of the funds mistakenly transferred by Citibank on August 11, 2020, through final disposition of Citibank's appeal. And, at a minimum, if this Court does not grant an injunction, this Court should at least extend the existing TROs until the Second Circuit decides whether to issue its own injunction pending appeal.

Dated: March 2, 2021

*s/ Matthew D. Ingber*

MAYER BROWN LLP                                          HOGAN LOVELLS US LLP

Nicole A. Saharsky                                             Neal Kumar Katyal
Matthew D. Ingber                                            555 Thirteenth Street, N.W.
Christopher J. Houpt                                         Washington, DC 20004
Luc W. M. Mitchell                                           (202) 637-5528
1221 Avenue of the Americas
New York, New York 10020
(212) 506-2500

THE LAW OFFICES OF JOHN F. BAUGHMAN, PLLC

John F. Baughman
Andrew H. Reynard
299 Broadway, Suite 203
New York, New York 10007
(212) 548-3212

*Attorneys for Citibank, N.A.*