**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re:* | Case No. 1:20-cv-06539 (JMF) |
| *Citibank August 11, 2020 Wire Transfers* | |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S**
**<u>MOTION FOR AN INJUNCTION PENDING APPEAL</u>**

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

Robert Loigman
Benjamin Finestone
Adam M. Abensohn
Sophia Qasir
Alexandre Tschumi
Mario O. Gazzola

51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................................................1

ARGUMENT .........................................................................................................................3

I.      **Citibank Fails To Establish That It Will Sustain Irreparable Harm Without An Injunction** ..........................................................................................................4

II.     **Citibank Fails To Establish That It Is Likely To Prevail on Appeal** ..........................10

    A.   **Citibank Is Not Likely To Prevail On Its Argument That The Discharge For Value Defense Requires A "Present Entitlement" To Mistakenly Transferred Funds** ...........................................................................12

    B.   **Citibank Is Not Likely To Prevail On Its Argument That Defendants Were On Notice Of A Mistake** ...............................................................................15

    C.   **Citibank Is Not Likely To Prevail On Its Argument That The Discharge for Value Defense Requires "A Separate Act of Discharge"** .........17

III.    **Citibank Fails To Establish That An Injunction Will Not Harm Defendants** ...........19

IV.     **An Injunction Would Not Serve The Public Interest** ...................................................22

V.      **If Citibank Were Granted Relief, Notwithstanding Its Failure To Meet Its Burden, Any Injunction Should Be More Limited Than Citibank Proposes** ............24

CONCLUSION......................................................................................................................24

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>CASES</u>

*A.I. Trade Finance, Inc. v. Petra Bank*,
 No. 89-CV-7987(JFK), 1997 WL 291841 (S.D.N.Y. June 2, 1997) .............................. 14

*Agudath Israel of Am. v. Cuomo*,
 979 F.3d 177 (2d Cir. 2020) .......................................................................................... 3, 10

*Banque Worms v. BankAmerica Int'l*,
 726 F. Supp. 940 (S.D.N.Y. 1989) ............................................................................ *passim*

*Banque Worms v. BankAmerica Int'l*,
 77 N.Y.2d 362 (1991) ................................................................................................ *passim*

*Banque Worms v. BankAmerica Int'l*,
 928 F.2d 538 (2d Cir. 1991) ...................................................................................... *passim*

*Bennett v. John*,
 151 A.D.2d 711 (2d Dep't 1989) ......................................................................................... 8

*Brenntag Int'l Chems., Inc. v. Bank of India*,
 175 F.3d 245 (2d Cir. 1999) ................................................................................................ 6

*Brenntag Int'l. Chems, Inc. v. Norddeutsche Landesbank GZ*,
 9 F. Supp. 2d 331 (S.D.N.Y. 1998) .................................................................................... 6

*Carlisle v. Norris*,
 215 N.Y. 400 (1915) .......................................................................................................... 14

*Centauri Shipping Ltd. v. W. Bulk Carriers KS*,
 528 F. Supp. 2d 186 (S.D.N.Y. 2007) ........................................................................... 5, 11

*CFTC v. eFloorTrade, LLC*,
 No. 16-CV-7544(PGG), 2020 WL 2216660 (S.D.N.Y. May 7, 2020) .............................. 4

*Colli v. Wirth*,
 No. 94 CIV. 3234(LBS), 1996 WL 243237 (S.D.N.Y. May 10, 1996) ............................. 9

*Copeland v. Vance*,
 893 F.3d 101 (2d Cir. 2018) ........................................................................................ 12, 15

*CRP/Extell Parcel I, L.P. v. Cuomo*,
 394 F. App'x 779 (2d Cir. 2010) ..................................................................................... 7, 8

*Fed. Deposit Ins. Corp. v. First Horizon Asset Sec., Inc.*,
 821 F.3d 372 (2d Cir. 2016) .............................................................................................. 23

ii

*Flatiron Health, Inc. v. Carson*,
    No. 19 CIV. 8999(VM), 2020 WL 1643396 (Apr. 1, 2020)............................................. 11

*Fluor Daniel Argentina, Inc. v. ANZ Bank*,
    13 F. Supp. 2d 562 (S.D.N.Y. 1998)............................................................. 6, 8, 19

*Gen. Elec. Capital Corp. v. Cent. Bank*,
    49 F.3d 280 (7th Cir. 1994) ........................................................................... 23

*Ger-Nis Int'l, LLC v. FJB, Inc.*,
    No. 07-CV-898(RCC), 2007 WL 656851 (S.D.N.Y. Mar. 1, 2007) ................................ 8

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
    481 F.3d 60 (2d Cir. 2007)............................................................................ 4

*Gulino v. Bd. of Edu. Of City School Dist. of City of N.Y.*,
    No. 96-CV-8414 (KMW), 2019 WL 2454094 .......................................................21

*Hatch v. Fourth Nat'l Bank*
    147 N.Y. 184 (1895) .................................................................................. 15

*Hayes v. City Univ. of New York*,
    503 F. Supp. 946 (S.D.N.Y. 1980) .................................................................... 5

*In re Calumet Farm, Inc.*,
    398 F.3d 555 (6th Cir. 2005) ........................................................................ 18

*In re Currency Conversion Fee Antitrust Litig.*,
    No. 01 MDL 1409, 2010 WL 1253741 (S.D.N.Y. Mar. 5, 2010) .................................... 8

*In re Initial Pub. Offering Sec. Litig.*,
    728 F. Supp. 2d 289 (S.D.N.Y. 2010)................................................................. 8

*In re Motors Liquidation Co.*,
    539 B.R. 676 (Bankr. S.D.N.Y. 2015) ............................................................... 22

*In re Tribune Co.*,
    477 B.R. 465 (Bankr. D. Del. 2012) ................................................................. 22

*In re Twenty-Six Realty Assocs., L.P.*,
    No. 95 CV 1262, 1995 WL 170124 (E.D.N.Y. Apr. 4, 1995)........................................ 4

*John Wiley & Sons, Inc. v. Book Dog Books, LLC*,
    327 F. Supp. 3d 606 (S.D.N.Y. 2018)............................................................... 21

*JSG Trading Corp. v. Tray–Wrap. Inc.*,
    917 F.2d 75 (2d Cir. 1990)............................................................................ 4

*Local 1303-362 of Council 4 v. KGI Bridgeport Co.*,
    No. 12 Civ. 1785(AWT), 2014 WL 555355 (D. Conn. Feb. 10, 2014)........................ 5, 20

*Malarkey v. Texaco, Inc.*,
    794 F. Supp. 1248 (S.D.N.Y. 1992).................................................................... 5

*Meringolo v. Power2Ship*,
    No. 03 CIV.4476 PKL, 2003 WL 21750009 (S.D.N.Y. July 28, 2003) ........................... 7

*Miller v. Marchuska*,
    31 A.D.3d 949 (3d Dep't 2006) ...................................................................... 8

*Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*,
    577 U.S. 136 (2016) .................................................................................. 8

*Nat. Res. Def. Council, Inc. v. FDA*,
    884 F. Supp. 2d 108 (S.D.N.Y. 2012) ...................................................... 4, 19

*NBase Commc'ns, Inc. v. Am. Nat'l Bank & Trust Co. of Chi.*,
    8 F. Supp. 2d 1071 (N.D. Ill. 1998) ........................................................ 18

*New York v. U.S. Dep't of Homeland Sec.*,
    974 F.3d 210 (2d Cir. 2020) .................................................................. 10

*Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of Va.*,
    144 F. Supp. 2d 241 (S.D.N.Y. 2001) .................................................. 8, 9

*Rodriguez ex rel. Rodriguez v. DeBuono*,
    175 F.3d 227 (2d Cir. 1999) .................................................................. 19

*Sperry Int'l Trade, Inc. v. Gov't of Israel*,
    670 F.2d 8 (2d Cir. 1982) ...................................................................... 4

*Stuckey v. Nat'l Union Fire Ins. Co.*,
    No. 15 Civ. 6639(CM), 2015 WL 5547441 (S.D.N.Y. Sept. 17, 2015) ........................... 5

*Trump v. Vance*,
    481 F. Supp. 3d 161 (S.D.N.Y. 2020) .................................................... 4

*U.S. S.E.C. v. Universal Express, Inc.*,
    No. 04 Civ. 2322 GEL, 2007 WL 2245509 (S.D.N.Y. Aug. 3, 2007) ........................... 10

*UBS Fin. Servs., Inc. v. West Va. Univ. Hosps., Inc.*,
    660 F.3d 643 (2d Cir. 2011) .................................................................. 3

*Usherson v. Bandshell Artist Mgmt.*,
    No. 19-CV-6368(JMF), 2020 WL 4228754 (S.D.N.Y. July 22, 2020) ....................... 4, 19

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .................................................................................. 3

## <u>RULES AND REGULATIONS</u>

Fed. R. Civ. P. 52(a)(6) ...................................................................................... 15

Fed. R. Civ. P. 62 ...................................................................................... 1, 21

N.Y. Ct. App. R. 500.27(a) ............................................................................ 14

## <u>ADDITIONAL AUTHORITIES</u>

Justin D. Forlenza, *"Erroneous Distribution" Provisions Begin Appearing in Credit Agreements*, Covenant Review Market Alert (Mar. 5, 2021) ........................................... 23

Restatement (First) Restitution § 14 ............................................................................................12

Restatement (Third) of Restitution and Unjust Enrichment § 67 .................................................18

## PRELIMINARY STATEMENT

Throughout this case, until now, Citibank pressed for speed.  It urged the Court to proceed quickly to trial so that, if Citibank won, the present injunction would lapse, and it would no longer be deprived "of the use of funds that rightfully belong to it."  Dkt. 41 at 5.  The result at trial was not the one Citibank wanted, but the same imperative still applies—*i.e.*, the Lenders are the rightful owners of the funds, and they should be able to put their money to use without delay.  That is in keeping with federal practice generally, which disfavors injunctions pending appeal.  It is also what *Banque Worms* demands—a case in which the Second Circuit and New York Court of Appeals stressed the need for finality in financial transactions specifically so that parties who receive funds they are owed can use those funds without delay.

The Court resolved this case in a thoroughly reasoned decision, with the benefit of extensive briefing and a full trial on the merits, and there is no sound basis for any continuing restriction on the Lenders' money.  Citibank highlights the weakness in its position by relying on a rule that does not actually govern the present motion, Fed. R. Civ. P. 62(b), and asking the Court to consider the relief that *would* be available *if* this were a different case, one involving the award of "a money judgment."  Mot. at 1.  That is not this case:  Citibank sought a money judgment, and lost at trial.  A stay or a continuing injunction in the present situation, governed by Rule 62(d) (not Rule 62(b)), is the rare exception, not the rule.  And Citibank fails to meet its burden to establish any of the factors necessary for such relief.

*First*, Citibank claims it faces the threat of irreparable harm, in the absence of a stay, because Defendants "could" and "might" release funds to investors, who, in turn, "could" transfer the funds again, potentially rendering it "very difficult" for Citibank to recover those funds if it prevails on appeal.  Mot. at 1.  Citibank is heaping one layer of speculation on another.  The issue is not what "could" or "might" happen.  The issue is whether Citibank can sustain its

burden to demonstrate an imminent risk that the Lenders will become insolvent or otherwise take steps to avoid any payment the Second Circuit or this Court might direct in the unlikely event of a reversal on appeal.  Citibank does not even attempt such a showing.  There is nothing, beyond Citibank's rank speculation, to suggest that any Lender, much less all Lenders, will become unable to satisfy any judgment that might hypothetically be entered after appeal.

*Second*, Citibank takes the Court's statement that it is unclear how the Court might have ruled had it been "writing on a blank slate" to mean that Citibank's prospects are strong on appeal.  Mot. at 2 (quoting Dkt. 243 at 99).  Citibank misses the point.  The Court was not writing on a blank slate, and the Second Circuit will not be writing on one either.  The long-established discharge for value rule, set forth by the Court of Appeals and the Second Circuit in *Banque Worms*, governs this dispute and fully supports the Court's verdict.  Likewise, that it "took this Court 100 pages," Mot. at 2, to render its opinion does not mean its judgment is unsound, but only goes to show that the Court has already thoroughly considered all the same arguments Citibank repeats here.  And while Citibank says its appeal will mostly involve *de novo* legal disputes, the purported "error" it focuses on most intently—its claim that Defendants were on notice of a mistake—turns largely on the Court's factual findings and assessment of witness credibility, which the Second Circuit reviews under the deferential clear error standard.

*Third*, Citibank tells the Court its ruling threatens to disrupt "the global financial system," and that the public interest therefore "strongly favors" injunctive relief.  Mot. 2.  That is the same argument, with the same parade of horribles, that the defendants in *Banque Worms* pressed before the Court of Appeals more than thirty years ago.  As this Court observed, the sky has not fallen—syndicated lending has grown exponentially since *Banque Worms* was decided, and mistakes like the one here are exceedingly rare.  In a sense, though, Citibank is right when it says

the Court's ruling will have an "enormous impact." *Id*. Banks have already reacted to the
verdict by reforming their wire transfer practices, and their credit agreements, to avoid similar
mistakes and disputes in the future. Thus, *Banque Worms* continues to have its intended effect,
and, far from damaging the public interest, this Court's ruling has advanced the very interests the
Court of Appeals identified decades ago.

In the end, Citibank seeks a stay, not because it can satisfy the criteria for obtaining one,
but because it is aggrieved that the Lenders received a "lottery-like windfall." Mot. at 1. They
did not. The Lenders received *exactly what they were owed*—a point never in dispute—which is
among the reasons the discharge for value defense applies. As rightful owners, the Lenders are
entitled to use their money as they see fit. Citibank's motion should be denied.[1]

## ARGUMENT

"[A]n injunction is 'an extraordinary remedy never awarded as of right.'" *Agudath Israel
of Am. v. Cuomo*, 979 F.3d 177, 179-80 (2d Cir. 2020) (quoting *Winter v. Nat. Res. Def. Council,
Inc.*, 555 U.S. 7, 24 (2008)); *see also UBS Fin. Servs., Inc. v. West Va. Univ. Hosps., Inc.*, 660
F.3d 643, 648 (2d Cir. 2011) (same). And to obtain such relief pending appeal, "more is
required" than before trial. *Agudath*, 979 F.3d at 180. Citibank bears a "heavy burden" to
establish that a balance of the following factors favors such relief:

> (1) whether the stay applicant has made a strong showing that he is likely
> to prevail on the merits; (2) whether the applicant will be irreparably
> injured absent a stay; (3) whether issuance of the stay will substantially
> injure the other parties interested in the proceeding; and (4) where the
> public interest lies.

---

[1] Citibank requests that, in the event its motion is denied, the Court leave the TRO in place long
enough for Citibank to seek an injunction in the Second Circuit. Mot. at 2. Defendants do not
oppose that request, provided that Citibank promptly seeks such relief, *i.e.*, within seven days of
any order on the present motion.

*Nat. Res. Def. Council, Inc. v. FDA*, 884 F. Supp. 2d 108, 122 (S.D.N.Y. 2012); *see also CFTC v. eFloorTrade, LLC,* No. 16-CV-7544 (PGG), 2020 WL 2216660, at *2 (S.D.N.Y. May 7, 2020) (movant bears "'the heavy burden' of demonstrating that a stay is warranted") (internal citation omitted).  "The first two factors—the likelihood of success and irreparable harm—'"are the most critical.'"  *Usherson v. Bandshell Artist Mgmt.*, No. 19-CV-6368 (JMF), 2020 WL 4228754, at *1 (S.D.N.Y. July 22, 2020) (quoting *NRDC v. FDA*, 884 F. Supp. 2d at 122 (holding that probability of success and irreparable harm are "the predominant factors")).  "[T]he applicant must demonstrate that both factors are satisfied . . . .'"  *Id.*

 As set forth below, Citibank fails to meet its burden to establish either of the two factors necessary for relief, or any of the relevant factors at all, and its motion should be denied.

## I. Citibank Fails To Establish That It Will Sustain Irreparable Harm Without An Injunction

 Citibank cannot prevail on its motion without establishing irreparable harm—such a showing is necessary but not by itself sufficient for relief.  *See In re Twenty-Six Realty Assocs., L.P.*, No. 95 CV 1262, 1995 WL 170124, at *15 (E.D.N.Y. Apr. 4, 1995) ("A showing of irreparable harm alone is insufficient . . . ."); *Trump v. Vance,* 481 F. Supp. 3d 161, 166 (S.D.N.Y. 2020) (holding that where movant fails to demonstrate irreparable harm, "the Court need not address the remaining factors governing entitlement to injunctive relief").  To make the required showing, Citibank must demonstrate that it will suffer an injury that is "neither remote nor speculative, but actual and imminent," *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007), and one "for which an award of money cannot compensate," *Sperry Int'l Trade, Inc. v. Gov't of Israel*, 670 F.2d 8, 12 (2d Cir. 1982).  In other words, Citibank "is required to establish not a mere *possibility* of irreparable harm, but that it is '*likely* to suffer irreparable harm if equitable relief is denied.'"  *JSG Trading Corp. v. Tray–Wrap. Inc.,* 917 F.2d

75, 79 (2d Cir. 1990) (emphasis in original).  Moreover, "[a]s the Second Circuit has said,

monetary loss is the quintessential form of reparable injury."  *Stuckey v. Nat'l Union Fire Ins.*

*Co.*, No. 15 Civ. 6639(CM), 2015 WL 5547441, at *8 (S.D.N.Y. Sept. 17, 2015) (citing *JSG*

*Trading Corp.*, 917 F.2d at 79).  Thus, to show irreparable harm in a case involving a claim for

monetary relief, it is necessary to show an imminent risk that the defendant would avoid

payment, such as through insolvency or an intent to frustrate a judgment by depleting funds.  *See*

*Local 1303-362 of Council 4 v. KGI Bridgeport Co.*, No. 3:12CV1785 (AWT), 2014 WL

555355, at *2 (D. Conn. Feb. 10, 2014); *Centauri Shipping Ltd. v. W. Bulk Carriers KS*, 528 F.

Supp. 2d 186, 194. (S.D.N.Y. 2007) (holding that a plaintiff must "establish [defendants']

imminent insolvency so as to establish a risk of irreparable injury.").

 Citibank has not come close to making its required showing, or even attempted to.  It

argues that, absent an injunction, the Lenders would "be able" to disperse the funds to investors;

that, if the Lenders were to make such hypothetical disbursements, the investors "may" then

transfer the funds again; and that, if this second round of hypothetical transfers were to occur, it

"may" not be possible for Citibank to recover the funds.[2]  Mot. at 4.  To describe Citibank's

argument is to see why it fails:  Far from establishing the kind of "imminent" or "likely" harm

---

[2]  Citibank argues the Court recognized "that reality" when it granted the TRO, and that
"nothing has changed since."  Mot. at 4.  Of course, one very significant thing has changed—
Defendants prevailed at trial and the Court determined the Lenders are the rightful owners of the
funds.  Moreover, when the Court granted the TRO, it did not focus on irreparable injury, but on
the fact that the discharge for value rule is "an affirmative defense" and there was "no evidence"
yet submitted to show that the defense applied—which is no longer the case.  Aug. 19 Hr'g Tr.
3:18-4:16.  Citibank's "nothing has changed" assertion also ignores that the "requirement of
irreparable harm is 'applied more stringently after trial, on motions for stays pending appeal . . . .
After judgment is entered, the propriety of the injury . . . has been judicially determined, and its
imposition without further delay is surely more acceptable than prior to judgment."  *Malarkey v.
Texaco, Inc.* 794 F. Supp. 1248, 1250 (S.D.N.Y. 1992) (quoting *Hayes v. City Univ. of New
York*, 503 F. Supp. 946, 964 (S.D.N.Y. 1980), *aff'd*, 648 F.2d 110 (2d Cir. 1981)).

necessary for an injunction, Citibank is engaging in exactly the kind of "speculation" insufficient to warrant such relief.  *See Fluor Daniel Argentina, Inc. v. ANZ Bank*, 13 F. Supp. 2d 562, 564 (S.D.N.Y. 1998) (denying injunction where movant "offer[ed] little more than speculation and surmise in support of its claim of inordinate financial risk").  Citibank's own cited authority makes clear injunctive relief is available only where there is a "substantial chance" the movant would not be able to recover on a judgment, and Citibank does not offer any facts to support such a finding here.  Mot. at 5 (citing *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999)).[3]

Citibank presents no evidence to satisfy its burden to prove that any Lender is at risk of insolvency or otherwise depleting its accounts.  All available evidence is to the contrary.  While Citibank seeks to portray the Lenders as shadowy operations, given to secreting funds through a "byzantine" network of investors, Mot. at 4, the reality is much different.  Several of the Lenders, for instance, are large civil servant pension funds with billions of dollars in holdings.[4] Likewise, Citibank itself produced documents demonstrating that the CLOs managed by

---

[3]  In *Brenntag*, the plaintiff moved for a preliminary injunction to enjoin payment under a letter of credit it issued for a shipment of goods to Petro Pharma, an entity "in receivership."  *Brenntag Int'l. Chems, Inc. v. Norddeutsche Landesbank GZ*, 9 F. Supp. 2d 331, 332 (S.D.N.Y. 1998). The Court granted that relief specifically because Brenntag had demonstrated Petro Pharmas' insolvency, and the general rule against injunctions in cases for money damages therefore gave way to the "insolvency exception."  *Brenntag*, 175 F.3d at 249.  Citibank has not made any showing that that exception applies here.

[4]  For example, Brigade manages Separately Managed Accounts for several such entities, each recently reporting holdings exceeding $45 billion.  *See, e.g.*, (https://www1.nyc.gov/html/ nycppf/downloads/ pdf/cafr2020.pdf) at 5; (https://www.trsnyc.org/memberportal/WebContent/ publications/ financialReports/cafr) at 28; (https://www.lacera.com/investments/Annual_Report/ cafr/cafr.pdf) at 5.  None of those pension funds held more than $10 million in the Revlon Term Loan.  *See* DX-0776.  Citibank provides no evidence that any of these Lenders (or any others) are at risk of insolvency, or likely to reduce their assets to levels that would render them incapable of returning the amounts they were paid by Citibank on August 11 if they were required to do so.

Defendants have large holdings, well in excess of the amounts Citibank transferred to the Lenders on August 11, 2020.[5]  Citibank offers no evidence that any of these Lenders would reduce their holdings to levels incapable of satisfying any payment obligation that might theoretically be imposed following an appeal.  At bottom, then, Citibank is relying on broad brush assertions about what a hypothetical lender could theoretically do, without demonstrating any concrete concerns that could justify restricting the rights of any specific Lender or Defendant in this case, much less all of them.  *See Meringolo v. Power2Ship*, No. 03 CIV. 4476 PKL, 2003 WL 21750009, *5 (S.D.N.Y. July 28, 2003) (denying injunctive relief where plaintiff failed to show any risk of insolvency as to one defendant, and showed only a possibility of insolvency as to the other).

Citibank's speculation that it would need to track down funds in "innumerable destinations and jurisdictions around the world," even if correct, would not justify an injunction. Mot. at 7.  In *CRP/Extell Parcel I, L.P. v. Cuomo*, 394 F. App'x 779 (2d Cir. 2010), the Second Circuit affirmed the denial of injunctive relief where the plaintiff argued that: (1) it would be "'unquantifiably difficult' to recover the [funds] at a later date, since a significant number of enforcement actions would be required to obtain and enforce judgments against the recipients"; and (2) the recipients of the funds might "'spend' whatever payments they receive, and could subsequently become insolvent." *Id.* at 781.  The Second Circuit rejected those arguments, essentially the same arguments Citibank makes here, explaining that the Court has never "held

---

[5]   For example, AIMCO CLO 2015-A, managed by Allstate, held only $994,711.38 in principal in the Revlon Term Loan, Dkt. 144-1, but as of September 2, 2020, held assets worth $480,314,588.45, (PX-0944 at Citi00031301).  Battalion CLO VII LLC, managed by Brigade, held $4,674,202.06 in principal in the Revlon Term Loan, Dkt. 144-1, but as of September 2, 2020, held assets worth $391,556,799.02, (PX-0978 at Citi00035413).  ZAIS CLO 11, Limited, managed by ZAIS, held $989,717.23 in principal in the Revlon Term Loan, Dkt. 144-1, but as of September 10, 2020, held assets worth $380,098,450.00, (PX-1009 at Citi00038972).

that the fact that recovery would involve a multiplicity of actions is sufficient—standing alone—

to make otherwise compensable harm irreparable." *Id.* A finding of irreparable harm requires

additional evidence of either "recurrent invasions of the movant's rights," or "a party on the

brink of insolvency." *Id.* Citibank has not made any such showing.[6] *See also Fluor Daniel*

*Argentina*, 13 F. Supp. 2d at 565 (denying motion for preliminary injunction where plaintiff

argued that enforcement of a money judgment against a defendant with no assets in the United

States would be difficult, because "these complexities do not rise to the extraordinary level

sufficient to warrant a finding of irreparable harm").

Citibank relies on *Quantum Corp. Funding, Ltd. v. Assist You Home Health Care*

*Services of Virginia*, 144 F. Supp. 2d 241 (S.D.N.Y. 2001), calling it "particularly instructive."

Mot. at 6. It is, but only because it makes clear the type of showing that is required, and that

Citibank fails to make. In *Quantum*, the court granted injunctive relief because the movant

"satisfied its burden," based on extensive witness testimony, that the defendant companies were

either insolvent or likely to be shut down to avoid judgment. *Id.* at 248 (finding "irreparable

---

[6]  Citibank relies on two inapposite cases involving claims under statutes creating rights in specific funds. *See Ger-Nis Int'l, LLC v. FJB, Inc.*, No. 07-CV-898 (RCC), 2007 WL 656851, at *2 (S.D.N.Y. Mar. 1, 2007) (defendant had "insufficient funds to pay the debt," and plaintiff asserted rights pursuant to a statutory trust established by the Perishable Agricultural Commodities Act); *Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*, 577 U.S. 136 (2016) (plaintiff asserted an equitable lien under ERISA). Citibank cannot assert a comparable equitable lien here because money is fungible and hence money damages would be sufficient to satisfy its claims. *See Miller v. Marchuska*, 31 A.D.3d 949, 951 (3d Dep't 2006) ("Courts should not permit a party to assert an equitable lien in a case which is essentially one for money owed, as the party has an adequate remedy at law to collect the debt.") (internal citations omitted); *Bennett v. John*, 151 A.D.2d 711 (2d Dep't 1989) (dismissing claim for equitable lien where "plaintiff  ha[d] an adequate remedy at law, to wit, monetary damages"). Citibank's citations to *In re Currency Conversion Fee Antitrust Litigation*, No. 01 MDL 1409, 2010 WL 1253741 (S.D.N.Y. Mar. 5, 2010) and *In re Initial Public Offering Securities Litigation*, 728 F. Supp. 2d 289 (S.D.N.Y. 2010) are also inapposite. Neither case involves injunctive relief, but involved a demand that objectors to a class settlement post a bond due to the risk of non-payment of costs on appeal.

harm in the form of an actual and imminent threat that [defendant] companies, wrought with accounting and payroll problems, will either cease to exist by [the CEO's] actions of shutting them down, as he has previously done with Assist you, Inc., or go under of their own accord for failure to pay operating expenses and payroll taxes, thereby making a judgment in Quantum's favor uncollectible."). The court relied on "evidence establish[ing] a continuing pattern of bad-faith by [the CEO] in evading creditor claims and simply winding-up companies at the first hint of financial trouble." *Id.* at 249. Again, there is no evidence even remotely like that here.[7]

Even if Citibank were right that it would not be able to recover funds from the Lenders or Defendants, it would still be unable to show irreparable harm since, *according to its own SEC filings*, it would have a claim to those amounts against Revlon. Abensohn Decl., Ex. A (Citigroup Inc., Annual Report (Form 10-K), at 116 ("As a result of the court's decision, Citi now has rights as a creditor related to the Revlon loan.")); *see, e.g.*, *Colli v. Wirth*, No. 94 CIV. 3234 (LBS), 1996 WL 243237, at *9 (S.D.N.Y. May 10, 1996) ("[I]t is to [the debtor], not the [creditor], that [the transferor] must look for restitution, for it is [the debtor], not [the creditor], who has been unjustly enriched at [the transferor's] expense."). The fact Citibank itself asserts that it would have an alternative source for recovering the amounts it transferred on August 11 forecloses its claim that it would sustain irreparable injury without a continuing injunction here.

---

[7]  Citibank tries to show that the Lenders are likely to empty their accounts by citing to provisions providing for nine CLOs (out of more than 100 total Lenders) to pay principal proceeds quarterly. *See* Mot. at 6 n.1. This is highly misleading. As an initial matter, there is nothing nefarious about dividends: Citibank provides no evidence that these CLOs, many with hundreds of millions of dollars in holdings, would be rendered insolvent as a result of such standard distributions, as would be required to justify an injunction. Moreover, these principal distributions, which are not evidence of imminent insolvency in any event, do not even occur until the CLO is past its Reinvestment Period, s*ee, e.g.*, PX-0026 at 149, which is true of only a minority of CLOs in this case, *see, e.g.*, *id.* at 47 (Reinvestment Period lasts until January 2024).

Finally, even aside from its other difficulties, Citibank's argument rests on the false premise that Defendants presently have "control over the money," and that an injunction would therefore serve to preserve that control and ensure that Defendants would be in a position to return the funds in the event Citibank prevails on appeal.  *See* Mot. at 6.  Defendants do not control the funds, as they have made clear throughout this litigation.  *See, e.g.*, Dkt. 85 (Sept. 22, 2020 Letter from R. Loigman), at 1 ("Defendants also made clear, however, that they cannot underwrite the lenders' ultimate compliance with Court orders."); Dkt. 142 (Defendants' Proposed Findings of Fact and Conclusions of Law), at ¶ 159 ("Defendants are *agents* of and *servants* of the funds, not their principals, and therefore, as a matter of law, do not control the Term Lenders.") (emphasis in the original).  Citibank transferred the funds to the Lenders' accounts, not to Defendants, and it is the Lenders who continue to hold and control the funds.  Thus, even if Citibank had a sound basis for its speculation that the Lenders cannot be counted on to preserve and make the funds available in the event of a reversal on appeal, that concern would exist regardless of any injunction against Defendants, which is entirely a function of Citibank's own decision to sue entities that did not actually receive the funds from the August 11 Transfer.

In sum, Citibank's claim of irreparable injury is entirely speculative, and cannot support injunctive relief.

## II.     Citibank Fails To Establish That It Is Likely To Prevail on Appeal

Citibank cannot prevail on its motion without "'a strong showing that [it] is likely to succeed on the merits.'"  *Agudath Israel of Am.*, 979 F.3d at 180 (quoting *New York v. U.S. Dep't of Homeland Sec.*, 974 F.3d 210, 214 (2d Cir. 2020); *see also U.S. S.E.C. v. Universal Express, Inc.*, No. 04 Civ. 2322 GEL, 2007 WL 2245509, at *2 (S.D.N.Y. Aug. 3, 2007) ("[E]ven where an applicant has demonstrated an irreparable injury, for instance, a stay will be

denied in the absence of a strong showing of likely success on the merits."). A "possibility of success on appeal," even if "not insignificant," is not enough. *Centauri*, 528 F. Supp. 2d at 196.

Citibank never acknowledges this rigorous standard, but insists this is "precisely" the situation in which a stay is warranted because this is "not a 'mine run' case" in which one party "disagrees with the application of settled law to the facts." Mot. at 9. That is exactly what this case is. The issues here are not "indisputably . . . novel." *Id*. Rather, as this Court recognized, Citibank's arguments, one after another, are foreclosed by the long-settled precedent of *Banque Worms*. Dkt. 243 (Entered Findings of Fact and Conclusions of Law (*hereinafter* "Findings of Fact")) at 96 ("Once again, the answer to this argument is *Banque Worms*."). As such, this is the type of case where a stay is unwarranted. *See Flatiron Health, Inc. v. Carson*, No. 19 CIV. 8999 (VM), 2020 WL 1643396, at *5 (Apr. 1, 2020) ("Relevant considerations include the extent to which the decision is supported by precedent.").[8]

As detailed below, this Court has already thoroughly considered, and correctly rejected, each of the three issues Citibank plans to press on appeal. Two of those issues—whether the discharge for value rule requires that a debt be due (rather than owed) and whether it requires a "separate act of discharge"—are answered directly by *Banque Worms*. And the remaining issue, whether the Lenders were on notice of a mistake, is a question this Court resolved based largely on its assessment of witness credibility at trial. Findings of Fact at 66 (finding testimony of the

---

[8]   Citibank misleadingly suggests that the Court found that Citibank satisfied the *prima facie* elements of its claims, such that "the funds must be returned unless some exception to the general rule, such as the discharge-for-value defense, applies." Mot. at 9. In fact, the Court stopped short of deciding whether Citibank made out its claims, and pointedly observed that Defendants' argument, that Citibank failed to establish requisite control over the funds, is "not without force." Findings of Fact at 35. Thus, even in the unlikely event Citibank were to prevail on appeal, it would remain highly uncertain whether Citibank would be entitled to any recovery, which is added reason a stay is unwarranted.

defense witnesses "strikingly consistent" and "both credible and persuasive"). The Second Circuit is highly unlikely to reject that assessment on appeal. *Copeland v. Vance*, 893 F.3d 101, 110 (2d Cir. 2018) ("Under the clear error standard, factual findings by the district court will not be upset unless we are left with the definite and firm conviction that a mistake has been committed.") (internal citations and quotations omitted).

### A. Citibank Is Not Likely To Prevail On Its Argument That The Discharge For Value Defense Requires A "Present Entitlement" To Mistakenly Transferred Funds

Citibank argues the discharge for value rule does not apply where a lender receives funds it is owed, unless those funds are also "due." Mot. at 10. This Court has already identified multiple independent grounds for rejecting such a requirement. Findings of Fact at 43-46.

*First*, the Restatement provision setting out the discharge for value defense, which the Court of Appeals adopted in *Banque Worms*, says expressly that the defense is available to "a creditor of another"—language that does not impose any requirement that the debt be due.[9] *Id.* at 44 (quoting Restatement (First) of Restitution § 14(1)). *Second*, the Second Circuit explained its holding in *Banque Worms* on the specific basis that Banque Worms was "Spedley's *bona fide* creditor"—without any suggestion that the due date on the loan was relevant to its analysis. *Id.* (quoting *Banque Worms*, 928 F.2d 538, 541 (2d Cir. 1991)). *Third*, as this Court observed, there are no cases imposing a requirement that a loan be presently due as a condition for discharge, whereas there is precedent in which a lender received funds not then due and the defense applied.

---

[9]  The Restatement also says the discharge defense is available to "one having a lien on another's property," Restatement (First) Restitution § 14(1), which is a condition that applies before a debt comes due. And it is undisputed that the Lenders had a lien on certain collateral posted by Revlon under the 2016 Credit Agreement governing the Term Loans. DX-0047 at Citi00002468. It is also telling that the commentary to Section 14 talks again in terms of "a debt owed another," Restatement (First) Restitution § 14 [cmt. b], and does not include any illustrations suggesting a requirement that a debt be due in order for the provision to apply.

*Id.* at 45 (citing cases).  In the face of all these considerations, it is not "likely that the Second Circuit will reach a different conclusion than this Court."  Mot. at 10.

Citibank also argues unconvincingly that its proposed standard is consistent with "the purpose behind the discharge for value defense."  *Id.* at 11.  Citibank reasons that a lender who receives funds early would have no reason to "assume" an "off-schedule repayment," *id.* at 12, and that the law therefore need not allow for the possibility that such a lender could reasonably believe that such a transfer was intended.  But Citibank is of course wrong when it claims that a creditor who receives payment before its loan is due can no more assume that the transfer was intentional than "a person that is not owed money at all."  Mot. at 12.  As the Court heard from numerous witnesses, including Citibank's witnesses, it is common—indeed standard—for loans to be paid prior to maturity.  Tr. 354:10-15 (Farrell agreeing that it "not uncommon for borrowers to prepay loans"), 569:2-7 (Perkal testifying that "[t]he vast majority [of loans] get prepaid in every instance that is well prior to maturity"); 719:14-23 (Crocombe testifying that "the vast majority" of syndicated loans, "when paid down, are done so on a prepayment basis and not at their maturity."); 875:6-12 (Dent testifying that "[c]ompanies pay their debt early all the time for a variety of reasons").  Thus, it is reasonable for a lender, upon receipt of the amount outstanding on a loan, to believe it has received early payment on that loan, and the primary purpose served by the discharge for value defense—to ensure that fund transfers can be treated as final if they appear valid, *Banque Worms*, 77 N.Y.2d at 368—is fully served regardless of when a creditor receives money it is owed.

The one case Citibank cites as support for its position that the discharge for value defense applies only where a debt is currently due is the 105-year old decision in *Carlisle v. Norris*, 215 N.Y. 400 (1915), which Citibank characterizes as "long established New York precedent" that

"remains good law today." Mot. at 10-11.[10]  Citibank is placing far more weight on *Carlisle* than

its parenthetical mention in *Banque Worms* can possibly bear.  As an initial matter, Citibank is

relying on a single line of the century-old decision, which does not actually say that the

discharge defense applies "only if," Mot. at 10, a debt is due, while ignoring that the court

focuses elsewhere merely on the fact that the disputed payment had been made on an

"indebtedness."  *Carlisle*, 215 N.Y. at 414-25.  Further, if *Carlisle* set forth the clear and

dispositive governing standard in New York, as Citibank would have it, there would have been

no need for the Second Circuit to certify any question to the Court of Appeals.  N.Y. Ct. App. R.

500.27(a) (authorizing certified questions "for which no controlling precedent of the Court of

Appeals exists").  And for its part, the New York Court of Appeals did not cite *Carlisle* as the

modern governing standard, but as an example of one of two "divergent" lines of historical

authority.  *Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 368 (1991).  The Court went on

to explain it was adopting the standard set forth in the Restatement, which, as this Court

recognized, Findings of Fact at 44-45, applies the discharge for value defense on behalf of

"creditor[s]"—the status the Lenders had here.  *Banque Worms*, 77 N.Y.2d at 376.

  In sum, the discharge for value defense is available where a debt is owed, just as *Banque*

*Worms* and the Restatement provide, and there is no substantial issue for appeal.

---

[10]  Citibank acknowledges this Court accurately distinguished *A.I. Trade Finance, Inc. v. Petra Bank*, No. 89-CV-7987 (JFK), 1997 WL 291841 (S.D.N.Y. June 2, 1997), on the basis that the plaintiff in that case was not a creditor at all, but merely the holder of an order of attachment. Mot. at 12.  Thus, Citibank recognizes that the holding in *A.I.* does not cover the present situation, which reduces Citibank to offering weakly that it "plans to argue that the rules should be no different for an uncertain entitlement and a future entitlement."  *Id*.

### B.     Citibank Is Not Likely To Prevail On Its Argument That Defendants Were On Notice Of A Mistake

Citibank argues that the Second Circuit will likely conclude Defendants were on notice of Citibank's mistake.  Mot. at 12-14.  Surely recognizing that this Court's factual findings will be given deference on appeal, *Copeland*, 893 F.3d at 110, Citibank tries to characterize this issue as "primarily a question of law," Mot. at 12.  Plainly it is not.  As Citibank recounts, the Court held in Citibank's favor on the legal question of whether actual or constructive notice applies; and, rather than decide which "kind of constructive notice" applies, the Court held there was no notice under any potentially applicable legal standard, including Citibank's preferred "inquiry notice" standard.[11] *Id*.  Thus, Citibank is not appealing this Court's legal determination of the applicable notice standard.  Rather, Citibank is challenging the Court's conclusion that, even under the standard most favorable to Citibank, Defendants had no notice of a mistake.  That is a conclusion the Court reached based largely on its factual findings at trial, which will be reviewed under the deferential clear error standard.  Fed. R. Civ. P. 52(a)(6).

The Court was clear on this point, stating explicitly that its holding was based "in no small part on its assessment of the witnesses' demeanor at trial," Findings of Fact at 66, a matter uniquely within a trial court's discretion.  The Court's findings had ample support in the record:

- Each Lender received the exact principal and accrued interest outstanding on their loans, (*see, e.g.*, Dkt. 144-1 (Stipulation) ¶ 16);

---

[11]   While the Court did not need to reach the issue, Defendants believe the correct standard is whether Defendants "should have known" at the time of the transfer that there was a mistake, not whether they were on "inquiry notice."  As between those two forms of notice, a "should have known" standard is the only one consistent with the repeated emphasis in *Banque Worms* on the "singularly important policy" favoring finality in business transactions, which would be undercut if the recipients of transfers needed to perform an inquiry before treating funds as their own.  77 N.Y.2d at 372 ("[T]o permit in every case of the payment of a debt an inquiry as to the source from which the debtor derived the money, and a recovery if shown to have been dishonestly acquired, would disorganize all business operations and entail an amount of risk and uncertainty which no enterprise could bear . . . .") (quoting *Hatch v. Fourth Nat'l Bank,* 147 N.Y. 184, 192 (1895)).

- It is not uncommon for loans to be prepaid, and, when they are, the administrative agent sends lenders their outstanding principal and accrued interest (*i.e.*, the same amounts the Lenders received here), (*see, e.g.*, DX-1044 ("Amended Loan Agreement") at -0105; Fratta Dep. Tr. at 91:5-17, 94:12-13, 164:15-165:9; Tichauer Dep. Tr. at 44:2-3; McCoy Decl. ¶ 27);

- The only scenario provided for in the Revlon Credit Agreement that would have accounted for an off-schedule interest payment is pre-payment of the loans, (*see* Amended Loan Agreement § 1.1, at -63; Tr. 94:14-18 (Fratta));

- The calculation statements accompanying the transfers reported that interest was "due," (*see, e.g.*, Dkt. 8-1 Zeigon Decl., Ex. A at 2-3), which would have only been accurate in the event of a pre-payment, (Perkal Decl. ¶¶ 21-22; Lenga Decl. ¶¶ 28-29; Tr. 415 (Frusciante); *see also* Amended Loan Agreement § 1.1, at -63);

- Unlike other Citibank calculation statements, the calculation statements here gave no indication that principal was not meant to be paid, (*compare* Dkt. 8-1 (Zeigon Decl., Ex. A) at 2-3 *with* PX-1629F); and,

- While notices are often missing or incomplete, Citibank had never in its history, prior to August 11, 2020, mistakenly paid lenders the exact amounts outstanding on their loans, and had never mistakenly transferred anything close to $900 million, (*see, e.g.*, Tr. 109:3-24 (Raj); Tr. 208:4-09:13 (Zeigon); *see also* Tr. 1115:4-21 (Caraher)).

The Court's conclusion from this evidence that the transfers reasonably appeared to be intentional pre-payments of the Revlon Loans, and not an historically unprecedented mistake, is unassailable, and certainly not "likely" to be reversed on appeal.[12]

Even the few exhibits Citibank cherry picks to support its motion, which would not be nearly sufficient in any event to overcome the Court's factual findings based on the other available testimony and exhibits at trial, serve mostly to highlight that it was Defendants' reasonable understanding that the transfer was a pre-payment on the Revlon loans. For example, Exhibit C to Citibank's motion, an email from a collateral manager on August 12, 2020, reports that Citibank sent the full amount of the outstanding loan, "which would indicate a full principal

---

[12]   Citibank inexplicably claims that "the record is clear that none of the defendants had resolved their doubts about the payment" as of the time Citibank sent its error notices.  Mot. at 13.  This ignores "a slew of communications evidencing a contemporaneous belief on the part of the Lenders that the payments were a full paydown of the 2016 Revlon Loan."  Findings of Fact at 71-72.  It also ignores testimony from numerous Defendants that they had firmly concluded that the payments were intentional prior to receiving any contrary notice from Citibank.  (*See, e.g.*, McCoy Decl. ¶ 4; Frusciante Decl. ¶ 4; Vaughan Decl. ¶ 4.)

repayment." Dkt. 253-3 at 1. And Exhibit D, which Citibank cites as evidence that "at least one defendant made the conscious decision not to call Citibank precisely because it was afraid" it would be advised that the transfer was a mistake, Mot. at 14, was testimony from a witness discussing his decision whether to contact Citibank *after it sent its error notices*. Dkt. 253-4 at 22:19-24. As this Court explained, it is irrelevant what Defendants thought at that later time. Findings of Fact at 46-54.

In sum, the Court had ample support, based on its factual findings at trial, for its holding that Defendants were not on notice of a mistake. That decision is unlikely to be reversed.

### C.   Citibank Is Not Likely To Prevail On Its Argument That The Discharge for Value Defense Requires "A Separate Act of Discharge"

Citibank claims this Court erred by failing to hold that Defendants needed to "actively 'discharge'" the debt in order to prevail on their defense. Mot. at 15. This is not a close call. As this Court put it, its holding was "compelled by *Banque Worms*." Findings of Fact at 47. All three courts in *Banque Worms* held that discharge occurs at the time funds are received, and not at some later time when a payment is credited to the recipient's account. *See Banque Worms v. BankAmerica Int'l*, 928 F.2d 538, 541 (2d Cir. 1991) (discharge occurred "at the time [the creditor] received the mistaken payment"); *Banque Worms*, 77 N.Y.2d at 373 (discharge occurs "when [the creditor] receives money"). The district court, in a ruling affirmed in all respects on appeal, explicitly rejected, as "mere bookkeeping," the argument that there can be no discharge until a "final settling of accounts," *Banque Worms v. BankAmerica Int'l*, 726 F.Supp. 940, 942 (S.D.N.Y. 1989), *aff'd* 928 F.2d 538, 542 (2d Cir. 1991).

Citibank argues that the Restatement, and various non-New York authorities, support a different result. They do not. The Restatement, in commentary Citibank ignores, addresses this issue directly, and rejects the very standard (and the same Sixth Circuit precedent) Citibank

advances here, citing *Banque Worms* as authority for doing so.  Restatement (Third) of

Restitution and Unjust Enrichment § 67 cmt. h (rejecting requirement in *In re Calumet Farm,*

*Inc.*, 398 F.3d 555 (6th Cir. 2005) that creditor must affirmatively "credit[] the debtor's account"

as "arbitrary, difficult to verify, and subject to manipulation").[13]  And the non-New York cases

that have adopted Citibank's preferred standard start with *NBase Commc'ns, Inc. v. Am. Nat'l*

*Bank & Trust Co. of Chi.*, 8 F.Supp. 2d 1071 (N.D. Ill. 1998), where the Court explained it was

imposing an affirmative discharge requirement because it "disagreed" with and "decline[d]" to

follow New York law, *id.* at 1076-77.  It is hardly a problem that this Court "openly disagreed

with other Circuits," as Citibank accusingly puts it, Mot. at 9, when it did so specifically because

those Circuits have rejected settled New York law.

Citibank's position is not only foreclosed by overwhelming authority, it is also

impractical for reasons this Court recognized—namely, because a standard dependent on when

and whether the recipient of a wire transfer affirmatively recorded the discharge of a debt would

entail complex factual analysis that would turn on the fortuities of when particular defendants

"book[ed]" payments.  Findings of Fact at 51-52.  Citibank insists this case would present no

such challenge, because it is undisputed that "no defendant took action to discharge the

debt."  Mot. at 17.  That isn't true.  Defendants presented dozens of exhibits at trial showing that

the trustee, administrator, or Defendants managing as many as 107 of the 126 Lenders applied

the funds.[14]  Defendants also presented evidence that Citibank itself recorded the Term Loans as

---

[13]   Among the reasons Citibank's proposed standard would make little practical sense is the fact
that, as numerous witnesses testified, creditors do not send "discharge notices" when they
receive payment on outstanding loans.  *See* Tr. 1233:10-25.

[14]   This includes all Lenders managed by Allstate, (McCoy Decl. ¶ 16 ("Our bank loans
operations team tagged the funds received by AIC and ALIC to the 2016 Term Loan's CUSIP
identifier"); DX-0621; DX-0622; DX-0623; DX-0626; DX-0404)), Bardin Hill, (Greene Decl. ¶
16), and Symphony, (Vaughan Decl. ¶ 17; DX-0954—DX-1001; DX-0577; DX-0562; DX-0552;

fully paid off in its internal Register.  Findings of Fact at 52 n.27.  In the face of this range of

evidence, it is impossible to understand Citibank's assertion that application of its proposed

standard would somehow "simplify the facts."  Mot. at 17.

      This is not a substantial issue for appeal.

## III.    Citibank Fails To Establish That An Injunction Will Not Harm Defendants

      The two factors discussed above—the likelihood of success on appeal and irreparable

harm—"are the most critical" for injunctive relief.  *Usherson*, 2020 WL 4228754, at *1.  "[T]he

applicant must demonstrate that both factors are satisfied."  *Id.* (quoting *Nat. Res. Def. Council,

Inc. v. FDA*, 884 F. Supp. 2d 108, 122 (S.D.N.Y. 2012)); *see also Rodriguez ex rel. Rodriguez v.

DeBuono*, 175 F.3d 227, 233-234 (2d Cir. 1999).  Thus, Citibank's failure to make that required

showing is dispositive, regardless of what showing it makes as to the remaining relevant factors.

*See, e.g.*, *Fluor Daniel Argentina*, 13 F. Supp. 2d at 565-66 (finding that where movants have

"utterly failed to establish a likelihood of irreparable harm," the Court "need not consider the

other prerequisites to the granting of injunctive relief, because, under any standard, the movant's

failure to show the likelihood of irreparable harm is fatal to the motion.").  In all events, the two

---

DX-0640; Tr. 988:2-89:24; 1018:3-7).  This also includes 36 of the 41 Lenders managed by
Brigade, ((DX-1005; DX-0387; DX-0574; DX-0584; DX-0593; DX-0483 at
BRIGADE_CITI_00003314; DX-1009 at BRIGADE_CITI_00010800; DX-0384 at
BRIGADE_CITI_00010910; DX-0583 at BRIGADE_CITI_00011042; DX-0639 at DX-0383 at
BRIGADE_CITI_00010830; DX-0383 at BRIGADE_CITI_00010828; DX-0135; DX-0363 at
BRIGADE_CITI_00010838; DX-0576 at BRIGADE_CITI_00010813; DX-1006 at
BRIGADE_CITI_00010869; DX-1014; DX-1121 at BRIGADE_CITI_00002375; DX-1110;
DX-1116; DX-1112; DX-1111; DX-1118; DX-1117; DX-1113; DX-1115; DX-1114; DX-1011
at BRIGADE_CITI_00010848; DX-0786 at BRIGADE_CITI_00002380; DX-1025; DX-1006 at
BRIGADE_CITI_00010869; DX-1119; DX-0776; Tr. 320:1-4; 340:14-18; 354:5-355:12; 357:2-
6; 400:14-24; 442:10-13; 462:1-12)), two of the three Lenders managed by Greywolf, (DX-0109;
DX-0114), 16 of the 18 Lenders managed by HPS, (DX-1129; PX-1199; DX-0560; DX-0504;
DX-0112), and six of the nine lenders managed by ZAIS, (DX-0594; DX-0596; DX-0613; DX-
0601; DX-0393; DX-0394).

remaining factors (harm to Defendants and the public interest) also weigh in Defendants' favor, and thus provide added reason that Citibank's motion should be denied.

Citibank claims "Defendants will not be harmed by an injunction," Mot. at 7, but this ignores Citibank's own position, at the outset of this litigation, that it was being prejudiced, as the "rightful[]" owner of the funds, "every day" it was deprived of the use of its money.  Dkt. 41 at 5.  Now that it has been held that the Lenders are the rightful owners of the funds, that prejudice is being sustained by them.  And that is a form of prejudice that weighs, at least to some extent, in Defendants' favor.  *See Local 1303-362 of Council 4 v. KGI Bridgeport Co.*, No. 12 Civ. 1785 (AWT), 2014 WL 555355, at *4 (D. Conn. Feb. 10, 2014) ("The harm caused by this lost opportunity," to invest one's own money, "appears to be slight, but it should still be factored in when the court 'balances the hardships' under this standard.").  Moreover, that harm should weigh more heavily in this context than in others.  The Court of Appeals in *Banque Worms* adopted the discharge for value defense in large part to serve the "singularly important" policy of finality in wire transfers, and to ensure that the recipients of fund transfers can make use of those funds without delay.[15]  77 N.Y.2d at 372.

Finally, Citibank's argument as to what would occur, under Rule 62(b), if this case involved a "traditional money judgment" is *non sequitur*.  Mot. at 7.  This Court has not rendered a money judgment—Citibank sought one but lost.  Thus, Citibank's application is governed by Rule 62(d), where injunctions through appeal are the exception and not the rule.  *See Gulino v.*

---

[15]  Citibank's suggestion, Mot. at 7, that Defendants' decision not to redeploy the funds in the days after Citibank sent its error notices on August 12, 2020, means they would not be harmed if the current injunction were extended falls in the category of no good deed going unpunished. Defendants made that decision because they anticipated that Citibank would initiate litigation. That prudent measure should hardly be held against Defendants, or their Lender clients, as a basis to extend a temporary restraining order from its current six month period to likely two years or more.

*Bd. of Educ. of City School Dist. of City of N.Y.*, No. 96-CV-8414 (KMW), 2019 WL 2454094, at

*1 ("Rule 62(b) applies only to stays of money judgments . . . . Where the relief provided by an

order is injunctive, Rule 62(d) governs").  Moreover, it is highly misleading for Citibank to

suggest that there would be no need for a bond since Defendants "already control the disputed

assets."  Mot. at 7.  Actually, as discussed *supra*, Defendants do not control the funds—rather,

the Lenders do.  But, in any event, bonds are meant to ensure that a party whose funds are tied up

pending appeal can be compensated, once it prevails, for the lost ability to use the funds during

the time those funds are constrained.  *See John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 327

F. Supp. 3d 606, 648 (S.D.N.Y. 2018) ("The bond . . . guarantees that the appellee can recover

damages caused by any delay incident to the appeal, such as interest and costs.").  Moreover,

Rule 62(d) expressly contemplates the issuance of a bond to secure injunctive relief under that

provision.   Fed. R. Civ. P. 62(d) (the court may grant an injunction pending appeal "on terms for

bond or other terms that secure the opposing party's rights.").  Thus, if the injunction Citibank is

seeking were granted here, the Lenders would suffer harm—the lost opportunity to use or invest

their funds for the entire period through resolution of the appeal, which could be another one to

two years—and a bond would be appropriate.  *In re Motors Liquidation Co.*, 539 B.R. 676, 686

(Bankr. S.D.N.Y. 2015) (holding that "[t]here can be no serious dispute" that a party burdened

by an injunction will be prejudiced when its funds "would generate much higher yields" once

freed for use).[16]

---

[16]   In the event an injunction is granted, the Court can look to historic return data to determine
appropriate compensation for loss of use of enjoined funds.  *See*, *e.g.*, *Motors Liquidation Co.*,
539 B.R. at 691 (using Bank of America Merrill Lynch US High Grade Master Index's historical
return to set the appropriate rate of return for fixed income investment at 6.45%); *In re Tribune
Co.*, 477 B.R. 465, 480-81 (Bankr. D. Del. 2012) (using 6.896% as the appropriate anticipated
rate of return to determine lost opportunity costs to high yield bond investors on the basis of the
Merrill Lynch U.S. High Yield Master II Index).  Here, because Defendants are credit investors

**IV.    An Injunction Would Not Serve The Public Interest**

Citibank claims "the public interest strongly favors an injunction" because "the financial

industry needs clarity" as to the rules that apply to mistaken payments, Mot. at 17—as though

precedent does not already provide such clarity.  Notwithstanding Citibank's professed

"uncertainty," *id.* at 19, the banking industry has been down this road before.  As this Court

observed, Findings of Fact at 96-97, Citibank's arguments as to why the Court's ruling "may

gravely impact the financial industry" are the same arguments the defendants made in *Banque*

*Worms* more than thirty years ago.  And the Court of Appeals and Second Circuit rejected those

arguments, holding that banks bear the risk of their mistaken transfers to creditors.  Even

Citibank's amicus admits *Banque Worms* considered and rejected the very arguments Citibank

advances here.  Dkt. 171 (LSTA Amicus Brief) at 5-6, n.5.  Against that backdrop, Citibank is

not so much looking for "clarity" in the law as it is hoping that the Second Circuit will change

the law.  That is not a likely result on appeal.  *Fed. Deposit Ins. Corp. v. First Horizon Asset*

*Sec., Inc.*, 821 F.3d 372, 375–76 (2d Cir. 2016) ("In general, a panel of this Court is bound by

the decisions of prior panels until such time as they are overruled either by an *en banc* panel of

our Court or by the Supreme Court.").

The thirty years that have passed since *Banque Worms* also show that the sky has not

fallen.  Findings of Fact at 97 ("[E]mpirically, the disastrous consequences predicted by Security

---

in "syndicated leveraged loans and high yield bonds," (*see*, *e.g.*, Crocombe Decl. ¶ 5), the Bank of America Merrill Lynch US High Yield Index is an appropriate benchmark.  This index returned 6.333% over the past decade, 8.834% over the past five years, and 6.243% over the past three years.  Abensohn Decl., Ex. C.  If an injunction is granted, accordingly, Citibank should be required to post a bond of no less than $49,093,921, which equals 18 months of interest at 6.243% (compounded quarterly) on the $504,169,401 in principal payments Citibank sought to recover from Lenders.  The interest rate on the Revlon Term Loans (currently 4.25%) would be a more conservative alternative for measuring the opportunity cost to the Lenders, though it does not reflect the return on a spectrum of investments, such as the Lenders have.

Pacific thirty years ago—and predicted again here by Citibank and amici—have not come to pass . . . .").  *Banque Worms* is working.  As numerous witnesses testified, the kind of mistake that occurred here is exceedingly rare.  That is almost certainly due in part to the decision by the Court of Appeals to place the onus of such mistakes, when they do occur, on the banks that make them.  *Gen. Elec. Capital Corp. v. Cent. Bank*, 49 F.3d 280, 284 (7th Cir. 1994) ("As the [*Banque Worms*] Court of Appeals saw things, a creditor should be able to treat funds credited in apparent payment of a debt as irrevocably his, unless news of the error precedes arrival of the funds.  Costs of errors should be borne by those who make errors (the better to induce them to take care) rather than by innocent beneficiaries.").  This litigation and the Court's ruling is already having the same desired effect—Citibank announced in just the past few weeks that it is improving its internal controls, and banks across the industry are adding language to credit agreements, to avoid similar mistakes and disputes in the future.[17]  Far from undermining "the financial industry's ability to plan ahead," Mot. at 19, this Court's ruling—like the *Banque Worms* ruling before it—has spurred the kind of planning and controls in the financial industry that will only serve to promote stability and predictability.

---

[17]   Abensohn Decl., Ex. A (Citibank Form 10-K) at 115-16 (Jan. 31, 2021) ("Human error at Citi and at a third-party vendor, and limitations in Citi's loan processing systems, were the main contributing factors.  After a careful assessment of the incident, Citi immediately put in additional controls to prevent similar loan disbursement errors in the future, while also embarking on a major upgrade of the loan infrastructure and controls."); *see also* Abensohn Decl., Ex. B (Justin D. Forlenza, *"Erroneous Distribution" Provisions Begin Appearing in Credit Agreements*, Covenant Review Market Alert, (Mar. 5, 2021)) (reporting that, following the verdict in this case, "administrative agents have begun to seek specific contractual provisions that would allow them to demand repayment of amounts that they have repaid to the lenders in error").  Citibank itself has added provisions to loan documents that require lenders to return mistakenly transferred funds.  *See, e.g.*, First Lien Credit Agreement dated as of March 4, 2021 by and among Petco Health and Wellness Company, Inc., as Borrower, Citibank, N.A., as Administrative Agent and Collateral Agent, and the Lenders Party Hereto at § 2.11, available at https://www.sec.gov/Archives/edgar/data/0001826470/000119312521070483/ d136557dex101.htm.

Citibank's parting shot is to suggest that Defendants are trying to "run off with the amount in dispute." Mot. at 19. Defendants are not "running off" with anything. Their clients received money they were owed; they have adhered to a *temporary* restraining order for more than six months; and they have prevailed, after extensive briefing and discovery, at a fully joined and hotly contested trial. The Lenders are entitled to their money, and there is no basis for any continuing constraints.

## V.     If Citibank Were Granted Relief, Notwithstanding Its Failure To Meet Its Burden, Any Injunction Should Be More Limited Than Citibank Proposes

For the reasons set forth above, Citibank is not entitled to relief and its motion should be denied. If the Court disagrees, however, Defendants respectfully submit that any injunction— rather than restricting the use of the funds—should be limited to precluding Defendants from taking any action that would assist any Lender to reduce the total assets held by such Lender below the amount it received in discharge of the Term Loan.[18] If each Lender's assets remain at that level, there would be no risk to Citibank that the Lenders would be unable to return the amounts paid by Citibank in the event such relief were ultimately ordered following appeal. At the same time, such an order would not prevent Lenders, with the assistance of their fund managers, from using and investing their funds, as they are entitled to do.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Citibank's Motion for an Injunction Pending Appeal.

---

[18]   It is not disputed that Citibank sent the funds to the Lenders' accounts, not to Defendants. As a result, Defendants could not guarantee repayment by the Lenders, who Citibank did not name as parties to this litigation, even if Citibank were to prevail on appeal. This is reflected, for example, in the parties' joint stipulation, ordered by the Court, whereby Defendants agreed to "request" that the Lenders comply with Court orders and "inform" Citibank if those Lenders "inform [a] Defendant" that "they do not intend on complying." Dkt. 52.

Dated: New York, New York
     March 12, 2021

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By:  */s/Robert Loigman*
      Robert Loigman
      Benjamin Finestone
      Adam M. Abensohn
      Sophia Qasir
      Alexandre Tschumi
      Mario O. Gazzola

      51 Madison Avenue, 22nd Floor
      New York, New York 10010
      (212) 849-7000
      robertloigman@quinnemanuel.com
      benjaminfinestone@quinnemanuel.com
      adamabensohn@quinnemanuel.com
      sophiaqasir@quinnemanuel.com
      alexandretschumi@quinnemanuel.com
      mariogazzola@quinnemanuel.com

      *Attorneys for Defendants*