```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :    20-CV-6539 (JMF)
IN RE CITIBANK AUGUST 11, 2020 WIRE                               :
TRANSFERS                                                         :    OPINION AND ORDER
                                                                  :
------------------------------------------------------------------X
```

JESSE M. FURMAN, United States District Judge:

Last August, Citibank N.A. ("Citibank"), acting as the Administrative Agent for a syndicated term loan taken out by Revlon, Inc. ("Revlon"), mistakenly wired nearly a billion dollars to Revlon's lenders. Although some lenders returned the money at Citibank's request, many did not, and this litigation — against ten investment advisory firms that managed these "non-returning" lenders — promptly followed. From the get-go, the case turned largely on an affirmative defense under New York law called the "discharge-for-value" rule. After expedited discovery, the case proceeded to trial and, on February 16, 2021, the Court held that the discharge-for-value rule applied and that Defendants are entitled to the funds at issue. Citibank filed an appeal from the Court's decision and now seeks an order maintaining a freeze on the funds pending the outcome of its appeal. For the reasons that follow, its motion is denied.

## BACKGROUND

The events underlying this case are detailed at length in the Court's Findings of Fact and Conclusions of Law, *see In re Citibank Aug. 11, 2020 Wire Transfers*, — F. Supp. 3d — , No. 20-CV-6539 (JMF), 2021 WL 606167, at *2-11 (S.D.N.Y. Feb. 16, 2021) (ECF No. 243), familiarity with which is assumed.[1] Thus, the Court will recount the relevant facts only briefly, focusing on the additional background relevant to the present motion. On August 11, 2020,

---

[1] Capitalized terms not otherwise defined herein have the definitions set forth in the Court's Findings of Fact and Conclusions of Law.

Citibank, acting in its capacity as Administrative Agent for Revlon's syndicated term loan, intended to wire approximately $7.8 million in interest payments to Revlon's lenders. Instead, it mistakenly wired, in addition to Revlon's $7.8 million, almost $900 million of its own money as well. Some of the lenders refused to return the funds, leading Citibank to file lawsuits against Defendants here, investment advisory firms to those lenders.

With each complaint, Citibank also filed a motion for a temporary restraining order ("TRO") enjoining each Defendant and its "officers, agents, employees, successors, and all those in active concert or participation with them from removing, withdrawing, transferring, assigning, or otherwise disposing of" the mistakenly transferred funds. ECF No. 5, at 1; *see also* 20-CV-6617, ECF No. 7, at 2; 20-CV-6713, ECF No. 6, at 2. Briefing and oral argument quickly made clear that the critical, and perhaps dispositive, issue would be the applicability of a doctrine under New York law known as the "discharge-for-value" rule: that "[w]hen a beneficiary receives money to which it is entitled and has no knowledge that the money was erroneously wired, the beneficiary should not have to wonder whether it may retain the funds; rather, such a beneficiary should be able to consider the transfer of funds as a final and complete transaction, not subject to revocation." *Banque Worms v. BankAmerica Int'l*, 570 N.E.2d 189, 196 (N.Y. 1991). Citing the fact that the discharge-for-value rule was "an affirmative defense" and that Defendants, at the time, had submitted no cognizable evidence in support of the defense, ECF No. 44 ("Aug. 19 Tr."), at 3-4, the Court granted Citibank's motion and entered TROs with respect to each Defendant, ECF No. 25; 20-CV-6617, ECF No. 16; 20-CV-6713, ECF No. 14. On consent of the parties and a finding of good cause, the TROs were later extended through the date of trial, *see* ECF Nos. 28, 46, 94, and later still through the date of this Opinion and Order, *see* ECF No. 183; *In re Citibank*, 2021 WL 606167, at *42.

From December 9 to 16, 2020, the Court held a bench trial (remotely using a Zoom-based video-conferencing platform due to the COVID-19 pandemic). On February 16, 2021, the Court issued its Findings of Fact and Conclusions of Law, totaling 101 pages, concluding that the discharge-for-value rule does apply and, thus, that the Non-Returning Lenders are entitled to retain the funds that Citibank had transferred by mistake. *In re Citibank*, 2021 WL 606167. Ten days later, Citibank filed a notice of appeal. ECF No. 249. On March 2, 2021, Citibank moved to convert the existing TROs into an injunction pending appeal. ECF No. 252 ("Pl.'s Mem."). On April 9, 2021, the Court conducted oral argument on Citibank's motion (using the same Zoom-based video-conferencing platform). ECF Nos. 262, 263.

## DISCUSSION

As both sides acknowledge, what Citibank seeks is a stay of the Court's ruling after trial. *See* ECF No. 254 ("Defs.' Opp'n"), at 3; ECF No. 256 ("Pl.'s Reply"), at 1. In deciding whether to grant a stay pending appeal, the Court must consider "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (internal quotation marks omitted); *accord New York v. U.S. Dep't of Homeland Sec.*, 974 F.3d 210, 214 (2d Cir. 2020) (per curiam). "The first two factors — the likelihood of success and irreparable harm — are the most critical, and have typically been evaluated on a sliding scale, so that a strong showing that the applicant is likely to succeed excuses a weaker showing of irreparable injury." *Usherson v. Bandshell Artist Mgmt.*, No. 19-CV-6368 (JMF), 2020 WL 4228754, at *1 (S.D.N.Y. July 22, 2020) (cleaned up). Nevertheless, as the Supreme Court has emphasized (in the similar context of issuing a preliminary injunction),

3

*see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), "the applicant *must* demonstrate that both factors are satisfied," *New York v. Trump*, 490 F. Supp. 3d 736, 741 (S.D.N.Y. 2020) (three-judge court) (per curiam) (emphasis added) (internal quotation marks omitted).  Notably, "[a] stay is not a matter of right, even if irreparable injury might otherwise result.  It is instead an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case."  *Nken*, 556 U.S. at 433 (cleaned up).  "Ultimately, the party or parties seeking the stay bear the heavy burden of demonstrating that a stay is warranted."  *New York*, 490 F. Supp. 3d at 741 (internal quotation marks omitted).

Applying these standards here, the Court concludes that Citibank fails to carry its "heavy burden."  *Id.*  The Court will address each of the stay factors in turn.

**A. Likelihood of Success on the Merits**

The Court begins with the merits.  At the outset, the parties dispute the relevant standard — that is, what Citibank must show to demonstrate a likelihood of success on the merits.  Citibank argues that it can satisfy its burden by showing that there are "'serious questions' going to the merits of the dispute and . . . that the balance of hardships tips *decidedly* in its favor."  *In re A2P SMS Antitrust Litig.*, No. 12-CV-2656, 2014 WL 4247744, at *2 (S.D.N.Y. Aug. 27, 2014); *see* ECF No. 278 ("Apr. 9 Tr."), at 11-12.  There are indeed some district court decisions that have applied that standard in this posture.  In fact, at least one judge in this District has opined that the "'serious questions' standard is particularly appropriate when a district court is asked to stay its own order" because "under such circumstances, the court has already determined that the applicant failed to succeed on the merits.  Asking the district court to then find that the movant is likely to succeed on the merits on appeal would require the district court to find that its own order is likely to be reversed — a standard that for practical purposes is rarely

4

going to be satisfied." *In re A2P*, 2014 WL 4247744, at *2. By contrast, citing recent Second Circuit authority, Defendants argue that the "serious questions" standard is applicable only to motions for preliminary injunctive relief and that, to obtain a stay after final judgment, a party must make a "strong showing that [it] is likely to succeed on appeal on the merits." Apr. 9 Tr. 28-29 (citing *Agudath Isr. of Am. v. Cuomo*, 979 F.3d 177, 180 (2d Cir. 2020), *reissued,* 980 F.3d 222 (2d Cir. 2020) (per curiam)). The Court need not resolve the parties' dispute because, either way, Citibank falls short.

In arguing that the Court's ruling is likely to be reversed on appeal, Citibank simply reprises the three arguments that it made at trial, namely that: (1) the discharge-for-value defense includes a "present entitlement" element, Pl.'s Mem. 10-12; (2) the relevant point in time for the discharge-for-value inquiry is the moment the debt is "actively 'discharg[ed]'" by the recipient, *id.* at 15-17; and (3) Defendants were on constructive notice of Citibank's mistake, *id.* at 12-14. The Court has already spilled copious amounts of ink on why these arguments fail, and will not repeat its analyses here, but a few additional comments are in order. Taking the issues in reverse order, Citibank's arguments about notice are actually weaker on appeal than they were at the time of trial because it must now contend with this Court's findings of fact. In fact, the Court *agreed* with Citibank that the relevant standard was constructive notice, not actual notice. *See In re Citibank*, 2021 WL 606167, at *22-25. Nevertheless, the Court found, based on the testimony of Defendants' witnesses and contemporaneous documentary evidence, that "the Lenders at issue in this case were *not* on notice of Citibank's mistake and, thus, that the discharge-for-value defense applie[d]." *Id.* at *26; *see id.* at *26-38. The Court's ultimate determination that the Non-Returning Lenders did not have constructive knowledge may be subject to *de novo* review,

but the many "factual findings that underpin" that determination are reviewable only for clear error. *Diebold Found., Inc. v. Comm'r*, 736 F.3d 172, 187 (2d Cir. 2013).

Turning to Citibank's second argument, the Court acknowledges — as it did before, *see In re Citibank*, 2021 WL 606167, at *21 — that other courts, most notably the Sixth Circuit in *First National Bank & Trust Co. v. Brant* (*In re Calumet Farm, Inc.*), 398 F.3d 555 (6th Cir. 2005), have held that it is error to "focus[] on when [the transferee] *received the funds* rather than on when [the transferee] *credited* [*the debtor's*] *account*." *Id.* at 561. Under other circumstances, the existence of such "divided views," even without more, might be enough to raise "serious questions." *In re A2P*, 2014 WL 4247744, at *2. But not here. First, these courts were not interpreting or applying New York law. *See In re Citibank*, 2021 WL 606167, at *21 (citing cases). And second, the Court's conclusion was "compelled by" the decisions of the Second Circuit and the New York Court of Appeals in *Banque Worms*. *Id.* at *20. Citibank takes issue with the Court's interpretation of those decisions. But significantly, the Court's interpretation is shared not only by the Seventh Circuit, *see Gen. Elec. Cap. Corp. v. Cent. Bank*, 49 F.3d 280, 284 (7th Cir. 1995) (Easterbrook, J.) ("As the [New York] Court of Appeals [in *Banque Worms*] saw things, a creditor should be able to treat funds credited in apparent payment of a debt as irrevocably his, *unless news of the error precedes arrival of the funds*." (emphasis added)), but also by one of the very courts on which Citibank relies — and upon which the Sixth Circuit relied in *Calumet*, *see NBase Commc'ns, Inc. v. Am. Nat'l Bank & Tr. Co. of Chi.*, 8 F. Supp. 2d 1071, 1076 (N.D. Ill. 1998) (explicitly noting its "disagree[ment] with *Banque Worms*[]" on the timing issue), *cited in Calumet*, 398 F.3d at 560-61. Thus, to prevail on this issue on appeal, Citibank would likely have to persuade *both* the Second Circuit and the New York Court of Appeals to revisit their opinions in *Banque Worms*. Possible, but not likely.

That leaves Citibank's argument that the discharge-for-value rule includes a "present entitlement" element.  As at trial, Citibank cites only two cases — one of which is more than a century old — in support of this argument in its briefing before this Court: *Carlisle v. Norris*, 109 N.E. 564 (N.Y. 1915), and *A.I. Trade Finance, Inc. v. Petra Bank*, No. 89-CV-7987 (JFK), 1997 WL 291841 (S.D.N.Y. June 2, 1997).  But these cases do not support the weight that Citibank places on them, for reasons the Court has already explained.  *See In re Citibank*, 2021 WL 606167, at *18-19.  Indeed, at the end of the day, Citibank's argument rests on little more than the fact that the *Carlisle* court used the phrase "indebtedness due" in its opinion — language that the *Banque Worms* court later quoted in a parenthetical.  *Carlisle*, 109 N.E. at 569; *see Banque Worms*, 570 N.E.2d at 193; *see also* Br. Pl.-Appellant ("Appellant Br.") at 15, 22, 27, *Citibank N.A. v. Brigade Cap. Mgmt., LP*, No. 21-487 (2d Cir. Apr. 29, 2021), ECF No. 49.  But it is by no means clear that that language formed part of the court's holding.  And in any event, "due" can mean *either* "[i]mmediately enforceable" *or* "[o]wing or payable; constituting a debt." *Due*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also Due*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/due (defining "due" as both "having reached the date at which payment is required" and "owed or owing as a debt").  In other words, *Carlisle*'s language is consistent with the Court's conclusion that it is "the recipient's status as a *bona fide* creditor that 'entitles' it to the funds at issue, not . . . when the transfer occurred in relation to the payment schedule." *In re Citibank*, 2021 WL 606167, at *18.[2]

---

[2]  Notably, another old New York case cited in *Banque Worms* quotes the "indebtedness due" language from *Carlisle* and also contains language indicating that the payment need only be for an "existing debt" in order to invoke the discharge-for-value rule.  *See N.Y. Title & Mortg. Co. v. Title Guarantee & Tr. Co.*, 201 N.Y.S. 529, 533-34 (1st Dep't 1923) ("If a thief gives stolen money, or negotiable securities before their maturity, in payment of his debt, or as security for it, to one who in good faith receives the money or securities as belonging to him, the creditor can hold the property as against the true owner. . . . *One receiving money or negotiable securities*

In its brief on appeal to the Second Circuit, Citibank does more than cite *Carlisle* and *A.I. Trade Finance*, but that does not alter the Court's conclusion. *See* Appellant Br. 26-29. Citibank asserts that the Court "primarily reasoned from silence." *Id.* at 26. But a near century of silence is, in fact, powerful evidence, *cf. Boggs v. Boggs*, 520 U.S. 833, 834 (1997) ("ERISA's silence with respect to the right of a nonparticipant spouse to control pension plan benefits by testamentary transfer provides powerful support for the conclusion that the right does not exist."), and the fact remains that the New York Court of Appeals's articulation of the discharge-for-value rule in *Banque Worms*, borrowed from the *Restatement (First) of Restitution* — namely, "that a creditor of another . . . who has received from a third person any benefit in discharge of the debt or lien, is under no duty to make restitution therefor, although the discharge was given by mistake of the transferor as to his interests or duties, if the transferee made no misrepresentation and did not have notice of the transferor's mistake," *Banque Worms*, 570 N.E.2d at 192 (cleaned up) — makes no reference to a present-entitlement element, *see also, e.g., Greenwald v. Chase Manhattan Mortg. Corp.*, 241 F.3d 76, 81 (1st Cir. 2001) ("[S]ection 14 of the *Restatement* is explicit: so long as the creditor or lienor made no misrepresentation and did not have notice of the transferor's mistake, there is no duty of restitution." (internal quotation marks omitted)). As if that were not enough, the current version of the *Restatement* explicitly rejects the notion that the discharge-for-value rule requires a present entitlement, noting that the "prior claim" of an "innocent payee" can be "something short of an enforceable right." RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 67 cmt. c (2011).

---

*in payment of or as security for an existing debt is not bound to inquire where the money or securities were obtained.*" (emphasis added) (quoting *Spaulding v. Kendrick*, 51 N.E. 453, 454 (Mass. 1898))), *aff'd,* 143 N.E. 769 (N.Y. 1924); *see Banque Worms*, 570 N.E.2d at 193.

For the foregoing reasons, the Court concludes that Citibank does not raise "'serious questions' going to the merits of the dispute" at this stage of the litigation. *In re A2P*, 2014 WL 4247744, at *2. Even if it did, Citibank fails to show — for reasons discussed below — that "the balance of hardships tips *decidedly* in its favor." *Id.* And Citibank certainly does not make a "strong showing that [it] is likely to succeed on the merits." *U.S. Dep't of Homeland Sec.*, 974 F.3d at 214 (internal quotation marks omitted). That is not to say that Citibank doesn't raise compelling arguments from first principles. Indeed, the Court acknowledged in its earlier ruling that it might have ruled in Citibank's favor had it been "writing on a blank slate." *In re Citibank*, 2021 WL 606167, at *41. But first principles do not govern this case; New York law does. And the Court was bound by the decisions of the New York Court of Appeals and the Second Circuit in *Banque Worms*. The Second Circuit obviously has more latitude to reconsider its own precedent than this Court does, but it too is bound by the New York Court of Appeals with respect to the meaning of New York law. In short, Citibank faces an uphill battle on appeal, and the likelihood-of-success-on-the-merits prong of the analysis cuts against a stay.

**B. Irreparable Harm**

That would probably be enough to deny Citibank's motion. *See Winter*, 555 U.S. at 22. At a minimum, it would require Citibank to make a particularly strong showing of irreparable injury. *See Usherson*, 2020 WL 4228754, at *1. Citibank fails to do so.

It is well established that, in general, "an injury compensable by money damages is insufficient to establish irreparable harm." *CRP/Extell Parcel I, L.P. v. Cuomo*, 394 F. App'x 779, 781 (2d Cir. 2010) (summary order); *accord Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (per curiam). On its face, that proposition would seem to doom Citibank's argument because this case is, at bottom, about money and, as Defendants argue, "money is

9

fungible." Defs.' Opp'n 8 n.6. But there is an exception to the general rule where, as here, "the monies at issue are identifiable proceeds that are supposed to be held for the party seeking [equitable] relief." *AQ Asset Mgmt. LLC v. Levine*, 974 N.Y.S.2d 332, 342 (1st Dep't 2013); *accord Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.*, No. 00-CV-8051 (JSM), 2000 WL 1610790, at *1 (S.D.N.Y. Oct. 27, 2000); *see also Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999) (noting that irreparable harm may exist "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied"). That is, courts have recognized that irreparable harm may lie where a "plaintiff creditor asserts a cognizable claim to specific assets of the defendant or seeks a remedy involving those assets." *United States ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489, 496 (4th Cir. 1999); *see, e.g.*, *Dong v. Miller*, No. 16-CV-5836 (NGG) (JO), 2018 WL 1445573, at *10 (E.D.N.Y. Mar. 23, 2018); *Crawford & Co. Med. Ben. Tr. v. Repp*, No. 11-C-50155, 2011 WL 2531844, at *4 (N.D. Ill. June 24, 2011); *Janvey v. Alguire*, No. 3:09-CV-724 (N), 2010 WL 11619267, at *6-8 (N.D. Tex. June 10, 2010); *AQ Asset Mgmt.*, 974 N.Y.S.2d at 342.

That exception was one reason the Court granted the TROs to Citibank in the first instance, ECF No. 25; 20-CV-6617, ECF No. 16; 20-CV-6713, ECF No. 14, and it would provide an argument for finding the irreparable-harm prong met here, save for one thing: At oral argument, Defendants unequivocally and "absolutely pledge[d] not to raise the kinds of tracing concerns that [Citibank is] talking about." Apr. 9 Tr. 39; *see also id.* at 30 ("Citibank isn't concerned about getting bills with the serial numbers that are currently on deposit in these accounts; Citibank is concerned about getting the amount it believes due."). Put differently, Defendants have agreed in the event of reversal (and a judgment in Citibank's favor — which,

by the way, would require more than mere reversal) not to argue that the case is moot because the particular monies transferred on August 11, 2020, have been used and to satisfy any judgment with any available funds. That representation — upon which the Court relies here — would presumably be binding in any future proceedings. *See Peralta v. Vasquez*, 467 F.3d 98, 105 (2d Cir. 2006) ("[J]udicial estoppel [may] be invoked [where] (1) the party against whom it is asserted . . . ha[s] advanced an inconsistent position in a prior proceeding, and (2) the inconsistent position . . . ha[s] been adopted by the court in some matter."). It follows that Citibank cannot show "a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied" without showing a risk that the Non-Returning Lenders would be insolvent and unable to pay back the same amount of funds. *Brenntag Int'l Chems.*, 175 F.3d at 249. It has not even tried to do so.

       Citibank makes two arguments for why, despite Defendants' concession, it risks irreparable harm, but neither is persuasive. First, Citibank argues that lifting the TROs would "basically convert[] [its] secured interest" in the transferred funds "into an unsecured one," thereby rendering it a "general creditor." Apr. 9 Tr. 7. In support of that argument, Citibank cites the *Restatement (Third) of Restitution and Unjust Enrichment*, which notes that "a right to restitution from identifiable property is superior to the competing rights of a creditor of the recipient," RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 60(1), whereas "[a] claimant who is entitled to restitution but who is unable to identify specific property from which restitution is available has a remedy via money judgment that ranks equally with the claims of general creditors," *id.* § 60(3); *see* Pl.'s Reply 3. But if there is no risk that the Non-Returning Lenders will be insolvent or otherwise take steps to frustrate a potential judgment in Citibank's favor, the difference in status is academic: Citibank would get the equivalent amount

11

of money back and be none the poorer. *Cf. JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79-80 (2d Cir. 1990) (finding no irreparable harm where the plaintiff asserted a statutory trust over specific assets because the plaintiff did not make an adequate showing that "absent the segregation of trust funds" the plaintiff's secured claims were "subject to dilution by the claims of other . . . creditors whose rights arose later than" the plaintiff's and there was instead "evidence of substantial current assets and sound financial health").

Citibank's cases do not suggest otherwise. Citibank argues that *Brenntag* stands for the proposition that, so long as it asserts an equitable claim, it need not show a risk of insolvency to establish irreparable harm. Apr. 9. Tr. 44-45. But *Brenntag* says nothing about the nature of irreparable harm vis-à-vis an equitable cause of action; its language about irreparable harm lying where "there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied" is included to explain the basis for the insolvency exception to the general rule that monetary injuries are not irreparable. 175 F.3d at 249-50. Indeed, *Brenntag* itself affirmed the district court's grant of a preliminary injunction predicated on a finding that one of the involved entities' "insolvency was sufficient under the circumstances to support a finding of irreparable harm." *Id.* at 247, 249-50. In *Jet Midwest International Co. v. Jet Midwest Group, LLC*, 953 F.3d 1041 (8th Cir. 2020), meanwhile, the Eighth Circuit found irreparable harm where a creditor in a fraudulent transfer action sought to prevent the transfer of assets in which it had a security interest given that "damages would be hard to calculate after the foreclosure sale because it would be difficult, or even impossible, to figure out what parts were sold, who had a security interest in the sold parts, and how much each sold for at the foreclosure" and the debtor had "misled" the creditor in an apparent attempt to "conceal[] assets." *Id.* at 1046. That is not the case here. Neither decision — nor any other

12

authority cited by Citibank — supports the proposition that increased credit risk, by itself, constitutes irreparable harm sufficient to support injunctive relief.

Citibank's second argument is that, without a stay, it might have to institute "over 100 separate collection actions against the [D]efendants' clients, each with its own burdensome discovery." Pl.'s Mem. 6; *see also id.* at 4-5; Pl.'s Reply 2-3; Apr. 9 Tr. 14. Relatedly, it notes that Defendants "can't waive traceability" on behalf of the Non-Returning Lenders themselves. Apr. 9 Tr. 8. More broadly, Citibank complains that Defendants will not "guarantee" that it would "be able later to get the money" from the Non-Returning Lenders. Apr. 9 Tr. 14. But these are all problems of Citibank's own making and exist even with the TROs in place. As the Court has noted before, Citibank chose for undisclosed "prudential reasons" to sue Defendants, not the Non-Returning Lenders themselves. *In re Citibank*, 2021 WL 606167, at *14 n.20 (quoting ECF No. 184, at 12). It is an open question whether that decision is fatal to Citibank's claims. *See id.* at *14. But either way, it does not call for a stay here. If Citibank's decision to sue Defendants and not the Non-Returning Lenders is not fatal, and Citibank ultimately prevails, then it would have no need to institute "separate collection actions" against the Non-Returning Lenders and it would be irrelevant whether they too waived traceability arguments; Citibank could recover directly from Defendants. By contrast, if Citibank sued the wrong parties, an injunction against Defendants alone would presumably do no good. And, of course, it would mean that Defendants should not have been enjoined in the first place, let alone on appeal.

In sum, although Citibank asserts equitable claims to particular funds, it fails to show that it is likely to suffer irreparable harm due to Defendants' waiver of any traceability arguments in later proceedings and the absence of any evidence that Defendants (or the Non-Returning Lenders) will be insolvent or otherwise take steps to frustrate a judgment in Citibank's favor.

13

## C. The Remaining Stay Factors

That is plainly enough to deny Citibank's motion. That is, there is no basis for a stay given Citibank's failure to demonstrate *either* a likelihood of success on the merits (or serious questions and a balance of hardships tipping decidedly in its favor) *or* irreparable harm. *See Winter*, 555 U.S. at 22; *In re A2P*, 2014 WL 4247744, at *2. In any event, the remaining factors — "whether issuance of the stay will substantially injure the other parties interested in the proceeding" and "where the public interest lies," *Nken*, 556 U.S. at 434 (internal quotation marks omitted) — do not come close to tipping the balance in Citibank's favor. The third factor arguably cuts against Citibank given that, with a stay, the Non-Returning Lenders would be deprived of the opportunity to invest funds that the Court has ruled are rightfully theirs. *See, e.g.*, *Loc. 1303-362 of Council 4 v. KGI Bridgeport Co.*, No. 3:12-CV-1785 (AWT), 2014 WL 555355, at *4 (D. Conn. Feb. 10, 2014). *But see, e.g.*, *U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*, No. 16-CV-8507 (AJN), 2020 WL 359907, at *5 (S.D.N.Y. Jan. 21, 2020). But any injury to the Non-Returning Lenders is mitigated (if not eliminated) by Citibank's offer to "place in escrow each quarter an amount equivalent to interest accruing on the disputed funds at a 4.25% annual rate," from which the Non-Returning Lenders could be compensated should they prevail on appeal. Pl.'s Reply 6 & n.2; *see also Wells Fargo Bank, N.A. v. ESM Fund I, LP*, No. 10-CV-7332 (AJN) (MHD), 2012 WL 3023997, at *6 (S.D.N.Y. Apr. 3, 2012) ("[C]ourts have, with some consistency, declined to compel enforcement of judgments pending appeal when the funds targeted by the judgment are segregated and held in escrow in a safe, interest-bearing account."), *report and recommendation adopted*, 2012 WL 3023985 (S.D.N.Y. July 24, 2012). Meanwhile, the final factor is neutral. As Citibank argues, the public interest favors ensuring that the Second Circuit can rule on appeal given the importance of the issues in this case to the

financial industry. *See* Pl.'s Mem 17-19; Pl.'s Reply 10. But Defendants' waiver of any argument concerning traceability ensures that the Second Circuit will indeed get that chance — or, at a minimum, that dissipation of the funds at issue will not get in the way.

## CONCLUSION

Given the amount of money at stake and the compelling arguments rooted in either first principles or policy that Citibank and its amici have raised, it is tempting to grant Citibank's request to preserve the status quo. But the Court "may not resolve a conflict between considered review and effective relief by reflexively holding a final order in abeyance pending review" because "[a] stay is an intrusion into the ordinary processes of administration and judicial review and accordingly is not a matter of right." *Nken*, 556 U.S. at 427 (cleaned up). Instead, the decision of whether to grant a stay, like the Court's decision on the merits, is a function of law, not abstract intuition, and guided by binding precedent. Applying the relevant legal standards, the Court concludes, for the reasons stated above, that Citibank is not entitled to a stay.

In arguing otherwise, Citibank invokes the Court's decision to preserve the status quo at the outset of the litigation last August. *See* Pl.'s Mem. 1 (referring to the TROs and asserting that the "very same equities support preserving the status quo during the appeal"); Pl.'s Reply 2; Apr. 9 Tr. 4. To conflate Citibank's TRO applications with this application, however, is to ignore two game-changing developments. First, when the TROs were entered, Defendants did not forfeit — as they have now — any argument that dissipation of the specific funds at issue would moot the case. And second, at the time of the TROs, there was no cognizable evidence in the record to support Defendant's affirmative discharge-for-value defense and the Court had not made a finding that the Non-Returning Lenders were entitled to keep the transferred funds. Of course, there is now ample evidence in the record — the testimony and exhibits admitted during

15

the six-day bench trial — and the Court has entered a final judgment based on its detailed analysis of the facts and the law. Armed with a final judgment in their favor, Defendants and their clients are entitled to use the money without interference from Citibank or the Court.

In sum, Citibank's motion for a stay pending appeal is DENIED. That said, Citibank requested that, if its motion were denied, the Court "extend the existing TROs until the Second Circuit decides whether to issue its own injunction pending appeal," Pl.'s Mem. 20, and Defendants consented to that request "provided that Citibank promptly seeks such relief, *i.e.*, within seven days of any order on the present motion," Defs.' Opp'n 3 n.1. Accordingly, assuming Citibank moves for a stay from the Second Circuit **within the next seven days**, the TROs will remain in effect pending a ruling on that motion. Absent such a motion within the next seven days, the TROs will no longer be in effect.

The Clerk of Court is directed to terminate ECF No. 252.

SO ORDERED.

Dated: May 12, 2021
      New York, New York

JESSE M. FURMAN
United States District Judge